1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN JOSE DIVISION

4

5

| | | |
|---|---|---|
| EMBLAZE LTD., | ) | C-11-01079 PSG |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | APRIL 17, 2013 |
| | ) | |
| APPLE INC., A CALIFORNIA CORPORATION, | ) | PAGES 1-163 |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

12

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PAUL S. GREWAL
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     DAVIS, WRIGHT, TREMAINE
                       BY:  MARTIN L. FINEMAN
                       505 MONTGOMERY STREET, SUITE 800
                       SAN FRANCISCO, CALIFORNIA  94111


APPEARANCES CONTINUED ON NEXT PAGE




OFFICIAL COURT REPORTER:     LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3      FOR THE PLAINTIFF:      COZEN O'CONNOR
                               BY:  MARTIN B. PAVANE
4                                   MARILYN NEIMAN
                               277 PARK AVENUE
5                              NEW YORK, NEW YORK  10172

6      ALSO PRESENT:           VIJAY MADISETTI
                               NAFTALI SHANI
7

8      FOR THE DEFENDANT:      GREENBERG TRAURIG
                               BY:  JAMES DECARLO
9                                   MICHAEL NICODEMA
                               200 PARK AVENUE
10                             FLORHAM PARK, NEW JERSEY  07932

11                             BY:  SARAH E. BARROWS
                                    STEPHEN ULLMER
12                             FOUR EMBARCADERO CENTER, SUITE 3000
                               SAN FRANCISCO, CALIFORNIA  94111

13
       ALSO PRESENT:           NATHANIEL POLISH
14                             DAVID MELAUGH

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    APRIL 17, 2013
 2                      P R O C E E D I N G S
 3         (COURT CONVENED AND THE FOLLOWING PROCEEDINGS WERE HELD:)
 4              THE COURT:  ALL RIGHT.  MR. RIVERA, WOULD YOU CALL
 5    THE MATTER THAT'S BEEN SET FOR THE CIVIL CALENDAR?
 6              THE CLERK:  YES, YOUR HONOR.
 7         CALLING EMBLAZE VERSUS APPLE, INC., CASE NUMBER CV-11-1079
 8    PSG, MATTER ON FOR CLAIMS CONSTRUCTION AND CASE MANAGEMENT
 9    CONFERENCE.
10         COUNSEL, PLEASE STATE YOUR APPEARANCES.
11              MR. FINEMAN:  GOOD AFTERNOON, YOUR HONOR.  I'M
12    MARTIN FINEMAN WITH DAVIS, WRIGHT, TREMAINE LLP OF
13    SAN FRANCISCO, CALIFORNIA, AND I AM CO-COUNSEL AND LOCAL
14    COUNSEL ON BEHALF OF THE PLAINTIFF, EMBLAZE.
15         MY CO-COUNSEL FROM NEW YORK HAVE ALREADY BEEN ADMITTED PRO
16    HAC VICE FOR PURPOSES OF REPRESENTING THE PLAINTIFF IN THIS
17    CASE, AND I'D LIKE TO INTRODUCE YOU TO THEM.
18              THE COURT:  GO AHEAD, MR. FINEMAN.
19              MR. FINEMAN:  THIS IS MARTIN PAVANE OF THE
20    COZEN O'CONNOR FIRM OF NEW YORK.
21              MR. PAVANE:  GOOD AFTERNOON, YOUR HONOR.
22              MR. FINEMAN:  THIS IS MARILYN NEIMAN, ALSO OF COZEN.
23              MS. NEIMAN:  GOOD AFTERNOON, YOUR HONOR.
24              THE COURT:  GOOD AFTERNOON.
25              MR. FINEMAN:  SEATED BESIDE THEM IS OUR EXPERT
```

1   WITNESS WHO WILL BE PARTICIPATING IN THE TUTORIAL PORTION, AND

2   THAT IS PROFESSOR VIJAY MADISETTI OF GEORGIA TECH.

3           MR. MADISETTI:  GOOD AFTERNOON, YOUR HONOR.

4           THE COURT:  GOOD AFTERNOON AND WELCOME.

5           MR. FINEMAN:  ALSO PRESENT, BUT NOT MAKING AN

6   APPEARANCE, IS THE CHAIRMAN OF THE BOARD OF EMBLAZE LIMITED,

7   THE PLAINTIFF, MR. NAFTALI SHANI, WHO IS IN THE COURTROOM.

8           THE COURT:  WELCOME, SIR.

9           MR. FINEMAN:  THANK YOU, YOUR HONOR.

10           MR. DECARLO:  GOOD AFTERNOON, YOUR HONOR.  MY NAME IS

11   JAMES DECARLO OF THE GREENBERG TRAURIG FIRM REPRESENTING APPLE.

12       WITH ME IS MY CO-COUNSEL, MR. MIKE NICODEMA.

13           MR. NICODEMA:  GOOD AFTERNOON, YOUR HONOR.

14           THE COURT:  GOOD AFTERNOON.

15           MR. DECARLO:  ALSO FROM THE FIRM IS SARAH BARROWS,

16   AND DAVID MELAUGH, PRINCIPAL COUNSEL AT APPLE.

17           THE COURT:  GOOD AFTERNOON.

18           MR. DECARLO:  I'D LIKE TO ALSO INTRODUCE OUR EXPERT

19   FOR TODAY, DR. NATHANIEL POLISH.

20       ALSO PRESENT IS STEVEN ULLMER FROM THE GREENBERG FIRM HERE

21   IN SAN FRANCISCO.

22           THE COURT:  ALL RIGHT.  GOOD AFTERNOON AND WELCOME TO

23   EACH AND EVERY ONE OF YOU.

24       LET ME BEGIN BY, FIRST OF ALL, EXPRESSING MY APPRECIATION

25   FOR YOUR FLEXIBILITY IN THE SCHEDULE.  AS YOU, I THINK, SAW, AT

1  LEAST IN PART THIS MORNING, I AM IN THE MIDDLE OF A JURY TRIAL

2  AND I WANTED TO GIVE YOU MY UNDIVIDED ATTENTION, AND SO WITH

3  YOUR INDULGENCE, I'VE BEEN ABLE TO CLEAR THE ENTIRE REST OF THE

4  DAY TO FOCUS ON THESE TERMS.  SO THANK YOU FOR THAT.

5      BEFORE WE TURN TO THE MARKMAN AND THE TUTORIAL THAT MAY BE

6  PRESENTED WITH IT, I WANTED TO ADDRESS THE CASE MANAGEMENT

7  CONFERENCE ISSUES.

8      SO I DON'T KNOW WHICH OR HOW MANY OF YOU WILL SPEAK TO

9  THOSE QUESTIONS, BUT IF YOU'D LIKE, IF YOU COULD TAKE A

10  POSITION AT THE PODIUM, I'D LIKE TO TALK ABOUT THE SCHEDULE YOU

11  ALL HAVE IN MIND AND WHAT ISSUES YOU THINK I NEED TO RESOLVE

12  HERE TODAY.

13      MS. BARROWS?

14          MS. BARROWS:  YES.  DID YOU WANT US TO --

15          THE COURT:  YOU'RE STANDING AND YOU'RE AT THE PODIUM,

16  SO YOU WANT TO EXPLAIN TO ME -- WHAT I'M PARTICULARLY

17  INTERESTED IN IS THE SCHEDULE.

18          MS. BARROWS:  SURE, YES.

19          THE COURT:  AND WHAT DISPUTES, IF ANY, REMAIN.

20      I'M CERTAINLY CAPABLE OF ENTERING A SCHEDULING ORDER IF

21  THERE ARE NO DISPUTES, BUT --

22          MS. BARROWS:  IT'S OUR UNDERSTANDING, YOUR HONOR,

23  THAT THERE ARE NO DISPUTES ABOUT THE SCHEDULE.  APPLE HAD MADE

24  A REQUEST FOR A MARCH 2014 TRIAL DATE DUE TO TRIAL CALENDARS

25  AND OTHER MATTERS, AND EMBLAZE DID NOT OBJECT AND THE PARTIES

1    WERE ABLE TO WORK TOGETHER TO PRESENT THE SCHEDULE THAT'S IN

2    THE JOINT CASE MANAGEMENT STATEMENT.

3             THE COURT:  OKAY.  AS I READ IT, YOU ALL ARE IN

4    AGREEMENT WITH THIS.

5        IS EMBLAZE ON BOARD WITH THE MARCH 2014 DATE?

6             MR. PAVANE:  YES, WE WERE AGREEABLE, IN VIEW OF THEIR

7    CONFLICT, TO DO THAT, YES.

8             THE COURT:  I APPRECIATE THAT.  AND I SHOULD NOTE, I

9    MAY HAVE TO TWEAK A DAY OR TWO TO ACCOMMODATE MY SCHEDULE, BUT

10   IN GENERAL, IF YOU'RE ALL ON THE SAME PAGE, I WILL ORDER THE

11   SCHEDULE THAT'S BEEN PROPOSED.

12            MS. BARROWS:  THAT'S TERRIFIC.

13            MR. PAVANE:  THANK YOU.

14            THE COURT:  ARE THERE ANY DISPUTES REGARDING

15   OUTSTANDING DISCOVERY THAT I NEED TO ADDRESS OR ANY OTHER

16   ITEMS?

17            MR. PAVANE:  THERE'S A PENDING MOTION THAT APPLE HAS

18   FILED, BUT WE HAVE NOT YET PUT IN OUR OPPOSITION, SO I DON'T

19   THINK ANYTHING IS RIPE AT THE PRESENT MOMENT.

20            THE COURT:  I TAKE IT -- I DIDN'T SEE THE MOTION ON

21   MY DOCKET, BUT I MAY HAVE JUST OVERLOOKED THE HEARING DATE.  IS

22   THAT HEARING DATE SET FOR SOME TIME IN MAY?

23            MS. BARROWS:  THAT'S CORRECT, YOUR HONOR.  IT'S

24   MAY 14TH.

25            THE COURT:  OKAY.  I'LL DEAL WITH THAT ONE IN DUE

1    COURSE.

2       ALL RIGHT.  UNLESS THERE'S ANYTHING ELSE TO DEAL WITH

3    SCHEDULING AND THE LIKE, I'M HAPPY TO TURN TO THE TUTORIAL AND

4    MARKMAN.

5          MS. BARROWS:  I THINK THERE WAS ONE ADDITIONAL ISSUE

6    WE HAVEN'T VISITED SINCE MAYBE THE CASE WAS FIRST FILED, WHICH

7    WAS THE DEPOSITIONS OF THE WITNESSES UNDER EMBLAZE'S CONTROL,

8    WHERE IN THE U.S. THEY WERE GOING TO TAKE PLACE.  I JUST DON'T

9    KNOW THAT WE'VE REVISITED THAT ISSUE WITH PLAINTIFF.

10         MR. PAVANE:  I, FRANKLY, DON'T REMEMBER BEING ASKED.

11   IN FACT, I HAVEN'T SEEN A DEPOSITION NOTICE IF I'M NOT

12   MISTAKEN.

13         MS. BARROWS:  NO, THAT'S RIGHT.  WE HAVEN'T DISCUSSED

14   IT.  WE JUST WANTED TO ADDRESS THE FACT THAT WE ARE UNDER THE

15   EXPECTATION THOSE WILL TAKE PLACE IN THE UNITED STATES.

16         THE COURT:  WELL, IF I MIGHT MAKE A SUGGESTION?  IF

17   YOU HAVEN'T HAD A CHANCE TO DISCUSS THIS, SEE IF YOU CAN WORK

18   IT OUT.

19      IF THERE'S A PROBLEM, JUST LET ME KNOW.  I'M HAPPY TO GET

20   ENGAGED ON THIS ON THE PHONE TO SAVE YOU ALL SOME TROUBLE AND

21   EXPENSE, BUT I'D JUST AS SOON SEE IF YOU CAN REACH AN

22   ACCOMMODATION.

23         MR. PAVANE:  AND I'M SURE WE WILL.

24         THE COURT:  OKAY.  I'M SURE YOU WILL, TOO.

25         MS. BARROWS:  THANK YOU, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  UNLESS THERE'S ANYTHING ELSE,

2     SHALL WE TURN TO THE TUTORIALS AND THE MARKMAN?

3          MR. PAVANE:  YES.  SO, YOUR HONOR, I BELIEVE

4     MR. FINEMAN INTRODUCED DR. VIJAY MADISETTI.

5        DR. MADISETTI IS A PROFESSOR AT GEORGIA TECH AND HE'S GOING

6     TO BE PRESENTING OUR TUTORIAL, AND THERE WILL BE, I BELIEVE,

7     SOME POWERPOINT SLIDES --

8          THE COURT:  ALL RIGHT.

9          MR. PAVANE:  -- WE'LL BE TRYING TO SHOW.  WE'VE HAD A

10    FEW GLITCHES, BUT I THINK WE STRAIGHTENED IT OUT.

11         THE COURT:  ALL RIGHT.

12      MR. RIVERA, CAN I ASK YOU TO HAND ME THE SIGN-IN SHEET IF

13    YOU COULD?

14         THE CLERK:  YES, YOUR HONOR (HANDING).

15         MR. MADISETTI:  GOOD AFTERNOON, YOUR HONOR.

16         THE COURT:  GOOD AFTERNOON.

17         MR. PAVANE:  IS THE PROJECTOR ON?  DO YOU HAVE ONE OF

18    THOSE HANDHELD --

19         MR. POLISH:  IT'S UP THERE.

20         MR. PAVANE:  OKAY.

21       (PAUSE IN PROCEEDINGS.)

22         THE COURT:  WHILE WE'RE WAITING FOR THE EQUIPMENT TO

23    WARM UP, LET ME JUST EXPLAIN, IF I HAVEN'T ALREADY, I GENERALLY

24    PREFER, ONCE WE'RE DONE WITH THE TUTORIALS, TO TURN TO EACH

25    TERM AND HEAR ARGUMENT ON EACH TERM ONE BY ONE, AND UNLESS THE

1    PARTIES HAVE A STRONG EMOTION ABOUT IT, IT SEEMS TO ME THE

2    ORDER IN WHICH THEY WERE PRESENTED IN THE JCCS WOULD BE THE

3    APPROPRIATE ORDER TO GO THROUGH THEM HERE TODAY.  SO IS THAT

4    AGREEABLE TO EVERYBODY?

5              MR. PAVANE:  YES, WITH ONE SMALL CAVEAT.  I THINK

6    WE'D AGREED ON A SLIGHT MODIFICATION OF THE ORDER THAT MADE

7    SENSE.  I BELIEVE MR. DECARLO PROPOSED IT AND I DIDN'T HAVE AN

8    OBJECTION.

9              THE COURT:  IF YOU ALL ARE ON THE SAME PAGE, THAT'S

10    FINE BY ME.

11              MR. DECARLO:  YES, YOUR HONOR.

12              THE COURT:  OKAY.

13              MR. PAVANE:  THANK YOU.

14         (PAUSE IN PROCEEDINGS.)

15              THE COURT:  ALL RIGHT.  PROFESSOR?

16              MR. DECARLO:  THAT WAS THE HARD PART.

17              MR. MADISETTI:  GOOD AFTERNOON AGAIN.

18              THE COURT:  GOOD AFTERNOON AGAIN.

19              MR. MADISETTI:  I'M HERE TO GIVE A VERY SHORT

20    TUTORIAL ON STREAMING MULTI-MEDIA CONTENT OVER NETWORKS.

21              THE COURT:  AND I WILL JUST WARN YOU, PROFESSOR, AS

22    WELL AS YOUR COLLEAGUE ON THE OTHER SIDE, I MAY BE INTERRUPTING

23    YOU FREQUENTLY JUST TO UNDERSTAND EACH OF YOUR POINTS.

24         I HOPE YOU'LL TAKE NO OFFENSE.  IT'S THE BEST WAY I LEARN.

25              MR. MADISETTI:  I WOULD WELCOME SUCH AN INTERRUPTION.

1        THE COURT:  GO AHEAD.

2        MR. MADISETTI:  I'M A PROFESSOR AT GEORGIA TECH AND I

3    GRADUATED FROM BERKELEY AND I'VE BEEN TEACHING AT GEORGIA TECH

4    FOR THE PAST 25 YEARS.

5        SO MULTI-MEDIA STANDS FOR TYPICALLY AUDIO AND VIDEO AND

6    THIS IS THE CONTENT THAT IS WHAT I'LL BE DESCRIBING, AND SO AS

7    AN EXAMPLE, YOU HAVE SOMETHING LIKE A LIVE EVENT, THAT'S THE

8    PRESIDENTIAL INAUGURATION, AND THEN YOU HAVE A NUMBER OF

9    CAMERAS.

10        THE COURT:  AND THIS WILL BE MY FIRST OF MANY

11    INTERRUPTIONS.

12        SO IT FAIR FOR ME TO UNDERSTAND THAT WHEN YOU SAY

13    "MULTI-MEDIA," YOU MEAN LITERALLY VIDEO AND AUDIO, THAT IS TWO

14    DIFFERENT TYPES OF DATA, AS OPPOSED TO JUST A VIDEO STREAM OR

15    JUST AN AUDIO STREAM?

16        MR. MADISETTI:  IT COULD BE VIDEO BY ITSELF; IT COULD

17    BE AUDIO BY ITSELF; OR IT COULD BE A COMBINATION OF VIDEO AND

18    ACCOMPANYING AUDIO THAT IS SYNCHRONIZED TO IT.

19        IT COULD ALSO MEAN IMAGES AND OTHER ACCOMPANYING SUBTITLES

20    AND OTHER INFORMATION.  SO IT'S MORE THAN JUST TEXT.

21        AND THE IDEA IS THAT YOU HAVE SUCH A LIVE EVENT THAT IS

22    BEING, THAT IS BEING CAPTURED ELECTRONICALLY, TYPICALLY THROUGH

23    A NUMBER OF VIDEO CAMERAS, AND YOU'D LIKE TO STREAM IT TO MAYBE

24    TENS OF THOUSANDS, EVEN MILLIONS OF VIEWERS.

25        AND THE DIFFERENCE IS THAT WHEN YOU STREAM CERTAIN CONTENT,

1    YOU CAN VIEW IT WITH ALMOST NO DELAY, JUST A FEW SECONDS OF

2    DELAY.  SO IT'S LIVE, SO YOU DON'T HAVE THE LUXURY OF WAITING

3    FOR THE ENTIRE INAUGURATION TO FINISH BEFORE YOU START VIEWING

4    IT.  YOU START VIEWING IT ALMOST RIGHT AWAY.

5        SO THAT'S THE ADVANTAGE OF STREAMING IS THAT YOU DON'T HAVE

6    TO DOWNLOAD THE ENTIRE PRESENTATION AT SOME POINT.

7        SO THE TECHNICAL PROBLEM IS HOW DO YOU TAKE SUCH AN EVENT,

8    WHICH IS A MULTI-MEDIA EVENT, AND THEN YOU BROADCAST IT IN

9    REAL-TIME OR NEAR REAL-TIME TO TENS OF THOUSANDS, EVEN MILLIONS

10   OF VIEWERS WHO ARE ABLE TO THEN VIEW THIS EVENT OVER A NETWORK,

11   SUCH AS INTERNET?

12       MANY OF THESE VIEWERS MAY BE VIEWING THIS ON MOBILE

13   DEVICES, MANY OF THEM ON WIRED LINE DEVICES.  THEY MAY HAVE

14   DIFFERENT CAPABILITIES, DIFFERENT IMAGE SIZES AND VIEWERS.

15       SO THE QUESTION IS, HOW DO WE DO THIS MOST EFFICIENTLY?

16       SO BEFORE WE GO TO THAT, THERE'S A -- WE'LL GO THROUGH A

17   FEW PRELIMINARIES.

18       THE FIRST IS THAT --

19           MR. ULLMER:  YOU SHOULD BE ABLE TO SCROLL DOWN WITH

20   THE MOUSE.

21           MR. MADISETTI:  RIGHT THERE, OKAY.  YEAH, THAT'S

22   GOOD.

23       SO TYPICALLY COMPUTERS STORE INFORMATION IN A DIGITAL

24   FORMAT, AND THIS FORMAT IS TYPICALLY BITS, AND A BIT STANDS FOR

25   A BINARY DIGIT, AND THEN YOU CAN HAVE DIFFERENT FORMATS ON

1    BITS.  FOR EXAMPLE, A BYTE IS 8 BITS.  A WORD COULD BE 16 OR 32

2    BITS.

3        BUT THIS IS THE BASIC UNIT OF INFORMATION, SO WHETHER IT'S

4    AUDIO OR VIDEO OR IT'S ANY OTHER IMAGE, IT IS EVENTUALLY STORED

5    AS BITS, AND THESE BITS ARE MOVED AROUND OVER THE NETWORK IN

6    BETWEEN FROM THE CAPTURE ALL THE WAY TO THE VIEWER.

7        NOW, THIS IS AN EXAMPLE OF A MOVIE, A POPULAR MOVIE,

8    MISSION IMPOSSIBLE.

9        VIDEO IS CAPTURED AS FRAMES, SO TYPICALLY 30 FRAMES A

10   SECOND.  SO THIS SHOWS HERE THE NUMBER OF BITS PER FRAME, SO WE

11   ARE LOOKING AT SOME SEQUENCE OF FRAMES NUMBERED FROM 0 TO

12   12,000.  30 OF THEM ARE IN EACH SECOND.

13       SO IN SOME CASES, SOME OF THESE FRAMES HAVE AS MANY AS

14   40,000 BITS.  SOME OF THEM HAVE LESS THAN AROUND 10,000 BITS.

15       SO WHEN YOU LOOK AT 30 FRAMES A SECOND, THIS COMES TO 30

16   TIMES 40,000, WHICH IS AROUND A LITTLE MORE THAN ONE MEGABIT

17   PER SECOND; AND AT THE LOWER END, IT IS 40 TIMES 10,000, WHICH

18   IS SOMETHING LIKE 40,000 -- SORRY -- 10 TIMES 40, 30, WHICH IS

19   300,000 BITS PER SECOND.

20       SO THE VARIATION IS TYPICAL FOR FRAMES BECAUSE IT DEPENDS

21   ON THE CONTENT.  SO SOME OF THE CONTENT MAY HAVE A LOT OF

22   MOVEMENT, A LOT OF DETAIL.  SOME OF IT MAY JUST BE BACKGROUND

23   AND SO ON.  SO THERE'S VARIABILITY IN TERMS OF THE BITS THAT

24   ARE REQUIRED PER FRAME.

25           THE COURT:  IS IT CORRECT FOR ME TO CHARACTERIZE WHAT

1      WE'RE LOOKING AT HERE ON THE SCREEN AS A DISTRIBUTION OF THE

2      TOTAL NUMBER OF BITS ACROSS A SERIES OF FRAMES?

3              MR. MADISETTI:  IT IS AN EXAMPLE OF HOW THE BITS VARY

4      PER FRAME.

5      SO SOME FRAMES CAN HAVE 40,000 BITS.  SOME FRAMES CAN HAVE

6      ABOUT 10,000 BITS.

7              THE COURT:  OKAY.

8              MR. MADISETTI:  SO THERE'S A 1 TO 4X VARIATION IN THE

9      NUMBER OF BITS PER FRAMES.  SO WHEN YOU MULTIPLY THAT TIMES 30

10     FRAMES, YOU GET DIFFERENT RATES AT THE LOW END AND HIGH END.

11     SO THIS IS WHAT I SAID IN THE EARLIER SLIDE, THAT THERE IS

12     RAPID VARIATION IN TERMS OF THE NUMBER OF BITS PER FRAME, AND

13     THAT'S WHAT THIS SLIDE SHOWS.

14     AGAIN, AS AN INTRODUCTORY MATTER, A NETWORK IN A GENERAL

15     MANNER IS SOMETHING THAT ALLOWS DIGITAL DEVICES, SUCH AS

16     COMPUTERS AND MOBILE PHONES, TO COMMUNICATE WITH EACH OTHER.

17     AND THE INTERNET IS A WELL-KNOWN EXAMPLE OF SUCH A NETWORK

18     THAT WE USE ROUTINELY TO ACCESS MULTI-MEDIA CONTENT.

19     NOW, WE'LL GET TO THE NOTION OF BANDWIDTH.

20     DEVICES ON A NETWORK, THEY EXCHANGE INFORMATION WITH EACH

21     OTHER THROUGH SOME SORT OF LINKS ON THE NETWORK, AGAIN, IN A

22     GENERAL MANNER.  EACH LINK HAS A CERTAIN AVAILABLE BANDWIDTH.

23     SO IF IT'S A WIRELESS SORT OF VIDEO LINK, DEPENDING ON

24     WHETHER IT'S A 3G OR 4G CONNECTION, YOU HAVE CERTAIN BANDWIDTH

25     THAT IS TYPICALLY THE CASE, BUT THAT ALSO DEPENDS ON THE

1    ENVIRONMENT, THE NOISE, THE INTERFERENCE, AND SO MANY OTHER

2    FACTORS.

3        IF YOU HAVE A WIRED NETWORK, YOU HAVE A LEVEL OF BANDWIDTH,

4    FOR EXAMPLE, IT'S A LOCAL AREA NETWORK OR WIDE AREA NETWORK.

5        THE COURT:  AND ON THAT POINT, PROFESSOR, IS IT

6    CORRECT FOR ME TO UNDERSTAND THAT THE AVAILABLE BANDWIDTH OF A

7    GIVEN LINK ITSELF VARIES WITH TIME DEPENDING ON ALL THESE

8    CONDITIONS, THAT THERE'S NO FIXED STATIC BANDWIDTH THAT APPLIES

9    ACROSS TIME?

10        MR. MADISETTI:  ESPECIALLY IN THE CASE OF WIRELESS

11    LINKS, THE BANDWIDTH DEPENDS ON INTERFERENCE, IT DEPENDS ON THE

12    NOISE, IT DEPENDS ON THE REFLECTION.  THERE'S SO MANY FACTORS.

13        IN THE CASE OF A WIRED LINK, IT IS A LITTLE MORE

14    PREDICTABLE.

15        BUT IN GENERAL, WIRELESS HAS FREQUENT VARIATION IN TERMS OF

16    BANDWIDTH.

17        NOW, BANDWIDTH IS ANALOGOUS TO A PIPE IN TERMS OF DIAMETER,

18    SO TYPICALLY A WIDER PIPE MEANS YOU HAVE HIGHER BANDWIDTH IN

19    TERMS OF BITS PER SECOND.

20        SO --

21        THE COURT:  I'M SORRY.  IF I COULD GO BACK TO SLIDE 7

22    FOR A MOMENT?

23        MR. MADISETTI:  YES, YOUR HONOR.

24        THE COURT:  YOU INDICATE THERE THAT BANDWIDTH IS

25    USUALLY MEASURED IN BITS PER SECOND.  ARE THERE OTHER COMMON OR

1   UNDERSTOOD WAYS IN MEASURING BANDWIDTH, OR WAYS OF MEASURING

2   BANDWIDTH?

3        MR. MADISETTI:  THIS, FOR EXAMPLE, YOU COULD THINK OF

4   IN TERMS OF INFORMATION CONTENT, IF YOU THINK OF INFORMATION

5   THEORETIC VIEWS, YOU COULD THINK IN TERMS OF BITS PER PIXEL AND

6   OTHER FEATURES.  BUT THOSE ARE MORE RELATED TO CONTENT.

7        BUT I WOULD SAY THAT BANDWIDTH MOST FREQUENTLY WOULD BE

8   USING SOMETHING LIKE BITS PER SECOND.

9        THE COURT:  OKAY.

10       MR. MADISETTI:  AND YOU COULD ALSO DEFINE IT AND SAY

11  HOW MANY OF THEM ARE ACTUAL BITS AND HOW MANY ARE PART OF THE

12  CHANNEL AND SO ON.

13       BUT BANDWIDTH IS TYPICALLY MEASURED IN BITS PER SECOND.

14       NOW, BANDWIDTH ALSO IS AT A PREMIUM AND MANY NETWORK LINKS

15  AT HOME OR WIRELESS NETWORKS HAVE BANDWIDTH LIMITATIONS, SO

16  THERE IS SOME SORT OF RANGE ON WHICH THIS BANDWIDTH IS

17  POSSIBLE.

18       RAW VIDEO, WHICH MEANS VIDEO AS CAPTURED -- SO IF YOU TAKE

19  A VIDEO DIGITAL CAMERA AND YOU'RE SEEING RAW VIDEO THAT IS

20  SAMPLED VIDEO, IT CAN HAVE VERY HIGH BIT RATE IN TERMS OF

21  SEVERAL MEGABITS PER SECOND.  EVEN LOW RESOLUTION VIDEO CAN

22  HAVE 36 MEGABITS PER SECOND, AND TYPICAL TV QUALITY VIDEO HAS

23  RATES OF OVER 165 MEGABITS PER SECOND.  SO THESE ARE HIGH

24  NUMBERS.

25       AND IF WE LOOK AT OUR WIRELESS LINK, IT COULD HAVE

1      SOMETHING LIKE A FEW HUNDRED KILOBITS PER SECOND, EVEN THE MOST

2      LATEST LINKS.

3          SO HOW DO WE REDUCE THE BIT RATE OF RAW VIDEO, BECAUSE IF

4      THE INAUGURATION EVENT IS TAKING SO MANY MEGABITS PER SECOND,

5      HOW DO WE STREAM IT OVER SOMETHING LIKE AN INTERNET?

6          SO ONE WAY TO DO THAT IS TO USE COMPRESSION.  SO

7      COMPRESSION IS ONE WAY OF REDUCING THIS BIT RATE OF RAW VIDEO.

8          SO WHAT IS COMPRESSION?

9          COMPRESSION IS A WAY BY WHICH THE BIT RATE IS REDUCED FROM

10     THE SEVERAL TENS OF MEGABITS TO SOMETHING THAT IS COMMENSURATE

11     WITH SMALLER BANDWIDTHS ON TYPICAL LINKS.

12         SO HOW DOES VIDEO COMPRESSION TYPICALLY WORK?

13         SIMILAR, WE CAN ALSO TALK ABOUT AUDIO, BUT I USE THE

14     EXAMPLE OF VIDEO.

15         SO HERE IN THE CASE OF VIDEO COMPRESSION, THE FIRST STEP

16     IS TYPICALLY TO REDUCE REDUNDANCY.  THAT MEANS THAT YOU DON'T

17     TRANSMIT THE SAME OBJECT THAT IS IN SUCCESSIVE FRAMES EACH AND

18     EVERY TIME.

19         SO HERE IS AN EXAMPLE WHERE IN FRAME 1 YOU HAVE A JELLY

20     FISH AND IN FRAME 4 YOU HAVE A JELLY FISH, BUT IT MOVED VERY

21     SLIGHTLY.  SO INSTEAD OF TRANSMITTING THE JELLY FISH AGAIN IN

22     DETAIL, YOU JUST POINT TO WHERE IT WOULD BE IF IT WERE

23     TRANSMITTED AND THAT'S CALLED A MOTION VECTOR.

24         SO AFTER YOU REMOVE ALL THIS TEMPORAL OR TIME REDUNDANCY

25     BECAUSE OF REPETITION, YOU ALSO DO ADDITIONAL TRANSFORM CODING

1    TO REMOVE SOME OF THE SPACIAL REDUNDANCY.

2              THE COURT:  SO ON THIS POINT, PROFESSOR, AM I CORRECT

3    IN UNDERSTANDING THAT IF WE HAVE, FOR EXAMPLE, AN ARRAY THAT --

4    CONSISTING OF CERTAIN FRAMES, THAT IN CERTAIN FRAMES THERE WILL

5    BE A POINTER TO AN EARLIER ARRAY?

6              MR. MADISETTI:  EXACTLY.

7              THE COURT:  AND I TAKE IT THAT THE POINTER ITSELF HAS

8    SOME -- WELL, ITSELF IS -- IT IMPOSES SOME CONSTRAINTS IN TERMS

9    OF DATA, BUT IT'S A FRACTION OF WHAT IT WOULD TAKE TO REPRODUCE

10   EXACTLY THE SAME?

11             MR. MADISETTI:  YOU'RE EXACTLY RIGHT, YOUR HONOR.

12       SO WHAT HAPPENS IS NOT ONLY DO WE HAVE A POINTER, YOU HAVE

13   A LARGE NUMBER OF POINTERS BECAUSE THERE ARE A LARGE NUMBER OF

14   OBJECTS THAT ARE REPEATED.

15       AND NOT ONLY CAN YOU POINT TO FRAMES THAT ARE BEHIND OR

16   AHEAD, YOU CAN ALSO HAVE BYTE PREDICTION.  YOU CAN PREDICT

17   FRAMES THAT ARE AHEAD OF YOU AND IN BACK OF YOU.

18       AND WHAT IS IMPORTANT IS THAT THERE ARE SOME FRAMES, WHICH

19   ARE TYPICALLY CALLED I-FRAMES OR T-FRAMES, THAT ARE SENT IN

20   FULL FIDELITY, BECAUSE YOU NEED TO BASE YOUR INFORMATION THAT

21   YOU'RE BUILDING UPON OR SUBTRACTING UPON ON SOME FUNDAMENTAL

22   FRAME, AN I-FRAME OR A T-FRAME, AND AFTER THAT YOU CAN DO

23   SUCCESSIVE DIFFERENCES OF THAT PARTICULAR FRAME AND TRANSMIT

24   THEM.

25             THE COURT:  OKAY.

1           MR. MADISETTI:  SO IF YOU HAVE A SEGMENT AND YOU

2    SUDDENLY LOSE TRACK, YOU REQUIRE ONE OF THESE FUNDAMENTAL

3    FRAMES, THESE I-FRAMES AND T-FRAMES, TO GET BACK ON TRACK.  SO

4    EVERY NOW AND THEN YOU INSERT ONE OF THESE DETAILED FRAMES.

5           THE COURT:  AS A REFERENCE POINT?

6           MR. MADISETTI:  AS A REFERENCE POINT.

7           THE COURT:  YOU ALSO BROUGHT UP THE WORD "TRANSFORM."

8    I TAKE IT WHAT WE'RE TALKING ABOUT HERE IS SOME TYPE OF FOURIER

9    TRANSFORM, OR FAST FOURIER TRANSFORM?

10          MR. MADISETTI:  THAT'S RIGHT.  IT'S A SPECIALIZED

11   TYPE OF VIDEO TRANSFER CALLED A COSINE TRANSFER, THIS IS FOR A

12   DVD, A COSINE TRANSFER, WHICH IS SMOOTHER THAN A FOURIER

13   TRANSFORM.

14      SO IF YOU LOOK AT HOW VIDEO COMPRESSION WORKS, YOU HAVE --

15   HERE YOU HAVE BIT RATE AND HERE YOU HAVE QUALITY.  SO PSNR

16   STANDS FOR SOMETHING LIKE A PEAK SNR, OR SIGNAL TO NOISE RATIO,

17   SO IT IS A ROUGH INDICATOR OF QUALITY.

18      AND BIT RATE IS THE NUMBER OF KILOBITS PER SECOND HERE.  SO

19   WHAT YOU HAVE HERE IS THESE VARIOUS CURVES, THE LEFT -- THE

20   RIGHTMOST CURVE IS WHERE YOU HAVE NO MOTION COMPENSATION, AND

21   THE LEFTMOST CURVE IS WHERE YOU HAVE THE MOST MOTION

22   COMPENSATION.

23      SO IF YOU TAKE A CERTAIN REFERENCE QUALITY, SAY 35, AND

24   DRAW A HORIZONTAL LINE, YOU'LL FIND THAT TO GET THE SAME

25   QUALITY OF 35 DB, OR DECIBELS, YOU WILL REQUIRE A BANDWIDTH OF

1   ABOUT 900 KILOBITS PER SECOND WHEN YOU DON'T HAVE MOTION

2   COMPENSATION, BUT IF YOU HAVE FULL MOTION COMPENSATION FOR 35,

3   YOU CAN GET AWAY WITH 300 KILOBITS PER SECOND.

4       SO THESE CURVES ALLOW US TO TRADE OFF BIT RATE VERSUS

5   QUALITY.

6       SO THERE ARE AT LEAST A COUPLE OF WAYS OF TRADING OFF VIDEO

7   QUANTITY WITH BIT RATE.

8       THE TWO WAYS ARE CONSTANT BIT RATE, WHICH MEANS THAT THE

9   OUTPUT IS MORE OR LESS CONSTANT.  THE BIT RATE IS, IS

10  CONTROLLED IN A MANNER THAT YOU CAN GIVE IT A RATE.  YOU CAN

11  ASSIGN IT A RATE THAT ALLOWS IT TO BE CONSTANT.

12      SO IT'S ALMOST LIKE CRUISE CONTROL ON YOUR CAR.  YOU CAN

13  SAY, "I WILL DRIVE ONLY AT 65 MILES AN HOUR FROM HERE TO

14  LOS ANGELES," BUT IF THERE ARE SOME HILLS AND THERE ARE SOME

15  VALLEYS, YOU MAY GO TEMPORARILY ON AND OFF, BUT YOU WILL BE

16  PRETTY MUCH AROUND 65 MILES AN HOUR.

17      THE SECOND TYPE OF TRADING OFF VIDEO QUALITY WITH BIT RATE

18  IS CALLED VARIABLE BIT RATE.

19      SO WHAT THIS MEANS IS THAT YOU DON'T CONTROL THE BIT RATE,

20  JUST AS YOU SAW IN MISSION IMPOSSIBLE.  YOU HAVE THIS VARIATION

21  IN BIT RATE SO THAT IF THERE'S A LOT OF SPORTS OR HIGH LIVE

22  CONTENT, THE BIT RATE GOES UP.  IF THERE'S LESS CONTENT, IT

23  GOES DOWN.

24      AND IN THE CASE OF A VARIABLE BIT RATE, YOU CAN OFTEN

25  SPECIFY SOMETHING LIKE SAY THAT THIS IS INTERNET FOR THE LAN

1   ENVIRONMENT OR THIS IS INTENDED FOR CELLULAR, SO IT PUTS -- IT

2   CAN PUT SOME SORT OF CEILING.

3       BUT EVEN THEN, IT'LL VARY UP TO THAT CEILING.  SO, FOR

4   EXAMPLE, YOU COULD PUT A SPEED GOVERNOR ON THE CAR AND SAY "MY

5   SPEED GOVERNOR IS 100 MILES AN HOUR."  BUT YOU WOULD ALWAYS

6   DRIVE AT 80 OR 90 OR 30 OR 20 DEPENDING ON TRAFFIC.  IT'S STILL

7   VARIABLE BIT RATE EVEN THOUGH IT COULD BE A GOVERNED RATE.

8       SO THESE ARE THE TWO TYPES OF BIT RATE OPTIONS.  ONE IS

9   CBR, OR CONSTANT BIT RATE, AND ONE IS VARIABLE BIT RATE.

10      SO THIS REPEATS THAT.  IN CBR COMPRESSION, THE OUTPUT

11  TARGET BIT RATE PER SECOND IS KNOWN BEFORE YOU START THE

12  COMPRESSION PROCESS.  YOU KNOW THAT YOU'RE TARGETING 100 OR 200

13  KILOBITS PER SECOND.

14          THE COURT:  BASED ON, SAY, THE BANDWIDTH OF THE LINK?

15          MR. MADISETTI:  YEAH.  IF IT'S A WIRELESS LINK, YOU

16  KNOW THAT IF YOU ARE GOING TO GO AT ONE MEGABITS PER SECOND,

17  THERE WILL BE A COUPLE OF PHONES AT THE RATE THAT CAN RECEIVE

18  THAT.

19      BUT IF IT WERE SOMETHING LIKE 200 OR 300 KILOBITS PER

20  SECOND, IT IS MUCH MORE THE RIGHT, THE AMOUNT OF BIT RATE

21  REQUIRED FOR A CELLULAR TYPE TRANSMISSION, LIKE AN LTE.  YOU

22  COULD GO AT HIGHER RATES, AND YOU WOULD HAVE AN IMPROVEMENT IN

23  QUALITY, BUT IT'S AT A HIGHER RATE.

24      SO THE CBR OUTPUT IS PRETTY CLOSE TO THE TARGET RATE,

25  BECAUSE THE WAY IT DOES THAT, AFTER DOING THE CODING, IT HAS A

1    FIXED BUDGET OF BITS PER FRAME.

2         SO THE CODER MAKES THE DECISION OF WHICH BIT TO GIVE TO

3    WHICH PORTION OF THE IMAGE.  SO COMPANIES USE THE INNOVATION TO

4    CHOOSE THE BITS WISELY SO THAT THE -- SO THAT ANY IMPERFECTIONS

5    ARE HIDDEN FROM THE USER.

6         SO VERY FAST EDGES AND OTHERS THAT IGNORE, OR CERTAIN EDGES

7    ARE KEPT DEPENDING ON PERCEPTIVITY.

8         SO THAT IS WHY THERE IS A COMPLICATED AREA OFTEN OF VIDEO

9    COMPRESSION.

10         THE COURT:  AND I TAKE IT THAT THERE ARE ANY NUMBER

11    OF DIFFERENT ALTERNATIVES ONE COULD COME UP WITH FOR ALLOCATING

12    THE BUDGET, AS YOU DESCRIBED IT, TO A GIVEN FRAME.

13         MR. MADISETTI:  EXACTLY.  SO THE LAST 20 YEARS HAS

14    BEEN VERY RICH IN TERMS OF RESEARCH ON HOW YOU WOULD ALLOCATE

15    THESE BITS.  THERE ARE ALGORITHMS THAT ARE CALLED WATER FILLING

16    THAT CHOOSE THE WATER THAT USE THE PERCEPTION AND THE VISUAL

17    CAPABILITY OF THE EYE, THE SENSITIVITY OF THE EYE TO THE

18    HORIZONTAL VERSUS VERTICAL, THE DIFFERENTIAL SENSITIVITY TO

19    ALLOCATE BITS WISELY.

20         THE COURT:  OKAY.

21         MR. MADISETTI:  AND SO STUDIOS AND OTHERS HAVE THEIR

22    OWN ALGORITHMS THAT AREN'T USUALLY DISCLOSED, BUT THE DECODER

23    SIDE TYPICALLY FOLLOWS THE STANDARDS.

24         NOW, VARIABLE BIT RATE COMPRESSION, ON THE OTHER HAND,

25    OUTPUT TARGET BIT RATE IS NOT KNOWN.  YOU STILL SPECIFY

1    QUALITY.  YOU STILL SAY CELLULAR OR IT'S GOING TO BE LAND OR

2    SOMETHING ELSE, BUT THAT IS MORE LIKE A GOVERNOR.  IT TELLS YOU

3    DON'T GO TOO HIGH ABOVE 200, BUT IF THERE'S NOT TOO MUCH

4    ACTION, YOU COULD TAKE IT 20 OR 30 KILOBITS PER SECOND.

5        SO VARIABLE BIT RATE IS TYPICALLY SOME SORT OF QUALITY

6    METRIC IS SPECIFIED, BUT THE OUTPUT TARGET BIT RATE IS NOT

7    KNOWN PRIOR TO COMPRESSION.

8        SO WHEN YOU LOOK AT AN ACTUAL STREAM, WHERE YOU HAVE LOW

9    MOTION, THE VBR CAN RUN AT 300 KILOBITS PER SECOND WITH VERY

10   GOOD ABILITY.

11       THE CONSTANT BIT RATE, ON THE OTHER HAND, KEEPS CONSTANT

12   AND USES MORE KILOBITS PER SECOND WHETHER OR NOT THERE'S ANY

13   ACTION.

14       ON THE OTHER HAND, WHERE THERE IS HIGH MOTION, A VBR

15   CONSUMES 800 KILOBITS PER SECOND, WHILE THE CBR STILL ALLOCATES

16   BITS CAREFULLY TO REMAIN IN AND AROUND 500 KILOBITS PER SECOND.

17       SO AS YOU CAN SEE, THERE IS A VARIATION THAT IS NOT PRESENT

18   IN CBR.  CBR PRETTY MUCH KEEPS IT AT THE TARGETS PLUS OR MINUS

19   A LITTLE.

20       NOW, GIVEN THIS BACKGROUND, I WOULD LIKE TO NOW PRESENT HOW

21   STREAMING IS TYPICALLY DONE TODAY.

22       AND SO THESE ARE SIX STEPS THAT ARE A SIMPLIFIED

23   REPRESENTATION OF HOW STREAMING IS DONE.

24       AND THIS -- THE IDEA IS THAT YOU WANT TO STREAM AND

25   BROADCAST TO LITERALLY TENS OF THOUSANDS OR EVEN MILLIONS OF

1    USERS, AND YOU WANT TO DO THAT IN AN EFFECTIVE MANNER.

2         SO THE WAY YOU DO THAT IS YOU TAKE THESE MULTI-MEDIA

3    STREAMS, AUDIO OR VIDEO, AT ONE OR MORE SPECIFIED RATES.  THAT

4    MEANS YOU SPECIFY WHAT RATE YOU WANT CREATING THAT STREAM.  IN

5    THIS CASE, IT'S A CBR RATE.

6         THEN YOU DIVIDE THAT VIDEO --

7              THE COURT:  ON THAT POINT, PROFESSOR, IT DOESN'T HAVE

8    TO BE A CBR RATE?  ONE COULD PERFORM THIS STREAMING, AS YOU

9    JUST DESCRIBED IT, USING A VARIABLE BIT RATE?

10             MR. MADISETTI:  THAT'S RIGHT.  THERE COULD BE

11   STREAMING THAT USES OTHER ALGORITHMS, FOR EXAMPLE, IN -- SUCH

12   AS THE REAL PLAYER AND A FEW OTHER STREAMERS, THEY WOULD NOT

13   REQUIRE A FIXED RATE.

14        BUT I'M TALKING ABOUT HOW TYPICAL STREAMING WOULD WORK

15   EFFICIENTLY TODAY.

16        WHAT YOU WOULD DO IS THEN YOU WOULD DIVIDE THIS VIDEO

17   STREAM INTO CHUNKS.  AGAIN, "CHUNKS" IS A LOOSE WAY OF SAYING

18   THAT IT'S A TIME DURATION.  SO THE TIME DURATION COULD BE

19   SOMETHING LIKE A COUPLE OF SECONDS OR TEN SECONDS OR SOMETHING

20   LIKE THAT.

21        AND THEN YOU TAKE THIS CONTINUOUS VIDEO STREAM, YOU BREAK

22   IT UP INTO CHUNKS, AND THEN YOU WANT TO BE ABLE TO PROVIDE SOME

23   SORT OF INDEX OR A NAME FOR THE CHUNK SO THAT YOU NOT ONLY KNOW

24   THAT THERE EXISTS A BIT OF A VIDEO, OR A CHUNK OF A VIDEO, YOU

25   ALSO KNOW WHERE IT IS IN THE FORMATION.

1        SO IT'S LIKE SAYING A PLAYER IS A HALFBACK OR SOMETHING.

2   YOU NOT ONLY KNOW THE PLAYER, BUT YOU KNOW THE POSITION AS

3   WELL.

4        SO IN SOME SENSE IT IS A SORT OF INDEX THAT HELPS YOU TO

5   CREATE A SEQUENCE OF FILES BECAUSE YOU CAN BLINDLY PUT

6   ARBITRARY NAMES.  YOU NEED TO HAVE SOME SORT OF INDEXING THAT

7   WILL ALLOW TO YOU CREATE A SEQUENCE OF FILES.

8             THE COURT:  AND IN THE EXAMPLE YOU'RE GIVING ME HERE,

9   YOU TALK ABOUT A DIVISION BASED ON TIME DURATION.  ARE THERE

10  OTHER WAYS IN WHICH ONE CAN DIVIDE THE VIDEO STREAM?

11            MR. MADISETTI:  FOR EXAMPLE, YOU COULD -- IF --

12  AGAIN, THERE ARE SOME ADVANTAGES TO USING FIXED TIME CHUNKS,

13  AND I WILL GET TO THAT.

14       BUT IF YOU DIDN'T WANT TO TAKE ADVANTAGE OF THIS, YOU COULD

15  RUN WITH VARIABLE CHUNKS AND THEN YOU WOULD HAVE TO HAVE A LOT

16  OF HOUSEKEEPING --

17            THE COURT:  ALL RIGHT.

18            MR. MADISETTI:  -- BECAUSE YOU NEED TO KNOW HOW MUCH

19  WAS THIS CHUNK?  WHERE IS THE NEXT CHUNK BEGINNING?  SO YOU

20  HAVE TO DO A LOT OF HOUSEKEEPING.

21       SO WE'RE LOOKING FOR A SCALEABLE, LIGHTWEIGHT SOLUTION THAT

22  DOESN'T REQUIRE THE SERVER TO CONTINUOUSLY THINK, THIS GUY HAS

23  22 SECONDS, THIS GUY HAS 10 SECONDS OF THE INAUGURATION, AND

24  THIS ONE HAS 4 SECONDS.

25       YOU WANT TO SAY, THIS GUY HAS ALL OF THEM AND I'M GIVING

1    THEM TEN SECOND CHUNKS.

2         SO I KEEP ONE CLOCK AND THAT MAKES THE PROVIDER MUCH MORE

3    EASY TO DESIGN.

4              THE COURT:  ALL RIGHT.

5              MR. MADISETTI:  AND EACH OF THE -- AND ALSO, IF YOU

6    MAKE THE CHUNK TOO LARGE, SMALL DEVICES, LIKE A MOBILE PHONE,

7    MAY NOT HAVE MEMORY TO STORE ALL OF THAT.  THERE MAY BE

8    LATENCY.

9         IF YOU MAKE IT TOO SMALL, YOU MAY FREQUENTLY NEED TO UPDATE

10   THESE CHUNKS.

11        SO IT'S A TRADE OFF.  BUT TWO TO TEN SECONDS IS WHAT

12   TYPICALLY MOST USE.

13        THEN YOU CREATE AN INDEX FILE OR A MENU AND SAY, I NOW HAVE

14   THE CURRENT -- I HAVE THE CURRENT PICTURE OF THE -- A CURRENT

15   VIDEO OF THE PRESIDENT 10 SECONDS AGO, 20 SECONDS AGO, AND 30

16   SECONDS AGO.

17        YOU'RE WATCHING TEN SECONDS AGO.  AFTER THAT YOU WATCH WHAT

18   IS BEING DONE NOW WHILE I'M PREPARING THE NEXT TEN SECONDS FOR

19   YOU.

20        SO YOU HAVE THIS -- DEPENDING ON WHAT YOU WANT TO ALLOW THE

21   VIEWER TO DO, YOU CAN PROVIDE THEM THE ENTIRE HISTORY AND SAY

22   THEY COULD GO BACK TO THE BEGINNING OF THE INAUGURATION IF THEY

23   TUNED IN LATE, OR THEY COULD WATCH IT LIVE, IN WHICH CASE

24   THEY'LL ONLY SEE THE MOST RECENT CHUNK.

25        AND THEN THEY MAKE THE NETWORK CLIENTS AWARE OF THIS SORT

1    OF MENU SO THE CLIENTS CAN THEN -- TYPICALLY A CLIENT IS A

2    PIECE OF SOFTWARE.  IT WILL DOWNLOAD IT AND IT WILL SAY, OKAY,

3    THIS IS WHAT I AM, NOW IT'S 8:30, THE INAUGURATION BEGAN AT

4    8:00, SO I KNOW I DOWNLOAD FROM 8:29 ONWARDS.

5              THE COURT:  AND EVEN THOUGH WE MAY BE DEALING WITH A

6    PRETTY HETEROGENOUS ENVIRONMENT WITH ALL TYPES OF DIFFERENT

7    CLIENTS, ARE THEY ALL USING THE SAME INDEX FILE IN ORDER TO

8    REASSEMBLE --

9              MR. MADISETTI:  YES, THEY'LL ALL BE USING A VERY

10   SIMILAR INDEX FILE, AND BECAUSE ALL OF THEM HAVE THE SAME TIME

11   CHUNK, AND I WILL GET TO THAT IN A MINUTE.

12             THE COURT:  OKAY.

13             MR. MADISETTI:  AND THE ADVANTAGES OF THAT, THERE ARE

14   MANY.

15             THE COURT:  OKAY.

16             MR. MADISETTI:  AND NOW, SO GOING THROUGH THESE

17   STEPS, SO WE HAVE THIS VIDEO STREAM, WE HAVE THE INAUGURATION

18   VIDEO AT FOUR BIT RATES, SO WE ASSIGN THE FOUR BIT RATES AND

19   SAY THIS IS TYPICAL -- A VERY GOOD WIRELESS LINK CAN TAKE 600,

20   A POOR WIRELESS LINK WOULD TAKE 150, LET'S CREATE FOUR OF THEM

21   AND BREAK THEM INTO TWO SECOND CHUNKS.

22        AND THEN WHAT DO WE DO?  WE THEN TAKE -- DO THIS INDEXING.

23   THIS INDEXING ALLOWS YOU TO FIGURE OUT WHERE THIS CHUNK IS IN

24   ITS FORMATION.

25        AND THAT IS DONE HERE.  SO WHAT YOU DO IS YOU CREATE THIS

1   SORT OF MENU THAT SAYS TIME FROM 0 TO 2, 2 TO 4, 4 TO 6 ARE

2   AT -- THESE LITTLE BITS OF VIDEO ARE STORED AS A WEB ADDRESS OR

3   A URL.

4       AND SIMILARLY, THE SAME TIME, 2 TO 4 IS ALSO STORED AT THE

5   LOWER BIT RATE AT 440.

6       SIMILARLY, ALL THESE WILL ALSO BE STORED.

7       SO YOU HAVE THIS NICE MENU OF ALL OF THE POSSIBLE TIMES,

8   BUT DIFFERENT PORTIONS OF THE SAME VIDEO AT DIFFERENT BIT

9   RATES.

10      NOW, WHAT IS THE ADVANTAGE OF THAT?  THE ADVANTAGE IS THAT

11  YOU ARE HAVING THE VIDEO IN LIFE, YOU'RE BREAKING IT UP INTO

12  THESE MULTIPLE STREAMS, YOU'RE CREATING THESE FILES, YOU'RE

13  MAKING AVAILABLE ALL OF THESE INDEXED FILES ON THE SERVER.

14      AND THEN WHAT HAPPENS IS THAT THE INDEX FILE IS THEN TAKEN

15  BY A CLIENT'S PIECE OF SOFTWARE.  LET'S ASSUME THAT IT'S ON A

16  MOBILE PHONE.

17      SO THIS IS WHAT HAPPENS.  THE CLIENT SAYS, I WOULD LIKE TO

18  WATCH THE INAUGURATION.  LET ME REQUEST THE INDEX FILE.

19      SO IF IT'S A LIVE PRESENTATION, IT GETS THE FIRST, THE

20  CURRENT TIME.  THE INDEX FILE IS CONTINUOUSLY DYNAMICALLY

21  CREATED AND UPDATED, SO THE SERVER WOULD REFRESH IT AND SAY

22  CURRENTLY I'M AT 8:30, SO THIS IS THE FOUR OR FIVE CHUNKS AT

23  THESE FREQUENCIES, AT THESE KILOBITS PER SECOND FOR THESE TIME

24  SLOTS.

25      SO THE CLIENT SAYS THAT MY LINK IS VERY GOOD, MY QUALITY IS

1    VERY GOOD, SO I WILL BE AMBITIOUS, I WILL TAKE THE FULL HIGH

2    QUALITY 600 KILOBITS PER SECOND, AND THEN IT GETS THE CHUNK

3    FROM 0 TO 2 SECONDS AT FULL 600 KILOBITS PER SECOND.

4        THEN THE LINK BECOMES BAD.  SO CURRENT CELL PHONES, THEY

5    CAN MEASURE THE QUALITY OF THE LINK.  THAT'S PART OF THE 3GPP

6    STANDARD.

7            THE COURT:  THAT'S A PREDICATE STEP TO MAKING THE

8    REQUEST FOR THE NEXT FILE?

9            MR. MADISETTI:  THAT'S RIGHT.

10       SO IF YOU WANTED TO CHOOSE AN OPTION, ALTERNATIVELY, YOU

11   DON'T HAVE TO CHANGE YOUR LINK, YOU JUST TAKE THE LOWEST THAT

12   YOU CAN SUPPORT OR THE BEST YOU COULD TAKE.

13       I MEAN, IT ALL IS -- IT'S A COMPETITION WITH ONE DIGIT, HOW

14   YOU DESIGN THE CLIENT SOFTWARE SO THAT THE USER DOESN'T GET A

15   BAD EXPERIENCE.

16           THE COURT:  AND THE STANDARD SUPPORTS ANY ONE OF

17   THESE DESIGNS?

18           MR. MADISETTI:  AND THE STANDARD ALLOWS YOU TO FLIP

19   AND CHANGE YOUR BIT RATE IN MIDSTREAM.

20       THE REASON YOU CAN DO THAT IS BECAUSE YOU HAVE CONSTANT

21   CHUNK SIZES, BECAUSE 0 TO 2 I COULD SEE AT 600, I KNOW AT 2 I

22   CAN KEEP 600 OR I CAN GO TO 400 OR I CAN GO 200.

23           THE COURT:  BUT THE SIZE OF THE CHUNK REMAINS SAME?

24           MR. MADISETTI:  BUT THE SIZE REMAINS THE SAME IN

25   TIME, NOT IN DATA SIZE, BECAUSE THEY'RE ALL DIFFERENT BIT

1   RATES, BUT THE TIME IS THERE.

2   SO I HAVE THE FLEXIBILITY IF ALL THE PERIODS AT GEORGIA

3   TECH ARE FROM 10:00 TO 11:00 OR 11:00 TO 12:00, I CAN PICK ANY

4   CLASSROOM NEXT.

5   EXACTLY THIS IS WHAT YOU DO HERE.  FROM 2 TO 4 YOU CAN

6   DECIDE TO GO TO A LOWER BIT RATE BECAUSE YOUR USER IS GOING TO

7   BE HAPPIER BECAUSE THEY HAVE A NOISY LINK.

8   THEN YOU FIND THAT YOUR LINK BECOMES CLEAR, THEN YOU SWITCH

9   BACK TO 4 TO 6 AT 600 KILOBITS PER SECOND.

10  SO THAT'S THE ADVANTAGE OF THIS APPROACH.  IT MAXIMIZES THE

11  CLIENT EXPERIENCE, THE SOFTWARE EXPERIENCE.

12  AND ALL OF THAT IS DONE AUTOMATICALLY.  YOU DON'T HAVE --

13  THE USER DOESN'T HAVE TO FIGURE IT OUT.  HE NEVER PROBABLY

14  KNOWS, HE OR SHE NEVER KNOWS THAT THIS IS HAPPENING.

15  SO THAT IS THE SORT OF TYPICAL STREAMING APPROACHES TO DATA

16  SO THAT YOU CAN WATCH VIDEO AS IT'S BEING CREATED AND YOU CAN

17  DO THAT -- AND ALL OF THE WORK IS DONE BY MILLIONS OF CLIENT

18  STATIONS.  IT'S NOT THE SERVER KEEPING TRACK OF 10 MILLION

19  USERS AND SAYING, "THIS GUY CAN ZOOM 600" BECAUSE THAT WHOLE

20  LIST MANAGEMENT IS JUST A MESS.

21          THE COURT:  THAT'S AT LEAST PART OF THE SCALEABILITY?

22          MR. MADISETTI:  THAT'S PART OF THE SCALEABILITY.

23          THE COURT:  OKAY.

24          MR. MADISETTI:  AND THIS ALSO ALLOWS YOU, THE CLIENT,

25  TO OPTIMIZE WHAT IS GOOD FOR THAT BASED ON POWER AND SPEED,

1    BECAUSE HIGHER BIT RATE MEANS MORE POWER.  THEY CAN EVEN

2    DECIDE, I'M JUST WATCHING LOWER VIDEO RATE, BECAUSE IT'S AN

3    ADVISEMENT OR SOMETHING.

4         AND ALSO, THIS SLIDE TALKS ABOUT THE IMPORTANCE OF VIDEO IN

5    THIS NEW WORLD, AND SO THESE ARE SOME STATISTICS THAT I TOOK

6    FROM CISCO THAT SAY THAT EVERY SECOND IN THE NEXT THREE YEARS

7    THERE WILL BE MORE THAN A MILLION MINUTES OF VIDEO CONTENT

8    ACROSS THE INTERNET, AND 60 PERCENT OF ALL TRAFFIC FROM THE

9    INTERNET WILL BE VIDEO IN THREE YEARS, AND WEB-BASED VIDEO

10   CONFERENCING WILL BECOME 50 PERCENT OF THE TOTAL BUSINESS VIDEO

11   CONFERENCING TRAFFIC.

12        SO THIS IS A VERY IMPORTANT MARKET AS WELL, AND THAT PUTS

13   THE TECHNOLOGY IN THE CONTEXT OF THE MARKET.

14        SO THAT'S ALL FOR TODAY, AND THANK YOU, YOUR HONOR.

15            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

16   PROFESSOR MADISETTI.

17            MR. MADISETTI:  THANK YOU.

18            THE COURT:  AND FROM APPLE?

19            MR. DECARLO:  THANK YOU, YOUR HONOR.

20        I'D LIKE TO INTRODUCE DR. NATHANIEL POLISH.  DR. POLISH HAS

21   A BACHELOR'S AND PH.D. FROM COLUMBIA.  HE WAS AN ADJUNCT

22   PROFESSOR AT COLUMBIA AS WELL.

23        FOR 30 YEARS HE'S OWNED AND OPERATED A SOFTWARE AND TECH

24   DEVELOPMENT FIRM.  HE'S GOT REAL ENGINEERS WORKING ON REAL

25   PRODUCTS.  HE'S GOT A NUMBER OF STREAMING VIDEO PRODUCTS BACK

1    FROM THE EARLY '90S, AND HE'S BEEN -- HE'S SERVING AS AN EXPERT

2    IN A NUMBER OF CASES.  HE'S BEEN A WITNESS, AS WELL AS A

3    QUALIFIED EXPERT, IN DOZENS OF PATENT CASES.

4        AND DR. POLISH IS GOING TO TALK ABOUT THE STATE OF THE ART

5    AT THE TIME OF THE INVENTION AS OPPOSED TO WHAT WE HAVE TODAY.

6            THE COURT:  ALL RIGHT.  THANK YOU.

7        DR. POLISH, WELCOME, SIR.

8            MR. POLISH:  THANK YOU.

9        I HAVE TO FIGURE OUT HOW TO GET TO MY SLIDES HERE.

10           THE COURT:  I DO ENJOY SEEING ACCOMPLISHED FACULTY

11   STRUGGLING WITH THE LAPTOP.

12           MR. POLISH:  YOUR HONOR, WE'RE NOT IMMUNE.

13           THE COURT:  NOR AM I.  I COULDN'T HELP BUT OBSERVE.

14       (PAUSE IN PROCEEDINGS.)

15           THE COURT:  DR. POLISH, BEFORE I INVITE YOU TO BEGIN

16   YOUR PRESENTATION, MAY I JUST ASK, AS A PRELIMINARY MATTER, IS

17   THERE MUCH OF WHAT DR., PROFESSOR MADISETTI HAD TO SAY THAT YOU

18   DISAGREE WITH?

19           MR. POLISH:  WELL, I'D SAY SOME OF IT I DISAGREE

20   WITH, SOME OF IT I DISAGREE WITH HOW IT'S CHARACTERIZED, AND

21   MOSTLY MY ISSUE WITH IT IS THAT IT'S FROM THE POINT OF WHERE

22   THINGS ARE TODAY RATHER THAN WHERE THINGS WERE AT THE TIME OF

23   THE FILING OF THE '473 PATENT.

24           THE COURT:  OKAY.  WHY DON'T YOU GIVE ME THE HISTORY

25   LESSON I THINK YOU'RE EAGER FOR ME TO HEAR?

1        MR. POLISH:  OKAY.

2     SO AS I SAID, I'M HERE TO TALK ABOUT THE STATE OF STREAMING

3  TECHNOLOGY AT THE TIME OF THE '473 PATENT, WHICH WAS ABOUT

4  1998.

5     TO GIVE IT SOME CONTEXT, THAT WAS A TIME WHEN MOST PEOPLE

6  ACCESSED THE INTERNET VIA DIALUP MODEMS WHICH HAD SPEEDS OF

7  ABOUT 28.8 KILOBAUD.

8     WHEN WE TALK ABOUT DATA RATES OR SPEEDS, THEY'RE REFERRED

9  TO AS BITS PER SECOND, SO YOU'LL HEAR ABOUT KILOBITS PER SECOND

10  OR MEGABITS PER SECOND.  YOU'LL HEAR ABOUT BAUD AND BITS PER

11  SECOND.  BAUD AND BITS PER SECOND MEAN THE SAME THING.  YOU'LL

12  ALSO HEAR ABOUT BYTES, WHICH ARE JUST EIGHT BITS PER BYTE.

13     SO IN THE CONTEXT OF THAT TIMEFRAME, DATA FILES ASSOCIATED

14  WITH MEDIA WERE -- TOOK MANY TIMES LONGER TO DOWNLOAD THAN TO

15  PLAY BACK, SO YOU MIGHT TAKE FIVE TIMES LONGER TO DOWNLOAD

16  SOMETHING THAN TO ACTUALLY PLAY IT.

17     STREAMING WAS JUST GETTING STARTED.

18     OKAY.  SO IN THAT TIMEFRAME, MEDIA, VIDEO, AUDIO, STARTED

19  OFF AS ANALOG.  IT WAS THEN DIGITIZED WITH AN ANALOG TO DIGITAL

20  CONVERTER.

21     IF YOU DO A, AN A TO D CONVERSION OF A VIDEO WITHOUT

22  COMPRESSION, YOU'LL BE GENERATING ABOUT 200 MEGABITS PER

23  SECOND.

24     IN THE CASE OF AUDIO, UNCOMPRESSED AUDIO IS TYPICAL IN

25  CD'S, THAT GIVES YOU ABOUT ONE AND A HALF MEGABITS PER SECOND.

1       THOSE ARE VERY HIGH RATES EVEN BY TODAY'S STANDARDS.

2           THE COURT:  WE'RE STILL COMPRESSING TODAY EVEN WITH

3   MUCH GREATER BANDWIDTH.  FAIR TO SAY?

4           MR. POLISH:  THAT'S CORRECT.

5       FOR AUDIO YOU CAN GET AWAY WITH CD'S WHICH ARE

6   UNCOMPRESSED, BUT WE STILL USE MP3'S, WHICH IS COMPRESSED, AND

7   VIDEO IS ALL COMPRESSED.

8       SO THE WAY YOU DEAL WITH THE HIGH BIT RATES IS YOU USE AN

9   ENCODER, WHICH IS DOING COMPRESSION.  SO ON THE LEFT YOU'LL SEE

10  200 MEGABIT PER SECOND UNCOMPRESSED NTSC VIDEO.  NTSC JUST

11  REFERS TO THE STANDARD FOR NORTH AMERICAN BROADCAST TV.

12      AND THEN THE ENCODER COMPRESSES IT.

13      AND THERE ARE A NUMBER OF STANDARDS THAT PEOPLE USED FOR

14  COMPRESSION, DIFFERENT TECHNIQUES.  MPEG WAS A VERY COMMON ONE.

15  STILL IS.  MPEG IS JUST A PUBLIC STANDARD FOR VIDEO

16  COMPRESSION.

17      THERE ARE DIFFERENT FORMS OF MPEG.  SOME GIVE YOU 1,000

18  KILOBIT PER SECOND, SOME HALF A MEGABIT PER SECOND, SOME A

19  QUARTER MEGABIT PER SECOND.

20      AND THEY'RE USED FOR DIFFERENT PURPOSES.

21      YOU ALSO, AT THE VERY LOW END AT THE TIME, HAD A NUMBER OF

22  PROPRIETARY TECHNOLOGIES, SUCH AS FROM REAL NETWORKS, THAT

23  WOULD GET YOU VIDEO DOWN TO ABOUT 20 KILOBITS PER SECOND.

24  THERE WERE A NUMBER OF COMPANIES THAT WERE DOING THAT AT THE

25  TIME.

1    THE OUTPUT OF THE ENCODER COULD BE STORED IN A FILE FOR

2    LATER PLAY BACK OR IT COULD BE SENT OUT OVER A NETWORK AS A

3    STREAM TO BE CONSUMED BY OTHER COMPUTERS ON THE NETWORK.

4    OKAY.  A LITTLE BIT MORE ABOUT WHAT THESE DIFFERENT DATA

5    RATES WOULD GIVE YOU AND QUALITY LEVELS.

6    SO AT THE TIME, AND STILL TODAY, ALL OF THESE COMPRESSORS

7    ARE USING WHAT'S CALLED PERCEPTUAL CODING.  SO THE COMPRESSORS

8    ALL HAVE KNOWLEDGE OF HOW HUMANS PERCEIVE VIDEO AND AUDIO, AND

9    AS A RESULT, THEY WILL ENCODE THINGS THAT ARE -- THAT HUMANS

10   ARE MORE SENSITIVE TO PERCEIVING AND THEY'LL THROW AWAY THE

11   THINGS THAT HUMANS WON'T EVEN NOTICE.

12   SO THAT CREATES A KIND OF HIERARCHY OF DIFFERENT FEATURES

13   THAT ARE MORE IMPORTANT THAN OTHERS.

14   AT THE HIGH QUALITY LEVEL, YOU MIGHT HAVE A MEGABIT PER

15   SECOND VIDEO, WHICH WOULD LOOK TO BE VERY HIGH QUALITY AND

16   WHICH MIGHT BE USED, AGAIN IN THE 1998 TIMEFRAME, WITHIN

17   COMMERCIAL LANS FOR, SAY, TRAINING VIDEOS.

18   AT THE MEDIUM LEVEL, LET'S SAY A QUARTER MEGABITS PER

19   SECOND, YOU WOULD START TO LOSE SOME OF THE QUALITY, AND THAT

20   WOULD BE APPROPRIATE TO VIDEO CONFERENCING OVER THINGS LIKE

21   ISDN LINES.

22   AND AT THE VERY LOW END, YOU HAD 20 KILOBITS PER SECOND

23   VIDEO, WHICH I DON'T KNOW IF YOU RECALL WHAT THOSE VIDEOS WERE

24   LIKE BACK IN THE DAY, BUT IT WAS EXTREMELY POOR QUALITY, BUT IT

25   WOULD --

         1          THE COURT:  YOU CAN BASICALLY WATCH SOUTH PARK AND

         2    NOT MUCH ELSE, RIGHT?

         3          (LAUGHTER.)

         4          MR. POLISH:  RIGHT.  BUT IT WAS -- IT WAS QUITE A

         5    MIRACLE TO BE ABLE TO WATCH VIDEO ON YOUR --

         6          THE COURT:  IT CERTAINLY WAS.

         7          MR. POLISH:  -- COMPUTER AT THE TIME.

         8    SO THAT WAS SIZED TO WORK OVER DIALUP LINES.

         9          OKAY.  SO ONCE YOU HAD SIZED YOUR VIDEO COMPRESSION TO THE

        10    PARTICULAR DATA CHANNEL YOU WERE TRYING TO STREAM OVER, YOU

        11    STILL HAD A LITTLE BIT MORE WORK TO DO.  YOU HAD TO SEND THE

        12    OUTPUT OF THE ENCODER INTO A STREAMING SERVER, WHICH WAS A

        13    SPECIAL PURPOSE NETWORK SERVER THAT WOULD BROADCAST THE STREAM

        14    OUT OVER A NETWORK TO CLIENTS SO THAT THE CLIENTS COULD THEN

        15    RECEIVE IT AND PLAY IT BACK.

        16          SO THIS IS JUST A DEPICTION OF THIS SET UP FROM THE PRIOR

        17    ART SECTION OF THE PATENT WHICH IS SHOWING A -- I'LL POINT WITH

        18    THIS -- SHOWING THE VIDEO CAMERA SENDING VIDEO TO A REAL-TIME

        19    ENCODER WHICH IS COMPRESSING IT, SENDING THE STREAM TO A

        20    BROADCAST SERVER WHICH IS THEN SENDING IT OUT OVER THE NETWORK

        21    SO THAT ALL THE CLIENT COMPUTERS CAN RECEIVE IT.

        22          AS THE VIDEO COMES IN, IT'S JUST COMPRESSED AND PASSED ON

        23    AND SENT OUT AND THE CLIENT COMPUTERS HAVE TO BE ON THE NETWORK

        24    AND ABLE TO KEEP UP WITH IT IN ORDER FOR THE VIDEO TO BE SEEN.

        25          IF THE COMPUTERS, FOR SOME REASON, CAN'T KEEP UP, THERE

1      WILL BE DEGRADATION OF THE VIDEO.

2           OKAY.  IT WAS ALSO KNOWN PRIOR TO THE FILING OF THE '473

3      PATENT IN 1998 THAT YOU COULD USE A STANDARD NETWORK SERVER, AN

4      HTTP SERVER, TO SEND OUT VIDEO INSTEAD OF A BROADCAST SERVER.

5           AND IN ORDER TO DO THAT, YOU HAD TO SLICE THE VIDEO UP

6      INTO FILES.  SO INSTEAD OF A CONTINUOUS STREAM, YOU WOULD HAVE

7      A SLICER WHICH WOULD SLICE THE VIDEO STREAM INTO FILES WHICH

8      WOULD THEN BE STORED ON THE NETWORK SERVER.

9           YOU COULD SLICE BEFORE YOU ENCODED OR COMPRESSED.  YOU

10     COULD SLICE AFTER.  YOU COULD PACKAGE THE SLICER AS PART OF THE

11     ENCODER.  YOU COULD DO ANY NUMBER OF THOSE THINGS.

12          BUT THE POINT WAS THAT IT WAS KNOWN THAT YOU COULD, YOU

13     COULD SLICE THE STREAM UP AND THEN USE A STANDARD NETWORK

14     SERVER.

15          THE COURT:  AND SO THIS MAY BE EITHER GETTING AHEAD

16     OF MYSELF OR IRRELEVANT TO THE POINT YOU WANTED TO MAKE.

17          YOU BRING UP THE TRANSPORT LAYER AND I'VE JUST NEVER QUITE

18     UNDERSTOOD.  IS THAT -- I TAKE IT THAT THE TRANSPORT LAYER IS

19     ALWAYS HTTP, THAT IT'S WITHIN THE SEVEN LAYERS OF THE

20     CONVENTIONAL STACK?  WE'RE ALWAYS TALKING ABOUT THAT PARTICULAR

21     TRANSPORT LAYER?

22          MR. POLISH:  WELL, FOR WHAT'S CALLED THE WEB.  WHEN

23     WE TALK ABOUT THE WEB, WE GENERALLY REFER TO USING HTTP AS THE

24     TRANSPORT.

25          THE THING ABOUT HTTP IS IT'S TRANSACTION ORIENTED, SO

1    THERE'S A REQUEST FOR SOMETHING TO THE SERVER AND THEN THE

2    SERVER GIVES IT BACK, AS OPPOSED TO A CONTINUOUS STREAM.

3         THE COURT:  SENDS AND ACTS AND ALL THAT?

4         MR. POLISH:  YES.

5    SO WHAT'S GOING TO HAPPEN WITH A BROADCAST SERVER IS THE

6    SYSTEM IS GOING TO SEND A CONTINUOUS STREAM OUT WITHOUT ANY

7    KIND OF ACKNOWLEDGMENT FROM THE CLIENTS.

8    WITH AN HTTP SERVER, THE SERVER IS SITTING THERE WAITING

9    FOR THE CLIENTS TO REQUEST THINGS, AND THEY REQUEST INDIVIDUAL

10   THINGS, SO YOU HAVE TO BREAK DOWN THE STREAM INTO, INTO FILES

11   THAT CAN THEN BE SENT IN RESPONSE TO A REQUEST.

12        THE COURT:  AND IS IT CORRECT FOR ME TO UNDERSTAND IN

13   THIS PARADIGM YOU'RE DESCRIBING THAT THE SERVER IS REALLY A

14   FILE SEVERER?  IT'S JUST -- WE'RE TALKING ABOUT A PARTICULAR

15   KIND OF FILE AND A PARTICULAR METHOD OF DISTRIBUTION, BUT AT

16   THE END OF THE DAY, IT'S SIMPLY SERVING UP FILES LIKE ANY

17   OTHER?

18        MR. POLISH:  AT THE SIMPLEST LEVEL, YES.

19        THE COURT:  THAT'S ABOUT AS FAR AS I KNOW, SO --

20        MR. POLISH:  IT'S FUNDAMENTALLY SERVING UP FILES.

21   THE HTTP SERVERS CAN ALSO EXECUTE CODE ON BEHALF OF THE CLIENT.

22   BUT AT THIS LEVEL --

23        THE COURT:  I TAKE YOUR POINT.

24        MR. POLISH:  -- IT'S SENDING UP DATA -- IT'S

25   RESPONDING TO REQUESTS FOR DATA.

1          THE COURT:  OKAY.

2          MR. POLISH:  OKAY.  SO A LITTLE BIT MORE ABOUT HOW

3    THE ENCODING AND THE SLICING INTERACT.

4          SO THERE'S A TECHNIQUE CALLED CONSTANT BIT RATE ENCODING

5    WHERE WHAT YOU'RE DOING IN THIS EXAMPLE IS YOU WOULD FIRST

6    CHOOSE A DATA RATE, IN THIS CASE 256 KILOBITS PER SECOND, AND

7    THE ENCODER WILL TRY TO KEEP THE DATA RATE AT THAT LEVEL OVER

8    THE COURSE OF THE VIDEO.

9          SO IT MAY VARY UP AND DOWN A FEW PERCENT DEPENDING UPON THE

10   CONTENT OF THE SCENE, BUT IT'S GOING TO TRY TO KEEP THE AMOUNT

11   OF VIDEO PER SECOND AT ABOUT THAT LEVEL.

12         SO IN THE EXAMPLE I HAVE HERE ON THE LEFT IS A SCENE WITH A

13   RUNNER RUNNING WHERE THERE'S GOING TO BE A LOT OF MOTION; IN

14   THE MIDDLE THERE'S A BATTER STANDING STILL WHERE THERE'S ALMOST

15   NO MOTION; AND ON THE RIGHT IS A PLAYER WALKING UP TO A PLATE

16   WHERE THERE'S SOME MOTION.

17         AND IN A CASE -- IN CASES LIKE THIS, WHAT'S GOING TO HAPPEN

18   IS THAT THERE'S GOING TO BE A NEED TO BUDGET MANY OF THE BITS

19   WITHIN THE FRAMES TO TRACKING MOTION ON THE FIRST EXAMPLE, SO

20   THERE WILL BE FEWER BITS AVAILABLE TO ENCODE THINGS LIKE THE

21   BACKGROUND.

22         AND THEN IN THE MIDDLE CASE, THERE'S ALMOST NOTHING GOING

23   INTO MOTION AND A LOT OF BITS AVAILABLE TO DEAL WITH THE

24   BACKGROUND, SO THE RESULT OF THAT IS A SLIGHT VARIATION IN THE

25   SIZE OF THE SLICES THAT ARE THERE, BUT THE OTHER -- BUT THE

1    PROBLEM WITH IT IS THAT THE USER WILL SEE A VARIATION IN

2    QUALITY.

3            THE COURT:  RIGHT.  SO WHEN MR. POSEY IS STANDING AT

4    BAT, YOU MAY SEE A HIGHER FIDELITY IMAGE, BUT AS HE ROUNDS

5    FIRST BASE, THE FIDELITY IMAGE WILL DEGRADE?

6            MR. POLISH:  PRECISELY.  THAT WAS MORE OF AN ISSUE IN

7    1998 BECAUSE BIT RATES WERE ALL MARGINAL.  IT WAS ALL JUST

8    BARELY WORKING.

9            THE COURT:  YOU DIDN'T HAVE A LOT OF ROOM FOR ERROR?

10           MR. POLISH:  RIGHT.  SO YOU WERE JUST BARELY ABLE TO

11   MAKE IT WORK, SO WHEN YOU TOOK BITS AWAY TO ENCODE MOTION, YOU

12   NOTICED IT.

13       ALL RIGHT.  SO ONE OF THE SOLUTIONS TO THAT WAS TO USE

14   VARIABLE BIT RATE ENCODING WHERE YOU ALLOWED THE ENCODER TO

15   DEPART MUCH FURTHER FROM THE SET RATE.  THERE'S STILL A RATE

16   ASSOCIATED WITH IT, BUT YOU'RE LETTING THE ENCODER VARY MUCH

17   MORE WIDELY.

18           THE COURT:  IS IT CORRECT FOR ME TO UNDERSTAND THAT

19   THE WAY THAT -- WELL, ONE WAY TO PROPERLY UNDERSTAND THIS IS

20   THAT THE TOLERANCE FOR THE VARIANCE, OR THE VARIABILITY THAT

21   WAS PERMITTED, WAS JUST SIMPLY EXPANDED?

22       IN OTHER WORDS, IN THE EARLIER EXAMPLE WITH CBR, YOU WERE

23   GIVING -- YOU ACKNOWLEDGED, I THINK, THAT THERE WAS STILL SOME

24   VARIATION.

25           MR. POLISH:  YES.

1          THE COURT:  IS IT TRUE THAT WHAT WE CALL VARIABLE BIT

2     RATE IS SIMPLY THAT THE VARIATION THAT'S PERMITTED IS MUCH

3     GREATER?

4          MR. POLISH:  I THINK THAT'S A REASONABLE WAY TO LOOK

5     AT IT.

6          THE COURT:  OKAY.

7          MR. POLISH:  THERE'S JUST DIFFERENT AMOUNTS OF

8     BUDGETING THAT GOES ON WITHIN THE ENCODERS AS TO HOW THEY

9     ALLOCATE THEIR BITS AND HOW FAR OUT THEY CAN GO.

10        SO WHEN YOU USE VARIABLE BIT RATE, YOU WIND UP WITH MUCH

11    MORE CONSISTENT VIDEO QUALITY, BUT THE SLICES ARE THEN MORE

12    DIFFICULT TO MANAGE ON A NETWORK BECAUSE WHEN YOU'RE DEALING

13    WITH A NETWORK THAT MIGHT BE MARGINAL, YOU'RE NOW GETTING

14    GREATER DEMANDS ON THE NETWORK ONE MOMENT AND LESS DEMANDS ON

15    THE NETWORK THE NEXT MOMENT.

16        AND SO VARIABLE BIT RATE, PARTICULARLY IN 1998, WAS A BIT

17    OF A CHALLENGE, BUT IT WAS SOMETHING THAT THE ENGINEERS HAD A

18    TRADE OFF.

19        THE COURT:  OKAY.

20        MR. POLISH:  ALL RIGHT.  SO BACK TO THE PRIOR ART

21    DEPICTION FROM THE PATENT.

22        AGAIN, YOU HAVE THE CAMERA SENDING INTO VIDEO THE REAL-TIME

23    ENCODER, WHICH IS ENCODING IT AT A CHOSEN BIT RATE APPROPRIATE

24    TO THE CHANNEL, WHICH IS THEN SENDING IT OVER TO THE BROADCAST

25    SERVER AND THE BROADCAST SERVER THEN JUST PASSES IT ALONG TO

1    THE CLIENT COMPUTERS.

2        SO IN THIS SET UP, THERE IS ESSENTIALLY ONE DATA RATE

3    BECAUSE THE ENCODER IS ENCODING AT THIS RATE AND THE BROADCAST

4    SERVER IS SENDING IT OUT AT THAT RATE AND THE CLIENT COMPUTERS

5    EITHER RECEIVE IT OR THERE'S A PROBLEM WITH THE VIDEO, THERE'S

6    SOME KIND OF DEGRADATION THAT OCCURS.

7            THE COURT:  WELL, IF YOU COULD JUST STAY WITH SLIDE

8    10 FOR A MOMENT.

9            MR. POLISH:  YES.

10            THE COURT:  WHAT IS IT -- WELL, WHY IS IT THAT THE

11    DATA RATE WOULD ESSENTIALLY BE THE SAME?  AS I THOUGHT YOU JUST

12    EXPLAINED, AS A DESIGN CHOICE, AN ENGINEER WOULD BE PERFECTLY

13    FREE, WOULDN'T HE OR SHE, TO USE A VBR APPROACH?

14            MR. POLISH:  RIGHT.  WHAT I MEAN IS THE DATA RATE

15    WOULD BE THE SAME ACROSS THE SYSTEM AT ANY GIVEN MOMENT.

16        SO IT MAY BE THAT RIGHT NOW THE DATA RATE IS 256 KILOBITS

17    PER SECOND AND IN TEN SECONDS IT MIGHT BE GREATER.  BUT THE

18    DATA RATE IS GOING TO BE THE SAME AT EACH OF THESE PLACES AT

19    THE SAME TIME.

20            THE COURT:  SO IT MAY BE VARYING WITH TIME, IT'S NOT

21    VARYING WITH SPACE?

22            MR. POLISH:  RIGHT.  BECAUSE OTHERWISE YOU WOULD

23    HAVE -- YOU WOULD HAVE -- YOU WOULD BE FALLING BEHIND OR

24    GETTING AHEAD, AND IN REAL TIME, YOU CAN'T REALLY GET AHEAD

25    BECAUSE YOU CAN'T GET THE VIDEO FROM THE FUTURE.

1    ALL RIGHT.  SO THIS, FIRST OF ALL, IS A DEPICTION OF USING

2    A STANDARD NETWORK SERVER, AN HTTP SERVER, WHERE YOU WOULD HAVE

3    THOSE SLICES SET UP PREVIOUSLY.

4    AND THAT WAS -- AS I SAID, THAT WAS KNOWN IN '98 TO BE ABLE

5    TO DO THAT.

6    WHAT IS BEING DONE IN THE '473 PATENT IS THEY'RE PACKAGING

7    WITHIN THIS TRANSMITTING COMPUTER AN ENCODER AND SLICER THAT

8    TAKES THE VIDEO FROM THE VIDEO CAMERA, COMPRESSES AND SLICES IT

9    UP, SENDS IT OVER TO THE NETWORK SERVER, AND THEN THE CLIENT

10   COMPUTERS IN THIS SET UP THEN REQUEST SLICES FROM THE STANDARD

11   NETWORK SERVER AT A RATE THAT IS SUFFICIENT TO KEEP THEM ABLE

12   TO PLAY.

13   AND IN THIS SET UP, THE DATA RATES ACROSS THIS WHOLE SYSTEM

14   ARE KEPT GENERALLY EQUAL, AND WHAT THE '473 PATENT TEACHES IS

15   THAT YOU HAVE TO -- THAT THESE COMPUTERS HAVE TO COORDINATE

16   WITH EACH OTHER TO KEEP THE DATA RATE OF THE TRANSMITTING

17   COMPUTER, THE STANDARD NETWORK SERVER, AND THE CLIENT COMPUTERS

18   ALL GENERALLY THE SAME.

19        THE COURT:  SO I'M SURE WE'RE GOING TO GET TO THIS IN

20   GREATER DETAIL IN JUST A FEW MINUTES, BUT SINCE YOU'VE GOT THE

21   '473 PATENT UP THERE, I HAVE ONE QUESTION, WHICH IS IN THIS

22   MODEL, AS DESCRIBED IN THE '473 AND CLAIMED IN THE '473, DOES

23   THE PERFORMANCE OF ONE CLIENT IN SOME SENSE DEGRADE, OR PERHAPS

24   ENHANCE, BUT NEVERTHELESS AFFECT OR IMPACT THE PERFORMANCE OF

25   ANY OTHER?  BECAUSE I TAKE IT THAT THE STANDARD NETWORK SERVER

1    NEEDS TO ACCOUNT FOR THE REPLAY RATES ACROSS THE ENTIRETY OF

2    THE CLIENT SET.

3         MR. POLISH:  WELL, OKAY.  THERE'S NOTHING THAT I'M

4    AWARE OF IN THE '473 THAT'S DISCUSSING THAT.

5        IN THE CASE OF HOW IT WOULD OPERATE IN THAT TIMEFRAME --

6    BECAUSE I BUILT SYSTEMS LIKE THIS IN THAT TIMEFRAME -- THERE'S

7    A GENERAL CAPACITY OF THAT NETWORK SERVER TO DELIVER DATA.  SO

8    THERE'S SOME -- THERE'S SOME BANDWIDTH THAT THAT COMPUTER CAN

9    PROVIDE, SOME VERY LARGE NUMBER, BUT IT'S SOME AMOUNT OF

10   BANDWIDTH.

11       AND IF YOU'RE GETTING CLOSE TO SOME MAXIMUM AND ONE OF THE

12   CLIENTS DROPS OUT, NOW YOU HAVE MORE ROOM TO SERVICE OTHER

13   CLIENTS.

14        THE COURT:  RIGHT.  AND -- OKAY.  I THINK THAT

15   ANSWERS MY QUESTION.

16        MR. POLISH:  OKAY.  SO THAT'S ALL I HAVE, SO IF YOU

17   HAVE ANY FURTHER QUESTIONS FOR ME, THAT'S FINE.

18        THE COURT:  OKAY.  I APPRECIATE THAT, DR. POLISH.

19   THANK YOU VERY MUCH.

20        MR. PAVANE:  COULD YOU LEAVE THAT UP FOR A SECOND?

21        MR. POLISH:  SURE.

22        THE COURT:  ALL RIGHT.  ANY FURTHER PRELIMINARY

23   REMARKS OR SHOULD WE TURN TO THE TERMS AT ISSUE?

24        MR. PAVANE:  I THINK WE CAN, IF THAT'S ALL RIGHT.

25        MR. DECARLO:  I THINK WE CAN.  WE'VE AGREED TO THE

1    TERMS WE'RE GOING TO USE.

2         MR. PAVANE:  I WOULD JUST LIKE TO POINT OUT ONE

3    THING, IF I MIGHT, YOUR HONOR?

4         THE COURT:  YOU MAY.

5         MR. PAVANE:  I THINK WE ALL UNDERSTAND THIS, BUT

6    THESE CLIENT COMPUTERS THAT WERE SHOWN ON THE SCREEN,

7    TYPICALLY AS I THINK DR. MADISETTI AND DR. POLISH BOTH

8    INDICATED, THERE COULD BE TENS OF THOUSANDS OF THEM OUT THERE.

9         AND ADDRESSING YOUR LAST POINT, EACH ONE OF THOSE COMPUTERS

10   CAN BE, FOR EXAMPLE, AS DR. MADISETTI INDICATED, REQUESTING

11   THAT DATA FROM THAT STANDARD NETWORK SERVER AT A DIFFERENT BIT

12   RATE DEPENDING ON ITS OWN PARTICULAR LINK BETWEEN THE SERVER

13   AND THAT PARTICULAR CLIENT COMPUTER, WHICH MIGHT BE A HANDHELD

14   DEVICE OR WHATEVER IT MAY BE.  I THINK THAT'S JUST AN

15   EXEMPLARY.

16        THE COURT:  ALL RIGHT.  I APPRECIATE THAT POINT.

17        MR. PAVANE:  OKAY.

18        THE COURT:  OKAY.  WHY DON'T WE START WITH WHAT I

19   UNDERSTAND IS THE FIRST TERM, WHICH IS "REAL-TIME

20   BROADCASTING."

21        MR. PAVANE:  YES.  OKAY.

22     CAN YOU JUST GIVE ME A HAND HERE GETTING THAT OFF?

23     (PAUSE IN PROCEEDINGS.)

24        MR. PAVANE:  OKAY.  SO I'M SURE YOUR HONOR HAS LOOKED

25   AT CLAIM 1.  I'M ASSUMING THAT -- YOU'VE GOT THE PATENT IN

1    FRONT OF YOU.  GREAT.

2        OKAY.  SO THE FIRST TERM THAT THE PARTIES ARE DISPUTING IS

3    THE TERM "REAL-TIME BROADCASTING," AND I DON'T THINK THERE'S A

4    TERRIFIC DISPUTE HERE BETWEEN THE PARTIES CONCERNING THOSE

5    TERMS.

6        OUR CONSTRUCTION IS THAT IT'S "A BROADCAST DATA STREAM THAT

7    IS RECEIVED AT ONE OR MORE CLIENTS WITHOUT SUBSTANTIAL DELAY

8    AFTER THE BROADCAST."

9        AND APPLE'S CONSTRUCTION IS "COMMUNICATING A DATA STREAM

10   THAT IS RECEIVED AT ONE OR MORE CLIENTS SIMULTANEOUSLY WITH

11   MINIMAL DELAY."

12       OKAY.  AND THE REAL -- THE ONLY DISPUTE HERE BETWEEN THE

13   PARTIES REALLY RELATES TO THE USE OF THE TERM "COMMUNICATING."

14       WE ALWAYS GET CONCERNED WHEN SOMEBODY BRINGS IN ANOTHER

15   WORD TO DEFINE ANOTHER TERM THAT SEEMS PERFECTLY CLEAR IN

16   ITSELF.  BROADCASTING IS BROADCASTING.  I THINK WE ALL KNOW

17   WHAT A BROADCAST IS.  I DON'T THINK A JURY IS GOING TO HAVE

18   PROBLEMS UNDERSTANDING WHAT A BROADCAST IS.

19       AND I HAVE NO IDEA WHAT SPIN APPLE MIGHT PUT ON THE WORD

20   "COMMUNICATING."  I DON'T KNOW.  BUT SINCE THAT'S NOT DEFINED,

21   I DON'T KNOW WHAT THAT MEANS.

22       BUT I KNOW WHAT "BROADCASTING" MEANS.  SO WE THINK IF IT

23   SAYS "REAL-TIME BROADCASTING," IT SHOULD BE "A BROADCAST."

24       THE SECOND THIS IS --

25           THE COURT:  BEFORE YOU GET TO YOUR SECOND POINT, I

1      JUST WANT TO ASK YOU ABOUT YOUR PREFERRED TERM.

2           I TAKE IT FROM YOUR COMMENT JUST NOW YOU WOULD HAVE NO REAL

3      PROBLEM IF THE COURT WERE TO SIMPLY SAY "BROADCASTING" RATHER

4      THAN "A BROADCAST DATA STREAM"?

5           THE REASON I ASK IS WE'RE SUBSTITUTING, IF I REMEMBER GRADE

6      SCHOOL ENGLISH CORRECTLY, A STRAIGHT UP NOUN FOR A GERUND, AND

7      I'M JUST --

8                MR. PAVANE:  A GERUND, RIGHT.  I REMEMBER THAT, TOO.

9                THE COURT:  OKAY.  SO I'M JUST CURIOUS ABOUT WHETHER

10     YOU -- YOUR MOST IMPORTANT POINT HERE IS THAT "BROADCAST" OUGHT

11     TO CAPTURE WHATEVER FORM OF THE WORD WE USE.

12               MR. PAVANE:  YOUR ASSUMPTION IS CORRECT.  I WOULD

13     HAVE NO OBJECTION.

14               THE COURT:  OKAY.

15               MR. PAVANE:  AND THEN THE OTHER QUESTION IS ABOUT

16     "SUBSTANTIAL DELAY."

17          I'M SORRY.  THE NEXT ONE IS ABOUT "SIMULTANEOUSLY."  IT

18     SAYS IT HAS TO BE "RECEIVED AT ONE OR MORE CLIENTS

19     SIMULTANEOUSLY."

20          NOW, AGAIN, I THINK WE ALL AGREE ON THE CONCEPT THAT IN

21     REAL-TIME STREAMING, IT'S GOING OUT TO ALL CLIENTS AND WHOEVER

22     HAPPENS TO TURN IT ON AND LOOK AT IT, THEY'RE ALL GOING TO SEE

23     IT AT CERTAINLY ABOUT THE SAME TIME.

24          BUT, AGAIN, MY CONCERN IS I DON'T WANT TO HEAR, IN FRONT OF

25     THE JURY, THAT "OH, NO, NO.  THEY HAVE TO RECEIVE IT AT THE

1    EXACT SAME MOMENT, AND UNLESS THAT'S HAPPENING, THERE'S NO

2    INFRINGEMENT."

3         SO THAT'S MY PROBLEM WITH THE TERM "SIMULTANEOUSLY."  IF

4    ALL IT'S INTENDED TO MEAN IS THE FACT THAT IT GOES OUT TO ALL

5    THE CLIENTS AT THE SAME TIME, AND IF THEY TURN IT ON, THEY'RE

6    GOING TO GET IT AT ABOUT THE SAME TIME, WELL, I AGREE WITH

7    THAT.

8         BUT SINCE I DON'T KNOW, AGAIN, WHAT SPIN IS GOING TO BE PUT

9    ON THAT DOWN THE ROAD, I DON'T WANT TO AGREE TO THAT.

10         AND THEN THE LAST THING IS THE "WITHOUT SUBSTANTIAL DELAY."

11         AND AGAIN, THE PATENT TALKS IN MANY PLACES ABOUT THE FACT

12    THAT THERE'S A -- LET'S SEE, THERE'S -- IT TALKS ABOUT, FOR

13    EXAMPLE, AT COLUMN 7, LINES 4 TO 50 -- I WON'T GO THROUGH ALL

14    OF THESE -- BUT IT SAYS "SUBSTANTIALLY IN REAL-TIME."

15         SO SUBSTANTIAL, "WITHOUT SUBSTANTIAL DELAY" SEEMS TO

16    CAPTURE THAT PERFECTLY.

17         AND MOREOVER, THAT'S ONE OF THOSE TERMS THAT THE FEDERAL

18    CIRCUIT HAS REPEATEDLY SAID IS ACCEPTABLE IN CLAIMS,

19    "GENERALLY," "SUBSTANTIALLY," AND WE CITED SOME CASES FOR THAT.

20    I'M NOT GOING TO BORE YOU WITH THAT.

21         SO THOSE ARE THE ISSUES WHERE WE DON'T SEE WHY IT SHOULD

22    BE -- AGAIN, "MINIMAL DELAY," I DON'T KNOW WHAT THAT MEANS

23    EXACTLY, WHAT SPIN IS GOING TO BE PUT ON THAT.

24         I MEAN, "SUBSTANTIAL" IS A WORD THAT THE FEDERAL CIRCUIT

25    HAS KIND OF PUT ITS STAMP OF APPROVAL ON.  THE PATENT TALKS

1    ABOUT "SUBSTANTIALLY IN REAL-TIME."

2         SO IT SEEMS TO ME THAT, AGAIN, SUBJECT TO YOUR HONOR'S

3    POINT ABOUT MAYBE CHANGING "A BROADCAST DATA STREAM" TO

4    "BROADCASTING TO ONE OR MORE CLIENTS WITHOUT SUBSTANTIAL DELAY

5    AFTER THE BROADCAST," WHICH I COULD CERTAINLY LIVE WITH, THAT'S

6    WHERE WE COME OUT ON THAT.

7              THE COURT:  DO YOU THINK THERE'S A MATERIAL

8    DIFFERENCE BETWEEN "WITHOUT SUBSTANTIAL DELAY" AND "WITH

9    MINIMAL DELAY"?

10        IN OTHER WORDS, CAN ONE BROADCAST WITHOUT SUBSTANTIAL DELAY

11   AND NOT BROADCAST WITH MINIMAL DELAY?  I'M TRYING TO --

12             MR. PAVANE:  YOU KNOW, THAT'S A VERY GOOD QUESTION.

13        AND AGAIN, THE ANSWER TO THAT QUESTION IS I DON'T KNOW

14   BECAUSE I DON'T KNOW WHAT, WHAT EXACTLY "MINIMAL DELAY" WOULD

15   MEAN DIFFERENT THAN "WITHOUT SUBSTANTIAL DELAY," WHICH IS KIND

16   OF WHAT THE PATENT TALKS ABOUT, BEING SUBSTANTIALLY IN

17   REAL-TIME.

18        SO, YOU KNOW, IF SOMEBODY IS GOING TO STAND UP HERE AND ON

19   THE RECORD SAY THOSE MEAN THE SAME THING, IF APPLE WILL SAY

20   THAT, THEN I IMAGINE DOWN THE ROAD IF SOMEBODY SAID SOMETHING

21   DIFFERENT, WE WOULD HAVE A RESPONSE.

22        BUT WITHOUT HEARING FROM APPLE BEYOND SEEING THE WORDS

23   "MINIMAL DELAY," I HONESTLY DON'T KNOW.

24             THE COURT:  ALL RIGHT.  I APPRECIATE YOUR POINT.

25             MR. PAVANE:  THANK YOU, YOUR HONOR.

1          THE COURT:  THANK YOU.

2      WHO WILL SPEAK FOR APPLE?

3          MR. DECARLO:  I WILL SPEAK FOR APPLE, YOUR HONOR, ON

4   THIS ISSUE.

5      THANK YOU, MARK.

6      SO IT'S MY TURN TO FUMBLE, IS IT?

7      (PAUSE IN PROCEEDINGS.)

8          MR. DECARLO:  THANK YOU, YOUR HONOR.

9      MR. PAVANE TALKED ABOUT THE FACT THAT WE HAVE DISCUSSED

10  CLAIM 1 AND I'D JUST LIKE TO SET THE CONTEXT A LITTLE BIT WITH

11  RESPECT TO THE PATENT THAT WE'RE TALKING ABOUT HERE.

12      IT'S TALKING ABOUT NETWORK BROADCASTING.  THE PATENT

13  ITSELF DESCRIBES NETWORK BROADCASTING AS "DATA THAT'S

14  TRANSMITTED OVER A NETWORK IN REAL-TIME FROM A SINGLE

15  TRANSMITTING COMPUTER TO A PLURALITY OF CLIENTS

16  SIMULTANEOUSLY."

17      SO APPLE'S CONSTRUCTION WAS INTENDED TO FOLLOW THE

18  LANGUAGE OF THE SPECIFICATION ITSELF IN SETTING THE STAGE,

19  ESPECIALLY IN THE CONTEXT OF THIS CLAIM TERM, WHICH IS FOUND IN

20  THE PREAMBLE, AND SETS REALLY THE CONTEXT FOR THE CLAIM.

21      AND IN DISCUSSING --

22          THE COURT:  I'M SORRY FOR INTERRUPTING YOU, COUNSEL,

23   AND THIS QUESTION COULD HAVE BEEN JUST AS EASILY AND FAIRLY

24   IMPOSED OF YOUR COLLEAGUE.

25      I TAKE IT FROM EACH OF YOU REQUESTING A CONSTRUCTION OF

1    THIS TERM THAT EACH PARTY AGREES THAT THE FACT THAT THE TERM IS

2    IN THE PREAMBLE OF THE CLAIM IS OF NO MOMENT, THAT IT DOES, IN

3    FACT, SERVE AS A LIMITATION ON THE INVENTION.

4          MR. DECARLO:  WELL, I THINK IT IS A LIMITATION IN THE

5    SENSE THAT IT HAS TO BE CONSTRUED BECAUSE IT SETS THE CONTEXT

6    FOR THE CLIENT.

7        THE WAY YOU WOULD CONSIDER SOMETHING IN A REAL-TIME

8    ENVIRONMENT IS DIFFERENT THAN IN A BATCH ENVIRONMENT OR IN AN

9    ENVIRONMENT WHERE YOU'RE NOT DEALING WITH AN APPLICATION THAT'S

10   CRITICAL.

11         THE COURT:  OKAY.

12         MR. DECARLO:  SO I DO THINK THAT IT'S A LIMITATION IN

13   THE SENSE THAT, AS THE PREAMBLE, ALL -- AS IT USUALLY DOES, IT

14   SETS IN THIS PARTICULAR INSTANCE A VERY SPECIFIC CONTEXT, AND

15   THAT IS WE'RE TALKING ABOUT REAL-TIME BROADCASTING, AND THE

16   PATENT ITSELF, AT ITS VERY OUTSET, DISCUSSES REAL-TIME

17   BROADCASTING AS BROADCASTING TO A NUMBER OF CLIENTS

18   SIMULTANEOUSLY.

19         THE COURT:  I WAS MERELY SEEKING TO CONFIRM THAT THE

20   PARTIES ARE NOT ASKING ME TO CONSTRUE A TERM THAT ONE OR BOTH

21   THINK HAS NO EFFECT WHATSOEVER ON WHAT IS CLAIMED.

22       IN OTHER WORDS, IT WOULD BE SOMEWHAT OF AN EXERCISE IN

23   FUTILITY.

24         MR. DECARLO:  NO.  I THINK BOTH SIDES AGREE THAT THIS

25   PREAMBLE MUST BE CONSTRUED, YOUR HONOR.

1              MR. PAVANE:  I CONCUR.

2              THE COURT:  ALL RIGHT.  GO ON.  I INTERRUPTED YOU.

3              MR. DECARLO:  I THINK THE PRINCIPAL NATURE OF OUR

4    DISPUTE -- AND IF I CAN GET TO OUR CLAIMS A LITTLE MORE QUICKLY

5    HERE, THE SLIDES -- IS THAT WE HAVE AN ISSUE WITH THE TERM

6    "SIMULTANEOUSLY," AS YOU'VE HEARD, AND ALSO WITH "MINIMAL"

7    VERSUS "SUBSTANTIAL DELAY."

8         AND I'D LIKE TO TALK ABOUT THAT A LITTLE BIT, YOUR HONOR,

9    BECAUSE I THINK THAT WHILE THOSE TERMS APPEAR ON THEIR FACE TO

10   BE SOMEWHAT SIMILAR, I THINK THAT THE CONNOTATION -- AND AGAIN,

11   WE'RE TRYING TO FIND A CONSTRUCTION THAT'S GOING TO ASSIST THE

12   FACT FINDER, IT'S GOING TO ASSIST, IN THE CONTEXT OF THE

13   PATENT, THE PERSON OF SKILL TO MAKE AND USE THIS INVENTION, AND

14   THESE WORDS HAVE MEANING.

15        SO WITH RESPECT TO "COMMUNICATING," I THINK -- JUST AS

16   MR. PAVANE INDICATED THAT PEOPLE KNOW WHAT "BROADCAST" MEANS, I

17   THINK PEOPLE ALSO KNOW WHAT "COMMUNICATE" MEANS, AND THAT MEANS

18   EXCHANGING DATA, CREATING -- COMMUNICATION BETWEEN TWO PEOPLE

19   IS EXCHANGING INFORMATION, GETTING IT FROM ONE PLACE TO

20   ANOTHER, AND I THINK THAT THAT'S UNDERSTOOD BY MOST TO BE A ONE

21   TO MANY CONCEPT AND I THINK THERE'S A DISPUTE IN THAT RESPECT.

22        BUT THE SPECIFICATION TEACHES THAT IN THE CONTEXT OF THIS

23   INVENTION, IT IS A CONCEPT THAT IS SOMETHING THAT HAPPENS TO A

24   PLURALITY OF CLIENTS SIMULTANEOUSLY.

25              THE COURT:  SO WHAT EXACTLY DOES "COMMUNICATING" DO

1    FOR THE JURY ABOVE AND BEYOND "BROADCASTING"?

2         MR. DECARLO:  YOUR HONOR, I THINK THEY ARE CLOSE

3    ENOUGH TERMS THAT IF, IN FACT, WE LEFT IT AS "BROADCASTING," WE

4    CAN PROBABLY STRIKE AN AGREEMENT.

5     I THINK THAT THE TRUE ISSUES ARE GOING TO SURROUND

6    "SIMULTANEOUSLY" AND "MINIMAL DELAY."

7         THE COURT:  OKAY.

8         MR. DECARLO:  AND I DO THINK --

9         MR. PAVANE:  I ACCEPT.

10        THE COURT:  WELL, LET'S GET TO IT.

11        MR. DECARLO:  SO IN THE CONTEXT OF THE SIMULTANEITY

12    ASPECT OF IT, I THINK PEOPLE UNDERSTAND IF YOU'RE WATCHING A

13    SHOW AND I'M WATCHING A SHOW AND YOU TUNE IN, YOU'RE GOING TO

14    BE WATCHING IT AT THE SAME TIME I'M WATCHING IT, AND THAT'S THE

15    CONCEPT THAT THE PATENT TEACHES.

16     BUT ALSO, YOUR HONOR, THE ISSUE OF "MINIMAL DELAY" --

17        THE COURT:  BEFORE YOU GET TO "MINIMAL DELAY," I WANT

18    TO MAKE SURE I APPRECIATE YOUR POSITION ON "SIMULTANEOUSLY."

19     BY USING THIS TERM, OR URGING ITS INCORPORATION INTO THE

20    DEFINITION, YOU'RE SIMPLY SEEKING TO CONVEY TO THE JURY THAT

21    EACH OF THE CLIENTS IS ENGAGED WITH THE DATA STREAM AT THE SAME

22    TIME?

23        MR. DECARLO:  THAT'S FAIR.

24        THE COURT:  THEY'RE WATCHING THE SAME PROGRAM?

25        MR. DECARLO:  THAT'S A CORRECT ALLOCATION, YOUR

1    HONOR.  WE'RE REAL-TIME STREAMING OF SOME EVENT.

2           THE COURT:  OKAY.

3           MR. DECARLO:  AND BECAUSE IT'S REAL-TIME STREAMING,

4    WE'RE ALL EXPERIENCING IT AT THE SAME TIME.

5           THE COURT:  OKAY.

6           MR. DECARLO:  SIMULTANEOUSLY.

7           THE COURT:  BECAUSE THAT CONCEPT I TEND TO

8    UNDERSTAND.

9       WHAT CONFUSED ME IN READING THE PAPERS EARLIER WAS THAT IF

10   EACH OF YOU IS ACKNOWLEDGING THAT THERE MAY BE SOME DELAY --

11          MR. DECARLO:  YES.

12          THE COURT:  -- HOWEVER YOU CHOOSE TO PHRASE IT --

13          MR. DECARLO:  YES.

14          THE COURT:  -- BY DEFINITION, BECAUSE LATENCY CAN

15   VARY ACROSS A NETWORK, IT MAY BE THE CASE THAT A SET OF FILES,

16   A GIVEN FILE, ARRIVES AT CLIENT 1 AT A SLIGHTLY DIFFERENT TIME

17   THAN AT CLIENT 2.

18      WOULD YOU DISAGREE WITH THAT?

19          MR. DECARLO:  I WOULD NOT DISAGREE WITH THAT.

20          THE COURT:  ALL RIGHT.  GO AHEAD.

21          MR. DECARLO:  BUT THE -- AGAIN, GOING BACK TO THE

22   CLAIM TERM, "COMMUNICATING A DATA STREAM THAT IS RECEIVED AT

23   ONE OR MORE CLIENTS," THE "MINIMAL DELAY" CONCEPT IS NOT

24   SOMETHING THAT WE CREATED OUT OF WHOLE CLOTH.  WE ARE

25   ACTUALLY -- THIS IS THE LANGUAGE THAT'S ACTUALLY FROM THE

1    SPECIFICATION.

2        I KNOW MR. PAVANE REFERRED TO "SUBSTANTIALLY IN REAL-TIME,"

3    BUT "SUBSTANTIALLY IN REAL-TIME," OR "REAL-TIME" AS IT'S

4    DESCRIBED IN THE PATENT, IS ACTUALLY DESCRIBED IN THE PATENT

5    AND IT GIVES NUMEROUS EXAMPLES THAT THE SEQUENCE HAS TO BE

6    "PLAYED BACK JUST AS IT WAS INPUT, PREFERABLY WITH ONLY A

7    MINIMAL NECESSARY TRANSMISSION AND DECODING DELAY."

8        THAT'S STRAIGHT FROM THE PATENT, AS IS THE NEXT QUOTE,

9    "SUBSTANTIALLY IN REAL-TIME, PREFERABLY WITH ONLY A MINIMAL

10   LAG."

11       THAT'S THE CONTINUATION OF THE QUOTE THAT MR. PAVANE RELIED

12   UPON.

13       I WOULD ALSO POINT OUT, YOUR HONOR, THAT AS YOU READ THIS

14   PATENT, YOU'LL HEAR "SEQUENCE" AND "STREAM."  THOSE TERMS ARE

15   USED INTERCHANGEABLY.  THEY GENERALLY RELATE TO THE DATA STREAM

16   THAT'S GOING TO BE COMING OUT OF THE TRANSMITTING COMPUTER.

17            THE COURT:  SO IT SEEMS THAT PARTICULARLY -- LET'S GO

18   BACK TO SLIDE 20, OR 19 RATHER.

19            MR. DECARLO:  YES.

20            THE COURT:  AS ONE EXAMPLE, YOU CITE TO COLUMN 10 AND

21   IT SEEMS TO EXPLICITLY REFER TO A PREFERRED EMBODIMENT IN THAT

22   LANGUAGE.  DOES THAT -- DOES THAT GIVE YOU PAUSE, OR SHOULD

23   THAT GIVE ME PAUSE?

24            MR. DECARLO:  I DON'T THINK IT SHOULD GIVE YOU PAUSE,

25   YOUR HONOR.  I'M NOT SURE THAT I AGREE THAT IT'S A SPECIFIC

1     EMBODIMENT.

2          IF YOU NOTICE, THIS CLAIM IS -- THIS PATENT IS WRITTEN IN A

3     FORM WHERE EVERYTHING IS PREFERABLE.

4          THE COURT:  I DID SEE THAT.

5          MR. DECARLO:  IT COULD BE THIS.  IT COULD BE THAT.

6          SO TO THE EXTENT THAT THE PATENT TRIES TO CAPTURE EVERY

7     PERMUTATION, I THINK THAT WHEN YOU LOOK AT THIS LANGUAGE,

8     ESPECIALLY IN THE SECTIONS THAT WE'RE REFERRING TO, IT'S NOW

9     DESCRIBING WHAT IS THE RESULT, HOW DO WE GET THERE?  WHAT ARE

10    WE TRYING TO DO?

11         AND AGAIN, THIS TERM IS IN THE PREAMBLE.  WE'RE SETTING THE

12    CONTEXT OF THE INVENTION THAT'S ABOUT TO BE RECITED IN THE

13    REMAINING CLAIM, IN THE REMAINING PORTION OF THE CLAIM.

14         THE COURT:  WHAT INACCURACY, OR POTENTIAL HERE DO YOU

15    FEAR FROM THE USE OF THE PRASE "WITHOUT SUBSTANTIAL DELAY" AS

16    CONTRASTED WITH "WITH MINIMAL DELAY"?

17         MR. DECARLO:  I THINK THAT'S A FAIR QUESTION, YOUR

18    HONOR, AND WE HAVE SOME EXAMPLES.

19         I THINK THAT, FIRST OF ALL, WE'RE USING THE SPECIFICATION

20    AS OUR GUIDE.

21         BUT I THINK WHAT HAPPENS IN THE CONTEXT OF "WITHOUT

22    SUBSTANTIAL DELAY" IS THAT IT DILUTES THE URGENCY OF WHAT THE

23    PATENT IS TRYING TO DO, TO PRESENT THIS IN REAL-TIME, TO

24    PRESENT IT WITH MINIMAL DELAY.  SO IT FAILS TO CONVEY THE

25    URGENCY.

1          AND I THINK THAT "MINIMAL" IS QUANTIFIABLE BY A PERSON,

2     RIGHT?  SHOOT FOR THE MINIMAL AMOUNT OF TIME.  GET THERE

3     WITHOUT SUBSTANTIAL DELAY.

4          SO IF YOU'RE A JUROR OR IF YOU'RE A DESIGNER TRYING TO

5     BUILD THIS AND THIS IS WHAT THE PATENT TEACHES YOU, I THINK

6     THAT YOU ARE -- WHILE THE TERMS SUPERFICIALLY AND UNRELATED TO

7     THE CONTEXT OF THE INVENTION MIGHT APPEAR TO BE SIMILAR,

8     THEY'RE FRAUGHT WITH MEANING WHEN YOU APPLY THEM TO THE

9     TECHNOLOGY THAT YOU'RE ACTUALLY TRYING TO CREATE FROM THIS

10    INVENTION.

11          THE COURT:  SO LET ME OFFER ONE POSSIBILITY WHERE

12    THIS DISTINCTION MIGHT ACTUALLY MAKE A DIFFERENCE.

13          MR. DECARLO:  UM-HUM.

14          THE COURT:  IT WOULD SEEM TO ME THAT IF WE WERE

15    TALKING ABOUT BROADCASTING WITH SOME DELAY, "SOME" MIGHT

16    CONNOTE MORE THAN MINIMAL DELAY, BUT LESS THAN SUBSTANTIAL

17    DELAY, AND SO THAT GRAY AREA, IT MIGHT ACTUALLY MAKE A

18    DIFFERENCE.

19          WOULD YOU AGREE WITH THAT?

20          MR. DECARLO:  I DO.  AND AGAIN, GOING BACK TO THE

21    SPECIFICATION, YOUR HONOR, IT POINTS TO THINGS LIKE VIDEO

22    CONFERENCING.

23          WELL, THERE I THINK YOU COULD GET MOST OF US TO AGREE THAT

24    ONLY THE MINIMAL AMOUNT OF DELAY WOULD BE ACCEPTABLE.

25          WHAT IS "WITHOUT SUBSTANTIAL DELAY" WHEN YOU'RE TALKING

1  ABOUT A VIDEO CONFERENCE?  THE MINIMUM AMOUNT YOU CAN DESIGN IN

2  THE SYSTEM, RIGHT?

3      SO I THINK THAT THE CONNOTATION OF THE TERM MORE CLOSELY

4  HUES TO THE CONTEXT AND WHAT WAS INTENDED BY THIS INVENTION.

5      AND THERE'S -- YOU KNOW, YOUR HONOR, THE DICTIONARY THAT

6  WAS PROVIDED ACTUALLY, BY EMBLAZE TO DESCRIBE THIS TERM, TALKS

7  ABOUT WHAT REAL-TIME IS AND HOW IT'S UNDERSTOOD BY PERSONS OF

8  SKILL.  THIS IS A DICTIONARY FROM THE TIME THAT THE PATENT WAS

9  FILED, AND IT TALKS ABOUT THINGS LIKE A REAL-TIME OPERATION,

10  MATCHING THE MACHINES THAT INCLUDES THE HUMAN PERCEPTION,

11  CHARACTERISTIC OF AIRCRAFT GUIDANCE SYSTEMS."

12      SO I ASK YOU, AND I THINK A JURY WOULD UNDERSTAND THIS,

13  WOULD YOU RATHER BE ON A PLANE WITH A GUIDANCE SYSTEM THAT

14  RESPONDS TO AN EMERGENCY WITH THE MINIMUM AMOUNT OF DELAY, OR

15  WITHOUT SUBSTANTIAL DELAY?

16      I THINK THAT THE JURY WOULD BE BETTER SUITED IN APPLYING

17  THIS PATENT AND THIS TECHNOLOGY WITH TERMS THAT MORE CLOSELY GO

18  TO WHAT THE SPECIFICATION SAYS.

19          THE COURT:  DO YOU THINK A JURY IN 2013 MIGHT VOTE

20  THE SAME WAY AS A JURY IN 1998?  IN OTHER WORDS, DOES THE TIME

21  OF THIS PATENT MATTER TO THIS QUESTION?

22          MR. DECARLO:  WELL, THE CLAIM CONSTRUCTION, WE ARE

23  TRYING TO UNDERSTAND AND GIVE MEANING, GIVE A CONSTRUCTION, AS

24  PHILLIPS TEACHES US, AT THE TIME THAT THE INVENTION WAS MADE.

25          THE COURT:  I HAVE TO LOOK AT THIS THROUGH THE LENS

1    OF 1998.

2            MR. DECARLO:  YOU HAVE TO LOOK AT THIS THROUGH THE

3    LENS OF 1998, YOUR HONOR.

4            THE COURT:  ALL RIGHT.

5            MR. DECARLO:  AND SO I THINK UNLESS YOU HAVE ANY

6    FURTHER QUESTIONS, APPLE'S PROPOSED CONSTRUCTION WITH BOTH THE

7    SIMULTANEITY AND THE MINIMAL DELAY I THINK IS THE MORE

8    APPROPRIATE CONSTRUCTION HERE.

9            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

10       ANY BRIEF RESPONSE?  OF COURSE.

11           MR. PAVANE:  YEAH, I WOULD LIKE TO HAVE A BRIEF

12   RESPONSE.

13           THE COURT:  GO AHEAD, MR. PAVANE.

14           MR. PAVANE:  I DON'T NEED THE VIDEO.  THANK YOU.

15       JUST VERY BRIEFLY, YOUR HONOR, A COUPLE POINTS I WANT TO

16   MAKE.

17       FIRSTLY, I THINK FOR THE ISSUE OF SIMULTANEITY, MR. DECARLO

18   CITES TO -- HE CITED YOU TO COLUMN 1, LINES 15 TO 17, THE VERY

19   FIRST LINE TALKING ABOUT THE BACKGROUND OF THE INVENTION.

20       PUTTING ASIDE THAT IT'S NOT TALKING ABOUT THIS INVENTION,

21   BUT THE BACKGROUND OF THE INVENTION, NEVERTHELESS, IF YOU READ

22   THAT SENTENCE CAREFULLY, IT'S NOT TALKING ABOUT RECEIVING THE

23   BROADCAST SIMULTANEOUSLY AT THE CLIENT.  IT'S TALKING ABOUT

24   TRANSMITTING IT SIMULTANEOUSLY TO THE CLIENT.  THERE'S A BIG

25   DIFFERENCE.

1    SO THE SIMULTANEITY IS NOT ON THE RECEIVING SIDE.  IT'S ON

2    THE TRANSMITTING SIDE.  THAT'S THE FIRST POINT.

3    THE SECOND POINT IS -- AND AGAIN WE GOT INTO THIS QUESTION

4    OF "COMMUNICATING" VERSUS "BROADCASTING," AND I THINK MAYBE

5    WE'RE PAST THAT AND THAT MAYBE YOUR HONOR HAS SETTLED ON

6    "BROADCASTING," IN WHICH CASE I'LL SKIP OVER THAT PARTICULAR

7    POINT.

8    AND THEN THE LAST POINT ON THIS ISSUE OF DELAY, "MINIMAL

9    DELAY" VERSUS "SUBSTANTIAL DELAY," WELL, FIRSTLY, AGAIN, I

10   THINK I STARTED TO SEE EXACTLY, YOU KNOW, WHAT I FEARED AND

11   WHAT'S GOING TO BE -- WHAT I'M GOING TO HEAR IN FRONT OF THE

12   JURY AND THEN WE'RE GOING TO START ARGUING ABOUT HOW MUCH TIME

13   IS "MINIMAL" VERSUS "SUBSTANTIAL."

14   AGAIN, THE PATENT IS VERY CLEAR.  IT SAYS, FOR EXAMPLE, IN

15   COLUMN 7 THAT THE -- COLUMN 7, LINE 4, IT SAYS, "CLIENTS

16   CONNECT TO THE SERVER AND RECEIVE THE MULTIMEDIA SUBSTANTIALLY

17   IN REAL-TIME."  THAT'S WHAT IT SAYS.

18   NOW, AS YOUR HONOR CORRECTLY NOTED, MR. DECARLO CITED A

19   NUMBER OF CASES WHERE THEY USED THE WORDS "MINIMAL DELAY," BUT

20   ALL PRECEDED BY THE WORD "PREFERABLY," AND THERE'S NOTHING

21   WRONG WITH THAT.

22   AS I THINK WE ALL KNOW, IT'S THE CLAIMS THAT DEFINE THE

23   SCOPE OF THE INVENTION, NOT PREFERRED EMBODIMENTS FOUND IN THE

24   SPECIFICATION.  WE'VE BEEN CAUTIONED ABOUT THAT REPEATEDLY BY

25   THE FEDERAL CIRCUIT.

1        INDEED, THERE'S A CASE THAT'S CITED IN OUR BRIEF THAT

2    ACTUALLY OVERRULED A COUPLE OF CASES THAT THEY CITED CALLED

3    LIEBEL-FLARSHEIM WHERE THE COURT SPECIFICALLY SAID, "HEY, EVEN

4    THOUGH THERE'S ONLY ONE EMBODIMENT IN THIS PATENT DESCRIBING

5    ONE EXAMPLE, THE CLAIMS ARE NOT GOING TO BE LIMITED TO THAT

6    EXAMPLE.  IT'S WHAT'S CLAIMED THAT DETERMINES THE SCOPE."

7        SO, AGAIN, THERE'S NOTHING IN THE CLAIM THAT SAYS "MINIMAL

8    DELAY."  THERE'S NO REASON TO IMPORT THAT LIMITATION INTO THE

9    CLAIM.

10        AND I THINK IT'S OUR POSITION THAT "WITHOUT SUBSTANTIAL

11    DELAY" FAR MORE CORRECTLY HUES CLOSELY TO WHAT WAS INTENDED BY

12    THIS INVENTION AND I DON'T SEE HOW A JURY WOULD HAVE ANY

13    DIFFICULTY UNDERSTANDING THAT CONCEPT.

14             THE COURT:  ALL RIGHT.  THANK YOU, MR. PAVANE.

15             MR. PAVANE:  THANK YOU.

16             THE COURT:  ALL RIGHT.  SHALL WE TURN TO THE NEXT

17    TERM?

18             MR. PAVANE:  OH, YEAH.  I GUESS I'M UP AGAIN.

19             THE COURT:  GO AHEAD.

20        (PAUSE IN PROCEEDINGS.)

21             THE COURT:  GO AHEAD.

22             MR. PAVANE:  DESPITE WHAT CONCLUSIONS YOU MAY HAVE

23    REACHED, HE'S ACTUALLY A GOOD GUY.

24             MR. DECARLO:  I'M NOT EVEN GOING TO TRY TO RESPOND TO

25    THAT.

1          MR. PAVANE:  DON'T RESPOND TO THAT.

2       SO THE NEXT, THE NEXT TERM THAT WE'RE GOING TO DISCUSS IS

3    TERM 2, AND I'LL JUST MOVE AHEAD -- OOPS.  I'LL GO BACK.

4       OKAY.  SO NOW WE'RE INTO THE FIRST ELEMENT OF CLAIM 1 AND

5    THE CLAIM TERM IS "PROVIDING AT THE TRANSMITTING COMPUTER A

6    DATA STREAM HAVING A GIVEN DATA RATE."

7       I KNOW YOU'VE HEARD A LOT ABOUT GIVEN DATA RATES AND SO ON,

8    BUT ANYWAY, LET'S GO INTO THIS A LITTLE BIT.

9       SO OUR CONSTRUCTION OF THAT TERM IS "PROVIDING FROM THE

10   TRANSMITTING COMPUTER A DATA STREAM HAVING AN ASSIGNED DATA

11   RATE, WHERE A DATA RATE IS AN AMOUNT OF DATA PER UNIT OF TIME."

12       APPLE BROKE THIS INTO TWO DIFFERENT TERMS, TWO AND THREE,

13   SO WE'LL TREAT THEM TOGETHER HERE, AND I ASSUME MR. DECARLO

14   WILL DO LIKEWISE, OR AT LEAST IN THAT ORDER.

15          MR. DECARLO:  YES.

16          MR. PAVANE:  OKAY.  SO APPLE, FOR THE FIRST PART,

17   "PROVIDING AT THE TRANSMITTING COMPUTER A DATA STREAM" SAYS

18   "INPUTTING A DATA STREAM TO THE TRANSMITTING COMPUTER FROM A

19   SOURCE OF BROADCAST DATA."

20       AND FOR TERM 3, FOR "DATA RATE," "A GIVEN DATA RATE," THEY

21   SAY "THE SPEED, AS MEASURED IN BITS PER SECOND, AT WHICH THE

22   DATA STREAM IS INPUT TO THE TRANSMITTING COMPUTER."

23       SO I'D LIKE TO JUST MAKE -- HERE I THINK THERE'S A REAL

24   DISPUTE BETWEEN THE PARTIES IN TERMS OF WHAT THIS TERM MEANS,

25   AND I THINK IT WOULD HELP IF YOU JUST TAKE A LOOK, AND I DON'T

1    HAVE IT UP ON THE SCREEN, BUT YOU HAVE THE PATENT IN FRONT OF

2    YOU, YOUR HONOR.

3         THE COURT:  I DO.

4         MR. PAVANE:  BUT IF YOU TAKE A LOOK AT FIGURE 2 OF

5    THE PATENT.

6         THE COURT:  I HAVE IT.

7         MR. PAVANE:  OKAY.  SO I THINK THE REAL DISPUTE AMONG

8    THE PARTIES IS NUMBER 34 THERE IS THE TRANSMITTING COMPUTER AND

9    THAT'S THE COMPUTER ON THE LEFT SIDE OF THE SCREEN THERE.

10        THE COURT:  UM-HUM.

11        MR. PAVANE:  OKAY.  AND IT'S OUR POSITION THAT THE

12   DATA STREAM THAT THE CLAIM IS TALKING ABOUT IS THE ONE THAT'S

13   GENERATED BY THE TRANSMITTING COMPUTER, AND THAT'S THE ONE THAT

14   HAS THE ASSIGNED DATA RATE -- YOU HEARD A LOT ABOUT HOW THAT'S

15   DONE WITH THE ENCODER -- AND IT GIVES IT AN ASSIGNED DATA RATE

16   WHICH THEN COMES OUT OF THAT TRANSMITTING COMPUTER.

17     AND IT HAS -- IT RESULTS IN A DATA STREAM HAVING A GIVEN

18   DATA RATE, BECAUSE AGAIN YOU HAVE WHATEVER ALGORITHM YOU'RE

19   USING, IT GIVES IT AN ASSIGNED DATA RATE, WHICH IS -- IF YOU'VE

20   READ THIS PATENT, THAT IS ONE OF THE KEY THINGS ABOUT THIS

21   PATENT IS YOU HAVE TO HAVE THE ASSIGNED DATA RATE.

22     MR. POLISH POINTED THAT OUT AS WELL.  YOU HAVE TO HAVE AN

23   ASSIGNED DATA RATE TO BE ABLE TO SLICE IT FOR A TIME DURATION.

24   BECAUSE I THINK WE ALL KNOW THE BASIC EQUATION, RATE EQUALS

25   DATA PER UNIT OF TIME.

1        SO IF YOU KNOW THE RATE, YOU'VE GIVEN YOURSELF A GIVEN RATE

2   AS THE CLAIM CALLS FOR, AND YOU KNOW THE DURATION OF THE SLICE,

3   THEN BY DEFINITION, YOU FIXED THE -- YOU FIX THE AMOUNT OF BITS

4   IN THAT SLICE BECAUSE THERE'S ONLY THREE VARIABLES IN THAT

5   EQUATION AND NOW YOU'VE SET TWO OF THEM.

6        SO THAT'S THE ESSENCE OF WHAT'S GOING ON HERE, AND I THINK

7   THAT'S IMPORTANT.

8        WHAT APPLE WANTS TO DO HERE IS THEY WANT TO SAY, "OH, NO,

9   NO, NO, NO.  THE DATA STREAM," AGAIN LOOKING AT FIGURE 2, "IS

10  THIS RAW FEED THAT'S GETTING INPUT INTO THE TRANSMITTING

11  COMPUTER" WHICH, AS YOU SAW FROM DR. MADISETTI'S SLIDES, COULD

12  BE ANYTHING.  IT'S ALL OVER THE MAP.  NO ONE KNOWS HOW MUCH

13  THAT IS, ANY PARTICULAR SLICE OF UNIT TIME.

14       SO OUR POSITION IS THAT JUST AS A MATTER OF COMMON SENSE,

15  THAT MAKES NO SENSE IN THE CONTEXT OF THIS INVENTION.  IT'S

16  VERY CLEAR THAT YOU'VE GOT TO GENERATE THAT GIVEN DATA RATE AT

17  THE TRANSMITTING COMPUTER.

18       AND THAT'S EXACTLY WHAT THE CLAIM SAYS, "PROVIDING AT THE

19  TRANSMITTING COMPUTER."  IT DOESN'T SAY ANYTHING ABOUT THE

20  INPUT TO THE TRANSMITTING COMPUTER.  IT DOESN'T SAY ANYTHING

21  ABOUT WHERE THAT DATA STREAM COMES FROM.

22       IT JUST SAYS ONCE YOU'RE IN THE TRANSMITTING COMPUTER, YOU

23  GIVE IT A GIVEN DATA RATE, WHICH, AGAIN, WE'RE USING THE WORD

24  "ASSIGNED," BUT "GIVEN" WOULDN'T BOTHER ME, EITHER.  I THINK

25  IT'S CLEAR THEY MEAN THE SAME THING.

1        AND IN TERMS OF THE WORD "DATA RATE," OUR ONLY POINT THERE

2    IS THEY WANT TO DEFINE IT AS "BITS PER SECOND."

3        AGAIN, I'M A CAUTIOUS GUY.  I'M A LAWYER.  I WORRY ABOUT

4    WHAT'S GOING TO HAPPEN THREE MONTHS FROM NOW OR SIX MONTHS,

5    WHENEVER WE TRY THIS CASE.

6        AND MY CONCERN IS THAT SOMEBODY IS GOING TO GET UP IN FRONT

7    OF A JURY AND SAY, "WELL, THE SPEED OF THIS PARTICULAR STREAM

8    AS SHOWN HERE IS MEASURED IN KILOBYTES PER SECOND."

9        DR. MADISETTI SAID A BYTE IS EIGHT BITS.

10        AND IT'S NOT IN BITS PER SECOND.

11        WELL, WE ALL AGREE IT'S DATA PER UNIT OF TIME.  THAT'S WHAT

12    A RATE IS AND I'M PERFECTLY HAPPY WITH THAT.

13        I DON'T SEE WHY IT SHOULD BE LIMITED TO A PARTICULAR

14    FORMULATION OF A RATE IN TERMS OF BITS PER SECOND.

15            THE COURT:  SO --

16            MR. PAVANE:  THAT'S MY PROBLEM WITH THAT.

17            THE COURT:  LET ME ASK YOU ABOUT THE EARLIER POINT

18    YOU WERE MAKING --

19            MR. PAVANE:  SURE.

20            THE COURT:  -- WHICH IS THAT THE TRANSMITTING

21    COMPUTER IS, IS PROVIDING OR SENDING OUT A DATA STREAM, IN

22    OTHER WORDS, THAT THE OUTPUT OF THE TRANSMITTING COMPUTER IS

23    THE DATA STREAM.

24        THAT DOESN'T SQUARE WITH PERHAPS MY ERRONEOUS READING OF

25    THE STRUCTURE OF CLAIM 1 WHICH SURE SEEMS TO SUGGEST THAT

1    WHATEVER IS GOING IN OR WHATEVER IS RESIDING ON THE

2    TRANSMITTING COMPUTER, THE NET RESULT OF THE WORK THAT'S DONE

3    THERE IS A SERIES OF FILES THAT ARE THEN UPLOADED TO A SERVER.

4        SO I HAD ALWAYS UNDERSTOOD THAT THE OUTPUT OF THE

5    TRANSMITTING COMPUTER WAS A SERIES OF FILES.  AM I WRONG ABOUT

6    THAT?

7             MR. PAVANE:  NO, YOU'RE NOT WRONG.

8             THE COURT:  OKAY.

9             MR. PAVANE:  THE ANSWER IS SEVERAL THINGS GO ON AT

10   THE TRANSMITTING COMPUTER.

11       IN FACT, IF YOU LOOK AT CLAIM 1, EVERY STEP OF CLAIM 1 --

12   IF I CAN GO BACK TO THAT ON THE SCREEN -- EVERY ONE OF THOSE

13   STEPS, UP TO THE UPLOADING STEP, IS ALL HAPPENING IN THE

14   TRANSMITTING COMPUTER BECAUSE, AGAIN, THE LAST STEP IS

15   UPLOADING TO THE SERVER.

16       IF YOU LOOK AT FIGURE 2, YOU WILL SEE THAT THE SERVER IS

17   THE NEXT COMPONENT AFTER THE TRANSMITTING COMPUTER.

18       SO EVERYTHING, ALL THOSE THINGS ARE HAPPENING IN THERE.  I

19   DIDN'T MEAN TO SUGGEST THAT THAT'S THE ONLY THING.

20       WHAT ACTUALLY -- WHEN I SAID OUTPUT FROM IT, WHEN YOU GET

21   IT, YOU PROVIDE IN THE TRANSMITTING COMPUTER A DATA STREAM

22   HAVING A GIVEN DATA RATE; THEN AS YOU'LL SEE, YOU SLICE IT TO

23   CREATE THESE UNIFORM, THESE PREDETERMINED DATA SLICES; THEN YOU

24   ENCODE THEM INTO FILES SO THEY'RE NO LONGER CHUNKS OF DATA,

25   THEY'RE ACTUALLY IN FILE FORMAT, AND THEN WITH EACH FILE HAVING

1    SOME KIND OF INDEX SO YOU CAN IDENTIFY IT; AND THEN YOU UPLOAD

2    THAT.  ALL OF THAT HAPPENS IN THERE.

3            THE COURT:  AND IT'S YOUR CONTENTION THAT THE UPLOAD

4    OF ENCODED SLICES OR FILES IS ITSELF A DATA STREAM?

5            MR. PAVANE:  IT'S ALWAYS A DATA STREAM, ABSOLUTELY.

6    IT'S A CONTINUOUS DATA STREAM.

7        AND IN FACT, I BELIEVE THAT IF YOU -- GIVE ME ONE SECOND

8    HERE JUST TO CATCH UP.

9        IF YOU LOOK AT FIGURE 3A OF THE PATENT, YOU'LL SEE IN

10   FIGURE 3A THE -- YOU CAN SEE THE SLICING GOING ON THERE.  SO

11   THAT'S OBVIOUSLY WHAT'S HAPPENING IN THE COMPUTER.

12       AND THEN LATER ON, DO YOU SEE THE NUMBER 40 THERE THAT'S

13   POINTING TO THAT?

14           THE COURT:  UM-HUM.

15           MR. PAVANE:  WELL, IF YOU READ THE PATENT, YOU'LL SEE

16   NUMBER 40 IS THE DATA STREAM.  SO THE DATA STREAM MAY TAKE

17   DIFFERENT FORMS.

18       IN OTHER WORDS, IT COMES IN AS RAW DATA TO THE TRANSMITTING

19   COMPUTER.  IT'S THEN PLACED IN A DIGITIZED FORMAT, OR PROVIDED

20   AT THE -- IT HAS RATHER A GIVEN DATA RATE IN THE COMPUTER; IT'S

21   THEN SLICED; IT'S THEN PUT INTO FILES.

22       BUT IT'S ALWAYS A DATA STREAM.  IT'S JUST CHANGING ITS

23   FORMAT.  THAT'S WHAT -- AGAIN, NUMBER 40 MAKES THAT VERY CLEAR,

24   THAT EVEN WHEN IT'S BEEN SLICED UP, IT'S STILL CALLED THE DATA

25   STREAM.

1          THE COURT:  RIGHT.  SO FOR EXAMPLE, COLUMN 7, LINE 23

2     OR THEREABOUTS, IT TALKS ABOUT DATA STREAM 40.  THAT'S WHAT

3     YOU'RE REFERRING TO?

4          MR. PAVANE:  FOR EXAMPLE.  ALSO AGAIN UP IN THE

5     RIGHT-HAND COLUMN, YEAH, EXACTLY.  IT'S ALL OVER THE PATENT.

6     THE NUMBER 40 IS ALWAYS THE DATA STREAM.

7          THE COURT:  I SEE.

8          MR. PAVANE:  AND THE PATENT IS CONSISTENT IN THAT

9     REGARD.

10     SO THOSE ARE OUR MAIN POSITIONS.  THOSE ARE THE KEY POINTS

11     THAT I SEE OF JUST GOING BACK -- SORRY -- SO THE KEY THINGS

12     FROM OUR POINT OF VIEW IS THAT, AGAIN, YOU'RE PROVIDING THIS

13     DATA STREAM HAVING A GIVEN DATA RATE AT THE TRANSMITTING

14     COMPUTER, THAT'S WHERE IT GETS GENERATED, AND DATA RATE MEANS

15     AN AMOUNT OF DATA UNIT PER TIME AS OPPOSED TO PUTTING A

16     SPECIFIC UNIT ON IT, SUCH AS BITS PER SECOND.

17          THE COURT:  OKAY.  THANK YOU VERY MUCH, MR. PAVANE.

18     MR. DECARLO?

19          MR. DECARLO:  THANK YOU.

20     OKAY.  HERE WE GO AGAIN.

21     OKAY, YOUR HONOR.  SO WE ARE AT APPLE'S TERM 2, WHICH, AS

22     MR. PAVANE POINTED OUT, COVERS EMBLAZE'S TERMS 2 AND 3.

23     SO "PROVIDING AT THE TRANSMITTING COMPUTER A DATA STREAM"

24     WE'RE LOOKING AT CLAIM 2, WHICH IS "INPUTTING A DATA STREAM TO

25     THE TRANSMITTING COMPUTER FROM A SOURCE OF BROADCAST DATA."

1    EMBLAZE'S PROPOSED CONSTRUCTION WE HEARD IS "PROVIDING

2    FROM."  I THINK THAT'S THE ISSUE, IS "PROVIDING AT."  IS THAT

3    TO OR FROM?

4    I CAN TELL YOU THAT THE TERM "PROVIDING" IS NOT USED IN

5    THE SPECIFICATION, IT'S ONLY USED IN THE CLAIM, SO WE GO TO THE

6    SPECIFICATION AND SEE HOW THE SPECIFICATION TEACHES US DATA

7    GETS AT THE TRANSMITTING COMPUTER.

8    AND THE TERM "PROVIDING AT THE TRANSMITTING COMPUTER A

9    DATA STREAM" IS DESCRIBED IN THE SPECIFICATION AS HOW THE DATA

10   STREAM ENTERS THE TRANSMITTING COMPUTER, AND IT TELLS US THAT

11   DATA ENTERS THE TRANSMITTING COMPUTER THROUGH AN INPUT DEVICE,

12   COMPUTER 34, WHICH IS THE TRANSMITTING COMPUTER, PREFERABLY

13   RECEIVES AUTO AND VISUAL INPUT FROM INPUT DEVICES.

14   THE COURT:  YOU WOULD AGREE WITH ME, MR. DECARLO,

15   THAT "COMPUTER" ITSELF IS A BIT OF A LOOSE TERM BECAUSE THE

16   INPUT CAN COME FROM NOT ONLY AN EXTERNAL CAMERA OR MICROPHONE,

17   BUT ALSO THE HARD DRIVE.

18   WHAT WE'RE REALLY TALKING ABOUT IS THE CENTRAL PROCESSING

19   UNIT, THE MICROPROCESSOR.

20   MR. DECARLO:  OR I THINK -- WELL, THE MICROPROCESSOR

21   CONTROLS MANY DIFFERENT FUNCTIONS, ONE OF WHICH WOULD BE, I

22   THINK IN THE INSTANCE THAT YOU'RE THINKING OF IS DATA COMING

23   ACROSS THE BUS OF A COMPUTER --

24   THE COURT:  YES.

25   MR. DECARLO:  -- FROM A DEVICE.

1          THE COURT:  YES.

2          MR. DECARLO:  OKAY.  BUT ALL OF THOSE THINGS ARE

3     STILL INPUT INTO THE TRANSMITTING COMPUTER.

4          THE TRANSMITTING COMPUTER IS A THING IN THESE CLAIMS, AND

5     THIS HAPPENS TO BE A METHOD CLAIM, BUT I THINK WE'RE CONSTRUING

6     THEM THE SAME FOR THE APPARATUS CLAIMS.

7          WELL, WHAT IS THE TRANSMITTING COMPUTER?  IT'S THE THING

8     THAT SLICES AND ENCODES AND THERE HAS TO BE AN INPUT THERE.

9          BUT WHEN THE PATENT DISCUSSES HOW THE MEDIA IS TAKEN IN TO

10    ENTER THIS PROCESS, OR ENTER THIS APPARATUS, IT'S THROUGH INPUT

11    DEVICES.

12         SO WE THINK THAT OUR TERM IS, AGAIN, JUST RECITING IT FROM

13    THE SPECIFICATION.

14         AND THESE ARE MULTIPLE EMBODIMENTS.  IT'S NOT LIKE WE'RE

15    TAKING A SINGLE EMBODIMENT.  THIS TERMINOLOGY IS USED

16    THROUGHOUT THE PATENT, ONE OR MORE INPUT DEVICES ARE USED TO

17    GENERATE A MULTI-MEDIA STREAM.  BUT THEY'RE STILL INPUT

18    DEVICES, OKAY?

19         COMPUTER MONITORS THE TIME CODES, IN THIS NEXT CITATION ON

20    SLIDE 26, SO THAT IT'S KEEPING UP WITH THE INPUT OF THE DATA TO

21    THE COMPUTER.

22         AND EVEN IF THE DATA IS GENERATED AT OR BY, IT'S STILL A

23    DATA INPUT TO THAT COMPUTER.

24         SO WE THINK THAT NOWHERE -- AS I THINK YOU RECOGNIZED, THE

25    THING THAT COMES OUT OF THE COMPUTER IS THE SEQUENCE OF SLICES.

1    THIS IS THE BASELINE DATA STREAM, THE ANTECEDENT DATA

2 STREAM, THAT ALL OF THE OTHER DATA STREAMS RELY UPON.  THE

3 UPLOADING HAS TO --

4    THE COURT:  THIS IS THE RAW CLAY.  WHAT COMES OUT IS

5 THE FIRED POT?

6    MR. DECARLO:  APTLY PUT, YOUR HONOR.  CREATIVELY PUT.

7    SO WE THINK THE SPECIFICATION IS CLEAR THAT THE TERM

8 "INPUTTING" IS THE MORE PROPER TERM.

9    AND THIS CONSTRUCTION OF EMBLAZE'S IS JUST SOMEHOW TAKING

10 THIS WORD "AT" AND CONVERTING IT TO "FROM," AND AS YOU POINTED

11 OUT, WE DON'T THINK IN THE CONTEXT OF THIS INVENTION THAT THAT

12 IS THE APPROPRIATE THING.

13    THIS IS WHERE IT STARTS.  THIS IS THE DATA RATE FROM WHICH

14 WE MEASURE.

15    AND THAT DATA STREAM HAS TO HAVE A GIVEN DATA RATE, AND IT

16 APPEARS IN MULTIPLE CLAIMS, THE DATA RATE OF THE STREAM, THE

17 DATA RATE.

18    BUT WE'RE TALKING ABOUT THE BASE LINE DATA STREAM FROM

19 WHICH WE MEASURE WHETHER OR NOT WE'RE PRACTICING THE INVENTION.

20    AND WE BELIEVE THAT THAT SHOULD BE "THE SPEED, AS MEASURED

21 IN BITS PER SECOND, AT WHICH THE DATA STREAM IS INPUT INTO THE

22 TRANSMITTING COMPUTER."

23    AND I WILL GO ON RECORD AND SAY THAT WHEN WE TALK ABOUT

24 BITS PER SECOND, IT COULD BE KILOBYTES, IT COULD BE MEGABITS,

25 BUT WE'RE TALKING ABOUT THE FACT THAT IN COMMON PARLANCE, AS

1    PEOPLE UNDERSTOOD IT IN 1998, AND AS PEOPLE UNDERSTAND IT TODAY

2    BECAUSE THEY'RE BOMBARDED WITH ADVISEMENTS, RIGHT, BITS PER

3    SECOND, PEOPLE KNOW WHAT BITS PER SECOND IS, WHETHER IT'S IN

4    KILOBYTES OR MEGABITS --

5              THE COURT:  OR BAUD.

6              MR. DECARLO:  OR BAUD, WHICH IS ARCHAIC AND YOU'RE

7    PROBABLY NOT GOING TO HEAR IT IN 2013.

8         BUT THAT'S NOT -- THE MISCHIEF THAT MR. PAVANE IS CONCERNED

9    ABOUT WITH RESPECT TO OUR USE OF AN ACTUAL UNIT OF MEASURE IS

10   NOT THAT WE'RE GOING TO SAY KILOBITS DON'T MEAN MEGABITS.

11        IT'S THE FACT THAT, AS WE'LL TALK ABOUT IN A MOMENT, THAT

12   YOU HAVE TO PUT SOME ART RECOGNIZED TERMINOLOGY HERE IF THIS

13   CLAIM IS GOING TO MAKE SENSE.

14        AND SO IF YOU'RE PROVIDING AT OR INPUTTING TO A COMPUTER A

15   STREAM HAVING A GIVEN DATA RATE, WELL, THAT'S GOING TO BE

16   MEASURED IN BITS PER SECOND.

17        NONE OF THE EXPERTS THIS MORNING TALKED ABOUT IT IN ANY

18   OTHER WAY.  EVERYBODY AGREES THAT IT'S BITS PER SECOND.

19             THE COURT:  BUT IF YOU'RE -- IF YOU'RE SAYING THAT

20   AND COMMITTING THAT YOU'RE NOT LOOKING TO MAKE SOME CLEVER

21   ARGUMENT ON KILOBITS OR MEGABYTES OR BAUD --

22             MR. DECARLO:  CORRECT.

23             THE COURT:  -- DOWN THE ROAD, WHAT HEARTBURN DO YOU

24   GET FROM THE CONSTRUCTION THEY PROPOSED, WHICH SIMPLY SAYS

25   GENERICALLY "A DATA RATE IS AN AMOUNT OF DATA PER UNIT OF

1      TIME"?

2           MR. DECARLO:  WELL, LET'S -- WE'LL SKIP THROUGH ALL

3      OF THESE EXAMPLES IN THE PATENT THAT TALK ABOUT DATA RATES IN

4      BITS PER SECOND AND GO TO THAT ARGUMENT, AND HERE'S THE

5      MISCHIEF.

6           THIS IS THE MISCHIEF THAT EMBLAZE'S AMORPHOUS CONSTRUCTION

7      PERMITS, AND WE CALL IT THE DEAD TIME ARGUMENT FOR SHORTHAND.

8           BUT -- SO EMBLAZE'S CONSTRUCTION, WHICH IS JUST "AN AMOUNT

9      OF DATA PER UNIT OF TIME," OKAY, PERMITS THIS KIND OF

10     MANIPULATION.

11          SO I'VE GOT A DATA STREAM THAT'S PROVIDED AT -- AND LET'S

12     USE THE TERM FROM THE CLAIM SO IT'S NON-CONTROVERSIAL -- TEN

13     KILOBITS PER SECOND.  OKAY?  I CREATE A TEN KILOBIT SLICE, BUT

14     IN TODAY'S WORLD, THE LINKAGE BETWEEN MY TRANSMITTING COMPUTER

15     AND THE STANDARD NETWORK SERVER, WHICH IN 1998 WE WERE TALKING

16     ABOUT 28.8 MODEMS, NOW I UPLOAD IT TO THE SERVER IN A HUNDRED

17     KILOBITS PER SECOND.  THAT TOOK A TENTH OF A SECOND.  SO THE

18     SPEED AT WHICH I UPLOADED IT WAS A TENTH OF A SECOND.

19          NOW I SIT THERE FOR NINE-TENTHS WHILE I WAIT FOR THE NEXT

20     SLICE.

21          WELL, THAT'S THE AMOUNT OF TIME -- THE UPLOAD RATE WAS

22     ACTUALLY 100 KILOBITS PER SECOND, BUT IN EMBLAZE'S AMORPHOUS

23     CONSTRUCTION, THE DEAD TIME ARGUMENT, THEY GET TO ARGUE, "WELL,

24     YOU REALLY ONLY TRANSMITTED TEN KILOBYTES, SO THE RATE IS TEN

25     KILOBITS PER SECOND," AND I USED BITS, SO I'M GOING TO STICK

1   WITH BITS.

2       IT'S ALMOST LIKE, YOUR HONOR, YOU'RE DRIVING ON A HIGHWAY

3   AT 90 MILES AN HOUR FOR AN HOUR AND YOU GET PULLED OVER BY A

4   COP AND YOU ARGUE THAT BECAUSE YOU WERE AT A REST STOP FOR THE

5   PREVIOUS HOUR, YOU WERE ONLY DOING 45.  THAT'S THE MISCHIEF.

6       AND WE NEED TO HAVE THIS FIXED SO THE PEOPLE -- SO

7   EVERYBODY UNDERSTANDS THE RATES THAT WE'RE TALKING ABOUT.

8       AND "AN AMOUNT OF DATA" OVER SOME UNSPECIFIED UNIT OF TIME

9   PERMITS THIS, YOU KNOW, MANIPULATION AND MANEUVERING.

10      AND WE THINK THAT IF YOU SAY "THE DATA RATE IS GENERALLY

11  EQUAL TO 100 KILOBITS PER SECOND," YOU HAVEN'T DONE ANY DAMAGE

12  TO THE CLAIM, YOU'VE ACTUALLY CONSTRUED THE CLAIM IN A WAY THAT

13  IS CLOSELY INTERPRETED BY THE SPEC; AS THE EXPERTS SAY, IT'S

14  CLOSE TO THE PARLANCE THAT THEY WOULD EXPECT THIS TERM TO BE

15  USED AS; AND I THINK THAT IT ELIMINATES THIS DEAD TIME ARGUMENT

16  THAT WE ARE AFRAID IS GOING TO REAR ITS UGLY HEAD.

17              THE COURT:  ALL RIGHT.  THANK YOU, MR. DECARLO.

18              MR. DECARLO:  YOU'RE WELCOME, YOUR HONOR.

19              MR. PAVANE:  BRIEF RESPONSE?

20              THE COURT:  OF COURSE.

21              MR. PAVANE:  THANK YOU, SIR.

22      OKAY.  NOW I GET A COUPLE OF POINTS THAT I DIDN'T

23  APPRECIATE FROM THE PAPERS.  OKAY.

24      SO HOW DO I GO BACK ON THIS, JIM?  I JUST HIT ESCAPE.

25  MINIMIZE, RIGHT?

1          MR. DECARLO:  MINIMIZE, YEP.

2      (PAUSE IN PROCEEDINGS.)

3          MR. PAVANE:  OKAY.  SO I KNOW UNDERSTAND WHY APPLE

4   BROKE IT INTO TWO PARTS.  I DIDN'T APPRECIATE IT BEFORE, BUT

5   NOW I GET IT.

6      OKAY.  SO THE CLAIM SAYS "PROVIDING AT THE TRANSMITTING

7   COMPUTER A DATA STREAM."

8          AND I AGREE, IF YOU PROBABLY JUST LOOK AT THAT, YOU COULD

9   SAY, WELL, MAYBE THAT'S THE INPUT TO THE COMPUTER.  MAYBE

10  THAT'S WHAT THEY'RE TALKING ABOUT, OKAY, EVEN THOUGH THE DATA

11  STREAM, AS I SHOWED YOU, IS WHAT COMES OUT OF THE COMPUTER.

12      BUT IT DOESN'T SAY THAT.  IT SAYS "PROVIDING AT THE

13  TRANSMITTING COMPUTER A DATA STREAM HAVING A GIVEN DATA RATE."

14  OKAY?

15      SO IT'S NOT SOME RANDOM RATE, WHICH IS THE CASE OF THE

16  INPUT DEVICES, SUCH AS THE CAMERA 22, AND THAT'S WHY THEY'RE

17  SEPARATING IT.  THEY DON'T WANT YOU TO LOOK OVER HERE AT THE

18  GIVEN RATE PART.

19      THAT CLAIM HAS TO -- THAT PHRASE SHOULD BE READ AS A

20  WHOLE.  YOU'RE PROVIDING AT THE TRANSMITTING COMPUTER A DATA

21  STREAM HAVING A GIVEN DATA RATE.  IT'S GOT A FIXED RATE.

22      THE CAMERA DOES NOT DO THAT.  THE INPUT DEVICE DOES NOT DO

23  THAT.

24      THAT HAPPENS AT THE TRANSMITTING COMPUTER AS THE PATENT

25  MAKES CLEAR WITH THE ENCODERS.

1          THE COURT:  WHEN YOU SAY THAT THE CAMERA DOESN'T DO

2     THAT OR THE OTHER INPUTS DON'T DO THAT, I'M NOT SURE I FOLLOW

3     THAT POINT.

4          MR. PAVANE:  SO IN OTHER WORDS, IF YOU REMEMBER THAT

5     PICTURE THAT DR. MADISETTI HAD WITH THE RATE VARYING ALL OVER

6     PER FRAME, THAT'S WHAT THE DATA LOOKS LIKE COMING OUT OF THE

7     VIDEO.

8          THE VIDEO IS NOT DOING ANYTHING TO BALANCE OUT THE AMOUNT

9     OF DATA PER UNIT OF TIME TO GIVE YOU A GIVEN RATE.  THE RATE

10    VARIES DEPENDING UPON THE AMOUNT OF MOTION IN WHATEVER FRAMES

11    YOU'RE FILMING.

12         SO IF I'M FILMING YOU SITTING ON THAT BENCH, I'VE GOT A

13    REAL LOW RATE.

14         BUT IF I TURN IT OVER THERE AND THERE'S A FOOTBALL GAME

15    GOING ON, THAT RATE IS GOING TO SHOOT WAY UP.

16         SO IT'S NOT A GIVEN DATA RATE.  YOU HAVEN'T ASSIGNED

17    ANYTHING TO THAT RATE.  THAT ALL HAPPENS AND THAT'S ONE OF THE

18    FUNDAMENTAL ASPECTS OF THE INVENTION.  WE'RE GOING TO READ THE

19    INVENTION OUT OF THE CLAIM IF YOU SAY THAT IT DOESN'T HAVE TO

20    HAVE A GIVEN DATA RATE.

21         AND THEY'RE JUST IGNORING THE WORD "GIVEN."  THAT'S WHAT

22    THEY WANT YOU TO DO, JUST IGNORE IT, AND THAT'S WHY THEY BROKE

23    IT INTO TWO PARTS.  LET'S FORGET THAT.

24         SECONDLY, THE PART ABOUT THE MISCHIEF THAT MR. DECARLO

25    BROUGHT UP, OKAY, I WANT TO SAY A COUPLE OF THINGS ABOUT THAT.

1    FIRSTLY, THAT'S AN INFRINGEMENT ARGUMENT.  THAT'S NOT A

2    CLAIM CONSTRUCTION ARGUMENT.  EVEN IF YOUR HONOR ADOPTS THE

3    RULING, ADOPTS OUR GENERIC DEFINITION OF UNIT PER TIME, HE

4    COULD STILL MAKE THAT INFRINGEMENT ARGUMENT AND SAY, "HEY, IT

5    TOOK ONLY A TENTH OF A SECOND TO UPLOAD THAT FILE AND,

6    THEREFORE, IT'S NOT INFRINGING BECAUSE IT WAS A TENTH OF A

7    SECOND AND THEN YOU HAVE TO WAIT NINE SECONDS."

8        BUT AS EVEN HE ACKNOWLEDGED WHEN HE SAID THAT, WHEN YOU DO

9    THAT, YOU CAN'T GO ANY FASTER ON THE UPLOAD SIDE.  YES, YOU MAY

10   HAVE TRANSMITTED ALL YOUR DATA IN A VERY SMALL SLICE, BUT

11   YOU'VE GOT TO SIT THERE FOR THE NEXT NINE SECONDS OR FOUR

12   SECONDS OR THREE OR WHATEVER YOUR SLICE DURATION IS BECAUSE

13   YOU'RE DOING THIS IN REAL TIME, SO IT'S IMPOSSIBLE TO LOAD IT

14   UP FASTER THAN IT'S BEING CREATED.

15       AND THAT'S THE ASPECT OF THIS ENTIRE CASE IS THAT IT'S A

16   REAL-TIME BROADCAST.  YOUR GIVEN RATE BECOMES YOUR DATA RATE TO

17   THE UPLOAD BECOMES GENERALLY YOUR DATA RATE TO THE DOWNLOAD.

18   THEY'RE ALL EQUAL.  THAT'S WHAT THIS IS ALL ABOUT AND THAT'S

19   WHAT THE SLICING AND DICING AND CREATING THE FILES ALLOWS YOU

20   TO DO.

21       SO TO SAY THAT, THAT BECAUSE OF THIS ALLEGED MISCHIEF WE

22   SHOULDN'T ADOPT MY TERM, THAT'S MIXING APPLES AND ORANGES.

23       THAT'S AN INFRINGEMENT ARGUMENT.  I GUESS THEY'RE FREE TO

24   MAKE THAT DOWN THE ROAD.  I THINK IT'S, FRANKLY, SUBJECT TO A

25   SUMMARY JUDGMENT RULING, BUT NEVERTHELESS, IT DOESN'T BELONG IN

1     THIS CLAIM CONSTRUCTION RULING.

2              THE COURT:  ALL RIGHT.  THANK YOU.

3        YOU WANT TO TURN TO THE NEXT TERM, WHOEVER HAS GOT THAT

4     ONE?

5              MR. PAVANE:  YEAH.  I GUESS THAT'S ME AGAIN.

6              THE COURT:  I THINK WE'RE TALKING ABOUT "SLICE."

7              MR. PAVANE:  YEAH.  AGAIN, THIS ONE I THINK I'LL BE

8     VERY SHORT.

9        OKAY.  SO NOW WE'RE INTO THE SECOND ELEMENT OF THE CLAIM,

10    AGAIN, THINGS THAT ARE GOING ON INTO THE -- IN THE TRANSMITTING

11    COMPUTER BEFORE WE DO THE UPLOAD.

12       SO IT SAYS "DIVIDING THE STREAM," AND WE TALKED ABOUT THE

13    DATA STREAM IN THE FIRST PART OF THE CLAIM THAT WE JUST LOOKED

14    AT, "INTO A SEQUENCE OF SLICES, EACH SLICE HAVING A

15    PREDETERMINED DATA SIZE."

16       OKAY.  SO A COUPLE OF THINGS HERE.  I SAID BEFORE, I

17    REITERATED -- EXCUSE ME.  I WANT TO REITERATE THAT, AS WE SAID

18    EARLIER, IF WE KNOW THE GIVEN DATA RATE AND WE'RE GOING TO HAVE

19    A PREDETERMINED DATA SIZE IN THAT SLICE, THERE'S A COUPLE OF

20    WAYS TO DO IT, RIGHT?  ONE WAY IS IF YOU KNOW THE RATE, YOU CAN

21    SET THE AMOUNT OF DATA AND THAT'S GOING TO FIX THE AMOUNT OF

22    TIME OF EACH SLICE; OR YOU CAN SIMPLY SET THE DURATION OF THE

23    SLICES.  ONCE YOU KNOW THE DATA RATE, THAT'S GOING TO FIX HOW

24    MUCH DATA WILL BE IN EACH SLICE BECAUSE, AGAIN, THERE'S ONLY

25    THREE VARIABLES IN THAT EQUATION.

1        SO OUR DEFINITION OF THIS TERM, OF "SLICE," IS IT'S "A

2    SEGMENT OF THE DATA STREAM."

3        APPLE'S CONSTRUCTION IS IT'S "A DISCRETE SEGMENT," SO LET

4    ME STOP RIGHT THERE.  MY FIRST QUESTION, AGAIN, BEING A LAWYER,

5    IS WHAT'S THE DIFFERENCE BETWEEN "SEGMENT" AND "DISCRETE

6    SEGMENT"?  HOW DO THEY DIFFER?  IT SEEMS TO ME THAT "SEGMENT"

7    CONVEYS EXACTLY WHAT EVERYONE NEEDS TO KNOW.  FRANKLY, I THINK

8    "SLICE" CONVEYS WHAT EVERYONE NEEDS TO KNOW.  BUT NEVERTHELESS,

9    I DON'T KNOW WHAT THE WORD "DISCRETE" MEANS, SO I DON'T AGREE

10   WITH IT.

11        THE COURT:  ISN'T THE CARD HE MAY BE HOLDING UP HIS

12   SLEEVE SOME TYPE OF ARGUMENT -- I DON'T MEAN TO CHARACTERIZE

13   MR. DECARLO -- I'M JUST SUGGESTING, JUST TO EXPLORE YOUR

14   CONCERN.

15        MR. PAVANE:  YEAH.

16        THE COURT:  ISN'T THE DIFFERENCE THAT WOULD BE

17   CREATED BY THE TWO CONSTRUCTIONS, OR THAT'S HIGHLIGHTED BY THE

18   TWO CONSTRUCTIONS, THAT IF THERE WAS OVERLAPPING DATA OR

19   REDUNDANT DATA FROM ONE SLICE TO THE NEXT, APPLE'S CONSTRUCTION

20   WOULD PROHIBIT ONE FROM CHARACTERIZING THAT AS TWO SLICES,

21   WHEREAS YOURS WOULD PERMIT THAT TYPE OF OVERLAP?

22        MR. PAVANE:  YOU'RE EMBARRASSING ME NOW BECAUSE I

23   DIDN'T THINK OF THAT.

24     BUT YES, I COULD SEE THAT.  I COULD SEE THAT.  I HADN'T

25   THOUGHT OF THAT, TO BE FRANK.

1    BUT, AGAIN, IT'S A SEGMENT OF THE DATA STREAM.  IT'S A

2    SLICE.  I DON'T THINK THERE'S ANYTHING THERE THAT SAYS THAT

3    THERE COULDN'T BE A LITTLE REDUNDANCY OVERLAP.

4         THE COURT:  AND I TAKE IT AS BETWEEN YOUR

5    CONSTRUCTION AND THE PLAIN AND ORDINARY MEANING OF "SLICE," YOU

6    WOULDN'T HAVE A PROBLEM WITH EITHER ONE AT THE END OF THE DAY?

7    WHAT YOU'RE CONCERNED ABOUT IS INTRODUCING THE "DISCRETE"

8    RESTRICTION?

9         MR. PAVANE:  YES, I THINK THAT'S FAIR, YOUR HONOR.

10    AND THEN AGAIN THE SECOND POINT IS THAT -- AND AGAIN, I

11    DON'T HAVE A REAL BIG PROBLEM HERE -- BUT THEY ADD ON THESE

12    WORDS "THAT RESULTS FROM THE DATA STREAM BEING DIVIDED."

13    AND MY ONLY PROBLEM WITH THAT IS THE FIRST PART OF THE

14    CLAIM SAYS -- THE FIRST PART OF THAT ELEMENT, EXCUSE ME, SAYS

15    "DIVIDING THE STREAM INTO A SEQUENCE OF SLICES."

16    SO IT'S ALREADY IN THE CLAIM, SO TO SAY "DIVIDING THE

17    STREAM INTO A SEQUENCE OF SLICES" AND THEN SAY "IT'S A SEGMENT

18    OF THE STREAM THAT RESULTS FROM THE STREAM BEING DIVIDED," IT

19    SEEMS TO ME IT'S REDUNDANT AND CONFUSING.

20    AND WITH THAT I WILL --

21         THE COURT:  OKAY.  THANK YOU VERY MUCH.

22         MR. DECARLO:  YOUR HONOR, MR. NICODEMA IS GOING TO

23    HANDLE THIS TERM FOR US.

24         MR. NICODEMA:  YOUR HONOR, I HOPE YOU DON'T MIND IF

25    WE CHANGE IT UP A LITTLE BIT.

1        THE COURT:  NOT AT ALL.

2        MR. NICODEMA:  MY LEGS ARE GETTING STIFF.

3     I HOPE I CAN MOVE IT ALONG AS FAST AS MY COLLEAGUE.

4     WHILE WE'RE SETTING THIS UP, I THINK YOUR HONOR HIT ON THE

5     POINT WHY WE WANT THE WORD "DISCRETE" AND THEY DON'T, AND YOU

6     WONDER WHY THEY WOULD OBJECT TO IT SO MUCH.

7     THE CLAIM IS CLEAR THAT EACH SLICE IS FORMED AS A RESULT OF

8     THE DIVIDING STEP, SO THEY'RE INDIVIDUALLY DISCRETE UNITS.

9     AND THE PATENT SPECIFICATION, IF WE EVER GET TO THAT ONE

10    SLIDE, SAYS THAT EACH OF THE SLICES CONTAINS A SEGMENT, JUST

11    ONE, A SEGMENT OF VIDEO AND/OR AUDIO DATA.  SO THAT'S ONLY

12    HIGHLIGHTING THE INDIVIDUAL DISCRETE NATURE OF THE SLICE.

13    AND IF YOU LOOK AT FIGURE 3A, IT SHOWS THEM AS INDIVIDUAL

14    UNITS, SLICE 1, SLICE 2, SLICE 3, AND SLICE 4.

15    SO WHAT WE'RE CONCERNED ABOUT IS ON THE NEXT SLIDE,

16    OVERLAPPING DATA WHERE THE JURY, AFTER IT HEARS SO MUCH

17    TECHNICAL TESTIMONY, MIGHT GET A LITTLE CONFUSED AND MIGHT SAY,

18    "OKAY, ARE THESE THREE SLICES TOGETHER ONE SEGMENT, OR NOT?"

19    SO IF YOU ADD THE WORD "DISCRETE," I THINK IT PREVENTS

20    THAT KIND OF CONFUSION.

21    I WON'T CALL IT MISCHIEF ON THE PART OF THE PLAINTIFFS.

22    I'LL CALL IT CONFUSION ON THE PART OF THE JURY.

23    AND IT DOESN'T HURT ANYBODY TO HAVE THE WORD "DISCRETE" IN

24    THERE.  IT HIGHLIGHTS THE FACT THAT EACH ONE OF THESE SLICES IS

25    INDIVIDUALLY DISTINCT FROM THE NEXT, AND I THINK IT'S GOING TO

1    AVOID CONFUSION DOWN THE ROAD.

2              THE COURT:  I SEE.  OKAY.  THANK YOU, MR. NICODEMA.

3              MR. NICODEMA:  YES, SIR.

4              THE COURT:  MR. PAVANE, ANY RESPONSE OR DO YOU WANT

5    TO TURN TO THE NEXT TERM?

6              MR. PAVANE:  THE ONLY THING I WOULD LIKE TO POINT OUT

7    IN TERMS OF, AGAIN, AVOIDING CONFUSION DOWN THE ROAD WITH THE

8    JURY IS THAT WE TALKED ABOUT THIS ISSUE OF MULTIPLE QUALITY

9    LEVELS, AND IF YOU JUST LOOK FOR A MINUTE AT FIGURE 3D --

10             THE COURT:  OKAY, I HAVE IT.

11             MR. PAVANE:  -- THIS IS AN AUDIO/VIDEO STREAM, BUT

12   THIS IS AN EXAMPLE -- AND AGAIN I'M NOT GOING TO GO THROUGH THE

13   WHOLE SPEC WITH YOU -- BUT I WILL REPRESENT THIS IS AN EXAMPLE

14   WHERE THEY'RE CREATING TWO DIFFERENT LEVELS OF THE DATA STREAM,

15   TWO DIFFERENT QUALITY LEVELS OF THE DATA STREAM, NUMBER 1 AND

16   NUMBER 2.

17        SO THE POINT I WANT TO MAKE HERE IS THAT EACH SEGMENT

18   HERE -- IN OTHER WORDS, THE STREAM IS DIVIDED INTO TWO, SO YOU

19   HAVE TWO STREAMS AND YOU HAVE TWO DIFFERENT LEVELS.  SO EACH

20   SEGMENT ACTUALLY GETS SLICED TWICE, IF YOU WILL, ONCE AT ONE

21   QUALITY LEVEL AND ONCE AT ANOTHER.

22        SO SAYING IT'S GOT TO BE DISCRETE, THEN DOES SOMEBODY SAY

23   IN FRONT OF A JURY, "WELL, IT'S NOT REALLY DISCRETE BECAUSE NOW

24   YOU'VE CREATED TWO, SO THOSE AREN'T DISCRETE.  THERE'S MORE

25   THAN ONE."

1      AND AGAIN, "SLICE," IT'S A CLEAR WORD.  THERE'S NO REASON

2   TO START BRINGING IN EXTRA WORDS THAT ARE GOING TO CONFUSE

3   ANYBODY.  THAT'S NOT THE PURPOSE OF CLAIM CONSTRUCTION.

4      THE COURT:  MR. PAVANE, LET ME ASK YOU, IF WE STEP

5   OUT OF THE PATENT FOR THE MOMENT AND TURN TO A PIZZA AND WE

6   SLICE THE PIZZA, OR CUT THE PIZZA INTO EIGHT SLICES, I TAKE

7   MR. NICODEMA'S POINT TO MEAN HE'S WORRIED YOU'RE GOING TO GRAB

8   TWO SLICES FROM THE PIE AND SAY YOU'VE GOT A SINGLE SLICE.

9   IS THAT A LEGITIMATE CONCERN THAT HE HAS?

10     MR. PAVANE:  WELL, AGAIN, I'LL ANSWER THAT FIRST BY

11  SAYING I THINK THAT'S A QUESTION, AN INFRINGEMENT QUESTION.

12  IT'S NOT REALLY A CLAIM CONSTRUCTION QUESTION.  "SLICE" MEANS

13  WHAT "SLICE" MEANS.  A SLICE IS A SEGMENT OF THE DATA, AND IT'S

14  A DISCRETE -- I AGREE IT'S A DISCRETE SEGMENT OF THE DATA.

15  IN MY MIND, AND TO ANSWER YOUR QUESTION DIRECTLY, I

16  HONESTLY CAN'T SEE HOW THAT WOULD BECOME RELEVANT IN THIS CASE

17  BASED ON MY UNDERSTANDING OF HOW THEIR SYSTEM WORKS AND WHAT

18  THIS IS DESCRIBING.

19     THE COURT:  BUT FOCUSSING, AS YOU PROPERLY DO, ON THE

20  PATENT, I'M NOT SUPPOSED TO EVEN -- I CAN LOOK AT THE PRODUCT,

21  BUT I'M NOT SUPPOSED TO THINK ABOUT IT TOO HARD IF I HAVE THE

22  LATEST FEDERAL CIRCUIT JURISPRUDENCE IN MIND -- BUT FOCUSSING

23  ON THE PATENT FOR A MOMENT, DO YOU THINK THAT THE PATENT

24  PERMITS A REFERENCE TO MORE THAN ONE OF THESE SLICES AS IS

25  DEPICTED UP ON THE SCREEN IN SLIDE 34 AS A SINGLE SLICE?

1          MR. PAVANE:  I GUESS THE ANSWER IS -- AND I'M REALLY

2     NOT TRYING TO BE EVASIVE HERE -- BUT I WOULD HAVE TO UNDERSTAND

3     HOW THOSE SLICES, THOSE TWO INDIVIDUAL SLICES -- AND AGAIN,

4     PUTTING ASIDE THE PATENT FOR A MINUTE.  LET'S TAKE YOUR CASE OF

5     THE PIZZA.  HOW ARE THOSE TWO INDIVIDUAL SLICES CREATED?

6          SO, FOR EXAMPLE, IF -- I DON'T KNOW -- TAKING YOUR PIZZA

7     ANALOGY, YOU KNOW, WHEN I GET A BIG PIE BACK WHERE I COME FROM

8     ON THE EAST COAST, THEY ALWAYS CUT IT IN EIGHT SLICES.  I DON'T

9     KNOW, I GUESS THEY DO THE SAME THING OUT HERE, RIGHT?

10         SO WHAT IF A GUY HANDS ME A PIZZA AND HE'S CUT IT INTO FOUR

11    SLICES, BUT IT'S INTENDED AS EIGHT?  IS THAT TWO SLICES REALLY

12    THERE OR IS IT REALLY ONE SLICE?

13         I WOULD HAVE TO KNOW HOW IT WAS BEING DONE TO REALLY BE

14    ABLE TO ANSWER THAT QUESTION IN ANY PARTICULAR CONTEXT.

15         BUT I THINK WE CAN ALL AGREE THAT SLICE 1, SLICE 2, THOSE

16    ARE THE INDIVIDUAL SLICES WE'RE TALKING ABOUT.

17            THE COURT:  THAT'S CERTAINLY WHAT'S DEPICTED IN

18    FIGURE 3A.

19            MR. PAVANE:  AND THAT'S WHAT'S DEPICTED.  THAT'S

20    EXACTLY RIGHT.  I AGREE WITH THAT.

21            THE COURT:  OKAY.  THANK YOU, MR. PAVANE.

22    WHY DON'T WE TURN TO THE NEXT TERM?

23            MR. PAVANE:  OKAY.

24         (PAUSE IN PROCEEDINGS.)

25            MR. PAVANE:  OKAY.  SO THE NEXT TERM IS, AGAIN GOING

1    FROM CLAIM 1 WHERE IT SPECIFIES "EACH SLICE HAVING A

2    PREDETERMINED DATA SIZE ASSOCIATED THEREWITH."

3        WE'VE ALREADY ESTABLISHED THAT THE STREAM HAS A GIVEN DATA

4    RATE, SO NOW WE ARE TALKING ABOUT GIVING IT A PREDETERMINED

5    DATA SIZE, SO WE'RE ASSIGNING SOME DATA SIZE TO THE SLICES.

6        SO OUR DEFINITION IS "EACH SLICE HAVING AN ASSIGNED DATA

7    SIZE," OKAY, "PREDETERMINED," "ASSIGNED," I CAN LIVE WITH

8    "PREDETERMINED DATA SIZE," AND ALL WE'RE RELATING TO IT, "WHICH

9    MAY BE AN ASSIGNED TIME DURATION."

10       NOW, AGAIN, I'M ADDING THAT PURELY FOR CLARITY.  I THINK I

11   WOULD BE ENTITLED TO ARGUE THAT IN FRONT OF A JURY EVEN IF

12   THOSE WORDS WEREN'T IN THE CLAIM CONSTRUCTION.

13       BUT THE REASON WE DID THAT IS BECAUSE THE WAY THE PATENT

14   SPECIFICALLY TALKS ABOUT CREATING THAT ASSIGNED DATA SIZE, I

15   THINK AS YOU'VE SEEN BY NOW, IS THAT IT SETS UP A TIME

16   DURATION.  ONCE IT HAS AN ASSIGNED DATA RATE ON THE DATA

17   STREAM, IT SLICES IT UP ACCORDING TO FIXED TIME DURATIONS.

18       AND IN FACT, I BELIEVE THERE'S EVEN A DEPENDENT CLAIM

19   HERE.  YEAH, IF YOU LOOK AT, FOR EXAMPLE, CLAIM 23 WHICH REFERS

20   BACK TO CLAIM 1, IT ACTUALLY SAYS "DIVIDING THE STREAM INTO THE

21   SEQUENCE OF SLICES COMPRISES DIVIDING THE STREAM INTO A

22   SEQUENCE OF TIME SLICES, EACH HAVING A PREDETERMINED DURATION

23   ASSOCIATED THEREWITH."

24       SO THE POINT IS THAT THAT'S THE WAY IT'S DESCRIBED IN THE

25   PATENT -- AND I'M LOOKING FOR THE PASSAGE.

1        DO YOU KNOW WHAT THE PASSAGE IS THAT TALKS ABOUT THE

2   SECONDS?

3        GIVE ME ONE SECOND HERE.

4        WE'RE ON TERM 5?

5            MR. DECARLO:  YES.

6            MR. PAVANE:  YEAH.  IF YOU LOOK, FOR EXAMPLE, AT

7   COLUMN 2 AT LINE, I GUESS IT'S 4, IT SAYS "THE DATA STREAM IS

8   DIVIDED INTO A SEQUENCE OF SEGMENTS OR SLICES OF DATA,

9   PREFERABLY TIME SLICES, WHEREIN THE DATA IS PREFERABLY

10  COMPRESSED."

11       SO AGAIN, WE'RE GETTING ACROSS THE CONCEPT, FOR THE JURY'S

12  SAKE, THAT FIXING THE DATA SIZE DOESN'T MEAN THAT YOU HAVE TO

13  SAY "I'M GOING TO PUT 200 KILOBYTES IN THERE" AND KNOW THAT YOU

14  COULD MEAN IT CAN BE -- I'VE GIVEN IT A DATA RATE.  YOU CAN SAY

15  "I'M GOING TO SLICE IT FOR TWO SECONDS," SO IF IT'S 100

16  KILOBYTES PER SECOND AND IT'S A TWO SECOND SLICE, I KNOW IT'S

17  GOING TO BE 200 KILOBYTES.

18           THE COURT:  SO TWO QUESTIONS FOR YOU ON THIS ONE,

19  MR. PAVANE.

20           MR. PAVANE:  SURE.

21           THE COURT:  MY FIRST QUESTION IS, YOU USE THE

22  LANGUAGE "WHICH MAY BE AN ASSIGNED TIME DURATION."  I TAKE IT

23  BY THAT THAT YOU DON'T MEAN TO SUGGEST THAT IT HAS TO BE AN

24  ASSIGNED TIME DURATION.  AM I RIGHT?

25           MR. PAVANE:  YES, I AGREE THAT -- YES, I DO AGREE

```
1    WITH THAT.

2              THE COURT:  OKAY.

3              MR. PAVANE:  THAT THERE MIGHT BE A WAY TO DO IT WHERE

4    YOU COULD SAY --

5              THE COURT:  I CAN'T IMAGINE WHAT IT MIGHT BE.

6              MR. PAVANE:  I CAN'T, EITHER, AND THAT'S WHY I

7    HESITATED.  EXACTLY RIGHT.

8              THE COURT:  OKAY.  MY SECOND QUESTION IS, WHAT IS IT

9    ABOUT APPLE'S LANGUAGE THAT YOU THINK WOULD PREVENT OR PRECLUDE

10   AN ASSIGNED TIME DIVISION PROVIDING THE ASSIGNED DATA SIZE?

11        IN OTHER WORDS, IS THERE SOMETHING ABOUT THE LANGUAGE THAT

12   APPLE IS PROVIDING THAT GIVES YOU CONCERN THAT TIME DURATION

13   MIGHT NOT BE THE METHOD BY WHICH THE SIZE IS DETERMINED?

14             MR. PAVANE:  OKAY, FAIR ENOUGH, AND I THINK THAT'S

15   WHAT I WAS TRYING TO SAY AT THE BEGINNING.

16        IN OTHER WORDS -- A COUPLE OF THINGS THERE.  WHEN THEY SAY

17   "AN AMOUNT OF DATA," FIRST OF ALL, "MEASURED IN BITS," I HAVE

18   THE SAME PROBLEM WITH "BITS" THAT I HAD WITH "BITS PER SECOND."

19   THAT'S MY FIRST POINT.

20             THE COURT:  I'LL GIVE YOU A STANDING OBJECTION ON

21   "BITS."

22             MR. PAVANE:  OKAY, FAIR ENOUGH.

23        BUT IN TERMS OF "ASSIGNED IN ADVANCE" -- "AMOUNT OF DATA

24   ASSIGNED IN ADVANCE," SO MY CONCERN IS THAT IF OUR SYSTEM IS

25   SET UP AND IT SAYS "THE ALGORITHM READS, ASSIGN THIS DATA
```

1    RATE," LET'S SAY IT'S AGAIN 100 KILOBYTES PER SECOND TO KEEP IT

2    SIMPLE, "AND SET THE SLICE DURATION AS TWO SECONDS," I'M

3    CONCERNED THAT SOMEBODY MIGHT SAY, "WELL, THEY DIDN'T ASSIGN A

4    DATA SIZE.  ALL THEY DID WAS TELL IT HOW MUCH TIME TO MAKE.

5    THEY DIDN'T SAY PUT 200 KILOBYTES IN THERE."

6         AND I KNOW IT'S LIKE A CHILD'S LITERAL READING.  BUT AGAIN,

7    BEING CAUTIOUS, BEING A LAWYER, THAT DOES CONCERN ME.

8         AND IF THAT'S NOT WHAT'S HAPPENING HERE, THEN I PROBABLY

9    WOULDN'T CARE.

10        THE COURT:  ALL RIGHT.  THANK YOU, MR. PAVANE.

11   WHO'S UP FOR APPLE ON THIS?

12        MR. DECARLO:  I THINK I'M TAKING THIS ONE, YOUR

13   HONOR.

14        THE REAL DISPUTE HERE, YOUR HONOR, IS WHAT DOES THE CLAIM

15   SAY?  WHAT DOES THE PATENT SAY?  AND CAN SIZE BE A TIME?

16        I MEAN, THESE ARE THE WORDS THAT THEY'VE CHOSEN IN THEIR

17   CLAIM, "PREDETERMINED DATA SIZE," AND A SIZE HAS TO BE MEASURED

18   IN BITS, AND "PREDETERMINED" MEANS YOU HAVE TO DECIDE IT IN

19   ADVANCE.  I THINK THE CLAIM LANGUAGE IS VERY CLEAR.

20        AND THE SPECIFICATION DISCLOSES THAT THE DATA, WHEN YOU ARE

21   TALKING ABOUT THE DATA COMPROMISING EACH SLICE, IT IS MEASURED

22   IN BITS.  THE DATA UNITS ARE EXPRESSED IN BITS.

23        THERE'S AN EXAMPLE, A QUOTATION, "FILE 42," WHICH IS ONE OF

24   THOSE SLICES THAT WE WERE CONCERNED ABOUT BEING DISCRETE,

25   THAT'S A REFERENCE NUMERAL TO ONE OF THESE DISCRETE SLICES,

1       "MAY BE ASSIGNED A FILE SIZE OF 10 KILOBYTES."

2           WHEN IT TALKS ABOUT SIZE, IT TALKS ABOUT BYTES OR BITS.

3           AND THE ORDER OF STEPS IS CLEAR.  YOU DIVIDE THE STREAM

4       INTO A SEQUENCE OF SLICES AND THEN EACH SLICE HAS A

5       PREDETERMINED DATA SIZE ASSOCIATED THEREWITH.

6           EMBLAZE'S CONSTRUCTION READS "PREDETERMINED" OUT OF THE

7       CLAIM.  IT'S GONE.  WHERE'S THE CONCEPT OF DOING THIS IN

8       ADVANCE?

9               THE COURT:  DOESN'T "ASSIGNED" GET US THERE?

10              MR. DECARLO:  ASSIGNED WHEN?  I MEAN --

11              THE COURT:  SO IF I SAID "PREASSIGNED," WOULD THAT

12      SOLVE THAT PROBLEM?

13              MR. DECARLO:  WHAT'S THAT?

14              THE COURT:  IF I SAID "PREASSIGNED"?

15              MR. DECARLO:  PREASSIGNED TO WHAT?  PREASSIGNED TO

16      FORMING THE SLICE?  IF IT'S PREASSIGNED TO FORMING THE SLICE,

17      WE MAY BE ABLE TO LIVE WITH THAT.

18              THE COURT:  WHICH IS ESSENTIALLY WHAT YOU'RE

19      SUGGESTING WHEN YOU SAY "AT THE TIME IN ADVANCE" --

20              MR. DECARLO:  "IN ADVANCE OF THE STREAM BEING

21      DIVIDED."

22          OTHERWISE -- AGAIN, THERE HAS TO BE SOME CLARITY HERE.

23      THERE HAS TO BE SOME STRUCTURE TO THIS CLAIM.

24          AND THE PATENT SPECIFICATION MAKES CLEAR, AND EMBLAZE, IN

25      THEIR BRIEFING, ADMITS THAT DATA SIZE AND TIME DURATION ARE

1    DIFFERENT THINGS.  THEY'RE NOT THE SAME.  THEY DON'T CONTEND

2    THAT A TIME DURATION IS THE SAME AS A PREDETERMINED DATA SIZE,

3    AND THEY CAN'T BECAUSE THE PATENT ITSELF POINTS OUT THAT

4    THEY'RE DISTINCT, AND IT POINTS OUT THERE ARE MULTIPLE

5    EMBODIMENTS.

6        IN COLUMN 13, IT MAKES CLEAR THAT IT'S UNDERSTOOD THAT IN

7    SOME CASES THE SLICES OF THE STREAM MAY BE TIME SLICES, BUT MAY

8    RATHER HAVE AN APPROPRIATE PREFERABLY VARIABLE DATA SIZE

9    ASSOCIATED THEREWITH.

10       SO THE BOTTOM LINE IS THE SPECIFICATION TEACHES TWO

11   EMBODIMENTS.  YOU CAN DO SLICE -- YOU CAN PREDETERMINE THE SIZE

12   IN BITS, OR YOU CAN SET A TIME AND BE SATISFIED THAT THE TIME

13   MAY, YOU KNOW, GET YOU WHERE YOU WANT TO GET.

14       BUT THIS IS THE INDEPENDENT CLAIM.

15       THE DEPENDENT CLAIMS ARE THE ONES THAT TALK ABOUT THE TIME

16   DURATION.  SO THE INDEPENDENT CLAIM SAYS YOU HAVE TO

17   PREDETERMINE THE DATA SIZE, AND WE ALL KNOW FROM 112, PARAGRAPH

18   4 THAT DEPENDENT CLAIMS ADD ADDITIONAL LIMITATIONS.  THEY DON'T

19   TAKE LIMITATIONS OUT OF THE INDEPENDENT CLAIM.

20       THEIR CONSTRUCTION IS KIND OF LIKE F EQUALS MA, AND THEY'RE

21   TRYING TO ARGUE THAT FORCE IS MASS.

22       THEY'RE NOT THE SAME UNIT.  YOU CAN CALCULATE THEM FROM ONE

23   OR THE OTHER.

24       AND I THINK THIS IS THE ISSUE.  YES, WE'RE NOT GOING TO

25   DISPUTE THE FACT THAT IF YOU KNOW THE PRECISE AMOUNT OF BITS

1    THAT ARE TRAVELLING INTO THAT SLICE AND YOU HAVE A

2    PREDETERMINED TIME DURATION, YOU CAN CALCULATE HOW MANY BITS

3    ARE GOING TO BE THERE.

4        BUT CALCULATION IS A POST-DETERMINATION.  THE CLAIM SAYS

5    PREDETERMINATION.  YOU'VE GOT TO SET THAT FILE SIZE IN ADVANCE.

6        AND THE FIGURE THAT MR. PAVANE POINTED TO, WHICH IS FIGURE

7    3D, IF YOU NOTICE, A, IT SUPPORTS OUR ARGUMENT ABOUT THE SLICES

8    BECAUSE EVEN THERE ALL OF THOSE SLICES ARE DISCRETE SLICES AND

9    THEY'RE DESCRIBED AS SO IN THE SPECIFICATION, BUT YOU'LL NOTICE

10   IN THE VIDEO SLICES, THERE'S AN ENTRY IN THAT SLICE.

11       AND WHAT DOES IT SAY?  SIZE.

12       WELL, THE ONLY WAY YOU'RE GOING TO KNOW WHAT THAT SIZE IS,

13   IF IT WAS PREDETERMINED, IS BEFORE YOU MADE THE SLICE.

14           THE COURT:  SO IS -- I'M SORRY FOR INTERRUPTING YOU.

15           MR. DECARLO:  NO, PLEASE.

16           THE COURT:  I WAS GOING TO ASK, IF WE PREASSIGN OR

17   PREDEFINE THE TIME DURATION BEFORE THE STREAM IS DIVIDED,

18   WOULDN'T IT SOLVE THAT PROBLEM YOU'VE JUST IDENTIFIED THAT --

19           MR. DECARLO:  ASSUMING THAT THE DATA RATE REMAINS

20   CONSTANT.  OTHERWISE YOU HAVEN'T PREDETERMINED A DATA SIZE.

21   YOU'VE PREDETERMINED A SLICE OF TEN SECONDS AND I DON'T KNOW

22   HOW MANY BITS ARE GOING TO BE IN THERE.

23       BUT THEY'RE THE ONES WHO CHOSE TO CLAIM THE PREDETERMINED

24   DATA SIZE, AND THE SPECIFICATION CLEARLY IDENTIFIES THAT THESE

25   ARE ALTERNATIVE EMBODIMENTS.

1    THEY CHOSE THE CLAIM, THE DATA SIZE EMBODIMENT.  WHY?

2    BECAUSE APPLE DOESN'T DO THAT.  THAT'S WHY THEY WANT TO DO

3    THAT.

4        BUT LET'S TALK ABOUT CLAIM DIFFERENTIATION FOR A MOMENT

5    BECAUSE THIS IS ONE OF THE THINGS THAT MR. PAVANE POINTED OUT.

6        CLAIM 23 ADDS THE CONCEPT OF THE TIME DURATION TO CLAIM 1.

7    IT DOESN'T EXTRACT THE DATA SIZE AND SAY REPLACE IT WITH TIME.

8        SO BECAUSE IT'S A DEPENDENT CLAIM, CLAIM 23 REQUIRES THAT

9    YOU PREDETERMINE THE DATA SIZE AND YOU PREDETERMINE THE TIME,

10   AND THE PATENT SPECIFICATION HAS AN EXACT RECITATION OF THAT

11   WHERE, IN ONE OF THE EXAMPLES AT COLUMN 11, 56 THROUGH 59, IT

12   SPECIFICALLY SAYS, HERE'S AN EXAMPLE, ADMITTEDLY, VERY LOW BIT

13   RATES BECAUSE YOU'RE TALKING ABOUT 1998, BUT WHAT DO THEY DO?

14   THEY SET BOTH THE DATA SIZE AND THE TIME.

15       SO THEY'RE DISTINCT.  THIS IS HOW THEY CLAIMED IT.

16       AND THEN AS A DEPENDENT FEATURE, THEY SAID YOU CAN ALSO SET

17   THE TIME AND THE TIME CAN CORRESPOND, IN CLAIM 37, TO A TIME

18   DURATION.

19       THE DATA SIZE CAN CORRESPOND, BUT THAT DOESN'T MEAN --

20   AGAIN, THAT CORRESPONDENCE RELATIONSHIP IS GOING TO EXIST AS A

21   POST-FORMATION CALCULATION.

22       SO "PREDETERMINED DATA SIZE" MEANS WHAT IT SAYS.  I DECIDE

23   IN ADVANCE OF MAKING THIS SLICE HOW MANY BITS I WANT IN THAT

24   FILE.

25           THE COURT:  ALL RIGHT.  THANK YOU, MR. DECARLO.

1          MR. DECARLO:  YOU'RE WELCOME.

2          THE COURT:  MR. PAVANE, I'M GOING TO GIVE YOU A

3     CHANCE TO RESPOND AND TURN TO THE NEXT TERM, BUT I DO NEED TO

4     TAKE A SHORT BREAK.

5          MR. PAVANE:  ABSOLUTELY.

6          THE COURT:  IF WE CAN TAKE FIVE OR TEN MINUTES, WE'LL

7     COME BACK AFTER THAT.

8          MR. PAVANE:  SURE.

9          MR. DECARLO:  THANK YOU, YOUR HONOR.

10     (RECESS FROM 3:09 P.M. UNTIL 3:30 P.M.)

11          THE COURT:  OKAY, COUNSEL, I BELIEVE WE WERE ABOUT TO

12     HEAR A BRIEF REBUTTAL FROM MR. PAVANE BEFORE WE TURN TO THE

13     NEXT TERM.

14          MR. PAVANE:  YES.  THANK YOU, YOUR HONOR.

15     OKAY, A FEW POINTS I WANT TO MAKE HERE.

16     I JUST WANT TO DIRECT YOUR HONOR TO A COUPLE OF SHORT

17     PASSAGES IN THE PATENT AND THEN MAKE A COUPLE OF VERY QUICK

18     POINTS.

19     IF YOU LOOK AT COLUMN 3, YOUR HONOR, AT LINE 40 --

20          THE COURT:  I HAVE IT.

21          MR. PAVANE:  -- IT SAYS "PREFERABLY DIVIDING THE

22     STREAM INTO A SEQUENCE OF SLICES," INCLUDING -- "INCLUDES

23     DIVIDING THE STREAM INTO A SEQUENCE OF TIME SLICES, EACH HAVING

24     A PREDETERMINED DURATION."

25          COLUMN 5, LINE 33 TO 35, "FURTHER PREFERABLY, THE DATA

1    STREAM INCLUDES MULTI-MEDIA DATA AND THE PREDETERMINED DATA

2    SIZE OF EACH OF THE SLICES CORRESPONDS TO A TIME DURATION OF

3    THE SLICE."

4        AND 9:33 TO 36 IS TO THE SAME EFFECT.

5        NOW, I THINK, HEARING MR. DECARLO SPEAK, WE, OF COURSE, NOW

6    UNDERSTAND WHERE THIS IS GOING.  MR. DECARLO WANTS TO BE ABLE

7    TO SAY TO THE JURY, "WELL, YOU KNOW, THEY HAD A GIVEN RATE ON

8    THE DATA STREAM, AND YES, WE ADMIT THAT THEY ASSIGNED IT A

9    GIVEN TIME DURATION, WHICH WE ADMIT WOULD RESULT IN A SPECIFIC

10   PREDETERMINED DATA SIZE.  BUT THEY DIDN'T ASSIGN IT A DATA

11   SIZE, SO THEREFORE, THERE'S NO INFRINGEMENT."  THAT'S WHAT HE

12   WANTS TO BE ABLE TO ARGUE.

13       AND IF YOU LOOK BACK AT THE WORDS OF THE CLAIM AT THE VERY

14   TOP OF THE SCREEN, "EACH SLICE HAVING A PREDETERMINED DATA SIZE

15   ASSOCIATED THEREWITH," I HAVE EVERY RIGHT TO ARGUE TO THE JURY

16   THAT IF YOU HAVE A GIVEN DATA RATE IN THE DATA STREAM AND YOU

17   SET THE TIME DURATION THAT YOU HAVE ESTABLISHED A PREDETERMINED

18   DATA SIZE, EXACTLY AS THE CLAIM REQUIRES.

19       IT DOESN'T SAY HOW YOU DID IT, IT JUST SAYS EACH SLICE HAS

20   IT, AND I HAVE EVERY RIGHT TO MAKE THAT ARGUMENT AND

21   MR. DECARLO SHOULD NOT BE ABLE TO ADOPT A CONSTRUCTION THAT

22   SAYS, "NO, NO, YOU HAVE TO SPECIFY IT IN TERMS OF BITS OR SOME

23   UNIT OF DATA SIZE."  THAT'S NOT WHAT THE CLAIM SAYS.

24       ALSO, I JUST SHOWED YOU IN THE SPECIFICATION THAT IT SAYS

25   REPEATEDLY THAT THE PREFERRED WAY OF DOING THIS IS BY SETTING

1       THE TIME DURATION OF THE SLICES.

2          I THINK WE'RE ALL FAMILIAR WITH THE FEDERAL CIRCUIT CASE

3       LAW THAT SAYS A CONSTRUCTION THAT READS THE PREFERRED

4       EMBODIMENTS OUT OF A CLAIM IS RARELY, IF EVER, CORRECT.

5          THAT'S EXACTLY WHAT THEY WANT TO DO.  THEY WANT TO COME UP

6       WITH A NON-INFRINGEMENT ARGUMENT THROUGH THIS CLAIM

7       CONSTRUCTION ARGUMENT.

8          THE THIRD THING I WANT TO POINT OUT IS, AND MAYBE YOUR

9       HONOR UNDERSTOOD THIS BUT I DID NOT UNDERSTAND IT, IF YOU LOOK

10      AT, FOR EXAMPLE, AT THE DEPENDENT CLAIMS THAT MR. DECARLO

11      CITED, LET'S LOOK AT 37 WHICH REFERS BACK TO 25 WHICH HAS THE

12      SAME LIMITATION AS CLAIM 1, AND YOU CAN DO THE SAME THING WITH

13      CLAIM 23 WHICH REFERS TO CLAIM 1, BUT LET'S LOOK AT 37, 37

14      WHERE IT SAYS "WHEREIN THE PREDETERMINED DATA SIZE OF EACH

15      SLICE CORRESPONDS TO A TIME DURATION OF THE SLICE."

16         IT'S THE SAME THING.  THEY'RE INTERCHANGEABLE.  IF YOU SET

17      THE TIME DURATION -- AND THIS IS WHAT I TOLD YOU RIGHT AT THE

18      BEGINNING, THERE'S ONLY THREE VARIABLES IN THAT EQUATION -- IF

19      YOU SET THE TIME DURATION, YOU HAVE SET A PREDETERMINED DATA

20      SIZE, AND THAT'S ALL THE CLAIM REQUIRES.

21         IT DOESN'T SAY "SPECIFY THE DATA SIZE OF THE SLICE."  IT

22      DOESN'T SAY HOW YOU DO IT.  IT JUST SAYS EACH SLICE HAS TO HAVE

23      THAT, AND YOU CAN HAVE THAT BY SETTING THE TIME DURATION.

24            THE COURT:  MR. PAVANE, OVER THE BREAK I ALSO WAS

25      READING THE SPECIFICATION AND IT OCCURRED TO ME THAT IN COLUMN

1    13 -- I'M SORRY -- YES, COLUMN 13, LINE 42, THERE'S A

2    DISCUSSION THERE THAT, NUMBER ONE, OF COURSE THE PREFERRED

3    EMBODIMENTS ARE NOT THE ONLY EMBODIMENTS WHICH ARE BEING

4    CLAIMED, THAT'S EARLIER IN THAT PARAGRAPH, BUT IT'S FURTHER

5    DISCUSSED THAT THE SLICES OF THE DATA STREAM CORRESPONDING TO

6    THE FILES WILL NOT NECESSARILY BE TIME SLICES.

7        DO YOU READ THAT AS SUGGESTING THAT THEY MAY BE OTHER

8    THINGS, BUT THEY CERTAINLY COULD BE TIME SLICES?

9            MR. PAVANE:  CERTAINLY COULD BE TIME SLICES,

10   ABSOLUTELY.

11           THE COURT:  YEAH.

12           MR. PAVANE:  AND AGAIN, WHEN YOU SET A TIME, A TIME

13   SLICE WITH A PREDETERMINED DURATION, YOU HAVE ESTABLISHED A

14   DATA SIZE.  AND THAT'S ALL THE CLAIM SAYS, THAT YOU HAVE TO

15   HAVE A PREDETERMINED DATA SIZE.

16       IT DOESN'T SAY YOU HAVE TO SAY TO WHATEVER THE DEVICE IS

17   THAT'S SETTING IT, "SET IT AT THIS DATA SIZE."  IT DOESN'T SAY

18   THAT.  IT JUST SAYS IT HAS TO HAVE A PREDETERMINED DATA SIZE.

19           THE COURT:  ALL RIGHT.  THANK YOU, MR. PAVANE.

20   YOU WANT TO TURN TO THE NEXT TERM?

21           MR. PAVANE:  SURE.

22       OH, AND BY THE WAY, JUST ONE OTHER QUICK THING ON THAT IF I

23   COULD?  THE POINT I WAS MAKING -- YOU KIND OF SIDETRACKED ME A

24   LITTLE BIT.

25           THE COURT:  THAT'S WHAT I DO, MR. PAVANE.

1          GO BACK AND MAKE THE POINT YOU WANT TO MAKE.

2          MR. PAVANE:  AND USUALLY I'M GOOD AT KEEPING TRACK,

3     BUT I LOST IT THERE.

4          IN CLAIM 37, THE POINT I WANTED TO MAKE IS THAT DEPENDENT

5     CLAIMS ARE, BY DEFINITION, NARROWER.

6          THE COURT:  RIGHT.  THEY ADD LIMITATIONS.

7          MR. PAVANE:  RIGHT, SO THEY'RE NARROWER.  SO THAT

8     WOULD MEAN THAT THE BROAD CLAIM HAS TO INCLUDE, IN ITS GENERAL

9     SENSE, WHAT IS IN THAT NARROW CLAIM.  SO YOU CAN'T MAKE THE

10    NARROW CLAIM BROADER THAN THE INDEPENDENT CLAIM FROM WHICH IT

11    DEPENDS.  SO YOU CAN'T MAKE A NEW EMBODIMENT.

12    MR. DECARLO'S POINT IS YOU ONLY CLAIMED THE EMBODIMENT IN

13    CLAIM 1 OF THE DATA SIZE, BUT YET YOU'VE GOT A DEPENDENT CLAIM

14    THAT SAYS YOU CAN SET THE DATA SIZE BY HAVING A TIME DURATION.

15         SO IT CAN'T BE RIGHT THAT THAT WERE RIGHT, BECAUSE IF IT

16    WERE LIMITED, THEN YOU'D BE BROADENING OUT THE CLAIM BY ADDING

17    A SECOND EMBODIMENT AND YOU CAN'T DO THAT.

18         THE COURT:  TO USE A MORE ABSTRACT EXAMPLE, IF AN

19    INDEPENDENT CLAIM CLAIMS AN ARTICLE COMPRISING A AND B AND A

20    DEPENDENT CLAIM CLAIMS THE CLAIM, THE PREVIOUS CLAIM, BUT

21    DEFINES A AS 1, PRESUMABLY ONE CAN LOOK AT EACH OF THOSE TWO

22    CLAIMS TOGETHER AND UNDERSTAND THAT THE REFERENCE TO A IN CLAIM

23    1 INCLUDES THE NUMERAL 1.

24         MR. PAVANE:  CORRECT.  WHAT YOU COULDN'T DO IS

25    ELIMINATE B OR A.  YOU COULDN'T SAY "WHEREIN CLAIM 1 IS ONLY

```
1        A."  THAT WOULD BE BROADENING AND THAT'S --

2              THE COURT:  OKAY.

3              MR. PAVANE:  OKAY.  THAT'S THE POINT I WANTED TO

4        MAKE.

5              THE COURT:  ALL RIGHT.

6              MR. PAVANE:  THANK YOU, YOUR HONOR.

7              THE COURT:  WHAT'S NEXT?

8              MR. PAVANE:  OKAY.  I THINK WE JUMP NOW TO TERM 16 BY

9        AGREEMENT.  IS THAT WHAT YOU HAVE?

10             MR. DECARLO:  CORRECT.  WHICH IS --

11             MR. PAVANE:  OKAY.  AGAIN, I'M USING MR. DECARLO'S

12       SLIDE SINCE WE ALL -- IS THIS IT?

13             MR. DECARLO:  TERM 16.

14             THE COURT:  I GOT CONFUSED BY 23 AND 37 UP THERE, BUT

15       THAT'S -- OKAY.  ANYWAY.

16          SO THE TERM THAT -- THE TERMS THAT WE'RE DEALING WITH, AND

17       LET'S DEAL IN CLAIM 23, AND THIS IS -- NOW WE'RE IN THE

18       DEPENDENT CLAIM, SO IT SAYS "WHEREIN DIVIDING THE STREAM" --

19       AND I THINK WE'VE KIND OF DONE THIS, IT'S KIND OF WHAT WE JUST

20       TALKED ABOUT -- IT SAYS "WHEREIN DIVIDING THE STREAM INTO THE

21       SEQUENCE OF SLICES COMPRISES DIVIDING THE STREAM INTO A

22       SEQUENCE OF TIME SLICES, EACH HAVING A PREDETERMINED DURATION

23       ASSOCIATED THEREWITH."

24          AND THERE'S SIMILAR LANGUAGE IN CLAIM 23 WHICH -- I'M

25       SORRY.  THE FIRST ONE I GUESS IS CLAIM 23, AND THE SECOND ONE
```

1    IS CLAIM 37.  MY APOLOGIES.  AND WE JUST WENT THROUGH THOSE.

2        SO THE DIFFERENCE IN OUR CONSTRUCTIONS IS APPLE IS SAYING

3    THAT IT MEANS "THE STREAM IS DIVIDED INTO A SEQUENCE OF SLICES,

4    EACH SLICE HAVING AN ASSIGNED DATA SIZE AND AN ASSIGNED TIME

5    DURATION, WITH BOTH THE DATA SIZE AND THE TIME DURATION OF EACH

6    SLICE BEING ASSIGNED IN ADVANCE OF THE STREAM BEING DIVIDED."

7        I DON'T THINK I NEED TO GO INTO THE DETAILS OF THAT.  MY

8    POINT IS THAT'S A NONSENSICAL READING.  THE PATENT SAYS THE

9    PREFERRED EMBODIMENT IS YOU SET THE DATA SIZE BY SETTING THE

10   TIME DURATION.  IT DOESN'T SAY YOU HAVE TO SET BOTH.  AND

11   AGAIN, WHEN YOU SET ONE, YOU'RE AUTOMATICALLY SETTING THE OTHER

12   ONE.

13       SO I THINK THAT'S A NONSENSICAL READING.  IT TRIES TO READ

14   THE PREFERRED EMBODIMENTS OUT OF THE CLAIM, OUT OF THE PATENT,

15   AND IS -- AND THE COURT'S -- OBVIOUSLY WHAT THEY'RE TRYING TO

16   DO, TO MAKE CLEAR, IS DEVELOP A NON-INFRINGEMENT ARGUMENT.

17       I DON'T THINK I NEED TO SAY ANYTHING MORE ON THAT TERM.

18           THE COURT:  ALL RIGHT.  THANK YOU, MR. PAVANE.

19       MR. DECARLO, YOU WANT TO RESPOND?

20           MR. DECARLO:  YES, YOUR HONOR.

21       I THINK CLAIM CONSTRUCTION IS ALWAYS ADDRESSING

22   INFRINGEMENT ARGUMENTS.

23           THE COURT:  AND INVALIDITY.

24           MR. DECARLO:  AND INVALIDITY ARGUMENTS AS WELL, YOUR

25   HONOR.  I THINK THAT'S WHAT WE'RE HERE TODAY TO DO IS TO

1   UNDERSTAND THE METES AND BOUNDS SO THAT WE KNOW HOW TO APPLY

2   THEM.

3       BUT I THINK -- LET'S BACK UP A LITTLE BIT.  FIRST OF ALL,

4   BOTH SIDES UNDERSTAND THAT CLAIMS 23 AND 37 ARE BEING READ THE

5   SAME WAY.

6       SO NOTICE, WHILE MR. PAVANE TRIED TO KIND OF LUMP THIS

7   TOGETHER WITH THE "PREDETERMINED DATA SIZE" ARGUMENT, THEIR

8   CONSTRUCTION OF CLAIMS 23 AND 37, FOR TERM 16, IS THAT "THE

9   PREDETERMINED DATA SIZE IS ESTABLISHED BY SETTING THE TIME

10  DURATION OF THE SLICES."

11      WELL, THAT'S WHAT HE SAID WAS IN CLAIM 1, SO WHERE'S THE

12  MEANINGFUL LIMITATION BEING ADDED BY THE DEPENDENT CLAIM?

13      AND I'LL AGREE THAT WHEN YOU --

14          THE COURT:  IF I COULD INTERRUPT YOU, MR. DECARLO?  I

15  THOUGHT I HEARD MR. PAVANE SUGGEST THAT IN CLAIM 1 IT MAY BE

16  ESTABLISHED IN THIS WAY.  IN OTHER WORDS, IT COULD BE.

17          MR. DECARLO:  THAT'S HIS ARGUMENT, YOUR HONOR, BUT

18  THAT'S NOT WHAT THE CLAIM SAYS.

19      AND WHILE MR. PAVANE DISCUSSES A LOT ABOUT PREFERRED

20  EMBODIMENTS AND THIS AND THAT, THE FACT IS THERE ARE TWO.  IT

21  DESCRIBES MULTIPLE EMBODIMENTS.  THEY CLAIMED ONE.

22      THAT'S NOT TO SAY THAT -- IT'S PERFECTLY PERMISSIBLE, IT'S

23  DONE ALL THE TIME, YOUR HONOR, WHERE YOU DECIDE ON AN

24  EMBODIMENT.

25      AND THEY DECIDED, IN THE FIRST INSTANCE, TO HAVE ALL THE

1      CLAIMS REQUIRE THAT YOU PREDETERMINE A DATA SIZE.  OKAY?

2          AND THEN THEY CLAIMED OTHER EMBODIMENTS WHICH, BY THE WAY,

3      ARE ALSO SUPPORTED IN THE SPECIFICATION.  AN EXAMPLE THAT I

4      READ TO YOU EARLIER, A NUMERIC EXAMPLE WHERE IT SAID YOU SET

5      BOTH AT THE SAME TIME, OR AT THE END OF THE PATENT

6      SPECIFICATIONS, WHICH YOU READ DURING THE BREAK, YOU CAN DO ONE

7      OR YOU CAN DO THE OTHER.

8          AND THE RECITATIONS THAT MR. PAVANE TALKED ABOUT EARLIER

9      WERE BASICALLY FROM THE SUMMARY OF THE INVENTION WHERE THE

10     CLAIM LANGUAGE WAS REPEATED, SO WE'RE ONLY TALKING ABOUT THE

11     DESCRIPTIONS OF THE EMBODIMENTS IN THAT RESPECT.

12         BUT I WANT TO GO TO THAT STATEMENT THAT THE STREAM

13     CORRESPONDING TO THE FILES WILL NOT NECESSARILY BE TIME SLICES.

14         BUT THEN ON THE NEXT LINE IT SAYS "IT MAY RATHER HAVE AN

15     APPROPRIATE."

16         SO I DO THINK THAT THE DISTINCTION THERE IS THAT IT'S ONE

17     OR THE OTHER.  THERE ARE EMBODIMENTS WHERE IT'S GOING TO BE

18     ONE, THERE ARE EMBODIMENTS WHERE IT'S GOING TO BE THE OTHER,

19     AND THERE ARE EMBODIMENTS WHERE IT'S GOING TO BE BOTH.

20         AND HOW DO WE ADDRESS THAT?

21             THE COURT:  WHAT DOES IT MEAN IN THIS CONTEXT TO

22     DEFINE BOTH?  BECAUSE IF ONE DEFINES THE TIME DURATION OF THE

23     SLICE, WHAT'S LEFT TO -- IN OTHER WORDS, WHAT DOES IT MEAN TO

24     DEFINE THE DATA SIZE ABOVE AND BEYOND SETTING THE TIME

25     DURATION?  WE'RE TALKING ABOUT A STREAM AT THE GIVEN RATE.

1          MR. DECARLO:  WELL, AGAIN, ASSUMING THAT YOU KNOW

2    WHAT THAT ABSOLUTE RATE IS, YOU CAN CALCULATE THEM.

3          I THINK HERE THEY WERE JUST TRYING TO CAPTURE THE

4    EMBODIMENT WHERE YOU HAD A FLOW CHART WHERE IT SAYS YOU SET THE

5    SIZE, YOU SET THE DURATION, AND SO THEY WERE CAPTURING THAT

6    EMBODIMENT WHERE YOU SET BOTH.

7          AND PROBABLY FOR SITUATIONS WHERE YOU WERE REALLY TRYING TO

8    CAREFULLY MONITOR -- BECAUSE, REMEMBER, WHAT IS THIS INVENTION

9    ABOUT?  GOING BACK TO THOSE DRAWINGS THAT WE SAW BEFORE, FIGURE

10   2, CAREFULLY MANAGING ALL OF THESE RATES, RIGHT, THROUGH --

11   AGAIN, READING THE PATENT -- THROUGH FEEDBACK.  THE CLIENTS

12   TELL THE SERVER, SLOW DOWN.  THE SERVER TELLS THE TRANSMITTING

13   COMPUTER, SPEED UP.  YOU'RE CONSTANTLY MANAGING THOSE RATES

14   THROUGH THE SYSTEM.

15         AND SO ONE OF THE WAYS YOU DO IT IS BY ADJUSTING THE SIZE

16   OF THE FILES.  ANOTHER WAY TO DO IT IS TO ADJUST THE DURATION.

17         IT MAY VERY WELL -- YOU KNOW, MR. PAVANE'S ARGUMENTS ABOUT

18   NON-INFRINGEMENT NOTWITHSTANDING, YOUR HONOR, YOU'VE GOT CLAIMS

19   THAT ARE DEPENDENT CLAIM S AND THEY ADD LIMITATIONS.  CLAIM 1

20   IS CLEAR, PREDETERMINE THE DATA SIZE.

21         CLAIM 23 SAYS "WHEREIN DIVIDING THE STREAM" IS DIVIDING THE

22   STREAM "INTO A SEQUENCE OF TIME SLICES."

23         NOTICE THAT THE LANGUAGE OF THE MODIFIER OF THE DEPENDENT

24   CLAIM IS NOT MODIFYING "PREDETERMINING THE DATA SIZE."  IT'S

25   MODIFYING "DIVIDING THE STREAM."

1      AND SO YOU CAN DIVIDE THE STREAM IN MULTIPLE WAYS, AND

2    THESE DEPENDENT CLAIMS BRING TO LIFE THE ULTIMATE EMBODIMENTS

3    OF DOING IT ALSO WITH TIME.

4      BUT CLAIM 1 IS STILL A PREDETERMINED TIME DURATION, AND THE

5    FACT THAT YOU CAN CALCULATE IT AFTER THE FACT IS

6    POST-TERMINATION, NOT PREDETERMINATION.

7          THE COURT:  ALL RIGHT.  THANK YOU, MR. DECARLO.

8          MR. DECARLO:  YOU'RE WELCOME, YOUR HONOR.

9          THE COURT:  MR. PAVANE?

10         MR. PAVANE:  YEAH, JUST ONE QUICK POINT ON THAT.

11     JUST STILL LOOKING AT THIS SCREEN, MR. DECARLO REFERRED YOU

12    TO 23, BUT THERE'S NO ANSWER TO -- FIRST OF ALL, HE DIDN'T

13    ANSWER YOUR QUESTION, WHICH IS WHAT'S LEFT TO SET AFTER YOU SET

14    THE DURATION?  THERE'S NOTHING LEFT TO SET.

15     AND CLAIM 37 SAYS -- IT DOESN'T MODIFY "DIVIDING" OR

16    "SEQUENCE."  IT SAYS "WHEREIN THE PREDETERMINED DATA SIZE

17    CORRESPONDS TO A TIME DURATION OF THE SLICE."  SO IT'S EQUATING

18    THE TWO.  IT SAYS YOU CAN SET IT THIS WAY, YOU CAN SET IT THAT

19    WAY.

20     AND YOU WERE EXACTLY RIGHT.  YOU CHARACTERIZED MY ARGUMENT

21    EXACTLY CORRECTLY.  I'M SAYING THAT CLAIM 1 COVERS NO MATTER

22    HOW YOU GET TO THE PREDETERMINED DATA SIZE BECAUSE THAT'S ALL

23    THE CLAIM REQUIRES IS THAT YOU HAVE A PREDETERMINED DATA SIZE.

24         THE COURT:  ALL RIGHT.  THANK YOU, MR. PAVANE.

25         MR. PAVANE:  OKAY.

THE COURT:  WHAT TERM IS NEXT?

MR. DECARLO:  "ENCODE."

MR. PAVANE:  TERM 6, YOUR HONOR.

THE COURT:  OKAY.

MR. PAVANE:  SO "ENCODING OR ENCODES THE SLICES IN A CORRESPONDING SEQUENCE OF FILES."

THEIR CONSTRUCTION IS THAT ENCODING MUST MEAN COMPRESSING AND SAVING "EACH COMPRESSED SLICE AS A FILE AFTER THE DIVIDING STEP."

AND OUR CONSTRUCTION IS THAT YOU'RE "FORMING EACH SLICE AS A FILE, WHEREIN A FILE INCLUDES DATA FROM A CORRESPONDING SLICE AND A FILE DESCRIPTOR, AND WHEREIN THE SEQUENCE OF FILES CORRESPONDS TO THE SEQUENCE OF SLICES."

I DON'T THINK WE HAVE A BIG FIGHT ABOUT SEQUENCE OF FILES CORRESPONDING TO SEQUENCE OF SLICES.  I DON'T THINK THAT'S WHERE THE ISSUE RESIDES.

THE DISPUTE HERE REALLY GOES TO THE WORD "ENCODING," AND ACCORDING TO APPLE'S CONSTRUCTION, "ENCODING" MUST MEAN "COMPRESSING."

AND, AGAIN, THE LANGUAGE IS "ENCODING THE SLICES."

OKAY.  NOW, IF YOU LOOK AT ALL OF THE EMBODIMENTS DESCRIBED IN THE PATENT, WE NEVER COMPRESS THE SLICES.  WE ONLY COMPRESS THE STREAM.  AND, FOR EXAMPLE, I WOULD DIRECT YOU TO COLUMN 5.

AND AGAIN, I THINK PART OF THE PROBLEM HERE IS, AND THE CONFUSION, IS THAT THE WORD "ENCODING" HAS MANY MEANINGS, AND

1    WE'RE SAYING, "HEY, YOU'VE GOT TO LOOK AT THE CONTEXT IN WHICH

2    THE TERM IS USED."

3        AND LET'S REMEMBER THAT IN THIS PATENT, THERE'S NOT A

4    DEFINITION ANYWHERE.  THERE'S NOWHERE WHERE IT SAYS "ENCODING

5    AS USED HERE MEANS COMPRESSING."  PEOPLE DO THAT A LOT MORE NOW

6    IN SPECS THAN THEY USED TO.  BUT THERE'S NOTHING LIKE THAT.

7        SO THE QUESTION IS, WHAT WOULD IT MEAN TO A PERSON OF

8    ORDINARY SKILL IN THE ART READING THIS?  OKAY?

9        SO IT SAYS "ENCODING THE SLICES IN A CORRESPONDING SEQUENCE

10   OF FILES."  LET'S LOOK AT FIGURE 5.  WE SEE THAT WE GET THE

11   DATA COMING IN, THE DATA STREAM THAT GETS ENCODED -- AND IN 80

12   IT SAYS THAT'S COMPRESSION, AND IN THE SPEC, AND I DON'T THINK

13   I'LL GET A FIGHT ON THAT FROM MY OPPONENT, 80 IS COMPRESSION --

14   AND THEN YOU SLICE.

15       SO YOU COMPRESS THE RAW DATA, WHICH IS WHAT YOU HAVE TO DO,

16   THEN YOU SLICE IT, AND THEN YOU CREATE A FILE FROM IT.  THOSE

17   ARE THE SEQUENCE OF STEPS SET FORTH IN THE CLAIM.  THAT'S

18   EXACTLY WHAT YOU HAVE TO DO.

19       NOW, IF YOU TAKE THE APPROACH THAT COMPRESSING MEANS --

20   THAT "ENCODING" MEANS "COMPRESSING," YOU'RE BASICALLY SAYING

21   THE ENTIRE SPEC DOESN'T MEAN ANYTHING.

22       EVERYWHERE IT TALKS ABOUT ENCODING, IT'S ENCODING THE

23   STREAM, AND THERE'S NO PLACE WHERE YOU'LL FIND IN THE SPEC

24   WHERE IT TALKS ABOUT ENCODING SLICES.

25       YES, IT'S USED IN THE CLAIM THAT WAY.  BUT IN THE CONTEXT

1    OF THE CLAIM, IT'S CLEARLY NOT BEING USED TO MEAN COMPRESSION

2    AT THIS POINT IN THE CLAIM.

3              THE COURT:  WELL, MR. PAVANE, IF I CAN INTERRUPT YOU?

4              MR. PAVANE:  SURE.

5              THE COURT:  WOULD -- GIVEN THAT INSTRUCTION FROM THE

6    SPECIFICATION, WOULD YOU HAVE ANY PROBLEM IF YOUR PROPOSED

7    CONSTRUCTION ADDED THE WORD "COMPRESSED" AFTER THE WORD

8    "INCLUDES" AND BEFORE THE WORD "DATA" SO THAT IT READS "FORMING

9    EACH SLICE AS A FILE, WHEREIN A FILE INCLUDES COMPRESSED DATA

10   FROM A CORRESPONDING SLICE IN A FILE DESCRIPTOR"?

11             MR. PAVANE:  NO, I WOULD NOT.

12        I AGREE THAT COMPRESSION IS OCCURRING SOMEWHERE.

13             THE COURT:  THAT'S MY POINT.

14             MR. PAVANE:  YES, I UNDERSTOOD YOUR QUESTION.

15             THE COURT:  OKAY.

16             MR. PAVANE:  AND I AGREE WITH YOU 100 PERCENT.  IT IS

17   OCCURRING SOMEWHERE.

18        BUT IT'S NOT OCCURRING IN TERMS OF COMPRESSING THE SLICES.

19   YOU'RE COMPRESSING THE STREAM.  YES, YOU WIND UP WITH A SLICE

20   THAT'S BEEN -- WITH COMPRESSED DATA, BUT YOU DON'T PERFORM THE

21   COMPRESSION ON THE SLICES.

22        AND AGAIN, NO QUESTION, THIS IS GOING TO A NON-INFRINGEMENT

23   ARGUMENT THAT APPLE WANTS TO MAKE WHERE THEY SAY, "NO, NO.  WE

24   DON'T COMPRESSES THE SLICE.  WE COMPRESS THE DATA."

25             WELL, EVERYONE COMPRESSES THE DATA.  IN FACT, EVERY

1    EMBODIMENT IN THIS PATENT COMPRESSES THE RAW DATA.

2         SO, AGAIN, YOU HAVE TO LOOK AT IT IN THE CONTEXT.

3         AND AGAIN, THEY POINT TO PLACES WHERE THE WORD "ENCODE" IS

4    USED TO MEAN "COMPRESS," AND I UNDERSTAND THAT.  BUT IT'S

5    ALWAYS USED IN THAT CONTEXT FOR ENCODING THE STREAM.  IT NEVER

6    SAYS "ENCODE THE SLICES."

7         THE CLAIM SAYS "ENCODING THE SLICES."

8         SO YOU HAVE TO LOOK AT IT IN THE CONTEXT, AND WE CITED TO

9    YOUR HONOR SOME FEDERAL CIRCUIT CASES THAT MAKE THAT EXACT

10   POINT.  YOU HAVE TO LOOK AT THE SURROUNDING LANGUAGE AND HOW

11   IT'S USED BECAUSE THERE ARE WORDS THAT, FRANKLY, ARE USED IN

12   DIFFERENT WAYS IN DIFFERENT CONTEXTS.  SO WE THINK THAT PART IS

13   VERY CLEAR.

14        AND AGAIN, THE OTHER POINT ABOUT THE FILES, THE SEQUENCE OF

15   FILES, I THINK YOU GOT THIS FROM DR. MADISETTI'S TALK AT THE

16   BEGINNING, BUT AGAIN, THE STREAM IS RAW DATA.  IT'S JUST

17   AUDIO/VISUAL DATA.  THERE'S NO RHYME OR REASON TO IT.  IT'S

18   COMING IN AS IT'S GENERATED.

19        YOU SLICE IT UP, AND THEN YOU ENCODE IT WITH SOME KIND OF

20   INDICATOR, BECAUSE AS DR. MADISETTI POINTED OUT, WHEN THE FILES

21   GO UP ONTO THAT SERVER, WHEN THE CLIENT COMPUTER WANTS TO

22   RETRIEVE THAT, IT'S GOT TO KNOW WHICH ONE TO RETRIEVE.  WHAT IS

23   IT RETRIEVING?

24        THEY ALL COULD BE -- YOU KNOW, THEY GET STORED IN DIFFERENT

25   PLACES UP THERE.  THEY DON'T JUST GO UP AND WIND UP IN ONE NEAT

1    LITTLE PACKAGE AND WHEN YOU HIT THE BUTTON THE FIRST ONE COMES

2    AND THEY ALL COME AFTER.

3        IT DOESN'T WORK THAT WAY.  YOU'VE GOT TO BE ABLE TO

4    IDENTIFY THE FILES THAT YOU WANT TO BRING DOWN, AND THE WAY YOU

5    DO THAT -- OR I SHOULD SAY IDENTIFY SLICES YOU WANT TO BRING

6    DOWN, AND THE WAY YOU DO THAT IS BY PUTTING SOME KIND OF --

7    WHAT DO YOU HAVE? -- A URL I THINK WAS ON THE SCREEN AS I

8    RECALL, BUT SOME KIND OF INDEX OR SOME KIND OF INDICES OR

9    SOMETHING SO THAT YOU CAN NOW RETRIEVE THOSE SLICES, AND THAT'S

10    WHAT'S GOING ON IN THAT ELEMENT IN THE CLAIM.

11        THE COURT:  SO MR. PAVANE, UNDER YOUR CONSTRUCTION,

12    BY THE LAST CLAUSE, DO YOU MEAN TO SUGGEST THAT THE ORDER OF

13    THE SLICES EQUALS THE ORDER OF THE FILES?

14        IN OTHER WORDS, THE FILE ARE ORDERED IN THE SAME WAY AS THE

15    SLICES ARE ORDERED?

16        MR. PAVANE:  I THINK I UNDERSTAND THE QUESTION.

17        WHAT I'M SAYING IS THAT WHAT THEY DO IS WHEN THEY ASSIGN,

18    IN THE REAL WORLD -- AND IT DESCRIBES IT THIS WAY IN THE

19    PATENT, TOO -- WHEN YOU ASSIGN -- SO LET'S SAY FIRST SLICE, RAW

20    DATA PLUS A FILE NAME THAT HAS, LET'S KEEP IT SIMPLE, THE

21    NUMBER 1 IN IT.

22        NEXT SLICE, FILE -- RAW DATA OF THE NEXT SLICE, NUMBER 2,

23    3, 4.

24        NOW, WHEN I'M DOWN AT MY CLIENT COMPUTER HERE, I CAN SAY --

25    AND IT SAYS IN THE PATENT YOU CAN DO THIS.

1       AND AS HE POINTED OUT, IF IT'S ALREADY STARTED AND YOU WANT

2   TO JUMP IN THE MIDDLE, DON'T GIVE ME 1, GIVE ME 7, AND THE

3   COMPUTER WILL, DEPENDING ON ITS ALGORITHM, PULL 7, PULL 8, PULL

4   9, PULL 10.

5       BUT YES, IF THOSE NUMBERS ARE IN A SEQUENCE WHICH IS

6   UNDERSTOOD TO BE THE SEQUENCE OF THE ORIGINAL VIDEO STREAM.

7           THE COURT:  IT WOULDN'T MAKE A HECK OF A LOT OF SENSE

8   IF THE SEQUENCE WAS DIFFERENT, SO THAT WHEN THE CLIENT THOUGHT

9   IT WAS GRABBING NUMBER 7, IT WAS ACTUALLY GETTING NUMBER 10?

10          MR. PAVANE:  EXACTLY.

11          THE COURT:  OKAY.

12          MR. PAVANE:  THAT'S EXACTLY RIGHT.

13          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

14          MR. PAVANE:  THE ONLY OTHER THING I WANT TO POINT OUT

15  ON THAT IS THAT -- I APOLOGIZE, JUST VERY QUICKLY -- AGAIN,

16  CLAIM DIFFERENTIATION, DEPENDENT CLAIMS, IF YOU LOOK AT CLAIM

17  16, WHICH REFERS BACK TO 15 WHICH GOES TO 1, SO IT'S A

18  DEPENDENT CLAIM, AND THAT SAYS, OFF OF THIS LANGUAGE -- OFF OF

19  CLAIM 1, RATHER, IT SAYS "WHEREIN ENCODING THE STREAM COMPRISES

20  COMPRESSING DATA IN THE STREAM."

21      SO WHEN THEY TALKED ABOUT ENCODING IN THE CONTEXT OF THE

22  STREAM, THEY MADE IT VERY CLEAR THEY WERE TALKING ABOUT

23  COMPRESSION.

24      BUT THERE'S NO SUCH CORRESPONDENCE IN CLAIM 1, WHICH TALKS

25  ABOUT ENCODING THE SLICES, NOT THE STREAM.

1          THE COURT:  OF COURSE, ANOTHER WAY TO READ THAT MIGHT

2   BE THAT YOU HAVE AN ANTECEDENT BASIS PROBLEM, RIGHT?

3          MR. PAVANE:  YOU KNOW, I LOOKED AT THAT QUESTION.

4   IT'S A FAIR POINT.  THE SAME EXACT THING OCCURRED TO ME AND I

5   DID CHECK THAT AND THERE ARE FEDERAL CIRCUIT CASES THAT SAY,

6   LOOK, THAT'S NOT A BASIS FOR INVALIDATING THE CLAIM, THE FACT

7   THAT YOU DON'T HAVE A CLEAR ANTECEDENT BASIS, AND I HAVE THEM

8   ON MY BLACKBERRY.

9          THE COURT:  I THINK I HAVE THAT CASE LAW.

10         MR. PAVANE:  OKAY.  THERE WERE SEVERAL CASES THAT SAY

11  THAT.

12      BUT I DID RECOGNIZE THAT THERE'S NOT A CLEAR ANTECEDENT

13  BASIS.

14      BUT IT'S CLEAR IT'S TALKING ABOUT COMPRESSING THE STREAM,

15  AND I THINK YOUR WAY OF MODIFYING MAYBE MY PROPOSED

16  CONSTRUCTION WOULD SOLVE THE PROBLEM ALL AROUND.

17         THE COURT:  OKAY.  THANK YOU, MR. PAVANE.

18         MR. PAVANE:  THANK YOU, YOUR HONOR.

19         THE COURT:  MR. NICODEMA?

20         MR. NICODEMA:  YES, SIR.  THANK YOU, YOUR HONOR.

21      YOUR HONOR, COUNSEL SAID THAT, "WELL, THERE'S NO DEFINITION

22  IN THIS PATENT OF 'ENCODING,' SO WE HAVE TO LOOK AT WHAT ONE OF

23  ORDINARY SKILL IN THE ART AT THE TIME OF THE PATENT APPLICATION

24  WOULD CONSTRUE THE TERM TO MEAN."

25      WELL, COUNSEL IS NOT ONE OF ORDINARY SKILL IN THE ART, AND

1    WE HAD TWO EXPERTS TODAY WHO GAVE TUTORIALS.  NEITHER OF THEM

2    SAID THAT COMPRESSION -- THAT "ENCODING" MEANS FORMING A FILE,

3    NEITHER OF THEM.

4        NOW, THERE COMES A POINT WHEN THE CLAIM LANGUAGE CONTROLS.

5    THERE COMES A POINT WHEN THE PATENTEE HAS TO BE BOUND BY WHAT

6    HE CHOSE TO USE AS THE WORDS IN THE CLAIM AND NOT WHAT HE

7    WISHED HE USED AS THE WORDS IN THE CLAIM.

8        NOW, ALL SIGNPOSTS IN THIS PATENT, YOUR HONOR, POINT TO A

9    CONSTRUCTION OF THE WORD "ENCODING" THAT MEANS "COMPRESSION."

10   AND IF YOU DON'T MIND, JUDGE, I'M GOING TO GO THROUGH MY

11   SLIDES --

12            THE COURT:  PLEASE.

13            MR. NICODEMA:  -- AND ADDRESS SOME OF COUNSEL'S

14   POINTS.

15       EVERY ONE OF THE CITATIONS IN THIS PATENT -- WE PUT SOME IN

16   OUR SLIDE, THERE'S SOME MORE IN OUR BRIEF -- EQUATES "ENCODING"

17   WITH "COMPRESSING."

18       AND COUNSEL ARGUED THAT, "WELL, THAT'S TALKING ABOUT

19   ENCODING THE STREAM AND NOT THE SEQUENCE OF SLICES, SO THAT

20   DOESN'T COUNT."

21       OKAY.  BUT LOOK AT THE CLAIM LANGUAGE.  THE CLAIM LANGUAGE,

22   YOUR HONOR, SAYS -- OH, AND BY THE WAY, BEFORE I GET TO THE

23   CLAIM LANGUAGE, THE PATENT TALKS ABOUT THE SEQUENCE ALMOST

24   INTERCHANGEABLY WITH THE DATA STREAM.

25       AND THERE IS AN EMBODIMENT IN THE PATENT, YOUR HONOR,

1    COLUMN 6, LINES 57 TO 65, WHICH TALKS ABOUT COMPRESSING THE

2    SEQUENCE, AND THE CLAIM LANGUAGE SAYS "DIVIDING THE DATA STREAM

3    TO FORM A SEQUENCE OF SLICES."  AND IT TALKS ABOUT USING

4    COMPRESSION SOFTWARE, GSM6-10.  OKAY?

5              THE COURT:  UM-HUM.

6              MR. NICODEMA:  SO THEY CAN'T GET AWAY WITH LOOSE

7    LANGUAGE IN THIS PATENT AND THEN SAY THERE'S NO EMBODIMENT

8    WHERE, WHERE COMPRESSION IS APPLIED TO THE SEQUENCE OF SLICES.

9              THE COURT:  DOESN'T THE -- I'M SORRY, MR. NICODEMA,

10   FORGIVE ME.

11       BUT IN COLUMN 6, A FEW LINES UP, I GRANT YOU THAT AT LINE

12   62 OR THEREABOUTS, IT DOES SAY "COMPRESSING THE MULTI-MEDIA

13   SEQUENCE," WHICH I THINK IS YOUR POINT.

14       A FEW LINES UP, THOUGH, IT SEEMS TO TALK ABOUT COMPRESSING

15   THE DATA IN THE SEQUENCE.

16       SO HOW DO I SQUARE ALL OF THAT?

17             MR. NICODEMA:  WELL, EACH SLICE HAS DATA AND IT'S

18   COMPRESSED.

19       AND THE PLAIN LANGUAGE OF THE CLAIM -- LET'S WALK THROUGH

20   THE CLAIM.  CLAIM 1 SAYS "DIVIDING THE DATA STREAM INTO A

21   SEQUENCE OF SLICES," STEP 1, AND THESE STEPS HAVE TO BE

22   FOLLOWED IN ORDER.

23       THEN IT SAYS, "ENCODING THE SLICES."  SO THAT'S STEP 2.  IT

24   NECESSARILY FOLLOWS STEP 1.

25             NOWHERE IN THIS PATENT IS "ENCODING" DEFINED AS "FORMING A

FILE."  EVERY TIME IT'S DEFINED AS "COMPRESSION."

AND IF WE LOOK AT CLAIM 16 THAT MR. PAVANE WAS TALKING ABOUT, SO THAT CLAIM 16 DEPENDS FROM 15 WHICH GOES BACK TO 1, THE TERM IS "ENCODING THE SLICES" AND CLAIM 16 TALKS ABOUT "ENCODING THE STREAM."

SO EITHER IT'S AN AMBIGUOUS CLAIM WHICH YOU CANNOT USE UNDER THE DOCTRINE OF CLAIM DIFFERENTIATION, OR WHAT THE PATENTEE MEANT TO SAY IS ENCODING THE SLICES, BECAUSE "SEQUENCE" AND "STREAM" ARE SOMETIMES USED INTERCHANGEABLY IN THIS PATENT.

NOW WE LOOK AT -- AND THIS IS NOT MY DICTIONARY.  THIS IS THEIR MICROSOFT COMPUTER DICTIONARY WHICH DEFINES WHAT AN ENCODER IS.  IT'S NOT SOMETHING THAT FORMS FILES.  IT'S SOMETHING THAT COMPRESSES DATA.

THE PATENT SPECIFICATION NEVER DESCRIBES ENCODING AS FORMING A FILE.

AND I'M ADDRESSING SOME OF THE THINGS FROM THEIR REPLY BRIEF, YOUR HONOR, BECAUSE OBVIOUSLY I DIDN'T GET A CHANCE TO DO IT IN WRITING.

SO ONE OF THE THINGS EMBLAZE SAYS IS, "WELL, YOU KNOW, THE PATENT HAS A ONE OFF STATEMENT THAT SAYS COMPRESSION ISN'T ESSENTIAL."

BUT THAT ISN'T WHAT YOU CLAIMED.  YOU CLAIMED ENCODING AND THE CLAIM LANGUAGE CONTROLS.

THE PATENTEE -- THE EMBLAZE INVENTORS COULD HAVE SAID AND

1    USED THE LANGUAGE "FORMING EACH SLICE AS A FILE," BUT THEY USED

2    THE WORD "ENCODING."

3         NOW LET'S LOOK AT CLAIM 11 WHICH DEPENDS FROM 2 AND BACK TO

4    1.  LOOK WHAT THIS SAYS.  IT MODIFIES THE STEP AND NARROWS THE

5    STEP, "ENCODING THE SLICES COMPRISES ENCODING SLICES AT A

6    PLURALITY OF DIFFERENT QUALITY LEVELS, SUCH THAT THE FILES

7    CORRESPONDING TO A GIVEN ONE OF THE SLICES HAVE A DIFFERENT,

8    RESPECTIVE DATA SIZE FOR EACH OF THE QUALITY LEVELS."

9         THERE'S NO DISPUTE HERE THAT CLAIM 11 IS TALKING ABOUT THE

10   ENCODING THE SLICES STEP.  AND IT'S -- NOW IT'S TALKING ABOUT

11   QUALITY LEVELS.

12        AND HOW DO YOU GET THOSE RESPECTIVE DIFFERENT DATA SIZES

13   THAT COMPRISE DIFFERENT QUALITY LEVELS?  LET'S LOOK AT THE

14   SPECIFICATION THAT SUPPORTS CLAIM 11.

15        RIGHT THERE, TO GET DIFFERING QUALITY LEVELS, YOU HAVE MORE

16   OR LESS COMPRESSION.  YOU DON'T HAVE MORE OR LESS FORMING

17   THINGS IN A FILE.  IT'S TIED, ONCE AGAIN, TO COMPRESSION.

18        NOW LET'S GO BACK TO CLAIM 16 WHICH EMBLAZE SAYS USES

19   ENCODING IN A DIFFERENT WAY THAN IN CLAIM 1.

20        NOW, YOU KNOW, COUNSEL LIKES TO TALK ABOUT THE FEDERAL

21   CIRCUIT CASES.  ONE OF THE MOST BASIC PRESUMPTIONS IN FEDERAL

22   CIRCUIT LAW IS THAT THE SAME TERM USED IN DIFFERENT CLAIMS,

23   THERE'S A HEAVY PRESUMPTION THAT IT HAS THE SAME MEANING.

24        AND, YOU KNOW, EMBLAZE CAN FIND A CASE WHERE UNDER THE

25   EXTREME FACTS THE INVENTOR MADE IT CLEAR THAT THE WORDS HAD

1    DIFFERENT MEANINGS.

2         BUT NOT SO HERE.  EVERY TIME THE WORD "ENCODE" OR ANY FORM

3    OF THAT WORD IS USED IN THIS PATENT, IT MEANS COMPRESSION.

4         AND OUR ARGUMENT ON WHAT ENCODING MEANS IS PERFECTLY

5    CONSISTENT WITH CLAIM 16.  CLAIM 16 ADDS A REQUIREMENT OF A

6    DESIRED COMPRESSION RATIO AS OPPOSED TO, LET'S SAY, A VARIABLE

7    COMPRESSION RATIO.  IT'S NOT ADDING THE STEP OF COMPRESSION.

8         THE TERM "ENCODING" IS USED IN THE SAME CONTEXT IN BOTH

9    CLAIMS AND THROUGHOUT THE ENTIRE PATENT.

10        AND LET'S TALK ABOUT THIS, THIS ISSUE OF OH, MY, ALL THE

11   EMBODIMENTS WOULD BE EXCLUDED.

12        THAT'S THE WAY YOU CLAIMED IT.

13        AND I CITED SOMETHING IN THE SPECIFICATION THAT TALKS ABOUT

14   COMPRESSING THE SEQUENCE.

15        BUT EVEN IF THEY WERE RIGHT, EVEN IF EVERY EMBODIMENT, YOUR

16   HONOR, WOULD BE EXCLUDED, THAT FALLS UNDER THE CATEGORY OF TOO

17   BAD, SO SAD BECAUSE THAT'S THE WAY YOU CLAIMED IT.

18        AND IF WE TAKE THE EXTREME EXAMPLE -- I'M SURE YOUR HONOR

19   KNOWS THE CHEF AMERICA CASE -- THE CLAIM TALKED ABOUT HEATING

20   THE DOUGH TO 850 DEGREES AND THE SPECIFICATION MADE IT CLEAR IT

21   WAS THE OVEN.

22        AND THE FEDERAL CIRCUIT SAID, "WHERE THE CLAIM LANGUAGE IS

23   UNAMBIGUOUS, TOO BAD.  WE'RE GOING TO CONSTRUE THE CLAIMS AS

24   WRITTEN AND NOT THE WAY YOU WISH THEY WERE WRITTEN."

25        SO HERE THE CLAIM LANGUAGE IS UNAMBIGUOUS.  THE SEQUENCE OF

1    STEPS ARE AS FOLLOWS:  DIVIDING THE STREAM INTO A SEQUENCES OF

2    FILES, AND ENCODING THE SLICES.

3        IT COULDN'T BE CLEARER.  YOU'RE ENCODING THE SLICES AND

4    "ENCODING" MEANS "COMPRESSION."

5        THANK YOU, YOUR HONOR.

6            THE COURT:  THANK YOU, MR. NICODEMA.

7        MR. PAVANE, ANY REBUTTAL OR SHALL WE TURN TO THE NEXT TERM?

8            MR. PAVANE:  I'D LIKE TO JUST MAKE A COUPLE OF POINTS

9    ON THAT.

10            THE COURT:  SURE.

11            MR. PAVANE:  LET ME JUST GO BACK.

12        FIRSTLY, AGAIN, WORDS CAN AND ARE USED OFTEN TIMES, COMMON

13    WORDS, IN DIFFERENT WAYS IN THE SPECIFICATION.

14        BUT EVEN IF, EVEN IF THE COURT WERE TO CONCLUDE THAT

15    "ENCODING" MEANT "COMPRESSING" IN THIS PATENT, THE CLAIM

16    DOESN'T REQUIRE THAT YOU APPLY THE COMPRESSION TO THE SLICES.

17        ALL THE CLAIM SAYS -- AM I IN THE WRONG ONE? -- LET'S GO

18    BACK.

19        (PAUSE IN PROCEEDINGS.)

20            THE COURT:  THERE'S THE CONSTRUCTION YOU WISH ME TO

21    ADOPT, RIGHT?

22            MR. PAVANE:  YEAH.  I'M JUST LOOKING FOR THE WORD

23    "ENCODING" IN THE CLAIM.  OH, UP AT THE TOP THERE, "ENCODING

24    THE SLICES IN A CORRESPONDING SEQUENCE OF FILES."

25            EVEN IF YOU CONCLUDED THAT THAT REQUIRES COMPRESSION, YOUR

1    HONOR'S INSTINCT ON THE FIRST ONE WHEN WE READ IT WAS THAT THE

2    POINT IS THAT COMPRESSION -- SO THE SLICES WIND UP WITH

3    COMPRESSED DATA IN THEM.

4        IT DOESN'T SAY YOU HAVE TO COMPRESS THE SLICES.  IT SAYS

5    THAT YOU ENCODE THE SLICES IN A CORRESPONDING SEQUENCE OF

6    FILES.

7        SO YOU HAVE COMPRESSED THE STREAM.  AT SOME POINT ALONG THE

8    WAY, YOU WILL WIND UP WITH FILES OR SLICES THAT WILL ALL BE

9    COMPRESSED.  EVERYTHING IS COMPRESSED AFTER THAT FACT.  THERE'S

10   NO QUESTION ABOUT THAT.

11       AND AGAIN, YOU WILL READ THE ENTIRE EMBODIMENTS OUT OF THE

12   CLAIM.  THIS IS NOT A CASE WHERE THE WORD "ENCODING" -- AGAIN,

13   WHERE THERE'S A DEFINITION THAT SAYS "ENCODE MEANS THIS."

14       AND IF YOU READ THE CLAIM, AND IF YOU GO BACK TO CLAIM 11

15   EVEN, THE CLAIM THAT HE POINTED YOU TO -- LET'S GO TO THAT, TO

16   THIS CLAIM -- IT SAYS "WHEREIN DOWNLOADING" -- I'M SORRY.

17       WHERE IT SAYS, "ENCODING THE SLICES COMPRISES ENCODING THE

18   SLICES AT A PLURALITY OF DIFFERENT QUALITY LEVELS."  AGAIN, THE

19   STREAM IS -- THE ONLY WAY TO DO THAT IS YOU TAKE THE STREAM,

20   YOU CREATE TWO STREAMS OUT OF IT, AND THEN YOU COMPRESS THEM AT

21   DIFFERENT RATES AND THEN YOU SLICE THEM AND YOU CREATE FILES.

22       WELL, YOU'RE DOING THAT.  THIS CLAIM SIMPLY SAYS THAT

23   YOU'RE GOING TO HAVE MULTIPLE LEVELS.  THAT'S ALL THE METHOD

24   REQUIRES.

25       IT DOESN'T SAY THAT YOU HAVE TO APPLY THE COMPRESSION HERE

1      OR THERE OR ANYWHERE ELSE.  IT SAYS THAT WHAT YOU WIND UP WITH

2      ARE SLICES THAT ARE ENCODED AT DIFFERENT QUALITY LEVELS.

3          AND AGAIN, ALL THE EXAMPLES HE PUT UP ON THE SCREEN, AGAIN,

4      REFER TO ENCODING THE STREAM.  IT WAS VERY CLEAR THAT THEY WERE

5      TALKING ABOUT THE STREAM THERE, WHEREAS CLAIM 11 DOES NOT TALK

6      ABOUT ENCODING THE STREAM.  IT TALKS ABOUT THE SLICES.

7          AND TO IMPART THAT AND SAY BECAUSE IT TALKED ABOUT AND USED

8      IT THAT WAY THERE, IT MUST MEAN THIS, THERE'S NO RATIONALE FOR

9      THAT, ESPECIALLY WHEN YOU'RE ADOPTING WHAT ESSENTIALLY AMOUNTS

10     TO A NONSENSICAL READING AND YOU READ OUT ALL THE EMBODIMENTS

11     IN THE SPECIFICATION.

12          THE COURT:  SO IT'S IN THAT WAY THAT YOU AVOID THE

13     APPLICATION OF THE DOCTRINE OF TOO BAD, SO SAD?

14          MR. PAVANE:  YEAH.  I JUST DON'T THINK IT APPLIES

15     HERE.  I DON'T THINK IT'S TOO BAD, SO SAD.  I DON'T THINK --

16     THIS IS NOT -- IN THE TOO BAD, SO SAD CASE, HE MADE THE EXACT

17     POINT, WHICH I AGREE WITH, WHEN IT'S SO CLEAR -- I MEAN, YOU

18     CAN'T ARGUE THAT HEATING THE OVEN IS THE SAME THING AS HEATING

19     THE DOUGH.  I MEAN, THOSE ARE TWO VERY DIFFERENT PHRASES.  ONE

20     SAYS HEAT THE OVEN, THE OTHER SAYS HEAT THE DOUGH.

21     HERE YOU HAVE TO TAKE A LEAP OF FAITH THAT THEY'RE RIGHT

22     ABOUT WHAT "ENCODE" MEANS, RIGHT?  IT JUST DOESN'T SAY -- IN

23     OTHER WORDS, THERE'S NOTHING HERE THAT SAYS -- IF IT SAYS

24     "ENCODE" MEANS "COMPRESS" -- MEANS "ACT ON THE SLICES AND

25     COMPRESS THEM," THEN HE WOULD HAVE THE EXACT TOO BAD, SO SAD

1    ARGUMENT.

2        BUT IT DOESN'T SAY THAT.

3            THE COURT:  LET ME ASK YOU ONE LAST QUESTION ABOUT

4    THIS, MR. PAVANE.

5            MR. PAVANE:  YEAH.

6            THE COURT:  SO IN YOUR -- IN YOUR CONCEPTION OF THIS

7    LIMITATION, IS THE COMPRESSION OF THE DATA PERFORMED AFTER THE

8    DATA STREAM IS DIVIDED INTO SLICES?

9            MR. PAVANE:  NO.  THE COMPRESSION OCCURS BEFORE AND

10   YOU WIND UP WITH EVERYTHING AFTER THAT BEING COMPRESSED,

11   INCLUDING THE SLICES, THE FILES, EVERYTHING.  EVERYTHING

12   DOWNSTREAM OF THE COMPRESSION STEP IS GOING TO BE COMPRESSED BY

13   DEFINITION.

14           THE COURT:  ALL RIGHT.  THANK YOU.

15       WHAT'S NEXT?

16           MR. PAVANE:  OKAY.  I THINK THE NEXT ONE IS --

17           MR. NICODEMA:  "DECODE," YOUR HONOR, "DECODE THE

18   SEQUENCE."

19           THE COURT:  OKAY.

20           MR. PAVANE:  AND AGAIN, I THINK HERE THE ARGUMENT IS

21   ROUGHLY THE SAME.

22       EXCUSE ME JUST ONE SECOND, YOUR HONOR, IF I MAY.

23       (PAUSE IN PROCEEDINGS.)

24           MR. PAVANE:  BY THE WAY, I SHOULD ALSO POINT OUT,

25   BACK IN CLAIM 1, IF YOU -- I DON'T WANT TO PULL IT BACK, BUT

1    YOU REMEMBER AT THE BEGINNING WE TALKED ABOUT A DATA STREAM

2    HAVING A GIVEN DATA RATE.  THAT'S WHERE YOU'RE SETTING YOUR

3    COMPRESSION.

4        IN OTHER WORDS, IF YOU SET MULTIPLE LEVELS, YOU'RE GOING TO

5    PROVIDE MULTIPLE GIVEN DATA RATES AT THAT POINT AND THAT'S WHAT

6    CLAIM 11 IS TALKING ABOUT.

7        YOU CAN HAVE MULTIPLE QUALITY LEVELS BECAUSE YOU HAVE

8    MULTIPLE DATA RATES, AND EACH ONE WILL HAVE A DIFFERENT AMOUNT

9    OF DATA PER UNIT OF TIME.

10       SO IF I TAKE A TEN SECOND SLICE, OR LET'S SAY A FIVE SECOND

11   SLICE AT ONE DATA RATE, OBVIOUSLY THERE'LL BE A CERTAIN AMOUNT

12   OF DATA IN THERE.

13       BUT IF IT'S A LOWER DATA RATE AND I TAKE THAT SAME SLICE,

14   IT'LL HAVE LESS DATA IN THERE, AND THAT'S WHAT DR. MADISETTI

15   WAS EXPLAINING ABOUT THE MULTIPLE -- THE ABILITY TO CHOOSE

16   AMONG DIFFERENT LEVELS AND THAT'S WHAT CLAIM 11 IS ALL ABOUT.

17            THE COURT:  OKAY.  AND ALL OF THIS, I TAKE IT, IS

18   HAPPENING AT THE TRANSMITTING COMPUTER PRIOR TO UPLOADING?

19            MR. PAVANE:  YES, AND I MADE THAT POINT AGAIN.

20   EVERYTHING -- THE LAST STEP OF THE CLAIM IS UPLOADING, SO

21   EVERYTHING IS HAPPENING IN THAT TRANSMITTING COMPUTER, WHICH

22   TYPICALLY WE CALL IT A TRANSMITTING COMPUTER.  THAT'S A LITTLE

23   BIT OF A MISNOMER.  IT'S A DEVICE THAT -- THE ENCODER

24   TECHNICALLY MAY BE SEPARATE FROM THAT.  OFTEN TIMES IT'S RIGHT

25   IN THE SAME COMPUTER.  BUT IT'S ALL HAPPENING BEFORE THE UPLOAD

1      IS THE POINT.

2           THE COURT:  ALL RIGHT.  SHALL WE TURN TO "DECODE THE

3      SEQUENCE"?

4           MR. PAVANE:  YEAH, "DECODE THE SEQUENCE."

5      OKAY.  AGAIN, JUST CONSISTENT WITH OUR, OUR CONSTRUCTION OF

6      THE FIRST PART OF THE CLAIM -- AND THIS IS IN CLAIMS 8 AND 26,

7      I SHOULD MAKE THAT CLEAR, WE'RE IN DEPENDENT CLAIMS NOW -- SO

8      "DECODE THE SEQUENCE."

9      APPLE SAYS, AGAIN CONSISTENT WITH THEIR ARGUMENT, THAT

10     "ENCODE" MEANS "COMPRESS" SO "DECODE" MEANS "DECOMPRESS."

11     OUR POSITION IS IT JUST MEANS "RETRIEVING AT LEAST A

12     PORTION OF THE DATA STREAM FROM THE DOWNLOADED FILE."  SO

13     YOU'RE TAKING WHATEVER THAT WAS AND NOW YOU'RE RECONSTRUCTING

14     IT SO IT CAN BE PLAYED.  YOU CAN'T PLAY IT IN THE COMPRESSED

15     FORM.  YOU'VE GOT TO DO SOMETHING TO IT AND TREAT IT TO GET IT

16     DOWN.

17     IT COULD INCLUDE DECOMPRESSING IT, BUT SINCE THE PATENT

18     SAYS THE FILE, THE STREAM DOESN'T HAVE TO BE COMPRESSED, EVEN

19     THOUGH I ADMIT IN 99 -- IN PROBABLY EVERY SITUATION WE'D BE

20     TALKING ABOUT HERE TODAY IT IS, IT JUST MEANS ACCEPTING THAT

21     AND BEING ABLE TO REPLAY THOSE FILES BACK ON TO YOUR COMPUTER

22     SO YOU CAN ACTUALLY VISUALIZE WHAT'S BEING IN THOSE FILES.

23           THE COURT:  OKAY.  SO ON THAT LAST POINT, IT MAY BE A

24     SUBTLE ONE, BUT LET ME TRY TO APPRECIATE IT.

25     YOU'RE SAYING THAT IN THIS CLAIM, THE DATA WHICH IS

1    INCLUDED IN THE FILE MAY OR MAY NOT BE COMPRESSED, AND SO IF IT

2    WERE COMPRESSED, PRESUMABLY IT WOULD HAVE TO BE DECODED AS PART

3    OF THE RETRIEVAL STEP.

4            MR. PAVANE:  IT WOULD HAVE TO BE DECOMPRESSED.

5            THE COURT:  THANK YOU, DECOMPRESSED.

6            MR. PAVANE:  YES, IT WOULD.  I CONCEDE THAT, YES.

7        IN FACT, IN THE PREFERRED EMBODIMENT WHEN THEY TALK ABOUT

8    DECODING BECAUSE THEY'VE DONE COMPRESSION, IT SAYS DECODE AND

9    THEN IT SAYS, PAREN, DECOMPRESS.

10       OR IT'S THE OTHER WAY AROUND I GUESS.  NO, MAYBE I'M --

11   DECODE AND THEN IT SAYS DECOMPRESS.  SO YES.

12           THE COURT:  OKAY.  THANK YOU, MR. PAVANE.

13           MR. PAVANE:  THANK YOU.

14           THE COURT:  MR. NICODEMA?

15           MR. NICODEMA:  YES, SIR.

16       SO, YOUR HONOR, IN ADDITION TO -- IN ADDITION TO COLUMN 6

17   THAT I POINTED OUT, THE SPECIFICATION AT COLUMN 4, LINES 39 TO

18   40 TWICE SAYS "ENCODING THE SLICES."  SO IT DOES THIS.

19       SO THE LAST TIME I CHECKED, THE SUMMARY OF THE INVENTION IS

20   PART OF THE SPEC, AND IT SAYS IT IN THERE TWICE.

21       NOW LET'S TALK ABOUT "DECODE."  SO IN EMBLAZE'S WORLD,

22   "ENCODE" IS FORMING A FILE.  IT'S NOT COMPRESSING.

23       "DECODE" IS RETRIEVAL.  IT'S NOT COMPRESSING.

24       IF WE GO BACK, IF WE LOOK RIGHT IN THE SPECIFICATION,

25   "DECODE" IS USED ONCE AND IT'S USED TO MEAN "COMPRESS" AT

1    COLUMN 10, LINES 45 TO 50.

2        AND IT MAKES PERFECT SENSE BECAUSE THE PATENT SPECIFICATION

3    MAKES CLEAR THAT THE TERM "ENCODE" MEANS "TO COMPRESS," SO IT

4    STANDS TO REASON THAT THE OPPOSITE OF "ENCODE," I.E. "DECODE,"

5    MEANS "TO DECOMPRESS."

6        THERE IS NOTHING IN THIS PATENT SPECIFICATION SAYING THAT

7    "DECODE" MEANS "TO RETRIEVE," OKAY?  NONE OF EMBLAZE'S CITED

8    INTRINSIC EVIDENCE USES THE WORD "RETRIEVE" TO DEFINE THE TERM

9    "DECODE."

10       NOW, IF WE LOOK AT THE SPECIFICATION AT COLUMN 11 -- IT'S

11   MY LAST POINT ON THIS SLIDE, YOUR HONOR -- COLUMN 11, LINES 7

12   TO 8, THE PATENT SPECIFICATION TEACHES THAT THE RETRIEVAL STEP

13   IS DIFFERENT FROM THE DECODING STEP.

14       SO HOW CAN THEY POSSIBLY SAY THAT "DECODING" MEANS

15   "RETRIEVING"?  LOOK WHAT IT SAYS.  IT SAYS "THE SLICES ARE

16   RECEIVED," RETRIEVED, "DECODED AND OUTPUT BY THE CLIENT."

17       "DECODING" AND "RETRIEVAL" ARE DIFFERENT STEPS.  THEY'RE

18   NOT THE SAME STEP.  AND THAT'S COLUMN 11, LINES 7 AND 8.

19           THE COURT:  IT ALSO FURTHER SUGGESTS THAT THE SLICES

20   ARE, IN FACT, ENCODED; CORRECT?

21           MR. NICODEMA:  YES, THEY ARE.  THE SLICES ARE

22   ENCODED.  THEY ARE COMPRESSED.

23       AND THE CLAIM LANGUAGE SAYS THEY'RE -- IT'S CRYSTAL CLEAR.

24   EVERY SIGNPOST IN THIS PATENT, YOUR HONOR, POINTS TO THE WORDS

25   "ENCODING" AND EVERY FORM THEREOF TO MEAN "COMPRESSION."

1          THE COURT:  ALL RIGHT.  THANK YOU, SIR.

2      MR. PAVANE, WHAT'S NEXT?

3          MR. PAVANE:  OKAY.  JUST VERY BRIEFLY ON THAT.

4          THE COURT:  SURE.

5          MR. PAVANE:  FIRSTLY, THE PASSAGES THAT HE MADE

6   REFERENCE TO, HE DIDN'T CITE WHERE THEY WERE, BUT IN THE

7   SUMMARY OF THE INVENTION WHERE IT SAYS ENCODING IS USED WITH

8   RESPECT TO THE SLICES, THEY'RE NO DIFFERENT THAN WHAT'S IN

9   CLAIM 1.  THEY READ EXACTLY THE SAME WAY AND IN THE SAME

10  CONTEXT.

11      I THINK, IN FACT, ONE OF THEM IS JUST A REPEAT OF THE

12  CLAIM.  IF YOU LOOK AT -- AS OFTEN PEOPLE DO, LIKE IF YOU LOOK

13  AT COLUMN 3, LINE 28, SO THEY GO THROUGH THE THING AND THEN

14  THEY JUST REPEAT WHAT BECAME CLAIM 1.  SO, YOU KNOW, IT'S IN

15  THE SAME EXACT CONTEXT.  THERE'S NO FURTHER CLARITY, IF YOU

16  WILL, THERE.

17      AND IN TERMS OF CLAIM 11, THE FACT THAT IT SAYS "RECEIVING"

18  AND THEN "DECODING," I MEAN, THOSE ARE TWO VERY DIFFERENT

19  THINGS.  AS WE SAW, YOU HAVE TO GET THE DATA TO COME DOWN TO

20  YOU, AND THEN YOU HAVE TO DO WHATEVER YOU HAVE TO DO TO BE ABLE

21  TO PLAY IT.  THOSE ARE TWO DIFFERENT THINGS.

22      SO IT'S NOT THERE -- IT'S INCONSISTENT TO SAY "DECODING"

23  MEANS GETTING THE DATA OUT OF THE FILE.  FIRST YOU HAVE TO

24  RECEIVE THE FILE BEFORE YOU CAN GET THE DATA OUT OF THE FILE IN

25  CLAIM 11.

1      THE COURT:  SO UNDER YOUR CONSTRUCTION WHERE YOU URGE

2  THE DEFINITION THAT SAYS "RETRIEVING AT LEAST A PORTION OF THE

3  DATA STREAM FROM THE DOWNLOADED FILE," I TAKE IT THAT IF THERE

4  WERE ANY COMPRESSION PERFORMED ON THE DATA PRIOR TO FORMING THE

5  SLICE, THERE WOULD BE A DECOMPRESSION OF THAT DATA AS PART OF

6  THIS RETRIEVAL.  IS THAT RIGHT?

7      MR. PAVANE:  AS PART OF THE DECODING, YES.  YOU WOULD

8  HAVE TO DECODE -- YOU WOULD HAVE TO DECOMPRESS IT TO BE ABLE TO

9  SEE IT.  YOU CAN'T VIEW COMPRESSED DATA.

10     YOU MUST GET ZIP FILES OCCASIONALLY, RIGHT?

11     THE COURT:  I DO.

12     MR. PAVANE:  OKAY.  YOU CAN'T READ A ZIP FILE.

13  YOU'VE GOT TO UNZIP IT.

14     IT'S THE EXACT SAME CONCEPT.  IN FACT, A ZIP FILE IS A

15  COMPRESSED DATA FILE.  THAT'S ALL IT IS.

16     THE COURT:  OKAY.

17     MR. PAVANE:  OKAY.  EXCUSE ME ONE SECOND, YOUR HONOR.

18     (PAUSE IN PROCEEDINGS.)

19     MR. PAVANE:  MY COLLEAGUES ALSO HAVE JUST ASKED ME TO

20  QUICKLY POINT OUT TO YOUR HONOR THE SENTENCE THAT BRIDGES FROM

21  THE BOTTOM OF COLUMN 3 TO THE TOP OF COLUMN 4 WHICH TALKS

22  ABOUT -- AGAIN, THE PREFERRED EMBODIMENT SAYS "PREFERABLY ONE

23  OR MORE CLIENT COMPUTERS DECODE THE SEQUENCE AND PLAY BACK THE

24  DATA STREAM RESPONSIVE TO THE INDICES."

25     SO IT LOOKS FOR THOSE INDICES AND DOES WHATEVER IT HAS TO

```
1        DO TO THE DATA TO MAKE IT VISIBLE, PLAYS IT BACK.

2           OKAY.  SO I THINK WE ARE NOW UP TO TERM, IS IT 11?

3               MR. NICODEMA:  14.

4               MS. NEIMAN:  14.

5               MR. PAVANE:  OH, WE'RE JUMPING TO 14?  YES, OKAY.

6           AGAIN, I THINK WE KIND OF COVERED THIS.  THIS IS REALLY

7        CLAIMS 11 AND 14 WHICH TALK ABOUT "ENCODING SLICES AT A

8        PLURALITY OF DIFFERENT QUALITY LEVELS."

9           I'LL ANSWER ANY QUESTIONS YOU HAVE, BUT I THINK WE'VE KIND

10       OF BEAT THIS TO DEATH.  I DON'T WANT TO JUST GO OVER IT AGAIN

11       FOR THE SAKE OF GOING OVER IT.

12              THE COURT:  NO, I THINK I UNDERSTAND YOUR RESPECTIVE

13       POSITIONS ON THIS ONE.

14              MR. PAVANE:  OKAY.

15              THE COURT:  I'LL GIVE MR. NICODEMA A CHANCE IF HE'D

16       LIKE.

17              MR. PAVANE:  SURE.

18              MR. NICODEMA:  I JUST WANT TO MAKE SURE I REMEMBER

19       WHAT'S IN THE SLIDES.  I MIGHT HAVE SOMETHING ELSE TO SAY, AND

20       HOPEFULLY I DON'T.

21              THE COURT:  ALWAYS A GOOD IDEA.

22              MR. NICODEMA:  JUST TRYING TO BE A LAWYER, JUDGE.

23       JUST TRYING TO BE CAREFUL.

24          OKAY.  WE DON'T NEED THAT.

25          YEAH, THIS -- JUST TO TIGHTEN THE BOW, THE ELEMENT IS
```

1    "ENCODING SLICES AT A PLURALITY OF DIFFERENT QUALITY LEVELS."

2        CLEARLY WHEN YOU DO THAT, IT'S COMPRESSING AT DIFFERENT

3    COMPRESSION RATES.  IT SAYS IT RIGHT IN THE SPECIFICATION.

4            THE COURT:  CAN WE JUST GO BACK TO THAT PREVIOUS

5    SLIDE, MR. NICODEMA --

6            MR. NICODEMA:  YEAH, SURE.

7            THE COURT:  -- SINCE YOU BROUGHT IT TO MY ATTENTION.

8        IT SEEMS IN THE HIGHLIGHTED PORTION THAT THE SPECIFICATION

9    IS AGAIN TALKING ABOUT THE DATA IN THE SLICE BEING COMPRESSED,

10   RIGHT, AS OPPOSED TO THE SLICE ITSELF?

11           MR. NICODEMA:  WELL, THE SLICES ARE -- UNLESS I DON'T

12   KNOW WHAT I'M TALKING ABOUT, THE SLICES ARE DATA.  THE SLICES

13   ARE DATA, AND THAT'S WHAT GETS COMPRESSED.

14           THE COURT:  OKAY.

15           MR. NICODEMA:  AND HERE'S TWO MORE REFERENCES IN THE

16   SPECIFICATION TO QUALITY LEVELS.  EACH AND EVERY ONE OF THEM

17   TIE QUALITY LEVELS TO A RATE OF COMPRESSION.

18       AND I JUST WANT TO MAKE THIS ONE POINT BECAUSE I DIDN'T GET

19   A CHANCE TO.  WE DIDN'T GET A BRIEF IN RESPONSE TO EMBLAZE'S

20   REPLY.

21       EMBLAZE ARGUED IN THEIR REPLY THAT THE TERM "QUALITY LEVEL"

22   REFERS TO THE DEGREE OF RESOLUTION AND NOT COMPRESSION, AND

23   THIS IS THE PORTION OF THE SPECIFICATION THAT THEY CITE.  THIS

24   IS WHAT IT SAYS:  "IN OTHER PREFERRED EMBODIMENTS, THE SLICES

25   ARE PROVIDED BY THE SERVER AT MULTIPLE RESOLUTION OR QUALITY

1  LEVELS."

2  BUT THEY SHOULD HAVE TOLD YOU WHAT IT SAYS IN THE NEXT

3  SENTENCE.  LOOK WHAT IT SAYS IN THE VERY NEXT SENTENCE OF THAT

4  CITE:  "EACH SUCH LEVEL HAS A DIFFERENT DEGREE OF DATA

5  COMPRESSION."

6  NOWHERE IN THIS PATENT IS THE WORD "ENCODING" DEFINED OR

7  SUGGESTED TO MEAN FORMING ANYTHING IN A FILE.

8  THANK YOU, JUDGE.

9  THE COURT:  THANK YOU.

10  MR. PAVANE:  BY THE WAY, I DON'T DISPUTE THAT FORMING

11  THE QUALITY LEVELS INVOLVES DIFFERENT COMPRESSION.  I THINK WE

12  OFFERED A PARTICULAR CONSTRUCTION, BUT WE'RE NOT ARGUING THAT

13  THAT'S NOT WHAT'S HAPPENING.  I THINK WE MAKE THAT CLEAR.  WE

14  AGREE THAT FORMING -- IT'S DONE BY COMPRESSION.  THAT'S HOW YOU

15  GET THE MULTIPLE RESOLUTIONS IS BY COMPRESSING.

16  THE COURT:  I TAKE IT THAT THE MORE COMPRESSED THE

17  DATA, THE LOWER THE RESOLUTION?  I MAY BE GETTING THOSE THINGS

18  BACKWARDS.

19  CAN YOU EXPLAIN TO ME THE RELATIONSHIP BETWEEN COMPRESSION

20  AND QUALITY?

21  MR. PAVANE:  YEAH.  YOU HAVE TO TIE IT BACK TO THE

22  IDEA OF A GIVEN DATA RATE, OKAY?  SO IN OTHER WORDS, IF YOU SAY

23  THAT IN THIS TEN SECOND SLICE, I ONLY HAVE 200,000 BITS THAT I

24  CAN PUT IN THERE BECAUSE I'VE GOT 100,000 -- LET'S MAKE IT A

25  TWO SECOND SLICE.

1    I HAVE 100,000 BITS PER SECOND AND I'VE GOT A TWO SECOND

2    SLICE, SO I'VE SET THE DATA RATE AT 100,000 BITS PER SECOND,

3    I'M GOING TO GIVE YOU A TWO SECOND SLICE.

4        SO NOW THAT'S ALL I CAN TRANSMIT UP THERE IS 200,000 BITS.

5    SO IF I COMPRESS AN ORIGINAL FRAME -- AND REMEMBER

6    DR. MADISETTI DID THIS, IT WAS LIKE A 4 TO 1 VARIATION OF

7    MISSION IMPOSSIBLE III, SO IF I HAVE AN ORIGINAL ONE THAT HAS

8    LIKE A MILLION BITS IN IT AND I COMPRESS IT DOWN TO 200,000,

9    THAT'S LIKE A 5 TO 1 REDUCTION.

10        ON THE OTHER HAND, IF I HAD A FRAME THAT ONLY HAD 400,000

11    BITS IN IT TO START WITH AND I COMPRESS IT DOWN TO 200,000, SO

12    THEY'RE BOTH GOING TO THE SAME LEVEL IN MY EXAMPLE, OBVIOUSLY

13    THE SECOND ONE IS GOING TO BE A BETTER QUALITY BECAUSE YOU ONLY

14    DROPPED HALF THE DATA.  IN THE FIRST ONE, YOU DROPPED 80

15    PERCENT OF THE DATA.

16        NOW, IN THE REAL WORLD, WITH THE MULTIPLE LEVELS -- JUST TO

17    CLOSE THE LOOP ON IT BECAUSE I THINK IT'S AN IMPORTANT

18    CONCEPT -- LET'S TAKE TWO SIMPLE DATA RATES.  LET'S ASSUME I'M

19    SAYING, OKAY, LOOK, I'VE GOT MOBILE USERS OUT THERE.  SOMETIMES

20    THEY'RE GOING TO BE ABLE TO TRANSMIT ON A DOWNLOAD LINK -- AND

21    REALLY THIS IS WHERE IT ALL HAPPENS IS ON A DOWNLOAD LINK.

22    THAT'S WHERE YOU'RE WORRIED ABOUT THE DATA.

23        AS MR. DECARLO CORRECTLY POINTED OUT, YOU'RE NOT THAT

24    WORRIED ON THE UPLOAD BECAUSE THERE IT'S USUALLY THE COMPANY

25    THAT'S DOING THE LIVE STREAM, LIKE AN ABC OR AN NFL.  THEY'RE

1    GOING TO HAVE SOPHISTICATED EQUIPMENT.  THEY'RE COMING UP THERE

2    FAST.  THEY'VE GOT THE BEST EQUIPMENT TO GET IT UP TO THE

3    SERVER.

4        IT'S THE GUY WHO'S STANDING THERE WITH HIS IPAD OR HIS

5    IPHONE --

6            THE COURT:  IT'S YOU AND ME STANDING WITH A MOBILE

7    DEVICE TRYING TO STREAM IT?

8            MR. PAVANE:  YEAH, EXACTLY.  SO WE'VE GOT TO --

9    THAT'S WHAT THIS IS ABOUT.  WE'VE GOT TO TAKE INTO ACCOUNT,

10   WAIT A MINUTE, WHAT DO WE DO IF THAT GUY HAS A NOISY SIGNAL, A

11   NOISY LINK ON HIS END?  I'M GOING TO SEND IT TO HIM AT FOUR

12   DIFFERENT DATA RATES.  I'M GOING TO BREAK THAT STREAM UP FOUR

13   WAYS.  I'M GOING TO HAVE A 400,000 BIT PER SECOND, 300,000,

14   200,000, AND 100,000.

15       AND OBVIOUSLY SINCE EACH SLICE HAS THE EXACT SAME AMOUNT OF

16   MOTION FROM WHATEVER THEY WERE WATCHING, THE 100,000 WILL BE

17   THE POOREST QUALITY, THE 400,000 WILL BE THE BEST.

18       BUT THIS GUY MAY ONLY BE ABLE TO RETRIEVE 200,000 AT ANY

19   GIVEN TIME, OR MAYBE 100,000.

20       BUT WHAT THIS LETS YOU DO, IT CAN ACTUALLY -- IT

21   AUTOMATICALLY BOUNCES BACK AND FORTH, AND IN FACT, THERE'S A

22   CLAIM THAT TALKS ABOUT MONITORING THE BANDWIDTH ON THE DOWNLOAD

23   SIDE AND ADJUSTING WHICH LEVEL YOU PICK BASED ON THAT.

24           THE COURT:  BUT IN ALL OF THE CLAIMS, THE MONITORING

25   IS HAPPENING ON THE CLIENT SIDE; RIGHT?

1          MR. PAVANE:  I DON'T KNOW ABOUT EVERY CLAIM.  I DON'T

2   HAVE IT ALL IN MY HEAD.

3        BUT YES, THE ONE I'M TALKING ABOUT IS HAPPENING ON THE

4   CLIENT SIDE.  THEY'RE MONITORING THE BANDWIDTH.  THAT'S WHERE

5   YOU CARE.

6        MAYBE WHEN THIS PATENT WAS WRITTEN THERE ACTUALLY WAS

7   CONCERN ON THE UPLINK SIDE BECAUSE THINGS WERE SLOWER.

8          THE COURT:  FAIR ENOUGH.

9          MR. PAVANE:  BUT I THINK NOW TODAY, AS MR. DECARLO

10  CORRECTLY POINTS OUT, THERE'S NOT MUCH OF A CONCERN ANYMORE.

11       BUT THERE IS STILL A CONCERN ON THE DOWNLOAD, IN FACT,

12  PROBABLY EVEN MORE SO BECAUSE WHEN THESE THINGS FIRST CAME OUT,

13  PEOPLE WERE ONLY -- I DON'T KNOW ABOUT YOU, BUT THE THING I

14  REMEMBER IS I HAD A COMPUTER, A LITTLE P.C. AT YOUR DESK AND

15  YOU WOULD DOWNLOAD WHATEVER YOU COULD DOWNLOAD.

16       NOW PEOPLE DOWNLOAD TO THESE LITTLE DEVICES THAT THEY WALK

17  AROUND WITH AND IT'S ALL WIRELESS, OR YOU HAVE WIRELESS IN YOUR

18  HOUSE, AND THOSE ARE LIMITED BANDWIDTH AS DR. MADISETTI POINTED

19  OUT.

20          THE COURT:  OKAY.

21          MR. PAVANE:  SORRY I GOT SIDETRACKED.

22       OKAY.  WHAT ARE WE UP TO NOW?

23          MS. NEIMAN:  TERM 7.

24          MR. PAVANE:  THIS ONE?

25          MS. NEIMAN:  YES.

1          MR. PAVANE:  OKAY.  AGAIN, THIS IS NOT ONE WITH A BIG

2     DISPUTE, BUT AS I LIKE TO SAY, I'M CAREFUL WHEN I SEE DIFFERENT

3     WORDS BEING PULLED INTO THE CLAIM THAT AREN'T THERE.  IT MAKES

4     ME NERVOUS.

5          SO A SEQUENCE OF FILES -- THE CLAIM TERM IS "SEQUENCE OF

6     FILES, EACH FILE HAVE BEEN A RESPECTIVE INDEX."

7          AGAIN, PROBABLY THIS DOESN'T EVEN NEED CONSTRUCTION IN MY

8     VIEW, BUT OUR CONSTRUCTION IS "A SEQUENCE OF FILES, WHEREIN

9     EACH FILE HAS AN INDICATOR THAT DISTINGUISHES THE FILE FROM

10    OTHER FILES," AND I THINK I TALKED TO YOU ABOUT THE CONCEPT.

11    I'M NOT GOING TO GO INTO THAT AGAIN.

12         LET'S TALK ABOUT APPLE'S CONSTRUCTION.  "WHEREIN EACH FILE

13    CONTAINS AN ALPHANUMERIC INDICATOR STORED THEREIN."

14         WELL, CAN I THINK OF SOMETHING THAT'S NOT ALPHANUMERIC?  I

15    DON'T KNOW.  MAYBE THOSE LITTLE SYMBOLS AT THE TOP WITH THE

16    POUND SIGN AND THE QUESTION MARK ARE NOT ALPHANUMERIC.  I DON'T

17    REALLY KNOW.

18         BUT I DON'T SEE ANYTHING IN THAT CLAIM THAT SAYS

19    ALPHANUMERIC.  IT JUST SAYS AN INDEX, RESPECTIVE INDEX.  THAT'S

20    THE FIRST POINT.

21         THE SECOND POINT IS THAT IT SAYS -- WITH RESPECT, "STORED

22    THEREIN" -- OH, THE "STORED THEREIN" PART.

23         IN OTHER WORDS, WHAT BOTHERS ME ABOUT THAT IS DOES THAT

24    MEAN THAT I'M GOING TO HEAR AN INFRINGEMENT ARGUMENT AT TRIAL

25    THAT SAYS THAT THE FILE HAS TO BE STORED SOMEHOW -- HAS TO BE

1   PART OF THE FILE, THE INDEX HAS TO BE PART OF THE FILE AS

2   OPPOSED TO ASSOCIATED WITH THE FILE IN SOME WAY?

3        SO IN OTHER WORDS, THE "STORED THEREIN" BOTHERS ME.

4        I AGREE, I DON'T DISPUTE THAT IT REPRESENTS THE SLICE'S

5   LOCATION IN THE SEQUENCE.  THAT'S FAIR.  THAT'S TRUE.  IT'S GOT

6   TO BE.

7             THE COURT:  SO YOUR POINT IS THAT A FILE CAN HAVE AN

8   INDEX EVEN IF IT'S NOT STORED --

9             MR. PAVANE:  IN THE FILE ITSELF, RIGHT.  AT LEAST --

10  YEAH, EXACTLY.

11       AND THAT'S ALL I HAVE TO SAY ON THAT.

12            THE COURT:  OKAY.  THANK YOU.

13       MR. NICODEMA?

14            MR. NICODEMA:  THIS WILL BE SHORT, YOUR HONOR.

15       THE MAJOR PART OF THIS CONSTRUCTION THAT APPARENTLY COUNSEL

16  HAS NO PROBLEM WITH ANYMORE IS THAT THE INDEX REPRESENTS A

17  RESPECTIVE SLICE'S LOCATION IN THE SEQUENCE.

18       NOW, WHERE DID WE GET THIS CONSTRUCTION?  WE DIDN'T JUST

19  MAKE IT UP.

20       THERE'S -- YOU HAVE TO CONSTRUE THE CLAIM IN LIGHT OF THE

21  SPECIFICATION, AND THE SPECIFICATION ON THIS POINT IS LIMITED.

22  IT'S AT 7:27 TO 28, COLUMN 7, LINES 27 TO 28, AND IT SAYS,

23  "COMPUTER 34 STORES EACH SLICE AS A CORRESPONDING FILE, HAVING

24  A RUNNING SLICE INDEX 1, 2, 3...N."

25       THAT'S IT.  THAT'S DISCLOSURE.

1      AND IT'S CLEAR FROM THE SPECIFICATION THAT THE INDEX OF

2    EACH FILE IS USED BY THE CLIENT COMPUTER TO DETERMINE WHAT FILE

3    IN THE SEQUENCE TO DOWNLOAD NEXT.

4      NOW, IF YOU LOOK AT EMBLAZE'S CONSTRUCTION, THEY JUST SAY

5    "HAS AN INDICATOR THAT DISTINGUISHES THE FILE FROM OTHER

6    FILES," AND IN THEIR BRIEF, THEY SAY, "WELL, THAT COULD JUST BE

7    A FILE NAME."

8      BUT REMEMBER, YOUR HONOR, THE CLAIM ELEMENT BEGINS WITH THE

9    WORDS "SEQUENCE OF FILES." "SEQUENCE" IMPLIES, AT THE VERY --

10    AN ORDER OF THINGS, A SEQUENCE, OKAY?

11      AND EACH, EACH FILE HAS ITS PLACE IN THAT SEQUENCE, AND

12    THERE HAS TO BE SOMETHING THAT DETERMINES THE PLACE OF EACH

13    FILE IN THAT SEQUENCE, AND THAT'S WHAT OUR CONSTRUCTION IS TIED

14    TO.

15      JUST BECAUSE, AS EMBLAZE SAID, "WELL, EACH FILE HAS AN

16    INDICATOR, IT COULD BE A FILE NAME," YEAH, THAT MAY DISTINGUISH

17    ONE FILE FROM ANOTHER.

18      BUT THE INDEX OF THE FILE DETERMINES WHERE IN THE SEQUENCE

19    THE FILE IS LOCATED, AND COUNSEL JUST SAID, "I HAVE NO PROBLEM

20    WITH THAT BECAUSE THAT'S WHAT IT DOES."

21      SO WHEN YOU LOOK AT BOTH CONSTRUCTIONS, OURS IS THE ONE

22    THAT MORE CLOSELY ALIGNS WITH NOT ONLY THE PLAIN LANGUAGE OF

23    THE CLAIMS WHICH BEGINS WITH THE WORDS "SEQUENCE OF FILES," BUT

24    WITH THE ENTIRE DISCLOSURE OF THE SPECIFICATION.

25      THIS BUSINESS ABOUT JUST HAVING AN INDICATOR WHICH MAY BE

1    A FILE NAME IS NOT EVEN IN THE SPECIFICATION.

2           THE COURT:  ALL RIGHT.  THANK YOU, MR. NICODEMA.

3        MR. PAVANE, WHAT'S NEXT?

4           MR. PAVANE:  AGAIN, ALL I'LL ADD THERE IS I THINK,

5    AGAIN, IT'S THE CARDINAL SIN OF READING LIMITATIONS FROM THE

6    SPECIFICATION INTO THE CLAIM.  THE CLAIM SAYS WHAT IT SAYS.

7        THAT WAS 7, RIGHT?

8           MS. NEIMAN:  YEAH.

9           THE COURT:  IT WAS.

10          MR. PAVANE:  JUST BEFORE WE JUST MOVE OFF THAT, I

11   JUST WANTED TO DIRECT YOUR ATTENTION TO -- SORRY -- ONE SHORT

12   PASSAGE.

13       I THINK INSTRUCTIVE -- JUST TO GO BACK TO THAT FOR ONE

14   SECOND.  IF YOU LOOK -- IF I COULD DIRECT YOU FOR ONE MORE

15   SECOND TO FIGURE 3B OF THE PATENT?

16          THE COURT:  ALL RIGHT, I HAVE IT.

17          MR. PAVANE:  ALL RIGHT, THANK YOU.  LET ME CATCH UP.

18       THIS IS TALKING ABOUT -- FIGURE 3B, IF YOU READ THE BOTTOM

19   OF COLUMN 7, IT'S TALKING ABOUT THE INDEX FILE THAT'S SENT TO

20   THE CLIENT.

21       SO IN OTHER WORDS, THE FIRST -- REMEMBER THE FIRST STEP IN

22   DR. MADISETTI'S LAST SLIDE, OR SECOND TO LAST SLIDE, YOU

23   DOWNLOAD AN INDEX FILE TO THE CLIENT SO HE SEES ALL OF THE

24   FILES THAT ARE AVAILABLE FOR YOU TO CHOOSE FROM, AND THEN YOU

25   CLICK ON THE ONE YOU WANT AND IT STARTS PLAYING THEM BACK IN

1    THE APPROPRIATE SEQUENCE.

2        SO IF YOU LOOK AT FIGURE 3B, 52 IS TALKING ABOUT THE INDEX

3    FILE THAT'S SENT DOWN, I THINK IT'S CALLED 50, THE INDEX FILE

4    50 IN 3B, AND IT SAYS THAT "THE INDEX FILE COMPRISES A SLIDE

5    I.D. 52," AND IT SAYS "THE SLICE I.D. HOLDS THE NAME OF THE NEW

6    FILE WHEREIN THE NAME COMPRISES A STRING FOLLOWED BY THE INDEX

7    OF THE FILE."

8        SO IT'S GOT THE NAME OF THE FILE FOLLOWED BY THE INDEX OF

9    THE FILE, SO ALL THOSE ARE PART OF WHAT IDENTIFIES THAT

10   PARTICULAR FILE AND ENABLES IT TO BE RETRIEVED FROM THE, FROM

11   THE SERVER WHERE IT'S BEEN UPLOADED TO.

12       THE COURT:  AND, OF COURSE, IT SAYS "TYPICALLY," NOT

13   "EXCLUSIVELY."

14       MR. PAVANE:  YES.

15       THE COURT:  OKAY.

16       MR. PAVANE:  AND AGAIN, JUST TO BE CLEAR THAT THE --

17   YOU KNOW, AGAIN, THE -- THE FILE, IN TERMS OF THE WORD

18   LOCATION, IT'S -- AGAIN, THE IDENTIFICATION, OR THE INDEX, IS

19   GOING TO GIVE YOU AT LEAST THE RELATIVE POSITION OF THAT FILE

20   IN THE SEQUENCE.

21       IT'S NOT GOING TO BE A SPECIFIC LOCATION SOMEWHERE.  THEY

22   MIGHT NOT BE ALL -- YOU KNOW, THEY COULD BE DISORDERED AND

23   SPREAD OUT ALL OVER WHERE THEY ARE.

24       BUT IT WILL TELL YOU THE RELATIVE POSITION RELATIVE TO

25   OTHER FILES SO THAT WHEN YOU GO TO RETRIEVE ONE, IT WILL

1      CORRECTLY RETRIEVE THE NEXT ONE AFTER IT.

2          SO I DON'T THINK -- SAYING IT'S A SLICE'S LOCATION IS MAYBE

3      NOT QUITE ACCURATE.  IT'S NOT REALLY A LOCATION.  IT'S A

4      RELATIVE POSITION RELATIVE TO OTHER FILES.

5          OKAY.  THIS ONE IS ALSO QUICK.  YEAH, TERM 8, YOU'RE RIGHT.

6          OKAY.  THIS IS IN INDEPENDENT CLAIMS 1 AND 25.  THE TERM

7      THAT WE'RE LOOKING TO CONSTRUE IS "UPLOADING OR UPLOADS THE

8      SEQUENCE TO A SERVER AT AN UPLOAD RATE GENERALLY EQUAL TO THE

9      DATA RATE OF THE STREAM."

10         AND AGAIN, THIS IS THE LAST STEP OF CLAIM 1, AND THIS IS

11     THE ONE WHERE YOU'RE NOW FINALLY GETTING IT UP TO THE SERVER.

12         SO JUST TO BE CLEAR, EVERYTHING IN CLAIM 1 DEALS WITH THE

13     SERVER SIDE AND GETTING IT UP TO THE SERVER.  WE HAVEN'T

14     ACTUALLY DOWNLOADED ANYTHING.  IT'S JUST SAYS "SUCH THAT IT CAN

15     BE DOWNLOADED," AND THE ACTUAL DOWNLOADING STEP IS ACTUALLY

16     CLAIMED SUBSEQUENTLY IN CLAIM 2, I BELIEVE, IT SAYS ACTUALLY

17     WHERE IT'S DOWNLOADED.

18         BUT ANYWAY, STICKING BACK WITH THIS PARTICULAR TERM, SO

19     EMBLAZE'S CONSTRUCTION IS THAT YOU UPLOAD THE "UPLOADING FILES

20     IN THE SEQUENCE FROM THE TRANSMITTING COMPUTER TO A SERVER AT

21     AN UPLOAD RATE GENERALLY EQUAL TO THE DATA RATE OF THE STREAM."

22         WE'RE KIND OF MORE OR LESS REPEATING WHAT THE CLAIM SAYS,

23     WHICH IS ALL I THINK THAT'S NECESSARY HERE, BECAUSE ONCE AGAIN,

24     YOU HAVE A GIVEN DATA RATE IN THE STREAM.  YOU CAN'T UPLOAD ANY

25     FASTER THAN THAT DATA RATE, RIGHT?  BECAUSE IT'S IN REAL-TIME.

1    SO IF YOU YOU'RE CREATING IT AT THIS RATE, YOU CAN'T UPLOAD

2    IT FASTER THAN THAT, SO YOU'RE UPLOADING IT AT THAT RATE.

3        AND, AGAIN, INFRINGEMENT ARGUMENT?  YES, THEY CAN MAKE THAT

4    INFRINGEMENT ARGUMENT THAT BECAUSE, FOR EXAMPLE, YOU CAN UPLOAD

5    A SEGMENT IN A TENTH OF A SECOND AND WAIT ANOTHER NINE-TENTHS

6    OF A SECOND BEFORE THE NEXT SLICE, THEY CAN MAKE THAT ARGUMENT.

7    I DON'T THINK IT'S A VALID ARGUMENT.  YOU'RE STILL UPLOADING AT

8    THE SAME RATE, SO THE DATA IS BEING UPLOADED AT THAT RATE.

9        SO WE BELIEVE THAT'S CLEAR.  THERE'S NOTHING MAGICAL ABOUT

10   IT.  IT'S STRAIGHTFORWARD.  IT JUST SAYS THAT YOU'RE UPLOADING

11   IT AT WHATEVER THE DATA RATE OF THE STREAM IS.  AND AGAIN,

12   THERE COULD BE MULTIPLE QUALITY LEVELS.  SO FOR EACH LEVEL, YOU

13   UPLOAD AT WHATEVER THE RATE IS YOU'VE SET IT AT.

14       THE COURT:  OKAY.  AND I TAKE IT YOUR OTHER

15   OBJECTIONS TO APPLE'S USE OF "BITS PER SECOND" CLOSELY MATCH

16   AND ARE CONSISTENT WITH YOUR EARLIER OBJECTIONS?

17       MR. PAVANE:  YES, I WAS JUST GOING TO SAY THAT, BUT

18   I -- YES, THANK YOU.  EXACTLY, YOUR HONOR.

19       THE COURT:  OKAY.  MR. DECARLO OR MR. NICODEMA?

20       MR. NICODEMA:  YOU'VE STILL GOT ME, YOUR HONOR.

21       THE COURT:  OKAY.

22       MR. NICODEMA:  THIS TERM IS PART OF A FAMILY OF THREE

23   THAT WE'VE LUMPED TOGETHER.

24       THE COURT:  UM-HUM.

25       MR. NICODEMA:  AND THE MAJOR ISSUES THERE ARE "DATA

1    RATE," WHICH WE TALKED ABOUT EARLIER, AND "GENERALLY EQUAL TO."

2    AND JUST A MOMENT ON WHY WE HAVE THE SPEED "AS MEASURED IN

3    BITS PER SECOND" AND THE "CLOSELY MATCHES."

4    YOU REMEMBER, THERE'S A CLAIM LIMITATION OF REAL-TIME,

5    RIGHT, REAL-TIME BROADCASTING, AND THE PATENT IS ALL ABOUT

6    CAREFULLY MANAGING THE DATA RATE AND THE UPLOAD RATE AND THE

7    DOWNLOAD RATE AND THE REPLAY RATE SO THEY CLOSELY MATCH.

8    AND WHEN YOU HAVE UNITS LIKE THIS, WE'RE BETTER ABLE TO

9    HAVE THE EXPERT REPORTS PREPARED AND THE JURY DETERMINE WHETHER

10   THESE ARE MET BY THE PRIOR ART OR THE ACCUSED DEVICE.

11   REMEMBER, REAL-TIME IS MATCHING HUMAN PERCEPTION OF TIME,

12   SO THAT'S WHY WE USE WORDS LIKE "CLOSELY MATCH."

13   NOW, EMBLAZE DOES NOT WANT THE TERM "GENERALLY EQUAL TO" TO

14   BE CONSTRUED.  THEY SAY "JUST LEAVE IT AS GENERALLY EQUAL TO."

15   AND THE CASES THEY CITE IN THEIR BRIEF, YES, THE FEDERAL

16   CIRCUIT AND OTHER COURTS SAY YOU CAN PUT RELATIVE TERMS IN THE

17   PATENT.  BUT THOSE CASES GO TO WHETHER THE CLAIMS ARE INVALID

18   FOR INDEFINITENESS.

19   WE'RE TALKING ABOUT, OKAY, UNDER PATENT LAW, YOU CAN PUT

20   THOSE WORDS IN THERE, BUT YOU'VE GOT TO PUT SOME METES AND

21   BOUNDS ON THEM, ESPECIALLY IN THE CONTEXT OF THIS PATENT WHERE

22   WE'RE TALKING ABOUT MANAGING DATA RATES, UPLOAD, DOWNLOAD,

23   REPLAY IN A REAL-TIME EXPERIENCE THAT MATCHES HUMAN PERCEPTION.

24   YOU HAVE TO PUT METES AND BOUNDS ON IT.

25   THERE ARE CASES THAT SAY "GENERALLY" MEANS "USUALLY,"

1    "GENERALLY" MEANS "MOST OF THE TIME," "THE MAJORITY OF THE

2    TIME," AND THINGS -- "GENERALLY" MEANS "CLOSELY" AND THINGS IN

3    BETWEEN.

4         SO WE WANT TO PUT SOME PARAMETERS ON THIS BECAUSE YOU'VE

5    HEARD COUNSEL SAY A FEW TIMES TODAY, "YOU'VE GOT TO READ THE

6    TERMS IN CONTEXT OF THE CLAIM."

7         WELL, THIS IS A REAL-TIME BROADCASTING CLAIM, SO THAT'S WHY

8    WE PUT "CLOSELY MATCHES."  THAT'S WHY WE HAVE "BITS PER SECOND"

9    AS THE SPEED, BECAUSE IT MORE CLOSELY TRACKS WHAT THESE CLAIMS

10   ARE ABOUT.

11        JUST LEAVING IT AS "GENERALLY EQUAL TO," IN OUR VIEW, IS

12   NOT GOING TO BE HELPFUL TO EITHER THE EXPERTS OR THE JURY.

13   IT'S JUST GOING TO CREATE FIGHTS.

14        AND I CAN SKIP SOME OF THESE.

15        YOU KNOW, YOU SEE THERE'S NUMERICAL EXAMPLES IN THE PATENT

16   WHERE THE DATA RATE AND THE UPLOAD RATE ARE THE SAME, AND OUR

17   CONSTRUCTION GIVES CREDENCE TO THE WORD "GENERALLY."  WE KNOW

18   "GENERALLY" DOESN'T MEAN "ABSOLUTELY."  BUT YOU NEED TO PUT

19   SOME PARAMETERS ON IT AND NOT JUST LET IT HANG THERE.  THAT'S

20   WHY WE USE "CLOSELY MATCHES."

21             THE COURT:  OKAY.  THANK YOU.

22             MR. NICODEMA:  THANK YOU, YOUR HONOR.

23             THE COURT:  THANK YOU.

24        WHAT'S NEXT?

25             MR. PAVANE:  I JUST WANT TO MAKE ONE QUICK POINT.

1          THE COURT:  SURE.

2          MR. PAVANE:  "GENERALLY" MEANS "APPROXIMATELY."  I

3     AGREE WITH THAT.

4          AND AGAIN, I THINK IF YOU DO READ THOSE FEDERAL CIRCUIT

5     CASES, IT WASN'T JUST ABOUT WHETHER THEY WERE INDEFINITE.

6     THOSE ARE WORDS THAT WERE LEFT IN THE CLAIM AND THERE WAS NO

7     SPECIFIC CONSTRUCTION.

8          THE JURY IS PERFECTLY CAPABLE OF DETERMINING WHAT

9     "GENERALLY" MEANS.

10         AND AGAIN, I AGREE IT'S IN REAL-TIME AND THEY'LL ALL BE

11    ABLE TO LOOK AT THAT AND JUDGE WHAT WE'RE GOING TO SHOW TO BE

12    THE INFRINGING SYSTEM AND THEY'LL BE ABLE TO SIT THERE AND SAY,

13    "IS THAT REAL-TIME OR NOT?  IS IT GENERALLY EQUAL?"  THEY'LL

14    KNOW.

15         THAT'S WHAT JURIES DO.  THEY MAKE DETERMINATIONS -- OR I

16    SHOULD SAY THE FACT FINDER, WHOEVER THAT ULTIMATELY IS.

17         THE COURT:  OKAY.

18         MR. PAVANE:  OKAY.  TERM 9.

19    I THINK HERE -- OKAY, THE TERM IS, AGAIN, AT THE END OF

20    CLAIM 1, AND I ALLUDED TO IT EARLIER, BUT IT SAYS "SUCH THAT

21    ONE OR MORE CLIENT COMPUTERS CAN DOWNLOAD THE SEQUENCE OVER THE

22    NETWORK FROM THE SERVER AT A DOWNLOAD RATE GENERALLY EQUAL TO

23    THE DATA RATE."

24         AND AGAIN, I'M NOT GOING TO GO OVER THE SPEED PER SECOND

25    THING, THE CLOSELY MATCHES.  WE WENT THROUGH THAT.

1    BUT I THINK THE MAIN DISTINCTION, THE MAIN DIFFERENCE

2   RATHER, BETWEEN THE PARTIES HERE IS THAT THEIR CONSTRUCTION

3   REQUIRES THAT THE CLIENTS ACTUALLY RECEIVE THE BROADCAST, AND

4   OUR POSITION IS THAT, NO, NO, CLAIM 1 IS DIRECTED TO JUST

5   WHAT'S GOING ON ON THE UPLOAD SIDE.  IT'S WE'RE UPLOADING IT,

6   WE'RE DOING IT SO THAT CLIENT COMPUTERS CAN DOWNLOAD THE

7   SEQUENCE OVER THE INTERNET, BUT THERE'S NOTHING IN CLAIM 1 THAT

8   REQUIRES THAT A PARTICULAR CLIENT ACTUALLY HAVE DONE SUCH

9   DOWNLOADING.

10        THE COURT:  SO YOUR NOTION IS THAT APPLE, OR ANY

11   OTHER PARTY, MAY INFRINGE THIS PATENT EVEN IF NO BROADCAST --

12   I'M SORRY -- THIS CLAIM, CLAIM 1, EVEN IF NO BROADCAST IS EVER

13   RECEIVED OR VIEWED?

14        MR. PAVANE:  THAT'S CORRECT.  THAT'S EXACTLY RIGHT.

15    AND IN FACT, THERE ARE FEDERAL CIRCUIT -- YOU REMEMBER --

16   THIS IS A LITTLE LESS SIGNIFICANT NOW.  REMEMBER -- I'M SURE

17   YOU KNOW THE FEDERAL CIRCUIT CAME OUT WITH THAT DECISION THAT

18   SAID NOW YOU CAN HAVE DIVIDED INFRINGEMENT.  OKAY?

19    AND I THINK BEFORE THAT, WHICH IS WHEN THIS CASE STARTED,

20   THIS WAS MUCH MORE OF A CONCERN.

21    BUT THE POINT I WANTED TO MAKE THERE IS THAT THE COURT OF

22   APPEALS HAS SAID, AND I BELIEVE SAID IN THAT CASE AS WELL,

23   THAT, LOOK -- AND THIS IS BEFORE THEY CHANGED THE RULE -- THEY

24   SAID, "LOOK, YOU CAN ALWAYS DRAFT A CLAIM TO MAKE IT CLEAR THAT

25   YOU'RE ONLY COVERING ONE ACTOR IN IT, AND IF YOU DIDN'T DO

1    THAT, IT'S YOUR PROBLEM."

2         AND THE EXACT TYPE OF LANGUAGE THEY TALK ABOUT IS WHEN YOU

3    USE SOMETHING LIKE "CAN" OR "IS ABLE TO" OR "SUCH THAT," AND

4    THAT'S EXACTLY WHAT THIS SAYS.  IT SAYS "SUCH THAT CLIENTS CAN

5    DOWNLOAD."  IT DOESN'T SAY ANYBODY ACTUALLY DOWNLOADS.

6         AND IN FACT, IF YOU LOOK AT, AS I THINK I MENTIONED BEFORE,

7    WHEN YOU LOOK AT CLAIM 2, IT SAYS "AND COMPRISING DOWNLOADING

8    THE SEQUENCE."

9         SO CLAIM 2 NOW AFFIRMATIVELY RECITES THAT YOU'RE

10   DOWNLOADING, WHEREAS CLAIM 1 DOESN'T SAY THAT.  IT SAYS "SUCH

11   THAT YOU CAN DOWNLOAD."

12        SO I THINK THAT'S THE MAIN DISTINCTION ON THAT.

13        LET ME SEE IF I HAD ANYTHING ELSE HERE.

14        (PAUSE IN PROCEEDINGS.)

15             MR. PAVANE:  I'M DONE, YOUR HONOR.  THANK YOU.

16             THE COURT:  ALL RIGHT.  THANK YOU.

17             MR. NICODEMA:  THANK YOU, YOUR HONOR.

18        THIS IS A METHOD CLAIM AND YOU CAN'T INFRINGE A METHOD

19   CLAIM BASED ON CAPABILITIES.  YOU HAVE TO SHOW THE METHOD, EACH

20   AND EVERY STEP, EACH AND EVERY PART OF IT WAS ACTUALLY CARRIED

21   OUT.

22             THE COURT:  IS THAT RIGHT?  IF YOU DRAFT THE CLAIM

23   IN --

24             MR. NICODEMA:  A METHOD CLAIM IS A METHOD CLAIM.

25   IT'S A SERIES OF STEPS.

1          THE COURT:  OKAY.

2          MR. NICODEMA:  AND YOU HAVE TO -- AND IN THIS CASE,

3    BECAUSE OF THE ANTECEDENT BASIS LANGUAGE IN THERE, THE STEPS

4    HAVE TO BE CARRIED OUT IN ORDER.

5          AND NOW COUNSEL BROUGHT UP CLAIM 2 AND SAYS, "WELL, UNDER

6    THE DOCTRINE OF CLAIM DIFFERENTIATION, DOWNLOADING DOESN'T HAVE

7    TO TAKE PLACE IN CLAIM 1 BECAUSE CLAIM 2 SAYS DOWNLOADING."

8          BUT NOT REALLY.  IT SAYS MORE.  IT SAYS "COMPRISING

9    DOWNLOADING THE SEQUENCE USING AN INTERNET PROTOCOL."

10          SO IT'S A PARTICULAR PROTOCOL THAT'S BEING USED TO MODIFY

11    CLAIM 1 AND NOT THE STEP OF DOWNLOADING.

12          AND WE HAVE THE SAME ISSUES, YOUR HONOR, WITH "GENERALLY

13    EQUAL TO."  HOW ARE WE GOING TO KNOW IF THE DOWNLOAD RATE IS

14    GENERALLY EQUAL TO UNLESS IT'S DOWNLOADED?  WE NEED TO PUT SOME

15    PARAMETERS ON THIS, AND THE SAME ISSUES ARISE.

16          SO IN APPLE'S VIEW, IT'S NOT A CAPABILITY CLAIM BECAUSE

17    IT'S A METHOD CLAIM.

18          AND AS TO ALL THE CLAIMS, "GENERALLY EQUAL TO" SHOULD BE,

19    SHOULD BE THE -- SHOULD BE CONSTRUED.

20          AND I THINK THIS IS THE ONE WHERE -- YEAH.  IF WE LOOK AT

21    BULLET POINT 2, SO WHEN YOU TAKE THEIR CONSTRUCTION OF

22    "GENERALLY EQUAL TO," WHICH IS NO CONSTRUCTION, AND THEN THEIR

23    CONSTRUCTION OF "DATA RATE," WHICH JUST SAYS "AN AMOUNT OF DATA

24    OVER AN AMOUNT OF TIME," SO YOU HAVE "GENERALLY EQUAL TO"

25    COMBINED WITH "AN AMOUNT OF DATA OVER AN AMOUNT OF TIME."

1    I DON'T THINK THE JURY IS GOING TO BE ABLE TO APPLY THAT.

2    IT'S MAKING MY HEAD SPIN AND I THINK IT'S GOING TO MAKE THEIR

3    HEAD SPIN.

4        AND THIS PASSING CONCERN, OR THIS POINT COUNSEL MADE OVER

5    DIVIDED INFRINGEMENT, THE LAST WORD IN WHAT I JUST SAID IS

6    IMPORTANT, AND THAT'S INFRINGEMENT.

7        IT'S GOT NOTHING TO DO WITH CLAIM CONSTRUCTION.  THE CLAIMS

8    ARE CONSTRUED IN LIGHT OF THE INTRINSIC RECORD.  IF IT CREATES

9    AN ISSUE OF DIVIDED INFRINGEMENT --

10            THE COURT:  THE CHIPS FALL WHERE THEY MAY.

11            MR. NICODEMA:  -- TOO BAD, SO SAD.

12            THE COURT:  ALL RIGHT.  THANK YOU.

13            MR. NICODEMA:  THANK YOU, JUDGE.

14            THE COURT:  THANK YOU, MR. NICODEMA.

15        GO AHEAD, MR. PAVANE.

16            MR. PAVANE:  I GUESS I JUST HAVE MORE FAITH IN THE

17    JURY SYSTEM THAN MY OPPONENT HERE.  I THINK THEY'LL HAVE NO

18    DIFFICULTY UNDERSTANDING IT.

19        THAT'S THE PURPOSE OF EXPERT WITNESSES.  THAT'S THE PURPOSE

20    OF TESTIMONY.  THIS IS NOT GOING TO BE PRESENTED TO THE JURY IN

21    A VACUUM WHERE WE JUST GIVE THEM THE CLAIM AND SAY, "HERE,

22    FIGURE THIS OUT."  IT DOESN'T WORK THAT WAY.

23        ALSO, I AGREE EVERY STEP OF THE CLAIM HAS TO BE CARRIED

24    OUT.  BUT WHAT IS THE STEP IN CLAIM 1 AT THE END?  IT'S NOT THE

25    CLIENT DOWNLOADING.  IT'S UPLOADING THE SEQUENCE TO A SERVER.

1    THAT'S THE GERUND, IF I WILL, OF THE STEP.  THAT'S THE METHOD

2    STEP.

3        AND THEN IT GOES ON TO SAY "SUCH THAT THEY CAN DOWNLOAD

4    IT."  IT DOESN'T SAY THEY HAVE TO DOWNLOAD IT.

5        AND YOU CAN ABSOLUTELY DETERMINE THAT ISSUE OF

6    INFRINGEMENT.  THERE'S NO ISSUE THERE.  I CAN JUST SHOW THAT

7    THE WAY THE SYSTEM IS SET UP, IT'S DESIGNED SO THAT THAT

8    DOWNLOAD CAN OCCUR.

9        SO LET'S GO ON TO THE --

10            MR. NICODEMA:  WE'RE AT "REPLAY RATE" MARTY.

11            MR. PAVANE:  THANK YOU.

12        AGAIN, I HAVE NOTHING TO SAY HERE.  IT'S THE SAME EXACT

13    POINT WE'VE BEEN TALKING ABOUT.  THE REPLAY RATE IS GENERALLY

14    EQUAL TO THE DATA RATE.

15        AGAIN, OUR POINT IS THAT'S WHAT THIS WHOLE SYSTEM IS ALL

16    ABOUT.  THEY'RE ALL EQUAL.  IT'S A GIVEN DATA RATE, UPLOAD

17    RATE, DATA RATE, YOU'RE IN REAL-TIME.

18            THE COURT:  ALL RIGHT.  I THINK I UNDERSTAND YOUR

19    POSITION.

20            MR. PAVANE:  I THINK YOU DO, YES.

21            THE COURT:  ANYTHING TO ADD?

22            MR. NICODEMA:  YOUR HONOR, IT'S THE SAME ISSUES.

23    IF YOU DON'T MIND, I'LL STAND HERE.

24            THE COURT:  GO AHEAD.

25            MR. NICODEMA:  ON THE DOWNLOAD RATE, AGAIN, I WOULD

1    BE REMISS IF I DIDN'T REMIND THE COURT THAT, REMEMBER, EACH ONE

2    OF THESE CLAIMS HAVE THE REAL-TIME BROADCASTING LIMITATION, AND

3    EMBLAZE'S OWN CONSTRUCTION REQUIRES THAT THE DATA BE RECEIVED

4    BY THE CLIENTS.

5        SO THAT HAS TO BE ENGRAFTED ON YOUR HONOR'S ANALYSIS OF

6    WHETHER THE DOWNLOAD LIMITATION IS SOME CAPABILITY OR SOMETHING

7    THAT, WHICH WE BELIEVE HAS TO BE --

8            THE COURT:  I'VE GOT TO DEAL WITH IT SOMEWHERE IS

9    WHAT YOU'RE TRYING TO SAY?

10           MR. NICODEMA:  THAT'S CORRECT.

11           THE COURT:  ALL RIGHT.  THANK YOU.

12           MR. NICODEMA:  THANK YOU, JUDGE.

13           MR. PAVANE:  THANKS.

14           MS. NEIMAN:  TERM 11.

15           MR. PAVANE:  RIGHT.  OKAY.  I THINK WE'RE DOWN TO THE

16   BONE HERE.

17       SO TERM 11 IS FOUND IN DEPENDENT CLAIMS 8 AND 26, SLIGHTLY

18   DIFFERENT IN EACH ONE, BUT BASICALLY "PLAY BACK THE DATA STREAM

19   RESPONSIVE TO THE INDICES OF THE FILES."

20       AND, AGAIN, YOU KNOW, THE STARTING POINT -- AND I SHOULD

21   HAVE MADE THIS POINT A FEW MORE TIMES WHEN I WAS TALKING ABOUT

22   SOME OF THE OTHER ELEMENTS -- BUT AGAIN, THE STARTING POINT OF

23   EVERY CLAIM CONSTRUCTION IS THE LANGUAGE OF THE CLAIM.

24       I MEAN, LET'S LOOK WHAT IT SAYS.  "PLAYING IT BACK

25   RESPONSIVE TO THE INDICES," SO WE SAY "PLAYING BACK THE DATA

1     STREAM BASED ON THE INDICES."

2          I COULD LIVE WITH "RESPONSIVE."  I MEAN, IT'S THE CLAIM

3     LANGUAGE.

4          AGAIN, I BELIEVE APPLE IS TRYING TO, AGAIN, NARROW IT, I'M

5     SURE FOR SOME REASON OF INFRINGEMENT.  BUT PLAYING IT BACK "IN

6     THE ORDER OF THE INDICES."

7          WELL, IT DOESN'T SAY THAT.  IT SAYS YOU PLAY BACK THE

8     STREAM RESPONSIVE TO THE INDICES.

9          AND IT ALSO DOESN'T SAY "BY READING THE INDEX IN EACH

10    FILE," AND I TALKED TO YOU ABOUT THE FACT ABOUT WHETHER THE

11    INDEX IS IN THE FILE OR NOT IN THE FILE.  IT JUST SAYS "PLAYING

12    IT IN RESPONSE TO THE INDICES."

13         AND AGAIN, PEOPLE OFTEN TIMES DRAFT CLAIMS BROADLY FOR THIS

14    EXACT REASON.  IN OTHER WORDS, THEY MAY HAVE PREFERRED

15    EMBODIMENTS WHERE THEY SAY, "IN MY PREFERRED EMBODIMENT, I PUT

16    THE INDEX IN THE FILE.  I DO THIS.  I DO VARIOUS THINGS AT

17    VARIOUS TIMES."

18         BUT WHEN IT COMES TO CLAIMING, ANY GOOD PATENT LAWYER, HIS

19    JOB IS TO CLAIM IT SO THAT SOMEBODY CAN'T SAY, "OH, YEAH, HE

20    SAID THIS, SO WE CAN DO IT THIS WAY AND DESIGN AROUND."  YOUR

21    WHOLE GOAL IN DRAFTING A CLAIM IS AVOIDING A DESIGN AROUND.

22         SO LET'S LOOK AT THE BASIC CLAIM LANGUAGE AND SEE WHAT IT

23    SAYS AND LET'S NOT JUST START DRAGGING THINGS IN FROM THE SPEC

24    THAT AREN'T FOUND IN THAT CLAIM.

25              THE COURT:  OKAY.  THANK YOU.

```
1            MR. PAVANE:  THANK YOU, YOUR HONOR.

2            THE COURT:  MR. DECARLO, WELCOME BACK.

3            MR. DECARLO:  HELLO THERE.

4            MR. PAVANE:  TAG TEAMING ME.

5            MR. DECARLO:  MY LEGS WERE GETTING STIFF.

6            THE COURT:  GO AHEAD.

7            MR. DECARLO:  YOUR HONOR, OBVIOUSLY THE DISPUTE
```

CENTERS ON THE FACT THAT THE WORD "RESPONSIVE" ACTUALLY EXISTS

HERE IN THIS CLAIM, AND "BASED ON," AS MR. PAVANE WANTS HIS

CONSTRUCTION TO READ, IS NOWHERE IN THE SPECIFICATION.

     AND SO WE'RE JUST TRYING, AGAIN, TO USE THE SPECIFICATION

AS A GUIDE AND TAKE THAT AND MAKE SURE THAT THE CLAIM LANGUAGE

COMPORTS WITH THE SPECIFICATION WITHOUT READING EMBODIMENTS PER

SE.

     BUT OUR CONSTRUCTION OF THE WORD "INDEX" TO MEAN

"ALPHANUMERIC INDICATORS" IS PERFECTLY CONSISTENT.

     APPLE'S CONSTRUCTION SAYS "RESPONSIVE TO THE INDICES" IN

ORDER -- IT'S THE ORDER OF THE INDICES.  YOU READ THOSE

INDEXES.

     AN INDEX IS SOMETHING THAT TELLS YOU WHERE SOMETHING IS.

WE'VE TALKED ABOUT THAT BEFORE.  IT HAS TO INDICATE THE

SEQUENCE -- IT HAS TO INDICATE WHERE IN THE SEQUENCE IT IS.

OTHERWISE IT DOESN'T REALLY HAVE ANY MEANING.  IT'S NOT AN

INDEX, RIGHT?

            THE COURT:  SO MR. DECARLO, ON THIS ONE, WHEN YOU SAY

1    "IN THE ORDER OF THE INDICES," ARE YOU REALLY SAYING "IN THE

2    ORDER INDICATED BY THE INDICES"?

3        IN OTHER WORDS, ARE THE INDICES THEMSELVES ORDERED, OR ARE

4    THEY SIMPLY PROVIDING THE ORDER OF THE FILES THAT THEY

5    DESCRIBE?

6        MAYBE I'M NOT BEING VERY CLEAR.

7            MR. DECARLO:  I THINK -- THE FILE HAS AN INDICES.

8            THE COURT:  YES.

9            MR. DECARLO:  THE INDICES INDICATES WHERE IN THAT

10   SEQUENCE OF FILES IT OCCURS.  IS IT SLICE 7?  IS IT SLICE 4?

11   IS IT SLICE 3?

12       WHEN THE CLIENT IS PLAYING BACK THE DATA STREAM, THEY'RE

13   GOING TO PLAY THOSE FILES BACK BECAUSE NOW THE INDEX FILE,

14   WHICH WE'LL TALK ABOUT IN A BIT, RIGHT, WHICH TELLS THE CLIENT

15   WHAT'S THE MOST RECENTLY UPLOADED FILE?

16       WELL, THE MOST RECENTLY UPLOADED FILE IS FILE 5.  I'M

17   GOING TO SEEK THE FILE WHOSE INDEX IS 5.

18       THAT'S WHAT THE -- THAT'S WHAT THE CLAIM SAYS, THAT'S WHAT

19   OUR CONSTRUCTION SAYS, AND THAT'S WHAT THE PATENT SAYS.  THAT'S

20   WHAT THE PATENT TEACHES.

21       WHAT IS "BASED ON"?  THAT IS PROBABLY AS AMORPHOUS A

22   CONSTRUCTION AS WE'VE HEARD TODAY.  THE CLAIMS ARE RESPONSIVE

23   TO.

24       IT TAKES THIS CONCEPT OF A RESPONSIVE RELATIONSHIP BETWEEN

25   THE CLIENT'S READING OF THE INDEX FILE THAT CONTAINS THE INDEX

1    OF THE MOST RECENTLY UPDATED FILE, IT TAKES IT RIGHT OUT,

2    "BASED ON."

3         AND MR. PAVANE WAS WAVING HIS ARMS AROUND BEFORE AND

4    TALKING ABOUT HOW THE FILES CAN BE EVERYWHERE.  WELL, OKAY.

5         WHERE THEY'RE LOCATED ON THE ACTUAL DISK PARTITION ON THE

6    SERVER IS NOT WHAT WE'RE TALKING ABOUT HERE.

7         WE'RE TALKING ABOUT THE FACT THAT THE CLAIM REQUIRES THAT

8    THE FILES BE SEQUENCED, THAT THEY BE INDEXED SO THAT WE

9    UNDERSTAND WHAT THAT SEQUENCE IS, AND THAT THE CLIENT CAN

10   UTILIZE THAT INDEX TO RECREATE THE SEQUENCE, AND THAT'S WHAT

11   WE'RE TRYING TO ACCOMPLISH HERE.

12        "BASED ON" IS MEANINGLESS IN THIS CONTEXT.  THE PATENT

13   TEACHES THAT NO MATTER WHERE THE USER BEGINS, IT WILL STILL BE

14   RESPONSIVE TO THE ORDER OF THE INDICES.

15        SO IN MR. PAVANE'S EXAMPLE, I TUNE IN WHEN IT'S TIME TO

16   PLAY SLICE 7.  WELL, I LOOK AT THE INDEX FILE, THE MOST

17   RECENTLY UPLOADED FILE IS SLICE 7.  THAT'S WHERE I START.

18        IT TOLD YOU WHERE IN THE SEQUENCE TO BEGIN AND IT WILL

19   PLAY THE NEXT SLICE WHEN IT READS -- IF THE NEXT FILE UPLOADED

20   IS 9, THAT'S WHAT IT'S GOING TO READ BECAUSE THAT'S WHAT THE

21   PATENT SAYS.

22             THE COURT:  OKAY.

23             MR. DECARLO:  SO THE INDEX IS AN INDICATOR OF THE

24    SEQUENCE.

25             THE COURT:  OKAY.  THANK YOU VERY MUCH, MR. DECARLO.

1          MR. NICODEMA:  YOU'RE WELCOME, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  I THINK WE'RE DOWN TO THE

3    LAST ONE OR TWO.

4          MR. DECARLO:  WE ARE INDEED.

5          THE COURT:  OKAY.

6          MR. PAVANE:  I JUST WANTED TO MAKE ONE OTHER POINT

7    ABOUT THE INDEX, ABOUT THE LOCATION, BECAUSE I WANT TO BE CLEAR

8    HERE.

9          YOUR HONOR HEARD EARLIER -- I DON'T REMEMBER THE CLAIM

10   NUMBER, BUT IT DOESN'T REALLY MATTER.  THE MULTIPLE QUALITY

11   LEVELS IS THE POINT I WANTED TO MAKE.

12         SO LET'S REMEMBER THAT WHEN WE HAVE MULTIPLE QUALITY

13   LEVELS, WE'VE UPLOADED TO THAT SERVER THE SAME SLICE MAYBE IN

14   FOUR DIFFERENT COMPRESSION FORMATS.

15         WELL, SO WHEN THE USER GOES TO GRAB THAT, HE'S GOT TO KNOW

16   NOT ONLY WHICH SLICE IN THE SEQUENCE, BUT HE'S GOT TO KNOW

17   WHICH LEVEL TO GRAB.

18         SO THERE'S MORE THAN INFORMATION ABOUT THE LOCATION.

19   THERE'S INFORMATION PERHAPS ABOUT THE LEVEL, OR THERE WOULD BE

20   INFORMATION ABOUT THE LEVEL IN MY EXAMPLE.

21         THE COURT:  OKAY.

22         MR. PAVANE:  IS THIS THE LAST ONE?

23         THE COURT:  IT IS ON MY LIST.

24         MR. DECARLO:  TERM 13.

25         MR. PAVANE:  I HAVE ONE MORE.  I HAVE 13 AND 15.

1          MR. DECARLO:  13 AND 15.

2          MR. PAVANE:  YEAH.  RIGHT, OKAY.  YEAH, I SEE IT.

3     HERE IT IS, 13.

4     HERE WE GO, 13.

5     OKAY.  THIS IS IN DEPENDENT CLAIMS 8 AND 26.  THE CLAIM

6  PHRASE IS "UPLOADING AND UPDATING AN INDEX FILE CONTAINING THE

7  INDEX OF THE FILE IN THE SEQUENCE THAT WAS MOST RECENTLY

8  UPLOADED."

9     EMBLAZE'S CONSTRUCTION SAYS "UPLOADING TO A SERVER AN

10 INDEX FILE, AND UPDATING THE INDEX FILE WITH THE INDEX OF THE

11 MOST RECENTLY UPLOADED FILE."

12     THAT'S PRACTICALLY A REPEAT OF THE CLAIM LANGUAGE.

13     LET'S LOOK AT APPLE'S CONSTRUCTION.  "UPLOADING TO THE

14 SERVER A FILE THAT CONTAINS A SINGLE ALPHANUMERIC INDEX" -- SO

15 THERE'S TWO THINGS I WANT TO CHALLENGE.  "ALPHANUMERIC" I WON'T

16 CHALLENGE BECAUSE I'VE ALREADY BEAT THAT TO DEATH -- "INDEX

17 VARIABLE AND CHANGING THE VARIABLE TO EQUAL THE INDEX OF THE

18 MOST RECENTLY UPLOADED FILE."

19     SO BASICALLY I THINK THE DIFFERENCE BETWEEN US IS WHAT

20 THEY WANT TO SAY IS THAT YOU CAN'T HAVE MORE THAN ONE FILE

21 INDEX NAME IN THE INDEX FILE AT A TIME.  YOU CAN ONLY HAVE THE

22 ONE.

23     AND I CERTAINLY CONCEDE THAT IN THE PREFERRED EMBODIMENT

24 THEY DESCRIBE, THAT'S EXACTLY WHAT THEY DO DESCRIBE.

25     BUT THE CLAIM DOESN'T SAY THAT.  AND AGAIN, YOU'RE

1    ENTITLED TO CLAIM MORE BROADLY THAN YOU DESCRIBE THE PREFERRED

2    EMBODIMENT.

3         AND ALL IT SAYS HERE IS YOU UPLOAD IT AND UPDATE THE INDEX

4    FILE CONTAINING THE INDEX OF THE FILE MOST RECENTLY UPLOADED.

5         IT DOESN'T SAY ANYTHING ABOUT -- AND AGAIN, IT'S AN

6    OPEN-ENDED COMPRISING CLAIM, RIGHT?  IT'S COMPRISING.  IT

7    DOESN'T SAY THAT YOU CAN'T HAVE OTHER THINGS IN THERE.  IT

8    DOESN'T SAY YOU CAN'T HAVE PREVIOUSLY UPLOADED INDEXES, FILE

9    INDEXES IN THERE, AND THAT'S WHAT THEY WANT TO DO.  THEY WANT

10   TO LIMIT IT TO A SINGLE ONE, AND THE CLAIM JUST DOESN'T SAY

11   THAT.

12        IT HAS -- YES, IT HAS THE MOST RECENT ONE AND IT'S UPDATED

13   WITH THAT ONE, BUT IT DOESN'T SAY THAT THE OTHER ONES ARE NOW

14   GONE, AND THAT'S THE WAY THEY WANT YOU TO READ THAT, THAT

15   YOU'VE GOT TO GET RID OF THE ONES BEFORE THAT AND IT'S JUST NOT

16   IN THE CLAIM.

17             THE COURT:  OKAY.  THANK YOU.

18             MR. DECARLO:  YOUR HONOR, QUITE SIMPLY, MR. PAVANE IS

19    RIGHT.  THAT IS --

20             MR. PAVANE:  YOU CAN SIT DOWN NOW.

21        (LAUGHTER.)

22             MR. DECARLO:  THAT IS THE ONLY -- THE -- IT'S THE

23    ONLY EMBODIMENT DESCRIBED.  IT'S THE ONLY WAY THAT THEY'VE

24    GIVEN ANYBODY ANY HELP TO UNDERSTAND WHAT THIS INVENTION IS.

25        THE PATENT, AT FIGURE 3B, TALKS ABOUT THE FACT THAT THE

1    INDEX FILE CONTAINS THIS SLICE I.D., AND THAT THAT SLICE I.D.

2    IS CONTINUOUSLY UPDATED.

3         AND I THINK THAT MR. PAVANE'S CHARACTERIZATION OF THE

4    SPECIFICATION IS CORRECT.  THIS IS WHAT WE'RE TALKING ABOUT.

5    THE SLICES HAVE FILE INDEXES, INDICES, AND THEN THERE IS AN

6    INDEX FILE.  THE INDEX FILE GETS UPLOADED TO THE SERVER.

7         AND WHEN THE SLICES ARE CREATED, YOU UPLOAD THE INDEX FILE,

8    YOU UPLOAD THE FILE INDEX, AND THEN AS EACH NEW SLICE IS

9    UPLOADED, THAT INDEX IN THAT FILE GETS UPDATED.  THAT'S WHAT

10   THE CLAIM SAYS.  THAT'S WHAT THE PATENT SAYS.

11        WHAT MR. MADISETTI WAS TALKING ABOUT THIS MORNING WITH

12   MENUS AND LOOKING AT ALL THESE DIFFERENT PLACES, WHERE IS THAT

13   IN THE PATENT?

14        WHERE -- MR. PAVANE HAS INDICATED THAT YOU CAN CLAIM MORE

15   BROADLY.

16        WITHIN LIMITS, YOUR HONOR.  I MEAN, THERE HAS TO BE SOME

17   SUPPORT IN THE SPECIFICATION FOR THE CONSTRUCTION THAT THEY'RE

18   SEEKING AND THERE IS NONE.

19        WHAT YOU JUST SAW IS EXACTLY WHAT THE PATENT TEACHES.

20        AND MR. MADISETTI TALKED ABOUT IS WHAT'S HAPPENING NOW.

21        WHAT THE PATENT IS TALKING ABOUT IS WHAT DID I INVENT IN

22   1998?

23        AND THIS IS WHAT THEY INVENTED AND THIS IS WHAT THE CLAIM

24   SAYS.

25             THE COURT:  SO THIS IS A GOOD EXAMPLE OF AN ISSUE

1    THAT WAS KIND OF DOGGING ME WHEN I WAS READING THE ENTIRETY OF

2    BOTH SIDES' BRIEFS.

3         SO IN THIS -- IN THE CONTEXT OF A PATENT LIKE THIS WHERE

4    THE PATENTEE, I THINK AS IS THEIR RIGHT, CONSTANTLY REFERS TO

5    PREFERRED EMBODIMENTS, OR PREFERABLE EMBODIMENTS, IN A

6    SITUATION LIKE THIS WHERE -- LET'S ASSUME FOR THE MOMENT THAT I

7    AGREE WITH YOU THAT THERE'S REALLY ONLY ONE EMBODIMENT

8    DESCRIBED FOR THE PURPOSE OF THIS LIMITATION.

9              MR. DECARLO:  UM-HUM.

10             THE COURT:  AM I REQUIRED, IN YOUR VIEW UNDER THE

11   CASE LAW, TO LIMIT THE SCOPE OF THE CLAIM TO THAT ONE

12   EMBODIMENT?

13             MR. DECARLO:  I THINK IN THIS PARTICULAR INSTANCE YOU

14   ARE, YOUR HONOR.  THERE'S NO OTHER TEACHING.

15        AND I DON'T THINK YOU CAN FAIRLY APPLY WHAT'S KNOWN IN THE

16   ART IN 2013 TO WHAT THEY WERE TRYING TO INVENT IN 1998.

17             THE COURT:  AND THE ISSUE WOULD BE -- THE ONLY OTHER

18   ALTERNATIVE I CAN THINK OF IS IF IT WAS GENERALLY KNOWN IN THE

19   ART IN 1998 THAT THERE WERE OTHER WAYS OF DOING THIS, RIGHT?

20             MR. DECARLO:  UM --

21             THE COURT:  I MEAN, IN OTHER WORDS --

22             MR. DECARLO:  WELL, I THINK YOU'LL ALSO FIND FEDERAL

23   CIRCUIT CASE LAW THAT SAYS JUST BECAUSE SOMEBODY IN THE ART

24   MIGHT HAVE BEEN ABLE TO FIGURE IT OUT DOESN'T MEAN THAT,

25   BECAUSE IT'S NOT IN YOUR SPEC, YOU'RE ENTITLED TO CLAIM IT, AND

1        I THINK THAT'S WHERE WE ARE.

2                THE COURT:  ALL RIGHT.  THANK YOU.

3                MR. DECARLO:  YOU'RE WELCOME, YOUR HONOR.

4                MR. PAVANE:  I THINK ON THAT SMALL POINT, I THINK IF

5        YOU READ THAT LIEBEL-FLARSHEIM CASE AND OTHER CASES, THAT'S

6        EXACTLY WHAT THEY SAY.  YOU'RE NOT LIMITED THAT TO THE

7        PREFERRED EMBODIMENT.

8            THAT'S WHY I MADE THE POINT THAT THE INQUIRY -- AND THE

9        FEDERAL CIRCUIT HAS MADE THIS CLEAR -- FOCUSES ON THE LANGUAGE

10       OF THE CLAIM.

11           AND ONCE YOU START GETTING INTO THAT SLIPPERY SLOPE OF

12       SAYING, "OKAY, YEAH, BUT THIS IS THE EMBODIMENT YOU DESCRIBED

13       FOR THAT," YOU'RE READING LIMITATIONS INTO THE CLAIM.

14           AND AGAIN, YOU'RE ENTITLED TO CLAIM MORE BROADLY.  PEOPLE

15       DO THAT ALL THE TIME.  YOU'D BE A LOUSY LAWYER IF YOU DIDN'T DO

16       THAT.

17               THE COURT:  THE LAST TERM, MR. PAVANE?

18               MR. PAVANE:  YEAH.  I JUST ALSO WANTED TO MAKE THE

19       POINT THAT THE PATENT DISCUSSES AT COLUMN --

20           WHERE IS THAT?  DO YOU KNOW WHERE THAT IS?  I'LL FIND IT IN

21       A MINUTE, BUT THE POINT IS THAT THE -- WHERE IS IT?

22           (PAUSE IN PROCEEDINGS.)

23               MR. PAVANE:  AT ONE POINT THE PATENT DISCUSSES THE

24       FACT THAT YOU CAN -- YOU DON'T HAVE TO DOWNLOAD THE MOST

25       RECENTLY UPLOADED FILE.  YOU CAN JUMP TO AN EARLIER POINT IN

1     TIME.

2          SO IF YOU WANT TO TALK ABOUT THE IDEA OF HOW YOU WOULD DO

3     THAT, IT SEEMS TO ME THERE'S PROBABLY A FEW WAYS TO DO IT.  ONE

4     WAY IS CERTAINLY TO KEEP THE INDICES OF THE FILES THAT ARE

5     STILL AVAILABLE ON THE SERVER SO THAT YOU CAN PICK OUT ONE

6     THAT'S EARLIER IN TIME.

7          PROBABLY ANOTHER WAY YOU COULD DO IT IS THAT YOU COULD SAY,

8     OKAY -- LET'S ASSUME WE'RE USING NUMBERS TO KEEP IT SIMPLE, AND

9     I'M UP TO SLICE 275.  I GUESS YOU COULD SAY, JUST DO IT -- HAVE

10    AN ALGORITHM AND IF THE GUY SLIDES BACK AND HE WANTS TO

11    WATCH -- YOU KNOW, SINCE YOU KNOW THE TIME DURATION OF EACH

12    SLICE AND HE WANTS TO WATCH SOMETHING THAT WAS FOUR MINUTES

13    AGO, YOU COULD SAY -- YOU'D DO A QUICK CALCULATION, 275 MINUS

14    37, SO GO TO SLIDE 152.  YOU COULD PROBABLY DO IT THAT WAY,

15    TOO.

16         BUT THE POINT IS IT'S IN THE CLAIMS, THE CONCEPT.  YOU'RE

17    NOT ALWAYS JUST DOWNLOADING THE MOST RECENTLY UPDATED FILE.

18              THE COURT:  OKAY.

19              MR. PAVANE:  OKAY.  LAST TERM.

20         SORRY, YOUR HONOR.  JUST GIVE ME ONE SECOND HERE.  I

21    APOLOGIZE.

22         (PAUSE IN PROCEEDINGS.)

23              MR. PAVANE:  OKAY.  I'M JUST -- I FOUND THIS ONE

24    PASSAGE, IF I COULD QUICKLY DIRECT YOU TO IT?

25              THE COURT:  SURE.

1        MR. PAVANE:  AT COLUMN 8, YOUR HONOR, LINE 7.

2     AND AGAIN, REMEMBER THERE ARE MULTIPLE PEOPLE WATCHING THIS

3     THING, SO IT SAYS "ALTERNATIVELY A USER OF ONE OF THE COMPUTERS

4     30," AND THOSE ARE THE CLIENT COMPUTERS, "MAY CHOOSE TO BEGIN

5     DOWNLOADING THE DATA STREAM FROM AN EARLIER POINT IN TIME THAN

6     THAT INDICATED BY I.D. 52," WHICH IS THE MOST RECENTLY UPLOADED

7     INDEX.

8     SO IT SPECIFICALLY CONTEMPLATES THAT YOU CAN DRAG SOMETHING

9     DOWN FROM AN EARLIER POINT IN TIME.

10     AND IT'S ALSO COVERED BY CLAIM 10, SPECIFICALLY CLAIMS THAT

11     EMBODY THAT.

12        MR. DECARLO:  YOUR HONOR, IF I COULD --

13        THE COURT:  WHY DON'T YOU SPEAK TO THAT ONE POINT?

14        MR. DECARLO:  YEAH, JUST THAT ONE POINT.

15     THE FACT THAT THE SPECIFICATION DESCRIBES THAT THERE'S AN

16     ALTERNATE EMBODIMENT THAT IS DESCRIBED AS A FUNCTION OF THE

17     CLIENT SOFTWARE, IT'S NOT -- IT DOESN'T TELL YOU -- THERE'S NO

18     ALGORITHM FOR YOU TO FIGURE THAT OUT.  THAT'S NOT DISCLOSED.

19     IT SAYS THE CLIENT DOES IT.

20     NOW, THERE'S A SOFTWARE APPENDIX IN THIS PATENT SOMEWHERE

21     THAT ALLEGEDLY CONTAINS THE SOURCE CODE FOR THE CLIENT

22     SOFTWARE, AND MAYBE IN THERE, IF WE WERE ABLE TO DECODE THAT,

23     IT WOULD TELL YOU HOW THIS HAPPENS.

24     BUT THE INDEX FILE, THE THING THAT WE'RE TALKING ABOUT, THE

25     PASSAGE THAT MR. PAVANE JUST POINTED TO SPECIFICALLY AGAIN SAYS

1    N IS THE INDEX OF THE MOST RECENT SLICE AND THE INDEX FILE JUST

2    CONTAINS N.

3         SO HOW DID THE CLIENT APPROACH THIS?  I DON'T KNOW.

4         BUT THEY DIDN'T CLAIM IT.

5              THE COURT:  OKAY.  WHY DON'T WE MOVE ON TO THE

6    LAST -- THANK YOU.

7              MR. DECARLO:  THANK YOU, YOUR HONOR.

8              THE COURT:  WHY DON'T WE TURN TO THE LAST TERM, WHICH

9    IS "DETERMINING"?

10              MR. DECARLO:  YES.

11              MR. PAVANE:  RIGHT, 15.

12              MR. DECARLO:  SLIDE 83.

13              THE COURT:  SO ON THIS ONE, MR. PAVANE, IF YOU PUT

14   ASIDE THE BITS PER SECOND ISSUE, WHICH WE'VE EXHAUSTIVELY

15   COVERED TODAY, ARE YOU ALL REALLY DISAGREEING ABOUT VERY MUCH?

16              MR. PAVANE:  PROBABLY NOT.  I DON'T THINK -- LET ME

17   JUST -- IF I MAY JUST ASK MY -- YEAH.

18       I GUESS THE ONE POINT I WOULD HAVE IS THE "MEASURES THE

19   DATA TRANSFER RATE."

20       YOU DON'T HAVE TO MEASURE A RATE, THAT'S IMPORTANT, BECAUSE

21   YOU CAN DETERMINE A DATA BANDWIDTH IN VARIOUS WAYS.

22         SO, FOR EXAMPLE, ONE OF THE WAYS IS WITH THESE TIME STAMPS,

23   AND THE PATENT TALKS ABOUT TIME STAMPING, SO EACH SLICE SAYS,

24   OKAY, YOU'RE SUPPOSED TO GET THIS ONE TWO SECONDS AFTER THE

25   NEXT ONE.  IF THEY'RE EACH TWO SECONDS, IT'LL PUT A TIME STAMP.

1    4 MINUTES, 22 SECONDS; 4 MINUTES, 24; 26.

2        AND IF IT STARTS TO SEE THAT IT'S NOT KEEPING UP ON THE

3    CLIENT SIDE, IT SAYS, "WAIT A MINUTE, THAT TOOK FOUR SECONDS

4    AND I DIDN'T GET THAT.  I'M NOT GETTING IT ON TIME.  I'VE GOT A

5    PROBLEM.  I'VE GOT TO GO TO A LOWER QUALITY LEVEL."

6        IT'S DETERMINED THAT HE'S GOT A LOUSY BANDWIDTH AND HE HAS

7    TO SWITCH TO A LOWER QUALITY LEVEL.

8        BUT YOU HAVEN'T REALLY MEASURED THE TRANSFER CAPACITY.

9    YOU'VE KIND OF DONE SOMETHING THAT'S A PROXY FOR THE --

10        THE COURT:  SUCH THAT IF THE PROXY WERE INACCURATE

11    FOR SOME REASON, YOU'D BE STUCK WITH IT?

12        MR. PAVANE:  WE'D BE WITH MR. NICODEMA, TOO BAD, TOO

13    SAD, RIGHT.

14        THE COURT:  OKAY.

15        MR. PAVANE:  BUT YES, THAT WOULD HAPPEN IN THAT CASE.

16        SO AGAIN, THE LANGUAGE IS "DETERMINING A BANDWIDTH."  IT

17    DOESN'T SAY "MEASURING."  IT DOESN'T TELL YOU HOW YOU HAVE TO

18    DO IT.

19        IT'S DRAFTED THAT WAY.  THAT'S THE CLAIM LANGUAGE AND

20    THAT'S THE -- AGAIN, IF THEY WANT TO ARGUE THAT WHAT THEY'RE

21    DOING IS NOT DETERMINING, FINE, THEY CAN SAY THAT.

22        THEY SAY WE ACTUALLY -- WE DON'T MEASURE THE RATE AND

23    DETERMINING REQUIRES IT.

24        BUT, AGAIN, THAT'S NOT THE LANGUAGE OF THE CLAIM.

25        THE COURT:  ALL RIGHT.  THANK YOU.

1          MR. NICODEMA?

2              MR. NICODEMA:  YES, SIR.

3          THE FUNDAMENTAL DISPUTE, WHICH I DIDN'T HEAR COUNSEL

4      ADDRESS, IS THE DIFFERENCE BETWEEN OUR CONSTRUCTION WHICH

5      CONSTRUES BANDWIDTH IN TERMS OF "DATA TRANSFER CAPACITY," AND

6      EMBLAZE'S CONSTRUCTION WHICH JUST SAYS "A DATA RATE."

7          REMEMBER WHEN DR. MADISETTI TALKED ABOUT, ONE OF HIS SLIDES

8      USED AN ANALOGY, BANDWIDTH IS LIKE A PIPE THAT HAS A DIAMETER.

9              THE COURT:  UM-HUM.

10             MR. NICODEMA:  SO IF IT'S AN 800 GALLON PER MINUTE

11     PIPE, THAT'S WHAT IT COULD FIT THROUGH THERE.

12         BUT TWO GALLONS PER MINUTE CAN FIT.  ALL THOSE OTHER THINGS

13     CAN FIT THROUGH THERE.

14         BUT THAT'S NOT THE BANDWIDTH.  THAT'S NOT THE CAPACITY.

15         AND IF WE LOOK UP AT THIS SLIDE, THE PATENT DOESN'T DEFINE

16     BANDWIDTH, BUT EMBLAZE'S DICTIONARY DOES, THE MICROSOFT

17     DICTIONARY, AND IT TRACKS NICELY WITH APPLE'S PROPOSED

18     CONSTRUCTION, "THE DATA TRANSFER CAPACITY, OR SPEED OF

19     TRANSMISSION, OF A DIGITAL COMMUNICATIONS SYSTEM AS MEASURED IN

20     BITS PER SECOND."  AND APPLE'S CONSTRUCTION PRETTY MUCH TRACKS

21     THAT.

22         NOW, IF YOU LOOK AT EMBLAZE'S CONSTRUCTION, THEY CONFUSE

23     DATA BANDWIDTH, WHICH IS A MEASURE OF DATA TRANSFER CAPACITY OF

24     A NETWORK, AND NOT JUST POTENTIAL DOWNLOAD RATES.

25         SO IF WE SEE THIS EXAMPLE, YOU HAVE A CONNECTION BETWEEN A

1    SERVER AND A CLIENT AT ONE MEGABITS PER SECOND BANDWIDTH.

2        WELL, THAT CAN HANDLE A FILE TRANSFER AT A DATA RATE OF 50

3    KILOBITS PER SECOND.

4        BUT 50 KILOBITS PER SECOND IS NOT THE BANDWIDTH.  THAT'S

5    NOT THE DATA TRANSFER CAPACITY.

6        SO EMBLAZE IS NOT CONSTRUING THE TERM AT ALL.  THEY'RE NOT

7    CONSTRUING THE DATA BANDWIDTH.  THEY'RE CONFLATING THE TERM

8    "BANDWIDTH" WITH THEIR CONSTRUCTION OF THAT TERM "DATA RATE,"

9    WHICH IS NOT THE BANDWIDTH.

10            THE COURT:  OKAY.  THANK YOU VERY MUCH.

11            MR. NICODEMA:  THANK YOU.

12            THE COURT:  LAST WORD, MR. PAVANE?

13            MR. PAVANE:  NO.  I'M GOOD.

14            THE COURT:  OKAY.  ALL RIGHT.

15        WELL, LET ME THANK YOU FOR WHAT'S HONESTLY BEEN A VERY

16    ENTERTAINING AND INTERESTING AFTERNOON.  IN CASE YOU CAN'T

17    TELL, I THOROUGHLY ENJOYED THE EXPERIENCE.

18        ORDINARILY IT IS MY PRACTICE TO GIVE YOU THE CONSTRUCTIONS

19    AT THE CONCLUSION OF THE HEARING.  I WILL CONGRATULATE BOTH

20    SIDES, YOU'VE GIVEN ME ENOUGH TO THINK ABOUT THAT I WANT TO

21    SLEEP ON THIS BEFORE I PUBLISH MY CONSTRUCTION.

22        BUT YOU CAN EXPECT THAT I WILL ISSUE THE CONSTRUCTION

23    FAIRLY SOON, AND CONSISTENT WITH THAT, I WILL SIMPLY ISSUE THE

24    CONSTRUCTION SO YOU CAN GO OFF AND DO THE REST OF YOUR CASE.

25        AN OPINION WILL FOLLOW THAT GIVES YOU THE REASONING AND

1  ANALYSIS FOR PURPOSES OF APPEAL OR JUST EDUCATION OR

2  EDIFICATION.

3      I ALSO MENTIONED EARLIER THAT I WILL ISSUE A SCHEDULING

4  ORDER CONSISTENT WITH THE SCHEDULE YOU ALL PROPOSED, SO YOU

5  WILL HAVE THAT AS WELL.

6      WITH THE TRIAL DATE SCHEDULED IN, WE SAID MARCH, I THINK --

7          MR. NICODEMA:  MARCH 2014.

8          THE COURT:  -- WE'RE OFF AND RUNNING.

9      AND I VERY MUCH LOOK FORWARD TO WORKING WITH YOU ON THE

10  REMAINDER OF THE CASE AND I WISH YOU ALL SAFE TRAVELS HOME.

11      HAVE A GOOD EVENING.

12          MR. PAVANE:  THANK YOU, YOUR HONOR.

13          MR. NICODEMA:  THANK YOU, YOUR HONOR.

14          MR. DECARLO:  THANK YOU, YOUR HONOR.

15      (THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

1

2

3                         CERTIFICATE OF REPORTER

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____

17   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595

18        DATED:  APRIL 29, 2013

19

20

21

22

23

24

25