# EXHIBIT C

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


EMBLAZE, LTD.,                          )
                                        )
              Plaintiff,                )
                                        )
vs.                                     ) Case No.:
                                        ) 5:11-cv-01079 (PSG)
APPLE, INC., a California               )
corporation,                            )
                                        )
              Defendant.                )
_____)


** CONFIDENTIAL - ATTORNEYS' EYES ONLY **

** SUBJECT TO A PROTECTIVE ORDER **


VIDEOTAPED DEPOSITION OF

HAGIT GAL

TEL AVIV, ISRAEL

JULY 24, 2013


REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

JOB NO.:  119633

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 2

1           Videotaped deposition of HAGIT GAL, taken
2    in the above-entitled cause pending in the United
3    States District Court, Northern District of California,
4    Oakland Division, pursuant to notice, before BRENDA
5    MATZOV, CA CSR 9243, at S. Turgeman, Attorneys at Law,
6    3 Daniel Frisch Street, 25th Floor, Tel Aviv, Israel,
7    on Wednesday, the 24th day of July, 2013, at 10:18 a.m.
8
9
10   APPEARANCES:
11   FOR PLAINTIFF:
12           COZEN O'CONNOR, LLP
             By:  MARTIN B. PAVANE, ESQ.
13           277 Park Avenue
             New York, New York 10172
14           (212) 883-4900 / Fax (212) 986-0604
             mpavane@cozen.com
15
16   FOR DEFENDANT:
17           GREENBERG TRAURIG, LLP
             By:  DOUGLAS R. WEIDER, ESQ.
18           200 Park Avenue
             Florham Park, New Jersey 07932
19           (973) 360-7900 / Fax (973) 301-8410
             weiderd@gtlaw.com
20
21   ALSO PRESENT:
22           DORON MATZOV, Videographer
23           ARNON GICELTER, Emblaze In-House Counsel
24           NAFTALI SHANI, Emblaze
25

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

```
                                                      Page 3
 1                      I N D E X
 2   WITNESS
 3   Hagit Gal (Sworn)
 4
 5   EXAMINATION                                        PAGE
 6   By Mr. Weider                                    8, 147
 7   By Mr. Pavane                                       145
 8
 9
10
11                    E X H I B I T S
12   NUMBER          DESCRIPTION                      MARKED
13   Exhibit 1       Letter from Hagit Gal, Emblaze,
                     Ltd., to Microsoft Corporation,
14                   "Re:  Emblaze Multimedia
                     Streaming Patents," Dated
15                   August 5, 2008
                     (Bates EMB011947 to EMB011949)       16
16
     Exhibit 2       Letter from Hagit Gal, Emblaze,
17                   Ltd., to RealNetworks, Inc.,
                     "Re:  Emblaze Multimedia
18                   Streaming Patents," Dated
                     August 5, 2008
19                   (Bates EMB011950 to EMB011952)       17
20   Exhibit 3       Letter from Hagit Gal, Emblaze,
                     Ltd., to Adobe Systems Incorporated,
21                   "Re:  Emblaze Multimedia and
                     Applications Streaming Patents,"
22                   Dated August 5, 2008
                     (Bates EMB011944 to EMB011946)       20
23
24
25
```

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 34

1        A.   With respect to the letters of 2008?

2        Q.   Yes.

3        A.   No.

4        Q.   When is the first time Emblaze made

5    any effort to preserve documents related to the

6    patent-in-suit as well as the Emblaze Live products

7    developed in conjunction with the patent-in-suit?

8        A.   In 2009.  I don't remember exactly when,

9    but roughly around mid-year.

10       Q.   What was the preservation effort made

11   mid-year 2009?

12       A.   We contacted Emblaze's present patent --

13   Israeli patent attorneys and asked them to obtain

14   copies of the Israeli file history -- the Israeli

15   patent file history as well as all three American ones.

16   And we've also approached Sanford Colb and asked him

17   for -- to produce to us whatever documentation he

18   would have with respect to these files.

