SARAH BARROWS (SBN 253278)
barrowss@gtlaw.com
William Coats (SBN 94864)
coatsw@gtlaw.com
Stephen Ullmer (SBN 277537)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

James J. DeCarlo (Admitted *Pro Hac Vice*)
decarloj@gtlaw.com
Michael A. Nicodema (Admitted *Pro Hac Vice*)
nicodemam@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400

*Attorneys for Defendant,*
*Apple Inc.*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., <br><br> Plaintiff; <br><br> v. <br><br> APPLE INC., a California Corporation, <br><br> Defendant. | CASE NO. 11-CV-01079 PSG <br><br> **DECLARATION OF DR. NATHANIEL POLISH, PH. D., IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT** |

I, Nathaniel Polish, Ph. D., hereby declare:

1. I have been asked to provide this declaration regarding Defendant Apple Inc.'s Motion for Summary Judgment of Non-Infringement ("Apple's Motion") in the above-captioned case. I have personal knowledge of the facts stated herein.

2. My analysis and opinions detailed in this declaration are consistent with my December 20, 2013 Expert Report regarding non-infringement. I understand that Apple has been accused of infringing U.S. Patent No. 6,389,473 ("'473 patent"). My report includes my opinion rebutting the infringement analysis provided by Dr. Vijay Madisetti, who provided an expert report on infringement on behalf of Emblaze on November 8, 2013.

3. I understand that my report and exhibits were all provided to Emblaze's counsel on December 20, 2013. I was also deposed regarding my opinions on January 30, 2014, in New York, New York. If asked, I could and would provide my report and accompanying exhibits to the Court, but for purposes of Apple's Motion I have been asked to provide sworn testimony (consistent with my opinion on the same issues in the report) regarding certain issues addressed in Apple's Motion.

4. I reviewed the report and exhibits provided by Dr. Madisetti, as well as his deposition testimony, including test data regarding certain streams allegedly affiliated with MLB, the NFL, ESPN, ABC, CBS/PGA, and Apple ("the Accused Streams"). I have also done some of my own testing with respect to the Accused Streams.

**Predetermined Data Size Limitation:**

5. I understand that every claim that Apple has been accused of infringing includes the limitation "each slice having a predetermined data size associated therewith" and that the Court construed this claim to mean "Each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided."

6. Per the claim term and the Court's construction, it is my opinion that a person of ordinary skill in the art (at any time, including as of March 24, 1998) ("ordinary artisan") would have understood that setting a time duration may result in a data size assigned in advance but that the "may" condition will only result in a predetermined data size assigned in advance if the data rate has

a constant value. If the data rate of the stream varies from slice to slice and such variability is not knowable or predictable in advance, setting the time duration is not establishing a data size assigned in advance.

7. The "data rate" of a stream cannot be assumed to be a constant value particularly in the case of a compressed video stream. An ordinary artisan would understand that, with respect to an uncompressed stream (e.g. a broadcast television feed), setting a time duration could result in slices having data sizes assigned in advance because an uncompressed stream generally has a constant data rate. In addition, some audio compression schemes such as the GSM 6.10 compression specifically described in the '473 patent have a constant data rate, as explained in the patent and as is known to a skilled artisan. However, encoded (i.e. compressed) video streams generally do not have a constant data rate and thus setting the time duration does not result in slices having a data size assigned in advance.

8. Essentially all video encoders use principles of human perception in deciding what to encode and with what detail. As a result, scenes with details that humans do not perceive very well are coded with fewer bits than scenes with many details that humans can perceive. Also, essentially all video encoders only encode the frame-to-frame differences. Thus, time periods where the video does not change much from frame to frame will be encoded with fewer bits than time periods with rapidly changing frames. So any given time period will vary substantially in the number of bits used relative to other time periods. Thus, in the case of most encoded video outputs, the data size cannot be assigned in advance of the stream being sliced.

9. The testing relied upon by Dr. Madisetti to show that the accused streams are divided into slices having a data size assigned in advance of the stream being divided[1] does not support that

---

[1] *E.g.*, Data produced by Dr. Madisetti at VKM000377-VKM386 including exhibits 12-14 to the Declaration of Douglas Wieder in Support of Apple's Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,389,473 as to All Accused Streams and excerpts of that data referenced in exhibit 2 (Dr. Madisetti's infringement expert report) to the Declaration of Stephen Ullmer in Support of Apple's Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,389,473 as to Specific Content Providers ("Specific Providers Ullmer Decl.") at ¶¶ 122, 202-03, 214, 215.

conclusion because the data sizes vary without a predictable pattern. Further, contrary to what Dr. Madisetti has said, my opinion is that an ordinary artisan would not consider "generally equal" to be a substitute for a claim term requiring "a data size … assigned in advance."

**Upload Rate Generally Equal To Data Rate Of The Stream Limitation:**

10. I understand that every claim that Apple has been accused of infringing includes the limitation "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" (Claim 1 and its dependents) or "which uploads the sequence to a server at an upload rate generally equal to the data rate" (Claim 25 and its dependents) and that the Court construed these limitations to mean "[t]ransmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream."

