SARAH BARROWS (SBN 253278)
barrowss@gtlaw.com
William S. Coats (SBN 094864)
coatsw@gtlaw.com
Stephen Ullmer (SBN 277537)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone:(415) 655-1300
Facsimile:(415) 707-2010

James J. DeCarlo (Admitted *Pro Hac Vice*)
decarloj@gtlaw.com
Michael A. Nicodema (Admitted *Pro Hac Vice*)
nicodemam@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Telephone:(212) 801-9200
Facsimile: (212) 801-6400

***Attorneys for Defendant,***
***Apple Inc.***

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., <br><br> Plaintiff(s); <br><br> v. <br><br> APPLE INC., a California Corporation, <br><br> Defendant(s). | CASE NO. 5:11-CV-01079 PSG <br><br> **DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY PURSUANT TO 35 U.S.C. §§ 102 & 103** <br><br> **[PUBLIC VERSION]** <br><br><br> Date: April 1, 2014 <br> Time: 10:00AM <br> Location: Courtroom 5, 4th Floor <br> Before: Hon. Paul Singh Grewal |

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 2
II. STATEMENT OF FACTS ................................................................................ 4
    A.  Emblaze Develops a Live Steaming Product That Uses a Regular Web Server ...................... 4
    B.  Emblaze Applies for Israeli Patent on Alleged Live Streaming Invention .......................... 5
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .............................................. 7
    D.  Emblaze Applies for U.S. Patent with Multiple Quality Level Claims .............................. 8
    E.  The Invalidating Cohen Patent ................................................................................ 8
    F.  Multiple Quality Level References And Ferriere: The Obvious Combination ...................... 11
        1.  Compressing audio and video streams into multiple quality levels was well known as of the '473 patent's invention date ............................................................................... 11
        2.  The Ferriere patent discloses compressing audio streams at multiple quality level based on the same GSM 6.10 audio compression software discussed in the '473 patent and discloses client computers selecting the compressed audio stream that matched their available bandwidth ........................................................................................................... 11
III. ARGUMENT .......................................................................................................... 14
    A.  Legal Standard ......................................................................................................... 14
        1.  Summary judgment generally ................................................................................... 14
        2.  Summary judgment of invalidity based on anticipation or obviousness ...................... 14
        3.  Scope of upload limitation for purposes of invalidity ............................................. 15
    B.  Cohen Anticipates All of the Asserted Claims Except Claims 11, 12, & 40 .......................... 16
        1.  Cohen discloses Claims 1 and 25 if "generally equal" is treated as inherent in a live implementation ......................................................................................................... 16
        2.  Cohen discloses Claim 2 (and comparable apparatus Claim 27) reciting "[a] method according to claim 1, and comprising downloading the sequence using an Internet protocol over the network from the server to the one more client computers" ................................. 18
        3.  Cohen discloses Claim 8 (and comparable apparatus Claim 26) reciting "[a] method according to claim 2, wherein the one or more client computers decode the sequence and play back the data stream responsive to the indices of the files, at a replay rate generally equal to the data rate" ................................................................................................. 18
        4.  Cohen discloses Claim 9 reciting "[a] method according to claim 8, wherein uploading the sequence comprises uploading and updating an index files containing the sequence that was most recently uploaded, and wherein the one or more client computers read the index file to play back the sequence" .......................................................................... 18
        5.  Cohen discloses Claim 10 reciting "[a] method according to claim 9, wherein the downloading the sequence comprises selecting a file in the sequence earlier than the files whose index is contained in the index file and downloading at least a portion of the encoded sequence of files beginning with the selected file" ....................................................... 19
        6.  Cohen discloses Claim 14 (and comparable apparatus Claim 29) reciting "[a] method according to claim 2, wherein the one or more client computers comprise a plurality of client computers, and wherein downloading the sequence comprising downloading the sequence to the plurality of client computers substantially simultaneously" .......................... 19
        7.  Cohen discloses Claim 21 (and comparable apparatus Claim 38) reciting "[a] method according to claim 1, wherein uploading the sequence comprises uploading a sequence using an Internet Protocol" ............................................................................................... 19
        8.  Cohen discloses Claim 23 (and comparable apparatus Claim 37) reciting "[a] method according to claim 1, wherein dividing the stream into the sequence of slices comprises

dividing the stream into a sequence of time slices, each slice having a time duration associated therewith" ................................................................................................. 20

9.    Cohen discloses Claim 24 (and comparable apparatus Claim 36) reciting "[a] method according to claim 1, wherein the data stream comprises multimedia data" .............................. 20

10.    Cohen discloses Claim 41 reciting an"[a]pparatus according to claim 25, wherein the network comprises the Internet" ........................................................................................ 20

11.    Emblaze's Arguments That Cohen Does Not Anticipate Ignore the Plain language of Cohen ................................................................................................................................ 20

C.    Scope of Claim 11 for Invalidity Analysis ................................................................ 22

D.    All of the Asserted Multiple Quality Level Claims (11, 12 and 40) Are Rendered Obvious by Cohen in Combination with Ferriere ........................................................................... 23

1.    Ferriere discloses the Multiple Quality Level Claims ...................................... 23

2.    A person of ordinary skill in the art would have been motivated to combine Cohen with Ferriere to render the Asserted Claims obvious ......................................................... 24

IV.    CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................... 14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................................... 14

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ...................................................................................................... 14

*Leggett & Platt, Inc. v. Vutek, Inc.*,
537 F.3d 1349 (Fed. Cir. 2008) .................................................................................... 14

*Schering Corp. v. Geneva Pharm., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003) .................................................................................... 14

*Union Carbide Corp. v. Am. Can Corp.*,
724 F. 2d 1567 (Fed. Cir. 1984) ................................................................................... 14

## STATUTES

35 U.S.C. § 102 ................................................................................................................ 14

35 U.S.C. § 103 ................................................................................................................ 14

## FEDERAL RULES

Fed. R. Civ. P. 56 ............................................................................................................. 14

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 1, 2014 at 10:00 a.m., or as soon thereafter as counsel may be heard, there will be a hearing on the motion of Defendant Apple Inc. ("Apple") for summary judgment of invalidity pursuant to §§ 102 and 103 of Claims 1, 2, 8-14, 21, 23-29, 36-38, & 40-41 ("Asserted Claims") of U.S. Patent No. 6,389,473 ("the '473 patent").

This motion is based this Notice of Motion, the Points and Authorities below, the February 14, 2014 Declaration of Douglas R. Weider ("Weider Decl.")[1] in support of this motion and the exhibits attached thereto, the complete record in this action, all matters of which the Court may take judicial notice, and such other written or oral argument as may be presented at or before the time this motion is taken under consideration by the Court.

