MARTIN L. FINEMAN (CA State Bar Number 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6575
Facsimile: (415) 276-6599
Email: martinfineman@dwt.com

MARTIN B. PAVANE *(admitted pro hac vice)*
LISA A. FERRARI *(admitted pro hac vice)*
ANDREW NEMIROFF *(admitted pro hac vice)*
MARILYN NEIMAN *(admitted pro hac vice)*
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Telephone: (212) 883-4900
Facsimile: (212) 986-0604
Email: mpavane@cozen.com
lferrari@cozen.com
anemiroff@cozen.com
mneiman@cozen.com

*Attorneys for Plaintiff Emblaze, Ltd.*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>APPLE INC., a California Corporation,<br><br>    Defendant. | CASE NO. 5:11-cv-01079-PSG<br><br>**DECLARATION OF DR. VIJAY MADISETTI IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY PURSUANT TO 35 U.S.C. §§ 102 & 103**<br><br>Hearing Date: April 8, 2014<br>Time: 10:00 AM<br>Location: Courtroom 5, 4th Floor<br>Before: Hon. Paul Singh Grewal |

I, Vijay Madisetti, Ph.D., hereby declare:

1. I have been asked to provide this declaration concerning Defendant Apple Inc.'s Motion for Summary Judgment of Invalidity (D.E. 350, "Apple's Motion") in the above-captioned case. I have personal knowledge of the facts stated herein.

2. In particular, I have been asked to review Apple's Motion and the Declaration of Dr. Michael Orchard with Exhibits A-C (D.E. 350 - 12-15) submitted in support thereof and provide a declaration analyzing Apple's arguments concerning the prior art it relies upon and whether that prior art anticipates or renders obvious the asserted claims of Emblaze's U.S. Patent No. 6,389,473 patent ("the '473 patent"). More particularly, I have been asked to analyze the teachings of U.S. Patent No. 5,751,968 ("Cohen") and 5,835,495 ("Ferriere") from the point of view of one of ordinary skill in the art, and to analyze whether any of claims 1, 2, 8, 9, 10, 14, 21, 23, 24, 25, 26, 27, 29, 36, 37, 38, and 41 of the '473 patent are anticipated by the teachings of Cohen and whether any of claims 11, 12, and 40 are obvious from the combined teachings of Cohen and Ferriere. For the reasons expressed herein, it is my opinion that none of claims 1, 2, 8, 9, 10, 14, 21, 23, 24, 25, 26, 27, 29, 36, 37, 38, and 41 is anticipated by Cohen and that none of claims 11, 12, and 40 is obvious from the combined teachings of Cohen and Ferriere.

3. Claims 1 and 25 are the only two independent claims in the '473 patent. (Ex. 1, '473 patent, 14:18-32, 15:63 – 16:8).[1,2] Apple's Motion asserts that claims 1 and 25 are anticipated by Cohen. (D.E. 350, Apple's Motion, pp. 16-17).

4. Apple and Dr. Orchard only apply Cohen to claim 1 and assert that the same analysis applies to claim 25. (D.E. 350, Apple's Motion, p. 16, n. 11). I likewise will address only claim 1

---

[1] Unless otherwise noted, all Exhibits referenced herein are attached to the Declaration of Martin Pavane submitted with Emblaze's opposition to Apple's Motion.
[2] All patent citations are in the format "column:line."

MADISETTI DECLARATION 2 CASE NO. 5:11-CV-01079-PSG

and accept Apple's implicit acknowledgement that if claim 1 is not anticipated by Cohen, claim 25 also is not anticipated by Cohen.

5. Claim 1 of the '473 patent reads as follows:

> 1. A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:
>
> providing at the transmitting computer a data stream having a given data rate;
> dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;
>
> encoding the slices in a corresponding sequence of files, each file having a respective index; and
>
> uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Ex. 1, '473 patent,14:18-32.

