MARK FOWLER (Bar No. 124235)
*mark.fowler@dlapiper.com*
ROBERT BUERGI (Bar No. 242910)
*robert.buergi@dlapiper.com*
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA  94303-2214
Tel:  650.833.2000
Fax:  650.833.2001

JOHN ALLCOCK (Bar No. 98895)
*john.allcock@dlapiper.com*
ERIN GIBSON (Bar No. 229305)
*erin.gibson@dlapiper.com*
ROBERT C. WILLIAMS (Bar. No. 246990)
*robert.williams@dlapiper.com*
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA  92101
Tel:  619.699.2700
Fax:  619.699.2701

Attorneys for Defendant
APPLE INC.

SARAH BARROWS (Bar No. 253278)
*barrowss@gtlaw.com*
WILLIAM SLOAN COATS (Bar No. 94864)
*coatsw@gtlaw.com*
STEPHEN ULMER (Bar No. 277537)
*ullmers@gtlaw.com*
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA  94111-5983
Tel.:  415.655.1300
Fax:  415.707.2010

JAMES J. DECARLO (*Pro Hac Vice*)
*decarloj@gtlaw.com*
MICHAEL A. NICODEMA (*Pro Hac Vice*)
*nicodemam@gtlaw.com*
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York  10166
Tel:  212.801.9200
Fax:  212.801.6400

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., | CASE NO.  5:11-CV-01079 PSG |
| Plaintiff; | **DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY PURSUANT TO 35 U.S.C. §§ 102 & 103** |
| v. | |
| APPLE INC., a California corporation, | |
| Defendant. | Date:  April 8, 2014 |
| | Time:  1:30 p.m. |
| | Place:  Courtroom 5, 4th Floor |
| | Judge:  Hon. Paul S. Grewal |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.  ARGUMENT ................................................................................................. 2

    A.   Cohen Anticipates Independent Claims 1 And 25 Under Emblaze's Incorrect Reading Of The Claims............................................................... 2

        1.   Emblaze Improperly Imports Into The Claims A Requirement That The "Given Data Rate" Be "Assigned ................................................................ 2

        2.   Undisputed Facts Establish that Cohen Discloses "A Data Stream Having A Given Data Rate," As Properly Construed ...................................... 4

            a.   Cohen's Sound Blaster disclosure inherently discloses "a data stream having a given data rate." .......................................................... 5

            b.   Cohen's disclosure of "any" suitable compression algorithm inherently discloses "a data stream having a given data rate." ............. 6

        3.   Emblaze Misstates that Cohen Fails to Disclose Live Streaming.................... 8

    B.   Cohen Also Anticipates Dependent Claims 2, 8-10, 13-14, 21, 23-24, 26-29, 36-38 And 41 Under Emblaze's Incorrect Reading Of The Claims ........................... 8

    C.   Cohen And Ferriere Render Obvious Claims 11, 12 and 40 Under Emblaze's Incorrect Reading Of The Claims ................................................................ 9

III. CONCLUSION ............................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)..................................................................................... 8

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009)..................................................................................... 7

*In re Petering*,
    301 F.2d 676 (C.C.P.A. 1962) ...................................................................................... 7

## Statutes

35 U.S.C. §§ 102 & 103 ..................................................................................................... 1

Defendant Apple Inc. ("Apple") respectfully submits this reply brief in further support of its Motion for Summary Judgment of Invalidity Pursuant to 35 U.S.C. §§ 102 & 103 (D.E. 384) (the "Motion").

