MARK FOWLER (Bar No. 124235)
mark.fowler@dlapiper.com
ROBERT BUERGI (Bar No. 242910)
robert.buergi@dlapiper.com
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA  94303-2214
Tel:  650.833.2000
Fax:  650.833.2001

JOHN ALLCOCK (Bar No. 98895)
john.allcock@dlapiper.com
ERIN GIBSON (Bar No. 229305)
erin.gibson@dlapiper.com
ROBERT C. WILLIAMS (Bar. No. 246990)
robert.williams@dlapiper.com
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA  92101
Tel:  619.699.2700
Fax:  619.699.2701

SARAH BARROWS (Bar No. 253278)
barrowss@gtlaw.com
WILLIAM SLOAN COATS (Bar No. 94864)
coatsw@gtlaw.com
STEPHEN ULMER (Bar No. 277537)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA  94111-5983
Tel.: 415.655.1300
Fax:  415.707.2010

JAMES J. DECARLO (*Pro Hac Vice*)
decarloj@gtlaw.com
MICHAEL A. NICODEMA (*Pro Hac Vice*)
nicodemam@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York  10166
Tel: 212.801.9200
Fax:  212.801.6400

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., <br><br> Plaintiff; <br><br> v. <br><br> APPLE INC., a California Corporation, <br><br> Defendant. | CASE NO. 11-CV-01079 PSG <br><br> **DECLARATION OF DR. MICHAEL ORCHARD, PH. D., IN SUPPORT OF DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** |

I, Michael Orchard, Ph. D., hereby declare:

1. I have been asked to provide this supplemental declaration in connection with Defendant Apple Inc.'s Reply In Support of Its Motion for Summary Judgment of Invalidity ("Apple's Reply") in the above-captioned case. I have personal knowledge of the facts stated herein.

2. I previously submitted a declaration in support of Defendant Apple Inc.'s Motion for Summary Judgment of Invalidity ("my initial declaration"). As detailed in my declaration, I have been retained by Apple to analyze U.S. Patent No. 6,389,473 ("'473 patent") with respect to the validity of the asserted claims in this case. My analysis and opinions are detailed in my November 9, 2013 Expert Report. I attached a true and correct copy of my Expert Report as Exhibit A to my declaration in connection with Apple's Motion.

3. I have since been asked to review Emblaze's Opposition to Apple's Motion for Summary Judgment of Invalidity ("Emblaze's Opposition") and the Declaration of Dr. Vijay Madisetti submitted in support thereof ("Madisetti Declaration."), and to provide this supplemental declaration with respect to Apple's Reply.

4. I have reviewed and considered the opinions of Emblaze's expert Dr. Vijay Madisetti as set forth in the Madisetti Declaration. Dr. Madisetti's declaration did not alter any of my opinions but it did help me gain some understanding regarding positions Emblaze is taking on validity that I was not aware of when preparing my initial report or initial declaration. I was also deposed regarding my opinions on January 28, 2014, in Houston, Texas.

5. In his declaration, Dr. Madisetti provides certain opinions regarding the teachings of U.S. Patent No. 5,751,968 ("Cohen"). (Madisetti Declaration, ¶ 2). At Paragraph 8, Dr. Madisetti opines that Cohen's disclosure at 4:33-36 fails to teach the limitation "providing at the transmitting computer a data stream having a given data rate," because this disclosure "only states that the feeding unit 12 in Cohen may include a Sound Blaster card for capturing an audio signal, but says nothing about assigning a 'given data rate' to the audio stream," and that "the Sound Blaster Card

only serves to capture an audio signal and convert it to a digital signal." (Madisetti Declaration, ¶ 8). I disagree for the following reasons.

6. As an initial matter, there is no requirement in the claim limitation ("providing at the transmitting computer a data stream having a given data rate") or the Court's construction of this limitation ("the transmitting computer provides a data stream having a given amount of data per unit of time") that requires "assigning" a given data rate. As construed by the Court, this limitation simply requires that the transmitting computer provide a data stream with a given data rate.

7. As stated in my expert report, Cohen discloses a transmitting computer providing a data stream having a given data rate. (Orchard Report, Ex. 3 at 1.) For instance, Cohen discloses a feeding unit (*i.e.* transmitting computer) receiving an audio presentation from a radio station:

> "According to a preferred embodiment of the present invention, the [feeding unit] receives a real time broadcast of a multi-media presentation, for example <u>an audio presentation from a radio station</u>, and feeds its content to the forming and distribution unit." (Cohen, 4:41-45) (emphasis added).

