# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | | |
|---|---|---|
| EMBLAZE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 45:11-cv-01079- |
| v. | ) | PSG (PSG) (N.D. Cal.) |
| | ) | Magistrate Judge Paul Singh Grewal |
| APPLE INC., A CALIFORNIA CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXPERT REPORT OF DAVID J. TEECE**

**November 8, 2013**

# I.  Background and Qualifications

1. My name is David J. Teece.  I am the Thomas Tusher Professor in Global Business, the Director of the Center for Global Strategy and Governance, and the faculty Director of the Institute for Business Innovation at the Walter Haas School of Business at the University of California at Berkeley.

2. I am also the Chairman and Principal Executive Officer of Berkeley Research Group, LLC ("BRG"), an international expert services and economic consulting firm.  BRG was founded in 2010 and currently has 25 offices in the U.S., the U.K., Canada, South America, and Australia, and some 620 employees. Previously, I was Chairman and then Vice Chairman of LECG, a publicly-traded expert services firm with over 1,000 employees worldwide and over $350 million in annual revenues.

3. I received my Ph.D. in economics from the University of Pennsylvania in 1975.  I was first assistant, then associate professor of business economics at the Graduate School of Business at Stanford University before joining the UC Berkeley faculty as a full professor in 1982.  From 1989 – 2007, I was the Mitsubishi Bank Professor of International Business and Finance.  I am a member of the School of Arts and Sciences Board of Overseers at the University of Pennsylvania.

4. My scholarly publications include over 200 articles and books in economics and business.  I am one of the top 10 most widely cited scholars worldwide in business and economics.  I have received four honorary doctorates and numerous academic awards and prizes for my scholarly work.  In July of this year, I received the Distinguished Scholar Award of the Association of International Business.

5. Topics I have performed scholarly work on include managing intellectual capital and intellectual property, standard setting, and competition policy.  I have focused in part on high technology industries including the semiconductor and electronics industries where intangible assets including patents and copyrighted code are key elements of value.

6. I also have extensive experience in litigation and regulatory issues.  I have served as an expert witness in numerous courts, administrative bodies and tribunals in the

U.S., Canada, Australia, New Zealand, the U.K. and Europe. I have testified before Congress, before tribunals, and in courts on a wide range of economic issues, including antitrust and competition policy issues, business valuation, patent damages, negotiating strategy, and complex damages.

7. I have been actively involved as a principal in numerous business transactions (including the purchase and sale of businesses) in a variety of jurisdictions. I have also been directly involved in equity raisings and placements.

8. I have studied licensing and cross-licensing in high technology industries for many years. An article I co-authored with a colleague on the topic, published in the *California Management Review* in 1997,[1] was one of the first academic studies of licensing in high-technology industries, and has been widely cited.

9. I have also studied standards, the standards setting process, the policies and behavior of standards setting organizations, and the economic significance of standards for many years. I co-authored an early article on standards setting and antitrust.[2] I was an invited participant at hearings held by the U.S. Department of Justice and the Federal Trade Commission on the interplay between standards setting, intellectual property and antitrust policy.

10. My curriculum vitae (including a list of my publications) is attached hereto as Attachment 1. My list of prior testimony is attached hereto as Attachment 2. (Those documents do not list my consulting work.) A list of material that I considered in forming my opinions in this case is attached hereto as Attachment 3. I have also relied on discussions that my staff and I had with Catharine Lawton, another BRG expert, and the material she cited in her Report. I understand from my discussions with her that Apple has not produced much in the way of information relevant to the topics that I have discussed. Should Apple produce additional relevant material, I reserve the right to supplement my Report.

---

[1] Peter C. Grindley and David J. Teece, "Managing Intellectual Capital: Licensing and Cross-Licensing in Semiconductors and Electronics," *California Management Review*, Vol. 39, No. 2 (1997), pp. 8-41.
[2] David J. Teece and Edward F. Sherry, "Standards Setting and Antitrust," *Minnesota Law Review*, Vol. 87 (2003), pp. 1913-1994.

