# EXHIBIT  2

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT CALIFORNIA

SAN JOSE DIVISION


EMBLAZE LTD.,

       PLAINTIFF,

       vs.                No.  5:11-CV-01079 PSG

APPLE INC., A CALIFORNIA

CORPORATION,


       DEFENDANT.

_____


VIDEOTAPED DEPOSITION OF

DAVID TEECE

Friday, January 10, 2014


Reported By:

KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR



Page 2

1                           INDEX

2                     INDEX OF EXAMINATIONS

3                                           PAGE

4     EXAMINATION BY MS. BARROWS ....................8

5     AFTERNOON SESSION ...........................90

6                     INDEX OF EXHIBITS

7     EXHIBIT           DESCRIPTION           PAGE

8     Exhibit 1    Expert Report of David J. .......31

9                  Teece

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                   DEPOSITION OF DAVID TEECE

2                   BE IT REMEMBERED that on Friday, January

3        10, 2014, commencing at the hour of 9:39 a.m.

4        thereof, at GREENBERG TRAURIG, LLP, 4 Embarcadero

5        Center, 30th Floor, San Francisco, California,

6        before me, Kathleen A. Wilkins,

7        RPR-RMR-CRR-CCRR-CLR, a Certified Shorthand

8        Reporter, in and for the State of California,

9        personally appeared DAVID TEECE, a witness in the

10       above-entitled court and cause, who, being by me

11       first duly sworn, was thereupon examined as a

12       witness in said action.

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

1                    APPEARANCES OF COUNSEL

2

3      For the Plaintiff:

4                COZEN O'CONNOR

5                (TELEPHONICALLY PRESENT)

6                BY:  LISA FERARRI, ESQ.

7                277 Park Avenue

8                New York, New York  10172

9                Telephone:  (212) 883-4994

10                E-mail:  Lferarri@cozen.com

11      For the Defendant:

12                GREENBERG TRAURIG, LLP

13                BY:  SARAH BARROWS, ESQ.

14                4 Embarcadero Center, Suite 3000

15                San Francisco, CA 94111-5983

16                Telephone:  (415) 655-1300

17                E-mail:  Barrowss@gtlaw.com

18      For the Witness:

19                DAVIS, WRIGHT, TREMAINE LLP

20                BY:  MARTIN L. FINEMAN, ESQ.

21                505 Montgomery Street, Suite 800

22                San Francisco, California  94111-6533

23                Telephone:  (415) 276-6575

24                E-mail:  Martinfineman@dwt.com

25      / /



1                    APPEARANCES

2      ALSO PRESENT:

3              Victoria Sikes, Ocean Tomo

4              Cathy Lawton, Berkeley Research Group

5              Kevin McMahon, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1      communications and computing.

2          Q.     What are untethered communications or

3      mobile communications?

4          A.     Well, mobile is basically untethered.

5      You don't need to be in a fixed location in order

6      to receive and transmit signals and to participate

7      in a network.

8          Q.     Okay.

9          A.     You can take the network with you, so to

10     speak.

11         Q.     Have you ever prepared an analysis on

12     the impact of live video streaming and the massive

13     convergence between computing and communications?

14         A.     I haven't done anything that specific.

15         Q.     Have you ever prepared an analysis on

16     live -- live video streaming?

17         A.     I haven't done anything that specific.

18         Q.     When you say "that specific," what do

19     you mean?

20         A.     Well, I haven't, for instance, published

21     an article which has live video streaming or video

22     streaming in the -- in the title.

23         Q.     Have you otherwise prepared any kind of

24     analysis that investigates either live video

25     streaming or video streaming?



1        Q.    If you look at page 3 in paragraph 10,

2    you state in the fourth sentence that -- or, I'm

3    sorry, the third sentence, a list of materials

4    that you've considered in forming my opinions in

5    this case as attached hereto as Attachment 3.  And

6    then in the next sentence it states:

7              "I have also relied on

8              discussions that my staff and I

9              had with Catherine Lawton, another

10             BRG expert, and the material she

11             cited in her report."

12             What do you mean by the phrase "the

13    material she cited in her report"?

