[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

MARK FOWLER (Bar No. 124235)
*mark.fowler@dlapiper.com*
ROBERT BUERGI (Bar No. 242910)
*robert.buergi@dlapiper.com*
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2214
Tel: 650.833.2000
Fax: 650.833.2001

JOHN ALLCOCK (Bar No. 98895)
*john.allcock@dlapiper.com*
ERIN GIBSON (Bar No. 229305)
*erin.gibson@dlapiper.com*
ROBERT C. WILLIAMS (Bar. No. 246990)
*robert.williams@dlapiper.com*
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: 619.699.2700
Fax: 619.699.2701

SARAH BARROWS (Bar No. 253278)
*barrowss@gtlaw.com*
STEPHEN ULLMER (Bar No. 277537)
*ullmers@gtlaw.com*
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Tel: 415.655.1300
Fax: 415.707.2010

JAMES J. DECARLO (*Pro Hac Vice*)
*decarloj@gtlaw.com*
MICHAEL A. NICODEMA (*Pro Hac Vice*)
*nicodemam@gtlaw.com*
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Tel: 212.801.9200
Fax: 212.801.6400

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., | CASE NO. 5:11-CV-01079 PSG |
| Plaintiff; | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF CATHARINE LAWTON** |
| v. | |
| APPLE INC., a California corporation, | Date: June 17, 2014 |
| Defendant. | Time: 10 a.m. |
| | Place: Courtroom 5, 4th Floor |
| | Judge: Hon. Paul S. Grewal |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................. 2

II. STATEMENT OF FACTS ................................................................................... 4

    A. The Accused Apple Products and Technology. ...................................... 4

    B. Ms. Lawton's Reasonable Royalty Analysis. ........................................ 5

    C. Ms. Lawton's Other Improper Opinions. ............................................... 7

III. LEGAL STANDARDS ........................................................................................ 8

IV. ARGUMENT ........................................................................................................ 9

    A. Ms. Lawton Violates the Correct Standard for the Entire Market Value Rule by Using an Unapportioned Base. ................................................. 9

        1. Ms. Lawton Failed to Apportion Unpatented Components By Including All Units Apple Sold in Her Product Royalty Base. ................. 12

        2. Ms. Lawton Failed to Apportion Because She Relies Upon Apple's Increase in Per-Unit Gross Margin Since Mid-2009. ................................ 15

        3. Ms. Lawton Cannot Tell the Jury Apple's Gross Profits or Revenues. ................................................................................................... 17

    B. Ms. Lawton's Analysis Is a "Black Box" Without Sound Economic and Factual Predicates. ................................................................................. 18

    C. Ms. Lawton's Opinions Based on Licenses and Damage Claims That Are Not Comparable to the Asserted Patent Should Be Excluded. ............................ 20

    D. Ms. Lawton's Other Opinions Should Be Excluded as Irrelevant and Prejudicial Mudslinging That Will Do Nothing to Assist the Trier of Fact. ......... 22

        1. Apple Did Not Make Apportionment "Impossible," And Nothing Supports Shifting the Burden of Proof on Apportionment. ..................... 22

        2. The Court Should Preclude Ms. Lawton's Other Irrelevant and Prejudicial "Opinions" Regarding the Alleged Bad Acts and Character of Apple and Steve Jobs. ......................................................... 24

V. CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964) ........................................................................................ 22

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   No. 10-cv-3428 PSG, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013) ...................... 11

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
   418 F. Supp. 2d 1021 (S.D. Ind. 2006), *aff'd* 576 F.3d 1348 (Fed. Cir. 2009)...................... 13

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
   1 Fed. App'x 879 (Fed. Cir. 2001)........................................................................ 13

*Cornell Univ. v. Hewlett-Packard Co.*,
   No. 01-cv-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008)........................... 9, 12

*Cornell University v. Hewlett-Packard Co.*,
   609 F. Supp. 2d 279 (N.D.N.Y. 2009) ................................................................ 10, 11

*Daubert v. Merrell Dow Pharms. Inc.*,
   509 U.S. 579 (1993) ................................................................................. 2, 4, 8, 9

*DSU Med. Corp. v. JMS Co., Ltd.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) .............................................................. 20

*Dynetix Design Solutions, Inc. v. Synopsis, Inc.*,
   No. 11-cv-05973 PSG, 2013 WL 4538210 (Aug. 22, 2013) .......................... 8, 15, 22

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
   744 F. Supp. 2d 870 (E.D. Wis. 2010) ................................................................ 9, 19

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)............................................................................................ 9, 20

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   438 F.3d 1354 (Fed. Cir. 2006)........................................................................... 13

*Golden Bridge Tech. v. Apple Inc.*,
   Case No 5:12-cv-4882-PSG, D.E. 471, Order Granting Def.'s Mot. to Exclude
   Opinions and Testimony of Karl J. Schulze at 10 (May 18, 2014)........................ 11

*GPNE Corp. v. Apple, Inc.*,
   No. 12-cv-02885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ............................. 9, 19, 20

*Guzik Tech. Enters., Inc. v. Western Digital Corp.*,
   No. 5:11-cv-03786-PSG, 2013 WL 6227626 (N.D. Cal. Nov. 22, 2013)............... 25

*Imagexpo, L.L.C. v. Microsoft Corp.*,
   284 F. Supp. 2d 365 (E.D. Va. 2003) ................................................................. 13

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .................................................................... passim

*Lawrence v. Raymond Corp.*,
   No. 09-cv-1067, 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011) *aff'd*, 501 F. App'x
   515 (6th Cir. 2012) ............................................................................... 9, 19

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ................................................................. passim

*Oak Indus., Inc. v. Zenith Electronics Corp.*,
   726 F. Supp. 1525 (N.D. Ill. 1989) ................................................................. 13

*Oracle Am., Inc. v. Google*,
   798 F. Supp. 2d 1111 (N.D. Cal. 2011) ............................................................. 10

*ResQNet Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ..................................................................... 21

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002) .................................................................... 8, 9

*Uniloc USA Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ................................................................. passim

*Westinghouse Co. v. Wagner Mfg. Co.*,
   225 U.S. 604 (1912) ............................................................................... 22

*Wordtech Sys. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) .................................................................... 21

**Statutes**

Patent Act of 1952, § 284 ............................................................................ 23

**Other Authorities**

Fed. R. Evid. 403 .................................................................................... 25

Fed. R. Evid. 702 ............................................................................... 4, 8, 25

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFF EMBLAZE LTD. ("EMBLAZE") AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 17, 2014, Defendant Apple Inc. shall and hereby does move for an order precluding Plaintiff Emblaze Ltd.'s damages expert Cathy Lawton from testifying at trial regarding unsupported damages theories and prejudicial evidence. This motion is based on this notice of motion, the accompanying memorandum of points and authorities in support thereof, the Declaration of Erin Gibson and exhibits attached thereto, and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.

**RELIEF REQUESTED**

1. That the Court issue an order striking Cathy Lawton's unapportioned reasonable royalty opinion that calculates damages using a royalty base including the value of unpatented components, and precluding Ms. Lawton from testifying to those opinions or otherwise testifying about an unapportioned royalty base.

2. That the Court issue an order striking Ms. Lawton's ultimate opinion regarding a $2 per-unit royalty applied to all Apple device unit sales, and precluding her testimony because it is not the product of sound methodology, but rather a "black box" selection of a royalty rate with no discernable acceptable method.

3. That the Court issue an order precluding Ms. Lawton from relying on licenses (and damage claims by Apple in other cases) that are not comparable to the asserted patent.