19       Q.   Were there any other preservation efforts

20   made in mid 2009 other than the ones you just described?

21       A.   No.

22       Q.   Who made the communication to Sanford Colb?

23       A.   I did.

24       Q.   Did you make that verbally or in writing?

25       A.   Both.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 35

1          Q.    What was the form of the writing?

2          A.    An e-mail.

3          Q.    Do you know whether the e-mail's been produced

4     in this litigation?

5          A.    I don't think so.

6          Q.    Is there a claim of privilege associated with

7     the e-mail?  Do you know -- withdrawn.

8                Do you know whether the e-mail's on Emblaze's

9     privilege log?

10         A.    I don't think so.  I -- this information was

11    not a part of Apple's request for production.

12         Q.    Was -- as part of that communication in

13    mid 2009, was Sanford Colb instructed to make sure

14    to maintain all the documents they had associated

15    with the patent-in-suit?

16         A.    Yes.  Verbally.

17         Q.    And you made that verbal request?

18         A.    Yes.  To Sanford Colb himself.

19         Q.    Did you only make that particular request

20    verbally?

21         A.    Yes.

22         Q.    When was the next time that Emblaze engaged

23    in any preservation activity associated with the

24    patent-in-suit and any software development associated

25    with the claims of the patent-in-suit?

***CONFIDENTIAL – ATTORNEYS EYES ONLY***

Page 40

1        A.   (Examining.)  Yes.

2        Q.   And it says:

3             "The parties have undertaken numerous steps

4   to preserve and collect both electronically stored

5   information ('ESI') and hard-copy materials that

6   are potentially relevant to the litigation, within

7   reasonable bounds.  These efforts include:  Collecting

8   electronic documents from relevant employee computers

9   and e-mail accounts and storing the information in

10  secured storage for retention during these proceedings;

11  collecting hard-copy documents from relevant employees;

12  and instructing relevant employees to retain and

13  preserve, on an on-going basis, all documents, data,

14  and materials if they concern evidence" related "to

15  the issues in this action."  (As read.)

16            Do you see that paragraph?

17       A.   Yes.

18       Q.   Did you review that paragraph before this

19  Joint Case Management Statement was submitted to the

20  Court?

21       A.   I don't remember specifically this paragraph,

22  but I remember this document.

23       Q.   As of September 5, 2011, what steps

24  had Emblaze undertaken to preserve and collect

25  electronically stored information and hard-copy

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 41

1   materials as identified in Gal 7?

2        A.   Well, that goes to the general retention

3   practices that Emblaze is using.  With respect to

4   electronic information, Emblaze has the practice of

5   preserving electronic documents for two years.

6             And since the -- we started the -- the process

7   of this litigation, basically everything was put on

8   hold.  And we hold all the electronic information from

9   that point on, so it's not destroyed.

10            As far as other information is concerned, as I

11  told you, we have obtained all the patent documentation

12  from the Patent Office in the U.S. -- the Israeli Patent

13  Office and the USPTO and also from Sanford Colb, who was

14  the prosecuting attorney for all these patents.  And we,

15  of course, have documents on-site.  So they were there.

16  We did not move them in -- into any storage.  They were

17  kept in the company's offices.

18       Q.   You reference that there was a hold that the

19  company put as to all electronic documents?

20       A.   Yes.

21       Q.   When was that hold put in?

22       A.   If I recall correctly, it was around that

23  time right before the -- the -- the claim was filed.

24  Right -- it was in consequence to the hold letter that

25  we received from our counsel.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 42

1      Q.   Is there a person at Emblaze who was in charge

2   of IT in -- about the time the -- withdrawn.

3           At the time the suit against Apple was filed,

4   who was in charge of IT at Emblaze?

5      A.   Sharon Sasson.  Sasson.

6      Q.   And was -- did you make this hold request

7   to -- withdrawn.

8           Was Mr. Sasson made aware of this hold

9   request at around the time of the filing of the

10  litigation against Apple?