11. In my opinion, an ordinary artisan would not have understood the "upload rate" to refer to a rate that includes the time during which no uploading occurs. None of the examples in the patent support this view, nor would an ordinary artisan refer to an upload (or "transmitting" as per the Court's construction) that takes 3 seconds for a file containing 10 seconds of media as having taken 10 seconds to upload or transmit. I described specific examples from the patent in my report and in several exhibits, including the patent's description (e.g. '473 patent at 11:60-61, 12:59-13:23) of an upload time variable referred to as "$T_{SL}$" the time in which a files is actually being uploaded. The patent also places significant emphasis on maintaining a generally equal relationship between the data rate of the stream and the upload rate (in fact, this is a limitation for all of the claims), including describing adjusting the compression level to "adjust the data streaming rate to the available bandwidth." ('473 patent at 7:45-49).

12. An ordinary artisan reading these descriptions, the rest of the specification, and the claims would have understood that the "upload rate" is not an inherent quality of live streaming (or, put another way, the upload rate is not "necessarily equal" to the data rate of the stream for live streaming) but that some kind of generally equal relationship must be maintained between the two to meet the claims of the patent. Otherwise, there would be no recognition that the two variables are not aligned (i.e., that the actual transmitting occurs much faster than the data rate) and that the

compression rate should be adjusted in view of the teachings of the '473 patent to take advantage of the additional bandwidth.

**Dr. Madisetti's Testimony that Encoder-Plus-Akamai Architecture Is "A" Transmitting Computer:**

13. I understand that every claim that Apple has been accused of infringing requires a "transmitting computer" (e.g. in Claim 1: "A method for real-time broadcasting from a transmitting computer to one or more client computers over a network" and in Claim 25: "Apparatus . . . comprising: a transmitting computer").

14. I also reviewed Dr. Madisetti's testimony where he was asked questions about the Akamai RTMP Architecture during his deposition. (*E.g.*, Ex. 8 to the Specific Providers Ullmer Decl. at 368:21-377:11). In answering those questions, he identified that the claimed transmitting computer could be either a combination of the Encoder, Entrypoint, RtmpCore, and Archiver, or that same combination plus the NetStorage, as he described in his deposition. (*See, e.g., id.*; Ex. 9 to the Specific Providers Ullmer Decl. at 5 (depicting Akamai's RTMP Architecture)).

15. In my opinion, an ordinary artisan would not have understood the transmitting computer described in the '473 patent to include the kind of specialized encoder and server architecture required to implement the Akamai RTMP Architecture. As I opined in my report in considerable detail, the patent describes expressly its goals of eliminating the need for dedicated broadcast encoders and hardware, using networks with common, existing server network infrastructure such as those offered by ISPs, and using conventional personal computers to provide streaming multimedia. ('473 patent at 1:50-67, 6:37-43, 6:62-63). These goals, especially in view of the other disclosures and claims in the patent, would indicate to an ordinary artisan that the transmitting computer itself cannot include the type of specialized server infrastructure that make up the Akamai RTMP Architecture.

**Testing data associated with HLS streams**:

16. As I discussed in my report and accompanying exhibits, I performed substantial testing of HLS streams and produced the results in my report. These tests included testing of some of the Accused Streams identified in Dr. Madisetti's report. For these tests, I measured the latency

between the time at which a scene appears on a live TV feed and the time at which the same scene appeared on certain Apple devices including an iPad and an iPhone. The latency I observed varied from a low of about 25 seconds to a high that exceeded 200 seconds of delay. Many of my results, including results for both the accused ESPN and ABC news streams, featured delays of 35-40 seconds when tested.

**Analysis of the Software Appendix Submitted with the application that became the '473 patent**

17. My analysis and opinions detailed in this declaration are also consistent with my November 9, 2013 Expert Report regarding the software appendix contained in the file history the '473 patent. My report includes my opinion that software files identified in the specification of the '473 patent that were purportedly produced with the application that became the '473 patent were irretrievably corrupted.

18. I understand that my report and exhibits were all provided to Emblaze's counsel on November 9, 2013. If asked, I could and would provide my report and accompanying exhibits to the Court, but for purposes of Apple's Motion I have been asked to provide sworn testimony (consistent with my opinion on the same issues in the report) regarding certain issues addressed in Apple's Motion.

19. The '473 patent references nine software files in a portion of the specification that is labeled Software Appendix. ('473 patent at 13:53-14:16). These files are also purportedly disclosed in the appendix. The appendix consists of a printout that an ordinary artisan would recognize as a hex dump, where the first set of columns expresses an address in base 16, a second set of columns consists of 16 pairs of hexadecimal numbers, and a final set of columns contains a text representation of the data in the second set of columns. Generally speaking, an ordinary artisan would know how to utilize a hex dump to run the program(s) contained in a hex dump or to create pseudo code by disassembling the files in the hex dump using a code disassembler.

20. Many of the pages of the Software Appendix are missing the first set of columns and the first character of the second set of columns. An ordinary artisan could not retrieve the files with this

amount of missing information due to the truncated columns—these files are not computer-readable and they could not be used to make computer-readable files or pseudo code.

I declare under penalty of perjury the foregoing is true and correct.

DATED: February 14, 2014                    GREENBERG TRAURIG, LLP


By: _____

Nathaniel Polish, Ph. D.
Expert for Defendant
Apple Inc.