### RELIEF REQUESTED

Apple respectfully requests that the Court enter summary judgment that the Asserted Claims are invalid under 35 U.S.C. §§ 102 and/or 103.

### STATEMENT OF ISSUES TO BE DECIDED

1.      Whether U.S. Patent No. 5,751,968 ("the Cohen patent" or "Cohen") invalidates the Asserted Claims (except for Claims 11, 12, and 40) if the scope of the Asserted Claims is determined to be in accord with Emblaze's contention that the "upload rate" limitation in all the Asserted Claims is inherently satisfied in a live implementation?

2.      Whether the Cohen patent, in combination with U.S. Patent No. 5,835,495 ("the Ferriere patent" or "Ferriere"), invalidates Claims 11, 12, and 40 ("the Asserted Multiple Quality Level Claims") if the scope of the Asserted Claims is determined to be in accord with Emblaze's contention that the "upload rate" limitation in all the Asserted Claims is inherently satisfied in a live implementation?

---

[1]  Exhibits cited herein are exhibits to the Weider Decl. unless otherwise noted.  The '473 patent is Exhibit 1 to the Weider Decl., but for convenience is referred to as the "'473 patent" throughout.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Emblaze is trying to navigate a slippery slope in this case, but whichever way it slides, it loses.  In an attempt to demonstrate infringement, Emblaze's expert has had to adopt a tortured reading of the claims that is not only at odds with the teachings of the suit patent, but also proves fatal to Emblaze on invalidity.

The asserted claims in this case are directed to the live streaming of audio or video streams having a "given data rate."  The asserted claims require that segments of such streams be formed into files at a transmitting computer and uploaded to a standard HTTP web server at an "upload rate" that is "generally equal" to the "given data rate" of the stream.  Client computers are then to download the files from the server at a "download rate" that is also "generally equal" to the data rate of the stream.

Because Emblaze has no evidence that the upload rates for the stream segments of the accused streams are "generally equal" to the data rate of the stream being segmented, Emblaze has posited a definition of upload rate that includes, not only the time to actually transmit the file, but also the time it takes for the next file to be formed and made ready for uploading.  Emblaze's definition ensures that the upload rate will always be "generally equal" to the data rate of the stream no matter how fast the file is actually transmitted from the transmitting computer to the server.  By this definition, <u>any</u> system that uploads files of relatively equal time duration will inherently meet the "generally equal" claim requirement.

With this postulate, Emblaze's slippery slope crumbles completely.  Well before the suit patent inventors ever conceived of their alleged invention, others had thought of, and filed patents for, a system that taught using a personal computer to segment streams into files for uploading to a standard web server for subsequent downloading using HTTP to a client computer.  One such patent is the Cohen patent, which was filed by VocalTec Ltd. in May 1996 -- well before the March 1998 Israeli priority date of certain claims of the suit patent.

Emblaze attempts to avoid anticipation by the Cohen patent by arguing that Cohen does not <u>explicitly</u> recite that the upload rate is "generally equal" to the data rate of the stream (so-called "rate control").  But if Emblaze is correct that live streaming using Apple's HLS protocol results in files

inherently being uploaded at a "generally equal" rate, then so, too, must the Cohen files. Emblaze cannot have it both ways. Either the equality is inherent and the claims are invalid, or the equality is not inherent and there is no infringement.

Several dependent claims, added in March 1999 at the time the U.S. application for the suit patent was filed, further require that the uploaded files contain segments of different quality levels so that the client computers receiving the files can maximize the available bandwidth between the receiving client and the server. These claims, however, are invalid as obvious. This idea of multiple quality levels (known in the art as "adaptive bit rate") is an old concept that was brought to Emblaze by an engineer[2] who had worked at an Emblaze competitor in Israel. That competitor, VDONet, sold systems that enabled live video streaming that adapted the data rate of the stream to the available bandwidth between client and server. Indeed, the fact that adaptive bit rate was well known before the 1999 filing date of the dependent "multiple quality level" claims is one thing on which Emblaze's and Apple's experts agree. ████████████████████████████

One particularly relevant adaptive bit rate system is described in the Ferriere patent. This patent teaches that one should measure the bandwidth between a client and server and send the highest quality stream that the measured bandwidth permits, just as the suit patent attempts to claim. Indeed, the Ferriere reference teaches that such a system should be used when transmitting audio streams encoded with the GSM encoding standard -- the very encoding technique used as a prime implementation example in the suit patent.

When Cohen is combined with Ferriere, all of the elements of the dependent adaptive bit rate claims are taught. The motivations for combining the two references are compelling. Both are directed to the same field and discuss streaming systems utilizing similar components. Just like the suit patent, Cohen describes the use of a Sound Blaster card, a well-known audio capture device, and, just like the suit patent, it teaches that "any known technique" can be used to encode the streams. Likewise, Ferriere, just like the suit patent, teaches that GSM encoding is a "known" technique that can be used to encode the streams and that its adaptive bit rate technique can be applied to such

---

[2] That engineer, Dror Gizberg, is a named inventor of the suit patent.

streams.  A person of skill in the art in 1998 would have had little or no difficulty combining these references to reach the asserted dependent claims, thus rendering them obvious.  Indeed, the suit patent's lead inventor, Sharon Carmel, testified that ███████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████

Thus, due to either anticipation or obviousness, all of the claims asserted against Apple in this lawsuit are invalid.

## II.    STATEMENT OF FACTS

### A.    Emblaze Develops a Live Steaming Product That Uses a Regular Web Server

Emblaze began developing multi-media web products in 1995.  (*See* Ex. 1, Deposition of Emblaze inventor and Chief Technology Officer Sharon Carmel ("Carmel Dep.") at 13:17-20).  By 1996 and 1997, Emblaze was releasing "boxed products" for sale in computer stores (e.g., Emblaze Creator, Emblaze Audio, and Emblaze Video, *see* Ex. 2, Deposition of Bruce Edwards ("Edwards Dep.") at 22:7-23-9)[3] that allowed video and audio files to be converted to a format wherein they could be placed on websites and played without special plug-in software. (*Id.* at 37:18-38:24).

Emblaze later had the idea of developing a live streaming product.  According to Carmel, at that time ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████ Emblaze did not want █████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ Moreover, Emblaze viewed itself as being in ████████████████████████████████ ████████████████████████████████████████████ ███ ████████████████ Consequently, Emblaze came up with ████████████████████████████████████

---

[3]  Bruce Edwards was president of Geo U.S., a company Emblaze opened to sell its products in the U.S.  (*See* Ex. 2, Edwards Dep. at 16:14-25).