6. In its Markman Order, the Court construed "providing at the transmitting computer a data stream having a given data rate" to mean "the transmitting computer provides a data stream having a given amount of data per unit of time," and the Court construed "data stream having a given data rate" to mean "a data stream having a given amount of data per unit of time." (D.E. 169, p. 1).

7. Unlike Cohen, the '473 patent recognizes, and claims, the necessity of "providing . . . a data stream having a given data rate," which is required if, as also required by claim 1, the files are to be "upload[ed] to a server at an upload rate generally equal to the data rate of the stream" such that "one or more client computers can download the sequence over the network form the server at a download rate generally equal to the data rate."

8. Apple's Motion cites to Cohen at 4:33-36 and 7:45-52 as teaching the limitation of "providing at the transmitting computer a data stream having a given data rate." (D.E. 350, Apple's Motion, p.16). My review of those passages shows that they do not teach the limitation of "providing at the transmitting computer a data stream having a given data rate." The first passage, at 4:33-36, only states that the feeding unit 12 in Cohen may include a Sound Blaster card for capturing

an audio signal, but says nothing about assigning a "given data rate" to the audio stream. (Ex. 2, Cohen, 4:33-36). In fact, and as Apple acknowledges, the Sound Blaster card only serves to capture an audio signal and convert it to a digital signal; it does *not* "provid[e] at the transmitting computer a data stream having a given data rate" as required by claim 1 of the '473 patent. (D.E. 350, Apple's Motion, p. 6). The second passage in Cohen at 7:45-52 states only that the data files "may be compressed in the HTTP server and subsequently decompressed in the UOD," i.e., user operated device. (Ex. 2, Cohen, 7:45-52). Here too there is no mention of assigning a "given data rate" to the data stream. Nor is assigning a "given data rate" to the stream inherent in "compression." In this regard, in the mid-1990s, and even now, various compression schemes were in available and in use. For example, one such scheme was variable bit rate without restraint ("VBR"), and such a compression scheme will *not* result in a stream having a given data rate. See Exhibit 1 attached to my Declaration showing the difference in bit rate over time with VBR encoding without restraint ("VBR" in Exhibit 1), VBR encoding with a maximum value of 1000 Kbps ("VBR max 1000" in Exhibit 1), and constant bit rate encoding at 1000 Kbps ("CBR 1000" in Exhibit 1); the bit rate of the former varies widely over time whereas the bit rate of the latter two are fairly constant. Yet there is no guidance in Cohen as to any particular compression scheme, which in my opinion demonstrates that Cohen did not appreciate the importance to real time live streaming of providing a data stream having a given data rate.

        9.        Moreover, the passage in Cohen at 7:45-52 demonstrates that Cohen's reference to compression is not a recognition of the need to assign a given data rate to the data stream, much less a disclosure of that step. This is evident from the fact that Cohen teaches that compression can be applied to the already-formed files on the server ("Similarly, the data files . . . may be compressed in the HTTP server and subsequently decompressed in the [user operated device].") (Ex. 2, Cohen, 7:47-50). However, applying compression to the already-formed files on the server necessarily means that the stream had been sliced, formed as files, and uploaded to the server before compression was applied. That would be antithetical to the invention of the '473 patent, which requires providing a data stream having a given data rate at the transmitting computer, then dividing

the stream into a sequence of slices, each slice having a predetermined data size associated therewith, then encoding the slices in a corresponding sequence of files, and only then uploading the sequence to a server. (Ex. 1, '473 patent, 14:18-33). That is, the method of claim 1 insures that the upload rate of the sequence of files to the server and the download rate of the sequence of files to the client device will both be generally equal to the data rate of the stream, whereas if Cohen's teaching is followed and compression is first applied to the already-formed files on the server, the upload and download rates will not be generally equal. Thus, it is clear that Cohen's reference to compression is not a teaching or suggestion to assign to the data stream a given data rate; indeed, this passage in Cohen demonstrates that Cohen did not even recognize the problems that would result from failing to do so.