I.    **INTRODUCTION**

Emblaze's opposition cites only a single alleged distinction between the asserted independent claims of the '473 patent and the prior art U.S. Patent No. 5,751,968 to Cohen ("Cohen") under the incorrect manner that Emblaze reads the claims on Apple's accused products for purposes of infringement.  Specifically, Emblaze argues that Cohen does not disclose providing "a data stream having a given data rate."  However, Emblaze's argument is blind to Cohen's disclosure of this limitation and depends upon injecting a non-existent "assigning" requirement into the claims.  Not only is the "assigning" requirement not in the claims, the Court previously rejected Emblaze's attempt to import such a limitation into the claims during claim construction.  Emblaze cannot create an issue of fact by arguing that Cohen fails to disclose a non-existent claim requirement.  Therefore, if the Court were to otherwise adopt Emblaze's reading of the claims (which it should not, for the reasons set forth in Apple's co-pending motion for summary judgment of non-infringement as to All Accused Streams), then the independent claims of the '473 patent are invalid as anticipated.   In this regard, Emblaze cannot have it both ways: either the claims are not infringed for the reasons set forth in Apple's co-pending motion, or they are invalid.

Emblaze does not dispute that most of the asserted dependent claims also are anticipated by Cohen under Emblaze's incorrect reading of the claims if Emblaze's "given data rate" argument fails. Emblaze asserts that two exceptions are dependent claims 23 and 27, which require dividing the stream into slices of predetermined duration.  However, Cohen's disclosure of a constant bit rate data stream, coupled with its disclosure of dividing a data stream into files of equal size, inherently discloses dividing the stream into slices of predetermined duration.

As established in Apple's moving papers, the remaining dependent claims 11, 12 and 40, are rendered obvious under Emblaze's incorrect reading of the claims.  Specifically, those claims are rendered obvious by Cohen in combination with U.S. Patent No. 5,835,495 to Ferriere ("Ferriere").

Emblaze's argument to the contrary fails because it ignores embodiments that are plainly taught in Ferriere.

## II.    ARGUMENT

### A.    Cohen Anticipates Independent Claims 1 And 25 Under Emblaze's Incorrect Reading Of The Claims.

Emblaze's reading of the claims is incorrect for the reasons set forth in Apple's co-pending motion for summary judgment of non-infringement as to All Accused Streams. *See* Apple's Reply Brief in Support of its Motion for Summary Judgment of Non-infringement of All Accused Streams at 1-5; D.E. 346 at 7-11.  However, as established in Apple's moving brief in the present motion, if the Court were to adopt Emblaze's incorrect reading of the claims (which it should not), then Cohen anticipates independent claims 1 and 25.  Moving Br. at 15-17, 8-10.[1]

In its opposition to the present motion, Emblaze's only argument as to why Cohen does not invalidate claims 1 and 25 is its assertion that Cohen does not disclose the limitation "providing at the transmitting computer a data stream having a given data rate."  Opp. at 14-16.[2]  This argument necessarily fails because it is premised upon Emblaze's attempt to import into the claims a requirement that the "given data rate" be "assigned."  No such requirement is found in either the claims or the Court's claim construction.  In fact, the Court previously rejected Emblaze's proposed substitution of the word "assigned" for the claim term "given" in the phrase "a given data rate."  Emblaze cannot manufacture an issue of fact by arguing that Cohen fails to disclose a non-existent claim requirement.  In this regard, undisputed facts demonstrate that Cohen discloses providing a "data stream having a given data rate" under the Court's existing constructions.

### 1.    Emblaze Improperly Imports Into The Claims A Requirement That The "Given Data Rate" Be "Assigned.

Two passages in Cohen disclose "providing a data stream having a given data rate."   Moving Br. at 16, Ex. 4, Cohen at 4:33-36 and 7:45-52.  Emblaze's argument to the contrary is premised upon its assertion that the "given data rate" be "assigned."  Opp. at 16 ("[B]ecause Cohen [sic] not

---

[1] Citations to "Moving Br." refer to Apple's moving brief, D.E. 384.
[2] Citations to "Opp." refer to Emblaze's opposition brief, D.E. 385.

1    teach the step of <u>assigning</u> a given data rate to the data stream, Cohen does not anticipate claim 1.")