8. Cohen further teaches that the feeding unit includes hardware and software, such as a Sound Blaster card and associated software, for generating a data stream from such an audio presentation:

> "The [feeding unit] may comprise any suitable means for generating a multi-media presentation. Preferably, <u>it comprises a computer equipped with suitable software and hardware</u> for receiving the multi-media presentation from any suitable source. For example, <u>if the multi-media presentation is an audio presentation, the computer forming the [feeding unit] will include an audio card capable of receiving audio signals, such as Sound Blaster</u>, manufactured and sold by Creative Lab Technologies of the USA. If the multi-media presentation is a video presentation, the computer forming the [feeding] unit 12 will include a video card capable of receiving video signals, such as the Video Blaster, manufactured and sold by Creative Lab Technologies of the USA." (Cohen, 4:28-40) (emphasis added).

9. Any person having ordinary skill in the art ("PHOSITA") at the time of the Cohen patent and the asserted patent would have been very familiar with Sound Blaster audio cards and how they operated. Sound Blaster cards were the most prevalent audio cards for recording (i.e., capturing) and playing audio on personal computers in the mid to late 1990s.

10. A PHOSITA would further understand that recording audio on a SoundBlaster card, as described in the Cohen patent, would inherently generate a data stream with a given data rate. In this regard, Dr. Madisetti recognizes that the Sound Blaster card captures audio signals and converts them into digital signals. (Madisetti Declaration, ¶ 8.) Capturing an audio presentation (such as a radio broadcast) and converting the audio to digital signals necessarily creates a stream of digital data. And, a PHOSITA would recognize that the Sound Blaster card created this data stream with a given data rate.

11. In this regard, the asserted patent itself describes using a Sound Blaster card to practice the invention. ('473 patent, 14:5-17.) The disclosure is set forth in a section of the specification titled "exemplary Software Appendix," which is described as "an integral part of the present patent application." ('473 patent, 13:53-14:16). It details the hardware configuration necessary to operate the transmitting computer according to the invention and states that "[t]he computer should be equipped with a Sound Blaster sound card, with a microphone connected to the line-in input jack thereon." ('473 patent, 14:12-14). In short, Cohen's disclosure of a Sound Blaster card is exactly what the '473 patent discloses for generating an uncompressed stream at a given data rate.

12. Moreover, a PHOSITA would have understood that the way Sound Blaster cards converted audio signals into digital signals was by "sampling." Sampling is a common and well known process for recording audio, in which audio data is analyzed (*i.e.* sampled) at fixed time increments (*i.e.* the sampling interval) and converted into a fixed number of bits of digital data (*i.e.* the bit depth). The number of sampling intervals sampled each second is typically referred to as the sampling rate.

13. In this regard, both Cohen and the asserted patent describe digital data streams created by sampling audio. For instance, Cohen describes a 660Kbyte audio file created using a sample rate of 11kHz (kilo-samples per second) with a bit depth of 1 byte (i.e. 8 bits per sample). (Cohen, 1:29-33). The sampling rate (11kHz) multiplied by the bit depth (1 Byte) multiplied by the number of seconds (60 seconds in a minute) results in a 600Kbyte audio file. Similarly, the asserted

patent describes creating an audio data stream using GSM 6.10 standard compression software using a sample rate of 8kHz and a bit depth of 16 bits per sample. ('473 patent, 6:62-65.)

14. As evident from these examples, sampling audio in this manner necessarily generates a data stream with a constant "given data rate," that can be defined by the following mathematical formula: the data rate of the data stream is equal to the sampling rate (*i.e.* number of samples per second) times the bit depth (*i.e.* number of bits per sample), resulting in a data rate measured in bits per second.

15. Public documentation relating to SoundBlaster cards from the mid 90s confirms that SoundBlaster cards generated data streams with a constant "given data rate" generated by sampling audio at a constant sampling rate and constant bit depth. For instance, a user guide for the SoundBlaster AWE32 sound card defines the hardware specifications of the audio card as supporting programmable, but fixed, bit depths and sampling rates. (SoundBlaster AWE 32 Getting Started Guide version 1.4 (Dec. 1996), available at: http://ccftp.creative.com/Manuals/TSD/2390/awe32.pdf at A-2, Ex. 11 to the Williams Decl.)[1]("16-bit and 8-bit digitizing in stereo and mono modes" and "Programmable sampling rate, 5kHz to 44.1 hHz in linear steps").