11. BRG is being compensated for the time I spend on this matter at my usual and customary rate of $975 per hour, plus expenses.  In preparing this Report, I have been assisted by a number of BRG staff members, working under my supervision and control.  BRG is being compensated for their time at their respective usual and customary rates, plus expenses.  I have no financial stake in the outcome of this litigation.  My compensation is not contingent on the opinions I have expressed.

12. I anticipate that, if asked, I may respond to opinions expressed by Apple's experts.

13. I anticipate using demonstratives at trial to assist the jury in understanding my testimony.  If I do use demonstratives, I will provide them at the time provided for by the court.  Any demonstratives will be based on the information contained in this Report, and/or on any other information provided by Apple (including Apple's experts) between now and trial.

## II. Scope of Tasks

14. I have been asked by Cozen O'Connor, as counsel for Emblaze, Ltd., to address three topics:  the convergence between computing and communications, network effects in software, and the implications of digital convergence and network effects for licensing the '473 patent at issue in this case.

## III. Convergence of Communications and Computers

15. The issue of the convergence between computing and communications has been studied by academics and practitioners for many years.  Back in 1977, NEC adopted "C&C" ("Computers and Communications") as its corporate slogan.  In 1995, the Computer Science and Technology Board of the National Research Council published "Keeping the U.S. Computer and Communications Industry Competitive: Convergence of Computing, Communications, and Entertainment," published by the

4

National Academies Press.[3]  A survey article by Prof. David Messerschmidt entitled "The convergence of telecommunications and computing:  What are the implications today?," published in the IEEE Proceedings in August 1996,[4] portrayed the then-state-of-the-art.  He followed that up with a 1999 article entitled "The Prospects for Computer-Communications Convergence."[5]  David Yoffie, currently the Max and Doris Starr Professor of International Business Administration at the Harvard Business School, edited a book entitled "Competing in the Age of Digital Convergence" published in 1997 by the Harvard Business School Press devoted to the topic.  1999 saw the publication of a book by Andy Covell entitled "Digital Convergence:  How the Merging of Computers, Communication and Multimedia is Transforming Our Lives."  The convergence has only increased since then.

16. Communications can either be one-to-one or one-to-many.  Some differentiate between "push" communications (such as advertising) and "pull" communications (whereby consumers seek out the information they want), and some add a third category ("push-pull communications"[6]).   Before the advent of computers, communication took many forms.  One-to-one pre-computer-era communications included conversations, mail, telephone calls, home movies and videotapes.  One-to-many pre-computer era communications included bulk mailing, surveys, newspapers/books/magazines, radio and television broadcasting, movies, and commercial videos/DVDs.

17. Since the advent of the computer, a number of different communications technologies have been added.  Post-computer-era one-to-one communications also include computer-based phone calls (VoIP), e-mail, texting, and online video calls (Skype, *etc.*), as well as the explosive growth of cellphones/smartphones built on the microprocessor-based ability of both the users' cellphones themselves and the cellular carriers' base station and other equipment to handle and process additional

---

[3] Available at http://www.nap.edu/catalog.php?record_id=4813 (visited November 6, 2013).
[4] Available at http://www.eecs.berkeley.edu/~messer/PAPERS/96/Proc1/ (visited November 6, 2013).
[5] Available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.39.1439&rep=rep1&type=pdf (visited November 6, 2013).
[6] http://www.graphics.com/article-old/push-communication-pushpull (visited November 6, 2013).

data and bandwidth.  Post-computer-era one-to-many communications also include bulk e-mail, blogging, CD-ROMs, the Internet, audio and video streaming and downloads, e-books and social media (Facebook, MySpace, LinkedIn, etc.).