14       A.    Well, there -- my understanding is that

15    she did a significant amount of review of the

16    public record and, you know, what trade -- excuse

17    me, what industry analysts, what the trade press

18    and other commentators refer to.

19             So I wasn't being all that specific

20    there, but I was just generally referring to the

21    fact that I'm also somewhat familiar with the

22    trade press because I do follow it to some extent.

23       Q.    So did you consider all of the documents

24    that Ms. Lawton lists on her documents reviewed

25    exhibit?



1      Q.    And when is it that you read the

2   redacted version of her report?

3      A.    Earlier this week.

4      Q.    So if you didn't read her report or the

5   materials in her report before you drafted your --

6   your report, what do you mean when you say there

7   in paragraph 10 that you relied on the materials

8   she cited in her report?

9      A.    That's probably not as artfully written

10   as it could be.  I did have some discussions with

11   Cathy Lawton.  I was generally familiar with the

12   kinds of things she was referring to.

13             And, you know, for instance, the Yoffie

14   book was something I know that she had -- had --

15   had paid attention to.  It's something that I took

16   a look at again.  So there was some amount of

17   discussion that was had between Cathy and myself

18   and my staff that gave me a feel for some of the

19   materials that she was relying on.

20      Q.    Okay.

21             So that is the basis for your statement

22   that you relied on the materials she cited in her

23   report?

24      A.    Yes.

25      Q.    What specific documents that were



1    produced by either Apple or Emblaze were most

2    relevant to your opinions?

3        A.    I didn't look at any specific documents

4    produced by Apple or Emblaze.

5        Q.    Did you review the patent-in-suit in

6    this litigation?

7        A.    Yes, I did have access to that, and I

8    think I read it online early on.

9        Q.    But that's not listed as a document you

10   relied upon in forming your opinion, correct?

11       A.    That is correct.

12       Q.    Did you speak to anyone about the

13   patent-in-suit in this litigation?

14       A.    Besides counsel, no.

15       Q.    And when you spoke to counsel about the

16   patent-in-suit litigation, how many times would

17   you estimate that you spoke to counsel about the

18   patent-in-suit?

19       A.    Maybe once.  It wasn't as to the

20   details.  I was just simply aware that there was a

21   patent litigation going on around certain Emblaze

22   patents.

23       Q.    And what was your understanding based on

24   your conversation with counsel as to what the

25   technology in the patent -- in that patent-in-suit



1      is?

2          A.     That they -- that the patents were

3      accused of -- well, excuse me -- that Apple was

4      accused of infringing Emblaze -- Emblaze's patents

5      or some of Emblaze's patents in its streaming

6      technologies, its HTTP-based streaming

7      technologies.

8          Q.     And is it your understanding that the

9      patent-in-suit -- there's only one

10     patent-in-suit -- covers all streaming, all types

11     of streaming?

12         A.     No.  As -- as I said before, I

13     understood it to be relevant only in the HTTP

14     context.

15         Q.     And is it your understanding --

16         A.     And -- and where it was streaming and

17     not -- not downloads, but streaming.

18         Q.     Is it your understanding that the

19     patent-in-suit in this case covers video on demand

20     streaming?

21         A.     No.  I -- I don't have a keen

22     understanding, but -- but I don't think it does.

23         Q.     What was -- what is your understanding

24     of what video on demand streaming is?

25         A.     Well, I suppose it depends on the type



1      of video on demand.  If it's done through a

2      download, then it's not streaming, I suppose.

3              So, look, I just don't know the answer,

4      to be -- to be honest.

5          Q.    So just to sort of summarize, your

6      understanding of the patent-in-suit is that it

7      relates to streaming technology; is that correct?

8          A.    Streaming technology that uses the HTTP

9      protocol.

10         Q.    Okay.  Did you ever speak to Ms. Lawton

11     about the patent-in-suit in this litigation?

12         A.    No.  But -- excuse me.  What do you mean

13     by "the patent-in-suit"?  I mean, obviously I'm

14     aware there's a patent-in-suit, but I didn't speak

15     to her about her reasonable royalty opinions.

16         Q.    Sure.  I guess what I meant by the

17     question, if I could rephrase it, is did you ever

18     speak to Ms. Lawton about the technology at issue

19     in the patent-in-suit in this litigation?