4. That the Court issue an order precluding Ms. Lawton from testifying at trial that "Apple's actions have made apportionment impossible" or that the "burden of apportionment shifts to the defendant" in this case.

5. That the Court issue an order precluding Ms. Lawton from testifying at trial regarding purported past bad acts or poor character of Apple and/or Steve Jobs.

/////

/////

/////

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Is Ms. Lawton's unapportioned reasonable royalty opinion, which calculates damages based upon a royalty base that includes the value of unpatented components, sufficiently relevant and reliable to satisfy the *Daubert* standard?

2.      Is Ms. Lawton's royalty rate opinion that is arrived at without the use of a discernable acceptable method, but rather drawn out of a black box, sufficiently reliable to satisfy the *Daubert* standard?

3.      Is Ms. Lawton's reliance on public licenses and damages claims from other lawsuits that are not comparable to the asserted patent sufficiently reliable and relevant to be admissible?

4.      Is Ms. Lawton an expert qualified to testify at trial regarding Apple's document production and/or the legal burden of proof on apportionment, and is her testimony that "Apple's actions made apportionment impossible," or that the "burden of apportionment shifts to the defendant" in this case, reliable and based upon sufficient facts or data, such that it would assist the trier of fact?

5.      Is Ms. Lawton's testimony that Apple and/or Steve Jobs "have always been shameless about stealing great ideas" and similar statements regarding purported past bad acts or poor character, not prejudicial and based upon sufficient facts or data, such that it would assist the trier of fact?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Emblaze's damages expert Cathy Lawton's expert report contains two general categories of inadmissible opinions.  The first category is her ultimate reasonable royalty opinion on Apple device sales, which must be stricken for three independent reasons.  First, it violates the rule that a damages expert must apportion the royalty base to remove the value of the accused product attributable to unpatented components unless the entire market value rule (EMVR) applies.  Ms. Lawton admits that the EMVR does not apply and that her opinion fails to apportion out anything for the substantial value attributable to unpatented features of the products.  Second, her opinion

violates the rule that a reasonable royalty opinion must use a discernable reliable methodology, and not arrive at a number using a "black box" approach. Ms. Lawton uses no discernable, much less reliable, methodology to arrive at her royalty rate, but rather just picks a $2 per unit number out of a wide range of data points with no explanation. Third, her opinion violates the rule that only comparable licenses be used in arriving at a royalty rate. Ms. Lawton uses public licenses and Apple's damages claim in another case based on patents which are in no way comparable to the asserted patent. The Court should strike Ms. Lawton's damages opinion on each of these grounds.

The second category of inadmissible opinion relates to mudslinging against Apple, as Ms. Lawton devotes hundreds of pages to that task in her expert report in an attempt to cure, and obscure, the flaws in her damages analysis. This category of inadmissible opinion includes two parts. The first part includes Ms. Lawton's "opinions" that "Apple's actions have made apportionment impossible." She opines that Apple must have had certain internal financial and marketing documents, that Apple must have failed to produce them in discovery, and that this failure requires that the burden of proof on apportionment shift to Apple. Setting aside the truth—which is that Apple has not withheld documents and that Ms. Lawton had more than enough information to apportion had she chosen to do so—none of these subjects are proper expert testimony in the first place. Ms. Lawton is certainly not qualified to opine as to the type of documents Apple creates or keeps, or to pass judgment on the propriety of what Apple did in discovery. Moreover, she is not a legal expert on which party bears the burden on apportionment, which is demonstrable because her burden shifting opinion is dead wrong on the law. The plaintiff bears the burden on apportionment, and the single case from 1912 she cites for her burden shifting proposition is inapplicable, as it was decided under a different statutory damages scheme than what exists today.

The second part of this category of inadmissible opinion includes Ms. Lawton's "opinions" on the character of Apple and Steve Jobs. For example, Ms. Lawton opines that Apple has "always been shameless about stealing great ideas" and repeatedly accuses Apple of copying others' technology. She concludes that Apple lives in a "reality distortion field" and that

1  Steve Jobs "had his own way with the truth." She further opines that Mr. Jobs would have been

2  personally present at the hypothetical negotiation, and that Apple has sought to "kill," "assault" or

3  "cut down" competitors. The basis for all this inflammatory, irrelevant and highly prejudicial

4  testimony is publications about Apple and Mr. Jobs, which are inadmissible hearsay, and

5  certainly not subject to the exception that they are the type of material upon which an economic

6  expert (or any expert) would commonly rely. Such inflammatory, prejudicial and irrelevant

7  testimony should be excluded.

8      In sum, Apple seeks to preclude Ms. Lawton from testifying contrary to Federal Circuit

9  precedent requiring an apportioned royalty base, a discernable and reliable methodology, and use

10  of comparable licenses to arrive at a royalty rate. Apple also seeks to preclude Ms. Lawton's

11  irrelevant and prejudicial opinions alleging Apple's actions made apportionment impossible and

12  defaming the character of Apple and Steve Jobs. Neither of these categories of opinions satisfies

13  the requirements for expert testimony set forth in *Daubert* and Federal Rule of Evidence 702.

14  **II.      STATEMENT OF FACTS**

15      **A.      The Accused Apple Products and Technology.**

16      Emblaze has accused certain Apple iPhones, iPads, Macs and other devices of

17  infringement because Apple allegedly induces infringement by encouraging users to stream live

18  video, a single feature present in those devices used by a relatively small percentage of users.

19      Emblaze's inducement claim is based on Apple technology called "HTTP Live

20  Streaming," or HLS. HLS was introduced in June 2009 with Apple's iOS 3.0 operating system.

21  Ex. 1, Expert Report of Catharine Lawton ("Lawton Report") at 20.[1] HLS was one of more than

22  100 new features added to the operating system at that time. Ex. 1, Lawton Report at 195; Ex. 2,

23  Transcript of Catharine Lawton Deposition ("Lawton Depo. Tr.") at 177:17-19 ("Apple has

24  included the HLS feature in addition to 9 -- at least 99 other features on a preexisting

25  product…"). The accused products and operating systems have hundreds of other very valuable,

26  much more frequently used features that were present before HLS was added in 2009. Indeed, it

27  _____

[1] Unless otherwise indicated, all exhibits cited herein are attached to the Declaration of Erin

28  Gibson ("Gibson Decl."), filed with this motion.

is that combination of preexisting unaccused features which revolutionized—indeed some experts say created—the smartphone and tablet markets.  Ex. 3, Expert Report of James Malackowski ("Malackowski Report") at 8.

Even HLS does more than live streaming.  It supports the far more frequently used video on demand capability.  Ex. 1, Lawton Report at 251; Ex. 3, Malackowski Report at 56. According to content delivery networks, about 95 percent of streaming content is by video on demand.  *Id.*  While no evidence in this case shows what percentage of actual Apple device owners use their devices to view live streams, one 2013 Accenture consumer survey estimates live streaming among device users generally at about 29 percent of tablet owners, 21 percent of smartphone users, and 53 percent of connected TV owners.  Ex. 1, Lawton Report at 253 & n.880 (citing Brightcove report of Accenture survey); Ex. 6 (Accenture survey).  Of the more than 960,000 applications on the Apple App Store, at most 3,300 may use HLS and thus may be capable of live streaming.  Ex. 3, Malackowski Report at 19.  ██████████████████ ████████████████████████████████████████████████ ███████████████████  Ex. 3, Malackowski Report at Exs. 4.0, 4.1.