11     A.   Yes.

12     Q.   Did you make that request to Mr. Sasson?

13     A.   "Sasson."

14     Q.   "Sasson"?

15     A.   "Sasson."

16     Q.   Did you make that request to Mr. Sasson?

17     A.   I didn't make it personally.  The chairman

18  of the board made it in my presence.

19     Q.   And that would be -- referred to Mr. Shani?

20     A.   Yes.

21     Q.   Other than the direction from Mr. Shani to

22  Mr. Sasson with respect to electronic documents, were

23  there any other actions that Emblaze took with respect

24  to the evidence preservation paragraph in Gal 7?

25     A.   No.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 43

 1             MR. PAVANE:  Well, she already testified that

 2   they put the electronic documents on --

 3             MR. WEIDER:  I said other than putting a

 4   hold --

 5             MR. PAVANE:  You said other communication

 6   to Mr. --

 7             MR. WEIDER:  Other than the communication

 8   to put on hold the electronic documents.

 9        Q.   BY MR. WEIDER:  Are you the person at Emblaze

10   with the primary responsibility for searching and

11   gathering documents in connection with the litigation

12   against Apple?

13        A.   I am.

14        Q.   Is that part of your responsibility with

15   respect to your position at Emblaze?

16             MR. PAVANE:  Objection to form.

17             THE WITNESS:  To collect documents?

18        Q.   BY MR. WEIDER:  Well, let me ask it this way.

19             Do you -- with respect to other litigations

20   of Emblaze, do you have the same responsibility with

21   respect to searching and collecting documents?

22        A.   Yes.  And also with the M & A activity.  But

23   that's, you know, due diligence.  But it's more or less

24   the same.

25        Q.   The 2009 contact that you referenced earlier,

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 44

1    that was -- you only made that contact to the -- is it

2    Sanford & Colb [sic], the Israeli patent counsel?

3        A.   And Soroker Agmon, our -- the current Israeli

4    counsels.

5        Q.   In connection with the verbal communication

6    you described earlier with Sanford Colb, did you give

7    any direction to Sanford Colb to advise Ladas & Parry

8    to preserve documents?

9        A.   No.

10       Q.   At the -- when you received --

11            (Brief interruption in the proceedings.)

12            MR. PAVANE:  Sorry.  Apologies.

13       Q.   BY MR. WEIDER:  What did you do with respect

14   to searching for documents after receiving Apple's first

15   set of document requests?

16            MR. PAVANE:  Objection to form.

17            THE WITNESS:  I looked for any and all

18   responsive documents in reference to various requests

19   from Apple.  So, for example, if there was a question

20   that was about Web-Radio, I was looking for everything

21   that we had on Web-Radio and then screened it to see

22   if it was responsive or not.

23       Q.   BY MR. WEIDER:  Identify for me the various

24   sources that you looked at in order to identify

25   documents responsive -- responsive to Apple's initial

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 45

1  request.

2      A.   So it would be hard-copy files, electronic

3  documents -- and by that, I mean files and e-mail --

4  and Internet.

5      Q.   With respect to hard-copy files, what were

6  the various hard-copy files that you looked at to

7  identify responsive documents?

8          MR. PAVANE:  Objection to form.

9          THE WITNESS:  Corporate files, legal files,

10 subsidiary files, employee files, patent files.  I

11 think that's about it.

12     Q.   BY MR. WEIDER:  With respect to corporate

13 files, what hard-copy corporate files were in --

14 withdrawn.

15         Can you elaborate in a little more detail

16 what you're referring to by "corporate files"?

17     A.   Corporate files -- our corporate files

18 contain documentation and information related to

19 the company's incorporation from date of inception,

20 various public offerings, change of names -- changes

21 of name.  So it really is our issues that are related

22 to the corporate of Emblaze.

23     Q.   Are they organized in some fashion, the

24 hard-copy files?