**B.      Emblaze Applies for Israeli Patent on Alleged Live Streaming Invention**

On March 4, 1998, Emblaze applied for an Israeli patent on its alleged live streaming invention ("the Israeli filing").  (*See* Ex. 3.)[4]  The Israeli filing is essentially identical[5] to the later U.S. filing that matured into the '473 patent except that it does not contain the Asserted Multiple Quality Level Claims and specification discussion relating thereto, which were not added until the U.S. filing.

The Israeli and U.S. filings, both of which contain independent Claims 1 and 25, include the same specification discussion describing the background and objects of the invention.[6]  This discussion (which tracks Carmel's testimony that prior art live streaming was limited to specialized servers and that Emblaze's solution to live stream over a "regular web server" was to divide the stream into little files) identifies, *inter alia,* three objects of the claimed invention:

Provide substantially continuous, high-bandwidth data streaming over a network using

---

[4]  Ex. 3 reflects the specification and claims in the Israeli filing.  While, in Israel, patent prosecution is conducted in Hebrew, specifications and claims are written in English.

[5]  Some wording changes unrelated to the Multiple Quality Level Claims were made in the U.S. filing but those changes are unrelated to any issue in this motion.

[6]  Citations in this section are to the '473 patent because the material discussed in this section is identical in the Israeli and U.S. filings.

common, existing server and network infrastructure. ('473 patent at 1:51-53);

Provide data broadcasting capability, particularly for multimedia data, <u>without the need for a dedicated broadcast computer system</u>. ('473 patent at 1:55-57);

<u>Enable a personal computer to remotely broadcast a multimedia program through an Internet service provider (ISP)</u> using common, universally-supported Internet communication protocols. ('473 patent at 1:64-67).

Additional details related to the "personal computer" intended to serve as the transmitting computer are described in conjunction with a Software Appendix attached "as an integral part of the present patent application." ('473 patent at 13:55-56).[7] In that section, the recommended computer on which the software operating the invention should be placed is "preferably a desktop PC (Pentium 1666 MHz, with 32 MB RAM), with a Windows 95 or Windows NT operating system installed." ('473 patent at 14:6-8). The specification also recommends that the computer "should be equipped with a Sound Blaster sound card, with a microphone connected to the line-in input jack thereon." ('473 patent at 14:12-13).

The Sound Blaster card, which is capable of capturing analog audio and converting it to a digital signal (Ex. 4, Cohen at Col. 4:32-34 (disclosing transmitting computer including "an audio card capable of receiving audio signals, such as Sound Blaster")), and the microphone correspond to the "input devices 22" at Fig. 2 for receiving such audio input. ('473 patent at 6:33-34). Additional discussion with respect to the transmitting computer states that, with respect to the "audio data" generated at such input devices, "the computer may typically run GSM 6.10 standard audio compression software, operating at a sample rate of 8 kHz, with 16 bits/sample." ('473 patent at 6:62-65).

Claim 1 reads:

1.      A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:

providing at the transmitting computer a data stream having a given data rate;

---

[7] The Appendix submitted with the Israeli application was corrupt and unreadable. (Declaration of Dr. Nathaniel Polish, Ph. D., concurrently-filed with Apple's Motion for Summary Judgment of Non-Infringement as to All Accused Streams ("Polish Decl.") at 17-20). The Appendix allegedly filed with the USPTO is missing from the PTO records.

dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;

encoding the slices in a corresponding sequence of files, each file having a respective index; and

uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Although Claim 25 is written in apparatus form, it contains the same transmitting computer limitations as Claim 1, and neither Apple's nor Emblaze's expert draw any distinction between Claims 1 and 25 in their invalidity analyses. (Ex. 5, Madisetti Rebuttal Invalidity Report, ¶ 39).

Following the March 4, 1998 Israeli filing, Dror Ginzberg joined Emblaze as an inventor. Prior to joining Emblaze in June 1998,

Carmel testified that, although he

Carmel was questioned closely about

1

2

3

4

**D.    Emblaze Applies for U.S. Patent with Multiple Quality Level Claims**

On March 24, 1999, Emblaze filed the US application that issued as the '473 patent. Emblaze's U.S. filing added the Asserted Multiple Quality Level Claims (Claims 11, 12, and 40) not present in the Israeli filing.  For the Asserted Multiple Quality Level Claims, Emblaze does not seek an invention date earlier than the March 24, 1999 U.S. filing date.  (*See* Ex. 7, Plaintiff Emblaze's response to Defendant Apple Inc.'s Third Set of Interrogatories, Interrogatory Nos. 21, 22).

As to the Asserted Multiple Quality Level Claims, Claim 11 depends from Claim 2, which, in turn, depends from Claim 1.  Claim 11 reads:

> A method according to claim 2,[8] wherein encoding the slices comprises encoding slices at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels.

Claim 12 asserts:

> A method according to claim 11, wherein downloading the sequence comprises determining a data bandwidth of the network between the server and the client computer and selecting one of the quality levels responsive to the determined bandwidth.

Claim 40 is the apparatus limitation equivalent of Claim 11.

**E.    The Invalidating Cohen Patent**

Filed on May 9, 1996, the Cohen patent qualifies as prior art to all of the Asserted Claims. (*See* Ex. 4, 35 U.S.C. § 102(a), (e)).

Cohen describes methods and systems "to provide substantially in real time multi-media presentations to at least one user operating a [client computer] connected to the network" (Ex. 4, Cohen at 1:39-41) in which "the preferred embodiment [of] … the computer network is the INTERNET network.  (*Id.* at 1:63-64) (emphasis in original).  For example, the described methods

---

[8]  Claim 2 recites "[a] method according to claim 1, and comprising downloading the sequence using an Internet protocol over the network from the server to the one or more client computers."

support "receiv[ing] a real multi-media presentation, for example an audio presentation from a radio station" (*Id.* at 4:42-44) and "broadcast[ing it] to users connected to the network." (*Id.* at 6:1-5).

In implementing "live" streaming over the Internet (i.e., substantially in real-time),[9] Cohen describes the same limitations that Emblaze inventor Carmel explained with the respect to the delivery of content over the Internet, namely, the fact that ███████████████████████████ ████████████████████████████████████████████████████████████████ (*Id.* at 1:10-19) (emphasis added).

Cohen arrived at the same solution as Emblaze for displaying live content over the Internet (although it did so two years earlier). Specifically, Cohen discloses a "forming and distribution unit" that "receive[s] [a] stream of multi-media data [e.g, a live audio presentation from a radio station as referenced above] … [and] form[s] therefrom a plurality of files forming together the multi-media presentation." (*Id.* at 4:46-51) Thus, as a result of breaking up the stream into a series of segments stored as files, the Cohen methods "provide substantially in real time the multi-media presentation to the users." (*Id.* at 4:51-53). Breaking the stream into smaller files permits live content to be streamed over the Internet because "the feeding [of the stream data] and the forming [of files] are substantially simultaneous" (*id.* at 4:51-59) and the outputted sequence of files can then be delivered to a "HTTP WWW server 20 … [that] is operative to distribute them to any number of … users of the network." (*Id.* at 5:5-10).