10. In addition to citing the foregoing two passages in Cohen, Apple's Motion also cites to "Sect. II(F)" of its Motion in support for its argument that Cohen teaches "providing . . . a data stream having a given data rate" as required by claim 1 of the '473 patent. (D.E. 350, Apple's Motion, p. 16. However, I have read that Section of Apple's Motion (*id.* at pp. 11-14), and I see that it addresses only claims 11, 12, and 40 of the '473 patent and the Ferriere prior art patent. I do not see in that Section any additional citations to Cohen that allegedly teach "providing . . . a data stream having a given data rate." Apple's final evidentiary support for the proposition that Cohen teaches "providing . . . a data stream having a given data rate," is a citation to Exhibit B to the Dr. Orchard's Declaration. (D.E. 350, Apple's Motion, p. 16). In Exhibit B, Dr. Orchard cites to Cohen at 4:28-45 as allegedly teaching "providing . . . a data stream having a given data rate." This citation overlaps with the above-discussed citation at 4:33-36 in Apple's Motion, and like that citation, says nothing about assigning a "given data rate" to the data stream in Cohen.

11. At pages 20-22 of Apple's Motion, Apple asserts that because Cohen discloses that his invention is suitable for live streaming, Cohen must be providing a stream having a given data rate. However, just because Cohen states that his system can broadcast in real time does not mean that his invention anticipates Emblaze's invention of claim 1, nor does it mean that Cohen in fact

discloses the necessary steps to live stream, much less to do so effectively.  Indeed, Apple has submitted no evidence that Cohen's system was ever implemented.

12. I provided a tutorial to the Court preceding the Markman hearing in this case.  At that time I explained the necessity of providing a data stream having a given data rate for successful real-time streaming.  Without the relationship taught in the '473 patent and required in claim 1 among the given data rate of the stream, the upload rate to the server, and the download rate to the users, real-time streaming is not feasible. Take as an example a video stream of a live baseball game.  A data stream of that event will have different amounts of data per unit of time depending on the amount of action occurring at any given time.  If there is a large amount of data in a very short time, e.g., during an action packed sequence, transmitting that segment will require a high bandwidth connection both between the transmitting computer and the server, and between the server and the users.  Conversely, when there is far less data in the same amount of time, e.g., when there is no action on the field, far less bandwidth will be required.

13. If a given data rate is not assigned to the stream, such that there is a given amount of data per unit of time, it is not possible to live stream to users with varying bandwidths.  For example, today, multimedia events are streamed to a variety of hand-held devices, such as iPads and iPhones.  These devices may be connected to the internet in a variety of ways, such as by a cellular or wireless connection.  The bandwidth of these connections varies widely, but typically cellular connections have limited bandwidths.  If the live data stream is not provided with a given data rate, then during times when the data rate is very high, e.g., during an action-packed sequence, the bandwidth available to the user may not be sufficient to receive the data in real time, in which event either the data will be dropped or corrupted if real time viewing is to be maintained, or the user's screen may "freeze" until the data from that segment is fully downloaded.  Either way the real time experience is compromised.

14. The only specific parameter taught in Cohen for dividing the stream into slices is according  data size. (Cohen, 5:29-41).  As explained above, slices of equal data size may have different time durations based on the level of activity of the event being streamed when a particular

slice is being formed. So following the teaching of Cohen, take a stream with three segments of equal data size.

        Segment 1: Duration four seconds - data size 200 kilobits ("kbits")

        Segment 2: Duration two seconds - data size 200 kbits

        Segment 3: Duration two seconds - data size 200 kbits

15. Now assume an available uplink bandwidth (from the transmitting computer to the server) to be 800 kbits per second, and a downlink bandwidth (from the server to the client device) to be 60 kbits per second. It will be apparent that there is sufficient bandwidth in the uplink to accommodate real time transmission of all three segments, as each segment has less than 800 kilobits per second of data. However, while the downlink can accommodate transmission of the first segment in real time (the first segment has a data rate of 50 kbits/second, i.e., less than the downlink bandwidth), the second and third segments cannot be transmitted over the downlink in real time, as each of those segments has a data rate of 100 kbits/second, which is greater than the bandwidth of the downlink. In that event the client's receipt of the second and third segments will be corrupted, lost or delayed, destroying the real-time experience. Yet this is what will happen with Cohen's method which places no constraints of the data rate of the stream.