2    (emphasis added).   In this regard, Emblaze contends that the first passage of Cohen cited by Apple

3    "says nothing about <u>assigning</u> a 'given data rate' to the audio stream."  Opp.  at 2 (emphasis added).

4    Similarly, Emblaze contends that the second passage cited by Apple does not disclose the limitation

5    because "there is no mention of <u>assigning</u> a 'given data rate' to the data stream."   *Id.* at 3 (emphasis

6    added); s*ee also id.* at 4, 5, 6, 8, 16 (generally replacing "providing" with "assigning").

7            This is not the first time Emblaze has argued that the claims require "assigning" a data rate.

8    Emblaze argued in its claim construction briefing that "a given data rate" should be "an assigned data

9    rate."  D.E. 111 at 10.  The Court declined to read "given" as meaning "assigned" and construed "a

10   data stream having a given data rate" to mean "a data stream having a given amount of data per unit

11   of time."  D.E. 169 at 1.  Having lost its attempt to inject "assigning" into the claims during claim

12   construction, Emblaze now seeks to read the "assigned" requirement into the claim term "providing."

13   This latest effort to import "assigned" into the claim also is incorrect, for the following reasons.

14           First, neither the claim language nor the Court's construction requires that the "given data

15   rate" be "assigned."  Independent claim 1 recites "providing at the transmitting computer a data

16   stream having a given data rate," which the Court construed to mean "the transmitting computer

17   provides a data stream having a given amount of data per unit of time."  D.E. 214.  As construed by

18   the Court, this limitation simply requires that the transmitting computer *provide* a data stream having

19   a given data rate.  The word "provide" is a plain English word that means "to make available."  It

20   does not suggest or connote any "assignment."  Nor does Emblaze cite anything in the claims,

21   specification or prosecution history that suggests the patentee intended to redefine this plain English

22   word.  Furthermore, independent claim 25 does not even require "providing" a data stream."  Rather,

23   the preamble of claim 25 recites an "[a]pparatus for real-time broadcasting of a data stream *having* a

24   given data rate."  Thus, to the extent Emblaze contends that "providing" should be construed to mean

25   "assigning," that argument cannot apply to claim 25.

26           Second, Emblaze cites no support in the patent specification for importing an "assigned"

27   requirement into the claims.   Indeed, there is none.   Rather, the specification describes embodiments

28   in which data streams are generated without the data rate being "assigned."  For example, much like

the Cohen reference, the '473 patent discloses embodiments in which the data stream comprises data "captured or generated by the transmitting computer." *Compare* '473 patent at 2:29-31*with* Opp. at 3 (acknowledging that the Sound Blaster card "serves to capture an audio signal and convert it" to a digital data stream); *see also* '473 patent at 1:24-28 ("One or more input devices 22 (for example, a video camera and/or microphone) are used to generate a multimedia data stream…").

Third, to the extent Emblaze contends that the given data rate must be assigned by a compression algorithm, such a requirement is at odds with the patent specification. Emblaze's expert, Dr. Madisetti, testified that in his opinion, the claim element "requires <u>assigning</u> a particular target rate for … CBR [constant bit rate] or VBR [variable bit rate] coding." Ex. 10 (Madisetti Depo. Tr.)[3] at 35:4-6 (emphasis added); *see also id.* at 67:22-68:4 (conceding that he was not aware of "any other methods for resulting in a given data rate other than assigning a target rate to an encoder and using a compression rate"). However, the patent specification expressly teaches that "compression is not essential to implementation of the present invention." '473 patent at 6:54-56. Indeed, Emblaze itself has recognized that the "claim clause 'providing at the transmitting computer a data stream having a given data rate'… allows the 'given data rate' to be compressed, but does not *require* compression." D.E. 127 at 5, fn. 6 (emphasis in original) (internal citations omitted); *see also id.* at 5 (acknowledging that the patent teaches this limitation, "whether it is the data rate at which the stream is generated or a data rate assigned by compression of the stream.").