16. Similarly, the user guides for the SoundBlaster AWE64 Gold audio card defined the hardware specifications of the card as supporting programmable, but fixed, bit depths and sampling rates. (SoundBlaster AWE 64 Gold Quick Start Guide version 1.01 (Nov. 1996), available at: http://support.creative.com/manuals/download.aspx?nDownloadId=877&prodName=SB, Ex. 12 to the Williams Decl.; AWE 64 Gold - Getting started, at A-2; SoundBlaster AWE 64 Gold Getting Started Guide version 1.2 (April 1997), available at: http://support.creative.com/manuals/download.aspx?nDownloadId=2392&prodName=Sound Blaster AWE 64 Gold Manual, Ex. 13 to the Williams Decl., at A-2.)

---

[1] The Williams Decl. refers to the Declaration of Robert C. Williams submitted in support of Apple's Reply In Support Of Its Motion For Summary Judgment On Invalidity

17. Furthermore, the user guide for software used with SoundBlaster card explained how a user would set the programmable sample rates and bit depths to record audio. (The 16-bit Sound Card User Guide: On-line Version, version 1.0 (Sept. 1994), available at: http://support.creative.com/manuals/download.aspx?nDownloadId=2368&prodName=16-Bit Sound Card Users Guide, Ex. 14 to the Williams Decl.) As illustrated in the excerpt below, the WaveEditor software application provided a dialog box which allowed a user to select a sampling rate and sampling size (bit depth) for recording audio.



(*Id*. at 1-9.)

18. Because a PHOSITA would have recognized that the SoundBlaster card generated a digital audio data stream by sampling audio with a fixed sampling rate and a fixed bit depth, a PHOSITA would have understood that the SoundBlaster card necessarily generated a data stream with a "given data rate." Accordingly, Cohen's disclosure of use of SoundBlaster inherently

discloses the limitation "providing at the transmitting computer a data stream having a given data rate."

19. I also disagree with Dr. Madisetti's opinion that Cohen's disclosure of 7:45-52 fails to disclose "providing at the transmitting computer a data stream having a given data rate." (Madisetti Declaration, ¶ 8.)

20. At 7:45-52, Cohen discloses:

> "Another example is that the data fed by the feeding unit can be compressed and subsequently decompressed by the UOD. Similarly, the data files including segments of the multi-media presentation or the single file may be compressed in the HTTP server and subsequently decompressed in the UOD. These compression and decompression steps may be performed <u>by any suitable compression and decompression algorithm known in the art</u>." (7:45-52).

21. Dr. Madisetti's opinion confuses compression algorithms as disclosed in Cohen with three modes of operation that can be applied to any algorithm, namely constant bit rate ("CBR") encoding, variable bit rate encoding with a maximum value ("VBR Max") and variable bit rate encoding without restraint ("VBR").  CBR, VBR Max and VBR are not themselves compression algorithms and a PHOSITA at the time would not understand them as such.  Nonetheless, a PHOSITA would have known at the time that all three of these modes would be applicable to almost every known algorithm at the time and that CBR mode would be applicable to every known algorithm at the time, including the "any suitable compression" algorithms described by Cohen.

22. As I stated in my expert report, even well before March 1998, there existed many industry standard algorithms for compression which were well known and understood by a PHOSITA, including standards such as H.261, H.263, MJPEG, MPEG-2, etc.  (Orchard Report, ¶ 64.)  Cohen's disclosure of suitable "compression algorithms" would immediately bring to mind these types of algorithms to a PHOSITA which can operate in one or more of these three modes (CBR, VBR and VBR Max).

23. Furthermore, as I stated in my expert report, to the extent it is determined that Cohen does not disclose "providing at the transmitting computer a data stream having a given data rate," it would have been obvious in view of Cohen's teachings.  (Orchard Report, Ex. 3 at 1.)  Indeed, a

PHOSITA certainly would have recognized that a "suitable" compression algorithm to use with Cohen's system would include industry standard algorithms, including those defined by the GSM 6.10 or MPEG-2 standards, to generate constant bit rate data streams. As I described in my report, such algorithms were well known and widely used. (Orchard Report, ¶ 64.) The selection of any particular compression algorithm would have been a mere design choice. A PHOSITA would have had good reason to modify Cohen to utilize a compression algorithm, not only because Cohen expressly teaches such a modification, but also because a PHOSITA would have recognized that compressing audio or video data before streaming over a network would conserve network bandwidth. Furthermore, in view of Cohen's disclosure of audio streaming embodiments (s*ee e.g.*, Cohen 1:29-32, 4:41-45), a PHOSITA would have been particularly motivated to select and use an audio compression algorithm in CBR mode, because that was the most common mode of operation for audio compression at the time.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct

DATED: March 27, 2014

By: *M. G. Orchard*

Michael Orchard, Ph. D.