18. In recent years, there has been a massive expansion of both the supply of, and demand for, new product categories that did not exist just a relatively few years ago: smartphones (such as Apple's iPhone, launched in 2007, following RIM's launch of the smartphone product category with the Blackberry in 1999), tablets (such as Apple's iPad, launched in 2010), Personal Digital Assistants ("PDAs"), e-book readers (such as Amazon's Kindle and Barnes & Noble's Nook), and digital video recorders (from TiVO and others).

19. One significant factor affecting the convergence between computing and communications has been the digitization of content.  For example, books, magazines and newspapers used to be provided only in hard copy (physical) form. Nowadays, the content of many books, magazines and newspapers is available in digital form as well.  Music used to be available in physical analog form (LP and cassette), now almost entirely replaced by (digital) CDs; nowadays most music is available as a digital download or via digital streaming services.  Movies and TV shows used to be available only in physical form (film, videotapes or DVDs); nowadays much TV and movie content is available digitally (*e.g.*, via Netflix). Digitization of content has enabled content providers to bypass traditional physical "bricks-and-mortar" distribution channels and distribute their content digitally over the Internet, either directly or via content distributors.  For example, Apple does not create the music that it distributes via its iTunes Store; instead, it distributes content created by others, and in return earns a share of the proceeds.   Similarly, YouTube distributes videos created by others, and earns its money selling advertising.

20. Another significant factor is the increase in computing power and speed, coupled with significant increases in the amount of available memory (both main memory and hard disk space) in which to store large files.  Still another significant factor is the improvement in compression/decompression "codecs" (whether "lossless" or

"lossy"), enabling large files to be compressed into smaller files for ease of storage and transmission, coupled with the increase in computing power enabling such compression/decompression.  Yet another factor is the increase in the bandwidth and transmission speed available to end-users, enabling them to send and receive large files in a reasonable period of time.[7]

21. Arguably the biggest changes associated with the computer era include e-mail, the Internet and the explosive growth of cellphones, especially smartphones.  According to market research firm the Radicatti Group, there were 3.146 billion worldwide e-mail accounts in 2011.  Radicatti estimated that the average corporate e-mail user sent and received 105 e-mails a day in 2011.  Despite spam filters, some 19% of them were classified as spam.[8]  But that still implies that (non-spam) e-mails dwarf the volume of physical mail.

22. Estimates of the number of Internet users vary, but one analyst estimated that the number of users grew from 70 million in December 2007 to 2.75 billion in March 2013.[9]  A 2013 Cisco report estimated that "global IP traffic" had increased more than fourfold over the preceding five years, and was projected to increase more than threefold in the next five years.[10]

23. Anyone familiar with the voice-only (or voice-and-text-only) earlier-generation (2G, 2.5G and 2.75G) digital cellphones of just a few years ago is aware of the explosive growth in the capabilities of the new generations of smartphones, capable of tasks (sending and receiving e-mail, Internet browsing, etc.) that were the exclusive domain of computers just a few years ago.

---

[7] See Committee on Intellectual Property Rights and the Emerging Information Infrastructure, Computer Science and Telecommunications Board, Commission on Physical Sciences, Mathematics, and Applications, National Research Council, *The Digital Dilemma:  Intellectual Property In The Information Age* (National Academies Press, 2000), Ch. 1; available at http://www.nap.edu/download.php?record_id=9601 (visited November 8, 2013).

[8] http://www.radicati.com/wp/wp-content/uploads/2011/05/Email-Statistics-Report-2011-2015-Executive-Summary.pdf (visited November 6, 2013).

[9] http://www.internetworldstats.com/emarketing.htm (visited November 6, 2013).

[10] http://www.cisco.com/en/US/solutions/collateral/ns341/ns525/ns537/ns705/ns827/white_paper_c11-481360.pdf (visited November 6, 2013), p. 1.  See also http://www.cisco.com/en/US/solutions/collateral/ns341/ns525/ns537/ns705/ns827/VNI_Hyperconnectivity_WP.pdf (visited November 6, 2013).