20         A.    Well, we certainly had discussions

21     around the general issue of streaming and -- but

22     it was at a fairly general nature.

23         Q.    Did you review any deposition testimony

24     from this litigation?

25         A.    No.



Page 49

```
 1        Q.    Did you review any of the public filings
 2   in this case?
 3             MR. FINEMAN:  What do you mean by
 4   "public filing"?
 5   BY MS. BARROWS:
 6        Q.    Some -- did you review the complaint in
 7   this case?
 8        A.    At one point, yes.  I thought I'd answer
 9   that in response to your earlier question.  I
10   think I had seen it online.
11        Q.    Well, my earlier question was whether
12   you had reviewed the patent-in-suit.  That means
13   just the actual patent document.
14        A.    Oh, okay.  Then I misunderstood.
15        Q.    Oh, I see.
16        A.    Only inasmuch as there was some
17   discussion of that, I think, in the complaint.
18        Q.    I see.  So just to go back to my earlier
19   question about whether you had reviewed the
20   patent-in-suit, you didn't actually go on, like,
21   Google Patents and look at the actual patent that
22   was filed, the issue?
23        A.    No.  I'm not a technical expert, and it
24   wouldn't necessarily convey much meaning to me.
25        Q.    Mh-hmm.  So if I understand you
```



Page 53

```
1        Q.    Do you know if Ed Sherry was on the line
2   with anybody else from your staff during those
3   conversations?
4        A.    I don't know.
5        Q.    What specific information provided to
6   you from your discussion -- your personal
7   discussions with Ms. Lawton was relevant to your
8   opinions?
9        A.    I think, you know, Cathy helped me
10  understand some of the issues that -- that were
11  relevant, I think, from -- from her perspective,
12  and -- and so I would say that the main impact was
13  that it sort of helped shaped the content and the
14  scope of -- of my report.
15            When I say "helped shape the content and
16  scope," I don't mean the details of the content,
17  but essentially the -- you know, the areas that I
18  am addressing here.
19       Q.    And what are the areas that you're
20  addressing here?
21       A.    Well, you know, I think they are
22  outlined reasonably well in my report.  But, you
23  know, to summarize it at a -- at a high level,
24  it's to lay out the parameters of -- if I could
25  use my own label, next-generation competition or
```



1    competition in industries that are deeply animated

2    by the convergence between computing and -- and

3    communications.

4              And that brings into play a number of

5    special features, such as network effects,

6    external economies, path dependencies, standards,

7    and, importantly, you know, windows of -- of

8    opportunity.

9              In these types of industries, there -- I

10   think that is Andy Grove, the CEO of Intel, who

11   coined the phrase "inflection points," or at least

12   popularized the term "inflection points."

13             And -- and when you have inflection

14   points, kind of the rules of the game change in

15   terms of factors that drive success and failures.

16   And inflections points, you better be nimble, you

17   better be prepared to -- to jump on to the

18   emerging bandwagon or you -- you suffer

19   significant negative consequences.

20             And the flip side of that, of course, is

21   that if you -- if you are able to step forward

22   when these windows of opportunity open up, you can

23   often get significant path-dependent future

24   benefits.

25        Q.    Can you recall any specific facts about



1    this case that Ms. Lawton personally told you that

2    shaped the content and scope of your opinion?

3         A.    No.  Not -- not really.  Because, as I

4    said, it was, you know, more what -- what are

5    the -- kind of the relevant background factors

6    here that eventually, you know, a jury will need

7    to understand to properly appreciate the context

8    of any future or any hypothetical licensing

9    negotiation.

10        Q.    And when you speak about the "relevant

11   background factors," do you mean the relevant

12   background factors you learned from Ms. Lawton or

13   relevant background factors you know from your

14   research as an economist?

15        A.    Well, I would say it's primarily the

16   latter, but I didn't want my testimony --

17   testimony to be shaped in a way that was unhelpful

18   to the Court, so I needed to get some overall

19   focus on the issues at hand in this litigation.

20        Q.    But you can't name -- recall any

21   specific case fact that you learned from

22   Ms. Lawton that would help to focus on the issue

23   at hand?