Significantly, Emblaze accuses just five applications of infringing—a tiny fraction of the 3,300 applications that may be capable of HLS live streaming.  The Court confirmed in its recent summary judgment order that only seven accused content provider streams remain in the case, and five have been identified as accused applications.[2]  Dkt. No. 424 at 17 ("[T]he court grants partial summary judgment of non-infringement as to the unanalyzed content provider streams.").

**B.      Ms. Lawton's Reasonable Royalty Analysis.**

Although Ms. Lawton's expert report is 528 pages long, the portion of it which actually details her reasonable royalty "analysis" is relatively short.  Ex. 1, Lawton Report at 472-528. Ms. Lawton begins with a royalty base consisting of more than ██████████ units of accused products sold (iPhones, iPads, iPod touches, Apple TVs, and Macs) and more than ██████████ units of operating system software upgrades, in addition to Apple's revenue from applications

---

[2] Seven content provider streams remain for trial, including the following five applications: ABC News, PGA, MLB at Bat, NFL Preseason, and ESPN.  Dkt. No. 424 at 19, 22-23.

capable of live streaming ███████████████████████████████████

███████████████████. *Id.* at 503, Schedule 1B. From that royalty base, Ms. Lawton does not

apportion out any units or revenue. *Id.* Ms. Lawton's report and attached schedules also refer to

Apple's U.S. and worldwide gross revenues, gross margins, earnings, cash, investments, income

projections, and many other all-company financial figures. *See, e.g., id.* at 423, 435, 442, 444,

446-49, and Schedules 2A-2B, 3A-3B, 4A-4B, 5A-5B, 6A-6B, 7, 9, 10A-10C, 11A-11B, 11E,

13A, 13B, 13C, 13D, 18A-18C.

Next, Ms. Lawton turns to the royalty rate. She uses something she calls the "Income

Approach" to calculate Apple's ██████ per unit "excess gross margin," which reflects 100 percent

of Apple's increase in worldwide gross margin for all accused devices since June 2009, when

Apple first introduced the accused HLS technology. *See id.* at 500; *see also* Ex. 2, Lawton Depo.

Tr. at 173:12-21 ("That's the number that I've calculated to provide some – some anchor,

something that somebody can look to say… Is it from, you know, zero up to the total gross

margin or is it some, you know, intermediate waypoint.)"), 174:24-175:10 ("We're saying this is

a data point that shows the economic gain that Apple enjoyed in terms of increase in gross margin

after the launch of HLS."). This unapportioned per unit profit includes the value of hundreds of

unpatented components, and also includes Apple's increase in profits from reducing its costs,

among other business factors. Ex. 1, Lawton Report at 195; Ex. 2, Lawton Depo. Tr. at 177:17-

19, 119:12-14. Ms. Lawton conceded as much in her deposition: "We're not saying that -- that

██████ is attributable to the '473, that it's attributable to HLS or that it's attributable to anything

else." Ex. 2, Lawton Depo. Tr. 174:5-8, 175:2-10. However, Ms. Lawton uses Apple's

unapportioned ██████ per unit profit as a key part of her royalty rate analysis, stating "it is

reasonable to infer 'that a substantial fraction of the accused products' profits stemmed from [the

patented invention],' which in this case would refer to the ██████ excess gross margin." Ex. 1,

Lawton Report at 500.

Ms. Lawton finds other improper data points for her royalty rate analysis by relying on

public license agreements and damages claims in unrelated lawsuits, without doing any analysis

whatsoever as to whether the patents involved are comparable to the asserted patent in this case.

*Id.* at 413-17. Indeed, Ms. Lawton creates a wide range of per-unit royalty rates between $0.10 and ███. *Id.* at 525. Ms. Lawton then picks $2 per unit out of that range to use as her royalty rate—for no discernable reason and based upon no discernable method. *Id.* at 524-25; *see id.* at 505-28.

### C.    Ms. Lawton's Other Improper Opinions.

Ms. Lawton's other improper opinions fall into two categories: (1) opinions that blame Apple's discovery conduct for her failure to apportion; and (2) opinions that sling mud at Apple and Steve Jobs. The following direct quotes are exemplary, and are by no means exhaustive, given the hundreds of pages Ms. Lawton devotes to these "opinions":

**Exemplary Opinions Blaming Apple's Discovery for Failure to Apportion**

- "Given that Apple is unusually secretive, this may explain Apple's failure to provide these basic business records. … Apple has a '**playbook**,' that it keep[s] secret; '**Secrecy is a central facet of life there**.'" *Id.* at 425, emphasis in original.

- "Never, ever in 30 years has there been an experience where a party like Apple has not produced their internally prepared financial documents for the products that are accused. Never in 30 years has that happened." Ex. 2, Lawton Depo. Tr. at 38:20-24.

- Disputing Apple's opposition to Emblaze's motion to compel, which Emblaze lost: "The contentions of Apple's counsel <u>in this case</u>, however, stand in sharp contrast to the publicly available information including the testimony of Apple personnel, Apple's contentions in <u>other cases</u>, and other publicly available sources." Ex. 1, Lawton Report at 387, emphasis in original.

- "In this litigation, Apple has alleged that it does not have data regarding actual HLS use. … it is unclear why Apple would not at least have data from its own data centers." *Id.* at 261.

- "In this case, Apple has provided very limited business planning and internal financial records… . While this information was requested, Apple has not provided it in this case." *Id.* at 465.

- "For the reasons I have already explained, it is my opinion that Apple's actions have made apportionment impossible." *Id.* at 500.

**Exemplary Opinions Bashing Apple and Steve Jobs**

- "As will be discussed throughout this report, Apple's accounts of certain facts and events appear to be affected by what is known at Apple as the '**reality distortion field**.' … [I]n some cases, I have identified what appears to be the 'reality distortion field' at work." *Id.* at 5, emphasis in original.

- "Apple has acknowledged that there are not many things that it can 'legitimately claim we did first.'" *Id.* at 87.

- "[T]his is why Apple have turned into paranoid security Nazis… ." *Id.* at 184.

- "The Apple raid on Xerox PARC is sometimes described as one of the biggest heists in the chronicles of industry. Jobs occasionally endorsed this view with pride. **As he [Jobs] once said, 'Picasso had a saying 'good artists copy, great artists steal'—and we have always been shameless about stealing great ideas.'** *Id.* at 89, emphasis in original.

- "'In classic Steve [Jobs] fashion, he would agree to something, but it would never happen,' said [the head of Sony music]. 'He would set you up and then pull it off the table. He's pathological, which can be useful in negotiations.'" *Id.* at 402-03.

- When Mr. Jobs learned he could not use a clip owned by Hanna-Barbera: "'I don't care,' Jobs said. 'We're using it.'" *Id.* at 405; *see id.* at 405-06 (discussing Bob Dylan's own trademark infringement lawsuit against Apple).

- "'He [Steve Jobs] had his own way with the truth,' Gassee later remarked. 'The only way to deal with him was to out-bully him.' … I used to be an angry man myself. I am a recovering assaholic. So I recognized that in Steve.'" *Id.* at 438.

- "There is little doubt that Steve Jobs would have been personally involved in the hypothetical negotiation" because he "micromanaged to a shockingly high degree." *Id.* at 484.