25     A.   Chrono -- chronologically by date.

***CONFIDENTIAL – ATTORNEYS EYES ONLY***

1   respect to where software developers stored documents

2   during their work at Emblaze?

3        A.   I don't know.

4        Q.   Did you ever learn, during the course of your

5   investigation, that Emblaze had a server on which there

6   was a Visual SourceSafe used to save source code as well

7   as project-related documents?

8        A.   You're talking about VSS?

9        Q.   Yes.

10       A.   The company -- yes, we have that type of

11  system, VSS.

12       Q.   And that system is still in place at the

13  company?

14       A.   Yes.

15       Q.   Did anyone ever search the VSS for documents

16  responsive to this litigation?

17       A.   Indeed.

18       Q.   And when was that search done?

19       A.   As part of the electronic search.

20       Q.   Prior to the electronic search -- withdrawn.

21            When you say -- when you say as part of the

22  electronic search, you're referring to the search of

23  the -- based upon the Apple search terms that were

24  provided?

25       A.   Correct.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 61

1      Q.   Prior to the electronic search done based

2   upon the Apple search terms, had there been any search

3   done of the Visual SourceSafe documents?

4      A.   Yes.  By Moshe Dgani.

5           MR. PAVANE:  Doug.

6           MR. WEIDER:  Yeah?

7           MR. PAVANE:  Just -- just for the record --

8   I -- I know you're apparently not familiar with Judge

9   Cousins' order.  But I just want to read you one other

10  aspect of that order.  Request for production No. 8

11  from Apple read:

12          "Any software related to or embodying the"

13  technology -- "technology described and claimed in any

14  of the '473 patent, '230 patent, and/or '432 patent."

15  (As read.)

16          And the ruling of Magistrate Cousins at that

17  time was:

18          "Apple's motion to compel is denied with

19  respect to this request, as Apple has not established

20  the relevance of the software responsive to the request,

21  the claims or defenses of this action."

22          MR. WEIDER:  Yeah, well -- and I'll also

23  advise that you probably either don't understand Visual

24  SourceSafe or weren't listening to the testimony of the

25  witnesses.  Because we have a well-developed record here

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 63

1    SourceSafe is maintained on a separate server from

2    the company's server that you described previously?

3        A.   I don't know.

4        Q.   Was there an -- an attempt made by the

5    company to contact the inventors on the patent with

6    respect to whether they had any responsive documents?

7        A.   I didn't get the first part.

8             Can you repeat the question?

9        Q.   Sure.  Was there an attempt by the company

10   to contact the inventors on the patent-in-suit to

11   determine whether they had any relevant documents?

12       A.   Yes.

13       Q.   Who made that request?

14       A.   Naftali Shani.

15       Q.   And was Mr. Shani able to reach some of

16   the inventors to determine whether they had responsive

17   documents?

18       A.   He reached all of them with the exception

19   of Edan Ayal, for whom we were unable to -- to get

20   contact information for quite a while.  But he was

21   finally reached also I think a few months ago, a

22   couple of months ago.

23       Q.   I take it Mr. Reifman probably wasn't

24   contacted either?

25       A.   No.  He's in jail.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 64

1      Q.   And did Mr. Shani indicate to you -- let's

2   just go through them inventor by inventor.

3           With respect to Mr. Carmel, did Mr. Shani

4   indicate to you that he spoke to Mr. Carmel?

5      A.   Yes.

6      Q.   And did he identify for you whether Mr. Carmel

7   had relevant documents?

8      A.   Yes.

9      Q.   And did Mr. Carmel have relevant documents?

10     A.   Yes.

11     Q.   Do you remember what documents Mr. Carmel had?

12     A.   It was hard-copy documents, some -- there was

13  drafting of the '473 patent with his -- some handwriting

14  comments on it.  It's all been produced.

15     Q.   What -- the draft with comments is probably --

16  was that privileged, or it was produced?