The Cohen patent's disclosed method for live streaming includes a transmitting computer (which Cohen calls a "feeding unit"), an HTTP WWW server (which Cohen sometimes calls a "distribution unit") and client computers that are referred to as user operated displays (UODs). (*Id.* at 4:21-27).

The Cohen transmitting computer (i.e., feeding unit) "comprises a computer equipped with suitable software and hardware for receiving the multimedia presentation from any suitable source."

---

[9] Emblaze contends that Accused Streams are sufficiently "live" to meet the "real-time broadcasting" limitation in Claim 1 of the '473 patent with delays of at least 30-40 seconds between the live event and when it is received at the Apple devices. (Polish Decl. at ¶ 16). Thus, Emblaze cannot argue that Cohen's disclosure of "substantially in real time" is a distinction.

(*Id.* at 4:28-33). Also, the Cohen transmitting computer is described to include the same audio card described in the '473 patent, namely "an audio card capable of receiving audio signals, such as Sound Blaster …." (*Id.* at 4:33-40). Cohen lists no specific audio compression software by name for compressing the captured audio received at the Sound Blaster Card (e.g. the GSM 6.10 audio compression software listed in the '473 patent) but, instead, states that the data fed by the feeding unit (e.g. the Sound Blaster card generated data stream) can be compressed "by any suitable compression … algorithm known in the art." (*Id.* at 7:45-52).

The method of operation of the feeding unit (i.e., the transmitting computer) on a given data stream to create a sequence of files is depicted below:



FIG.2

- At step 22, the feeding unit computer is activated. (*Id.* at 5:27-29);

- At step 24, the feeding unit applies parameters for segmenting (i.e., slicing) the data stream. The parameters for segmenting the stream include "<u>the size of the file</u>." (*Id.* at 5:39-40) (emphasis added).

- At step 26, the segments of the data stream divided according to the segmenting parameters are passed to the file forming manager 18 (*Id.* at 5:33-36) and file forming manager 18 can be part of the feeding unit. (*Id.* at 5:1-3).

- At step 28, "<u>the file forming manager forms the files of the data segments</u> of the multi-media presentation." (*Id.* at 5:36-38) (emphasis added).

Finally, as the sequence of files is generated at the feeding unit, the files are uploaded to "an HTTP WWW server 20 which receives the files … and is operative to distribute them to any number of UODs [client computers] of the network …." (*Id.* at 5:1-11).

**F.     Multiple Quality Level References And Ferriere: The Obvious Combination**

**1.     Compressing audio and video streams into multiple quality levels was well known as of the '473 patent's invention date**

It is undisputed that, prior to the U.S. filing date of the '473 patent, it was well known in the art that audio and video streams could be compressed at multiple quality.  Emblaze's expert's rebuttal invalidity report states:

> It was well known at the time that the application for the '473 patent was filed (i.e., March 24, 1999) to use transcoding or multiple compressors to generate multiple quality level video compressed streams.  It was also well known that media could be compressed at several rates, including standards for GSM half-rate (HR) and full-rate (FR), for instance.

(Ex. 5, Madisetti Rebuttal at ¶ 179) (citations omitted).

Emblaze inventors Ginzberg and Carmel also testified that ████████████████████████ ████████████████████ (*See* Statement of Facts ("SOF"), Sect. II(C) *supra*).   Indeed, Ginzberg brought the idea to Emblaze after leaving his prior company (VDONet).   (*Id.*)  Further, Apple's expert describes in detail the extent to which compressing a stream at multiple quality levels was known, as was delivering different quality level streams to client computers based on the available bandwidth between the server and the client computers.   (Declaration of Dr. Michael Orchard ("Orchard Decl."), Ex. A at ¶¶ 68-70 & 131-133).

**2.     The Ferriere patent discloses compressing audio streams at multiple quality level based on the same GSM 6.10 audio compression software discussed in the '473 patent and discloses client computers selecting the compressed audio stream that matched their available bandwidth**

The Ferriere patent was filed on October 11, 1995.  (Ex. 8).  In this motion, Apple offers the Ferriere patent only to show that it, in combination with the Cohen patent, renders obvious the Asserted Multiple Quality Level Claims under 35 U.S.C. § 103.   Though the Asserted Multiple Quality Level Claims have a later invention date, Ferriere qualifies as prior art as to all the Asserted Claims.  *See, e.g.*, 35 U.S.C. § 102(a), (e).

Ferriere describes a system for delivering audio blocks of digitized voice data over computer networks to support various applications including "[o]nline service providers on the Internet."  (Ex. 8 at 1:13-20 & 1:66-2:5)  The audio encoding scheme described in Ferriere is based in part on the

same GSM 6.10 audio compression described in the '473 patent, and Ferriere incorporates the technical specification entitled "GSM Full Rate Speech Transcoding GSM 06.10 Version 3.2,0" by reference (hereinafter, "the GSM 6.10 Specification"). (*Id.* at 5:46-49 & 6:3-10). GSM 06.10 is an audio compression standard for encoding speech developed for the European Digital Mobile Radio (DMR) system. (Ex. 9, GSM 6.10 Specification (February 1992) at pg. 6.) GSM 6.10 audio compression is a fixed bit rate scheme that generates 260 bits for every 20 milliseconds (ms) of speech. (*See, e.g.*, Ex. 9 at 6 & 10; *see also* Orchard Decl. at ¶ 4).

The problem Ferriere sought to solve was the fact that "[c]urrent implementations of audio file transmission systems involve a transmission scheme in which the audio frames carrying digital data … [have] a fixed [encoded] size"; however, client computers have modems operating at three different rates: 9.6 kilobits per second (kbps), 14.4 kbps and 28.kbps. (Ex. 8 at 1:22-26). Ferriere explained that then-present systems "typically compressed [audio files] at a bit rate of 8000 bits/second which can be sent to modems connected [at all three conventional speeds]." (*Id.* at 1:28-33). This rate "uses most of the available bandwidth at 9.6 kbps… but only a fraction of the available bandwidth at 14.4 kbs and 28.kbps." (*Id.* at 1:33-35). Accordingly, "customers who use higher performing modems are penalized because they are unable to retrieve audio files of a quality commensurate with the performance of the systems." (*Id.* at 1:37-40). Ferriere solves this problem through a system that provides for audio files that are:

> encoded [at a] bit stream bit rate that is less than or equal to the an effective operational bit rate of recipient's modem. For example, if the modem connection speed is 14.4 kbps, a version of the audio data compressed at 13000 bits/s might be sent to recipient; if the modem connection speed is 28.8 kbps, a version of the audio data compressed at 24255 bits/s might be sent to the receiver.