16. By providing a data stream having a given data rate as taught and claimed in the '473 patent, this problem -- which Cohen does not even recognize much less solve -- is elegantly resolved. By assigning the stream a given data rate, the amount of data being transmitted per unit of time is established and known in advance, regardless of the bit rate of the raw stream which, as noted, can vary widely. Considering that the range of uplink and downlink bandwidths is also known, it is possible to assign the stream with a given data rate that is less than, but close to, the lowest available bandwidth connection. If the sequence of files is then "upload[ed] . . . to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate," as also required by claim 1 of the '473 patent (Ex. 1, '473 patent, 14:28-32), real time transmission of the sequence of files to the client devices is assured. That is, the '473

1 patent insures optimal real time streaming by maintaining the triumvirate of assigning a data rate to
2 the data stream, uploading the sequence of files at a data rate generally equal to the data rate of the
3 stream, and downloading the sequence at a download rate generally equal to the data rate of the
4 stream. Indeed, in my opinion, that is why, despite the fact that Emblaze first applied for the '473
5 patent in 1998, its technology has been adopted by many other companies, including Apple, and is
6 still in use today.

7       17. Take the example given above of a stream having three segments. According to
8 Emblaze's invention, the first step is to provide the data stream with a given data rate. Now if the
9 downlink (60 kbits/second) is the limiting, i.e., lowest, bandwidth in the system between the
10 transmitting computer and the client device, then the data rate of the stream can be set, e.g., at 50
11 kbits/second. If the stream is then sliced into segments of equal duration, as taught and preferred in
12 the '473 patent (Ex. 1, '473 patent, 3:40-42), the amount of data per unit of time is fixed, regardless
13 of the fluctuations in the amount of data in the raw data stream at any given time. So, in the example
14 under consideration, if the data rate of the stream is set at 50 kbits/second, and each segment is 5
15 seconds in duration (or any other duration), the client is assured that all of the segments can be
16 received in real time since the data rate of the segments will never exceed about 50 kbits/second,
17 whereas the bandwidth of the downlink to the client device is 60 kbits/second, i.e., greater than the
18 given data rate of the stream. Therefore, as long as the other conditions of claim 1 are met, i.e., that
19 the upload rate of the sequence of files is generally equal to the given data rate of the stream and the
20 download rate of the sequence of files is also generally equal to the data rate of the stream (Ex. 1,
21 '473 patent, 14:28-32), the client is assured of an optimal real-time experience. These latter claim
22 limitations are also essential to the method of claim 1 because if the upload rate or the download rate
23 of the sequence is slower than the given data rate of the stream, the client will fall behind the real
24 time experience, resulting in stalls on the client's device while it waits for the next file.

25       18. Providing the data stream with a given data rate also makes live adaptive bit rate
26 streaming possible, i.e., streaming to users at different bit rates depending on available bandwidth.
27 That is, and as taught in the '473 patent (Ex. 1, '473 patent, 10:64 – 11:22), by assigning the stream
28

different given data rates, such that there are now multiple streams, each with a different given data rate, the user can select the stream that most closely matches his/her available bandwidth, thereby insuring an optimal viewing experience.

19. Cohen also does not teach the limitation in claim 23 of "dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith," or the limitation in claim 37 of "wherein the predetermined data size of each of the slices corresponds to a time duration of the slice." Claim 23 is dependent on claim 1, and reads as follows:

> 23. A method according to claim 1, wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith.

(Ex. 1, '473 patent, 15:57-60).

Claim 37, dependent on claim 36, which in turn is dependent on independent system claim 25, reads:

> 37. Apparatus according to claim 36, wherein the predetermined data size of each of the slices corresponds to a time duration of the slice.

Apple and Dr. Orchard only apply Cohen to claim 23 and assert that the same analysis applies to claim 37, and accordingly I will do likewise.