In short, there is no support for importing an "assigning" requirement into claims 1 and 25. Because the false "assigning" requirement is the sole basis on which Emblaze attempts to distinguish Cohen from these claims, summary judgment of invalidity should be granted.

### 2.    Undisputed Facts Establish that Cohen Discloses "A Data Stream Having A Given Data Rate," As Properly Construed.

Cohen includes two passages that disclose this claim limitation to one skilled in the art. Moving Br. at 16 (citing Moving Br., Ex. 4, Cohen at 4:33-36 & 7:45-52), 8-10. First, Cohen

---

[3] Unless otherwise noted, citations to exhibits herein are identified in the March 27, 2014 Declaration of Robert C. Williams In Support of Apple's Reply, filed concurrently herewith. These exhibits continue the numbering used in the February 14, 2014 Declaration of Weider (D.E. 350-1), which concluded at Exhibit 9.

discloses an embodiment implemented using the Sound Blaster audio card.  *Id.* at 4:33-36.  Second,

Cohen teaches that the described invention could be practiced using "any suitable compression…

algorithm known in the art."  *Id.*  at 4:33-36.  One skilled in the art readily appreciates that each of

these passages inherently disclose "a data stream having a given data rate."

a. **Cohen's Sound Blaster disclosure inherently discloses "a data stream having a given data rate."**

Cohen discloses a feeding unit (*i.e.* transmitting computer) with a Sound Blaster audio card

and associated software for generating a data stream from an audio presentation:

> The [feeding unit] may comprise any suitable means for generating a multimedia presentation.  Preferably, it comprises a computer equipped with suitable software and hardware for receiving the multi-media presentation from any suitable source.  For example, if the multi-media presentation is an audio presentation, the computer forming the unit 12 will include an audio card capable of receiving audio signals, such as Sound Blaster, manufacture and sold by Creative Lab Technologies of the USA.

Moving Br., Ex. 4, Cohen at 4:28-36.

Undisputed facts establish that the Sound Blaster card inherently generates a data stream

having a given data rate.[4]  *See* Declaration of Dr. Michael Orchard ("Orchard Decl.") (filed

concurrently herewith), ¶¶ 9-18.  In the mid-to-late 1990s, Sound Blaster audio cards were the most

common type of audio cards for capturing audio on personal computers.  *Id.* ¶  9.  Accordingly, one

of ordinary skill in the art would have been familiar with Sound Blaster cards and how they operated

to generate a data stream having a given data rate.  *Id.* ¶  10.  In this regard, Emblaze does not dispute

that the Sound Blaster card captures an audio signal and generates a digital data stream.  *See* Opp. at

3 (acknowledging that the Sound Blaster card "serves to capture an audio signal and convert it to a

digital signal").  One skilled in the art would have understood that Sound Blaster cards converted

audio signals into digital signals by way of "sampling" and that the manner in which this sampling

operates <u>necessarily</u> results in a constant "given data rate."  *Id.* at ¶¶ 12-18.  Thus, Cohen's teaching

of the use of the Sound Blaster card inherently discloses "providing… a data stream having a given

---

[4] Emblaze's sole argument with respect to Cohen's Sound Blaster teaching is that there is no <u>assignment</u> of a rate in Cohen.  As established above, this is not a claim requirement.

data rate" as construed by the Court.

Significantly, the Sound Blaster card is the only exemplary embodiment <u>in the '473 patent</u> for capturing audio and generating an uncompressed stream having a given data rate. '473 patent at 14:12-14. This disclosure is set forth in a section of the specification titled "exemplary Software Appendix," which is "an integral part of the present patent application." *Id.* at 13:53-14:16. The disclosure details the hardware configuration necessary to operate the transmitting computer according to the invention and states that "[t]he computer should be equipped with a Sound Blaster sound card, with a microphone connected to the line-in input jack thereon." *Id.* at 14:12-14. In short, Cohen's disclosure of a Sound Blaster card is exactly what the '473 patent discloses for generating a data stream at a given data rate.