24. Cellphones and (especially) smartphones now operate using much more sophisticated operating systems than their predecessors.   Google's Android operating system is available both for smartphones and tablets/laptops.   Google gives away Android, and makes its money selling advertising.   Apple, by contrast, sells hardware and software as well as applications (via its App Store) and content (via its iTunes store).   Both Android and Apple's iOS each support hundreds of thousands of "apps."[11]  Industry analyst Gartner estimated 2013 applications store revenues at $216.7 billion (despite the fact that 91% of apps are free) and app downloads at 102 billion.[12]

25. A smartphone such as Apple's latest iPhone 5s has both an operating system (Apple's iOS, which runs not only on Apple's iPhones but also on its non-cellphone iPad and iPod Touch products) and a powerful chip (the A7 chip, a dual-core ARM-based processor clocked at 1.3 GHz, with 1GB RAM[13]) that has more processing power than most personal computers had until only a few years ago.

26. Worldwide smartphone sales are projected to reach 1 billion per year in 2013, a figure that has doubled in just two years.[14]

27. Many smartphone owners have wireless (cellular) broadband access, whether 3G (and 3.5 and 3.75 G) GSM Edge and UMTS W-CDMA or 4G LTE, often with performance rivaling wired broadband access previously available only to computer owners, and use their smartphones not only to make telephone calls but also to send and receive e-mail, to surf the Internet and to stream and/or download audio and video over the Internet.   Verizon and AT&T each announce that their broadband LTE service is available to 90+% of Americans.

---

[11] http://techland.time.com/2013/04/16/ios-vs-android/ (visited November 6, 2013).
[12] http://techcrunch.com/2013/09/19/gartner-102b-app-store-downloads-globally-in-2013-26b-in-sales-17-from-in-app-purchases/ (visited November 6, 2013).
[13] http://gizmodo.com/iphone-a7-chip-benchmarks-forget-the-specs-it-blows-e-1350717023 (visited November 6, 2013).
[14] http://phys.org/news/2013-09-global-smartphone-sales-billion.html (visited November 6, 2013).

28. Tablet sales are increasing as sales of "traditional" personal desktop and laptop computers are declining.[15] Tablet sales are forecast to overtake "traditional" computer sales by the end of 2013.[16]

29. E-book sales now account for some 20% of all book sales, according to publishers' reports.[17] Authorized digital downloads and digital streaming of music now amount to a multi-billion-dollars-a-year business; U.S. digital music sales in 2012 were estimated at $8.9 billion by industry analyst Strategy Analytics, with streaming revenues growing faster than download revenues.[18] Apple's iTunes Store still dominates digital downloads, with an estimated 63% market share.[19]

30. In my opinion, all of these demonstrate the massive convergence between computing and communications, which has grown significantly in recent years and is expected to continue to grow.

## IV. Network Externalities in Software

31. The concept of network externalities has been analyzed by economists for a number of years. One early article was written by two of my UC Berkeley colleagues, Michael Katz and Carl Shapiro.[20] Survey articles include two articles by S.E. Liebowitz and Stephen Margolis, "Network effects and externalities"[21] and "Network Externality: An Uncommon Tragedy,"[22] and William Page and John Lopatka, "Network Externalities."[23] A book-length discussion is Oz Shy, *The Economics of*