24        A.    Well, you know, the -- the obvious

25   points that this -- that the patents at issue



```
 1    implicated streaming, that, you know, the history

 2    seemed to indicate that Apple was a bit of a

 3    Johnny-come-lately to the streaming party, and --

 4    and that, you know, there came a point in time

 5    where -- where Apple did successfully develop

 6    software on the HTTP protocol that enabled it not

 7    to just catch up, but -- but also to get ahead

 8    in -- in video streaming.

 9             MS. BARROWS:  We've been going for a

10    little bit over an hour.  Would you like to take a

11    short break at this time?  Does that work for you

12    guys?

13             THE WITNESS:  That's fine.

14             THE VIDEOGRAPHER:  We are going off the

15    record.  The time is 10:55 a.m.

16             (Whereupon, a recess was taken.)

17             THE VIDEOGRAPHER:  We're back on the

18    record.  The time is 11:09 a.m.  This is beginning

19    of Media Number 2 in the deposition of

20    Dr. David Teece on January 10th, 2014.  Please

21    proceed.

22    BY MS. BARROWS:

23       Q.    Professor Teece, before we took a break,

24    we had talked about the conversations that members

25    of your staff had with Ms. Lawton.
```



1          What specific information provided to

2    you from your staff members from those

3    specification discussions with Ms. Lawton was

4    relevant to your opinion?

5          A.    I'm not sure it was relevant except

6    inasmuch as it helped me frame this set of issues

7    that might be useful background to the Court.  I

8    mean, obviously, the general area of the economics

9    of technological change is an extremely broad

10   area.  And I didn't want my opinions to wander

11   aimlessly across that entire scope of potential

12   issues.  I wanted to help shape my opinions so

13   they would be relevant to the issues at hand.

14          So it was primarily to get an

15   understanding of issues that would be appropriate

16   for building the relevant background.

17          Q.    And what is your opinion as to the

18   issues that might be useful background to the

19   Court in this case?

20          A.    I think I answered that in -- perhaps

21   not completely, in my response to your earlier

22   question.  But also, you know, at the end of the

23   day, at the end of my testimony here, I do have a

24   section, Section 5, Implications for Licensing the

25   '473 Patent.



```
 1    Ms. Lawton about that?
 2         A.    Apple had been extremely parsimonious
 3    with respect to documents, and I don't know much
 4    beyond that since I haven't seen what it is.  But
 5    I got a sense from her that she was of the belief
 6    that there was obviously a much richer body of
 7    documents that would -- would inform the questions
 8    that she was considering, and those documents were
 9    not provided.
10         Q.    In the course of your conversations with
11    Ms. Lawton, did you ask her for specific
12    Apple-produced documents that she was unable to
13    give you because they had not been produced?
14         A.    No.  I was not under the protective
15    order, so I couldn't see them anyway.  So I was
16    not focused on that.  That was more -- that was
17    more her domain.
18         Q.    Are you aware of whether or not you
19    could have been eligible to be under the
20    protective order in this matter?
21         A.    I think it was a matter of timing.  I
22    probably could have been eligible earlier on.
23         Q.    So let's -- let's go to that timing,
24    then.
25               When were you retained as an expert by
```



Page 64

1    Cozen O'Connor on behalf of Emblaze?

2         A.    I don't recall specifically.

3         Q.    Do you have a month?  Was it in October

4    of this year -- or, I'm sorry, October of last

5    year?  November of last year?  Sometime before

6    then?  Your report was November 8th.

7         A.    Yeah.  I believe that there was, you

8    know, a phone call sometime in the fourth quarter.

9    I don't remember when.  But -- and so I don't --

10   and I'm not even sure that a separate contract was

11   executed.

12            So I -- I don't know if there is,

13   indeed, a crisp start date.  But I didn't start

14   working on this till -- I'd have to check my -- my

15   records, but sort of the October/November time

16   frame.

17            MR. FINEMAN:  When you -- just for the

18   sake of clarity, when you say "separate contract,"

19   you mean separate from that which -- under which

20   Ms. Lawton is working?

21            THE WITNESS:  That is correct.

22   BY MS. BARROWS:

23        Q.    Okay.  So you did not start your work on

24   this case until somewhere in the October/November

25   time frame; is that correct?