## III. LEGAL STANDARDS

The court must exercise its "basic gatekeeping obligation" to ensure that Ms. Lawton's damages testimony is reliable and "tied to the relevant facts and circumstances of this particular case." *Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, No. 11-cv-05973 PSG, 2013 WL 4538210, at *2 (Aug. 22, 2013), citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 598 (1993); *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Federal Rule of Evidence 702 requires that experts base opinions on sufficient facts or data, use reliable principles and methods, and reliably apply the principles and methods to the facts of the case. Vigilance in assessing the admissibility of expert testimony is critical because of its potentially misleading and powerful influence on untrained jurors. *Daubert*, 509 U.S. at 595. Fed. R. Evid. 702; *see also Daubert,* 509 U.S. at 590. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In particular, a patent damage expert's opinions must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). The

expert's proponent has the burden of establishing admissibility. *Daubert*, 509 U.S. at 592 n. 10. As Judge Koh recently found, "[e]xperts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v. Apple Inc*., No. 12-cv-02885, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014), citing *Lawrence v. Raymond Corp*., No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) *aff'd*, 501 F. App'x 515 (6th Cir. 2012). "The Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *Id*.; *accord Fail-Safe, L.L.C. v. A.O. Smith Corp*., 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court...the court cannot simply take an expert's word for a specific proposition"). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Although the Federal Circuit allows for "some approximation" in the reasonable royalty context, this "does not negate the Federal Circuit's requirement of 'sound economic and factual predicates' for that analysis." *Cornell Univ. v. Hewlett-Packard Co*., No. 01-cv-1974, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (Rader, C.J., sitting by designation) (citing *Riles*, 298 F.3d at 1311, and granting-in-part HP's *Daubert* motion).

## IV.    ARGUMENT

### A.    Ms. Lawton Violates the Correct Standard for the Entire Market Value Rule by Using an Unapportioned Base.

In *LaserDynamics,* the Federal Circuit reaffirmed it is improper to include the entire market value of accused products in the royalty base unless the patentee proves that the "patented feature drives the demand for [the] entire multi-component product." *LaserDynamics*, 694 F.3d at 67. The EMVR is a "narrow exception" to the general rule that a damages expert may include only revenues attributable to the allegedly infringing feature in his or her royalty base. *Id*.

Here, Ms. Lawton admits that live streaming "clearly is not 'the basis for customer demand,'" and thus EMVR is inapplicable. Ex. 1, Lawton Report at 503. She testified: "We're not saying this is the feature that drives demand. Not anything close to that." Ex. 2, Lawton Depo. at 175. Yet, Ms. Lawton totally ignores the prohibition on relying on the entire market

1  value, instead arguing that the accused products are already the smallest saleable patent-practicing

2  units and "Apple's actions have made apportionment impossible." Ex. 1, Lawton Report at 500.

3  This is flatly impermissible. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332-33 (Fed.

4  Cir. 2009) (requiring apportionment for multi-component software product); *Oracle Am., Inc. v.*

5  *Google*, 798 F. Supp. 2d 1111, 1115-16 (N.D. Cal. 2011) ("The fact that Java may be a critical

6  component of Android does not justify application of the entire market value rule."); *Cornell*

7  *University v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88, 290 (N.D.N.Y. 2009)

8  (rejecting Cornell's argument that royalty base must reflect what HP actually sold).

9  In *LaserDynamics*, the Federal Circuit rejected a similar argument. There, the patentee

10  contended that it needed to use total revenues from the entire product in its royalty base due to the

11  "practical and economic" difficulties of apportioning revenue for the alleged infringing optical

12  drives. *LaserDynamics*, 694 F.3d at 67. The Federal Circuit disagreed because the argument

13  failed to address the EMVR's "fundamental concern" that "permitting [the patentee] to use a

14  laptop computer royalty base does not ensure that the royalty rate applied thereto does not

15  overreach and encompass components not covered by the patent." *Id.* at 70. A court cannot

16  excuse a failure to apportion the royalty base out of purported practical necessity. *Id.*

17  In *Cornell University v. Hewlett-Packard Co.*, the court rejected a different but equally

18  pertinent impossibility argument. Cornell argued that it could not rely upon a processor-only

19  royalty base, or even the higher CPU brick[3] royalty base the court eventually struck, because HP

20  typically sold servers and workstations—not their components. 609 F. Supp. 2d at 287, 289-90.

21  Thus, Cornell argued, the record only supported a royalty base of server and workstation revenue

22  and any further apportioned royalty base was not possible. "As counsel for Cornell put it, 'One of

23  the problems we face here, your Honor, is if we move outside of the server workstation market,

24  we don't have one.'" *Id.* at 287. Chief Judge Rader, sitting by designation, required Cornell to

25  /////

26

27  [3] HP's "processors are a part of CPU modules that, when combined with a temperature
controlling thermal solution, external cache memory, and a power converter, make up CPU
bricks." *Id.* at 283, internal quotations omitted.

28

rely upon a further apportioned royalty base, even though it had to be derived from the processors' estimated, not actual, value. *Id.* at 289-90.

> [T]he damages equation is not based on Hewlett–Packard's earnings, but instead on the compensation due to Cornell for infringement. Because the entire server did not infringe, Cornell needs to provide some reason to extend its damages to features and components not encompassed within the claimed invention.

*Id.* at 290.

Similarly here, Ms. Lawton uses all iPhone, iPad, iPod Touch, Apple TV, Mac and operating system upgrade units in her royalty base, claims those are the smallest saleable units, and eschews further apportionment of the royalty base. She fails to apportion out the value of hundreds of very important features in those products that are unrelated to the patented feature and contribute to demand for the products. Ms. Lawton failed to apportion by: (1) using a royalty base that includes sales of all Apple units; (2) citing Apple's gross revenue figures; and (3) using Apple's ███ entire per unit increase in gross margin since June 2009 in her royalty rate analysis. Each of these expressions of the royalty base must be reduced to account for the value of features not covered by the patent in suit. Indeed, the Court recently granted a motion to exclude expert testimony where the expert did not apportion the royalty base to account for non-patented features of accused products. *Golden Bridge Tech. v. Apple Inc.*, Case No 5:12-cv-4882-PSG, D.E. 471, Order Granting Def.'s Mot. to Exclude Opinions and Testimony of Karl J. Schulze at 10 (May 18, 2014) ("[T]he Court cannot square this no-base-apportionment, no-demand-analysis methodology with *Lucent's* central holding.").

In sum, "[i]n light of the Federal Circuit's guidance that juries should not be presented with entire revenues or profits absent sufficient proof that the entire market value rule is appropriate," testimony regarding unapportioned royalty figures is unreliable as a matter of law under *Lucent* and *LaserDynamics* and must be excluded from trial. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-cv-3428 PSG, 2013 WL 831528, at *15 (N.D. Cal. Jan. 10, 2013) (vacating jury award and granting new trial on damages).

/////

/////

**1. Ms. Lawton Failed to Apportion Unpatented Components By Including All Units Apple Sold in Her Product Royalty Base.**

Ms. Lawton's product royalty base includes more than ███████ units of all accused products sold (iPhones, iPads, iPod touches, Apple TVs, and Macs) and more than ███████ units of accused operating system software upgrades, in addition to all revenue from applications capable of live streaming.  Ex. 1, Lawton Report, Schedule 1A.  However, under *LaserDynamics* and *Cornell*, the individual software applications that are sold on the Apple App Store that rely on HLS and are capable of live streaming constitute smallest salable units much more closely tied to the accused functionality.  *See* Ex. 3, Malackowski Report at 64.  Indeed, Ms. Lawton opines Emblaze should be awarded one percent of this application revenue royalty base, an opinion the present motion does not challenge.  Ex. 1, Lawton Report at 528.