17          MR. PAVANE:  Well, she means produced to us --

18          MR. WEIDER:  Okay.

19          MR. PAVANE:  -- to -- to Emblaze by

20  Mr. Carmel.

21          I think that's what you mean.  Is that what

22  you mean?

23          THE WITNESS:  Except for the ones that we

24  received yesterday.  Those were the first time seen

25  yesterday, because he had additional documents.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

1          MR. WEIDER:  Well, let's -- let's break --

2          MR. PAVANE:  Okay.  Yeah.

3          MR. WEIDER:  -- this down.

4          MR. PAVANE:  I wasn't aware of that either.

5    So go ahead.

6        Q.   BY MR. WEIDER:  All right.  So -- so let's

7    do this separately, make sure the record's clear.

8          So what we've been talking about to now,

9    that's contact that Mr. Naftali made some time ago?

10       A.   Yes.

11       Q.   And with respect to the documents that

12   Mr. Carmel identified he had -- withdrawn.

13         Let's try to set some framework.

14         When -- what was the time frame in which this

15   first contact was made between Mr. Shani and Mr. Carmel

16   with respect to whether he had responsive documents?

17       A.   I think it was the beginning of 2010.

18         MR. WEIDER:  All right.  We're -- we're about

19   one minute from the tape change.  So why don't we take

20   a break.

21         THE VIDEOGRAPHER:  This is the end of Tape

22   No. 1 in the video deposition of Hagit Gal.  Going off

23   the record.  The time is 12:18.

24         (Recess from 12:18 p.m. to 12:26 p.m.)

25         THE VIDEOGRAPHER:  This is the beginning of

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 66

1    Tape No. 2 in the video deposition of Hagit Gal.  Going

2    back on the record at 12:26.

3         Q.   BY MR. WEIDER:  Before we took our break, we

4    were discussing the contact -- I think you said around

5    2000 -- beginning of 2010 --

6         A.   Yes.

7         Q.   -- that Mr. Carmel -- I'm sorry -- that

8    Mr. Shani had with Mr. Carmel.

9              You were informed by Mr. Shani that Mr. Carmel

10   had indicated he had some documents?

11        A.   Correct.

12        Q.   And were those documents at some point

13   provided to you?

14        A.   Yes.

15        Q.   And what was in the documents that Mr. Carmel

16   provided?

17        A.   It was drafts of the -- of the patent --

18   the patent-in-suit and also one other patent, with

19   some handwritten notes on it, and also copies of some --

20   some correspondence from Sanford Colb.

21        Q.   And did you provide all that material to

22   outside counsel?

23        A.   We did.

24        Q.   And was the determination of whether to

25   produce those documents or make a privilege claim,

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

1    was that done by outside counsel?

2          A.   It was.

3          Q.   I'm sorry.  The patent with the handwritten

4    note, was it the suit patent or a different patent?

5          A.   Both.

6          Q.   He had a copy of the patent-in-suit with

7    handwritten notes?

8          A.   The patent-in-suit?  You mean after it was

9    granted?

10         Q.   Yes.

11         A.   No.

12         Q.   Okay.  So when you say a patent with

13   handwritten notes, you're talking about a draft

14   of the patent application --

15         A.   Correct.

16         Q.   -- with handwritten notes?

17         A.   Yeah.

18         Q.   And in connection with his deposition that

19   took place yesterday, Mr. Carmel brought some additional

20   documents that were related to the patent-in-suit?

21         A.   Yes.

22         Q.   Those documents he brought were different

23   than the documents that he had provided in 2010?

24         A.   Yes.

25         Q.   Okay.  And those have been provided to

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 68

1    counsel?

2        A.   Yes.

3        Q.   And -- and, generally, what were the

4    documents, just sort of general identification of

5    the documents that Mr. Carmel brought yesterday?

6        A.   Same general description, drafts and

7    correspondence with Sanford Colb.

8        Q.   And when you say "drafts," you're referring

9    to drafts of the patent applications?