(*Id.* at 2:8-14).

Since GSM 6.10 (as defined in the specification) compressed speech at only a single bit rate (Orchard Decl, ¶ 4), Ferriere discloses a modified "audio codec 50," the components of which are set out in Fig. 2 and accompanying text. Audio codec 50 is based on all of the standard components of a GSM 6.10 encoder except for the RPE encoder 64 component. (Ex. 8 at 6:2-10). Based on

modifications to the RPE encoder, audio codec 50, "which is preferably implemented in software" (*Id.* at 5-50), generates:

> audio data blocks [that] have nine different sizes of 164 bits, 176 bits, 188 bits, 200 bits, 212 bits, 224 bits, 236 bits, 248 bits, and 260 bits. The difference in block sizes are caused by differing numbers of encoded signal sampling bits, whereby more bits result in higher quality and fewer bits results in lower quality.

(*Id.* at 5:55-60).

In addition, the Ferriere system can generate 27 different encoded bit rates. (*Id.* at Table 11, 13:22-48). Like the GSM 6.10 standard from which the Ferriere system is derived, the encoded block sizes shown in Table 11 are all fixed size; thus, if a block size of 164 bits is selected at a sample rate of 8000 samples/s, the generated encoded output of 8200 bits/s will be constant. (*Id.* at Table 11, 13:22-48; Orchard Decl., ¶ 4).

An example of how Ferriere might operate in practice is described in the context of "an online network system in which participants … dial up and request audio files … [and an] audio server … retrieves… and downloads the audio files to the requesting computing units" (*Id.* at 3:53-58), as shown in Fig. 1 below:



The system at Fig. 1 supplies "the audio files at different bit rates which are appropriate for the receiving modem." (*Id.* at 4:1-3). Specifically, at the time of the request for an audio file:

the <u>requesting computing unit transmits its present modem connection speed</u> in terms of effective bit rate …. <u>The computing unit 33 determines the effective bit rate by querying its operating system</u> for the current connection speed of the modem 37…. [Then,] the computing unit 33 sends a request for an audio file and the effective bit rate of the modem 37 to the audio server 24. In return, <u>the audio server 24 supplies a compressed version</u> of the audio file over network 40 <u>such that a bit stream bit rate of the compressed version is less than or equal to the effective bit rate of 13.0 kbps</u> from modem 37. For instance, <u>the audio server 24 might supply the compressed version at a bit rate of 12.955 kbps, 12.1 kbps, or 11.3 kbps.</u>

(*Id.* at 4:4-27) (emphasis added).

## III.    ARGUMENT

### A.    Legal Standard

#### 1.    Summary judgment generally

Summary judgment is appropriately granted if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.*  Mere denials or conclusory statements are insufficient.  *Union Carbide Corp. v. Am. Can Corp.*, 724 F. 2d 1567, 1571 (Fed. Cir. 1984); *see also Anderson*, 477 U.S. at 250 (after movant identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial").

#### 2.    Summary judgment of invalidity based on anticipation or obviousness

A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claim inventions.  35 U.S.C. § 102; *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Anticipation "may be decided on summary judgment if the record reveals no genuine dispute of material fact."  *Leggett & Platt, Inc. v. Vutek, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008) (affirming summary judgment of anticipation).

A claim is invalid for obviousness if the differences between the claimed subject matter and the prior art would have been obvious to a person having ordinary skill in the art at the time of the claimed invention. 35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426 (2007). Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR*, 550 U.S. at 427.

### 3.     Scope of upload limitation for purposes of invalidity

Notwithstanding the Court's clear construction of "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" as meaning "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream," Emblaze has come up with a methodology of calculating "upload rate" that is contrary both to the Court's aforementioned construction and the '473 patent. Apple disagrees with Emblaze's methodology and, in fact, has concurrently moved for summary judgment of non-infringement on the basis that Emblaze has failed to show that the Accused Streams meet the upload rate limitation if computed properly. (*See* Apple's Motion for Summary Judgment as to All Accused Streams at 7-11).

But if Emblaze's calculation is correct, which Apple accepts solely for purposes of this motion for summary judgment on invalidity grounds (as well as its consequence, namely, that upload rate will always equal the data rate of the stream for a live implementation according to Emblaze's methodology), then the Asserted Claims are invalid.[10]

---

[10]   Apple invalidity expert Dr. Michael Orchard opines that all of the Asserted Claims are invalid under 35 U.S.C. § 103 even if the "upload rate generally equal to the data rate of the stream" limitation is properly construed because it would have been obvious to combine the Cohen patent with various references (including the Ferriere patent references discussed herein) that disclose that limitation. Again, however, for purposes of this motion Apple is only moving for summary judgment of invalidity should the Court accept Emblaze's method of calculating the upload rate.

**B.      Cohen Anticipates All of the Asserted Claims Except Claims 11, 12, & 40**

**1.      Cohen discloses Claims 1 and 25 if "generally equal" is treated as inherent in a live implementation[11]**

Because Emblaze contends that none of the limitations of Claims 1 and 25 are taught by Cohen, each claim element is addressed below.

(a)      Cohen discloses the Claim 1 limitation "[a] method for real-time broadcasting from a transmitting computer to one or more client computers over a network"

The Cohen patent, including, but not limited to, its descriptions of systems and methods for displaying multi-media presentations "substantially in real time" to enable applications such as "the display of radio station broadcasts to users connected to the network," discloses this limitation. (*See, e.g.*, Ex. 4 at 5:42-46 & 6:1-5; SOF, Sect. II(F), *supra*; Orchard Decl., Ex. B).[12]

(b)      Cohen discloses the Claim 1 limitation "providing at the transmitting computer a data stream having a given data rate"

The Cohen patent, including, but not limited to, the feeding unit embodiment containing "an audio card capable of receiving audio signals such as the Sound Blaster" which outputs a data stream having a given data rate, and the statement that "the data fed by the feeding unit can be compressed … by any suitable compression … algorithm known in the art," discloses this limitation. (*See, e.g.*, Ex. 4 at 4:33-36 & 7:45-52; SOF Sect. II(F), supra; Orchard Decl., Ex. B).

(c)      Cohen discloses the Claim 1 limitation "dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith"

The Cohen Patent, including, but not limited to, the teachings that the stream can be divided into "segment data files" based on any "any suitable characteristics of the segment data files"

---

[11]   Claim 25 differs from Claim 1 only in that the "given data rate" limitation is included in the preamble, making the claim have four limitations instead of five. Accordingly, anticipating five limitations of claim 1 as set forth below necessarily invalidates Claim 25.