20. The Court's claim construction order construed the limitation in claim 23 to mean "the steam is divided into a sequence of slices, wherein the predetermined data size of the slices is established by setting the time duration of the slices." (D.E. 169, pp. 2-3).

21. Cohen discloses that the defining characteristic of the data segments "may be any suitable characteristics of the segment data files. Non-limiting examples include the size of the data file . . ." (Ex. 2, Cohen, 5:39-43). According to Apple, this teaching is sufficient to anticipate the limitation of claims 23 and 37. Specifically, Apple alleges that if the stream has a constant bit rate, i.e., if the stream is assigned a given data rate, then dividing a segment by data size "will also result in dividing a stream by time duration." (D.E. 350, Apple's Motion, p. 20). The fallacy of Apple's

position is that it assumes that Cohen teaches assigning to the data stream a given data rate (what Apple refers to here as a constant bit rate), and as I have explained above, there is no such teaching in Cohen.

22. Furthermore, a teaching that the defining characteristic of the segment data files may be "any suitable characteristic" is not a teaching to divide the stream into slices based on time duration. Cohen's specific example of a suitable characteristic is "the size of the data file." (Ex. 2, Cohen, 5:40-41). In the '473 patent, claim 1 recites that each slice (and hence each file) has "a predetermined data size associated therewith". Claim 23, which depends from claim 1, does not recite a new characteristic of the slices, but rather sets forth a method by which the data size of the slices may be predetermined, a step that is only significant because the method of claim 1 provides a data stream having a given data rate, such that setting the time duration of the slices predetermines the data size of the slices. Nowhere does Cohen teach providing a data stream having a given data rate, and nowhere does Cohen suggest the additional step in claim 23 of establishing the predetermined data size of the slices by dividing the stream into a sequence of time slices, each slice having a predetermined time duration.

23. Dividing the slices by time duration is a significant aspect of the invention of the '473 patent. In the case of multiple quality streams, providing data files of equal time duration insures that when a user switches from one stream to the next, the transition will be seamless to the user. For example, if there are three video streams available, each at a different given data rate and therefore each of a different quality, adaptive streaming contemplates that the user will be able to switch to the highest quality stream available at any given time depending on the bandwidth of the user's connection to the server. If the slices in all three streams are of equal time duration, say 5 seconds, then as long as the system keeps track of the slice number, transitioning away from one stream at the end of a slice to the beginning of the next slice in another stream insures that the

transition is transparent to the user, as all three streams are always "in sync." Indeed, I see that Apple agrees that Emblaze's use of "time duration" slicing allows switching between different quality level streams to "be done 'seamlessly'". (D.E. 350, Apple's Motion, p. 22).

24. It has been explained to me that anticipation requires that each and every element of a claim is found either expressly or inherently in a single prior art reference. Because I have concluded that Cohen does not teach all of the limitations of claims 1 and 25, it is my opinion that Cohen does not anticipate those claims.

25. Apple also asserts that claims 2, 8, 9, 10, 14, 21, 23, 24, 26, 27, 29, 36, 37, 38, and 41 are anticipated by Cohen. All of these claims depend directly or indirectly from independent claims 1 or 25, and it has been explained to me that as a consequence these dependent claims incorporate all of the limitations of claims 1 or 25. I understand, therefore, that if independent claims 1 and 25 are not anticipated by Cohen, then these dependent claims are likewise not anticipated by Cohen. Having concluded that independent claims 1 and 25 are not anticipated by Cohen, it is also my opinion that claims 2, 8, 9, 10, 14, 21, 23, 24, 26, 27, 29, 36, 37, 38, and 41 are not anticipated by Cohen. It is also my opinion that claims 23 and 37 are not anticipated by Cohen for the additional, independent reason that Cohen does not teach the limitations of those dependent claims, as explained above.