**b.     Cohen's disclosure of "any" suitable compression algorithm inherently discloses "a data stream having a given data rate."**

Much like the '473 patent, Cohen teaches that his system can be implemented using any known compression algorithms:

> Another example is that the data fed by the feeding unit can be compressed and subsequently decompressed by the UOD. Similarly, the data files including segments of the multi-media presentation or the single file may be compressed in the HTTP server and subsequently decompressed in the UOD. These compression and decompression steps may be performed <u>by any suitable compression and decompression algorithm known in the art</u>."

Moving Br., Ex. 4, Cohen at 7:45-54 (emphasis added); *see also* '473 patent at 2:46-47. Emblaze contends that this disclosure fails to disclose "a data stream having a given data rate" for two reasons.

First, Emblaze contends that Cohen's disclosure of "any" suitable compression algorithm fails to inherently disclose providing a data stream having a given data rate, because there are certain types of compression algorithms that do not practice the limitation. Emblaze's expert, Dr. Madisetti, identifies three "schemes" for compressing data streams, including variable bit rate encoding ("VBR"), variable bit rate encoding with a max value ("VBR Max") and constant bit rate encoding ("CBR"). D.E. 385-7 (Madisetti Decl.) at ¶ 8. According to Dr. Madisetti, for VBR, "the bit rate …. varies widely over time," while the bit rates of VBR Max and CBR are "fairly constant." *Id.* Based on these differences, Dr. Madisetti concludes that VBR does not provide "a data stream having a

1  given data rate," but that VBR Max and CBR do, because these schemes assign a target rate. *Id.* at ¶¶

2  12-18; *see also* Opp. at 4-7. [5]

3          Apple's expert agrees that one or more of these modes would be applicable to any suitable

4  compression algorithm of the time.  Orchard Decl. at ¶¶ 21-23.  It is therefore undisputed that

5  compression algorithms generally can be grouped into these three categories.  Because one skilled in

6  the art would understand that the genus of compression algorithms consists of a limited number of

7  species, *i.e.* CBR, VBR or VBR Max, Cohen's disclosure of "any suitable compression… algorithm"

8  inherently discloses the use of any of these species.  *See In re Gleave*, 560 F.3d 1331, 1337-38 (Fed.

9  Cir. 2009) (holding that when "the genus is so limited that a person of ordinary skill in the art can at

10  once envisage each member of this limited class," the anticipatory reference is treated as if all the

11  species of the group are disclosed.); *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962) (declaring

12  that, if the anticipatory reference "describes to one skilled in this art not only the broad class but also

13  this much more limited class within that broad class, … we think it is immaterial that [the reference]

14  did not expressly spell out the limited class…..").  Thus, because Emblaze contends that two of these

15  modes disclose providing a data stream having a given data rate, Cohen should be found to anticipate.

16          Second, Emblaze contends that Cohen fails to disclose providing a data stream "at the

17  transmitting computer," because Cohen teaches compressing files on the server.  Opp. at 15.

18  However, anticipation does not require that every embodiment disclose the claimed limitation. In this

19  regard, Cohen also plainly discloses that "the data fed by the feeding unit [*i.e.* the transmitting

20  computer] can be compressed and subsequently decompressed."  *Id.* at 7:45-47.  Accordingly, Cohen

21  discloses an embodiment in which the data stream can be provided a given data rate via compression

22  prior to being uploaded.

23

24

---

25  [5]  Apple does not agree that setting a target rate to compression algorithm will necessarily provide a
    data stream having a given data rate.  As established in Apple's motion for summary judgment of
26  non-infringement, some compression schemes (*e.g.*, GSM 6.10) yield a given data rate.  The Accused
    Streams, on the other hand, have varying data rates over time intervals of the video stream, thus
27  resulting in data sizes that are not predetermined.  D.E. 345 at 12-13.  If the Court finds that setting a
    target is not inherently setting a given data rate, then the Accused Streams do not infringe.  D.E. 345
28  at 11-12.