---

[15] http://www.vg247.com/2013/10/10/pc-hardware-sales-drop-worldwide-as-tablets-continue-to-rise-report-finds/ (visited November 6, 2013).
[16] http://www.telegraph.co.uk/finance/newsbysector/mediatechnologyandtelecoms/electronics/10305093/Tablets-forecast-to-overtake-PC-sales-at-end-of-year.html (visited November 6, 2013).
[17] http://www.usatoday.com/story/life/books/2013/05/15/e-book-sales/2159117/ (visited November 6, 2013).
[18] http://www.strategyanalytics.com/default.aspx?mod=pressreleaseviewer&a0=5268 (visited November 7, 2013).
[19] http://appleinsider.com/articles/13/04/16/apples-itunes-rules-digital-music-market-with-63-share (visited November 8, 2013).
[20] M. Katz and C. Shapiro, "Network externalities, competition, and compatibility," *American Economic Review*, Vol. 75 (1975), pp. 424-440.
[21] Pp. 671-674 in Peter Newman (ed.), *The New Palgrave Dictionary of Economics and The Law*, Vol. 2 (1998).
[22] *Journal of Economic Perspectives*, Vol. 8, No. 2, Spring 1994, pp. 133-150; available at http://www.utdallas.edu/~liebowit/jep.html (visited November 6, 2013).
[23] Available at http://encyclo.findlaw.com/0760book.pdf (visited November 6, 2013).

*Network Industries* (Cambridge Univ. Press, 2001), which includes chapters on Hardware Industries, The Software Industry, Technological Advance and Standardization, and Telecommunications.

32. An "externality" arises when the activities of one economic actor (individual or firm) affect another economic actor in ways that are not intermediated by the price system.[24]  For example, if I hold a loud party at my house, the sound/noise affects my neighbors.   Externalities can be either positive (others find my conduct beneficial) or negative (others find it undesirable).

33. A (positive) "network externality" arises when a product's value to a user increases as the number of users of the product grows.   A classic example is the value of telephone service.  The value of having a phone depends on the ability to call others or to have them call you.  Increasing the number of telephone subscribers increases the number of people you can call (or receive calls from), the value of which is (generally) thought to increase with the number of other subscribers.  Similarly, the value of having a fax machine increases with the number of others who have a compatible fax machine.

34. Networks can be physical (as in the case of the physical network of wired telephones, with each telephone physically connected to the central phone system and thus indirectly to other telephones) or virtual (as when one talks of the "network" of users of some particular software package or programming language).

35. (Positive) network externalities are a particular case of what economists, engineers, scientists and mathematicians call "positive feedback."[25]  Positive feedback markets sometimes result in a "winner take all" outcome, in which products supported by a majority become ever more attractive and may capture the entire market, while products supported by a minority become ever less attractive and may die away

---

[24] A "pecuniary externality" involves a situation in which one actor's behavior affects another actor via the price mechanism.  For example, if I increase my demand for some good, that may raise the price of that good, which in turn affects others who are interested in buying (or selling) that good.  See J. Laffont, "Externalities," in P. Newman (ed.), *The New Palgrave Dictionary of Economics*, Vol. 2, pp. 263-265.
[25] For a general discussion, see Carl Shapiro and Hal Varian, *Information Rules* (Harvard Business School Press, 1999), Ch. 7 ("Networks and Positive Feedback").

altogether.  Some refer to positive feedback as creating a "virtuous cycle" in which success breeds further success, or a "vicious cycle" in which lack of success leads to further reductions in sales.  A related concept is what is termed "critical mass," when the attractiveness of some product is enhanced if there is a minimal "critical mass" of users or suppliers, and products that do not attract the necessary "critical mass" may fade away altogether. Another related concept involves "tipping," in which the market may "tip" one way or another, often to a polar "winner take all" outcome.

36. "Winner take all" outcomes can be especially significant in the presence of economies of scale (in which per-unit costs fall as volume increases), economies of scope, or both.

37. It is frequently the case that the attractiveness of some product depends on participants' *expectations* of what others will do.  For example, people deciding what cellphone to buy may be concerned not so much about the current availability of apps for the cellphone as their expectations about the *future* availability of such apps.  If consumers believe that some particular cellphone operating system will attract more (or more desirable) apps in the future, which may make them more willing to buy cellphones that use that operating system.  Similarly, apps developers care about their expectations of future sales, which may in turn depend on what they anticipate other apps developers (of rival or complementary apps) may do and on how successful they believe the operating system will be in attracting users.