Page 69

1    online to -- to check, see if there's any recent,

2    relevant press releases from Emblaze or anybody

3    else that might be pertinent.

4        Q.    Did you find any recent relevant press

5    releases that might be pertinent to this case?

6        A.    Certainly nothing that changed any of my

7    opinions.  They were not -- you know, I didn't --

8    I obviously didn't find anything that was all that

9    salutary.

10        Q.    If you could turn to Attachment 3 that

11    you just mentioned that you were reviewing in your

12    preparation.  Attachment 3 is the document you

13    relied upon in your expert report you've recently

14    reviewed.

15            Can you identify any documents in

16    Attachment 3 that discuss live streaming on mobile

17    devices?

18        A.    When you say discuss it, with a single

19    then out, like an industry analyst, my -- is that

20    your question?  Because, you know, obviously, as I

21    said, I'm looking at the background and, you know,

22    a lot of -- you know, I'm speaking mainly to

23    general principles in my report.

24            These principles implicate live

25    streaming.  But to be clear, you're asking me, is



1       Q.    Okay.

2       A.    -- a colleague at UC Berkeley.  If you

3   look at the fifth article, I believe it is.

4       Q.    Okay.

5       A.    Number 6.

6       Q.    Oh, got it.

7       A.    Article Number 6.

8             And then, again, further down, 7, 8,

9   9 -- Article Number 10.

10       Q.    What date is that?  Okay, the 99?

11       A.    Yeah.  I wouldn't say early on, but

12   mainly in the late '90s, David was, you know, I

13   think one of the quite articulate people talking

14   about convergence and the likely implications for

15   competition and for the user.

16       Q.    Is there anything else on the

17   Attachment 3 that deals with streaming video

18   generally or live streaming specifically?

19       A.    As I said, these are usually at a higher

20   level of generality than that.

21       Q.    So did you rely on any documents that

22   discuss video streaming on Apple mobile devices in

23   the forming any of the opinions in your report?

24       A.    Could I have that question again,

25   please.



Page 72

1          Q.     Sure.

2                 Did you rely on any documents that

3     discuss video streaming on Apple mobile devices in

4     the forming of any of the opinions in your report?

5          A.     Well, you know, I -- I was aware,

6     because I follow the trade press, of a whole

7     panoply of -- because I follow the trade press,

8     also follow Apple to some extent, because I find

9     it to be a most intriguing company.

10                I'm aware of the fact of, you know, the

11    iPhone, when initially launched, you know, did not

12    have streaming capabilities; that Samsung's

13    initial launch of a competitive product did.  That

14    Apple was -- was playing catch-up, and that

15    eventually, you know, got ahead with its

16    HTTP-based protocol.

17                So, you know, I haven't necessarily

18    cited everything that I've read in the past, but

19    because I actively follow the industry, I'm

20    generally familiar with the trade press and

21    analyst reports and so forth that sort of track

22    the -- track that history.

23         Q.     Are there any documents that are not

24    listed on Attachment 3 that you did, in fact, rely

25    upon in drafting your report?



1          A.    Well, I mean, let's be clear about what

2     "rely upon" means for a scholar that is kind of

3     working in this area.

4               You know, there's probably 5,000

5     articles I've read over the last 20 to 30 years,

6     if not more, that form part of my general

7     understanding of the industry.

8               Here, I'm trying to address issues at a

9     more general level and -- and, you know, was --

10    and Cathy Lawton was going to be focused more on

11    the specifics of the industry.  So I am familiar

12    with the evolution of -- of streaming to some

13    degree.  And I am familiar with -- certainly

14    familiar with the -- the launch of the iPhone, the

15    iPad, the iPod before that, and the overall story

16    about competition in mobile telephony.