However, Emblaze was not content with a damages claim of one percent of that smallest salable unit royalty base.  Instead, Ms. Lawton used a royalty base of all Apple device unit sales and operating system upgrade sales, and applied her $2 per-unit rate equally to every unit sold.

This is a fundamental error.  The royalty base cannot consist of every unit sold when Emblaze: (1) only accuses Apple of indirect infringement; (2) does not allege that every accused Apple device is used to directly infringe; (3) is bound by a summary judgment order that only seven accused streams constitute Emblaze's total evidence of direct infringement; and (4) ignores record evidence that the percentage of users who actually use the infringing feature is small—a fraction of Ms. Lawton's total royalty base.  Indeed, other than a small handful of users, Emblaze has not introduced any actual evidence "describ[ing] how many…users [have] ever performed the patented method or how many times."  *Lucent*, 580 F.3d at 1334-35.  Thus, Emblaze has not only failed to establish the number or frequency of direct infringement, it has used an all-unit royalty base that is flatly contradicted by the record evidence and the court's summary judgment order.

Allowing Ms. Lawton to testify using a royalty base of all units would be an error in this case.  The proof required to establish liability for induced infringement is vastly different than the proof required to justify an inducement damages award.  "Although a single direct act of infringement is sufficient to satisfy the inducement of infringement analysis, a separate damages

analysis must still be performed." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 1 Fed. App'x 879, 882 (Fed. Cir. 2001) (examining the issue in a lost profits context). Thus, in *Lucent*, the Federal Circuit vacated a damages award where there were extensive sales but "[n]o evidence describ[ing] how many…users had ever performed the patented method or how many times." *Lucent*, 580 F.3d at 1334-35.

*Lucent* involved a claimed method for entering information into fields on a computer screen without using a keyboard. *Lucent*, 580 F.3d at 1308. Lucent alleged that end users' use of Microsoft software on Gateway computers directly infringed. *Id.* at 1308-09. The Federal Circuit addressed *Georgia-Pacific* factor 11, "the extent of direct infringement," and found the record "conspicuously devoid of any data about how often consumers use the patented [] invention." *Id.* at 1334. The Federal Circuit recognized that it had "never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence." However, the court found a reasonable royalty for inducement must be tied to the prevalence of underlying direct infringement. *Id.* at 1334 ("The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers.").

Other cases similarly support that, where only a percentage of accused units ever allegedly infringe the asserted patent, a royalty base cannot include all units sold, because that would compensate the plaintiff for non-infringing sales and uses. *See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021 (S.D. Ind. 2006), *aff'd* 576 F.3d 1348, 1358-59 (Fed. Cir. 2009) ("Absent proof that St. Jude's devices were programmed for and actually executed the claimed method, CPI may not recover damages for the sales of devices merely capable of infringing."); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1372-73 (Fed. Cir. 2006) (damages award must be reduced by number of units returned without being assembled into infringing product); *Imagexpo, L.L.C. v. Microsoft Corp.*, 284 F. Supp. 2d 365, 369-70 (E.D. Va. 2003) (where not every sale leads to direct infringement, plaintiff must establish the connection between sales and direct infringement to establish damages for indirect infringement); *Oak Indus., Inc. v. Zenith Electronics Corp.*, 726 F. Supp. 1525, 1543-44 (N.D. Ill. 1989) (damages must be apportioned between infringing and non-infringing uses).

The problem is magnified here, where for asserted method and apparatus claims, not every Apple accused product sold will result in an alleged infringement and where hundreds of unaccused features help drive demand for the accused products. Ms. Lawton has done nothing to take this into account. Instead, Ms. Lawton ignores the scarcity of alleged underlying direct infringement, and merely claims that "Apple has made significant use of the '473 Patent that includes: hosting live streaming events, promoting live streaming which was an important feature." Ex. 1, Lawton Report at 519. These are qualitative—not quantitative—considerations that do nothing to correlate the damages award "to the extent the infringing method is used by consumers." *Lucent*, 580 F.3d at 1334. Ms. Lawton cannot include all unit sales as a result of Emblaze asserting apparatus claims, either. In this case, the accused Apple products themselves cannot be capable of infringing, because third parties' actions and equipment (such as transmitting computers and servers) also are required to infringe. Moreover, the actual evidence in the record contradicts Ms. Lawton's qualitative opinions. For example, Emblaze cites a multinational Accenture survey showing that 29 percent of tablet owners watch live streaming video on their tablet devices and only 21 percent watch live events on their mobile device or smartphone. Ex. 1, Lawton Report at 253.[4] Her opinion relying upon a royalty base of all accused Apple device unit sales violates *Lucent* and other precedent, and must be excluded.

Importantly, since *Lucent* was decided in 2009, the Federal Circuit clarified in *Uniloc* that "[t]he Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." *Uniloc*, 632 F.3d at 1319-20 (explaining that statements in *Lucent* suggesting otherwise were taken out of context). Under *Uniloc*, merely adjusting the royalty rate using *Georgia-Pacific* factor 11 cannot properly apportion a royalty base that includes so many sales that will never result in direct infringement. But in any event, Ms. Lawton does not use factor 11 to decrease, but rather uses it to increase, the royalty rate applied to all unit sales in this case.

---

[4] Ms. Lawton did not conduct or commission her own surveys of Apple device users, and Apple does not track HLS or live streaming usage by its customers. Therefore, actual statistics for live streaming on all accused Apple devices do not exist in this case.

Ex. 1, Lawton Report at 518-19.  Ms. Lawton has done nothing to attempt to apportion or otherwise account for unit sales that will never result in a direct infringement, despite Emblaze accusing only a handful of applications of infringement and despite that relatively few end users will ever use these applications (or any other application) to perform live streaming on Apple devices.  Her testimony regarding a royalty base of all Apple device unit sales should be excluded as a result.

> **2.      Ms. Lawton Failed to Apportion Because She Relies Upon Apple's Increase in Per-Unit Gross Margin Since Mid-2009.**

Ms. Lawton also violates the apportionment rule with her unreliable "Income Approach" valuation analysis that she claims values the benefits of the accused technology to Apple. Ms. Lawton begins by calculating an unapportioned ███ per unit gross margin, which reflects 100 percent of Apple's increase in worldwide gross margin since mid-2009.  Ex. 1, Lawton Report, Schedule 18A.  Next, Ms. Lawton opines "it is reasonable to infer 'that a substantial fraction of the accused products' profit stemmed from [the patented invention],' which in this case would refer to the ███ excess gross margin."  *Id.* at 500.  This inference is based upon her opinion that live streaming was important, and is unsupported by reliable facts or data. Regardless, any testimony regarding Apple's unapportioned gross margin is improper.