10       A.   Yes.

11       Q.   Mr. Shani was able to reach Dror Ginzberg

12   to determine whether Mr. Ginzberg had any --

13       A.   Yes.

14       Q.   -- responsive documents?

15            Do you know when Mr. Shani was able to reach

16   Mr. Ginzberg?

17       A.   He -- he reached all of them at the same time.

18   He did it in a matter of one or two days, at the same

19   time.

20       Q.   This is in 2010?

21       A.   Yes.

22       Q.   Did Mr. Shani report back to you after he

23   spoke with Mr. Ginzberg?

24       A.   Yes.

25       Q.   And what did he tell you about his

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 69

1    conversation with Mr. Ginzberg?

2        A.   That Dror said he did not have any documents.

3        Q.   And that same conversation and result took

4    place with respect to Mr. Daboosh?

5        A.   Correct.

6        Q.   And did that same conversation and result

7    take place with respect to Mr. Eliraz?

8        A.   Correct.

9        Q.   Now, did you subsequently learn that

10   Mr. Eliraz had relevant documents?

11       A.   Correct.

12       Q.   And when did you learn that?

13       A.   Earlier this week.

14       Q.   Do you have an understanding how it came

15   to be that Mr. Eliraz previously indicated he didn't

16   have any relevant documents and then this week was

17   able to identify relevant documents?

18       A.   He said he found some in a box and also that

19   he did not remember that he's been asked for it before.

20            (Exhibit 8 marked.)

21       Q.   BY MR. WEIDER:  I'm showing you what's been

22   marked as Gal 8.  It's a:

23            "Declaration of Hagit Gal in Opposition to

24   Apple's Motion to Compel."

25            Do you -- and it was filed on April 19, 2013.

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 119

1    that this -- these were documents that were produced

2    in the recent production.

3            You see at the top it refers to an "Emblaze

4    AudioLive 2.0"?

5        A.    Yes.

6        Q.    Do you have any understanding why what we've

7    marked as Gal 13 wasn't found and produced as part of

8    Emblaze's initial searches for documents?

9        A.    I don't.  Because, as I -- as I told you,

10   I recall that we did search for documents responsive

11   to the word "live."  But as I told you before, the --

12   when we did that search, we used, you know, regular

13   search methods for -- you know, the ones that are

14   available in Microsoft.

15           And as far as the VSS system is concerned,

16   I know that it also has some search mechanisms.  I'm

17   not familiar with it, but Moshe Dgani told me he used

18   it.  When the ESI search was done, it was -- it was

19   done using that designated software Concordance.  And

20   I guess it has, you know, better capa -- searching

21   capabilities.

22           MR. PAVANE:  When you say the "ESI search,"

23   the one you did with the Apple search terms?

24           THE WITNESS:  Yes.

25       Q.    BY MR. WEIDER:  That was done using search

***CONFIDENTIAL - ATTORNEYS EYES ONLY***

Page 138

1        Q.   -- Emblaze Systems, Ltd.?

2        A.   Yes.

3             (Exhibit 19 marked.)

4        Q.   BY MR. WEIDER:  I'm showing you now what's

5   Hagit -- I'm sorry, I keep doing that -- Gal 19, which

6   is the assignment record from the Patent Office.  You

7   see the bottom one shows an assignment from Emblaze

8   Systems, Ltd., to Emblaze, Ltd.

9             Is that just as a result of the name change

10  that occurred?

11       A.   (Examining.)  Yeah.

12       Q.   Leaving Mr. Shani aside, who's a employee

13  of the company, has Emblaze entered into any agreements

14  with any of the inventors on the patent-in-suit with

15  respect to this lawsuit?

16       A.   No.

17       Q.   Emblaze hasn't agreed to provide any

18  compensation whatsoever to any of the inventors

19  in the patent-in-suit who are former employees?

20       A.   No.

21       Q.   Do you have an understanding of what the

22  basis was of the claim to a small entity status in

23  connection with the filing of the application for

24  the patent-in-suit?

25       A.   What do you mean "understanding"?