[12]   The anticipatory citations listed here and in the SOF are exemplary. Apple submits that these exemplary citations are sufficient to show that Cohen anticipates the associated limitations. Additional citations upon which Apple relies to show that Cohen anticipates the Asserted Claims (other than the Asserted Multiple Quality Level Claims) are included in the Cohen claim chart that was part of Dr. Orchard's expert report and is attached as Ex. B to his declaration submitted with this motion.

examples of which include "the size of the data file" and the references to an embodiment in which the file forming manager that does the slicing is part of the feeding unit (i.e., transmitting computer), discloses this limitation. (*See, e.g.*, Ex. 4 at 5:1-3 & 5:39-43; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

(d)    Cohen discloses the Claim 1 limitation "encoding the slices in a corresponding sequence of files, each file having a respective index"

The Cohen patent, including, but not limited to, the discussion of a file forming manager that "forms files of the data segments," the references to an embodiment in which the file forming manager is part of the feeding unit and the description of sequentially numbered segments that meet the Court's construction of an index (i.e., "an indicator that represents a respective slice's location in the sequence"), discloses this limitation. (*See, e.g.*, Ex. 4 at. 5:1-3, 5:35-38; Fig. 4; & 6:10; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

(e)    Cohen discloses the Claim 1 limitation "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate"

If the aspect of this limitation requiring "uploading … at an upload rate generally equal to the data rate of the stream [so it can be downloaded] at a download rate generally equal to the data rate" is inherent in a live implementation as Emblaze asserts, then Cohen discloses this aspect of the limitation for the same reasons that Cohen anticipates the "real-time broadcasting limitation" in the preamble to the claim. As to the remaining aspects of this limitation, the Cohen patent, including, but not limited to, the references to an embodiment in which the file forming manager is part of the feeding unit and the teaching that the sequence of files outputted from the file forming manager are transmitted to a "HTTP WWW Server 20 which receives the files …. and is operative to distribute them to any number of UODs [client computers] of users of the network…," anticipate the remaining aspects of this limitation. (*See, e.g.*, Ex. 4 at 5:1-3, 5:5-11; SOF Sect. II(F) *supra*; Orchard Decl., Ex. B).

**2.      Cohen discloses Claim 2 (and comparable apparatus Claim 27) reciting "[a] method according to claim 1, and comprising downloading the sequence using an Internet protocol over the network from the server to the one more client computers"**

The Cohen patent, including, but not limited to, the preferred embodiments describing the server as an HTTP Server and stating that "the communication between the UOD 16, the HTTP server, and the feeding unit 12 is via a TCP/IP communication protocol," discloses Claims 2 and 27. (*See, e.g.*, Ex. 4 at 6:16-19; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

**3.      Cohen discloses Claim 8 (and comparable apparatus Claim 26) reciting "[a] method according to claim 2, wherein the one or more client computers decode the sequence and play back the data stream responsive to the indices of the files, at a replay rate generally equal to the data rate"**

The Cohen patent, including, but not limited to, the statement that the stream "can be compressed and subsequently decompressed by the UOD [the client computer]" and the discussion detailing that Cohen enables a long real time display of multimedia presentations such as the display of a radio station broadcast to users connected to the network" (which discloses "decode a sequence" and does so "at a replay rate generally equal to the data rate" aspects of this limitation) and the Claim 1 disclosure of files having indices, the teaching of "a connection file [that] includes the status of the files [at the server]" and the client computer features describing that a user may "select whether to display files which were distributed at an earlier time or the current file, or may 'jump' and display only selected files" (which disclose the playback based on indices aspect of the limitation), discloses Claims 8 and 26.  (*See, e.g.*, Ex. 4 at. 7:45-47; 6:35-43:19; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

**4.      Cohen discloses Claim 9 reciting "[a] method according to claim 8, wherein uploading the sequence comprises uploading and updating an index files containing the sequence that was most recently uploaded, and wherein the one or more client computers read the index file to play back the sequence"**

The Cohen patent, including, but not limited to, the presence of a "connection file" that is "updated in the WWW and therefore includes the status of all the files currently in the distribution unit," the description that the client computers receive information from the connection file about the uploaded files including "the file having the most current segment of the multimedia presentation … and user options to delay and/or to redisplay some of the files" and the teachings that servers are

"operative to distribute data files … to additional [servers] …," discloses Claims 2 and 27. (*See, e.g.*, Ex. 4 at 6:25-50; 5:12-18; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

> **5.** **Cohen discloses Claim 10 reciting "[a] method according to claim 9, wherein the downloading the sequence comprises selecting a file in the sequence earlier than the files whose index is contained in the index file and downloading at least a portion of the encoded sequence of files beginning with the selected file"**

The Cohen patent, including, but not limited to, the teaching that the "user interacts with the display application to select whether to display files which were distributed at an earlier time than the current file" and the description that "the user selected sequence … includes … displaying a formerly distributed file, re-displaying displayed files and displaying the files out of order," discloses Claim 10. (*See, e.g.*, Ex. 4 at 6:25-50; 5:12-18; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

> **6.** **Cohen discloses Claim 14 (and comparable apparatus Claim 29) reciting "[a] method according to claim 2, wherein the one or more client computers comprise a plurality of client computers, and wherein downloading the sequence comprising downloading the sequence to the plurality of client computers substantially simultaneously"**

The Cohen patent, including, but not limited to, the description of a "distribution unit operative to distribute … segments of the multi-media presentation to additional [servers] … whereby the multi-media presentation may be distributed substantially simultaneously to even a large number of users," discloses Claims 14 and 29. (*See, e.g.*, Ex. 4 at 5:12-17; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

> **7.** **Cohen discloses Claim 21 (and comparable apparatus Claim 38) reciting "[a] method according to claim 1, wherein uploading the sequence comprises uploading a sequence using an Internet Protocol"**

The Cohen patent, including, but not limited to, the discussion of a "preferred embodiment" in which "the communication between UOD 16, HTTP server, and feeding unit 12 is via TCP/IP communication protocol," discloses Claims 21 and 38. *(See, e.g.*, Ex. 4 at 6:16-19; SOF Sect. II(F), supra; Orchard Decl., Ex. B).