26. Apple's Motion also asserts that claims 11, 12, and 40 are obvious from Cohen in view of Ferriere. Claims 11 and 12 are dependent on claim 1, and claim 40 is dependent on claim 25. Apple does not assert that claims 11, 12, and 40, the so-called "multiple quality level" claims, are anticipated by Cohen. Rather, Apple only asserts that claims 11, 12, and 40 are obvious from Cohen in view of Ferriere. As Apple explains: "In this motion, Apple offers the Ferriere patent only to show that it, in combination with the Cohen patent, renders obvious the Asserted Multiple Quality Level Claims under 35 U.S. C.103." (D.E. 350, Apple's Motion, p. 11). This is also evident in

Exhibit C to the Declaration of Michael Orchard (D.E. 350-15) submitted with Apple's Motion, where Dr. Orchard relies solely on Cohen for all of the elements of claim 1, and relies on Ferriere for the additional limitations found in claims 11, 12, and 40.[3] As I have explained above, however, Cohen does not teach all of the elements of claim 1, and for this reason alone it is my opinion that combining Cohen with Ferriere does not render claims 11, 12, or 40 obvious.

27. Furthermore, unlike the invention of the '473 patent, Ferriere relies on a server controlled solution to stream audio to multiple clients, the very solution which the Emblaze patent avoids. (Ex. 1, '473 patent, 1:54-67). For example, in Ferriere's system the server streams audio only when the server receives a request from a client for a specific audio file. If, while the audio is being streamed, that client device signals to the server that it can accept a higher quality stream, the Ferriere system stops generating the original stream and switches to generating a new stream for that client device at the higher bit rate. (Ex. 3, Ferriere, 16:1-9). As Ferriere explains:

> It is noted that the computing units of FIG. 1 and the communication units of FIG. 6 can be configured to query the connection speed of their corresponding modems on routine occasions to continually update that information. *If the [bandwidth] conditions have improved whereby a modem connection speed increases, the codec might scale the next series of frames to a higher quality which can now be handled by the modems.*

(*Id.*) (emphasis added). In other words, Ferriere is not streaming all quality level streams at all times, but rather must maintain a separate point-to-point network connection with each client device and generate a new stream for each client device based on the bandwidth conditions between that server and that client device. This is exactly the solution avoided by the '473 patent, wherein server-based control is not required and point-to-point connections need not be maintained. When the method of claim 1 of the '473 patent is carried out with multiple quality level streams in accordance with claims 11, 12, and 40, all levels are streamed at all times and the client device can select from

---

[3] Exhibit C to Dr. Orchard's Declaration is copied from his expert report and also cites to references other than Ferriere as purportedly teaching the limitations of claims 11, 12, and 40, but Apple does not rely on those other references in support of its present motion.

among the various quality levels without requiring server-based control, e.g., without requiring the generation of a new stream at the server. (*Id.*).

28. In view of these differences in technology, it is my opinion that a person of ordinary skill in the art[4] would not combine Ferrier with Cohen. As explained above, Ferriere is a server-controlled system that requires maintaining a point to point connection with each client device. Cohen, on the other hand, is not a server-controlled system. Rather, and as Apple points out, Cohen's system streams multimedia files for deliver to a "HTTP server WWW server 20 . . . [that] is operative to distribute them to any number of . . . users of the network." (Ex. Cohen, 5:5-10; Apple's Motion, p. 9). Because Cohen and Ferriere are based on different streaming technologies (broadcasting vs. server-based control), in my opinion a person of ordinary skill in the art would not have looked to Ferriere's server-controlled system to modify Cohen's broadcasting system for streaming multiple quality level streams as required by claims 11, 12, and 40. For this additional, independent reason, it is my opinion that claims 11, 12, and 40 are not obvious from the combination of Cohen and Ferriere.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: March 13, 2014

By: 
Vijay Madisetti, Ph.D.

---

[4] As Apple notes in its Motion, Dr. Orchard and I agree on the level of ordinary skill in the art. (D.E. 350, Apple's Motion, p. 25, n. 14).

MADISETTI DECLARATION                                                CASE NO. 5:11-CV-01079-PSG