3.       **Emblaze Misstates that Cohen Fails to Disclose Live Streaming.**

As Apple established in its moving brief, if Emblaze were correct (which it is not) that upload rates and download rates are inherently generally equal to the data rate in a live stream, Cohen's disclosure of live streaming inherently discloses providing "a data stream having a given data rate" that is generally equal to the upload and download rates. Moving Br. at 20-22. Emblaze raises two meritless arguments in response. First, Emblaze contends that Cohen's disclosure of real time broadcasting somehow fails to disclose live streaming "effectively" because Apple submitted no evidence that Cohen's system was implemented. Opp. at 16. Whether or not Cohen's system was ever implemented is irrelevant as a matter of law, because, as a duly issued patent, Cohen's disclosure is presumed to be enabling. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). Emblaze offers no evidence to rebut the presumption that Cohen's live streaming disclosures are enabling. Indeed, Emblaze ignores Cohen's multiple repeated disclosures of "real-time" streaming (*e.g.* Moving Br., Ex. 4, Cohen at 1:39-41; 2:57-62, 3:3-6, 5:44-47, 6:43-50, 6:55-61.) and of streaming content "substantially simultaneously" with the generation of that content. *Id.* at 4:52-59, 3:43-45, 5:44-53.

Second, Emblaze contends that Apple somehow concedes that Cohen fails to disclose providing a data stream having a given data rate, because providing a data stream that is less than the available bandwidth runs afoul of the Court's claim construction requiring that the data stream have a "given amount of data per unit of time" and would result "in a very inefficient system incapable of taking full advantage of the available bandwidth." Opp. at 16-17. Emblaze's criticisms are at odds with its own expert, who testified that even a variable bit rate (VBR) compression algorithm would satisfy the claim limitation if you set "a certain maximum," such as the available bandwidth. Ex. 10 (Madisetti Depo. Tr.) at 42:7-23. And, whether Cohen's system could "take full advantage of the available bandwidth" is irrelevant, as there is no such requirement in the claims. Opp. at 16-17.

B.       **Cohen Also Anticipates Dependent Claims 2, 8-10, 13-14, 21, 23-24, 26-29, 36-38 And 41 Under Emblaze's Incorrect Reading Of The Claims.**

Cohen discloses each limitation of dependent claims 2, 8-10, 13-14, 21, 23-24, 26-29, 36-38 and 41. Moving Br. at 18-20. Emblaze's sole assertion with respect to claims 2, 8-10, 13-14, 21, 24,

26-29, 36, 38 and 41 is that the independent claims from which they depend (*i.e.* claims 1 and 25) do not anticipate. Opp. at 17. Because, as established above, Cohen does anticipate the independent claims under Emblaze's interpretation of the claims, and because Emblaze does not dispute that Cohen discloses the additional limitations set forth in claims 2, 8-10, 13-14, 21, 24, 26-29, 36, 38 and 41, summary judgment of invalidity should be granted as to these claims.

With respect to claims 23 and 37, Emblaze contends that Cohen fails to disclose the additional limitation recited in these claims of "dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith." Opp. at 17-18. However, as Emblaze recognizes, Cohen teaches dividing the stream into data segments using "any suitable characteristics of the segment data files," including size. Opp. at 18 (citing Moving Br., Ex. 4, Cohen at 5:39-41). And, as established above in Section I.A.2.a and in Apple's moving brief (Moving Br. at 20), Cohen discloses providing an uncompressed data stream with a *constant* given data rate. Because a data stream with a *constant* data rate has a constant amount of data for each unit of time, dividing such a stream by size generates slices of equal duration. Thus, Cohen's disclosure of a data stream with a constant data rate coupled with its disclosure of dividing the data stream into segments by size discloses dividing the stream into slices having a predetermined duration.