38. Network externalities can be either "direct" or "indirect."  One author illustrated the difference with the following example:  "A telephone becomes more valuable to an individual as the total number of telephone users increases. This is a direct network effect. A DVD player becomes more valuable as the variety of available DVDs increases, and this variety increases as the total number of DVD users increases. This is an indirect network effect."[26]

---

[26] M. Clements, "Direct vs. Indirect Network Effects:  Are They Equivalent?," unpublished working paper, January 2004, available at http://www.krannert.purdue.edu/centers/ijio/accepted/2113.pdf (visited November 6, 2013).

39. Some network effects arise in what economists term "one-sided markets," while others arise in what economists call "two-sided markets."[27] Two-sided markets involve two distinct types of participants (or "agents") brought together via an intermediary (or "platform") in which the decisions of each set of participants affects the outcomes of the other set of participants.   Examples include credit-card networks (consumers prefer credit cards honored by more merchants, while merchants prefer cards carried by more consumers, and the task of the credit card company is to attract both types of participants), video game systems (consumers prefer game consoles that support the number and types of games they want to play; game developers want to supply games that work on game consoles that are used by large numbers of consumers; one of the tasks of game console developers is to attract both consumers and game developers), HMOs (which need to attract both patients and physicians), dating services (which need to attract both men and women), *etc.*  The DVD example in the previous paragraph is an example of a two-sided market, involving both content providers (issuing their content on DVDs) and end-user consumers, with the "platform" being DVD players (a complementary good to the DVDs themselves).

40. Most of the economics literature on network externalities has focused on positive network externalities, but there are also well-known examples of negative network externalities.   Congestion is probably the best known.   When lots of people try to drive on the same freeway at the same time or try to use the same cellular telephone network at the same time, the resulting congestion harms all of the users.

---

[27] See J. Rochet and J. Tirole, "Two-Sided Markets:  A Progress Report," unpublished working paper, November 2005, available at http://idei.fr/doc/wp/2005/2sided_markets.pdf (visited November 6, 2013); T. Eisenmann, G. Parker, and M. VanAlystne, "Strategies for Two-Sided Markets," *Harvard Business Review*, October 2006; M. Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, Vol. 23 No. 3 (2009), pp. 125-43, available at http://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.23.3.125 (visited November 6, 2013).

41. Software is a commonly-used example to illustrate (positive) network effects.[28]  The more people who know and use a particular software program, the more willing others are to learn and use that program, as they can share the files they create among themselves.  The more commonly used a particular software package is, the more likely it is that people will find it worthwhile investing the human capital (time and effort) to learn the program.  The more people who are familiar with the program, the more likely it is that firms will buy and support that program for their business uses, as that reduces the firm's training costs and/or recruiting costs.  Similarly, popular software packages will attract complementary products (such as books and courses explaining their features and making it easier to learn them, or "add-ons" that make them more attractive to users) that make them in turn even more valuable.

42. Standards (whether formal interoperability standards developed by standards-setting bodies, or *de facto* standards, in which one product or protocol or format becomes the industry norm) can play a significant role in markets characterized by network externalities.  One example relevant to this case involves file formats for streaming video.  Over time, a large number of competing streaming video file formats has been developed.  Some of these file formats (*e.g.* the MPEG-4 format) were developed by formal standards setting organizations (in the case of MPEG-4, the Motion Picture Experts Group, together with the ITU-T); others are proprietary formats.  Content providers need to decide what file formats to provide their content in.  Content distributors (such as YouTube or Hulu), transmitters and receivers must decide which file formats to support.  (For example, access to files using some file formats may be blocked by some users' systems' firewalls.)  Users need to have software/hardware capable of supporting the file formats that have the content that they want to receive/use/send.  File formats come into and go out of fashion as technology changes, as new file formats become available, and as

---

[28] See, *e.g.*, J. Gallagher and Y. Wang, "Understanding Network Effects in Software Markets:  Evidence From Web-Server Pricing," *MIS Quarterly*, Vol. 26, No. 4 (Dec. 2002), pp. 303-327; Andreas Kemper, *Valuation of Network Effects in Software Markets* (Springer-Verlag, 2010), Chs. 5, 15.

different market participants choose to support different formats. The historic competition between Beta and VHS for videocassette recordings is a well-known example of format competition.