17              And, you know, it's stuff I discuss in

18    classes.  I assign to my students various articles

19    that cover these topics.  So I haven't included

20    every single thing I've read because it would be

21    obviously a much more comprehensive list, and

22    this -- this report is at a general level, and so

23    I kept my references at a general level.

24         Q.    In all of those articles that you've

25    read that you just mentioned in your work in the



Page 87

1              MR. FINEMAN:  Object to the form of the
2      question.
3              THE WITNESS:  You know, I would say
4      there's some of both coming on.  But, you know,
5      live is becoming increasingly important.
6      BY MS. BARROWS:
7          Q.    What's the basis for your understanding
8      that live streaming is becoming increasingly
9      important?
10         A.    Over the years, as I read the -- the
11     trade press, and as I observe what consumers are
12     doing, when they can, you know, be it events like
13     a presidential inauguration or royal wedding or
14     news events, to the extent when there's breaking
15     news, you know, there is, in -- in our world of --
16     of untethered communications, you know, there's
17     increasing use of streaming when it's available.
18     When it's available and when it works.
19         Q.    Do you know what portion of streaming on
20     mobile devices is live?
21         A.    As I sit here right here, right now, no.
22         Q.    Do you -- could you estimate if it's
23     more than 5 percent?
24         A.    As I sit here right now, I don't know
25     for sure.



1             When you say "5 percent," you mean 5

2    percent of the value or do you mean 5 percent of

3    the hours or --

4       Q.    Five percent of the -- all the streaming

5    done on mobile devices.

6       A.    So just a time measure, in other words.

7             I don't know.

8       Q.    Do you know what portion of streaming on

9    Apple's mobile devices is live?

10      A.    No, I don't.

11      Q.    If you were to assume that Apple did not

12   support live streaming with HLS and could only do

13   video on demand, is it your opinion that

14   Microsoft's Smooth Streaming would have -- would

15   be the de facto standard?

16      A.    Could I have that question again,

17   please.

18      Q.    If you were to assume that Apple did not

19   support live streaming with HLS and could only do

20   video on demand, is it your opinion that

21   Microsoft's Smooth Streaming would have been --

22   would be the de facto standard?

23      A.    I'd have to think about that.  I don't

24   have an opinion on that as I sit here right now.

25      Q.    Would you need additional information in



1     the parties that control the content make it

2     available.

3          Q.    What is your understanding of the

4     parties that are capable of streaming live content

5     using HTTP-based protocols?

6          A.    That are capable or that actually do it?

7          Q.    That actually do it.

8          A.    I think some television stations do it.

9     Many don't.

10               As I said, I think it's an expanding

11    category.

12         Q.    Have you done any investigation in

13    connection with your report in this case on

14    that -- whether or not that is an expanding

15    category?

16         A.    I haven't focused at that level of

17    granularity, at least not to date.

18         Q.    And you have -- is that also the case

19    for -- we've been talking about streaming versus

20    video on demand on mobile devices.

21               Have you done any investigation as to

22    what portion of streaming is done on a laptop of

23    desktops that's live streaming using HLS?

24         A.    No.

25         Q.    Before we took the break, we discussed



1    was -- was in a significant competitive race.

2        Q.    And then your understanding as just --

3    just based on your recollection of that period of

4    history and the training?

5        A.    Well, as I said to you earlier, you

6    know, Apple is one of the companies that I follow.

7    The mobile telephony space is one that I pay

8    attention to, you know, not just from my

9    publications, but, you know, I'm in the classroom

10   and every student knows something about Apple, so

11   it's a good company to talk about.

12            And -- and so I have made it my point

13   over the years of doing my best to keep up with

14   the -- Apple's strategy and its -- and the

15   outcomes in the market.

16       Q.    Do you know how many Apple apps are

17   available in Apple's App Store?

18       A.    I've seen that number.  It's a rapidly

19   growing number.  It's a very impressive number,

20   but I don't remember exactly what it is.

21       Q.    Do you know if it's less than a million?

22       A.    Today?

23       Q.    (Nods head.)

24       A.    I would think it would be more, but I'm

25   not entirely sure.  I've seen those numbers on



Page 102

1     multiple occasions, but I just don't remember.

2          Q.     Okay.

3          A.     It's an impressive number.

4          Q.     An impressive number.

5                 So -- and an impressive number might be

6     something around a million?

7          A.     Well, what's impressive really is more a

8     function of what anybody else has.  And -- and so

9     it's a -- partially a relative concept.

10         Q.     And do you have any concept of whether

11    or not Apple has more or less apps than other

12    smartphone ecosystems?