In *Dynetix*, the plaintiff wrongly relied upon a royalty base that included sales data for defendant's entire product because the defendant had not separately sold any smaller components. *Dynetix*, 2013 WL 4538210, at *1.  The Court excluded the plaintiff's expert's opinion as "fundamentally flawed" because he "relied on the blanket assumption that, once he selected the smallest salable unit…he could end the analysis… ."  *Id.* at *4.  The Court cited *LaserDynamics* as supporting the premise that apportionment is required "even where the accused product is the smallest salable unit or where…the smallest salable unit it is still a multi-component product encompassing non-patent related features."  *Id.* at *3.  The Court saw "no logical basis to depart from an apportionment requirement in a case, such as the present one, where the alleged smallest salable unit is not closely tied to the patented feature."  *Id.*

/////

1    Similarly here, Ms. Lawton's reliance on Apple's unapportioned gross margins is

2    "fundamentally flawed."  No evidence supports that Apple's gross margins on iPhones, iPads,

3    iPod touches, Apple TVs, Macs and operating system software upgrades are driven by the

4    patented live streaming feature, because they are not.  Ms. Lawton even admits that the ███

5    per unit figure "does <u>not</u> measure the contribution of the '473 Patent alone."  Ex. 1, Lawton

6    Report at 467, emphasis in original.  Yet Ms. Lawton relies upon this unapportioned gross margin

7    figure to support her reasonable royalty analysis in several improper ways.  First, Ms. Lawton

8    uses the ███ per unit figure as a "ceiling" and an "anchor" on the royalty rate she says the

9    parties would consider at the hypothetical negotiation.  *Id.* at 466-67; Ex. 2 at 173:12-21.  Second,

10   Ms. Lawton uses the ███ per unit figure as a check to provide "additional economic data that

11   would inform the hypothetical negotiation."  *Id.* at 467.  Third, Ms. Lawton awards Emblaze a

12   very large fraction of the ███ per unit figure (about ██ percent) after giving lip service to the

13   *Georgia-Pacific* factors, opining "it is reasonable to infer 'that a substantial fraction of the

14   accused products' profit stemmed from [the patented invention],' which in this case would refer

15   to the ███ excess gross margin."  *Id.* at 500.  In other words, she treats the ███ figure as an

16   unapportioned royalty base, and then awards Emblaze a substantial fraction of that base based

17   upon the accused technology's purported value to Apple.

18   The *Uniloc* case bars Ms. Lawton's approach.  There, the Federal Circuit cautioned

19   against allowing revenue figures including unpatented components to reach the jury, finding the

20   "disclosure that a company has made [billions] in revenue from an infringing product cannot help

21   but skew the damages horizon for the jury, regardless of the contribution of the patented

22   component to this revenue."  *Uniloc*, 632 F.3d at 1320-21.  The Federal Circuit also rejected

23   using such revenue figures as a "check," since that would tend to lend legitimacy to the plaintiff's

24   inflated damages calculation.  *Id.*  Similarly here, Ms. Lawton may call the ███ per unit figure

25   a ceiling for a reasonable royalty rate or a check, but it is nothing other than an improper

26   unapportioned royalty figure intended to skew the jury's consideration of a damages award.

27   To the extent Ms. Lawton claims her "income approach" valuation analysis helps apportion

28   the royalty base, it is an unreliable and inadmissible apportionment methodology that the Court

should exclude from trial. In order to conclude that a "substantial fraction" of the ███ in increased per unit gross profits is attributable to Apple's use of the '473 patent, Ms. Lawton should have performed some analysis of factors driving Apple's company-wide increased gross margin. Factors could include the hundreds of desirable features Apple introduced in its products during the same time period, Apple's introduction of the iPad that created the tablet market, changing geographic distribution of sales, changing economic conditions, and supplier and assembly partners' improved pricing since June 2009. Ms. Lawton does not examine even one of these factors before concluding that a "substantial fraction" of Apple's increased gross profits since June 2009 was derived from using the '473 patent. Instead, Ms. Lawton opines regarding "four very valuable" qualitative benefits that Apple allegedly derived from using the '473 patent.

As set forth in greater detail below, none of these "four very valuable benefits" has any bearing on the value of the '473 patent to Apple, because none is sufficiently tied to Apple's alleged use of live streaming technology. In *LaserDynamics*, the Federal Court rejected similar methodology relying on "vague qualitative notions of the relative importance of the [accused] technology." *LaserDynamics*, 694 F.3d at 69. The court reasoned that "[w]hether called 'product value apportionment' or anything else, the fact remains that the royalty was expressly calculated as a percentage of the entire market value of a laptop computer rather than a patent-practicing [optical disk drive] alone." *Id*. at 68. Similarly here, Ms. Lawton cannot testify that Emblaze deserves a "substantial fraction" of Apple's ███ per unit unapportioned incremental gross profits. The Court should preclude all evidence of unapportioned revenues from trial.

### 3. Ms. Lawton Cannot Tell the Jury Apple's Gross Profits or Revenues.

Ms. Lawton's report and attached schedules improperly refer to Apple's U.S. and worldwide gross revenues, gross margins, earnings, cash, investments, income projections, and many other unapportioned financial figures. *See, e.g.*, Ex. 1, Lawton Report at 423, 435, 442, 444, 446-49, and Schedules 2A-2B, 3A-3B, 4A-4B, 5A-5B, 6A-6B, 7, 9, 10A-10C, 11A-11B, 11E, 13A, 13B, 13C, 13D, 18A. The chart below is one example among many:

/////

/////

**Apple's U.S. Sales Revenue and Standard Cost of Accused Devices**

| Revenue | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 |
|---|---|---|---|---|---|
| iPhone | | | | | |
| iPod touch | | | | | |
| iPad | | | | | |
| Mac | | | | | |
| Apple TV | | | | | |

*Id.* at 447.

Any of these ████████████████ figures threaten to "skew the damages horizon for the jury" and must be excluded. *LaserDynamics*, 694 F.3d at 68, quoting *Uniloc*, 632 F.3d at 1320 ("the $19 billion cat was never put back into the bag" and neither cross-examination nor a jury instruction could offset resulting prejudice). Ms. Lawton should not be permitted to make an end-run around the law by giving the jury tools to calculate Apple's unapportioned revenue, either. For example, Ms. Lawton's ████ per unit increase in gross margins, when multiplied by Apple's accused product device units sold of ████████ (*see* Ex. 1, Lawton Report, Schedule 18A), easily multiplies to more than ████████ in unapportioned increased profits. "Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to patent a patentee's proffered damages amount appear modest by comparison… ." *LaserDynamics*, 694 F.3d at 68. Unapportioned Apple financial figures have no place before the jury at trial. *Id.*

**B.      Ms. Lawton's Analysis Is a "Black Box" Without Sound Economic and Factual Predicates.**

Ms. Lawton concludes her scant analysis by opining that Emblaze deserves $2 per unit (plus 1 percent of application revenue) to compensate Emblaze for the benefits Apple allegedly received from live streaming:

> In this case, "The *Georgia-Pacific* Range Factors" suggest a very general minimum range from **$0.10 to $3.10 per unit to** ████, with an expected rate— due to the impossibility of apportionment—towards the lower end of the range.

Ex. 1, Lawton Report at 524, emphasis in original.

Ms. Lawton provides no rationale at all for how she picked this $2 per unit royalty rate out of her wide range of data points from $0.10 to ████. Instead, she includes a chart listing those

data points ("$0.10 to $3.10"; and "███████") next to some *Georgia-Pacific* factors. Next to factor 15, the "amount Emblaze and Apple would have agreed upon at the time infringement began," she states: "A range of $0.10 per unit to ██████ per unit, and would have agreed to a reasonable royalty of $2.00 per unit for hardware and 1% of revenue for software and applications." Ex. 1, Lawton Report at 525. Next, she reiterates general qualitative factors that streaming media was important to Apple and "the economic stakes were very high." *Id.* at 527-28.

As in *LaserDynamics,* Ms. Lawton's royalty rate "appears to have been plucked out of thin air based on vague qualitative notions of the relative importance of the [accused] technology." *LaserDynamics*, 694 F.3d at 69. Ms. Lawton's black box reasonable royalty opinion, based upon a theoretical royalty rate applied to an unapportioned royalty base, is entirely unreliable and inadmissible as a result.