**8.**    **Cohen discloses Claim 23 (and comparable apparatus Claim 37) reciting "[a] method according to claim 1, wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each slice having a time duration associated therewith"**

The Cohen patent, including, but not limited to, the teachings that a transmitting computer (i.e., the feeding unit) provides parameters   for dividing a stream that "may be any suitable characteristics of the segment data files" and time duration is a "suitable characteristic" or dividing segments by "size of the data file" as explicitly referenced will also result in dividing a stream by time duration for uncompressed stream that have a constant bit rate or known compression algorithms such as GSM 6.10 that have a constant bit rate," discloses Claim 23 and 37. (*See, e.g.*, Ex. 4 at 5:30-41; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

**9.**    **Cohen discloses Claim 24 (and comparable apparatus Claim 36) reciting "[a] method according to claim 1, wherein the data stream comprises multimedia data"**

The Cohen patent, including, but not limited to, the citations to streaming "multi-media presentations," discloses Claims 21 and 36. (*See, e.g.*, Ex. 4 at 1:39-41; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

**10.**    **Cohen discloses Claim 41 reciting an "[a]pparatus according to claim 25, wherein the network comprises the Internet"**

The Cohen patent, including, but not limited to, the discussion that the preferred network embodiment for the invention is the Internet discloses Claim 41. (*See, e.g.*, Ex. 4 at 2:13-20; SOF Sect. II(F), *supra*; Orchard Decl., Ex. B).

**11.**    **Emblaze's Arguments That Cohen Does Not Anticipate Ignore the Plain language of Cohen**

The heart of Emblaze's opposition to Cohen as anticipatory reference is summarized in its expert's rebuttal report:

> Firstly, however, Cohen does not disclose data rates that are given to multimedia stream by the transmitting computer, and thus dividing the multimedia stream (of the given data rate) is not disclosed in Cohen. Secondly, the given data rate should satisfy the upload and download rates as required by the '473 patent and live streaming, and therefore Cohen is not able to live stream data as required by Claim. Instead Cohen only focuses on the lag between the transmission and reception of the stream (6:50-52).

(Ex. 5, Madisetti Rebuttal Expert Report at 35). Dr. Madisetti goes on to state that the issue with Cohen and the given data rate term is that "[n]o rates are disclosed in any portion of the Cohen patent."

In short, Dr. Madisetti argues that, notwithstanding: (i) the extensive disclosure of substantially real-time implementations in Cohen, including capturing an audio feed from a radio station and broadcasting it to users over the Internet (*see* Ex. 4 at 4:41-45 & 6:1-5); (ii) the Cohen disclosure of the same division of a stream into a sequence of files to be delivered from a transmitting computer (i.e. the feeding unit) to a regular web server for delivery to client computers (SOF Sect. II(F), *supra*); and (iii) Cohen's transmitting computer disclosure of a computer containing the same Sound Blaster card for receiving audio signals that is described in the '473 patent (compare Cohen, Ex. 4 at 4:32-36 with '473 patent at 14:12-13), the Cohen patent cannot live stream because it does not actually identify particular rates that enable it to live stream. That argument is frivolous.

Picking "a given data rate" to satisfy "the upload and download rates as required by the '473 patent and live streaming" requires nothing more than having a given data rate (whether by an uncompressed stream or a compressed stream) that is less than the available bandwidth. (Orchard Decl. at ¶ 4). The fact that Cohen discloses streaming that is substantially in real time is a disclosure that a given data rate is being used that satisfies Emblaze's definition of upload and download rates. (Orchard Decl., Ex. B). The '473 patent does not require a particular numerical value for a given date rate. It only requires that there be a given data rate and that the upload rate be generally equal to the data rate. Cohen's disclosure of substantially real-time streaming satisfies that requirement.

Dr. Madisetti's statement that the Cohen patent "only focuses on the lag between the transmission and reception of the stream" is a red herring. The Cohen patent is not about "lag"; it is simply a feature that "may be selected by the user. <u>If a substantially real time display is of interest a minimal lag time will be selected</u> and if a delayed display of interest, the lag there between will be longer." (Ex. 4 at 6:55-58) (emphasis added). The disclosure of a system that operates substantially in real time with minimal lag can hardly be a point of distinction between Cohen and the '473 patent

given the patent suit's disclosure that a client computer "starts receiving the data stream substantially in real time, preferably with only a minimal lag." ('473 patent at 8:4-6).

### C.    Scope of Claim 11 for Invalidity Analysis

The parties agree that Claim 11's requirement that "files corresponding to a given one of the slices have a different data size for each quality levels" means that encoding at multiple quality levels must result in files at the different quality level that relate to the same slice (i.e, cover the same time duration and contain the same content, albeit with a different number of bits to represent the content) so as to permit "seamless" switching.  (*See* Ex. 5, Madisetti Invalidity Rebuttal Report at 23-25). This means, for example, that the 10th slice at one quality level has the same chunk of video as the 10th slice at a different quality level; thus, switching from the 9th slice at one quality level to the 10th slice at the new quality level can be done "seamlessly." (*See id.*).  Indeed, if Claim 11 did not require files to correspond to the same slice, even Emblaze's expert would have to concede that the claim would be invalid given his admission that it was "well known at the time that the application for the '473 patent was filed … to generate multiple quality level video compression streams." (*Id.* at 71). [13]

.

---

[13]  Apple does not agree with Emblaze's contention that Claim 11 is satisfied by choosing to encode a stream captured from a camera and compressed at three different "given data rates" so long as the above-described conditions of files relating to slices are satisfied.  Nothing in Claim 11 suggests that practicing the claim involves starting with three different given data rates.  Claim 1 has **a** given date rate for a stream that is divided into a sequence of slices.  Those slices -- and only those slices -- are encoded in the encoding step.  Claim 11 modifies that encoding step and requires that the encoding of the slices (i.e., the same slices created from a stream having a given data rate) generate "files corresponding to a given one of the slices" and that the files "have a different, respective data size for each of the quality levels."  Thus, Apple submits that Claim 11 requires that the slice itself be encoded at different quality levels, which will necessarily result in the files corresponding to the same slice.  The accused streams do not encode slices at multiple quality levels in the manner the claim requires, which is why the files (or, if not formed as files, segments) do not correspond to a slice, as the claim requires.

Nonetheless, for purposes of this invalidity motion, Apple will assume Emblaze's construction that Claim 11 can be satisfied through compressing a stream at multiple given data rates as long as it results in files at the different quality levels that correspond to a particular slice (i.e. the time duration and content of a given slice) to enable seamless switching.

---

**D.    All of the Asserted Multiple Quality Level Claims (11, 12 and 40) Are Rendered Obvious by Cohen in Combination with Ferriere**

**1.    Ferriere discloses the Multiple Quality Level Claims**

(a)    Ferriere discloses Claim 11 (and corresponding Apparatus Claim 40)

The Ferriere patent discloses Claim 11 reciting "[a] method according to claim 2, wherein encoding the slices comprises encoding the slices at a plurality of different quality levels, such that the files corresponding to a given one of the slices have a different, respective data size for each of the quality levels." As described in the SOF, Sect. II(F)(2), *supra*, Ferriere's audio encoding is based on a modified GSM 6.10 encoding scheme. The standard GSM 6.10 as described in the specification (incorporated by reference in Ferriere) encodes 20 ms of audio into 260 bits. (Ex. 9, GSM Specification at 6 & 10; Orchard Decl., ¶ 5). Ferrier's modified encoder uses nine different bit sizes (164, 176, 188, 200, 212, 224, 236, 248 and 260) along with three different sampling rates to enable encoding at 27 different bit rates. (SOF Sect. II(F)(2), *supra*).