### C.   Cohen And Ferriere Render Obvious Claims 11, 12 and 40 Under Emblaze's Incorrect Reading Of The Claims.

The combination of Ferriere with Cohen renders claims 11, 12 and 40 obvious because Ferriere discloses the additional limitations of dependent claims 11, 12 and 40, and because one skilled in the art would have been motivated to combine the teachings of Ferriere with Cohen to create a system that practices each of these claims. Moving Br. at 23-25. Emblaze does not dispute that Ferriere discloses the additional limitations set forth in claims 11, 12 and 40. Rather, Emblaze contests only that one skilled in the art would have been motivated to combine the two references. Opp. at 19, 10-11. Specifically, Emblaze contends that Ferriere discloses a server-controlled architecture that requires maintaining a point-to-point connection with each client device, which one skilled in the art would not seek to combine with Cohen's disclosure of a broadcasting architecture. Opp. at 19. According to Emblaze, Ferriere must maintain a separate point-to-point network with

each client device, because it does not disclose "streaming all quality level streams at all times" and must "generate a new stream for each client device."  Opp. at 10 (citing Moving Br., Ex. 8, Ferriere at 16:1-9).

However, Emblaze's argument overlooks Ferriere's disclosure of alternate embodiments that are not limited to architectures requiring separate point-to-point networks.  Specifically, Ferriere discloses embodiments that do allow for "streaming all quality level streams at all times" and need not "generate a new stream for each client device."  *Id*.   For example, claim 13 claims an audio server comprising multiple versions of compressed audio files that could be delivered to a client depending on the available bandwidth:

> An audio file database to store <u>multiple versions of an audio file</u>, each version of the audio file being configured in audio data blocks of <u>different block sizes</u> and produced using different sample rates, wherein block size represents the number of data bits contained within an individual audio data block;

> an audio server to <u>select an appropriate version</u> of an audio file …<u>that is less than or equal to the effective bit rate of the client's modem</u> ….

Moving Br., Ex. 8, Ferriere at 18:22-30 (emphasis added); *see also id.* at col. 4:24-26.  Thus, claim 13 of Ferriere discloses an audio server that stores multiple versions (quality levels) of the audio stream and makes all of these versions available to clients at all times.  And, because the streams are stored, the audio server need not generate a new stream for each client.  This is unlike the point-to-point architecture Emblaze contends is required by embodiments that cannot "stream[] all quality levels at all times" and must "generate a new stream for each client device."  Opp. at 10.  Emblaze cannot create an issue of fact by simply ignoring embodiments disclosed in the reference.

## III.   CONCLUSION

For the foregoing reasons and for the reasons set forth in its moving brief, Apple respectfully requests that the Court grant Apple summary judgment of invalidity.

Dated:  March 27, 2014                               DLA PIPER LLP (US)


                                                      By: /s/ Mark Fowler
                                                           Mark Fowler (Bar No. 124235)
                                                           mark.fowler@dlapiper.com
                                                           Robert Buergi (Bar No. 242910)
                                                           robert.buergi@dlapiper.com

1
2
3

DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, California 94303
T: 650.833.2000
F: 650.833.2001

4
5
6
7
8
9
10

John Allcock (Bar No. 98895)
john.allcock@dlapiper.com
Erin Gibson (Bar No. 229305)
erin.gibson@dlapiper.com
Robert Williams (Bar No. 246990)
robert.williams@dlapiper.com
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101
T: 619.699.2862
F: 619.764.6662

11
12
13

GREENBERG TRAURIG, LLP

14
15
16
17
18
19
20

Sarah Barrows (SBN 253278)
barrowss@gtlaw.com
William Coats (SBN 94864)
coatsw@gtlaw.com
Stephen Ullmer (SBN 277537)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

21
22
23
24
25
26

James J. DeCarlo (Admitted *Pro Hac Vice*)
decarloj@gtlaw.com
Michael A. Nicodema (Admitted *Pro Hac Vice*)
nicodemam@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400

27

*Attorneys for Defendant Apple Inc.*

28