43. Industry participants are not averse to using patented technology when such use is justified. While some have expressed a preference for unpatented standards, and a handful of standard setting organizations "SSOs") (notably the World Wide Web Consortium, or W3C) have policies against incorporating patented technology into their standards unless the patent holder commits to license its technology royalty-free to those practicing the standard, most SSOs *are* willing to incorporate royalty-bearing patented technology into their formal interoperability standards if the patent holder is willing to commit to making licenses for its patented technology available on "reasonable and non-discriminatory" ("RAND") terms.[29] The widespread adoption and commercial success of the MP3 digital audio compression standard, the H.264 video compression standard, and the WCDMA and LTE cellular communications standards, despite the fact that all of these standards incorporate significant amounts of patented royalty-bearing technology, demonstrates that firms in the industry are not averse to using patented technology, both for formal standards (such as those adopted by SSOs) and for informal or *de facto* standards.

44. Many economists who have studied markets characterized by network externalities have expressed concerns that such externalities change the nature of competition in complex ways, and that market outcomes may not be economically efficient. In particular, some are concerned that positive feedback can lead to the situation in which one supplier dominates the industry. Others have expressed concern that externalities may increase switching costs and create some degree of "lock-in," especially if users are reluctant to abandon their already-generated base of output

---

[29] See Mark Lemley, "Intellectual Property Rights and Standard-Setting Organizations," 90 *California Law Review* 1889-1980 (2002).

compatible with the old (*e.g.*, old software files created with older versions of software).[30]

45. The extent to which consumers are "locked in" depends on their "switching costs" of switching to an alternative;[31] high switching costs imply a high level of lock-in, whereas if switching costs are low, there is little or no lock-in.

46. Some also refer to "lock-out," a situation in which, due to the presence of lock-in to incumbent suppliers, rival suppliers find it difficult to obtain a toehold in the market. The prospect of either "lock-in" and "lock-out" (or both) can create a degree of what economists call "path dependence."[32]

47. Sometimes lock-in can be reduced by the availability of "file translation" programs that will enable files created in one software package to be read by other software packages, or by physical converters or adapters (*e.g.*, 3-pin-to-2-pin adapters that enable products with 3-prong electrical plugs to be plugged into older 2-prong electrical outlets). The extent to which alternatives are backwards- or forwards-compatible with rival products can also play a role.

48. In some contexts, software developers make it easier for others to produce complementary software that enhances the value of their own software offerings. Operating systems developers (like Microsoft or Google) often provide programming toolkits and "APIs" (Application Programming Interfaces) allowing developers to develop more (or more powerful) applications programs that, in turn, make the operating system more valuable to end-users. This generates an "ecosystem" made up of hardware, operating system and software applications.

---

[30] See generally Carl Shapiro and Hal Varian, *Information Rules* (Harvard Business School Press, 1999), Ch. 5 ("Recognizing Lock-In").

[31] P. Klemperer, "Markets With Consumer Switching Costs," *Quarterly Journal of Economics*, Vol. 102, pp. 375-394 (1987); P. Klemperer, "Switching costs," in S. Durlauf and L Blume, *The New Palgrave Dictionary of Economics*, 2d ed (2008), pp. 125-128.

[32] See P. David, "Path Dependence, its critics and the quest for 'historical economics,'" available at http://economics.ouls.ox.ac.uk/12448/1/0502003.pdf (visited November 7, 2013); Arthur, W. Brian, *Increasing Returns and Path Dependence in the Economy* (University of Michigan Press, 1994).