13         A.     My sense is that it's ahead of the game

14    and that it's -- you know, its apps go through,

15    you know, a semi-rigorous screening process by

16    Apple, so they typically work.

17         Q.     Do you know what portion of the apps

18    available on Apple's App Store are capable of

19    streaming live streams using HLS?

20         A.     No, I don't.

21         Q.     Have you ever tried to look for that

22    information?

23         A.     No, I have not.

24         Q.     Did you ever discuss that type of

25    information with Cathy Lawton?



1      A.    That type of information?  What do you

2   mean by "type of information"?  That specific

3   ratio?

4      Q.    Yes.

5      A.    I don't remember doing so.

6      Q.    Do you know whether anyone on your staff

7   spoke with Cathy Lawton about the percentage or

8   number of apps on the App Store that uses HLS to

9   stream live video?

10      A.    No, I don't remember.

11      Q.    Do you believe that that discussion took

12   place?

13      A.    I -- I don't know.

14      Q.    Are you aware of any evidence showing

15   that the ability to play live streaming video

16   using HLS is a purchase consideration of Apple

17   iPhones?

18      A.    I think streaming -- I think there's --

19   there's, you know, certainly commentary from --

20   from analysts and people that watch purchase

21   decisions that streaming is an important attribute

22   for purchase.

23            Just how important and the distinction

24   between live and other forms of streaming, I

25   haven't seen a lot of granularity on that.  But --



1    these types of reports before.  And I've put

2    forward a number of opinions in my report.

3         Q.    I believe you testified earlier that you

4    have now read a redacted version of Ms. Lawton's

5    report?

6         A.    Correct.

7         Q.    Based on your understanding of

8    Ms. Lawton's report, how did Ms. Lawton use the

9    information in your report in arriving at her

10   reasonable royalty opinion?

11             MR. FINEMAN:  Object that that assumes

12   facts not in evidence.

13             THE WITNESS:  Yeah --

14             MR. FINEMAN:  Also calls for

15   speculation.

16             THE WITNESS:  And I'm not -- I mean,

17   she -- she obviously is, either explicitly or

18   implicitly, appealing to certain general industry

19   competitive parameters, which -- which is an area

20   that -- that I have given opinions on.  So I don't

21   know whether you would call it using my report.

22             I mean, she's using, you know, accepted

23   principles of industrial organization and

24   competitive strategy to help form her opinions.

25   Perhaps that's one way of -- of expressing it.



```
 1    But, you know, her report speaks for itself.
 2    BY MS. BARROWS:
 3        Q.    It does speak for itself.  And just to
 4    address the idea that maybe that would call for
 5    speculation, I just want to be clear I was asking
 6    that question based on your understanding how
 7    Ms. Lawton used the information in your report to
 8    arrive at her reasonable royalty opinion.
 9        A.    Yeah, "I don't know" is the answer to
10    that.
11        Q.    Did you consider whether Apple had any
12    available noninfringing alternatives to the
13    patent-in-suit when you issued your report?
14        A.    It wasn't a question I was specifically
15    asked to address.
16        Q.    Does that mean that that is not
17    something that you considered when you issued your
18    opinion?
19        A.    Well, the general idea that there might
20    be noninfringing alternatives, of course I'm
21    generally aware of.  I wasn't -- you know, I
22    didn't -- you know, I'm not talking about the
23    hypothetical negotiation.  It's not what I've
24    covered in my report.  It's not what I was asked
25    to cover.
```



1    your documents that you relied on in your report.

2             Did you look at -- so does that help

3    answer the question?

4        A.    Well, I'd answer it this way:  I mean,

5    obviously, I have relied on public domain

6    information that I've -- when I say "relied,"

7    that's informed my understanding of the space as

8    an expert over the years.

9             You know, I did give reference to

10    specific things I looked at here, and none of them

11    were from the Apple or Emblaze productions.

12       Q.    Right.  So you -- I think you testified

13    earlier that you didn't look at any Apple- or

14    Emblaze-produced documents.  Some of the documents

15    produced in litigation were not confidential or

16    AEO stamped, so you could have looked at them.

17    But you didn't look at anything specifically that

18    had a -- either Apple or Emblaze Bates stamp

19    number on it; is that right?

20       A.    That is correct.

21       Q.    And as for documents in the public

22    domain, did you look at any documents from Apple's

23    web site in forming your opinion?