Judge Koh's recent order striking the damages testimony of the plaintiff's expert in *GPNE Corp. v. Apple Inc.* is on point. Indeed, Ms. Lawton's approach is more flawed than the expert's approach in GPNE. GPNE's damages expert used financial documents produced in discovery to calculate a $86 per unit average net incremental profit, which he attributed to the Apple devices' accused cellular capability. *GPNE Corp.*, 2014 WL 1494247, at *3. The expert recited a number of qualitative factors regarding the importance of cellular technology "before simply concluding that Apple and GPNE would agree to a per unit royalty of $1 per accused device." *Id.* at *2. Judge Koh struck his testimony on several independent grounds, finding that the expert "attempts no apportionment analysis" and "cloaks his lack of a methodology in a list of considerations that relate to the value of 3G and 4G LTE technology generally." *Id.* at *5. The court further found:

> Experts must follow some discernable methodology, and may not be "a black box into which data is fed at one end and from which an answer emerges at the other." *GPNE Corp. v. Apple Inc.,* No. 12-CV-02885, April 16, 2014 Order at 7, citing *Lawrence v. Raymond Corp*., No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) aff'd, 501 F. App'x 515 (6th Cir. 2012). "The Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *Id.*; *accord Fail-Safe, L.L.C. v. A.O. Smith Corp*., 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court...the court cannot simply take an expert's word for a specific proposition").
> ...
> Mr. Dansky's derivation of the $1 per unit royalty from Apple's average net incremental profit "is classic *ipse dixit*" reasoning, "[p]icking th[e] million dollar

number." *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1158 (N.D. Cal. 2003). The analytical gap between Apple's profits and Mr. Dansky's royalty figure "is simply too great." Gen. Elec., 522 U.S. at 146.

*Id.* at *4-5.

Ms. Lawton's wide analytical gap and apportionment violation are more severe. Where the GPNE expert calculated per unit profit attributable to the accused functionality (*id.* at *2), Ms. Lawton calculates Apple's <u>entire</u> ▇▇▇ per unit incremental profit since mid-2009. Ex. 1, Lawton Report at 465-67. Ms. Lawton does not disclose any methodology that allowed her to pluck the $2 per unit royalty out of her $0.10 to ▇▇▇ royalty rate range, either. Ex. 1, Lawton Report at 525-28. Instead, Ms. Lawton relies upon qualitative value factors nearly identical to those considered by the GPNE expert and rejected by the court, including: (1) Apple allegedly would have lost critical market share without a license; (2) Apple allegedly needed the accused technology to compete; (3) the per-unit royalty "is only a fraction of [Apple's] overall profit earned on an infringing device"; and (4) Apple allegedly understood the importance of the accused technology to its overall business and the high market demand. *Compare GPNE Corp.*, 2014 WL 1494247, at *3 *with* Ex. 1, Lawton Report at 500, 527-28. Ms. Lawton concludes that the *Georgia-Pacific* factors "suggest a very general minimum range from $0.10 to $3.10 per unit to [▇▇▇], with an expected rate—due to the impossibility of apportionment—towards the lower end of the range." Ex. 1 at 524, emphasis omitted. Thus, as in *GPNE*, cross-examination cannot cure the deficiencies in Ms. Lawton's analysis because she simply states that live streaming is valuable and that apportionment is impossible. Nor can Ms. Lawton cloak her unreliable methodology in a list of considerations that relate to the value of live streaming generally. The Court should exclude her testimony from trial.

**C.      Ms. Lawton's Opinions Based on Licenses and Damage Claims That Are Not Comparable to the Asserted Patent Should Be Excluded.**

In determining a royalty rate, Ms. Lawton improperly considers several types of license agreements that are irrelevant, and her opinions regarding these particular licenses should be excluded. The Federal Circuit has held repeatedly that evidence of royalty rates from licenses without a relationship to the claimed invention cannot form the basis of a reasonable royalty

calculation. *ResQNet Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010); *see Lucent*, 580 F.3d at 1327 (an expert may not rely on license agreements that are "radically different from the hypothetical agreement under consideration" to determine a reasonable royalty); *see also Uniloc*, 632 F.3d at 1318 ("[E]vidence purporting to apply to [the *Georgia-Pacific* factors], must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."). Ms. Lawton's opinions do not come close to meeting these standards.

First, Ms. Lawton relies upon public information from other lawsuits having nothing to do with the accused technology in this case. For example, Ms. Lawton relies upon a public trial exhibit from an *Apple v. Samsung* case tried in this district to opine that Apple "claimed reasonable royalties of $2.05 per unit and $3.10 per unit in connection with three patents it asserted against Samsung." Ex. 1, Lawton Report at 415-16. It is not appropriate for a damages expert to use the opinion of another damages expert from an unrelated patent case to arrive at a royalty rate simply because both cases involved the same party. *See Lucent*, 580 F.3d at 1327. Ms. Lawton also relies on irrelevant public information from the *Apple v. Motorola* lawsuit to opine that Apple paid $1 per phone to Motorola for the use of Motorola's standards-essential patents. Ex. 1, Lawton Report at 413-15. Ms. Lawton uses the per-unit *Samsung* and *Motorola* litigation amounts as data points in her royalty rate analysis without doing anything to establish they are technically and economically similar to the facts of this case. *Id.* at 413-17, and Schedule 17A; *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) ("[C]omparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them."), quoting *ResQNet*, 594 F.3d at 873. Accordingly, this information should be excluded from trial.

Second, Ms. Lawton relies upon various websites for information on alleged royalty rates associated with licenses to standards-essential technology, including MP3, MPEG-4 and AVC/H.264. *Id.* at 456-463, and Schedule 17A. However, Apple produced its actual license agreements for these technologies in this case. Ex. 3, Malackowski Report at 85-86. Ms. Lawton should be precluded from opining that unreliable public information about licenses to MP3,

1  MPEG-4 and AVC/H.264 standards-essential technology would inform the hypothetical

2  negotiation and influence the proper royalty rate, when Apple entered into actual license

3  agreements to use this technology.

### D. Ms. Lawton's Other Opinions Should Be Excluded as Irrelevant and Prejudicial Mudslinging That Will Do Nothing to Assist the Trier of Fact.

#### 1. Apple Did Not Make Apportionment "Impossible," And Nothing Supports Shifting the Burden of Proof on Apportionment.

7  Recognizing she is on shaky ground, Ms. Lawton claims Apple made it "impossible" for

8  Emblaze to apportion by not producing certain types of documents in discovery. Ex. 2, Lawton

9  Depo. at 141; Ex. 1, Lawton Report at 500. Specifically, Ms. Lawton opines:

> In this case, Apple has provided very limited business planning and internal financial records which typically provides the information and data that forms the basis for Income Approach methods. While this information was requested, Apple has not provided it in this case. This case is further complicated by the fact that Apple introduced HLS as part of iOS 3.0, which included more than 100 new features. In view of these facts, it is my opinion that it is impossible to make a further apportionment.

> I also understand that in circumstances in which the accused infringer has made apportionment impossible, the burden of proving apportionment shifts to the infringer.

16  Ex. 1, Lawton Report at 465. This is just one of perhaps 100 statements in Ms. Lawton's report

17  attempting to blame Apple's document production, or 30(b)(6) deposition testimony, for her

18  failure to apportion. *See* **Section II.B.**, *supra*, collecting exemplary citations.