Based on this scheme, Ferriere describes end users dialing up to obtain different encoded versions that have been compressed at multiple quality levels and made available to the server so that "audio server 24 might supply the compressed version at a bit rate of 12,955 kbps, 12.1kbps, or 11.3 kbps." (Ex. 8 at 4:4-26 and SOF Sect. II(F)(2) *supra*).

By definition, the Ferriere encoding scheme will satisfy the requirement that the encoded audio blocks (i.e. slices) at different quality levels will correspond to the same time duration of the audio file. This is because the encoding scheme is based on constant time duration blocks encoded at a fixed rate. Changing the bit rate only changes the number of bits used to encode each duration of the audio file. (Orchard Decl., ¶ 5) The Ferriere reference does not teach putting individual audio blocks (or a combination thereof) into a file; however, for "obviousness" purposes, it need not do so to teach Claim 11 because Cohen teaches putting the segments of audio stream into files. The necessary motivation to combine is shown in subsection 2 below.

(b)    Ferriere discloses Claim 12 (and corresponding Apparatus Claim 40)

The Ferriere patent discloses Claim 12, reciting "[a] method according to claim 11, wherein downloading the sequence comprises determining a data bandwidth of the network between the

server and the client computer and selecting one of the quality levels responsive to the determined bandwidth." As detailed in the SOF *supra*, Ferriere discloses that the client computers "determine[] the effective bit rate by querying its operating system for the current connection speed of the modem" and makes a request "for an audio file," passes to the server "the effective bit rate of the modem," and, based on that information, a quality level is supplied to the modem that is "less than or equal to effective bit rate of … [the] modem." (*See* Ex. 8 at 4:4-27; SOF Sect. II(F)(2) *supra*).

Importantly, after an initial determination of quality level appropriate for the link condition, Claim 12 does not require switching streams if link conditions vary. Claim 12 simply says, determine the bandwidth and select the quality level. It does not say that that has to happen more than once. Nonetheless, Ferriere discloses dynamic switching, stating that the client computers "can be configured to query the connection speed of their corresponding modems on routine occasions," and if, for example, connection speeds have improved, "the codec might scale the next series of frames to a higher quality which can now be handed by the modems. This dynamic scaling would ensure that the highest quality signal is always being sent." (Ex. 8 at 16:1-9).

### 2. A person of ordinary skill in the art would have been motivated to combine Cohen with Ferriere to render the Asserted Claims obvious

The motivations to combine Cohen with Ferriere to render the Asserted Claims obvious (and, thus, invalid) are compelling. As detailed in the SOF, *supra*, both patents are directed to systems for streaming audio over the Internet. Cohen describes the real-time capture and broadcast of audio using any known compression technique, and Ferriere describes an audio compression scheme based on the same GSM encoding scheme described in the '473 patent. The problem of delivering media over the Internet to client computers having different available bandwidth was well-known and had an obvious solution: encode the media at multiple quality levels. A person of ordinary skill in the art would, therefore, be motivated to combine Cohen with Ferriere to achieve the same benefit of Cohen, that to be able to deliver streaming audio at multiple quality levels. (Orchard Decl., Ex. C)

As an objection to the motivation to combine Cohen with Ferriere, Emblaze's expert argues, without explanation, that the combination would not work in a technical manner if they were combined to try to mimic the teachings of the '473 patent. (Ex. 5, Madisetti Rebuttal Report at 45).

That is not the case.  The Cohen system is flexible enough to work with any compression scheme including the GSM-based one described in Ferriere.  (Orchard Decl. at ¶ 6)  No technical limitation prevents capturing audio using the Sound Blaster card in Cohen (i.e., the identical sound capture card described in the suit patent) and encoding the stream at different quality levels using the GSM-based audio encoding scheme described in Ferriere, slicing each of the different quality level streams based on data size parameters as taught in Cohen, forming the slices into files as taught in Cohen as to each of the multiple quality level streams, delivering the files to a server as taught in Cohen, and distributing the appropriate quality level based on the client determination of bandwidth per Ferriere. (Orchard Decl. at ¶ 6)

In short, a person of skill in the art in 1998[14] would have had little or no difficulty combining these references to reach the asserted dependent claims, rendering them obvious.  Where as here the references to be combined are in the same field of endeavor (streaming media), utilizing to the same technology platform (personal computers on the dial-up internet), and addressed to the same problem (maximizing quality for the user in a bandwidth constrained environment), very little motivation is required to put the pieces together between references.[15]

Indeed, the suit patent's lead inventor, Sharon Carmel, testified that ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████  The requisite motivation to combine is therefore apparent.

### IV.    CONCLUSION

For the reasons herein, Apple's instant Motion should be granted.

---

[14]  Both sides' Experts agree as to the level of ordinary skill in the art.

[15]  Additional bases for the motivation of one skilled in the art to combine Cohen and Ferriere are found Orchard Decl. at Ex. C, which was originally attached as Ex. 4 to the Expert Report of Michael Orchard.

1    Dated: February 14, 2014                    GREENBERG TRAURIG, LLP

2                                                By: /s/ Sarah Barrows
3                                                SARAH BARROWS (SBN 253278)
                                                 barrowss@gtlaw.com
4                                                William S. Coats (SBN 094864)
                                                 coatsw@gtlaw.com
5                                                Stephen Ullmer (SBN 277537)
                                                 ullmers@gtlaw.com
6                                                GREENBERG TRAURIG, LLP
7                                                4 Embarcadero Center, Suite 3000
                                                 San Francisco, CA 94111-5983
8                                                Telephone: (415) 655-1300
                                                 Facsimile: (415) 707-2010

9
                                                 James J. DeCarlo (Admitted *Pro Hac Vice*)
10                                               decarloj@gtlaw.com
                                                 Michael A. Nicodema (Admitted *Pro Hac Vice*)
11                                               nicodemam@gtlaw.com
                                                 GREENBERG TRAURIG, LLP
12                                               MetLife Building
                                                 200 Park Avenue, 34th Floor
13                                               New York, New York 10166
                                                 Tel.: (212) 801-9200
14                                               Fax: (212) 801-6400

15
16                                               ***Attorneys for Defendant, Apple Inc.***

17
18
19
20
21
22
23
24
25
26
27
28