## V. Implications for Licensing the '473 Patent

49. What conclusions follow from the combination of digital convergence and network externalities for assessing a "reasonable royalty" for licensing the '473 patent? I believe that the following five conclusions follow.

50. First, from an economic perspective, the stakes are especially high in digitally-converging industries with network externalities. The "winner take all" nature of much of the competition in such contexts means that it is extremely important to be the "winner." This in turn implies that "time to market" can be a significant competitive factor.

51. Second, the "positive feedback" nature of network externalities means that incumbents often have a significant advantage over new-entrant rivals that offer "similar" or "comparable" products. Only if the new entrant is able to offer something that is significantly more valuable than the incumbents' offerings is it likely that incumbents can be unseated, especially if users have significant investments (in the form of human capital, or in existing files created using one software package) that would be lost if they were to switch to a rival product.

52. Nevertheless, there are numerous examples where incumbents have been unseated. To take one well-known example, Word Perfect used to be the dominant word processing software, especially for computers running the MS-DOS operating system, but it has been all but entirely replaced by Microsoft Word.

53. Third, in the digital distribution industry, by 2007-2008 digital convergence was in full swing, in an industry subject to network externalities. While digital convergence had been predicted for a long time, by 2007-08 it had clearly arrived. One key battle ground was the new mobile market that we now call the "smartphone" market (originally pioneered by RIM's Blackberry in 1997, and revolutionized by Apple's iPhone in 2007), and content distributed to such devices.

54. I am aware that, in her work in this case, my BRG colleague Cathy Lawton has summarized the state-of-play at the time, and I do not intend to duplicate her work. As I understand it from my discussions with her, at the time there were three main

16

rivals for digital streaming formats: Adobe's Flash, Microsoft's Smooth Streaming (built on its Silverlight), and Apple's HTTP Live Streaming. At the time, I understand that Adobe had the incumbent's advantage because it was the established incumbent with 90% penetration on the desktop. So Adobe's Flash would have been the strong favorite and predicted winner. Microsoft's clout would have made it the most likely candidate to be a successful challenger to Adobe. Apple's relatively small market share in the computer market would have rendered it a much less likely successful challenger.

55. Fourth, as I have written about extensively in my academic work, commercial success requires access not only to an innovative idea, but also to the complementary assets and capabilities needed to commercialize that idea, including the right to use any necessary intellectual property.[33]

56. Fifth, as noted above, industry participants are not averse to using patented technology in industry standards, whether formal interoperability standards adopted by an SSO or informal *de facto* standards, so long as licenses are available.

57. Sixth, licensing negotiations for key IP inputs during high-stakes industry transitions that have the potential for spawning new product categories, new business opportunities, or major industry shifts can result in significant royalties, as without licenses to key IP, firms risk losing out on major opportunities.

58. It is worth recognizing that this and related industries have undergone major shifts over the past decade. Microsoft, which (with the exception of its Xbox business) had previously focused on software, recently paid €5.44 billion ($7.2 billion) in cash to acquire Nokia's cellular handset business (plus a license to Nokia's patents and trademarks).[34] Apple, which had previously been a maker of computers and iPods, "came out of nowhere" to dominate the smartphone category before competition from Android-based smartphones from Samsung, HTC and others emerged. The

---

[33] See my "Profiting from Technological Innovation," *Research Policy*, Vol. 15, pp. 285-305 (1986), and my *Managing Intellectual Capital* (Oxford University Press, 2002).

[34] http://www.microsoft.com/en-us/news/press/2013/sep13/09-02announcementpr.aspx (visited November 7, 2013).

stakes are very high.   Apple's market capitalization (of $461.11 billion as of November 6, 2013) shows what is involved, especially in markets where time-to-market is a crucial element of success.


Respectfully submitted,


David J. Teece

David J. Teece

November 8, 2013