24       A.    Well, I -- I mean, I did look at Apple's

25    financials.  And -- but I really didn't spend a



```
1                You don't necessarily have to be first,
2     but -- you know, Google was not the first in
3     search.  But getting a good technology implemented
4     at the right time that can enable you to ride
5     forward with the strong network effects, that's a
6     very critical -- it's a very critical factor to
7     all of its financial success.
8          Q.    What are the specific facts in this case
9     that indicate to you that a winner-take-all
10    phenomenon would result?
11         A.    Would result?
12         Q.    Did result -- does result.
13         A.    Well, that's a very complicated
14    question.  I wasn't asked to address that, but --
15    but, you know, I can answer it in a limited way.
16                You know, actually, can I have the
17    question read back, or maybe you can repeat it,
18    because there's a --
19         Q.    What are the specific facts in this case
20    that indicate to you that a winner-take-all
21    phenomenon would result?  And then you said,
22    "Would result," and then I said, "Did result."
23         A.    Well, there's many aspects to the
24    industry.  I mean, if you focus more narrowly on
25    streaming, being -- you know, having a good
```



1      Q.     Did you specifically investigate the

2    implications of live streaming on desktops for

3    this report?

4      A.     No, I didn't do a specific investigation

5    of that.  Obviously, a desktop is not compromised

6    by a small screen in the way a phone is.  And some

7    people -- you know, a desktop and laptop, should I

8    say, do -- do watch streaming that way.

9      Q.     And what is the basis of your

10   understanding that some people do watch streaming

11   on their laptop and desktop?

12     A.     General industry knowledge.

13     Q.     Is it your opinion that the accused

14   Apple devices in this case -- well, strike that.

15            Let me just start with do you know what

16   the accused Apple devices are in this case?

17     A.     They include the iPhone, the iPad, I

18   think the mini iPad.  I also think the laptop, but

19   I'm not -- I'm not entirely sure.

20     Q.     Anything else?

21     A.     Maybe the desktop too.

22     Q.     Are you aware of whether or not Apple TV

23   is accused?

24     A.     I think it might be.

25     Q.     What about any of the iPods?



Page 211

```
 1                  MR. FINEMAN:  I do have --

 2                  MS. BARROWS:  Great.

 3                  MR. FINEMAN:  -- this page.

 4     BY MS. BARROWS:

 5          Q.    Now, if you could turn to what is page

 6     44 of the Malackowski report.

 7          A.    Okay.  So what's the question?

 8          Q.    The question is do you have any

 9     criticisms of that portion of James Malackowski's

10     critique of your report?

11          A.    Well, I can make some comments.  Let me

12     pick the second question.

13                  "Mr. Teece's report is

14               entirely devoid of case-specific

15               facts that would enable such an

16               analysis."

17               I don't think that's entirely true.

18     There is reference to Apple.  There's reference to

19     some case-specific facts.  But he's right if he

20     means that I'm not doing a fully granular

21     case-specific analysis.  That's what Cathy Lawton

22     is doing.

23               As I explained, my focus is primarily at

24     the level of principle, so that I can provide

25     context.
```



Page 216

1           CERTIFICATE OF REPORTER

2           I, Kathleen A. Wilkins, Certified

3   Shorthand Reporter licensed in the State of

4   California, License No. 10068, hereby certify that

5   the deponent was by me first duly sworn, and the

6   foregoing testimony was reported by me and was

7   thereafter transcribed with computer-aided

8   transcription; that the foregoing is a full,

9   complete, and true record of proceedings.

10          I further certify that I am not of

11  counsel or attorney for either of any of the

12  parties in the foregoing proceeding and caption

13  named or in any way interested in the outcome of

14  the cause in said caption.

15          The dismantling, unsealing, or unbinding

16  of the original transcript will render the

17  reporter's certificates null and void.

18          In witness whereof, I have hereunto set

19  my hand this day:

20  _____ Reading and Signing was requested.

21  _____ Reading and Signing was waived.

22  ___x___ Reading and Signing was not requested.

23          _____

24          KATHLEEN A. WILKINS

25          CSR 10068, RPR-RMR-CRR-CCRR-CLR