19  Ms. Lawton's position is unsupportable. It is black letter law that "[t]he burden of

20  proving damages falls on the patentee." *Dynetix*, 2013 WL 4538210, at *2, quoting *Lucent*, 580

21  F.3d at 1324 and *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964).

22  As *LaserDynamics* held, a difficult apportionment case is not an impossible one. *LaserDynamics*,

23  694 F.3d at 66. The one case Ms. Lawton relies on is inapposite. Ex. 1, Lawton Report at 465-

24  66, citing *Westinghouse Co. v. Wagner Mfg. Co.*, 225 U.S. 604, 621-22 (1912). *Westinghouse*

25  was decided under a different statutory patent damages scheme, and thus its holding and its

26  rationale are inapplicable. In 1912, the patent laws allowed a plaintiff to recover the infringer's

27  profits, and thus the plaintiff in *Westinghouse* sought precisely that. *Id.* at 614 ("Where the

28  infringer has sold or used a patented article, the plaintiff is entitled to recover all of the profits.").

The plaintiff established the legal requirement to show profits had been made by using the patented invention, but none of the defendants' witnesses was able to show what profits were made or what part of the profits were attributable to the patent as opposed to any valuable additions. *Id.* at 618. Thus, the court found that the burden shifted to the defendant to show it had profits not attributed to the patented invention. *Id.* at 621-22. The damages law changed with the Patent Act of 1952, which introduced Section 284 and reasonable royalty damages. No case since 1952 has applied this burden-shifting doctrine.

Moreover, Ms. Lawton's "opinions" on this subject are counter to this Court's actual rulings. For example, Emblaze moved to compel production of license agreements, trial transcripts, trial exhibits and other evidence from the *Apple v. Samsung* case, but the Court ruled against Emblaze because Emblaze failed to articulate any relevancy of the information sought. *See* Dkt. No. 296 at 39-40; Dkt. No. 294 at 3. Yet, Ms. Lawton uses the "fact" that "Apple did not produce these documents" to justify her burden shifting opinion. Ex. 1, Lawton Report at 415-16. Similarly, Emblaze moved to compel Apple to produce internal marketing valuations of HLS, but the Court ruled that Apple could not be compelled to produce HLS marketing documents that did not exist. Dkt. No. 294. Yet, Ms. Lawton uses the fact that marketing documents were not produced to justify her opinion. Ex. 1, Lawton Report at 377. Relying on assertions made in failed discovery motions cannot excuse a proper apportionment analysis.

In any event, Ms. Lawton did not need the documents she complains about to perform a proper apportionment analysis. As Ms. Lawton admits, "Apple introduced HLS as part of iOS 3.0, which included more than 100 new features." *Id.* at 465. HLS itself was an "incremental addition" since Apple devices already had video capabilities. Ex. 2, Lawton Depo. at 164:21-165:5. Thus, "[c]learly the incremental change in the feature set was to make available live streaming." *Id.* at 167:3-6. The accused Apple products are some of the most well-known consumer products in the world, both to consumers and to third-party analysts. To value the "incremental change in the feature set," Ms. Lawton could have conducted a consumer survey or used industry reports regarding which features drove purchasing decisions, which new features Apple customers actually use and how often, and whether customers value live streaming or not

(as opposed to video on demand or any other unpatented features). Ms. Lawton's report contains almost 30 pages of text regarding surveys and third-party reports on live streaming usage (Ex. 1, Lawton Report at 249-78), but she chose not to use that information to apportion the value of unpatented features from her chosen royalty base, either. Nor did she look at documents Apple produced regarding why customers purchase accused devices—perhaps because these Apple internal documents do not mention HLS at all. *See* Ex. 4, APPLE283786-836, at 283789; Ex. 5, APPLE283985-4035, at 284021 and 284023.

The simple fact is that Emblaze and Ms. Lawton did not apportion unpatented features from the royalty base because any proper apportionment analysis would have resulted in a much lower damages demand than the ███████████ number proposed. In fact, as discussed above, Ms. Lawton did use the smallest saleable unit—revenue from sales of applications capable of live streaming—in rendering one of her damages opinions. Apple is not challenging this opinion in this motion. But because that opinion is too low for their purposes, Emblaze and Ms. Lawton have sought to proffer an additional, improper opinion using a much larger unapportioned royalty base, which should be precluded.

> **2.      The Court Should Preclude Ms. Lawton's Other Irrelevant and Prejudicial "Opinions" Regarding the Alleged Bad Acts and Character of Apple and Steve Jobs.**

The Court should preclude Ms. Lawton from testifying regarding alleged past misconduct and the alleged poor character of Apple and Steve Jobs. These "opinions" primarily are in the form of extensive quotations from books and articles, are irrelevant to reasonable royalty damages, and amount to nothing more than unfair and prejudicial mudslinging. Exclusion of these "opinions" is particularly appropriate given this Court's grant of summary judgment of no willful infringement. Thus, Ms. Lawton's hundreds of pages of accusations— characterizing Apple as an "unusually secretive" company of "paranoid security Nazis" run by a "pathological" "assaholic" that has "always been shameless about stealing great ideas"—have no place in this lawsuit. *See* **Section II.C.**, *supra*, collecting exemplary citations. Needless to say, these opinions are far flung and are not materials economists typically include in their expert reports. Other than demonstrating that Ms. Lawton is more advocate than expert, these opinions are irrelevant, are

not based upon sufficient facts or data, and will not help the jury determine any relevant issue, rendering them properly excluded under Federal Rule of Evidence 702.

At the very least, Ms. Lawton's opinions are more prejudicial than probative under Federal Rule of Evidence 403. As this Court has noted, the "probative value of evidence pertaining to [a party's] past acts is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury." *Guzik Tech. Enters., Inc. v. Western Digital Corp.*, No. 5:11-cv-03786-PSG, 2013 WL 6227626, at *2-3 (N.D. Cal. Nov. 22, 2013) (precluding defendant from introducing evidence that the inventor often got angry and screamed). In *Guzik*, the Court also noted that "[t]he relevance of Mr. Guzik's temperament is dampened by the court's order that willfulness will not be submitted to the jury." *Id.* at *3. Here, Ms. Lawton's anti-Apple quotations are much more inflammatory and prejudicial than the potential evidence at issue in *Guzik*, and their relevance is also dampened based on the Court's grant of summary judgment of no willful infringement. Dkt. No. 424 at 27-29.

## V. CONCLUSION

For the foregoing reasons, Apple requests that the Court grant the requested relief and preclude Ms. Lawton's improper testimony.

Dated: May 20, 2014

DLA PIPER LLP (US)

By: /s/ Mark Fowler
Mark Fowler (Bar No. 124235)
mark.fowler@dlapiper.com
Robert Buergi (Bar No. 242910)
robert.buergi@dlapiper.com
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, California 94303
T: 650.833.2000
F: 650.833.2001

John Allcock (Bar No. 98895)
john.allcock@dlapiper.com
Erin Gibson (Bar No. 229305)
erin.gibson@dlapiper.com
Robert Williams (Bar No. 246990)
robert.williams@dlapiper.com

DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101
T: 619.699.2862
F: 619.764.6662

GREENBERG TRAURIG, LLP

Sarah Barrows (SBN 253278)
barrowss@gtlaw.com
Stephen Ullmer (SBN 277537)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

James J. DeCarlo (Admitted *Pro Hac Vice*)
decarloj@gtlaw.com
Michael A. Nicodema (Admitted *Pro Hac Vice*)
nicodemam@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400

*Attorneys for Defendant Apple Inc.*