[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

# EXHIBIT 1
# (REDACTED)

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| EMBLAZE LTD., | ) |
|        Plaintiff, | ) |
| | ) |
|    v. | ) Civil Action No. 45:11-cv-01079-SBA |
| | ) (PSG) (N.D. Cal.) |
| APPLE INC., A CALIFORNIA | ) Magistrate Judge Paul Singh Grewal |
| CORPORATION, | ) |
|        Defendant. | ) |
| | ) |
| | ) |

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**EXPERT REPORT OF CATHARINE M. LAWTON**

**NOVEMBER 9, 2013**

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

this case, I have relied on publicly available information to provide additional information based on the limited information that Apple has provided.

(18)   As will be discussed throughout this report, Apple's accounts of certain facts and events appear to be affected by what is known at Apple as the **"reality distortion field."**  The "reality distortion field" has been described as "a confounding mélange of a charismatic rhetorical style, indomitable will, and eagerness to bend any fact to fit the purpose at hand."[2]  As part of my investigation in this case, I have attempted to document the facts. Although my ability to test and confirm the facts in this case has been limited for the reasons I have explained, in some cases, I have identified what appears to be the "reality distortion field" at work.

(19)   I reserve the right to supplement and/or revise this report to the extent that additional information and/or data become available to me.

(20)   At trial, I intend to use various demonstrative exhibits based on information contained in this report and supporting material.  Such exhibits have not yet been prepared.

### F. Assumptions

(21)   My work in this matter is based on a number of assumptions.  These assumptions are as follows:

   a) Emblaze is the current owner of the '473 Patent, filed on March 24, 1999 with a priority date of March 24, 1998.[3]

   b) The '473 Patent is valid and enforceable.

   c) The asserted claims of the '473 Patent (hereinafter, the "Asserted Claims") are claims 1, 2, 8, 9, 10, 11, 12, 13, 14, 21, 23, 24, 25, 26, 27, 28, 29, 36, 37, 38, 40, 41,

---

[2] Isaacson, Walter, *Steve Jobs*, (New York:  Simon & Schuster Paperbacks, 2013), 118.
[3] The patent was initially issued to Geo Interactive and transferred to Emblaze on February 5, 2001. See U.S. Patent No. 6389473 B1, "Network Media Streaming."  See also, Patent Assignment Abstract of Title, U.S. Patent No. 6389473, U.S. Patent Office, (available at: http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=6389473&pub=&asnr=&asnri=&asne=&asnei=&asns=).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

Emblaze.[67] On January 11, 2010, Apple responded with a letter indicating that Apple's HLS does not infringe the claims of the '473 patent.[68] Emblaze subsequently filed its initial Complaint against Apple's infringement of '473 patent on July 28, 2010.[69]

## III. The Accused Products

(41) In this case, Emblaze has accused Apple's software and hardware that incorporates HTTP Live Streaming (HLS) technology of infringing the '473 Patent.

(42) According to Apple's advice to its developers, the devices capable of using HLS are as follows:

> HTTP Live Streaming allows you to send live or prerecorded audio and video to iPhone, iPad, and other devices including desktop computers, using an ordinary Web server. Playback requires iOS 3.0 or later on devices running iOS; QuickTime X or later is required on the desktop.[70]

(43) All iPhones sold after the 2009 release of the iPhone on the iOS 3.0 system had HLS functionality, according to Apple's Dennis Backus.[71] Similarly, all Mac PCs had HLS functionality after the release of Snow Leopard OS X version 10.6.8,[72] which was announced June 2009 and released worldwide on August 24, 2009.[73]

(44) Based on currently available information, there are at least 116 Apple products (8 software products, 82 hardware device products and, at least, 26 apps) that are accused of infringing the '473 Patent during the period of 6/17/2009 - 6/29/2013.

---

[67] Letter Re: U.S. Patent No. 6,389,473, from Lisa Marie Schull to Edward M. Weisz, dated December 14, 2009.
[68] Letter Re: Emblaze U.S. Patent No. 6,389,473, from Lisa Marie Schull to Edward M. Weisz, dated January 11, 2010.
[69] Declaration of Lisa A. Ferrari in Support of Plaintiff Emblaze Ltd.'s Unopposed Motion to Amend Pleadings, April 10, 2012, in the matter of Emblaze Ltd. v. Apple Inc., A California Corporation, 4:11-cv-01079-SBA, ¶ 2.
[70] "Technical Note TN2235 – Media Stream Validator Tool Results Explained," Apple, August 3, 2010, (https://developer.apple.com/library/ios/technotes/tn2235/ index.html).
[71] August 15, 2013, Deposition of Dennis Backus, 82:20 – 83:1.
[72] August 15, 2013, Deposition of Dennis Backus, 85:21 – 86:8.
[73] "Apple Previews Mac OS X Snow Leopard to Developers," Apple Press release, (http://www.apple.com/pr/library/2008/06/09Apple-Previews-Mac-OS-X-Snow-Leopard-to-Developers.html). "Apple to Ship Mac OS X Snow Leopard on August 28," Apple, August 24, 2009, (http://www.apple.com/pr/library/2009/08/24Apple-to-Ship-Mac-OS-X-Snow-Leopard-on-August-28.html).

iMac] for the number one use that consumers tell us they want a computer for, which is to get on the Internet simply and fast. And that's what this product is targeted for."[314] "The 'i,' Jobs later explained, was to emphasize that the devices would be seamlessly integrated with the Internet."[315] The Internet, however, is an example of Apple correctly identifying an emerging market years before its competition (1984, in the Internet), but failing to capitalize on it.[316] Some have reported, however, "it's [Apple] wealthy, yes, but moving less swiftly, with a tendency to be a couple of years behind when it comes to stuff like the Internet."[317]

(183)    From the introduction of the Apple I computer in 1976 until the introduction of the iPod in 2001, Apple's primary focus was personal computers. On January 9, 2007, Apple dropped "Computer" from its name and became Apple, Inc.,[318] which coincided with the launch of the iPhone, and recognized Apple's strategic shift from computers to consumer electronics.[319]

(184)    Apple has acknowledged that there are not many things that it can "legitimately claim we did first."[320] For example, in describing the source of the idea for Apple's vaunted graphical user interface[321] which Apple copied[322] from Xerox PARC,[323] (and was the

---

[314] "The First iMac Introduction," YouTube, May 6, 1998, (http://www.youtube.com/watch?v=0BHPtoTctDY). *See, also,* Segall, Ken, "Steve Jobs Almost Named the iMac The MacMan, Until This Guy Stopped Him," Fast Company, May 31, 2012, (http://www.fastcodesign.com/1669924/steve-jobs-almost-named-the-imac-the-macman-until-this-guy-stopped-him).

[315] Isaacson, Walter, *Steve Jobs,* (New York: Simon & Schuster Paperbacks, 2013), 338.

[316] Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 147 – 151.

[317] Cantrell, Amanda, "Apple's remarkable comeback story; The once-troubled computer maker, turning 30, has found new life as a mobile music company. Still, challenges loom," CNNMoney, March 29, 2006, (http://money.cnn.com/2006/03/29/technology/apple_anniversary/?cnn=yes). *See,* Owen W. Linzmayer's discussion of Apple's "Telecom Troubles." Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 147 – 151.

[318] Apple, Inc. Form 8-K Filed Jan. 10, 2007, p 1.

[319] http://www.engadget.com/2007/01/09/apple-drops-computer-from-name/

[320] Apple v. Samsung Trial Tr. August 3, 2012 Vol. 3 (Phil Schiller), 674. (Discussing April 6, 2010 email from Steve Sinclair which stated: "I don't know how many things we can come up with that you can legitimately claim we did first. Certainly we have the first commercially successful versions of many features.")

[321] Popularizing the graphical user interface has been described as one of Apple's greatest contributions to the industry. Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 103.

[322] "He [Steve Jobs] persuaded the Apple board to invest in technology copying what he had seen at Xerox PARC." "Triumph of the Nerds [3 of 3]," YouTube, 6:36 – 6:42,

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

subject of the award winning 1999 movie *Pirates of Silicon Valley*[324]—described in 2011 as "a cult hit among the Technorati"[325]), Walter Isaacson wrote under the heading **"Great Artists Steal"**[326]:

> The Apple raid on Xerox PARC is sometimes described as one of the biggest heists in the chronicles of industry. Jobs occasionally endorsed this view with pride. **As he [Jobs] once said, "Picasso had a saying— 'good artists copy, great artists steal'—and we have always been shameless about stealing great ideas."**[327] (Emphasis added.)
>
> Another assessment, also sometimes endorsed by Jobs, is that what transpired was less a heist by Apple than a fumble by Xerox. "They were copier-heads who had no clue about what a computer could do," he said of Xerox's management. "They just grabbed defeat from the greatest victory in the computer industry. Xerox could have owned the entire computer industry.[328] **Could have been, you know, a company ten times its size. Could have been IBM. Could have been the IBM**

---

me almost thirty years later. Upon hearing this, Gates responded, 'If he believes that, he really has entered into one of his own reality distortion fields.' In a legal sense, Gates was right, as courts over the years have subsequently ruled. And on a practical level, he had a strong case as well. Even though Apple made a deal for the right to use what it saw at Xerox PARC, it was inevitable that other companies would develop similar graphical interfaces. As Apple found out, the 'look and feel' of a computer interface design is a hard thing to protect." Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 177 – 178.

[324] "Pirates of Silicon Valley," Wikipedia, (http://en.wikipedia.org/wiki/Pirates_of_Silicon_Valley).

[325] "Noah Wyle on playing Steve Jobs," Fortune, October 7, 2011, (http://tech.fortune.cnn.com/2011/10/07/noah-wyle-steve-jobs/?section=magazines_fortune).

[326] Citing sources, including interviews with Steve Jobs, and others. Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 586.

[327] As stated by Steve Jobs in the multi-part PBS television program, "Triumph of the Nerds: The Rise of Accidental Empires," that premiered in June 1996: "Ultimately it comes down to taste. It comes down to trying to expose yourself to the best things that humans have done and then try to bring those things in to what you're doing. I mean Picasso had a saying he said good artists copy great artists steal. And we have always been shameless about stealing great ideas." (Emphasis added.) As stated by Jobs earlier in 1988 and published in the *Sydney Morning Herald* newspaper of Australia: "He headed the team that developed the Macintosh. Steve Jobs said that while it was being developed he kept in mind a quote from Pablo Picasso. 'Good artists copy. Great artists steal.'" (Emphasis added.) "Good Artists Copy; Great Artists Steal," Quote Investigator, March 6, 2013, (http://quoteinvestigator.com/2013/03/06/artists-steal/). *See, also,* the video clip of Steve Jobs interview in 1994 where he stated "good artists copy, great artists steal." "Steve Jobs: Good artists copy great artists steal," YouTube, (http://www.youtube.com/watch?v=CW0DUg63lqU). *See, also,* Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 94. ("Jobs wanted to avoid licensing copyrighted typefaces— such as Times, Century, Helvetica, and Gothic—for the Mac, so he instructed artist Susan Kare (www.kare.com) to design knockoffs. Kare, who had grown up in the suburbs of Philadelphia, wanted to name her fonts after the railroad stations of the Paoli Local train: Ardmore, Merion, Rosemont, etc. Jobs liked the idea of using city names, but insisted on world-class cities that corresponded to the original typefaces: New York (Times), Geneva (Helvetica), London (Old English), etc. . . . By the way, Kare designed all the original Mac fonts except Venice, which was the creation of Bill Atkinson.")

[328] Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 98.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

**giving the machines away, as long as he can charge rent for access to data (or apps) he's got a business model**. He can also maintain quality (whatever that is), exclude malware, and beat off rivals. A well-cultivated app store is actually a customer draw. It's also a powerful tool for promoting the operating system the apps run on. Operating system, hardware platform, and apps define an ecosystem.

**Apple is trying desperately to force the growth of a new ecosystem — one that rivals the 26-year-old Macintosh environment — to maturity in five years flat. That's the time scale in which they expect the cloud computing revolution to flatten the existing PC industry. Unless they can turn themselves into *an entirely different kind of corporation by 2015* Apple is doomed to the same irrelevance as the rest of the PC industry — interchangeable suppliers of commodity equipment assembled on a shoestring budget with negligible profit.**

Signs of the Macpocalypse abound. This year, for the first time, the Apple Design Awards at WWDC'10 are only open to iPhone and iPad apps. Mac apps need not apply; they don't contribute to Apple's new walled garden ecosystem.

**Any threat to the growth of the app store software platform is going to be resisted, vigorously, at this stage**. Steve Jobs undoubtedly believes what he (or an assistant) wrote in his thoughts on flash: "Flash is a cross platform development tool. It is not Adobe's goal to help developers write the best iPhone, iPod and iPad apps. It is their goal to help developers write cross platform apps." And he really *does not want* cross-platform apps that might divert attention and energy away from his application ecosystem. **The long term goal is to support the long-term migration of Apple from being a hardware company with a software arm into being a cloud computing company with a hardware subsidiary** — almost like Google, if you squint at the Google Nexus One in the right light. The alternative is to join the PC industry in a long death spiral into irrelevance.

. . .

This is why there's a stench of panic hanging over silicon valley. this is why Apple have turned into paranoid security Nazis, why HP have just ditched Microsoft from a forthcoming major platform and splurged a billion-plus on buying up a near-failure; it's why everyone is terrified of Google:

(365)   HLS was one of **"more than <u>100</u> new features"** included in the Apple's new iPhone OS 3.0 software.[702]  (Emphasis added.)

(366)   On May 1, 2009, "[t]he technology behind HTTP Live Streaming leaked into public knowledge . . . when **Apple submitted it to the Internet Engineering Task Force (IETF) as a draft standard** on track to become an RFC [Request for Comments]."[703] Apple submitted HLS as an open standard that anyone can implement that "is not attached to any particular proprietary encoder, server or player client,"[704] with the hope of making it a **"ubiquitous standard."**[705] (Emphasis added.)

(367)   On June 8, 2009, Apple launched HLS with the release of iOS 3.0, which was the first version of iOS that was capable of streaming live content.[706]

(368)   By April 2009, however, Flash still dominated:

> According to a recent report from comScore, roughly 80 percent of online videos worldwide are viewed via Flash. On the smartphone front, comScore says more than a billion mobile devices will have shipped with the Flash runtime embedded by the end of Q1 2009. These stats are especially crucial because the new framework is also backwards-compatible with pre-existing Flash apps.[707]

(369)   *Apple Insider* reported that with the launch of the iPhone in June 2007, "the landscape changed again, with a new demand for streaming to take advantage of the bandwidth that customers had already paid for when buying the iPhone"—which included

---

[702] "Apple Announces the New iPhone 3GS – The Fastest, Most Powerful iPhone Yet," Apple Press Release, June 8, 2009, (https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html).

[703] McLean, Prince, "Apple Launches HTTP Live Streaming standard in iPhone 3.0." *Apple Insider.* July 08, 2009. (http://appleinsider.com/articles/09/07/08/apple_launches_http_live_streaming_standard_in_iphone_3_0).

[704] Dilger, Daniel Eran, "Brightcove adds support HTTP Live Streaming for Apple iOS devices," Apple Insider, November 2, 2010, (http://appleinsider.com/articles/10/11/02/brightcove_adds_support_http_live_streaming_for_apple_ios_devices).

[705] Foresman, Chris, "Apple proposes HTTP streaming feature as IETF standard – Apple has touted new HTTP Live Streaming features of the iPhone OS 3.*de facto . . .*" ars technica, July 9, 2009, (http://arstechnica.com/apple/2009/07/apple-proposes-http-streaming-feature-as-a-protocol-standard/).

[706] August 16, 2013 Deposition of David Biderman, 33:4 – 33:9.

[707] Russell, Terrence, "Adobe unleashes web video, widgets onto TVs," VentureBeat, April 19, 2009. (http://venturebeat.com/2009/04/19/adobe-announced-flash-for-tvs-and-a-slew-of-a-list-partnerships/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(467)    A mid-2010 Apple presentation for the Graphics & Media State of the Union stated that **"the HTTP Live streaming protocol has really take[n] off <u>with widespread adoption</u>"**:

> Key idea:
>
> A little over a year ago ... we introduced the HTTP Live Streaming protocol which enables the delivery of high quality content to iPhone OS devices from almost any web server.
>
> <u>**Since then, the HTTP Live streaming protocol has really take[n] off with widespread adoption including a wide range of TV shows, sporting events, and educational programs delivered to your iPhone and iPad every day**</u>.[875] (Emphasis added.)

### C.  Statements by CDNs and Other Apple Partners

(468)     Akamai has described HTTP Live Streaming as **"<u>a key feature</u>"** in the iPhone 3.0 Update that **<u>benefits consumers</u>**.    Akamai's Tim Napoleon stated:

> <u>**Variable bit rate streaming was a key feature delivered in the recent iPhone 3.0 update**</u> and this new capability expands Akamai's ability to provide consumers with the highest quality video streaming experience on their iPhone or iPod touch. . . .
>
> <u>**"Apple's extensive support for new web standards like HTML 5 and HTTP streaming of live and on-demand video to the iPhone and iPod touch has transformed the quality of video content that consumers can now view while mobile," said Tim Napoleon, Chief Strategist Digital Media at Akamai. "To be able to watch video anytime, anywhere at a quality this high is nothing short of amazing."**</u>
>
> <u>**Variable bit rate streaming over HTTP benefits the consumer**</u> by enabling a high fidelity viewing experience at any bit rate, faster video start up times and reduced video buffering. <u>**Studies have shown that content owners and publishers see the strategic business**</u>

---

PDT on Apple.com," *Cult of Mac*, October 20, 2010, (http://www.cultofmac.com/64720/apple-will-live-stream-todays-back-to-mac-event-at-1000am-pdt-on-apple-com/). (Posting Apple's Press Release).
[875] APPLE009911 – APPLE009951, at 944 (Apple Presentation, Graphics & Media State of the Union, Session 000, undated).

Expert Report of Catharine M. Lawton

**opportunity to maximize consumer access to their content by delivering video to iPhone and iPod touch**.[876] (Emphasis added.)

(469)     Akamai's 2011 White Paper, "Akamai HD Network – Encoding Best Practices for the iPhone and iPad," reports that 50% of worldwide data-capable handsets support streaming video, and that "iPhone users are much more active on the network than others, generating a disproportionate amount of mobile web and application traffic":

> The consumption of mobile content around the globe is growing rapidly, thanks to the introduction of consumer-friendly connected devices, like the iPhone® and iPad®. These devices expand the opportunity for content publishers to leverage the public internet (rather than closed-walled garden approach of carriers) to extend audience reach to new platforms.
>
> Video capabilities on mobile devices have increased significantly. According to a recent study, 75% of worldwide data-capable handsets are able to download video clips, and **almost 50% support streaming video**. Apple's iPhone® represents a large and growing share of this market when measured by number of handhelds. But **iPhone® users are much more active on the network than others**, generating a disproportionate amount of mobile web and application traffic. With the introduction of the iPad®, this trend has continued as consumers leverage this new device to consume a variety of rich media content such as video, audio, electronic books etc.[877] (Emphasis added.)

(470)     Akamai's 2011 White Paper, "Akamai HD Network – Encoding Best Practices for the iPhone and iPad," also provided some examples of how content is delivered to users:

> **Long-playing videos, such as movies or full TV episodes**, have typically been downloaded to the handset and stored until the user is ready to play them. This involved a two-step process that goes first to a desktop and then to the handset when docked (for example, via iTunes). With the availability of Wi-Fi enabled smartphones and faster wireless 3G data speeds, direct to handset streaming delivery over standard web protocols is becoming increasingly popular for full TV episodes. In this model, the video begins to play as soon as enough content has been buffered.

---

[876] "Akamai Announces Variable Bit Rate Streaming Support to Deliver Live High Quality Video Content to iPhone and iPod Touch," July 2, 2009, Akamai, (http://www.akamai.com/html/about/press/releases/2009/press_070209.html)
[877] "Akamai HD Network – Encoding Best Practices for the iPhone and iPod," Akamai, 2011, 1, (http://www.akamai.com/dl/whitepapers/Akamai_HDNetwork_Encoding_BP_iPhone_iPad.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

**Short videos and time-sensitive video clips, such as sports or news highlights**, are often delivered by streaming, which means they begin to play as soon as enough content has been received. These typically have to fit into brief windows of opportunity, with selection, download, ad display (if any), and main video completed in less than two or three minutes.

**Simulcast of live sports, news and events** to mobile handsets requires special considerations around scalability and performance of the delivery mechanism. Prior to the release of the 3.0 OS, live streaming required a custom proprietary solution. The iPhone®/iPad® OS now has built-in support for live video streaming that dynamically adapts to available bandwidth, optimizes full screen video playback and increases battery life.[878] (Emphasis added.)

## D. Surveys

(471)   A **2010 informal survey** outlined the most popular categories of live stream events:

> One area that has remained unchallenged, though, is the acceptance of large-scale live event streaming. Streaming, after all, began as a way to deliver audio across the internet (or an intranet) in real time to those who wanted to hear about a particular, timely topic. From concerts to breaking news to sports, streaming's roots are in live broadcasts.

> Fast-forward to 2010, though, and we're in an almost completely different delivery model. CDNs routinely state that 95% of what they deliver is on-demand content. Even if the on-demand content is streamed-using some of the newer HTTP streaming and adaptive bitrate solutions-it is still prerecorded content that has been transcoded and uploaded as a file to a server for delivery.

> . . .

> I asked the survey respondents to list the market segments in which they found the biggest traction for live events. I suggested six market segments (news, government, corporate, concerts, pay per view, and sports), but I encouraged them to add other key market segments.

> Tallying up all the responses, sports and news dominated the top end of the list, both on the delivery side and on the production side. An aggregated ranking might look like the following list, with the

---

[878] "Akamai HD Network – Encoding Best Practices for the iPhone and iPod," Akamai, 2011, 2, (http://www.akamai.com/dl/whitepapers/Akamai_HDNetwork_Encoding_BP_iPhone_iPad.pdf).

percentages representing the overall ranking across the multiple respondents:

- News: Breaking (90%)
- Sports (75%)
- Concerts (75%)
- Corporate (50%)
- Pay per view (50%)
- Government (25%)
- News: Press conferences (25%)

Among those companies that deliver the content bits and can most accurately gauge audience sizes, the most popular types of events are often based on the particular focus of the CDN.

"Sports is by far the biggest segment for events," said Mark Taylor, VP of product for the content markets division at Level 3. "Second is news or one-off, nonsporting events like presidential debates or Michael Jackson's funeral."

"News clearly leads the pack," said Matt Smith, who spent several years at Yahoo! Broadcast Solutions before joining Inlet Technologies as senior director of systems architecture. "When an event is newsworthy and breaking, users have clearly shown they will turn to the digital domain for live, immediate updates and video. Sports is next, as events like March Madness and the U.S. Open have shown, office-bound viewers will flock online to catch a few (or even several) minutes of sports."

Both Yahoo! and Level 3 have broadcast capabilities beyond just the streaming portion, but they often use production companies to augment for particular events. Yet even the production companies have different opinions about the current market segment sweet spot.

One of the production companies, Net-StreamLive, sees news, sports, and concerts as the highest-ranking market segments but also included corporate events such as town hall meetings or all-hands meetings that were dominant in their customer base.[879]

---

[879] Siglin, Tim, "The Economics of Live Events," Streaming Media, April/May 2010, (http://www.streamingmedia.com/Articles/ReadArticle.aspx?ArticleID=66648&PageNum=1).

(472)    A 2013 multi-national consumer survey by Accenture and reported by Brightcove found:

> "Consumers are increasingly accessing live event coverage, providing new opportunities for publishers to drive revenues and increase viewer engagement," said Ashraf AlKarmi, vice president of product management at Brightcove. "Live events have historically been difficult to manage and expensive to deliver. With Video Cloud Live, we are removing that complexity and high cost and enabling customers of all levels and technical expertise to deliver impactful live video events in an easy-to-use dashboard within the Video Cloud environment."
>
> Today, live video is mainstream and content publishers must keep pace with consumer demand for immediate access to streaming content. In fact, according to a recent multi-national consumer survey from Accenture, 29 percent of tablet owners watch live video content via their tablet devices. The survey also found that 53 percent of connected TV owners stream live content, while 21 percent enjoy live events on their mobile device or smartphone.[880]

(473)    A **May 2013 online survey** reported "[s]trong preference for viewing sporting events live on second screen" in the U.S.[881]:

> Sporting events and news are the two content types that viewers prefer to watch live across all three countries [U.S., UK, and Canada]. More than 80% of consumers prefer to watch these types of programs live. Among these respondents, over 40% in the UK and US watch sporting events live on second screens (desktops, laptops, tablets and smartphones). This share was slightly lower in Canada, at just over 30%.

(474)    And, in **March 2012, Video Industry News article** reported that the growth of video streaming on mobile devices in the U.S. was projected to be on the rise (not limited to live):

---

[880] "Brightcove Launches Video Cloud for Easy Setup, Management and Monetization of Live Video Events," Brightcove, 2013, (http://investor.brightcove.com/common/mobile/iphone/releasedetail.cfm?ReleaseID=764635&CompanyID=amda-mdia0&mobileid=#).

[881] "Survey Assesses Consumer Streaming Video Viewing Habits and Ad Tolerance; Reveals Business Model Insights for Service Providers," QuickPlay Media, June 10, 2013, (http://www.quickplay.com/news/press-releases/mobile-survey-live-video-vod-viewing-habits/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

- 2/3 of smartphone users in the U.S. have streamed video in 2011 (Jupiter Research 2011);

- Mobile video usage in the U.S. will rise at a compound annual growth rate of 28% over the next 5 years (Visiongain 2011);

- In 2015, 63% of the U.S. population will own a smartphone/tablet and 86% will stream videos (Inlet Market Intelligence 2011);

- Mobile video will generate 66% of mobile data traffic by 2015 (Cisco VNI 2011).[882]

## E. Third Party Reports

(475)    There is substantial evidence of **general demand for live streaming of video**. The following are a sampling of representative anecdotes beginning with the launch of HLS on the iPhone in mid-June 2009.

(476)    Discussion regarding **AT&T's decision in June 2009 to allow Major League Baseball fans to stream games live onto their iPhones**—with "the new offering [] based on the upgrades in the iPhone 3.0 software [i.e., HLS] that is being rolled out Wednesday[June 17, 2009]"[883]:

> With the release of the 3.0 version of Apple's iPhone operating system this week, <u>**subscribers to a popular application from Major League Baseball called At Bat will now get the chance to stream live video feeds of baseball games directly to their iPhones or iPod Touches**</u>. The first game was streamed Thursday afternoon, featuring a match up between the Chicago Cubs and White Sox. . . .

> Indeed, streaming video eats up a lot of bandwidth. Because cellular networks are divided into cells, users in a particular cell share the available bandwidth in that cell or region. This means that streaming a lot of high-quality video over the network could potentially eat up all the available bandwidth and degrade service for other subscribers in that cell. . . .

---

[882] "Videostreaming," Video Industry News, March 12, 2012, (http://www.videoindustrynews.com/2012/03/14/the-growth-of-video-streaming-is-on-the-rise/videostreaming/).
[883] Rosenberg, Dave, "MLB streaming games to iPhones," CNET News, June 17, 2009, (http://news.cnet.com/8301-13846_3-10266452-62.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

But more importantly, MLB At Bat subscribers will be tuning into the same video event at the same time. And since sports fans often root for teams in their own city, there is a good chance that many fans tuning into a particular game on their iPhones will be in the same geographic area, which is exactly the kind of scenario that could bring a cellular network to its knees.[884] (Emphasis added.)

(477)    Data regarding live streaming of the **July 2009 Michael Jackson Memorial Service** establishes demand:

> **CNN.com** had . . . 8.9 million live video streams [9.7 million live video streams between noon and 5 p.m. PDT], according to Omniture. The site had 781,000 peak concurrent live streams, according to server logs. . . . **MSNBC.com** says that visitors watched 3 million live streams of Jackson's service. . . . **ABC News** reports nearly 6 million live Jackson memorial streams on ABCNEWS.com and on partner sites Yahoo!, Verizon, Charter, AT&T and RCN. . . . **MTV** reports that its live stream of the memorial service ranked among its top 10 live streams ever.[885] (Emphasis added.)

\* \* \*

---

[884] Reardon, Marguerite, "Is AT&T playing gatekeeper to the Wireless Web," CNET News, June 18, 2009, (http://news.cnet.com/8301-1035 3-10268319-94.html). *See, also,* MLB.com Streams Live Baseball Games to the iPhone," The New York Times, June 17, 2009, (http://bits.blogs.nytimes.com/2009/06/17/mlbcom-streams-live-baseball-games-to-the-iphone/). ("On Wednesday, Apple upgrades the iPhone with the 3.0 version of its operating system. The new era could literally begin with a home run. MLB.com, which sells the popular At Bat application for the iPhone and iPod Touch, said it will add live feeds of some games for no additional charge, at least for now. Owners of the $9.99 application will at first get to see two games each day, chosen by MLB.com. (The games are subject to local blackout restrictions—and your iPhone, remember, knows where you are.) Thursday's 2:20 p.m. game between the Cubs and White Sox will be the first to be streamed live on the At Bat application; the Tigers-Cardinals game at 8:15 p.m. will follow. MLB.com says it plans to roll out the entire slate of games as the season progresses. Presumably it will make users pay to watch some games, using the new ability of iPhone developers to charge users for content within applications. The company says it has not yet settled on a price. The implications of MLB's move are significant. Live television on mobile devices has been slow to take hold in the United States, as channel aggregators like MobiTV tried to recreate the cable model in the wireless ecosystem. Content owners themselves, using mobile applications to offer their video a la carte to the people who are willing to pay for it, could get much more traction."). *See, also,* Rosenberg, Dave, "MLB streaming games to iPhones," CNET News, June 17, 2009, (http://news.cnet.com/8301-13846 3-10266452-62.html). ("Major League Baseball has been on the cutting-edge of iPhone applications since it debuted the At Bat application at Apple's Worldwide Developers Conference in June 2008. At Bat delivers audio and video highlights, but not real-time games. Wednesday, MLB.com is releasing a new product--live video streaming of certain baseball games for the iPhone and iPod Touch, with an eye toward providing the full slate of MLB games (some free, some presumably for an additional charge) over the next several months as the season progresses. The new offering is based on the upgrades coming in the iPhone 3.0 software that is being rolled out Wednesday.")
[885] Gannes, Liz, "Michael Jackson Funeral Live Streams, By the Numbers," Gigaom.com, July 7, 2009, (http://gigaom.com/2009/07/07/michael-jackson-funeral-live-streams-by-the-numbers/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

Global web traffic was at least 19% above normal during most of the
event at the Staples Center, according to Akamai Technologies, a
Massachusetts-based firm that handles 20% of the world's web traffic.
It said the Jackson memorial brought the internet's second largest day
ever in terms of total traffic.

"When a public figure of global prominence such as Michael Jackson
passes away, the public's desire for up-to-date information and news is
rarely satiated," said Robert Hughes, executive vice-president of global
sales, services and marketing at Akamai.[886]

(478)    Data regarding live streaming of the **April 2011 Royal Wedding of Prince William
and Catherine Middleton** described the impact of live streaming:

The company Livestream, which provides live video services to the
Associated Press, Entertainment Tonight, CBS and others, tells CNN
partner site Mashable that it broke its all-time record for simultaneous
live streams.

Some 300,000 people were watching the company's live video feed at 6
a.m. ET, Mashable says.

Akamai says it's difficult to compare live streaming events to each
other, but that preliminary data suggests more people watched online
video of the royal wedding simultaneously than any other event the
company has provided live video services for.

The wedding slightly topped the World Cup in terms of live video. That
sporting event saw a peak of 1.6 million people watch Akamai's
streams concurrently.

"Each year we are seeing more people consume video online at events
of this nature, but it's very hard obviously to do that apples to apples
comparison," [Akamai spokesman, Jeff] Young said. How widely an
event is syndicated greatly affects how many people will end up seeing
it on the Internet, he said.

The interest in the royal wedding online does show how the Internet is
changing the way people look for and consume information, he said.

"This is an example of just how important the Internet and connected
devices have become to how people experience something like this," he

---

[886] Holmwood, Leigh, "Michael Jackson memorial brings 19% spike in world web traffic; Video-streaming
surge prompted by Michael Jackson memorial service falls short of record set by Obama inauguration," The
Guardian, July 8, 2009, (http://www.theguardian.com/media/2009/jul/08/michael-jackson-memorial-
service-web-traffic).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

said. "It wasn't the fact that people were at the office in front of their computers -- and yet still a huge number of folks have gone online to experience this event."

"That shows where we've moved as a society."[887]

(479)    Data regarding live streaming of the **2012 Summer Olympics in London** establishes demand:

> According to NBC research president Alan Wurtzel, 28 million people have visited NBCOlympics.com since Friday's Opening Ceremony, marking an 8 percent increase versus the analogous period four years ago.
>
> Thus far NBC has served up 64 million total video streams, which translates to a 182 percent improvement from the first five days of the Beijing Olympics. Per comScore data, **45 percent of the streams, or 29 million, were live**.
>
> As of last night, the single most-streamed event of the London Olympics was the women's gymnastics team final, which was held on Tuesday. Some 1.5 million users watched the U.S. team take the gold in real time.
>
> **NBC's Olympics apps for the Apple** and Android platforms have been downloaded 6 million times since the start of the Summer Games.[888] (Emphasis added.)

(480)    In May 2013, ABC explained its move to live streaming, with Apple devices coming first—which was accelerated by about one year:

> **ABC had originally planned to introduce a live-streaming feature for its apps in 2014, but decided to speed up that process this year**.
>
> "We keep a very close eye on consumer demand," said Anne Sweeney, the president of the Disney-ABC Television Group, which includes the

---

[887] Sutter, John D., "Will + Kate = sixth biggest Web event ever, CNN, April 29, 2011, (http://www.cnn.com/2011/TECH/web/04/29/royal.wedding.internet.traffic/).
[888] Crupi, Anthony, "NBC: Twitter Beefs No Match for the 'Silent Majority' Huge TV, digital audience, outweighs tape-delay concerns," AdWeek, August 2, 2012, (http://www.adweek.com/news/technology/nbc-twitter-beefs-no-match-silent-majority-142486). *See, also,* Wurtzel, Alan, "The Billion Dollar Research Lab: A Look into the Future – London Olympics 2012," The 2012 European Television Symposium, November 8 – 9, 2012, (http://www.slideshare.net/asi_radiotv9194/1-nbcs-billion-dollar-research-lab-asi-2012-tv-symposium). ("Top 2 Live Stream Events [United States vs. Japan, Women's Soccer Final (1,467,465 streams) & Team USA Women's Gymnastics win Gold (1,462,834 streams)] Delivered More Streams Than All Vancouver Olympics." "Mobile video usage eclipsed Vancouver's total in less than 1 day.")

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

broadcast network. "We watch how people are behaving with their devices, and we really felt that we needed to move faster."

Internally the project was code-named Project Acela, a reference to the high-speed train between Boston and Washington. A team led by Albert Cheng, Ms. Sweeney's executive vice president for digital media, was given a deadline of May 14, the date of the ABC upfront. **While Apple devices came first, other phones and tablets will be supported in the coming months**, Mr. Cheng said. Securing the necessary rights from programming providers was laborious, but ABC will be able to stream all of its stations' local newscasts, syndicated talk shows like "Katie," and national series like "Grey's Anatomy."

The live-stream functionality comes at a time when ABC and its broadcast rivals are trying to keep the attention of audiences that are increasingly turning to cable channels and Internet streaming services like Netflix.

It gives ABC another talking point about how it is adapting to audience preferences; in this case, viewers will be able to carry "Good Morning America" with them as they move around the house in the morning, or tune into a weekend basketball game while out with friends. The live stream will work anywhere in a local market, the same way an old-fashioned TV antenna would.

During a demonstration of the app in her New York office on Friday, Ms. Sweeney said she was struck by how personalized television becomes when it is live-streamed to a person's phone.

The app is also an implicit rebuttal to Aereo, the start-up backed by Barry Diller that is being sued by major station owners for streaming their signals to paying subscribers in New York. Ms. Sweeney reiterated her view that Aereo is illegal but said the plans for the app's live-stream feature predated the service.[889] (Emphasis added.)

(481)   More, generally, on March 13, 2013, Akamai reported how **worldwide internet streaming traffic** on its platform increased dramatically at the time that the new Pope was selected.  Akamai reported:

On March 13, white smoke appeared at 7:06 PM local time (2:06 PM Eastern Time). Within minutes, live streaming traffic on the Akamai Intelligent Platform began to climb, as shown in Figure 36. Anticipation,

---

[889] Stelter, Brian, "ABC to Live-Stream its Shows via App," *The New York Times,* May 12, 2013, (http://www.nytimes.com/2013/05/13/business/media/abc-to-let-app-users-live-stream-local-programming.html?_r=0).

and traffic, grew for the next hour, until the selection of Jorge Mario Bergoglio as the newly elected Pope Francis was announced at 8:15 PM local time (3:15 PM Eastern time). Live streaming traffic continued to grow for a few more minutes after the announcement, reaching a peak of 2197 Gbps (just under 2.2 Tbps) at 8:25 PM local time (3:25 PM Eastern time).[890]

(482)    **Chart 20**, below, is Akamai's chart that shows the huge increase in streaming that occurred around the time that the new Pope was named on March 13, 2013:[891]

**Chart 20**



Figure 36: Akamai Live Streaming Traffic on March 13, 2013

---

[890] "The State of the Internet, 1st Quarter, 2013 Report," Akamai, August 1, 2013, 33, (http://www.akamai.com/dl/whitepapers/akamai_soti_q113.pdf?).
[891] "The State of the Internet, 1st Quarter, 2013 Report," Akamai, August 1, 2013, 33, (http://www.akamai.com/dl/whitepapers/akamai_soti_q113.pdf?).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## IX. Evidence of Use of  HTTP Live Streaming[892]

(483)    Because some of the Asserted Claims are method claims, "[t]he damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers.  This is so because that is what the parties to the hypothetical negotiation would have considered."[893]

(484)    In this case, there is significant evidence of consumer demand for live streaming, as previously discussed.  Apple, however, alleges that data regarding use of HLS is not available.  The rapid adoption of HLS as "the standard," however, suggests that HLS has been widely adopted and used.

(485)    Notwithstanding the fact that Apple has not produced data regarding the use of HLS, evidence of use is demonstrated by:

- The rapid adoption of HTTP Live Streaming as "the standard"

- Apple's use of HTTP Live Streaming

- CDN use of HTTP Live Streaming

- Content Provider use of HTTP Live Streaming

(486)    First, I will briefly review some of the evidence that demonstrates that HLS was rapidly adopted as "the standard."  Next, I will review Apple's contentions that HLS data is not available, and the facts that suggest otherwise.  Last, I will review evidence of HLS use by Apple, the CDNs and the Content Providers.

## A. HTTP Live Streaming was Rapidly Adopted as "The Standard"

(487)    As was discussed previously, HTTP Live Streaming was rapidly adopted and became "The Standard."  By December 2011, HTTP Live Streaming had become "The Standard."

---

[892] *See, also,* "Brief History of Streaming" for additional evidence of use of HTTP Live Streaming.
[893] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

## B. Availability of Data Showing Actual HLS Use

(488)   In this litigation, Apple has alleged that it does not have data regarding actual HLS use.[894]  This contention, however, is inconsistent with a number of Apple documents and Apple deposition testimony, and information available from Akamai.  In addition, given that Apple itself owns several large data centers including what has been described as the world's largest data in North Carolina, it is unclear why Apple would not at least have data from its own data centers.  The following are representative examples of documents that establish that Apple has data, or likely has access to data regarding HLS use.

## 1) HTTP Stream Data following July 16, 2010 Apple Live Press Conference

(489)   An **July 26, 2010 email from Dennis Backus to Travis Brown and others**, establishes that Apple did at that time, in fact, have access to actual "numbers" regarding at least the number of HTTP streams:



[895] (Emphasis added.)

(490)   The July 16, 2010 live event discussed in the email was Apple's press conference to address the iPhone 4 antenna issue, dubbed **"antennagate"**:

> "However," says Jobs, "we began getting reports about antenna issues...and this has since been dubbed 'antennagate.'...We heard about this just 22 days ago and Apple is an engineering-driven company and

---

[894] September 25, 2013 Defendant Apple Inc. Opposition to Emblaze's Motion to Compel, 13:18-13:22.
[895] August 27, 2013 Deposition of Travis Brown, 171:12 – 179:11.  Exhibit 14 – APPLE264057.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

the way that we work is that we want to understand what the problem is before we come up with a real solution."[896] (Emphasis added.)

(491)   Apple's Travis Brown testified regarding the July 26, 2010 email: "This is an email that's just tracking the streams we provided for an event.  And we delivered the event on HT – using HTTP live streaming."[897]  ". . . Dennis would have accumulated those numbers somehow from a – **probably working with Akamai to determine what those numbers were**."[898]  (Emphasis added.)  "Again, this is technical, and I don't know how these numbers were generated."[899]

> Q.  Did Apple monitor HTTP live streaming versus RTSP streaming in any other situations that you're aware of?
>
> A.  Yeah, I do know that Dennis can determine certain things about the streams.
>
> Q.  Do you know if he kept records as to the percentage of HTTP live streaming versus RTSP streaming for other events?
>
> A.  Yeah, let me – Dennis – Dennis is able to determine certain things about the streams, but we don't use that information as marketing.[900]
>
> Q.  So I just want to know if it has that data.  It's a simple question.  Does it maintain data comparing HTTP live streaming to RTSP for any other events?
>
> A.  But I – so what was the question again?  Could you rephrase it.
>
> Q.   Does Apple have records as to the percentage of HTTP live streaming compared to RTSP for other events?
>
> A.  Yes, I can't talk to if Dennis – I mean, I'm not – I don't know if Dennis keeps statistics like this around, stores them, and if he's done the same analysis on each of that.  . . . We, actually, let me – yes, I'd say I don't

---

[896] Paczkowski, John, "Apple's 'Just Encase' Answer to iPhone 4 Complaints [Live Blog]," All Things D, July 16, 2010 (http://allthingsd.com/20100716/apple-iphone-4-press-conference/). *See, also*, Topolsky, Joshua, "Live from Apple's iPhone 4 press conference," engadget, July 16, 2010, (http://www.engadget.com/2010/07/16/live-from-apples-iphone-4-press-conference/). *See, also*, "Apple Events – July 16, 2010 Press Conference," Apple, July 16, 2010, (http://www.apple.com/apple-events/july-2010/).
[897] August 27, 2013 Deposition of Travis Brown, 172:18 – 172:23.
[898] August 27, 2013 Deposition of Travis Brown, 174:20 – 175:2.
[899] August 27, 2013 Deposition of Travis Brown, 176:4 – 176:5.
[900] August 27, 2013 Deposition of Travis Brown, 177:7 – 178:9.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

know – to your question.  I don't know if he keeps that, you know, data that he derives from doing what he does with the keynote events.[901]

## 2) Akamai Media Analytics

(492)    Furthermore, Apple's contention is also inconsistent with the fact that its long-time CDN, Akamai, promotes its **"Media Analytics"**—"Better Insight with Media Analytics; Make better decisions – **media analytics to understand audience habits results in informed decisions that impact consumers**."[902]  (Emphasis added.)  In addition, Akamai's—**"Visualizing Akamai"**—provides real-time data showing **"total active streams,"** "on demand streams," and **"live streams."**  (Emphasis added.)  Akamai states:

> Akamai handles 20% of the world's total Web traffic, providing a unique view into what's happening on the Web - what events are generating traffic, how much, from where, and why. Bookmark this page to get a feel for the world's online behavior at any given moment - how much rich media is on the move, the sheer volume of data in play, the number and concentration of worldwide visitors, and average connection speeds worldwide.[903]

(493)    **Chart 21**, below, shows Akamai's real time data on November 6, 2013 at about 4:54 p.m.:[904]

---

[901] August 27, 2013 Deposition of Travis Brown, 178:17 – 179:11.
[902] "Akamai HD for iPhone & iPad – Next generation native streaming to the Apple iPhone and Apple iPad," Akamai, (http://www.akamai.com/html/solutions/iphone.html).
[903] Akamai website:  "Visualizing Akamai," (http://www.akamai.com/html/technology/dataviz3.html).
[904] Akamai website:  "Visualizing Akamai," (http://www.akamai.com/html/technology/dataviz3.html).

Expert Report of Catharine M. Lawton

**Chart 21**



## C.  Apple's Use of HTTP Live Streaming

(494)    Remarkably, Apple has not produced a summary of its own use of HLS.  Based on publicly available information, Apple's own use of HTTP Live Streaming is significant. The following examples are representative.

### 1) Apple WWDCs and Product-Related Events

(495)    In 2010—after this litigation was filed—"Apple resume[d] the practice of offering live streams of media event keynotes, which it had stopped in 2005."[905]

(496)    On July 16, 2010, Apple live streamed a Press Conference to address iPhone 4 antenna issues that had been dubbed "antennagate."[906]

---

[905] Ong, Josh, "Adobe caves, adds support for Apple's HTTP Live Streaming standard," Apple Insider, April 15, 2011, (http://appleinsider.com/articles/11/04/15/adobe_caves_adds_support_for_apples_http_live_streaming_standard
[906] Paczkowski, John, "Apple's 'Just Encase' Answer to iPhone 4 Complaints [Live Blog]," All Things D, July 16, 2010 (http://allthingsd.com/20100716/apple-iphone-4-press-conference/). *See, also,* Topolsky, Joshua,

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(497)    On September 1, 2010, Apple live streamed an **"Apple Special Event" "using Apple's industry leading HTTP Live Streaming"** in which Steve Jobs unveiled the new iPod line-up, Apple TV, and iTunes 10.

> Apple® will broadcast its September 1 event online using Apple's industry-leading HTTP Live Streaming, which is based on open standards. Viewing requires either a Mac® running Safari® on Mac OS® X version 10.6 Snow Leopard®, an iPhone® or iPod touch® running iOS 3.0 or higher, or an iPad™. The live broadcast will begin at 10:00 a.m. PDT on September 1, 2010 at www.apple.com.[907]

(498)    On October 20, 2010, Apple live streamed its **"Back to Mac" event**, which was again described HLS as **"Apple's industry-leading HTTP Live Streaming,"** which was only open to people using Mac products:

> Apple will broadcast its October 20 event online using Apple's industry-leading HTTP Live Streaming, which is based on open standards. Viewing requires either a Mac running Safari on Mac OS X version 10.6 Snow Leopard, iPhone or iPod Touch running iOS 3.0 or higher or an iPad.[908]

(499)    On June 11, 2012, Apple live streamed the **WWDC Opening Keynote Address**.[909]

(500)    On October 23, 2012, Apple live streamed the **launch of the iPad Mini**.

> In a first for the company, Apple are to live stream their big October 23 press event tonight through their Apple TV set-top box.
>
> Expected to reveal the iPad Mini (and potentially new Mac Mini, iMac and MacBook Pro with Retina Display models), a new "Apple Events" icon has appeared on the Apple TV set-top box dashboard. Clicking it

"Live from Apple's iPhone 4 press conference," engadget, July 16, 2010, (http://www.engadget.com/2010/07/16/live-from-apples-iphone-4-press-conference/). *See, also,* "Apple Events – July 16, 2010 Press Conference," Apple, July 16, 2010, (http://www.apple.com/apple-events/july-2010/).

[907] "Apple to Provide Live Video Streaming of September 1 Event," Apple Press Release, September 1, 2010 (http://www.apple.com/pr/library/2010/08/31Apple-to-Provide-Live-Video-Streaming-of-September-1-Event.html). *See, also,* "Apple Special Event – Watch CEO Steve Jobs unveil the new iPod lineup, Apple TV, and iTunes 10," Apple, September 1, 2010, (http://www.apple.com/apple-events/september-2010/).

[908] Brownlee, John, "Apple Will Live Stream Today's Back to Mac Event At 10:00 AM PDT on Apple.com," *Cult of Mac*, October 20, 2010, (http://www.cultofmac.com/64720/apple-will-live-stream-todays-back-to-mac-event-at-1000am-pdt-on-apple-com/). (Posting Apple's Press Release).

[909] "Live from Apple's WWDC 2012 Opening Keynote Address," AppleInsider Live Blog, June 11, 2012, (http://live.appleinsider.com/Event/Live_from_Apples_WWDC_2012_Opening_Keynote_Address?Page=0).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

reveals an icon for an "Apple Special Event – Live", with instructions telling viewers to tune in at 10 AM on October 23 to watch live video from the California Theater in San Jose California, or 6pm for UK viewers.[910]

(501)   On June 10, 2013, Apple live streamed its **2013 WWDC**:

> First up, those of you with Apple TVs won't have to do anything in order to access the live video feed. Apple has pushed out a small update that automatically added an "Apple Events" channel for WWDC to users' home screens. Simply tune into that channel at 1:00 p.m. EDT, 10:00 a.m. PDT and you're all set.[911]

(502)   In September 2013, Apple live streamed the **iPhone 5S and 5C event**: "product announcements are great opportunities to directly and indirectly promote company products (since you need to own an Apple device to live stream the event in the first place)."

> Apple will also post Tuesday's presentation in full directly on its website later in the day, which is tradition for the company; in fact, Apple never used to live stream any of its major events, which made the unveilings feel more mysterious and exclusive. It was believed that Apple founder Steve Jobs wanted total control over his product launches, and choosing to live stream any Apple events would effectively remove control provided by the editing room. With millions of live viewers tuning in to watch the single real-time stream, Jobs may have wanted a chance to correct any on-stage blunders, which aren't uncommon for technology-related unveilings (right, Microsoft?) But the live stream option changed with Tim Cook at the helm at Apple, likely because the former operations specialist realizes how these product announcements are great opportunities to directly and indirectly promote company products (since you need to own an Apple device to live stream the event in the first place).[912]

(503)   On October 22, 2013, Apple streamed an **iPad Special Event** live online:

---

[910] Lynch, Gerald, "Apple TV users get iPad Mini event live stream," *TechDigest*, October 23, 2012 (http://www.techdigest.tv/2012/10/apple_tv_users.html).

[911] Epstein, Zach, "Apple to Live-Stream WWDC 2013 keynote - here's how to watch," *BGR*, June 10, 2013 (http://bgr.com/2013/06/10/apple-wwdc-live-stream-link-how-to/).

[912] Smith, Dave, "Apple iPhone 5S, 5C Event: 3 Ways To Live Stream Tuesday's Announcement On Your Computer, iPhone or iPad," *International Business Times*, September 10, 2013, (http://www.ibtimes.com/apple-iphone-5s-5c-event-3-ways-live-stream-tuesdays-announcement-your-computer-iphone-or-ipad).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

An Apple Special Event channel appeared on users' Apple TV set-top boxes on Tuesday as well as the company's website, indicating that the company plans to offer a live stream of the day's keynote, where it is expected to unveil new iPads and other products.

"Watch the special event held at the Yerba Buena Center for the Arts Theater in San Francisco, CA," the event listing reads, noting that the presentation will kick off at 10 a.m. Pacific.

**Updated:** Users can access the live feed by choosing the "Apple Events" channel on the Apple TV home screen. The stream is also available on a Mac via Apple's official Events website.[913]

## 2) Apple iTunes Festival & Other Music Events

(504)    Apple has live streamed the annual "iTunes Festival" (that first began in 2007) and other live concert events since 2009.  The following examples are representative.

(505)    In August 2009, the first live music event that was streamed to the iPhone— **Underworld's concert in Oakland, California**.  Apple's Dennis Backus testified that Apple provided support for the live streaming of this concert.[914]

> Apple isn't the first company to get involved in live streaming of musical performances, but they are the first to try and put it in your pocket. This past Saturday the UK electronic group Underworld performed a concert live from Oakland, California, and for the first time ever you were able to watch this streamed live to your iPhone.[915]

(506)    In July 2010, Apple streamed the **iTunes Festival London 2010** on the official iTunes Festival app and also on the MySpace website.[916]

(507)    On June 22, 2011, Apple announced the release of a **new app that allowed iOS users** to stream live performances from the **iTunes Festival London 2011**:

---

[913] "Apple to stream today's iPad special event live online," Apple Insider, October 22, 2013, (http://appleinsider.com/articles/13/10/22/apple-to-stream-todays-ipad-special-event-live-online).
[914] August 15, 2013 Deposition of Dennis Backus, 98:23-99:18.
[915] Squires, Jim, "News:  Did you catch the iPhone's first streaming concert?," Macapper, August 10, 2009 (http://macapper.com/2009/08/10/news-did-you-catch-the-iphones-first-streaming-concert/).
[916] Hirst, Arron, "iTunes Festival London 2010 Performances Available to Stream LIVE, from the Official App!" Razorianfly, July 1, 2010, (http://www.razorianfly.com/2010/07/01/itunes-festival-london-2010-performances-available-to-stream-live-from-the-official-app-tonight/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

Apple has released a new application for iOS devices that will allow users to stream live performances from the iTunes Festival London 2011, and even watch them on an HDTV via AirPlay.

The new, free software (iTunes link) from Apple is a universal application designed for both the iPhone and iPad. It requires a device running iOS 4.1 or later, and weighs in at 9.7MB.

"Download the official app now to explore the lineup in more detail and watch the shows LIVE or on demand for a limited period from wherever you are in the world," the official description reads. "You can even invite your friends to watch on the big screen with AirPlay support for streaming the gigs to your Apple TV."

The festival features performances by 62 bands over 31 nights in London, England. Artists include Foo Fighters, Paul Simon, Duran Duran and Moby.

Also performing at this year's festival is Coldplay, a band with a history of ties to Apple. In addition to participating in an Apple commercial, the band's frontman, Chris Martin, performed at Apple's annual iPod event last September, and Apple CEO Steve Jobs was even spotted at a Coldplay concert in 2009.

The broadcasts will be produced by Live Nation, according to *All Things D*. In addition to Apple's official application, the performances will also be streamed on Live Nation's iOS App Store software.[917]

---

[917] Marsal, Katie, "Apple releases iTunes Festival London 2011 iOS app with live streaming," Apple Insider, June 22, 2011, (http://appleinsider.com/articles/11/06/22/apple_releases_itunes_festival_london_2011_ios_app_with_live_streaming/). *See, also,* Kafka, Peter, "Free, Live Streaming Music and Video on Your iPhone – From Apple," June 22, 2011, All Things D, (http://allthingsd.com/20110622/free-live-streaming-music-on-your-iphone-from-apple/?reflink=ATD_yahoo_ticker). ("There are more than 425,000 apps in Apple's iTunes store, but it's always worth paying attention to the ones that Apple produces itself. Here's the latest: "iTunes Festival London 2011," a free app that will stream live footage from an Apple-branded concert series throughout July. The app will work on both iPhones and iPads, and includes AirPlay support so you can get the shows up on your plasma, via Apple TV. This looks like a pretty cool lineup (Coldplay! Bruno Mars! The Arctic Monkeys! And, um, Gwyneth Paltrow!), so it's hard to see why you wouldn't want to at least play around with the app on a slow summer day. Concert giant Live Nation handles the actual producing duties for the shows, and will stream them via its app, too. Wired.com's John Abell thinks this app could be the precursor to a long-running series of live events streamed by Apple. Who knows? Could be. My hunch is that Apple is putting the app out as a glorified demo and will be happy to let other companies carry the ball forward from here."). *See, also,* Abell, John C., "Apple Launches HD Streaming App for iTunes Festival 2011," Wired, June 21, 2011, (http://www.wired.com/business/2011/06/apple-launches-hd-streaming-app-for-itunes-festival-2011/). ("App developers have some new competition for music fans' attention: Apple itself, which released a free iOS app on Tuesday that will stream live performances from the iTunes Festival London 2011 at the city's famous Roundhouse venue, which will run for 31 days throughout the month of July.... This is no lightweight music festival, either. Bands include Mogwai, Paul Simon, Manic Street Preachers, Linkin Park, Gwyneth Paltrow,

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(508)  On February 9, 2012, Apple streamed its first live music event to Apple TV—**a Paul McCartney concert at Capitol Studios** that was **free on both Apple TV and iTunes**. Apple was also promoting the sale of Paul McCartney's new album, "Kisses on the Bottom," (with guest appearances from Eric Clapton, Stevie Wonder, and Donna Krall) for sale on iTunes for $9.99, and the full catalog of Beatles songs that had been available since November 2010. In the first two months, the Beatles collection had reportedly sold 5 million songs and a million albums.[918]  The Paul McCartney concert event was described as follows:

> A live concert from legendary artist Paul McCartney will be streamed live by Apple to iTunes and Apple TV set-top boxes on Thursday.
>
> The singer-songwriter's event is being hyped on his official page on iTunes, where it is counting down the days, hours, minutes and seconds to the live, free performance. The concert will take place at Capitol Studios on Thursday, Feb. 9 at 7 p.m. Pacific, 10 p.m. Eastern.
>
> The stream can be viewed within Apple's iTunes desktop client, or on an HDTV using the Apple TV set-top box. Users can access the stream by choosing "iTunes Live" from the Apple TV Internet menu. . . .
>
> Last year, Apple did a live broadcast of the iTunes Festival London 2011. Those could be viewed on iOS devices with a free application, but watching on the big-screen via Apple TV required the use of AirPlay. With this week's McCartney concert, Apple TV owners will be able to

---

Arctic Monkeys, Bruno Mars, Foo Fighters, Friendly Fires, Swedish House Mafia, Coldplay, Lang Lang, Kasabian, Moby+Silver Apples, and SXSW 2011 headliners Duran Duran (full line-up). Apple sells iTunes albums of its iTunes Live performances, including those recorded during previous festivals, which is nice. But the company's redoubled approach of packaging the entire thing as an iOS app represents a major step forward. Tellingly, the app too is called iTunes Live — a name that doesn't necessarily tie it to this particular festival. It could be a sign of more live music to come from the Cupertino crew. And because Apple puts on this festival itself, it has one less party to worry about convincing to agree to license the live appcast — an issue that has dogged other companies with similar ideas. In addition to the shows, iTunes Live includes a schedule, a news feed with descriptions of the artists, and a photo archive from previous iTunes Festivals all the way back to '07. Perhaps our favorite thing about Apple's app, though, is that it includes Apple AirPlay support. This means you'll be able to zap the audio and video stream over to your television via Apple TV. Connect that to an HD television and surround sound system, and you can have yourself a month-long music festival on your own couch.").
[918] Marsal, Katie, "iTunes-sponsored live Paul McCartney concert to stream for free on Apple TV," Apple Insider, February 8, 2012, (http://appleinsider.com/articles/12/02/08/itunes_sponsored_live_paul_mccartney_concert_to_stream_for_f ree_on_apple_tv.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

watch the show right on their HDTV without an iPhone, iPad or iPod touch.[919]

(509)    The February 9, 2012 Paul McCartney concert was described as significant to Apple for a number of reasons.

> The reason this is significant is because of long-standing rumors that Apple is looking for ways to challenge traditional TV delivery methods, like cable and satellite. There has been buzz that Apple might try to launch its own TV subscription service, while others (myself included) believe Apple is more likely to begin allowing third-parties to create "apps" for the Apple TV that will let them stream their own live content with ads. Apple will undoubtedly be watching its viewer numbers during the McCartney concert on Thursday, and if it sees anything encouraging coming from Apple TV viewers, it may be able to use those statistics to woo more content producers to give it a shot as well.[920]

(510)    Apple, however, did not produce data regarding the number of live streams for the Paul McCartney live event (or any other Apple-sponsored event), and I have not otherwise been able to locate such data.

(511)    In September 2012, Apple promoted its live streaming of the **iTunes Festival**—to both iOS devices, and to Apple TV—in what was Apple's second attempt at streaming a live music event to Apple TV:

> Apple on Monday launched a universal iTunes Festival iOS app and an accompanying Apple TV app, both of which will feature live streaming capabilities when the 30-day music celebration kicks off on Sept. 1.

> The 2012 iTunes Festival will be hitting the Roundhouse in London from Sept. 1 to Sept. 30, and Apple will be offering free live streaming of the performances via an iOS app as it did last year. New for 2012,

---

[919] Marsal, Katie, "iTunes-sponsored live Paul McCartney concert to stream for free on Apple TV," Apple Insider, February 8, 2012, (http://appleinsider.com/articles/12/02/08/itunes_sponsored_live_paul_mccartney_concert_to_stream_for_f ree_on_apple_tv.html). *See, also,* "Apple to stream live iTunes Festival shows via Apple TV, iOS app," Apple Insider, August 27, 2012, (http://appleinsider.com/articles/12/08/28/apple_to_stream_live_itunes_festival_shows_via_apple_tv_ios_ap p).
[920] Cheng, Jacqui, "Paul McCartney concert stream will test the waters on live Apple TV viewership = Can the Apple TV compete with cable or satellite with interesting live . . ." ars technica, February 8, 2012, (http://arstechnica.com/apple/2012/02/paul-mccartney-concert-stream-will-test-the-waters-on-live-apple-tv-viewership/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

however, is Apple TV compatibility, both in the form of AirPlay and a new dedicated app. . . .

While the iOS app is available from the App Store, Apple TV owners should have the program pushed to their devices automatically in a software update. If the "iTunes Festival" icon doesn't appear on the Apple TV homescreen, restart the device or conduct a software update manually.[921]

(512)    In September 2013, Apple promoted its live streaming of **the iTunes Festival**:

The iTunes Festival returns with 30 nights of free music in September. Browse the eclectic line-up.  If you live in the U.K., you can still enter to win tickets with the app.   If you can't join us in person at the Roundhouse in London, stream selected shows live or afterward for a limited time.[922]

(513)    Others also promoted the fact that Apple was live streaming the **2013 iTunes Festival** event:

As always, iTunes is letting fans stream the concert live for free via its respective platform and apps. ... iPhone/iPad/iPod Touch/Apple TV ... iOS users & those with an Apple TV can now watch the festival live from their respective Apple devices by downloading the "iTunes Festival London 2013" app from the App Store.  Those with an Apple TV can simply load up a pre-installed iTunes Festival app![923]

## D. CDN Use of HTTP Live Streaming

(514)    CDNs also began using HLS as soon as it was available in mid-June 2009.  The following examples are representative.

(515)    On July 1, 2009, Apple's long-time CDN, Akamai announced "Variable Bit Rate Streaming Support to Deliver Live High Quality Video Content to iPhone and iPod

---

[921] "Apple to stream live iTunes Festival shows via Apple TV, iOS app," Apple Insider, August 27, 2012, (http://appleinsider.com/articles/12/08/28/apple_to_stream_live_itunes_festival_shows_via_apple_tv_ios_app).
[922] "iTunes Festival London 2013 by iTunes" (https://itunes.apple.com/us/app/itunes-festival-london-2013/id431168066?mt=8).
[923] "How to Watch the iTunes Festival Live Online," *Kempire Daily*, September 1, 2013, (http://kempiredaily.com/how-to-watch-the-itunes-festival-live-online).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

Touch," describing it as "<u>a key feature</u>" in the iPhone 3.0 Update that <u>benefits</u> <u>consumers</u>, and highlighting "<u>Apple's extensive support</u> for new web standards":

> Akamai Technologies, Inc. (NASDAQ: AKAM), the leader in powering rich media, dynamic transactions and enterprise applications online, today announced variable bit rate streaming support for live and high quality video content on the iPhone and iPod touch. **Akamai HTTP Streaming for the iPhone is available as part of Akamai's Media Delivery solution.**
>
> Akamai is also announcing the launch of the iPhone 3.0 Video Showcase - <u>iphone.akamai.com</u> - to demonstrate this new solution. Content owners and publishers including Canadian Broadcasting Corporation, Discovery, FOX News, Martha Stewart Living Omnimedia, MTV, NPR, Turner Sports and USA TODAY are participating in the showcase site. Inlet Technologies' Armada and Spinnaker solutions are being used to encode the VOD and live experiences on the showcase site. Akamai has also developed a whitepaper, entitled "Streaming to the iPhone 3.0 - Best Practices" that can be accessed here: <u>http://www.akamai.com/dl/whitepapers/iphone_wp.pdf</u>
>
> **"Apple's extensive support for new web standards like HTML 5 and HTTP streaming of live and on-demand video to the iPhone and iPod touch has transformed the quality of video content that consumers can now view while mobile," said Tim Napoleon, Chief Strategist Digital Media at Akamai. "To be able to watch video anytime, anywhere at a quality this high is nothing short of amazing."**
>
> **Variable bit rate streaming over HTTP benefits the consumer** by enabling a high fidelity viewing experience at any bit rate, faster video start up times and reduced video buffering. **Studies have shown that content owners and publishers see the strategic business opportunity to maximize consumer access to their content by delivering video to iPhone and iPod touch**. Content owners can now use Akamai's Media Delivery solution to deliver live and on-demand content while leveraging a highly-available and fault tolerant infrastructure of tens of thousands of HTTP servers.[924] (Emphasis added)

---

[924] "Akamai Announces Variable Bit Rate Streaming Support to Deliver Live High Quality Video Content to iPhone and iPod Touch," July 2, 2009, Akamai, (<u>http://www.akamai.com/html/about/press/releases/2009/press_070209.html</u>).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(516)     On August 7, 2009, Akamai announced that it was working with Turner Sports "to bring live streaming of 91st PGA Championship to iPhone and iPod Touch Users," again noting that "variable bit rate streaming <u>benefits the consumer</u>" and is "<u>critical for mobile video</u>":

> Akamai Technologies, Inc. (NASDAQ: AKAM), the leader in powering video, dynamic transactions and enterprise applications online, announced today it will serve as the exclusive live video streaming provider to Turner Sports for the official PGA Championship App available on the App Store. The 91st PGA Championship will be held August 13-16 with 18 hours of television coverage on TNT complemented by four video streams of live coverage exclusively on PGA.com.

> The PGA Championship iPhone App for the iPhone and iPod touch supports Turner Sports' integrated broadcast strategy of combining traditional television coverage with online and mobile components to provide fans with a multiplatform experience.

> "Turner Sports is known for its innovation in presenting content across multiple platforms, and this is another example of that strategy," said Tim Napoleon, Chief Strategist for Digital Media at Akamai. "Organizations like Turner Sports are leading the charge with live streaming and **taking the fan experience to a whole new level to mobile devices**. Streaming the PGA Championship live to the iPhone and iPod touch brings a personalized and high-quality experience to even more golf fans, no matter where they are. With increasingly better connectivity over WiFi, we've reached the point where high definition experiences are no longer limited to the PC."

> **Variable bit rate streaming benefits the consumer** by enabling a high fidelity viewing experience at any bitrate - **critical for mobile video as viewing conditions vary dramatically between carrier edge networks to 3G to WIFI**. Using Akamai HTTP Streaming for iPhone and Inlet Technologies SpinnakerTM solution to deliver live and on-demand content, content owners can enable higher-quality video experiences at near HD bitrates over WiFi and 3G.

> "Inlet works closely with Akamai to ensure our live encoding service for mobile applications works seamlessly across the Akamai network to provide for the **optimal live video experience**," said John Bishop, senior vice president of strategy and business development, Inlet Technologies. "Working with Akamai we are able to provide a smooth end to end process for content providers to make it easier to deliver

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

next generation video experiences – such as variable bit rate streaming."[925] (Emphasis added.)

---

[925] "Akamai Works With Turner Sports to Bring Live Streaming of 91st PGA Championship to iPhone and iTouch Users," Akamai, August 7, 2009, (http://www.akamai.com/html/about/press/releases/2009/press_080709_1.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## E. Content Provider Use of HTTP Live Streaming

(517)    Numerous content providers began using HLS as soon as it was available in mid-June 2009.  The following examples are representative.

(518)    In June 2009, MLB made "Streaming video now part of At Bat app."

> A new day in entertainment and technology is here, with streaming video now added to the award-winning MLB.com At Bat 2009 application on the **iPhone and iPod touch devices** -- at no additional cost to current subscribers. **Being able to watch <u>live games</u> this way means every known viewing platform is covered -- TV (cable/satellite), computer (MLB.TV) and now mobile.**[926] (Emphasis added.)

(519)    In September 2009, CBS added ". . . live streaming of college sports to iPhone App."

> CBS Sports will stream the entire 2009 Southeastern Conference of football games on the CBS Sports College **iPhone and iPod touch application**. The application provides users with in-game box scores and player statistics as an overlay on top of the **streaming video**. In addition to the overlaying information, a full division scoreboard, individual game centers for top 25 matchups, polls, headlines and standings are all accessible on the application.[927]  (Emphasis added.)

(520)    In October 2009, the NBA added "live streaming to mobile phones."

> The National Basketball Association will announce its first set of applications that let fans watch games **live on a mobile device** Thursday.  NBA League Pass Mobile will be available for download for the **iPhone, iPod Touch**, and Android phones starting Friday, the third day of the league's regular season.[928]  (Emphasis added.)

(521)    In April 2010, **Turner Broadcasting** and **CBS Sports** entered into a **14-Year agreement with NCAA and March Madness for $10.8 billion** that covered rights to broadcast on TV, internet and wireless platforms, including rights to live streaming

---

[926] Newman, Mark, "Streaming video now part of At Bat App," *MLB.com*, June 22, 2009, (http://cleveland.indians.mlb.com/news/article.jsp?ymd=20090616&content_id=5353382&vkey=news_mlb &fext=.jsp&c_id=mlb).
[927] Hamick, Chris, "CBS adds live streaming of college sports to iPhone app," *Mobile Marketer*, September 28, 2009. (http://www.mobilemarketer.com/cms/news/video/4279.html).
[928] Ogg, Erica, "Live NBA games now on iPhone, Android," *CNET News*, October 29, 2009, (http://news.cnet.com/8301-31021_3-10386343-260.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

video of the NCAA Division championship on NCAA.com and CBSports.com.[929] These partnership agreements include providing live sports video Apps through Apple's App Store:

> In partnership between the NCAA, Turner Sports and CBS Sports, NCAA March Madness Live was launched from www.ncaa.com/marchmadness, www.cbssports.com and www.bleacherreport.com, and was available via the **App Store** and Google Play.

> The NCAA March Madness Live app has ranked No. 1 as the top sports app in the App Store and Google Play during the tournament. It was also the No. 1 free app across all categories in the App Store.[930] (Emphasis added.)

(522)    In September 2010, the UFC joined with MobiTV to provide live streaming of events on the UFC iOS app.

> UFC and MobiTV today announced the availability of the **Ultimate Fighting Championship App on the App Store**. Powered by MobiTV the app features live Pay-Per-View content and in-app purchasing of live events. The first fight featured will be the live stream of UFC 103 on September 19, featuring former UFC Middleweight Champion Rich Franklin vs. former UFC Light Heavyweight Champion Vitor Belfort at the American Airlines Center in Dallas.[931] (Emphasis added.)

(523)    In March 2011, Apple added **MLB.TV** and **NBA** apps to Apple TV. The addition of HLS to Apple TV was described as **"The Real Killer App"** because it "could enable [Apple] to **strike deals with content providers to stream linear TV channels**":

> Sports fans received great news Wednesday when **Apple updated its Apple TV set-top box** with new Apps that will let them stream live and on-demand games from **MLB.tv** and the **NBA**. While the availability of sports will open up a whole new potential audience for the device, the more important addition is **Apple TV's** ability to now

---

[929] NCAA Press Release, "CBS Sports, Turner Broadcasting, NCAA Reach 14-Year Agreement, April 22, 2010.
[930] "2013 NCAA Tournament Delivers Record–setting Video Consumption across All Digital Platforms," April 10, 2013.
[931] "Ultimate Fighting Championship App Now Available On App Store," *PRNewswire*, September 17, 2010, (http://www.prnewswire.com/news-releases/ultimate-fighting-championship-app-now-available-on-app-store-62200692.html).

stream live video, which could enable it to strike deals with content providers to stream linear TV channels.[932] (Emphasis added.)

(524)   In June 2011, **NBC** offered a **"Tour de France All-Access Pass"** that included a live video feed on **Versus**.

> The tour will be shown live on Versus, the Comcast-owned sports network, with repeats and highlights being aired on NBC. . . .
>
> The network is also promising paying subscribers access to highlight video clips, interviews and other exclusive online content. All access subscribers can even personalize the race by tracking their favorite riders both via live GPS on Google Maps, as well as through a stats dashboard.  All of this will also be available through **dedicated iPhone, iPad** and Android apps, which will be available in time for the race, according to NBC.
>
> Speaking of timing: Versus will begin airing some of the pre-race activities starting this Thursday, but All Access subscribers will get their **first live video feed Saturday July 2** at 7 a.m. EDT.[933] (Emphasis added.)

(525)   In August 2011, the MLB's main objective was "to expand the experience through interactive media" anywhere, anytime:

> "Our main objective is to expand the experiences through interactive media so a fan that has a few minutes to **watch a live game on-the-go**, at work or wherever can do so.  We have to get it there, get it right and have it ready for them to consume." Says Matthew Gould, vice president of corporate communications at MLBAM.[934] (Emphasis added.)

(526)   In 2011, CNN launched a "new live-streaming 24-hour iOS app for CNN and HLN's network."

> **CNN launches live-streaming iOS app for multi-channel video service.**  CNN announced the launch of its new live-streaming 24-hour iOS app for CNN and HLN's network.  The app is available in the **iTunes store** with free updates to CNN's existing **iPhone and iPad apps**.  The

---

[932] Lawler, Ryan, "The Real Killer App For Apple TV Isn't Sports – It's Live," *Gigaom*, March 10, 2011, (http://gigaom.com/2011/03/10/apple-tv-live/).
[933] Roettgers, Janko, "Where to watch the Tour de France 2011 online," *Gigaom*, June 29, 2011, (http://gigaom.com/2011/06/29/tour-de-france-2011-live-stream/).
[934] Catone, John, "Baseball Everywhere: How MLB Is Innovating With Digital Media", "August 26, 2011 (http://mashable.com/2011/08/26/mlb-digital-media/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

app requires a subscription to CNN's multi-channel video service to access content.[935] (Emphasis added.)

(527)   In April 2013, "YouTube add[ed] support for live streaming on iOS with latest update."

> If you were hoping to watch last weekend's Coachella concert on your iDevice, you just missed your chance; although the event was **streamed live** on YouTube for free the iOS YouTube app doesn't support live streaming. It does now **YouTube 1.3 for iOS, released today**, adds a handful of new features and fixes, not the least of which is access to live streams.[936] (Emphasis added.)

(528)   In May 2013, ABC "add[ed] live-streaming to its iOS app with rollout in NYC, Philadelphia."

> **This week ABC will quietly revolutionize its app for iPhones and iPads with a button called "live."** Users around New York and Philadelphia will be able to live-stream all the programming from ABC's local stations there, the first time that any major broadcaster has turned on such a technology. The functionality will be featured at ABC's upfront presentation for advertisers on Tuesday. **It is, among other things, an attempt to keep up with the rapidly changing expectations of television viewers**. It also reflects the increasing role that subscriber fees play in the broadcasting business: the live stream will be available only to paying subscribers of cable and satellite providers, even though the stations' signals are available free over the public airwaves. . . .
>
> ABC, a unit of the Walt Disney Company, said the live stream would be available in the other six cities where it owns stations sometime this summer. It is also in talks with the companies that own ABC's more than 200 affiliates to make the "live" button work in their markets.
>
> ABC finished the first of its affiliate deals, with Hearst Television, on Sunday afternoon; it said the live streams would work in Hearst's 13 markets, including Boston and Pittsburgh, in the coming months.[937] (Emphasis added.)

[935] "Daily Datatimes, July 19, 2011," Oppenheimer, Equity Research, Industry Update, July 19, 2011, p. 3.
[936] Broida, Rick, "YouTube adds live streaming to iOS app," *CNet Reviews*. April 15, 2013, (http://reviews.cnet.com/8301-19512_7-57579691-233/youtube-adds-live-streaming-to-ios-app/).
[937] Stelter, Brian, "ABC to Live-Stream its Shows via App," *The New York Times*, May 12, 2013, (http://www.nytimes.com/2013/05/13/business/media/abc-to-let-app-users-live-stream-local-programming.html?_r=0). *See, also,* Silbert, Sarah, "ABC to add live-streaming to its iOS app with rollout in NYC, Philadelphia," *Engadget*, May 13, 2013, (http://www.engadget.com/2013/05/13/abc-live-streaming-app-limited-rollout/). ("Starting this week, ABC will live-stream shows via its Watch ABC app for iOS. This

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## XV.   Apple Business Background

### A. Apple Business Strategy

(764)    Based on my review of the available documents and other information, it appears that Apple has not produced any business, strategy, and/or marketing plans.   Although it is well known that Steve Jobs was "allergic to PowerPoints," he had many meetings: "an executive staff session every Monday, a marketing strategy session all Wednesday afternoon, and endless product review sessions."[1252]

(765)    Apple's business and business strategy has been the subject of a number of books, case studies, and other commentaries which provides at least some information on this subject.  I have reviewed numerous sources in connection with my investigation in this matter including:  *Steve Jobs,* by Walter Isaacson (2013), *Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company,* by Owen W. Linzmayer (2008), *Apple – The Inside Story of Intrigue, Egomania, and Business Blunders,* by Jim Carlton (1997), and *Inside Apple, How America's Most Admired—and Secretive—Company Really Works,* by Adam Lashinsky (2012), among others.  I will, however, not attempt to recap that information in this report.

(766)    Apple's general business strategy and history is summarized in the section, "Apple Inc." Apple's business strategy as it relates to the facts of this case is summarized in the section, "Brief History of Streaming."

(767)    In this section, I will briefly review Apple's apparent HTTP Live Streaming business strategy in the context of David Yoffie's CHESS strategy.

### 1) Apple's iDevice Business Strategy

(768)    David Yoffie's 1997 book, *Competing in the Age of Digital Convergence,* outlines in detail Apple's business and licensing strategy for the **Newton in the early-1990s—which, later appears to have become the "blueprint" for Apple's later business strategy**

---

[1252] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 362.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton



[1273] (Emphasis added. Footnote citations omitted.)

. . .

[H]is [Boris Teksler, Director of Patent Licensing Strategy] title does not imply that Apple ████████. (*See* FDX J at 1). Mr. Teksler's title only demonstrates that Apple employs people that work on licensing, including patent licensing. ████████████████████████████████████ ████████████████████████. (FDX D at 112:16-113:10, 118:4-8). . . . ████████████████████████████████████

.[1274] (Emphasis added.)

(789) The contentions of Apple's counsel <u>in this case</u>, however, stand in sharp contrast to the publicly available information including the testimony of Apple personnel, Apple's contentions in <u>*other cases*</u>, and other publicly available sources. The following are but a few examples.

---

[1272] August 21, 2013 Deposition of C.K. Haun, 8:5 – 8:21, 108:14 – 124:21. (Testimony regarding 30(b)(6) Deposition Topic No. 56 – "Apple's policies from 2008 to the present concerning the licensing or evaluation of patents and the factors that Apple considers when negotiating license agreements or attempting to determine the value of patents, including established or recognized industry licensing practices.")
[1273] September 25, 2013 Defendant Apple Inc. Opposition to Emblaze's Motion to Compel, 16 – 18.
[1274] September 25, 2013 Defendant Apple Inc. Opposition to Emblaze's Motion to Compel, 18 – 19.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

copy of the Mac OS. Our Board is convinced that if Apple continues this practice the company will never return to profitability, no matter how well Apple performs, and the entire Macintosh 'ecosystem' will continue to decline, eventually killing both Apple and the clone manufacturers. The scenario has no winners.[1322]

## 3) Apple's In-Licensing Policies

(806)   As discussed previously, only very limited information is available regarding Apple's licensing policies generally, and even less is known about Apple's In-Licensing policies. For example, Boris Teksler's trial testimony in *Apple v. Samsung* did not address either in-licensing or Apple's acquisition of patents.

(807)   Walter Isaacson's account of Steve Jobs negotiations with the music industry in connection with the iTunes Store provide insight into Steve Jobs's negotiating tactics:

> Andy Lack, the new head of Sony music, had the unenviable task of negotiating with Jobs about whether Sony would sell its music in the iTunes store. . . . He realized that, for Sony, selling its songs in the iTunes store was both insane and necessary—which seemed to be the case with a lot of decisions in the music business. Apple would make out like a bandit, not just from its cut on song sales, but from driving the sale of iPods. Lack believed that since the music companies would be responsible for the success of the iPod, they should get a royalty for every device sold.
>
> Jobs would agree with Lack in many of their conversations and claim that he wanted to be a true partner with the music companies. "Steve, you've got me if you just give me *something* for every sale of your device," Lack told him in a booming voice. "It's a beautiful device. But our music is helping to sell it. That's what true partnership means to me."
>
> "I'm with you," Jobs replied on more than one occasion. But then he would go to Doug Morris [head of Universal Music Group] and Roger Ames [head of Warner Music] to lament, in a conspiratorial fashion, that Lack just didn't get it, that he was clueless about the music business, that he wasn't as smart as Morris and Ames. "In classic Steve fashion, he would agree to something, but it would never happen," said Lack. "He would set you up and then pull it off the table. He's

---

[1322] . Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 256.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

pathological, which can be useful in negotiations. And he's a genius."[1323]

(808) Public reports of Apple's actual intellectual property practices present a much different picture regarding Apple's <u>in-licensing</u> than that suggested by either the testimony of Apple's Boris Teksler or Apple briefs in *Apple v. Motorola*.

### i. 1978 - 2007 – Ongoing Trademark Dispute with Apple Corps.

(809) Apple's disputes with Apple Corps. began in 1978. In 1981, the parties settled and Apple agreed that it would not enter the music business. Apple Corps sued Apple twice, first in 1986 when Apple added audio-recording capabilities to its computers. Apple settled in 1991 for around $26.5 million. Apple was sued again in 2003, following the launch of iTunes. On February 5, 2007 the second suit was settled for an estimated $500 million.[1324]

### ii. 2007 – iPhone Trademark Dispute

(810) The Cisco-Apple trademark dispute over "iPhone" and "iOS" was reported by numerous sources, including *The Wall Street Journal*:

> Cisco today announced that it has filed a lawsuit in federal court in California against Apple, seeking to prevent Apple "from infringing upon and deliberately copying and using Cisco's registered iPhone trademark." . . .
>
> "Cisco entered into negotiations with Apple in good faith after Apple repeatedly asked permission to use Cisco's iPhone name," said Mark Chandler, senior vice president and general counsel, Cisco. "There is no doubt that Apple's new phone is very exciting, but they should not be using our trademark without our permission." With its lawsuit, Cisco is seeking injunctive relief to prevent Apple from copying Cisco's iPhone trademark."

---

[1323] Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 400 – 401.
[1324] Roberts, Laura, "Apple vs. Apple: long-running legal dispute delayed Beatle's iTunes deal," The Telegraph, November 16, 2010, (http://www.telegraph.co.uk/culture/music/music-news/8136469/Apple-vs-Apple-long-running-legal-dispute-delayed-Beatles-iTunes-deal.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

### iii. 1998 – Apple's Alleged Unauthorized Use of Jetson's Clip

(812) Walter Isaacson's 2011 book, *Steve Jobs,* he described an incident around the time of the iMac's launch in early-May 1998:

> There was also a problem with the video he planned to show [at the iMac launch]. In it, Jony Ive is shown describing his design thinking and asking, "What computer would the Jetsons have had? It was like, the future yesterday." At that moment there was a two-second snippet from the cartoon show, showing Jane Jetson looking at a video screen, followed by another two-second clip of the Jetsons giggling by a Christmas tree. At a rehearsal a production assistant told Jobs they would have to remove the clips because Hanna-Barbera had not given permission to use them. "Keep it in," Jobs barked at him. The assistant explained that there were rules against that. "I don't care," Jobs said. "We're using it." The clip stayed in.[1327]

### iv. 1994 – Apple's Alleged Unauthorized Use of Names of Famous Individuals Including Bob Dylan

(813) On August 24, 1994, Bob Dylan sued Apple for trademark infringement over Apple's use of "Dylan" for its programming language for the Mac.[1328] The complaint claimed:

---

[1327] Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 352. *See, also,* Levy, Steven, "Damn the torpedos – it's iPhone!" Steven Levy, January 16, 2007, (http://www.stevenlevy.com/index.php/01/16/damn-the-torpedos-its-iphone). (". . . On the stage of the auditorium that would hold the event, Jobs stood back and watched as his television production crew screened a video to be screened after he introduced the iMac.... Jobs watched with an eagle eye as the sharply edited vignettes ran on the large screen. One of the highlights was a playful reference to the retro-futuristic look of the egg-shaped, lollipop-blue machine, which looked like something from the 1960s animated television series 'The Jetsons.' As homage, the video included a five-second clip from the actual series. Though it would be over almost as soon as the crowd recognized it, the clip would be sure to delight the geeky audience. Then one of the production guys gingerly approached Jobs and warned him of a problem. It seemed that Hanna-Barbera, the animation house that owned the rights to the Jetsons, had yet to sign off. The permission was still stalled with the lawyers. If the issue wasn't resolved before tomorrow, the nervous media specialist told Jobs, the clip would have to go. Jobs's face turned to steel. 'Keep it in,' he said. 'Ummmm, Steve, we can't do that,' said the production guy. He began to explain what Jobs certainly knew from his other job as majority shareholder of the Pixar studio, and thereby the owner of some of the animation world's most valuable intellectual property: using the clip without permission could incur huge liabilities. Jobs abruptly cut him off. 'I don't care!' he shouted. 'We're using it.' The clip stayed in the picture....") *See, also,* Joseph, Cliff, "Meet George Jetson's new computer; The surprise launch of iMac is the latest chapter in Apple's comeback story," The Independent, May 12, 1998, (http://www.independent.co.uk/arts-entertainment/meet-george-jetsons-new-computer-1159570.html).

[1328] Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 196.

Confidential - Attorney's Eyes Only          405          CORRECTED

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

"Apple is intentionally using, and intentionally has used the names of famous individuals, including (Isaac) Newton, Carl Sagan and now Dylan, in conjunction with Apple's products in a deliberate attempt to capitalize on the goodwill associated with these famous individuals."[1329]

(814) "Shortly after the suit was filed, Apple reached a confidential out-of-court settlement and obtained the rights to trademark Dylan."[1330]

### v. 1993 – Alleged Unauthorized use of "BIG" Logo

(815) In 1992, Apple began using a calligraphic logo of a light bulb with its Newton personal digital assistant that looked similar to Alfred J. Mandel's—a former Apple employee— logo for his Palo Alto-based marketing consulting group, Big Idea Group, or BIG:

> Mandel initially offered Apple a nonexclusive license to use his firm's log on the Newton. . . . Uncomfortable with such an arrangement, Apple's legal department tried to establish that the BIG logo was based on prior art. Anxious to avoid a protracted lawsuit, Mandel sold Apple the logo on July 29, 1993, with the provision that he could continue using it for one year. . . . Terms of the settlement remain confidential.[1331]

### vi. Early-1980s – Apple's Alleged Design of "Knockoff" Fonts to Avoid Copyright Licensing

(816) Owen Linzmayer's 2008 book, *Apple Confidential 2.0,* recounts another, earlier, example around during the development of the Macintosh:

> Jobs wanted to avoid licensing copyrighted typefaces—such as Times, Century, Helvetica, and Gothic—for the Mac, so he instructed artist Susan Kare (www.kare.com) to design knockoffs. Kare, who had grown up in the suburbs of Philadelphia, wanted to name her fonts after the railroad stations of the Paoli Local train: Ardmore, Merion, Rosemont,

---

[1329] Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 196.
[1330] Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 196 – 197.
[1331] Linzmayer, Owen W., "Apple Confidential 2.0 – The Definitive History of the World's Most Colorful Company," (San Francisco: No Starch Press, Inc.: 2008), 189.

Confidential - Attorney's Eyes Only          406          CORRECTED

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## 6) Publicly Available Information Regarding Other Apple In-Licensing Negotiations

### i. *Apple Inc. v. Motorola Mobility LLC*

(826)  In *Apple Inc. v. Motorola Mobility LLC,* Apple's counsel summarized Apple's licensing negotiations with Motorola beginning in August[1339] or September 2007[1340] and 2008, noting that **"Apple had paid royalties of approximately $1 for each phone for a license to certain of Motorola's standards-essential patents"**[1341]:

> Apple had developed abundant evidence that the price Motorola demanded for a license to its SEP portfolio—2.25% of the entire price of allegedly infringing Apple products, or about $12 per iPhone at 2007 prices—was unreasonable and discriminatory, and that the correct rate was $1[1342] or less.[1343] (Emphasis added.)

---

[1339] *Apple, Inc. v. Motorola Mobility, Inc.*, Opinion and Order, (W.D. Wisc.) dated August 10, 2012, 12. (Negotiations for Licensing between Apple and Motorola: In 2005, Apple began developing the iPhone. No later than mid-2006, Apple became aware that Motorola had declared patents essential to cellular standards. Apple released its iPhone in [June] 2007 without seeking a patent license from Motorola. In August 2007, Motorola offered Apple a license to its essential patents. At the initial meeting between the companies, Motorola presented information to Apple concerning its licensing program and stated that its standard royalty rate was 2.25% for a worldwide license to its portfolio of standards-essential patents. Apple rejected the 2.25% rate. Motorola continued to engage in license negotiations with Apple for approximately three years, but Apple refused to accept a license on any terms offered by Motorola.")

[1340] *Apple, Inc. v. Motorola Mobility, Inc.*, Opinion and Order, (W.D. Wisc.) dated June 7, 2011, 6, 23. (At 6: "In September 2007, representatives of Apple and Motorola met to discuss a licensing agreement regarding Motorola's declared-essential patents. At the meeting, Motorola demanded a royalty rate based on the total revenue of the covered devices. Apple believes the rate is unreasonably high and that the value and contribution of the declared-essential patents is disproportionate to the revenue received by Apple for sales of its products. In addition, the demanded rate was higher than the rate Motorola has offered to other competitors. The parties have negotiated on and off for three years but have been unable to agree on licensing terms." At 23: "With respect to the second alleged breach, Apple alleges that Motorola has made royalty demands on Apple that exceeded those made on comparable parties for use of the declared-essential patents, discriminated against Apple by terminating Qualcomm's contract with Motorola solely as to Apple, demanded a rate that was based on the total revenue base of Apple's products rather than the revenue from the components that utilize the technologies of the declared-essential patents, sought to include cross-licenses to certain of Apple's non-essential patents as a condition of a licensing agreement and sued Apple when Apple refused to accede to Motorola's demands.")

[1341] *Apple, Inc. v. Motorola Mobility, Inc.*, Opinion and Order, (W.D. Wisc.) dated October 29, 2012, 34.

[1342] *Apple, Inc. v. Motorola Mobility, Inc.*, Opinion and Order, (W.D. Wisc.) dated October 29, 2012, 34 – 36. ("In a related breach of contract theory, Apple also alleged in its amended complaint that Motorola unreasonably terminated an agreement it had with Chi Mei Communications Systems, another supplier of component parts for Apple, through which Apple had paid royalties of approximately $1 for each phone for a license to certain

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

. . .

Apple responded that it would accept a license if the price were $1 per device or less, but could not commit to accept any higher offer without knowing how much higher that offer would be. [1344]

---

of Motorola's standards-essential patents. Id. at ¶¶ 54-55. Shortly after Motorola terminated the Chi Mei license, Motorola sought a license rate from Apple of $12 for each phone. At summary judgment, Motorola did not challenge Apple's ability to prove breach of contract on the basis of the Chi Mei and Qualcomm licenses. . . . Moreover, I agree with Apple that at the very least, the Chi Mei and Qualcomm licenses are relevant to the reasonableness of Motorola's licensing demands. Therefore, I will not preclude Apple from introducing evidence of the Chi Mei and Qualcomm licenses and of Motorola's actions in terminating them." (Emphasis added.))

[1343] *Apple Inc. v. Motorola Mobility LLC,* Opening Brief and Addendum of Plaintiff-Appellant, Apple Inc.," dated July 23, 2013, 46. *See, also,* 16 – 18, 32, 64, 66. (At 32: "The moment a serious competitor came along [Apple], Motorola canceled the license to its declared-essential patents and demanded an exorbitant rate. See supra at 15-19. Apple had proof that Motorola's offer of $12.35 was far outside any reasonable range. As Apple's expert explained, Motorola's patents "represent, at best, small improvements over alternatives that were available before the standard was set" and thus REDACTED A8082-83. The offer was also "discriminatory relative to the rates Motorola has charged other smart phone manufacturers." A8085. Meanwhile, as the district court found, Motorola's only expert "did not offer any opinion about what particular rate or range or rates would constitute a [FRAND] royalty," and was therefore precluded from testifying about a particular rate at trial. A156." (Emphasis added.)  At 64: "This case is the perfect example of where resolving a hotly contested issue would have served exactly such a "useful purpose." As explained above, see supra at 16-19, from the parties' first licensing discussion in 2007, Motorola's $12-per-iPhone demand has represented an insurmountable roadblock. Even after Apple made valuable concessions, Motorola refused to budge. Without judicial intervention, the parties are highly unlikely ever to reach a license agreement on their own. By removing this roadblock, the district court would not merely have sent the parties "back to the negotiation table to hammer out the details of a license," A175, but would also have broken the "logjam" that was impeding any resolution of the license question, as Apple argued, A90,175-76." (Emphasis added.))

[1344] *Apple Inc. v. Motorola Mobility LLC,* Opening Brief and Addendum of Plaintiff-Appellant, Apple Inc.," dated July 23, 2013, 53.  *See, also, Apple, Inc. v. Motorola Mobility, Inc.,* Opinion and Order, (W.D. Wisc.) dated November 8, 2012, 5. ("Although Apple wanted the court to determine a fair, reasonable and non-discriminatory rate that Motorola must offer to Apple, it maintained that Motorola had never asked the court for an order requiring Apple to accept this rate. Rather, Apple argued, the case had always focused on Motorola's obligation to offer a fair, reasonable and non-discriminatory license to Apple. Id. at 4. It added, however, that it would be willing to pay a rate of no more than $1 for each Apple device going forward, while it retained the right to appeal any award higher than $1, as well as to refuse any such rate and proceed to further infringement litigation. Id. at 5.  Perhaps it should have been evident earlier in the case that Apple was seeking only a ceiling on the potential license rate that it could use for negotiating purposes, but it was not. This became clear only when Apple informed the court in its October 31 response that it did not intend to be bound by any rate that the court determined. This meant that the court would determine what it believed to be a fair, reasonable and non-discriminatory rate for a license with Motorola, but Apple would pay that rate only if it was the rate Apple wanted. Even then, it was only volunteering to pay the rate. If Apple succeeded in showing that a breach occurred but did not win the rate it wanted, it could walk away, leaving Motorola without a mechanism for obtaining compensation from Apple for the use of its patents except by filing infringement suits. The court would be resolving all of the issues raised in this case without necessarily bringing the parties any closer to a license agreement.  In effect, Apple was asking the court to assist it in negotiating, not in putting the parties' dispute to rest." (Emphasis added.))

Confidential - Attorney's Eyes Only                     414                     CORRECTED

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

This record vividly illustrates the stark choices that Apple would have confronted once the district court set the FRAND rate. If the rate was reasonable enough—say, lower than $1 per unit—Apple was prepared to buy litigation peace and move on. If, by some chance, the trial yielded a rate closer to Motorola's demanded $12 per unit, it would have been far more sensible for Apple to continue fending off Motorola's patent attacks and demonstrating why each patent was either not infringed (and therefore not essential) or not valid, or why Motorola's patent rights were exhausted. And if the rate was somewhere in the space between those two poles, Apple would have had to make the difficult business judgment whether to accept the license or the risk. [1345]

(827)  Motorola and Apple also engaged in confidential settlement discussions after January 4, 2011, pursuant to a January 2011 agreement[1346] and that was extended in November 2011 to November 16, 2013.[1347]

(828)  Apple's expert testified regarding how the value of Motorola's SEP patent should be determined:

> As Apple's own experts have testified, the value of Motorola's declared-essential patents should be determined by an assessment of their value over any non-infringing alternatives at the time Motorola's patents were incorporated into the standard. E.g., Carlton Rep., dkt. #208, ¶ 49.[1348]

## C. Apple's Patent Litigation Damages Claims

### 1) Apple v. Samsung

(829)  I have reviewed the Apple v. Samsung trial exhibits.  I understand that Apple claimed reasonable royalties of $2.05 per unit and $3.10 per unit in connection with three

---

[1345] *Apple Inc. v. Motorola Mobility LLC,* Opening Brief and Addendum of Plaintiff-Appellant, Apple Inc.," dated July 23, 2013, 58 – 59.

[1346] *Apple, Inc. v. Motorola Mobility, Inc.,* Opinion and Order, (W.D. Wisc.) dated October 29, 2012, 10. ("Motorola's argument on this point is simply a critique of the methods and opinions of Apple's experts. In particular, Motorola criticizes the methods used by Apple's experts and argues that the experts failed to consider the hundreds of essential patents owned by Motorola as well as the confidential settlement negotiations between the parties after January 4, 2011....")

[1347] *Apple, Inc. v. Motorola Mobility, Inc.,* Opinion and Order, (W.D. Wisc.) dated October 29, 2012, 11 – 12. ("Motorola contends that all evidence relating to its conduct or the parties' patent license negotiations after January 4, 2011 should be precluded under the parties' Mutual Non-Disclosure and Rule 408 Agreement.... The agreement was extended in November 2011 until November 16, 2013.... The January 2011 agreement...")

[1348] *Apple, Inc. v. Motorola Mobility, Inc.,* Opinion and Order, (W.D. Wisc.) dated October 29, 2012, 17 – 18.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

patents it asserted against Samsung. Emblaze requested production of the trial transcripts and trial exhibits; however, Apple did not produce these documents. I understand that Mr. Musika's Exhibit 25A may include additional information regarding how these rates were arrived at. I understand that Apple acknowledged that it would take no more than 1 to 8 months to design around these patents.

(830) I also understand that Apple offered to license its patent portfolio for $30 per phone and $40 per tablet. Apple did not produce this and other documents about Apple's licensing.

## 2) Mirror Worlds v. Apple

(831) I have reviewed the Mirror Worlds v. Apple trial transcripts. Mirror Worlds accused all Apple computers and servers that run the Mac OS X operating system versions 10.4 ("Tiger"), 10.5 ("Leopard"), and 10.6 ("Snow Leopard") of infringement, as well as Apple's mobile devices that run the iOS operating system. More specifically, three specific features embedded in those operating systems were identified as infringing. They were Spotlight (a search and indexing application), Cover Flow (a graphical user interface that allows a user to flip through a stack of documents on the computer) and Time Machine (an automatic backup and archiving application).[1349]

(832) Plaintiff Mirror World's damages expert Mr. Walt Bratic performed a reasonable royalty and Georgia Pacific Analysis. The royalty base he relied upon was Apple's U.S. sales of the accused products. The royalty rates he determined were 8.8% for the accused software product and 0.8% for the hardware (computer) – recognizing the fact that the hardware had more features and functionality than the software. His assessment for damages totaled $625 million. In this case Apple produced its own consumer surveys,

---

[1349] September 6, 2012 Mirror Worlds v. Apple: Apple Operating System Does Not Infringe, IP Watchdog (available at http://www.ipwatchdog.com/2012/09/06/mirror-worlds-v-apple-apple-operating-system-does-not-infringe/id=27804/).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

which Mr. Bratic relied upon to determine the relative importance of the accused features reported by Apple customers.[1350]

(833) Defendant Apple's damages expert Mr. Keith Ugone's opinion relied on sales transactions of the accused patents. He also considered the terms for other technology licenses involving Apple, and relied on a technical expert's opinion on comparability between technologies. He opined that Apple would have paid a lump-sum for the accused technology ranging between $210,000 and $4 million.[1351]

### 3) VirnetX v. Apple

(834) I have also reviewed the *Virnetx, Inc. v. Apple, Inc.* trial transcripts. In this case, Virnetx accuses Apple of infringing its patents through Apple's use of FaceTime and VPN on Demand. Apple's VPN on Demand feature allegedly infringes Virnetx's '135 and '151 patents that create secure communications between devices through a virtual private network.[1352] Apple's FaceTime feature allegedly infringes Virnetx's '504 and '211 patents that create a secure communication link.[1353]

(835) The Plaintiff concludes a reasonable royalty of 1 percent applied to the royalty base.[1354] The royalty rate was determined by evaluating the *Georgia-Pacific* factors, taking into account Virnetx's standard licensing policy of 1 to 2 percent and other license agreements entered into by Virnetx.[1355] The royalty base was determined by taking the lowest saleable unit price for each Accused Product to the number of units sold.[1356]

(836) In this case, Apple corporate representative testified about usage data that he could access both from Apple's servers and Akamai's servers. Emblaze requested usage data in this case; however, Apple has not produced this data for live streaming.

---

[1350] September 29, 2010 Mirror Worlds, LLC v. Apple, Inc. Transcript of Jury Trial; Afternoon Session; Before the Honorable Leonard Davis; United States District Judge.
[1351] September 30, 2010 Mirror Worlds, LLC v. Apple, Inc. Transcript of Jury Trial; Afternoon Session Part 2; Before the Honorable Leonard Davis; United States District Judge.
[1352] November 1, 2012 Virnetx, Inc. vs. Apple, Inc., Transcript of Trial, 15:3 – 16:8.
[1353] November 1, 2012 Virnetx, Inc. vs. Apple, Inc., Transcript of Trial, 16:9 – 17:8.
[1354] November 1, 2012 Virnetx, Inc. vs. Apple, Inc., Transcript of Trial, 121:13 – 121:20.
[1355] November 1, 2012 Virnetx, Inc. vs. Apple, Inc., Transcript of Trial, 121:21 – 122:16.
[1356] November 1, 2012 Virnetx, Inc. vs. Apple, Inc., Transcript of Trial, 124:10 – 124:20.

Expert Report of Catharine M. Lawton

(844)   Finally, there is at least some information regarding Apple's transfer pricing practices because it was the subject of a Congressional investigation into Apple's tax practices.[1391] Charts from Drs. Shay and Harvey's reports highlight the key issues:

| Country | 2011 Pre-Tax Income | | Employees @ June 2011[2] | | 2011 Customer Location[3] |
|---|---|---|---|---|---|
| | $ Billions | % | # | $ | |
| United States | 10.2 | 30% | 67% | 79% | 39% |
| Ireland | 22.0 | 64 | 4 | 3 | 1 |
| Other countries | 2.0 | 6 | 29 | 18 | 60 |
| Consolidated | 34.2 | 100% | 100% | 100% | 100% |

| | Pre-tax Income/Sales | % of Pre-tax Income | General & Administrative Expenses | | Sales, Marketing, & Distribution Expenses | |
|---|---|---|---|---|---|---|
| | | | $ billions | % | $ billions | % |
| US | 24% | 30% | 1.7 | 85% | 3.3 | 59% |
| Non-US | 36% | 70% | 0.3 | 15% | 2.3 | 41% |
| Consolidated | 32% | 100% | 2.0 | 100% | 5.6 | 100% |

## C. Apple's Management Structure

(845)   At Apple, [t]he executive team, a small council of advisors to the CEO, runs the company, assisted by a cadre of fewer than one hundred vice presidents."[1392]   Phil Schiller testified that the executive team "is the group of executives at Apple that are the most

---

[1391] "Testimony of Stephen E. Shay Before the U.S. Senate Permanent Subcommittee on Investigations Of the Committee on Homeland Security and Governmental Affairs Hearing on Offshore Profit Shifting and the Internal Revenue Code," May 21, 2013, (http://www.hsgac.senate.gov/download/?id=c8199653-35a4-49b2-82fc-9b5031f2cd0e). "Testimony of J. Richard (Dick) Harvey, Jr. Before the U.S. Senate Permanent Subcommittee on Investigations," May 21, 2013, (http://www.hsgac.senate.gov/subcommittees/investigations/hearings/offshore-profit-shifting-and-the-us-tax-code -part-2).  "Hearing on Offshore Profit Shifting and the U.S. Tax Code, Part 2 (Apple Inc.)," United States Senate Permanent Subcommittee on Investigations, May 21, 2013, (http://info.publicintelligence.net/HSGAC-AppleOffshore.pdf).
[1392] Lashinsky, Adam, *Inside Apple, How America's Most Admired—and Secretive—Company Really Works,* (New York: Hachette Book Group, 2012), 37.

afternoon with his [Steve Jobs] top agency, marketing, and communications people to kick around messaging strategy"[1395]—and endless product review meetings."[1396]

(848)   In addition, Apple reportedly has a variety of other meetings including annual management retreats.[1397] quarterly review presentations,[1398] product strategy sessions,[1399] and product review sessions;[1400] as well as spreadsheets that are provided to Apple's CEO, Tim Cook.[1401]

(849)   Based on the foregoing, I would expect that Apple would have the typical range of business and accounting records that are typically produced in litigation, but have not been provided in this case.

## D. Apple's Financial Information Provided in this Litigation

(850)   The financial information Apple has produced in this litigation is highly limited, and has been prepared in connection with this litigation. Based on my review, Apple financial information is limited to certain sales summaries that were prepared in connection with this litigation.  Apple has not provided any business planning documents, strategic plans, chart of accounts, product line profitability reports, budgets, management reports or other similar documents that, in my experience, are routinely produced in litigation.

(851)   Given that Apple is unusually secretive, this may explain Apple's failure to provide these basic business records.   For example, Adam Lashinsky wrote that Apple has a **"playbook,"** that it keep secret; **"Secrecy is a central facet of life there"**[1402]:

---

[1395] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 332.
[1396] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 362.
[1397] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 154, 182.
[1398] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 199.
[1399] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 337.
[1400] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 337, 338.
[1401] Helft, Miguel, "The Understudy Takes the Stage at Apple," The New York Times, January 23, 2011, (http://www.nytimes.com/2011/01/24/technology/24cook.html?pagewanted=all&_r=0).
[1402] Lashinsky, Adam, Inside Apple, How America's Most Admired—and Secretive—Company Really Works, (New York:  Hachette Book Group, 2012), 164.

Expert Report of Catharine M. Lawton

**Table 7**

## Apple's Earning Calls Forecast Summary

| Quarter | Target Revenue | GAAP Gross Margin | GAAP OpEx | OI&Es | Tax Rate | GAAP EPS |
|---------|----------------|-------------------|-----------|-------|----------|----------|
| 1Q2009 | $7.6 - $8 billion | 32.5% | $1.33 billion | $60 million | 31% | $0.90 - $1 |
| 2Q2009 | $7.7 - $7.9 billion | 33.0% | $1.35 billion | $55 million | 31% | $0.95 - $1 |
| 3Q2009 | $8.7 - $8.9 billion | 34.0% | $1.445 billion | $30 million | 30% | $1.18 - $1.23 |
| 4Q2009 | $11.3 - $11.6 billion | 34.0% | $1.64 billion | $30 million | 30% | $1.70 - $1.78 |
| 1Q2010 | $11 - $11.4 billion | 39.0% | $1.64 billion | $30 million | 29% | $2.06 - $2.18 |
| 2Q2010 | $13 - $13.4 billion | 36.0% | $1.83 billion | $45 million | 27% | $2.28 - $2.39 |
| 3Q2010 | $18 billion | 35.0% | $2 billion | $50 million | 26.5% | $3.44 |
| 4Q2010 | $23 billion | 36.0% | $2.325 billion | $65 million | 25.5% | $4.80 |
| 1Q2011 | $22 billion | 38.5% | $2.35 billion | $50 million | 25.5% | $4.90 |
| 2Q2011 | $23 billion | 38.0% | $2.5 billion | $70 million | 25% | $5.03 |
| 3Q2011 | $25 billion | 38.0% | $2.725 billion | $50 million | 24% | $5.50 |
| 4Q2011 | $37 billion | 40.0% | $3.25 billion | $85 million | 24.25% | $9.30 |
| 1Q2012 | $32.5 billion | 42.0% | $3.05 billion | $125 million | 25.25% | $8.50 |
| 2Q2012 | $34 billion | 41.5% | $3.3 billion | $175 million | 25.25% | $8.68 |
| 3Q2012 | $34 billion | 38.5% | $3.5 billion | $175 million | 25.5% | $7.65 |
| 4Q2012 | $52 billion | 36.0% | $4.05 billion | $380 million | 26% | $11.75 |
| 1Q2013 | $41 - $43 billion | 37.5% - 38.5% | $3.8 - $3.9 billion | $350 million | 26% | n/a |
| 2Q2013 | $33.5 - $35.5 billion | 36% - 37% | $3.85 - $3.95 billion | $300 million | 26% | n/a |

Sources and Notes:
This table summarizes the outlook that Apple forecasts in each of its quarterly earnings calls. The forecast is made for the following quarter.
AAPL Earnings Conference Call - 2009 Q1-2013 Q2.

(866)   Forecasts presented in connection with earnings call guidance, however, are not the type of forecasts that are typically used in the determination of a reasonable royalty in a patent damages case.   Rather, in sketching the hypothetical negotiation situation, internal business forecasts prepared in the ordinary course of business at or about the time of first infringement are typically the focus.

(867)   While Apple has not produced any of these types of internal business forecasts, both Mr. Buckley's testimony and other publicly available information suggests that Apple likely has some type of internal business forecast information that it has not produced.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> **number, in the United States and around the world**. "I would spend fifteen to twenty minutes every morning going through these numbers, and then I would call people on it," Diery recalls. And each Thursday, Diery received **reports from Apple's resellers** indicating how much product had actually been sold the week before, so he could match those numbers against Apple's **backlog**.
>
> Diery's technique, while not as methodical and comprehensive as the one used under Yocam, was for the most part effective. . . .[1443] (Emphasis added.)

(872)   Walter Isaacson also provided a Steve Jobs vignette relating to Apple's sales forecasts in or about 1984:

> The most substantive disagreements Jobs had on the European trip concerned **sales forecasts**. Using his reality distortion field, Jobs was always pushing his team to come up with higher projections. He kept threatening the European managers that he wouldn't give them any allocations unless they **projected bigger forecasts**. They insisted on being realistic, and [Mac team member, Joanna] Hoffmann had to referee. "By the end of the trip, my whole body was shaking uncontrollably," Hoffmann recalled.
>
> It was the trip that Jobs first got to know Jean-Louis Gassee, Apple's manager in France. Gassee was among the few to stand up successfully to Jobs on the trip. "He had his own way with the truth," Gassee later remarked. "The only way to deal with him was to out-bully him." When Jobs made his usual threat about cutting down on France's allocations if Gassee didn't **jack up sales projections**, Gassee got angry. "I remember grabbing his lapel and telling him to stop, and then he backed down. I used to be an angry man myself. I am a recovering assaholic. So I recognized that in Steve."[1444] (Emphasis added.)

(873)   Walter Isaacson's biography, *Steve Jobs,* also outlines Steve Jobs's focus beginning in 1998 on more advanced procurement and supply chain management techniques, including JIT:

> He [Steve Jobs] let go of his control-freak desire to manufacture products in his own factories and instead outsourced the making of everything from the circuit boards to the finished computers. And he

---

[1443] Carlton, Jim, *Apple – The Inside Story of Intrigue, Egomania, and Business Blunders,* (New York: Random House, 1997), 328 – 330.
[1444] Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 185.

Expert Report of Catharine M. Lawton

### E. 1999/2000 – Oracle Handheld Checkout System for Apple Stores

(879)    In or about 1999, Oracle was developing software for the handheld checkout system that Apple was developing for the new Apple stores.[1456]

(880)    With Oracle's software, Apple had "instant information on how to integrate manufacturing, supply, and sales channels"[1457]:

> By 2004 Apple stores were averaging 5,400 [visitors] per week.  That year the stores had $1.2 billion in revenue, setting a record in the retail industry for reaching the billion-dollar milestone.  Sales in each store were tabulated every four minutes by Ellison's [Oracle] software, giving instant information on how to integrate manufacturing, supply, and sales channels.[1458]

(881)    Steve Jobs's comments about Apple's store in Manhattan on Fifth Avenue makes it imminently clear that Apple has access to significant data—not just about Apple's retail stores, but also data related to other retailers:

> "This store gross more per square foot than any other store in the world," Jobs proudly noted in 2010.  "It also grosses more in total—absolute dollars, not per square foot—than any other store in New York.  That includes Saks and Bloomingdale's."
>
> . . .
>
> In July 2011, a decade after the first ones opened, there were 326 Apple stores.  The biggest was in London's Covent Garden, the tallest in Tokyo's Ginza.  The average annual revenue per store was $34 million, and the total net sales in fiscal 2010 were $9.8 billion.[1459]

### F. Conclusion Regarding Apple's Forecasts

(882)    The foregoing provides substantial evidence regarding the types of information that Apple appears to maintain (or has maintained in the past) in the ordinary course of its business—none of which has been made available in this litigation.  Furthermore, given

---

[1456] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 372.
[1457] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 374.
[1458] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 374.
[1459] Isaacson, Walter, Steve Jobs, (New York:  Simon & Schuster Paperbacks, 2013), 376.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Table 8**

**Apple Analyst Report Income Projection ($'s in Millions)**

| Qtrs & Years | Net Sales | Cost of Sales | GM | Gross Profit | SG&A | % of Sales | Op Ex | Oper Inc | Oper Margin | Net Inc | GAAP EPS | Growth Y/Y Rev | EPS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **[A] December 17, 2007** | | | | | | | | | | | | | |
| Dec-07 | $ 9,084 | $ 6,177 | 32% | $ 2,907 | $ 890 | 10% | $ 1,108 | $ 1,799 | 20% | $ 1,356 | $1.50 | 28% | 32% |
| Mar-08 | $ 7,072 | $ 4,809 | 32% | $ 2,263 | $ 813 | 12% | $ 1,026 | $ 1,238 | 18% | $ 974 | $1.07 | 34% | 24% |
| Jun-08 | $ 7,240 | $ 4,851 | 33% | $ 2,389 | $ 847 | 12% | $ 1,064 | $ 1,325 | 18% | $ 1,034 | $1.13 | 34% | 23% |
| Sep-08 | $ 8,250 | $ 5,610 | 32% | $ 2,640 | $ 908 | 11% | $ 1,139 | $ 1,502 | 18% | $ 1,157 | $1.26 | 33% | 25% |
| Dec-08 | $ 11,052 | $ 7,471 | 32% | $ 3,581 | $ 1,028 | 9% | $ 1,315 | $ 2,266 | 21% | $ 1,677 | $1.82 | 22% | 21% |
| Mar-09 | $ 9,456 | $ 6,430 | 32% | $ 3,026 | $ 1,069 | 11% | $ 1,362 | $ 1,664 | 18% | $ 1,271 | $1.37 | 34% | 28% |
| Jun-09 | $ 10,332 | $ 7,026 | 32% | $ 3,306 | $ 1,137 | 11% | $ 1,467 | $ 1,839 | 18% | $ 1,390 | $1.49 | 43% | 32% |
| Sep-09 | $ 12,008 | $ 8,166 | 32% | $ 3,843 | $ 1,237 | 10% | $ 1,597 | $ 2,246 | 19% | $ 1,666 | $1.78 | 46% | 42% |
| Dec-09 | $ 15,405 | $ 10,383 | 33% | $ 5,022 | $ 1,464 | 10% | $ 1,895 | $ 3,127 | 20% | $ 2,269 | $2.42 | 39% | 33% |
| **[B] March 31, 2008** | | | | | | | | | | | | | |
| Mar-08 | $ 6,968 | $ 4,738 | 32% | $ 2,230 | $ 906 | 13% | $ 1,122 | $ 1,108 | 16% | $ 883 | $0.97 | 32% | 12% |
| Jun-08 | $ 7,117 | $ 4,768 | 33% | $ 2,349 | $ 833 | 12% | $ 1,046 | $ 1,302 | 18% | $ 1,018 | $1.12 | 32% | 22% |
| Sep-08 | $ 8,102 | $ 5,510 | 32% | $ 2,593 | $ 891 | 11% | $ 1,118 | $ 1,475 | 18% | $ 1,139 | $1.24 | 30% | 23% |
| Dec-08 | $ 11,572 | $ 7,823 | 32% | $ 3,749 | $ 1,065 | 9% | $ 1,366 | $ 2,384 | 21% | $ 1,757 | $1.91 | 20% | 8% |
| Mar-09 | $ 9,278 | $ 6,309 | 32% | $ 2,969 | $ 1,011 | 11% | $ 1,299 | $ 1,670 | 18% | $ 1,275 | $1.38 | 33% | 41% |
| Jun-09 | $ 10,194 | $ 6,932 | 32% | $ 3,262 | $ 1,060 | 10% | $ 1,386 | $ 1,876 | 18% | $ 1,415 | $1.52 | 43% | 36% |
| Sep-09 | $ 11,844 | $ 8,054 | 32% | $ 3,790 | $ 1,184 | 10% | $ 1,528 | $ 2,262 | 19% | $ 1,678 | $1.80 | 46% | 45% |
| Dec-09 | $ 15,926 | $ 10,734 | 33% | $ 5,192 | $ 1,497 | 9% | $ 1,943 | $ 3,249 | 20% | $ 2,352 | $2.51 | 38% | 32% |
| **[C] June 23, 2008** | | | | | | | | | | | | | |
| Jun-08 | $ 7,219 | $ 4,836 | 33% | $ 2,382 | $ 888 | 12% | $ 1,169 | $ 1,213 | 17% | $ 916 | $1.01 | 33% | 10% |
| Sep-08 | $ 7,943 | $ 5,401 | 32% | $ 2,542 | $ 874 | 11% | $ 1,096 | $ 1,446 | 18% | $ 1,084 | $1.19 | 28% | 18% |
| Dec-08 | $ 11,402 | $ 7,662 | 33% | $ 3,740 | $ 1,049 | 9% | $ 1,345 | $ 2,394 | 21% | $ 1,738 | $1.90 | 19% | 8% |
| Mar-09 | $ 9,331 | $ 6,345 | 32% | $ 2,986 | $ 1,017 | 11% | $ 1,316 | $ 1,670 | 18% | $ 1,242 | $1.35 | 24% | 16% |
| Jun-09 | $ 9,674 | $ 6,578 | 32% | $ 3,096 | $ 996 | 10% | $ 1,287 | $ 1,809 | 19% | $ 1,338 | $1.45 | 34% | 43% |
| Sep-09 | $ 10,947 | $ 7,422 | 32% | $ 3,525 | $ 1,084 | 10% | $ 1,401 | $ 2,124 | 19% | $ 1,559 | $1.68 | 38% | 41% |
| Dec-09 | $ 14,393 | $ 9,701 | 33% | $ 4,692 | $ 1,353 | 9% | $ 1,756 | $ 2,936 | 20% | $ 2,123 | $2.28 | 26% | 20% |
| **[D] September 29, 2008** | | | | | | | | | | | | | |
| Sep-08 | $ 8,369 | $ 5,691 | 32% | $ 2,678 | $ 954 | 12% | $ 1,270 | $ 1,409 | 17% | $ 1,062 | $1.17 | 35% | 16% |
| Dec-08 | $ 11,415 | $ 7,877 | 31% | $ 3,539 | $ 1,039 | 9% | $ 1,336 | $ 2,203 | 19% | $ 1,606 | $1.76 | 19% | 0% |
| Mar-09 | $ 9,344 | $ 6,448 | 31% | $ 2,897 | $ 1,009 | 11% | $ 1,308 | $ 1,589 | 17% | $ 1,186 | $1.29 | 24% | 11% |
| Jun-09 | $ 10,154 | $ 7,006 | 31% | $ 3,148 | $ 1,015 | 10% | $ 1,320 | $ 1,828 | 18% | $ 1,351 | $1.47 | 36% | 24% |
| Sep-09 | $ 11,096 | $ 7,656 | 31% | $ 3,440 | $ 1,065 | 10% | $ 1,387 | $ 2,053 | 19% | $ 1,510 | $1.63 | 33% | 40% |
| Dec-09 | $ 14,406 | $ 9,940 | 31% | $ 4,466 | $ 1,239 | 9% | $ 1,614 | $ 2,852 | 20% | $ 2,065 | $2.22 | 26% | 26% |

Sources:

[A] Munster, Gene and Olson, Michael J., "Analysis Of 1st 2 Mos Of Dec Qtr iPod NPD Data Suggests 24m-25m Units," Piper Jaffray & Co., December 17, 2007, p. 3.

[B] Munster, Gene, Olson, Michael J., and Murphy, Andrew H., "Apple's 3 Cylinder Engine: Part 1 - iPhone," Piper Jaffray & Co., March 31, 2008, p. 5.

[C] Munster, Gene, Olson, Michael J., and Murphy, Andrew H., "Assessing The Impact Of The Prepaid Market On The iPhone 3G; Maintain Buy," Piper Jaffray & Co., June 23, 2008, p. 5.

[D] Munster, Gene, Olson, Michael J., and Murphy, Andrew H., "Perspective On Recent Downgrades," Piper Jaffray & Co., September 29, 2008, p. 2.

(884)   In some cases, the analyst reports also comment on estimated gross margins by device. For example:

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## XVIII.   Accused Device, Software & Application Sales Analysis

### A. Apple's Currently Available Sales Data

(885)   I have summarized the limited sales, cost and standard margin data that Apple has produced in this litigation for the Accused Devices, Software and Applications.

### 1) Accused Devices

(886)   **Table 9**, below summarizes Apple's reported **U.S. Unit Sales as a % of Apple's reported Worldwide Units Sales** for the period June 2009 to June 2013 based on Apple's definition of U.S. sales:

**Table 9**

Apple's U.S. Unit Sales as a Percent of Worldwide Unit Sales of Accused Devices

|  | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 |
|---|---|---|---|---|---|
| [A] iPhone |  |  |  |  |  |
| [B] iPod touch |  |  |  |  |  |
| [C] iPad |  |  |  |  |  |
| [D] Mac |  |  |  |  |  |
| [E] Apple TV |  |  |  |  |  |

Sources and Notes:
[A] Schedules 2A and 2B.
[B] Schedules 3A and 3B.
[C] Schedules 4A and 4B.
[D] Schedules 5A and 5B.
[E] Schedules 6A and 6B.

(887)   **Table 10**, below, summarizes Apple's reported <u>U.S. Unit Sales</u> of the Accused Devices for the period June 2009 to June 2013:

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Table 10**

Apple's U.S. Unit Sales of Accused Devices

|  |  | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 |
|---|---|---|---|---|---|---|
| [A] | iPhone |  |  |  |  |  |
| [B] | iPod touch |  |  |  |  |  |
| [C] | iPad |  |  |  |  |  |
| [D] | Mac |  |  |  |  |  |
| [E] | Apple TV |  |  |  |  |  |

Sources and Notes:
[A] Schedule 2A.
[B] Schedule 3A.
[C] Schedule 4A.
[D] Schedule 5A.
[E] Schedule 6A.

(888) **Table 11**, below, summarizes Apple's reported <u>U.S. Sales Revenue and Standard Cost</u> for the Accused Devices for the period June 2009 to June 2013:

**Table 11**

Apple's U.S. Sales Revenue and Standard Cost of Accused Devices

| Revenue |  | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 |
|---|---|---|---|---|---|---|
| [A] | iPhone |  |  |  |  |  |
| [B] | iPod touch |  |  |  |  |  |
| [C] | iPad |  |  |  |  |  |
| [D] | Mac |  |  |  |  |  |
| [E] | Apple TV |  |  |  |  |  |

| Standard Costs |  | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 |
|---|---|---|---|---|---|---|
| [A] | iPhone |  |  |  |  |  |
| [B] | iPod touch |  |  |  |  |  |
| [C] | iPad |  |  |  |  |  |
| [D] | Mac |  |  |  |  |  |
| [E] | Apple TV |  |  |  |  |  |

Source:
[A] Schedule 2A
[B] Schedule 3A
[C] Schedule 4A
[D] Schedule 5A
[E] Schedule 6A

Expert Report of Catharine M. Lawton

(889)    **Table 12**, below, summarizes Apple's reported <u>U.S. Standard Margin</u> for the Accused Devices for the period June 2009 to June 2013:

**Table 12**

Apple's U.S. Standard Margins of Accused Devices

|  | Standard Margin | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 |
|---|---|---|---|---|---|---|
| [A] | iPhone | | | | | |
| [B] | iPod touch | | | | | |
| [C] | iPad | | | | | |
| [D] | Mac | | | | | |
| [E] | Apple TV | | | | | |

Source:
[A]  Schedule 2A
[B]  Schedule 3A
[C]  Schedule 4A
[D]  Schedule 5A
[E]  Schedule 6A

## 2) Accused Software

(890)    **Table 13**, below, summarizes **Apple's reported** <u>U.S. Software Downloads</u> for the period June 2009 to June 2013. Apple has provided download counts for software that is capable of using HTTP Live Streaming which includes Mac OS X (version 10.6 and greater), and iOS 3.0 or greater. Apple's Mark Buckley could not explain why the foregoing software versions were selected; Buckley testified: "You know, I'm not certain why someone chose 10.6. I have ideas, but I don't know."[1464]

**Table 13**

Apple's U.S. Software Downloads of Accused Devices

|  | Software | Q3/Q4 2009 | FY 2010 | FY 2011 | FY 2012 | Q1 to Q3 FY 2013 | Total |
|---|---|---|---|---|---|---|---|
| [A] | iPhone iOS 3.0+ | | | | | | |
| [B] | iPod Touch iOS 3.0+ | | | | | | |
| [C] | Mac OS X 10.6+ | | | | | | |

Sources:
[A]  Schedule 8
[B]  Schedule 9
[C]  Schedule 7

---

[1464] August 20, 2013 30(b)(6) Deposition of Mark Buckley, 109:19 – 109:20.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## 3) Accused Applications

(891)   **Table 14**, below, summarizes Apple's reported <u>U.S. HLS App Downloads and Revenue</u> for the period June 2009 to June 2013.

**Table 14**

### Apple's U.S. HLS App Downloads and Revenues

| App Family | Downloads | Revenue |
|------------|-----------|---------|
| MLB.com | | |
| NFL | | |
| PGA | | |
| ABC News | | |

Sources:
Schedule 1A and 10A

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(895)    Analytically, a similar or "comparable" license is one that is both technically and economically similar.[1471]  This is because actual royalty rates are determined based on the market value that the technology provides.[1472] The incremental benefit to the user drives an invention's market value and thus should be the focus of the valuation analysis.[1473]

(896)    Market transactions that occur close to the date of first infringement are generally more instructive.[1474]  This is because the circumstances related to each license negotiation are necessarily unique, and changes in the industry, business, and/or general economic or cultural environment over time may render other market transactions at different points in times of limited utility.[1475]

(897)    Because license agreements are usually confidential, only limited information from actual market transactions may be available from public sources.  As such, the license agreements provided by the parties to the litigation may be the only source of available information.[1476]   Therefore, it is important to ensure that all available license agreements are provided.[1477]

(898)    Judge Rader has addressed the issue of comparable licenses and stated "where our emphasis ought to be, not on counting *Georgia-Pacific* factors, but on locating the best market we can come up with. That's usually going to be licenses, . . .":

> **CHIEF JUDGE RADER:** . . . While every case is going to be different, you have to look at the relevant economic evidence in each case. I like to use

---

[1471] Weil, Roman L., Michael J. Wagner, Peter B. Frank, *Litigation Services Handbook – The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc.), 2001, 24-19.

[1472] Weil, Roman L., Michael J. Wagner, Peter B. Frank, *Litigation Services Handbook – The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc.), 2001, 24-19.

[1473] Weil, Roman L., Michael J. Wagner, Peter B. Frank, *Litigation Services Handbook – The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc.), 2001, 24-25.

[1474] *See, e.g.,* Parr, Russell L., *Intellectual Property Infringement Damages – A Litigation Support Handbook,* (New York:  John Wiley & Sons, Inc., 1993), 183.

[1475] *See, e.g.,* Parr, Russell L., *Intellectual Property Infringement Damages – A Litigation Support Handbook,* (New York:  John Wiley & Sons, Inc., 1993), 186.

[1476] Weil, Roman L., Michael J. Wagner, Peter B. Frank, *Litigation Services Handbook – The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc.), 2001, 24-19.

[1477] Weil, Roman L., Michael J. Wagner, Peter B. Frank, *Litigation Services Handbook – The Role of the Financial Expert,* (New York:  John Wiley & Sons, Inc.), 2001, 24-19.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

claimed invention, I think the eye is on the right ball and they'll make contact more often than not.[1478]

(899)    In this case, Apple has submitted its HTTP Live Streaming specification to the IETF as a proposed standard; the first submission was on May 1, 2009.   As such, my investigation has focused on licenses involving standards in the digital media industry:   MP3, MPEG-4 and H.264.   Publicly available information indicates that Apple holds a license to each of the foregoing, and Apple has produced these licenses.   My summary of Apple's license agreements is attached as **Schedule 17A**.

## 1) Apple 30(b)(6) Testimony on Licensing and its Licenses

(900)    No meaningful information was obtained from Apple's 30(b)(6) witness on Apple's licensing policies and practices and licenses.

(901)    Apple's 30(b)(6) witness on licensing, C.K. Haun, ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████[1481]

(902)    C. K. Haun's deposition preparation was limited to a <u>4.5 minute</u> conversation with Taraneh Maghame.[1482]   C.K. Haun testified:

> Q.  Okay.  And what did you discuss with her about Topic 56? . . .
>
> A.  She indicated to me that in answer to 56, there is not a specific policy  or  procedure  for  licensing.    We  respect  other  people's

---

[1478] Haas, David A., John R. Bone, David N. Paris, "View from the Federal Circuit: An Interview with Chief Judge Randall R. Rader," Stout | Risius | Ross, July 9, 2012, (http://www.srr.com/article/view-federal-circuit-interview-chief-judge-randall-r-rader).

[1479] August 21, 2013 Deposition of C.K. Haun,

[1480] August 21, 2013 Deposition of C.K. Haun, 21:22 – 22:3.

[1481] August 21, 2013 Deposition of C.K. Haun, 110:19 – 110:24.

[1482] August 21, 2013 Deposition of C.K. Haun, 13:16 – 13:22, 14:8 – 16:17, 17:13 – 18:10.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

Q. I assume your answer would be the same if I asked you if you know whether they have licenses that call for a single lump-sum payment?

A. Correct.

Q. And, therefore, it would also be true that you wouldn't know what factors would go into Apple's decision whether to pay a lump sum or do a running royalty per device?

A. Correct.[1487]

. . .

Q. When Apple licenses technology in from a third party, do you know how it makes a determination as to whether it's going to take an exclusive or a nonexclusive license?

A. I do not.[1488]

. . .

Q. Do you know whether the ultimate decision to – whether to take a license under third-party technology is centralized somewhere in Apple? Is there a group that makes those final decisions whether to sign off on a license?

A. I do not know that.[1489]

Q. Are you aware of any licenses that Apple is a party to that involve the licensing of HLS technology?

A. I am not.[1490]

## 2) Publicly Available Information about MP3, MPEG-4, and H.264 Licenses

(903)    In view of the fact that Apple provided no meaningful information, I investigated to determine what, if any, information is publicly available.

---

[1487] August 21, 2013 Deposition of C.K. Haun, 118:14 – 119:5.
[1488] August 21, 2013 Deposition of C.K. Haun, 120:9 – 12013.
[1489] August 21, 2013 Deposition of C.K. Haun, 120:20 – 120:25.
[1490] August 21, 2013 Deposition of C.K. Haun, 121:8 – 121:11.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

### i. MP3 Licensing

(904)   Like HTTP Live Streaming, MP3 became a *de facto* standard for streaming music on the Internet in the late-1990s: "MP3 is a system of audio encoding and decoding that has become a *de facto* standard for music transmission on the Internet."[1491]   The MP3 licensing program, however, was not developed during the "digital convergence" period that began in the mid-2000s.

(905)   The MP3 format achieved "instant notoriety" as a result of the "explosion of online music trading."[1492] MP3 technology and its impact was described as follows[1493]:

> MP3 technology takes advantage of our auditory shortcomings to shrink digital music files by a factor of 10 or more without sacrificing the quality of the listening experience. The software eliminates what our ears can't discern, then replaces redundancies in the remaining string of digital bits with abbreviations. MP3 can turn a 50-megabyte file that would otherwise take hours to download from the Internet into a five-megabyte file that takes minutes. Consequently, consumers have access to high-quality music recordings on Web sites such as Napster and MP3.com-a threat to CD sales that currently has the recording industry in a snit.[1494]

(906)   MP3 is covered by a portfolio of patents;[1495] the background of the technology was described in 2001 and 2002 as follows:

> Although the MP3 hullabaloo is fairly recent, the technology has been around since the Erlangen, Germany, research facility the Fraunhofer Institute for Integrated Circuits acquired a German patent for it in 1989. (The U.S. patent was approved in 1996.) Fraunhofer allowed free use of the technology in its early days, giving developers a chance to

---

[1491] Kiang, Stuart, "MP3 Goes Pro; MP3's creators ready a better-sounding version of the ubiquitous online music format and finally reveal their licensing scheme for streaming MP3," MIT Technology Review, June 7, 2001, (http://www.technologyreview.com/news/401068/mp3-goes-pro/).

[1492] Kiang, Stuart, "MP3 Goes Pro; MP3's creators ready a better-sounding version of the ubiquitous online music format and finally reveal their licensing scheme for streaming MP3," MIT Technology Review, June 7, 2001, (http://www.technologyreview.com/news/401068/mp3-goes-pro/).

[1493] For the history of MP3's development, see, "The History of mp3," mp3licensing.com, (http://mp3licensing.com/mp3/history.html).

[1494] "MP3 Software; How MP3 software works," MIT Technology Review, April 1, 2001, (http://www.technologyreview.com/article/400958/mp3-software/).

[1495] The current patent portfolio includes numerous patents. "Patent Portfolio," mp3licensing.com, (http://mp3licensing.com/patents/index.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

improve its encoding and decoding performance. It was soon integrated into the Moving Picture Experts Group's standards for the compression of digitized audio and video. (The name MP3 itself comes from the group's acronym, MPEG, and stands for MPEG audio, layer three.) The first MP3-playing software, the Amp, was created in 1997 by Advanced Multimedia Products and became a model for later Windows- and Mac-based devices such as WinAmp and MacAmp.[1496]

\* \* \*

The Fraunhofer Institute has been the main developer of MPEG audio Layer-3, and the MP3 standard that has been approved is mainly based on their work, which Fraunhofer has protected by several patents. They decided to join their patents with those of Thomson Multimedia (also known as RCA) in order to create a joint patents portfolio, and to ask royalties for the use of this portfolio.

They now control a portfolio of 18 patents related to MP3, and one for Mp3Pro. This portfolio is very extensive, and covers various aspects of MP3 encoding. Some of those patents could be avoided in an MP3 implementation by either not using several features of the standard, or by using different algorithms than those specified. But what is important is that there are some of those patents that you will not be able to avoid, so practically it means that you can not use any MP3 implementation without using some parts of those patents.[1497]

(907)    Fraunhofer Institute's early licensing in 1998 was described as follows: "In September 1998, the Fraunhofer Institute announced that it would begin collecting royalties and charging developers a license fee of $15,000 annually."[1498] (Emphasis added.) Another source reported that in September 1998, Fraunhofer was seeking a royalty payment

---

[1496] "MP3 Software; How MP3 software works," MIT Technology Review, April 1, 2001, (http://www.technologyreview.com/article/400958/mp3-software/).

[1497] "Patents and MP3," mp3-tech.org, 2002, (http://www.mp3-tech.org/patents.html).

[1498] "MP3 Software; How MP3 software works," MIT Technology Review, April 1, 2001, (http://www.technologyreview.com/article/400958/mp3-software/). *See, also,* "Patents and MP3," mp3-tech.org, 2002, (http://www.mp3-tech.org/patents.html). ("Many people think that the MP3 standard is free and open, and that the ISO reference source code is also. But in the beginning of September 98, Fraunhofer Institute, largely involved in the development of MPEG-audio compression, has sent a letter to several developers of "free" ISO-source based encoders. In this letter they make it very clear that all developers and publishers of MPEG-audio layer 3 (MP3) encoders based on ISO-source must pay a license fee to Fraunhofer.")

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

beginning at $25 per encoder. Additionally, a 1% or .01 per file royalty is also put forth as being required."[1499]

(908) Based on the *Lucent-Alcatel v. Microsoft, et al.* litigation, I understand that Microsoft obtained a license from Fraunhofer Institute in <u>1997</u> for a lump sum payments of $16 million.[1500]

(909) Later, Thomson Multimedia (RCA) was responsible for licensing the MP3 patent portfolio, and in <u>June 2001</u> its licensing program was described as follows:

> Last year, Thomson notified MP3 users that royalties for MP3 streaming, or MP3 broadcasting, would not be charged "until the end of the year 2000," while it gauged "where this new market is going."

> This left users in the uncomfortable position of not knowing what the licensing cost of streaming MP3 would be, or when payments would fall due. In contrast, the licenses for software and hardware MP3 decoders had been set at $0.50 per unit with a minimum fee of $15,000 per year.

> This week, Linde revealed Thomson's licensing policy for streaming or broadcasting "pure MP3." The royalty rate is two percent of revenues related to streaming, with a minimum fee of $2,000 per year.

> This licensing model aims to find "the right middle ground between consumer acceptance and profitability for content providers," Linde says.

> "If MP3 is used for free distribution on the Internet, we will not charge royalties," he says. But "if people monetize, the inventors should have their fair share," he adds.

> For MP3Pro, Thomson will also offer a license based on "revenues related to streaming," such as advertising, Linde says. The royalty rate for MP3Pro will be three percent of revenue, with a minimum fee of $3,000 per year.

> Linde estimates that 80 to 90 percent of the market for streaming MP3Pro would only be required to pay the minimum fee. "Not that

---

[1499] "Why does multimedia specifically need open source? Example: An 'open' standard closes," xiph.org, (http://www.xiph.org/about/).
[1500] August 6, 2007 Decision of Judge Rudi Brewster (JMOL).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

many will be earning $100,000 from streaming," he says, "so it will amount to a $3,000 flat fee [per year] for most of the people."[1501]

(910) Technicolor, which describes itself as "a worldwide leader in the media and entertainment sector,"[1502] now serves as the licensing representative of MP3 patents and software of the Fraunhofer Institute in Germany. The licensing program was reportedly launched in 1995. Technicolor claims that it has played an instrumental role in making mp3 the *de facto* standard in digital audio—and that mp3 is the most supported audio format in the world. In addition, Technicolor reports that licensing agreements are in place with more than 600 companies, including hardware, software, IC, content distribution and game companies.[1503] Fraunhofer reports that over the course of more than two decades, it has licensed its audio codec software and application-specific customizations to at least 1,000 companies, and that its licensing has enabled more than 5 billion commercial products worldwide using its mp3, AAC and other media technologies.[1504] Licensed companies include the key players in the live streaming business: **Apple, Microsoft, Adobe, Real Networks**, as well as key players in the mobile handset industry: **Apple,** Samsung, Motorola, Nokia, Sony Ericsson, and many others.[1505]

(911) Ironically, Boris Teksler, Apple's head of Patent Licensing & Strategy until June 2013, is now President of Technicolor's "Technology Group which includes Intellectual Property & Licensing and the company's world class Research & Innovation activities."[1506]

---

[1501] Kiang, Stuart, "MP3 Goes Pro; MP3's creators ready a better-sounding version of the ubiquitous online music format and finally reveal their licensing scheme for streaming MP3," MIT Technology Review, June 7, 2001, (http://www.technologyreview.com/news/401068/mp3-goes-pro/).

[1502] "Technicolor Names Boris Teksler as Head of Its Technology Business Segment," Yahoo! Finance, June 17, 2013, (http://finance.yahoo.com/news/technicolor-names-boris-teksler-head-171830179.html).

[1503] "About Technicolor," mp3licensing.com, (http://mp3licensing.com/about/thm.html).

[1504] "About Fraunhofer," mp3licensing.com, (http://mp3licensing.com/about/fhg.html).

[1505] "Licensing Companies," mp3licensing.com, (http://mp3licensing.com/licensees/index.asp).

[1506] "Technicolor Names Boris Teksler as Head of Its Technology Business Segment," Yahoo! Finance, June 17, 2013, (http://finance.yahoo.com/news/technicolor-names-boris-teksler-head-171830179.html). *See, also,* Hughes, Neil, "Apple patent chief departs amid major ongoing IP lawsuits," AppleInsider, June 19, 2013, (http://appleinsider.com/articles/13/06/19/apple-patent-chief-departs-amid-major-ongoing-ip-lawsuits). *See, also,* Mawad, Marie, "Technicolor Dissects iPhone in Hunt for Patent Payoff," Bloomberg, May 29, 2012, (http://www.bloomberg.com/news/2012-05-28/technicolor-dissects-iphones-in-hunt-for-patent-payoff.html).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(912)    Technicolor's published royalty rates are reported in **Chart 30**, below:[1507]

**Chart 30**



[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(913)    Other parties also claim to hold important technology that pertains to MP3, including Lucent-Alcatel—that was reportedly developed by Bell Labs who claims to be "the main creative engine behind what went on to become the MP3 standard."[1508]  In 2003, Lucent filed suit against Gateway, Dell and eventually Microsoft.  Lucent alleged that Microsoft infringed two Bell Labs patents related to MP3 compression and playback in the Microsoft Windows Media Player.  Lucent reportedly sought a "0.5% royalty on the average retail price of all computers sold preloaded with Windows, a much larger sum than a royalty on Windows sales to computer makers."[1509]  The trial in February 2007 resulted in a $1.52 billion jury verdict that was thrown out by the trial judge,[1510] which was affirmed by the Federal Circuit.[1511]

### ii.  H.264 Standard

(914)    "The H.264 Standard is a video coding standard, also known as MPEG-4 Part 10, or AVC (Advanced Video Coding).  The first version of the H.264 Standard was adopted in May 2003."[1512]  Three core features of the H.264 Standard are coding . . ., prediction, and transform/quantization."[1513]  "The JVT formalized the first version of H.264 in May

---

[1508] Heingartner, Douglas, "Patent Fights Are a Legacy of MP3's Tangled Origins," The New York Times, March 5, 2007, (http://www.nytimes.com/2007/03/05/technology/05music.html?pagewanted=print&_r=0).

[1509] "Big Suits:  Lucent v. Microsoft," The American Lawyer, May 1, 2007, (http://www.kirkland.com/sitecontent.cfm?contentID=230&itemId=6922).

[1510] "Microsoft and Alcatel-Lucent settle most patent suits," The New York Times, November 16, 2008, (http://www.nytimes.com/2008/12/16/technology/16iht-16alcatel.18741804.html).  See, also, St. Onge, Jeff, Crayton Harrison, "Microsoft Judge Negates Alcatel-Lucent MP3 Patent Win (Update 3)," Bloomberg, August 6, 2007, (http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aBvWFl4BaEn0&refer=home).  See, also, Walters, Mark P., "Alcatel-Lucent v. Microsoft:  A Reason to Delay Patent Reform?" March 2009, (http://wapatents.blogspot.com/2009/03/alcatel-lucent-v-microsoft-reason-to.html).  ("On August 6, 2007, U.S. District Judge Rudi Brewster, granted Microsoft's motions for Judgment and for new trial, saying that the jury's decision was not supported by the evidence. The Judge's Order found that there was insufficient evidence both for Microsoft's liability and for the damages model used by Alcatel-Lucent. Alcatel-Lucent appealed and the Court of Appeals for the Federal Circuit heard oral arguments in July 2007. On September 25, 2008, upholding the dismissal of the case by Judge Brewster on two grounds, the CAFC that there was a joint developer and thus co-owner of one patent, which made Lucent lack standing to sue. The other patent was not infringed because Lucent failed to show that the accused algorithm was ever used.")

[1511] Lucent Technologies, Inc., et al. v. Gateway, Inc. et al., (http://www.cafc.uscourts.gov/images/stories/opinions-orders/07-1546.pdf).

[1512] Microsoft Corporation v. Motorola, Inc., Findings of Fact and Conclusions of Law dated April 25, 2013, 45.

[1513] Microsoft Corporation v. Motorola, Inc., Findings of Fact and Conclusions of Law dated April 25, 2013, 45.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

2003. Like the VCEG draft standard from July 2001, it achieved an average of approximately 50 percent improvement in compression over prior standards."[1514]

(915)     "H.264 is currently the most widely used video coding format. . . . [I]n the past four quarter, the H.264 format went from 31 percent of all videos to 66 percent, and is now the largest format by far."[1515]

(916)     "The H.264 Standard resulted from the contributions of roughly 170 entities that submitted over 2,300 documents. H.264 is a large and technically complex standard developed with the goal of providing significantly improved compression compared to prior video standards. The largest technology contributor to the H.264 Standard was Telenor Group, which contributed many of the core innovations of H.264 and submitted the August 1999 proposal that became the basis of the first draft of the design. Telenor decided not to seek patents on its contributions and notified the JVT of its decision. In addition to Telenor's contribution to the standard, there are at least 2,500 patents throughout the world that are essential to the H.264 Standard. Of those 2,500 patents, over 360 are United States patents."[1516]

## B. The Cost Approach

(917)     The Cost Approach considers historical cost—the actual cost incurred in creating the technology, and replacement cost—the estimated cost of replacing patented technology or developing an equivalent. This Cost Method is typically of limited relevance because there is usually little correlation between the development cost of an asset and its value. The Cost Method may be a relevant benchmark when there are market transactions involving the technology that are relatively close in time to the particular valuation date.[1517]

---

[1514] *Microsoft Corporation v. Motorola, Inc.,* Findings of Fact and Conclusions of Law dated April 25, 2013, 48.
[1515] *Microsoft Corporation v. Motorola, Inc.,* Findings of Fact and Conclusions of Law dated April 25, 2013, 46.
[1516] *Microsoft Corporation v. Motorola, Inc.,* Findings of Fact and Conclusions of Law dated April 25, 2013, 52.
[1517] *See, e.g.,* "Methods For Patent Valuation," International Conference On "IP As An Economic Asset: Key Issues In Exploitation And Valuation, July 1, 2005, 4, (http://www.oecd.org/science/sci-tech/35428822.pdf). *See. e.g.,* Hadjiloucas, Tony, "IP valuation, exploitation and finance," WIPO Workshop on Effective Intellectual

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

- **Cost Savings Method:** This method is based on the cost associated with using the patented invention to the cost associated with using an alternative that lacks the patented invention.[1520]

- **Indirect Methods**: The residual earnings left after deducting other costs including the fair returns on all other assets is assumed to be attributable to the patented invention.

(921)  In this case, Apple has provided very limited business planning and internal financial records which typically provides the information and data that forms the basis for Income Approach methods.   While this information was requested, Apple has not provided it in this case.    This case is further complicated by the fact that Apple introduced HLS as part of iOS 3.0, which included more than 100 new features.  In view of these facts,  it is my opinion that it is impossible to make a further apportionment.

(922)  I also understand that in circumstances in which the accused infringer has made apportionment impossible, the burden of proving apportionment shifts to the infringer:

> None of the cases cited discuss the rights of the patentee who has exhausted all available means of apportionment, who has resorted to the books and employees of the defendant, and by them, or expert testimony proved, that it was impossible to make a separation of the profits. This distinction, between difficulty and impossibility, is involved in the ruling by the Circuit Court of Appeals for the Sixth Circuit in Brennan & Co. v. Dowagiac Mfg. Co., 162 Fed. Rep. 472, 476, where the Garretson Case was distinguished, and the court said:

> "In the present case the infringer's conduct has been such as to preclude the belief that it has derived no advantage from the use of plaintiff's invention. . . . In these circumstances, upon whom is the burden of loss to fall? We think the law answers this question by declaring that it shall rest upon the wrongdoer, who has so confused his own with that of another that neither can be distinguished. It is a bitter response for the court to say to the innocent party, `You have failed to make the necessary proof to enable us to decide how much of these profits are your own;' for the party knows, and the court must see, that such a requirement is impossible to be complied with. The proper remedy to be applied in such cases is that stated by Chancellor Kent in Hart v. Ten Eyck, 2 Johns. Ch. (N.Y.) 62, 108, where he said: `The rule of

---

[1520] *See. e.g.,* Hadjiloucas, Tony, "IP valuation, exploitation and finance," WIPO Workshop on Effective Intellectual Property Asset Management by SMEs," June 2011, 24 – 26, (http://www.wipo.int/edocs/mdocs/sme/en/wipo_smes_tlv_11/wipo_smes_tlv_11_ref_t15.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> law and equity is strict and severe on such occasion. . . . All the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it.'"
>
> It may be argued that, in its last analysis, this is but another way of saying that the burden of proof is on the defendant. And no doubt such, in the end, will be the practical result in many cases. But such burden is not imposed by law; nor is it so shifted until after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impossible of accurate or approximate apportionment. If then the burden of separation is cast on the defendant it is one which justly should be borne by him, as he wrought the confusion.[1521]

(923)     Notwithstanding the foregoing, I have prepared an analysis based on the Indirect Method, that estimates the amount of Apple's excess profit—using Apple's pre-iPod (*i.e.,* pre-digital hub strategy) gross margin as a benchmark.   I then estimate the increase in gross margin that Apple realized with each successive iDevice product launch beginning with the iPod.   My analysis is summarized on Schedule 18A, and **Table 15** below:

---

[1521] Westinghouse Co. v. Wagner Mfg. Co., 225 U.S. 604, 621-622, (S.Ct. 1912).

Expert Report of Catharine M. Lawton

**Table 15**



| iDevice | Increase in Worldwide Gross Margin % | Increase in Gross Margin $ per Accused unit |
|---------|--------------------------------------|---------------------------------------------|
| iPod | | |
| iPhone | | |
| iPhone 3GS | | |

Source: See Schedule 18A

(924)    The foregoing analysis—because of the impossibility of apportionment described previously—does <u>not</u> measure the contribution of the '473 Patent alone. I am relying on this analysis as provide additional economic data that would inform the hypothetical negotiation.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

## XXI.  Reasonable Royalty

### A.  Summary of Reasonable Royalty Opinion

(935)   Based on currently available information, my investigation and analysis to date, the facts of this case and for the reasons that are explained in this report, it is my opinion that Emblaze has experienced damages as a result of Apple's alleged infringement of the '473 Patent during the period July 30, 2008 through June 3, 2013 (most current available data). In particular, it is my opinion that Emblaze's damages should be based on a reasonable royalty in the form of a running royalty of $2.00 per unit of each Accused Product, 1% of software and application revenue.

### B.  Reasonable Royalties Damages Principles

(936)   "When the evidence is inadequate to establish actual or nearly actual damages, a court may under Section 284 employ a 'reasonable royalty' as the floor below which a damage award may not fall."[1537] A reasonable royalty is a measure of damages that is "intended to provide a just recovery to persons who for evidentiary or other reasons cannot prove lost profits or an established royalty."[1538] The "reasonable royalty" is a measure of damages and "is not, in precise terminology, a royalty at all, but it is frequently spoken of as a 'reasonable royalty'; and this phrase is a convenient means of naming this particular kind of damage."[1539] In establishing the reasonable royalty, "they [the jury] did not make a contract for the parties, but found a measure of

---

[1536] *See, e.g.,* Jordan, Larry, "The Basics of HTTP Live Streaming," Larry Jordan, June 9, 2013, (http://www.larryjordan.biz/basics-of-http-live-streaming/). ("This new video protocol is called HTTP Live Streaming and was invented by Apple. Google and Microsoft each have something similar, though with a different name. This streaming protocol is supported by any HTML/5-compliant browser and requires no changes on the part of the end user.")

[1537] *Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc.,* 853 F. 2d 1568 (Fed. Cir. 1988). *See, also,* Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-180; *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 926 F.2d at 1163 (Fed. Cir. 1991).

[1538] *Hayhurst v. Rosen,* 1992 WL 123178 (E.D. N.Y. 1992); Chisum, 5 Patents §20.02[3] at 20-159.

[1539] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-30 – 20-31. *United States Frumentum Co. v. Lauhoff,* 216 F. 610, at 616 – 617 (6th Cir. 1914).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

damages."[1540]   "Royalties are paid and payable on the use made of the invention, *i.e.,* on *infringing* products and *infringing* uses of the claimed process."[1541] (Emphasis in the original.)

(937)    The calculation of the "reasonable royalty" "is not a mere academic exercise in setting some percentage figure as a royalty."[1542]  The determination remains one of damages to the injured party, and shall be adequate to compensate for the use made of the invention by the infringer.

(938)    "Adequate to compensate" means equal to the injury, and "the injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed;"[1543] "full compensation for 'any damages' [the patent owner] suffered as a result of the infringement."[1544]   "Thus, the language of the statute is expansive rather than limiting," and "in enacting § 284, Congress sought to 'ensure that the patent owner would in fact receive full compensation for 'any damages' [the patentee] suffered as a result of the infringement.' . . . [T]he Bill was intended to allow recovery of 'any damages the complainant can prove.'"[1545]

(939)    A reasonable royalty for use of the patented invention is defined as the amount which would have been agreed upon in an arm's length negotiation between a willing patent owner (the licensor) and a willing potential user (the licensee) as of the date when infringement began in fact and on the assumption that the patent was valid and entitled to respect.[1546]

---

[1540] *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 649 (S. Ct. 1915).
[1541] *Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc.,*  853 F. 2d 1568 (Fed. Cir. 1988).
[1542] *Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc.,*  853 F. 2d 1568 (Fed. Cir. 1988).
[1543] *Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc.,*  853 F. 2d 1568 (Fed. Cir. 1988).
[1544] *Grain Processing Corporation v. American Maize Products Company,* 185 F.3d 1341 (Fed. Cir. 1999).
[1545] *Rite-Hite Corporation, et al. v. Kelley Company, Inc.,* 56 F.3d 1538 (Fed. Cir. 1995).  Citing *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 654 – 655 (S. Ct. 1983).
[1546] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-181.   *Howard A. Fromson v. Citiplate, Inc.,*  699 F. Supp. 398; 1988 U.S. Dist. LEXIS 13134; 9 U.S.P.Q.2D (BNA) 1506, (Fed. Cir. 1988).

Expert Report of Catharine M. Lawton

(940)    The hypothetical negotiation is deemed to be an arm's length transaction.[1547]

(941)    "The key element in setting a reasonable royalty . . . is the necessity to return to the date when infringement began."[1548]    The correct determination of the hypothetical negotiation date is essential for properly assessing damages.[1549]

> Indeed, the basic question posed in a hypothetical negotiation is: if, on the eve of infringement, a willing licensor and licensee had entered into an agreement instead of allowing infringement of the patent to take place, what would that agreement be?  This question cannot be meaningfully answered unless we also presume knowledge of the patent and of the infringement at the time the accused inducement conduct began.  Were we to permit a later notice date to serve as the hypothetical negotiation date, the damages analysis would be skewed because, as a legal construct, we seek to pin down

[1547] *Minks v. Polaris Industries, Inc.,* 546 F.3d. 1364, 1373 (Fed. Cir. 2008). ("Courts should not, therefore, accept 'as conclusive the royalty arrangement between the patent owner and the single licensee, a close corporation owned by the inventor's family. . .' *Cheramie v. Orgeron,* 434 F.2d 721, 727 (5ᵗʰ Cir. 1970)." Citing *Rite-Hite Corp. v. Kelley Co.,* 774 F. Supp. 1514, 1535 (E.D.Wis. 1991), *aff'd in part, rev'd in part,* 56 F.3d. 1538 (Fed. Cir. 1995) ("This court also places little weight upon the royalty rate that Mike White paid for Rite-Hite patents when Mike White bought Rite-Hite from his father.  Such an intra-family sales is too dissimilar from this hypothetical situation in which one competitor voluntarily grants a novel license to its primary competitor.")
[1548] *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1158 (6ᵗʰ Cir. 1978).
[1549] *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 75 (Fed. Cir. 2012) (Citing *Integra Lifesciences I, Ltd. v. Merck KGaA,* 331 F.3d 860, 870 (Fed. Cir. 2003) ("The first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred. The correct determination of this date is essential to properly assessing damages.  The value of a hypothetical license negotiated in 1994 could be drastically different from one undertaken in 1995 due to the more nascent state of the RGD peptide research in 1994. Indeed, factoring in the rapid development of biotechnological arts, a year can make a great difference in economic risks and rewards."). *Unisplay, S.A. v. American Electronic Sign Co., Inc.,* 69 F.3d 512, 518 (Fed. Cir. 1995) ("Clearly, Burns was not discussing what royalty rate a hypothetical negotiation would have yielded *at the time the infringement began.*  Instead, Burns was testifying to what the parties might arrive at *at the time of the trial.*  Such testimony was not directed to the proper reasonable royalty criterion and therefore cannot support the jury's verdict."). *Wang Laboratories, Inc. v. Toshiba Corp.,* 993 F.2d 858, 870 (Fed. Cir. 1993) ("In choosing the January 1990 date, the district court failed to follow our precedent.  It is not illogical to hypothesize a negotiation at the time of notice.  After all, an accused infringer may not know of the patents until notice is given.  Nonetheless, this case is governed by the rule in *Fromson,* in which hypothetical negotiations were determined to have occurred when the infringement began, which was the date the patent issued, even though, under 35 U.S.C. § 286, the infringer was only liable for damages for the six years prior to the filing of the infringement action.  In this case, infringing products were being sold on date of issuance of the '605 patent.  Therefore, under *Fromson,* hypothetical royalty negotiations should have been considered to have occurred on the patent issuance date. It is true that limitations may apply to the period for which damages may be recovered. . . . However, the court confused limitation on damages due to lack of notice with determination of the time when damages first began to accrue, and it is the latter which is controlling in a hypothetical royalty determination."). *See, also,* Katherine L. Parker and Anders T. Aannestad, "An Assignment's Effect On Hypothetical Negotiation," *IPLaw360,* February 7, 2008, (http://www.mofo.com/files//Uploads/Images/RoyaltyArticle.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

how the prospective infringement might have been avoided via an out-of-court business solution.[1550]

(942) "Where an accused product is developed and tested here in the United States, however, 'use' and therefore infringement will almost always begin well before the first sale."[1551]

(943) The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement.[1552]

(944) In particular, the hypothetical negotiation should reflect what parties regularly do during "real-world" licensing negotiations.[1553] In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme.[1554]

(945) Any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty.[1555]

(946) Royalty payments can be interpreted as a profit sharing mechanism.[1556] In other words, royalty payments allow a technology licensor to share in the profit streams generated from the licensee's efforts in commercializing the patented technology.[1557] At the hypothetical negotiation, the parties would establish a royalty that would divide between them the predicted economic benefits to be realized by the licensee's adoption

---

[1550] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) .

[1551] *Oracle America, Inc. v. Google Inc.*, 798 F.Supp. 2d 1111 (N.D.Ca. 2011) ("Oracle argues that 'the date of the hypothetical negotiation is the date that the infringing product was first offered for sale in the United States' (Opp. 18). This is not the law.")

[1552] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[1553] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[1554] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[1555] *I4I Limited Partnership and Infrastructures for Information, Inc. v. Microsoft Corporation*, 598 F.3d 831, 857 – 858 (Fed. Cir. 2009). *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1336 (Fed. Cir. 2009).

[1556] Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA. "Profitability and Royalty Rates Across Industries: Some Preliminary Evidence," 2008, p. 2, (http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf).

[1557] Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA. "Profitability and Royalty Rates Across Industries: Some Preliminary Evidence," 2008, p. 2, (http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

of the product or process.[1558]  The actual division of profit between the patentee and the licensee will vary with the circumstances and with the customs of the industry in question.[1559]  In order to compensate the patentee for the infringement, a reasonable royalty must make the patentee a willing seller even if a rational infringer is not a willing buyer at that price.  The type of license the parties would or could have negotiated is generally a question of fact dependent on the circumstances.[1560]

(947)   The relevant profit measure is the profits the parties would have anticipated or predicted as of the date just prior to the infringer's commencement of infringing activity.[1561]  Evidence of actual profits may be considered as an indication of the infringer's anticipated profits.[1562]  "While either the infringer's or the patentee's profit expectation may be considered in the overall reasonable royalty analysis, neither is an absolute limit on the amount of the reasonable royalty that may be awarded upon a reasoned hypothetical negotiation analysis under the *Georgia-Pacific* factors."[1563]

(948)   The owners of all of the assets needed in order to commercialize the innovation need to share the gains in order to supply goods or services, or to be willing to bear risks.[1564]  As such, the patentee and the owners of the needed complementary assets will split the gains from innovation in some fashion based on the facts of the case.[1565]  If the

---

[1558] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-219.
[1559] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-219.
[1560] Donald S. Chisum,  *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-182.
[1561] *Lucent Technologies, Inc., et al., v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009).  (Citing *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1081 (Fed. Cir. 1983).  ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.")) See also, Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-222.  (Citing, among others, *Hanson v. Alpine Valley Ski Area, Inc.* 718 F.2d 1075 (Fed. Cir. 1983).)
[1562] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-221 – 222.  (Citing *Trell v. Marlee Elecs. Corp.* 912 F.2d 1143, at 1146 (Fed. Cir. 1990) – citing *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1568 (Fed. Cir. 1984).).  ("Evidence of the infringer's actual profits generally is admissible as probative of his anticipated profits.")
[1563] *Powell v. Home Depot U.S.A., Inc.,* 663 F.3d 1221, 1239 (Fed. Cir. 2011).
[1564] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 151.
[1565] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 151.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

intellectual property is one of several assets which together create value, then the gains from the innovation must be apportioned amongst the assets whose services are used along with the intellectual property to create value.[1566]   If the various assets are traded or otherwise available for purchase or rental in a reasonably transparent market, then the apportionment problem is simplified.[1567]   If not, then some kind of apportionment method must be developed.[1568]   The apportionment problem is especially acute when the complementary assets needed to commercialize a given innovation include other pieces of intellectual property.[1569]

(949)   The incremental value attributable to the intellectual property will likely depend on many factors.[1570]   When the intellectual property is paramount, and the complementary assets and skills needed to commercialize the innovation are readily available from a variety of sources, the bargaining over sharing of the gains will favor the patent holder.[1571]   In contrast, if the intellectual property is less important than other complementary assets and skills such as manufacturing, distribution or marketing, then the bargaining may favor the firm that supplies the complementary assets.[1572]

(950)   In determining the license rate, the Court considers a variety of factors or categories of evidence[1573] including the factors set forth in *Georgia-Pacific Corporation v. U.S. Plywood-Champion Papers Inc.,* 318 F.Supp. 116 (S.D.N.Y. 1970).   The specific facts of the case often have a significant impact on the reasonable royalty negotiations including the following:

1.   Market power, if any, conferred by the patent

2.   The availability of acceptable, non-infringing substitutes

---

[1566] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 150.
[1567] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 150.
[1568]*See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 150.
[1569] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 152.
[1570] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 150.
[1571] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 151.
[1572] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 151.
[1573] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-181.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> 3. What each party brings to the table and the relative bargaining power of the relevant parties to the negotiation
>
> 4. Timing of the negotiation

(951) Reasonable royalty determinations in litigation are not equivalent to ordinary royalty negotiations among truly "willing" patent owners and licensees.[1574]  The goal in determining a reasonable royalty cannot and should not be the normal, routine royalty non-infringers might have paid.  "If that were the criterion it would 'make an election to infringe a handy means for competitors to impose a 'compulsory license' policy on every patent owner.'"[1575] "[W]hat an infringer would prefer to pay is not the test for damages."[1576]

(952) In determining a reasonable royalty rate, the Court of necessity must make an informed estimate or approximation.[1577]  Evidence of subsequent events can be considered as a basis for inferring what royalty rate would have been set in hypothetical negotiations as of the date when the infringement began.[1578]

(953) Industry averages and rules of thumb are generally of limited value, and can lead to errors of great magnitude.[1579]  For example, industry averages are generally of little, if any, value because they are based on distributions with wide dispersions that likely do not reflect the facts of any particular case.[1580]  Similarly, rules of thumb are broad

---

[1574] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-187. *TWM Mfg. Co., Inc., v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986) citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).

[1575] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-186 – 187. *TWM Mfg. Co., Inc. v. Dura Corp*, 789 F.2d 895, 900 (Fed. Cir. 1986) citing *Panduit Corp. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).

[1576] *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011).

[1577] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-181.

[1578] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-181.

[1579] *See, e.g.,* Lauren Johnston Stiroh and Richard T. Rapp, *Practising Law Institute, "Modern Methods for the Valuation of Intellectual Property,"* 1998, p. 4.

[1580] *See, e.g.,* Lauren Johnston Stiroh and Richard T. Rapp, *Practising Law Institute, "Modern Methods for the Valuation of Intellectual Property,"* 1998, p. 4.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

generalizations that may or may not reflect the facts of any particular case.[1581]  This point has been summarized as follows:

> Accordingly, there is no basis in economics for a simple percentage profit split 'rule', such as the one-quarter to one-third 'rule' sometimes proposed which suggests that the owner of the intellectual property should receive 25 percent (or 33 percent) of the profits made from practicing the innovation.  Such ad hoc sharing rules make no sense.  They could only be reliable if the relative contributions of the innovation in question and the other complimentary skills and assets needed to commercialize that innovation were the same across different innovations, but this is not so.[1582]

## C. Methodology

(954)   There are two (2) generally accepted methods that are used to calculate a reasonable royalty:

- **Analytical Method:**   The Analytical Method focuses on the infringer's projections of profit for the infringing product at the time the infringing began and subtracts the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices.[1583]  The Analytical Method has been described as "calculating damages based on the infringer's own internal profit projections for the infringing item at the time the infringement began, and then dividing the projected profits between the patent owner and the infringer."[1584]

- **Hypothetical Negotiation Approach:**  The hypothetical negotiation or "willing licensor-willing licensee" approach is the more common approach used to determine a reasonable royalty.  This approach attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated a license agreement just before infringement began, assuming that the asserted patent claims are valid and infringed.[1585]

---

[1581] *See, e.g.,* Lauren Johnston Stiroh and Richard T. Rapp, *Practising Law Institute, "Modern Methods for the Valuation of Intellectual Property,"* 1998, p. 3. *Uniloc USA, Inc. and Uniloc Singapore Private Limited v. Microsoft Corporation,* 632 F.3d 1292 (Fed. Cir. 2011).

[1582] David J. Teece, *Managing Intellectual Capital.*  Oxford University Press, 2002, p. 152.

[1583] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009).  See also, *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F. 2d 895, at 899 (Fed. Cir. 1986).

[1584] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009).  *See, also, TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F. 2d 895, at 899 (Fed. Cir. 1986).

[1585] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(955)     As previously discussed, Apple has produced a 1-page summary titled "Forecast History
– WW Units & Revenue Forecast – Q1FY08 thru Q3FY13" that was prepared for this
litigation.[1586] This litigation summary reports quarterly worldwide "Units" for the Mac,
iPod, iPhone, and iPad, and quarterly worldwide "Revenue Guidance."[1587] Apple claims
that it does not have any projections for U.S. sales, reportedly does not prepare
"projections of profit for the infringing product," and also reportedly does not prepare
or report actual profits for any product line.  Based on my investigation to date, Apple
does not appear to have profit projections at or about the time of first infringement.   As
such, in my opinion, the most appropriate method for determining the reasonable
royalty in this case is the Hypothetical Negotiation Approach.

## D. Data Regarding "Real-World" Licensing Practices

(956)     The 1997 Degnan and Horton survey also reiterated the importance of the particular
facts and circumstances of the licensing negotiation:

> Industry does matter when setting royalty rates.  Because of the special
> circumstances in which each industry operates, economic realities
> often dictate the range of royalties within that industry. . . . However,
> although significant variations in royalty rates may exist between
> industries, there may also be a wide range of royalty rates within each
> industry. The authors recognize that royalty rates from the past are
> seldom the touchstone to setting a royalty in a new situation.  Royalties
> are seldom, if ever, 'pure.'  Rather, they are contextual.  They are forged
> in the crucible of arms-length negotiations where the royalty rate,
> although a vital component, is frequently not the only important issue.
> Each royalty is only a single data point and the relevance of a prior
> negotiation by others to your case (even if for the same technology)
> depends crucially on the comparability of the issues and the economics.
> Seldom will they be 'on all fours,' and frequently all you will know is the
> category of technology (e.g., 'medicine') and the royalty rate that
> resulted.  Reducing the data to generalized ranges is a further dilution
> of it.  Moreover, some 'data' is merely hypothesizing e.g. 'reasonable
> royalty' determinations in infringement or tax litigation.   Although
> useful, this information does not have the same meaning or value as
> actual arms-length negotiated royalties.  Having thus disclaimed, we

[1586] APPLE273813.
[1587] APPLE273813.

Confidential - Attorney's Eyes Only                480                                 CORRECTED

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> still feel that the past experiences of specific royalty agreements bargained for by others can be a useful guide, a reality check ('are we in the ballpark?') and a reassurance. As a tool of persuasion, even generalities from the past (royalty ranges) may help not only with those on the other side of the table but on your side as well. And, at times, where the ability to generate a profitability prediction is limited, prior royalty rates may even be the best guide available.[1588]

(957)  Notwithstanding the foregoing, it should be noted, that industry averages are generally of limited relevance in establishing a reasonable royalty for patent infringement. For example:

> The unquestioning use of industry-wide royalty rates as benchmarks for royalties—in both damage cases and license negotiations—is probably one of the leading sources of error in patent valuation. Established industry royalty rates can be useful as comparables only if the patents in the industry are of similar character and strength; however, this is rarely the case.[1589]

(958)  Innovation, technology acquisition and licensing trends and practices in the relevant industry provide an important factual backdrop to the hypothetical negotiation because they provide the common base of industry-specific knowledge that would be known to the negotiators at the time of the hypothetical negotiation. It should be noted, however, that statistically significant "standard industry royalty rates" are generally not available, and even if they were, it is likely that they would not reflect the economic considerations relevant to the particular licensing negotiation at issue.[1590] Furthermore, only limited information regarding license terms and royalty rates is publicly available, because such information is typically kept confidential.[1591]

---

[1588] Stephen A. Degnan and Corwin Horton. *"A Survey of Licensed Royalties."* les Nouvelles, June 1997, pp. 95 – 96.

[1589] Rapp, Richard T., and Phillip A. Beutel. *"Patent Damages and the Law: Rules on the Road to Economic Rationality,"* p. 8.

[1590] *See, e.g.,* Daniel M. McGavock, David A. Haas, and Michael P. Patin. *"Factors Affecting Royalty Rates."* les Nouvelles, June 1992, p. 107.

[1591] *See, e.g.,* Stephen L. Becker, Ph.D. and Jiaqing Lu, Ph.D., CFA. *"Royalty Rate and Industry Structure: Some Cross-Industry Evidence."* 2009, p. 2, (http://www.royaltysource.com/news/Becker%20and%20Lu%20Royalty%20Rate-Market%20Structure%20Paper.pdf).

(959)    As part of my investigation in this case, I have searched for information and data regarding licensing practices involving other *de facto* standards including MP3 and MPEG-4, and licensing in the Mobile Handset Industry.

## 1) Licensing in the Mobile Handset Industry

(960)    As part of my investigation in this case, I have searched for information and data regarding licensing practices in the Mobile Handset industry both generally during the period from the early-1990s to the present. In general, I understand that cross-licensing is common in the mobile handset industry. For example, Qualcomm's Senior VP & General Manager, Qualcomm Technology Licensing, Eric Reifschneider, described the situation in the early 1990s as follows:

> [M]ajor GSM IPR [Intellectual Property Rights] holders (large handset manufacturers) cross-licensed their IPR between themselves and otherwise used their IPR to protect their position in the downstream handset market.[1592]

(961)    In addition to the prevalence of cross-licensing, some of the major companies in this industry only license their entire patent portfolio in the ordinary course of their business. Qualcomm is an example.[1593] In view of the foregoing, and given the generally confidential nature of patent licensing, publicly available information regarding ordinary business course licensing of individual patents is generally highly limited.

(962)    As such, patent licensing in the telecommunications industry related to equipment and the features of the equipment generally occurs between the patentee and the equipment OEM, such as Motorola. For example, by 1995, Qualcomm was licensing its patent portfolio to equipment OEMs based on a percentage of net selling price of, for

---

[1592] Eric Reifschneider, "The Qualcomm Technology Licensing Program and the Licensing of Standards-Essential Patents, *Licensing Executive Society*, February 20, 2013, Slide 4 (https://noppa.fi/noppa/t-76.5750/luennot/T-76_5750_qualcomm_licensing_eric_reifschneider.pdf).
[1593] Eric Reifschneider, "The Qualcomm Technology Licensing Program and the Licensing of Standards-Essential Patents, *Licensing Executive Society*, February 20, 2013, Slides 4 and 13 (https://noppa.fi/noppa/t-76.5750/luennot/T-76_5750_qualcomm_licensing_eric_reifschneider.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

example, handset equipment.[1594]   In fact, Qualcomm's Senior VP & General Manager, Qualcomm Technology Licensing, Eric Reifschneider, stated:

> While Qualcomm has various business relationships with network operators, Qualcomm prefers to license their suppliers. Network operators have generally purchased only from Qualcomm licensed suppliers. QTL has not asserted [its patents against] network operators or attempted to collect royalties from them.[1595]

(963)   Qualcomm's first license was with Nokia in 1992; in 1993, Qualcomm entered into license agreements with Matsushita (Panasonic), Samsung, LG, Hyundai and NEC.[1596] Information regarding Qualcomm's licensing was generally well known in the industry for two reasons: a) Qualcomm holds the patents that are required for CDMA, and b) most if not all mobile handset companies have a license with Qualcomm.

(964)   Finally, common royalty metrics in the mobile handset industry are per unit amounts (*i.e.,* MP3, MPEG-4, H.264 Licenses, Palm OS), percentage of handset revenue (*e.g.,* Qualcomm, Motorola), and lump sum payments.

## E.  The Advantages and Benefits of the '473 Patent

(965)   The advantages and benefits of the '473 Patent were discussed previously.

## F.  Apple's Potential "Alternative Actions" & the Availability of Alternatives to the '473 Patent

(966)   Apple's potential "alternative actions" and the availability of alternatives to the '473 Patent were discussed previously.

---

[1594] Eric Reifschneider, "The Qualcomm Technology Licensing Program and the Licensing of Standards-Essential Patents, *Licensing Executive Society,* February 20, 2013, Slides 6 – 17, and 23 (https://noppa.fi/noppa/t-76.5750/luennot/T-76_5750_qualcomm_licensing_eric_reifschneider.pdf).

[1595] Eric Reifschneider, "The Qualcomm Technology Licensing Program and the Licensing of Standards-Essential Patents, *Licensing Executive Society,* February 20, 2013, Slide 18 (https://noppa.fi/noppa/t-76.5750/luennot/T-76_5750_qualcomm_licensing_eric_reifschneider.pdf).

[1596] Eric Reifschneider, "The Qualcomm Technology Licensing Program and the Licensing of Standards-Essential Patents, *Licensing Executive Society,* February 20, 2013, Slide 5 (https://noppa.fi/noppa/t-76.5750/luennot/T-76_5750_qualcomm_licensing_eric_reifschneider.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## G. Date of Hypothetical Negotiation

(967)    The date of the hypothetical negotiation was discussed previously. For the reasons that I have explained, I assume that Apple's date of first infringement is **not earlier than July 30, 2008**—the date that Apple used an ESPN feed to test demo software—and **not later than February 12, 2009**—the date that Apple had an HLS Demo configuration.

## H. Parties to the Hypothetical Negotiation

(968)    The Parties to the Hypothetical Negotiation are **Emblaze**, the owner of the '473 patent-in-suit, and **Apple**, the entity that designed, tested and has used the allegedly infringing technology and requires the use of HLS on iDevices that are streaming live content greater than 10 minutes of 5 MB, as well as promoted and supported the use of HLS within the Apple Developer group, and others.

(969)    There is little doubt that Steve Jobs would have been personally involved in the hypothetical negotiation. He was hands on and reportedly "micromanaged to a shockingly high degree to an amazingly low level in the organization. . . . At the height of his power Jobs personally ran marketing, oversaw product development, involved himself in the details of every acquisition and met weekly with Apple's advertising agency."[1597] "Jobs had many [meetings]: an executive staff session every Monday, a marketing strategy session all Wednesday afternoon, and endless product review sessions."[1598]

## I. Reconstructing the "But-For" World

(970)    In determining Emblaze's damages, the determinative question is "Had Apple not infringed what would Apple have made?"[1599] The "but for" inquiry has been described as follows:

---

[1597] Lashinsky, Adam, "Inside Apple: How America's Most Admired—and Secretive—Company Really Works," (New York: Hachette Book Group, 2012), 20.
[1598] Isaacson, Walter, Steve Jobs, (New York: Simon & Schuster Paperbacks, 2013), 362.
[1599] *Grain Processing Corporation v. American Maize Products Company,* 185 F.3d 1341 (Fed. Cir. 1999).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> The 'but for' inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee 'would . . . have made.' Reconstructing the market, by definition a hypothetical enterprise, requires a patentee to project economic results that did not occur. To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and the likely outcomes with infringement factored out of the economic picture. Within this framework, trial courts, with this court's approval, consistently permit patentees to present market reconstruction theories showing all the ways in which they would have been better off in the 'but for world,' and accordingly to recover lost profits in a wide variety of forms. . . . By the same token, a fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed.[1600] (Citations omitted.)

(971)    In this case, Apple has not produced any business planning or strategy documents. As such, it is particularly difficult to reconstruct the market as it would have developed but for Apple's alleged infringement. As discussed in detail earlier in this report, in 2008, Adobe's Flash dominated the media player market, and Microsoft was attempting to kill Flash. This was a replay of Microsoft's earlier attempts in the late-1990s to kill both RealPlayer and Apple's QuickTime. As such, and given that the industry was moving to HTTP-based delivery that was being promoted as the "optimal" solution, the two most likely but-for world scenarios are:

- Microsoft's Smooth Streaming becomes the *de facto* delivery standard and kills Real—and, thus, would have "beat Apple to the punch."

- Adobe maintains its dominant position. This alternative is less likely because Adobe did not launch its HTTP Dynamic Streaming until June 2010—15 months after Microsoft introduced Smooth Streaming and about 1 year after Apple introduced HTTP Live Streaming.

## 1) But-For World – Microsoft Kills Flash

(972)    Hypothesizing a but-for world in which Microsoft kills Real and Microsoft's Smooth Streaming becomes the dominant standard would likely have enabled Microsoft to

---

[1600] *Grain Processing Corporation v. American Maize Products Company,* 185 F.3d 1341 (Fed. Cir. 1999).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

become dominant in the mobile market. How the rapidly developing mobile market would have evolved in this but-for world scenario is unclear.

(973) Based on currently available information, I am unable to develop either a qualitative sketch or quantitative projections. As stated previously, Apple has produced no business planning or strategic planning documents or substantive 30(b)(6) testimony that would provide insight regarding Apple's business strategy and how it perceived the Microsoft threat in mid-2008 to early-2009.

(974) There is little doubt, however, given Apple-Microsoft history, that Apple would have regarded Microsoft as a serious threat. In addition, there can be little doubt that Microsoft would have been a serious competitor with the capability to reshape the industry. For example, in 1997, Microsoft was said to have "a clear advantage" in "a relatively dumb network server" because "Microsoft wants to keep intelligence at the lowest possible level, with minimal network interactions, so that it can be the major player in manipulation."[1601]

(975) However, the "Microsoft threat" and the extent to which it could reshape the industry would depend on how the industry eventually evolved:

> Since so many industry observers are wondering about Microsoft's future role, it is critical to distinguish between the retail and wholesale applications. Retail applications, such as the consumer GUI, are the traditional domain of Microsoft, which understands the consumer/computer interface and consumer needs extremely well. A very different environment, where Microsoft has traditionally had no presence or poor success, is that of wholesale, computer/computer interface applications. While it is reasonable to expect Microsoft to continue to perform well in the former, its success in the latter is more questionable because of the two very different technological requirements.

> The technological requirements of this new kind of software are so various—involving interactivity, connectivity, real time, and digital

---

[1601] Yoffie, David. B., Ed. *Competing in the Age of Digital Convergence,* (Boston: Harvard Business School Press, 1997), 191.

Expert Report of Catharine M. Lawton

switching—that neither the computer industry nor the telecommunications industry has an overwhelming advantage.[1602]

(976)    Given Microsoft's prior track record of "killing" competitors and the significant industry shifts that Microsoft precipitated as a result, Microsoft would generally be expected to have the potential to extract significant economic gains if it achieved dominance. This is borne out by Microsoft's past track record. These prior battles provide some economic data—in the form of damages claims and settlement amounts, and their magnitudes— that provides at least some insight:

a.    **Apple v. Microsoft (GUI Litigation):** On March 17, 1988, Apple sued Microsoft for copyright infringement related to its GUI.[1603] Apple sought $5.5 billion in damages.[1604] In May 1993, Apple's claims were dismissed on summary judgment.[1605]

b.    **Apple v. Microsoft (QuickTime):** In 1995, Apple brought the "QuickTime piracy" lawsuit against Microsoft. In 1997, this case was settled as a result of direct negotiations between Steve Jobs and Bill Gates. Apple agreed to make Internet Explorer its default browser, to the detriment of Netscape. Microsoft agreed to continue developing Microsoft Office and other software for the Mac over the next five years, and Microsoft purchased $150 million of nonvoting Apple stock. Apple and Microsoft also signed a patent cross-licensing agreement.[1606]

c.    **RealNetworks v. Microsoft (RealPlayer):** In December 2003, RealNetworks sued Microsoft for anticompetitive conduct in the multimedia market.

---

[1602] Yoffie, David. B., Ed. *Competing in the Age of Digital Convergence,* (Boston: Harvard Business School Press, 1997), 190.
[1603] "Apple v. Microsoft," (http://itlaw.wikia.com/wiki/Apple_v._Microsoft).
[1604] Andrews, Paul, "Apple-Microsoft Lawsuit Fizzles To A Close – 'Nothing Left' To Fight About," The Seattle Times, June 2, 1993, (http://community.seattletimes.nwsource.com/archive/?date=19930602&slug=1704430). Farber, Dan, "Apple in the courtroom: 25 years of defending the crown jewels," CNET News, August 10, 2012, (http://news.cnet.com/8301-13579_3-57489319-37/apple-in-the-courtroom-25-years-of-defending-the-crown-jewels/).
[1605] Andrews, Paul, "Apple-Microsoft Lawsuit Fizzles To A Close – 'Nothing Left' To Fight About," The Seattle Times, June 2, 1993, (http://community.seattletimes.nwsource.com/archive/?date=19930602&slug=1704430). Farber, Dan, "Apple in the courtroom: 25 years of defending the crown jewels," CNET News, August 10, 2012, (http://news.cnet.com/8301-13579_3-57489319-37/apple-in-the-courtroom-25-years-of-defending-the-crown-jewels/).
[1606] "Apple Computer, Inc. v. Microsoft Corporation," (http://en.wikipedia.org/wiki/Apple_Computer,_Inc._v._Microsoft_Corporation).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

RealNetworks claimed damages of $1 billion. On October 11, 2005, the lawsuit was settled. The parties entered into three agreements:

> The three agreements include an agreement to resolve all the companies' antitrust disputes worldwide; an agreement for a wide-ranging digital music collaboration between the parties, including promotional and marketing support of Real's leading digital music subscription service, Rhapsody®, on MSN properties; and an agreement to offer RealNetworks' digital games through MSN Games and Xbox Live Arcade for Xbox 360.
>
> Under the music and games agreements, Microsoft is scheduled to pay Real <u>$301 million in cash</u> and provide services over 18 months in support of Real's product development, distribution, and promotional activities. Microsoft will earn credits at predetermined market rates to be applied to the $301 million for subscribers delivered to Real through MSN. Additionally, Real will take steps to support MSN Search, and Real and Microsoft will jointly promote use of Windows Media technologies with Rhapsody to Go.
>
> The antitrust and technology assurance agreement resolves all antitrust disputes worldwide, based on <u>a $460 million up-front cash payment to resolve all damages claims</u> and a series of technology licenses and commitments under which Real will obtain long-term access to important Windows Media technologies that will enhance Real's media software solutions.[1607] (Emphasis added.)

## 2) But-For World – Flash Remains Dominant

(977)   Hypothesizing a but-for world in which Flash remains dominant appears to be a somewhat less probable outcome, given the fact that Adobe was late to respond to the 2008 "technological sea change" which made HTTP the "it" technology that was regarded as "optimal.". In fact, Adobe did not begin working on its HTTP Dynamic Streaming solution (Project Zeri) until October 4, 2009—5 months after Apple submitted the HTTP Live Streaming protocol as a proposed standard to the IETF, and 6 months after Microsoft released its Smooth Streaming technical specification.

---

[1607] "Microsoft and RealNetworks Resolve Antitrust Case and Announce Digital Music and Games Partnership," Microsoft News Center, October 11, 2005, (http://www.microsoft.com/en-us/news/press/2005/oct05/10-11msrealpr.aspx).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(978)    It is unclear why Adobe did not begin to develop its HTTP-based solution earlier.  One possible explanation is that Adobe underestimated the threat and was complacent.   If Adobe understood the threat, it is unclear why Adobe did not seek to be the first mover with an HTTP-based solution.  Such a move would have enabled Adobe to lead the cannibalization of Flash's existing dominant—98% on the desktop—market penetration, and likely would have pre-empted Microsoft's and Apple's ability to do so. Instead, Apple "starved" Flash by not supporting it on the iDevices, which ultimately led to the death of Flash in the mobile market.

(979)    Here again, however, based on currently available information, I am unable to develop either a qualitative sketch or quantitative projections.  As stated previously, Apple has produced no business planning or strategic planning documents or substantive 30(b)(6) testimony that would provide insight regarding Apple's business strategy and how it perceived the Adobe threat including the potential for Adobe's Flash to divert revenue from Apple's iTunes Store and App Store.

(980)    Notwithstanding the foregoing, in this scenario, Adobe was poised "to really hurt Apple." [1608]  As discussed previously, one of the reasons why Apple wanted to kill Flash was "the fact that it would really put a dent on Apple's App Store."[1609]   One commentator wrote:

> If Apple would have supported Flash like they should have, developers could have easily created apps, and games that could have bypassed the App Store therefore, losing revenue from potential sales. Just imagine, being able to play awesome games from a website without having to download an app, for free on your mobile device. This was Jobs biggest fear after all, the iPhone played a huge role in the growth of mobile development. Apple wanted full control of the mobile space and the only company at that the time that posed a threat was Adobe.  I sometimes wonder, what would have happened if Apple would have

---

[1608] Ferreira, Armando, "Why Steve Jobs Killed Flash," The Droid Effect, March 28, 2013, (http://thedroideffect.com/why-steve-jobs-killed-flash/).
[1609] Ferreira, Armando, "Why Steve Jobs Killed Flash," The Droid Effect, March 28, 2013, (http://thedroideffect.com/why-steve-jobs-killed-flash/).

supported Flash development. Would the web we see today be different?[1610]

(981)   And, the fact that Adobe was regarded as a "dangerous" threat to Apple was stated as early as November 2008:

> **Allowing Flash — which is a development platform of its own — would just be too dangerous for Apple**, a company that enjoys exerting total dominance over its hardware and the software that runs on it. **Flash has evolved from being a mere animation player into a multimedia platform capable of running applications of its own. That means Flash would open a new door for application developers to get their software onto the iPhone: Just code them in Flash and put them on a web page. In so doing, Flash would divert business from the App Store, as well as enable publishers to distribute music, videos and movies that could compete with the iTunes Store.** [1611]   (Emphasis added.)

### 3) Situation at the Time of the Hypothetical Negotiation in July 2008 to February 2009

(982)   The situation at the time of the Hypothetical Negotiation in July 2008 to February 2009 has been discussed in great detail throughout this report.

### J.  The Book of Wisdom

(983)   "The hypothetical negotiation analysis may consider a wide range of evidence, . . ." and "that evidence is not necessarily limited to facts predating the date of the hypothetical negotiation; in certain circumstances, 'factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation.'"[1612]

---

[1610] Ferreira, Armando, "Why Steve Jobs Killed Flash," The Droid Effect, March 28, 2013, (http://thedroideffect.com/why-steve-jobs-killed-flash/).

[1611] Chen, Brian X., "Why Apple Won't Allow Adobe Flash on iPhone," Wired, November 17, 2008, (http://www.wired.com/gadgetlab/2008/11/adobe-flash-on/).

[1612] Compensatory Damages Issues in Patent Infringement Cases:  A Handbook for Federal District Court Judges.  January 2010, pp. 4 – 5.
http://www.nationaljuryinstructions.org/documents/DamagesHandbookFinal.pdf  See also, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(984)     The hypothetical negotiation approach to reasonable royalty has been said to encompass both fantasy and flexibility—"fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothetical negotiators."[1613]  Looking at the events and facts after the date of the hypothetical negotiation has been referred to as the "Book of Wisdom" and was described by the U.S. Supreme Court as follows:

> . . . At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or savings of expense. . . . This will generally be the case if the trial follows quickly after the issue of the patent.  But a different situation is presented if years have gone by before the evidence is offered.  Experience is then available to correct uncertain prophecy.  Here is a book of wisdom that courts may not neglect.  We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

> . . . To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value non-existent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning.

> . . . An imaginary bid by an imaginary buyer, acting upon the information available at the moment of the breach, is not the limit of recovery where the subject of the bargain is an undeveloped patent.  Information at such a time might be so scanty and imperfect that the offer would be nominal.  The promise of the patent has less than fair compensation if the criterion of value is the price that he would have received if he had disposed of it at once, irrespective of the value that would have uncovered if he had kept it as his own.  Formulas of measurement declared alio intuit may be misleading if wrested from their setting and applied to new conditions. [1614]

---

[1613] *Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc.*, 853 F.2d 1568 at 1575 (Fed. Cir. 1988).  Citing *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (S. Ct. 1933).
[1614] *Howard A. Fromson v. Western Litho Plate and Supply Co. and Bemis Company, Inc.*, 853 F.2d 1568 1575 – 1576 (Fed. Cir. 1988). See also, *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(985)    The importance of actual experience in determining damages has been described as follows:

> The infringement here was committed sometime after the issuance of the patent, and the machine described in it had been for many years in use. Expert testimony to be of value must yield to or agree with actual experience of the patentee and other users of the patented device and the damage allowed to Horvath must find its premise in the use to which his machine has been put and the benefits ensuing to its users.[1615]

(986)    Post-infringement evidence is probative in certain circumstances; the hypothetical negotiation analysis "permits and often requires a court to look at events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators."[1616]

(987)    The "Book of Wisdom" provides the parties to the hypothetical negotiation with knowledge of certain facts including the extent of the use of the invention and actual revenue and profit, but cannot be used to introduce facts based on confidential information from third parties that neither party to the negotiation would have any way of knowing.[1617]

(988)    In my opinion, based on the facts of this case it is appropriate to make use of the "Book of "Wisdom" for the following reasons:

a.    The date of the hypothetical negotiation in this case is sometime between July 2008 to February 2009. Nearly five years have passed since the date of first infringement, and thus, substantial "experience is then available to correct uncertain prophecy."

b.    As discussed throughout this report, the information and data that Apple has produced is highly limited. As such, it is particularly appropriate to augment the available information with later information in an effort to develop a picture that is as complete as possible.

---

[1615] *Horvath v. McCord Radiator & Mfg. Co.,* 100 F.2d 326, 336 (6th Cir. 1938)
[1616] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[1617] William C. Rooklidge and Martha K. Gooding, "When Hypothetical Turns to Fantasy: The Patent Reasonable Royalty Hypothetical Negotiation," *AIPLA,* November 15, 2010, p. 8, (www.aipla.org/learningcenter/library/papers/am/2010/Documents/Rooklidge_Paper.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## K. Availability of Forecasts

(989)   The subject of forecasts was discussed previously in this report.

## L. Structure of the License Agreement

(990)   The structure of the license agreement is an issue of fact that will depend on the circumstances of the case.[1618]   It should be noted that the structure of the agreement affects the relative risks borne by the licensor and the licensee,[1619] as well as the value.[1620]   For example, exclusive agreements are almost always worth more than non-exclusive agreements.[1621]

(991)   The form of payment also impacts the amount actually paid, as it may significantly impact risk sharing between the licensor and licensee.[1622]   In general, the three (3) most common forms of payment in license agreements are:[1623]

- <u>Single, Up-Front Lump-Sum Payment:</u>  This form places all of the downside risk with the licensee, who must pay even if it makes no sales that use the claimed invention. However, this form also enables the licensee to retain all of the upside potential by capping its liability and giving it the ability, usually for remaining term of the patent, to actually use the patented technology in its own products without any further expenditure.   A lump-sum license benefits the patent holder in that it enables the company to raise a substantial amount of cash quickly.   Parties agreeing to a lump-sum agreement may, during the license negotiation, consider the expected or estimated usage or production of a given invention, assuming that proof is presented to support the expectation.   In general, the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump-sum payment.   Lump-sum payments are useful for technology that licensors no longer need, or when a given technology falls outside the patentee's

---

[1618] *See, e.g.,*  Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-181 – 182.
[1619] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1326 – 1327 (Fed. Cir. 2009).
[1620] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 153.
[1621] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 153.
[1622] *See, e.g.,* Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 153.
[1623] *See, e.g.,* Richard T. Rapp, and Phillip A. Beutel.  "Patent Damages and the Law:  Rules on the Road to Economic Rationality," p. 8.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

business, or when the patentee abandons activities relating to the subject technology, or there is a policy shift.[1624]

- **Running Royalty:**  A running royalty based on use of the claimed invention allows the patentee and licensee to share the risk.  Poor performance by the licensee diminishes the royalties paid to the licensor, however, when the licensee's performance is better than anticipated, the licensor gains proportionally.  One of the attractive features of a running royalty based on a percentage of sales is that the licensee does not pay unless it is successful with the licensed technology.  A running royalty based on a percentage of sales, however, generally disfavors the licensee because the royalty obligation continues (assuming it is not renegotiated) regardless of the licensee's future profits.  In addition, running royalties tend to result in delayed cash payments (vis-à-vis lump sum royalties) and impose monitoring costs on the parties, as the royalty base may need to be audited to make sure the licensee is complying with the terms of the license.[1625]

- **Combination of Lump-Sum and Running Royalty:**  Combinations of lump-sums and running royalties is an alternative risk-sharing arrangement that provides the licensor with a minimum upfront royalty together with a royalty that reflects the licensee's use of the claimed invention.  The lump sum enables the patentee to recoup some of its investment in the technology.

(992)  When the licensee and licensor have divergent views regarding the licensee's expected sales, the structure of the license can be affected.  For example, if the licensee's sales expectations are higher than the licensor's expectations regarding the licensee's sales, then the licensee might seek a lump sum license, or possibly a sliding scale royalty where the royalty rate diminishes after certain volume thresholds are met.[1626]

(993)  Typically, some of the factors that are relevant to whether a patentee would charge a running royalty or a fully paid up lump sum royalty include the prospective licensee's ability to pay, market conditions, product lifecycle and the licensed product's expected market life, and the status of alternatives and competing products or processes and the

---

[1624] *See, e.g.,* Robert Goldscheider, "The Negotiation of Royalties and Other Sources of Income from Licensing," *The Journal of Law and Technology,* 1995, p. 7.  *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[1625] *See, e.g.,* Robert Goldscheider, "The Negotiation of Royalties and Other Sources of Income from Licensing," *The Journal of Law and Technology,* 1995, p. 7.  Teece, David J., Managing Intellectual Capital, (Oxford University Press, 2002), p. 153.  *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[1626] *See, e.g.,* David J. Teece, *Managing Intellectual Capital,* Oxford University Press, 2002, pp. 153 – 154.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

potential for such alternatives and competing products or processes to erode the licensed product's target market or obsolete the licensed product or process. These factors in the context of the facts of this case have already been discussed at length in this report.

(994)   It is my opinion based on currently available information, the facts of this case and the licensing history of the parties, Emblaze and Apple would have agreed to a per unit royalty on the accused hardware devices and a running royalty based on software revenue. My opinion is based on the following:

a.   Both Emblaze and Apple have entered into license agreements that include a per unit royalty on hardware devices.

b.   Industry licensing practices in both the handset and multimedia industry provide further support for the reasonableness of a per unit royalty on hardware and a running royalty based on software revenue.

c.   Given the significant economic advantages of the patented invention, as previously discussed, it would be fair and reasonable for Emblaze to share in the success that its technology helped create.

d.   Given the high stakes "digital convergence" and that Apple used the '473 Patent—for which there were no alternatives at the time, and none appear to be looming on the horizon—to help it achieve a dominant position in digital video and live streaming by establishing HLS as *de factor standard*, it would be fair and reasonable for Emblaze to share in the success that its technology helped create.

## M. Apportionment & the Entire Market Value Rule Exception

(995)   In determining "the amount of a use-based reasonable royalty 'adequate to compensate for the infringement,' a jury may consider not only the benefit to the patentee [Emblaze] in licensing the technology, but also the value of the benefit conferred to the infringer [Apple] by use of the patented technology."[1627]  The benefit conferred on the infringer can include the competitive advantage conferred upon the infringer, and, where appropriate, consideration of the extent to which Apple's use of the technology

---

[1627] *Powell v. Home Depot U.S.A., Inc.,* 663 F.3d 1221, 1240 (Fed. Cir. 2011).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

preserved its viability as a business.[1628]   When determining a reasonable royalty, the proper compensation base—the "royalty base"—must be determined.  In doing so, two issues are addressed:  "Apportionment" and the "Entire Market Value Rule Exception."

## 1) Apportionment

(996)   When the patent at issue covers an entire product that is accused of infringement, the royalty base is usually the total sales or uses of the infringing product.  In contrast, when the patent at issue covers only a component of or an improvement to the product that is accused of infringement, the royalty base includes only the value attributable to the patented component or improvement.  That is, apportionment is generally required and the sales or uses must be apportioned between the patented invention and the remaining unpatented components.[1629]  This principle has been described as follows:

> Where the patent admittedly creates only part of the profits, the patentee is only entitled to that part, and he must apportion the infringer's profits and show by reliable and satisfactory evidence either what part of the profits are attributable to his patent or that the entire value of the infringing article is attributable to his patent.[1630]

> Where the patentee shows that profits have been made by the use of his patent, but the defendant proves that there were other elements contributing to the profits, it then devolves upon the plaintiff to apportion the amount of profits attributable to the use of his patent.[1631]

> [The burden of proof is shifted to the Defendant] after the plaintiff has proved the existence of profits attributable to his invention, and demonstrated that they are impossible of accurate or approximate apportionment.  If then the burden of separation is cast on the defendant, it is one which justly should be borne by him, as he wrought the confusion.[1632]

---

[1628] *Monsanto Company v. Homan McFarling,* 488 F.3d 973 (Fed. Cir. 2007).  *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1240 (Fed. Cir. 2011).  *Fromson v. Citiplate, Inc.,* 699 F.Supp. 398 (E.D.N.Y. 1988), *affirmed* 866 F.2d 1300 (Fed. Cir. 1989).

[1629] Donald S. Chisum, Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement, Volume 7, Chapter 20, pp. 20-43 – 20-44.

[1630] *Westinghouse Elec. Co. v. Wagner Elec. Co.,* 225 U.S. 604, at 605, 615 (S. Ct. 1912), citing *Garretson v. Clark,* 111 U.S. 120 (S. Ct. 1884).

[1631] *Westinghouse Elec. Co. v. Wagner Elec. Co.,* 225 U.S. 604, 605 (S. Ct. 1912).

[1632] *Westinghouse Elec. Co. v. Wagner Elec. Co.,* 225 U.S. 604, 622 (S. Ct. 1912).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> If the plaintiff's patent covered only a part of the infringing machine and created only a part of the profits, he is required to take the initiative in presenting evidence looking to an apportionment.

> In an apportionment of profits, mathematical exactness is not indispensable, reasonable approximation being what is required, and it usually may be attained through the testimony of experts and persons informed by observation and experience.[1633]

(997)    The goal of apportionment is to identify the "benefit" attributable to the patent and ensure that the patentee's damages are proportional to the value the patent at issue contributed to the accused infringing product—and does not include value attributable to unpatented components.[1634]  In some cases, this can be shown by comparing the profits of a product containing the patented improvement to the same or comparable product that did not include the improvement.[1635]  The apportionment analysis has been described as follows:

> The price paid for the patented invention is the price received for the whole article, less what it would have brought in the open market had the patented invention been omitted.  Its cost is the difference between the expense of making the article with it and without it.  If the article is more expensive and brings a higher price when it includes the patented invention, the subtraction of the excess of cost from the excess of price will show whether a profit has been made and in what amount.  When the price remains the same as if the patented invention were not used, and the expense of manufacturing the article is lessened, the profit is the decrease in its cost.  If cost and price are unchanged by the introduction of the patented invention, or are increased or diminished in the same proportion, or the price decreases while the cost is still the

---

[1633] *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641 (S. Ct. 1915).  See also, *Uniloc USA, Inc. and Uniloc Singapore Private Limited v. Microsoft Corporation,* 632 F.3d 1292, 1318 (Fed. Cir. 2011). ("the patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative, . . .")

[1634] See e.g., Brian J. Love, *"Patentee Overcompensation and the Entire Market Value Rule,"* Stanford Law Review, October 2007, p. 268, (http://www.stanfordlawreview.org/system/files/articles/Love.pdf)  Eric E. Bensen and Danielle M. White, "Using Apportionment to Rein in the *Georgia-Pacific* Factors," The Columbia Science and Technology Law Review, February 19, 2008, PDF pp. 19 – 20, (http://www.stlr.org/volumes/volume-ix-2007-2008/bensen/).

[1635] *See, e.g.,*  Eric E. Bensen and Danielle M. White, *"Using Apportionment to Rein in the Georgia-Pacific Factors,"* The Columbia Science and Technology Law Review, February 19, 2008, PDF p. 18, http://www.stlr.org/volumes/volume-ix-2007-2008/bensen/) (Citing *e.g., Metallic Rubber Tire Co. v. Hartford Rubber Works Co.,* 275 F. 315, 322-23 (2d Cir. 1921).)

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> same, there is no profit in the sale of any single article for which the plaintiff has a right to an account from the defendant, and whatever benefit exists must be occasioned by an increase in his sales. . . .[A]ll the profits on those articles, which would not have been sold had they not contained the patented invention, are due to the infringement.[1636]

(998)   Difficulty arises in applying the apportionment principle to "those cases where it is impossible to separate the single profit into its component parts."[1637]

(999)   In identifying the "benefit" attributable to the patent—the nature of the patented invention and the nature of its use are considered.  For example, in cases in which the alleged infringement entails the *manufacture and sale of the claimed invention*, the "benefit" is usually the profit attributable to the invention. In cases in which the alleged infringement entails the *use of the claimed invention*, "the benefit derived from its employment rarely assumes the form of a specific sum of money, . . . and hence requires the application of different and more complicated rules for its detection."[1638]   The analysis was described by Professor William Robinson in his 1890 treatise as follows:

> The cost of using the invention may present little difficulty, but the benefit derived from its employment rarely assumes the form of a specific sum of money, like the price received for an article sold, and hence requires the application of different and more complicated rules for its detection.  The benefit derived from the use of any art or instrument may manifest itself either in the increase of pecuniary receipts, or in the decrease of expenses.  A process or machine whose products, though entailing the same cost of manufacture on the maker, command a higher price, confers upon its user an advantage measured by the increment of price received.  An art or article whose use results in lessening the expenses of the business, without increasing its receipts, is profitable to its employer in proportion to the savings it involves.   Thus the profits from the unlawful use of a patented invention may assume different forms according to the nature of the

---

[1636] Donald S. Chisum, <u>Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement</u>, Volume 7, Chapter 20, p. 20-44.

[1637] *Westinghouse Co. v. Wagner Mfg. Co.*, 225 U.S. 604, 615 (S.C. 1912).

[1638] Donald S. Chisum, <u>Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement</u>, Volume 7, Chapter 20, p. 20-45.  See also,  Eric E. Bensen and Danielle M. White, *"Using Apportionment to Rein in the Georgia-Pacific Factors,"* <u>The Columbia Science and Technology Law Review</u>, February 19, 2008, PDF pp. 19 – 20.  http://www.stlr.org/cite.cgi?volume=9&article=1  (Citing *e.g.*, *Metallic Rubber Tire Co. v. Hartford Rubber Works Co.*, 275 F. 315, 322-23 (2d Cir. 1921).)

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

> invention and the circumstances under which it is used, and consist
> either in direct gains, or in savings, or in both together.
>
> . . .
>
> . . . [the recoverable profit is] the advantage [the new invention] affords
> in excess of that obtainable by other means which have been previously
> bestowed upon the public.[1639]

(1000)    The first issue is what "benefit" did Apple derive as a result of its use of the patented

methods?  The answer to this question is that Apple derived at least four very valuable

benefits:

a.  <u>Apple Became a Leader in Digital Video and Live Streaming:</u>  Apple rise to digital
video leader from a distant third place to being recognized as "the standard" in a
short 2.5 years was remarkable. From a historical perspective, Apple's
accomplished this result in half the time it took Microsoft in the late-1990s (1997
to 2002 when Microsoft killed Real).   Apple's accomplishment is also quite
notable in view of Apple's failed efforts to make QuickTime a digital video
standard for more than a decade.   QuickTime, however, never gained any
"traction" in the marketplace.

b.  <u>Apple Captured and has Kept a Critical Advantage</u>: The evidence shows that
Apple benefited greatly from the claimed invention.  First, nearly all of Apple's
products are accused of infringement in this case.  Second, Apple's documents
and deposition testimony establish that live streaming was and is an important
feature, and its importance is expected to continue in the future.  Third, timing
was critical in view of the digital convergence and the fact that the smartphone
market was at an inflection point at the time of the hypothetical negotiation.
Fourth, HTTP Live Streaming was instrumental in Apple's success in killing Flash
at the time the market was at the inflection point.  In short, Apple is now
recognized as the leader in digital video and Apple's use of Emblaze's patented
invention, allowed it to capture and keep a critical competitive advantage, which
helped it protect its iDevice franchise.

c.  <u>Increasing iDevice Sales and Operating Profits</u>:  Apple's very valuable iPhone
franchise avoided risk which enabled it to continue realizing the increasing sales
and operating profits—the increasing returns associated with "network effects."

---

[1639] Donald S. Chisum, <u>Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,</u>
Volume 7, Chapter 20, p. 20-45.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

      d.  <u>Cost Savings:</u>  Apple and other that use HLS realize cost savings as well the other advantages associated with the '473 Patent.  The magnitude of these cost savings and other advantages is not known.

(1001)    The second question is what is "the value of the benefit conferred to the infringer [Apple] by use of the patented technology?"[1640]  The facts and circumstances of this case make this question particularly difficult to answer.  First, I am not aware of any "analogues" in which an accused infringer submitted a patented protocol to a standards body—in the hope of having the world adopt and use that protocol to the advantage of the submitting party and that party's platform and ecosystem, and the collateral damage is that the market incumbent is killed (that at the time had 98% market penetration on the desktop).  Second, add to the first point the high stakes situation around the digital convergence –which has proved to be a watershed event that created the new mobile market juggernaut, and there is simply nothing that is even close to comparable.  Third, combine the foregoing with the fact that most of the available licenses are for compression technologies—not a protocol that was being promoted by Microsoft as optimal—that were not negotiated during economic circumstances that are comparable.   The result is that the license agreements available in this case are, at best, an absolute floor for the value of the '473 Patent.  The central valuation issue in this case is what is a fair premium given the use that Apple is claimed to have made of the '473 Patent.  For the reasons I have already explained, it is my opinion that Apple's actions have made apportionment impossible.  However, notwithstanding this issue, my Income Approach valuation analysis shows increased gross margin of ████ per unit.  In view of the foregoing, it is reasonable to infer "that a substantial fraction of the accused products' profits stemmed from [the patented invention],"[1641] which in this case would refer to the ████ excess gross margin.

---

[1640] *Powell v. Home Depot U.S.A., Inc.,* 663 F.3d 1221, 1240 (Fed. Cir. 2011).
[1641] *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, at 1211 (Fed. Cir. 2010).

Expert Report of Catharine M. Lawton

## 2) Entire Market Value Rule Exception

(1002)    Notwithstanding the foregoing apportionment requirement, under certain circumstances, it is appropriate to apply the "Entire Market Value Rule" in determining the royalty base.[1642]   "The 'Entire Market Value Rule' recognizes that the economic value of a patent may be greater than the value of the sales of the patented part alone. The Entire Market Value Rule has been described as follows:

> Where the article, though embracing other features than those covered by the patent, so far derives its marketability from the presence of the invention that articles from which it is absent would be totally unsalable, the entire profit on the sales must be attributed to the infringement.  This may occur where an article previously in demand has been wholly superseded in the market by the same article containing a patented improvement.  The original still preserves its former utility, and if marketable might become a source of profit to the seller.  But if unsalable without the patented improvement no profit could arise, since in this form of infringement profits are the fruit of sales, not of utility, and, therefore, when made salable by the incorporation of the patented improvement, it is to this that both the sales and profits are due.  Hence, in these cases, though with some hesitation on the part of certain judges, the entire profits on the sales are awarded to the plaintiff, notwithstanding the intrinsic value of the original invention, or its present usefulness to anyone who might wish to employ it.[1643]

(1003)    Under this rule, courts have allowed recovery of lost profits or a reasonable royalty based not only on the profit from the patented part, but also on non-patented parts.[1644] That is, in certain circumstances and with proper proof, the Entire Market Value Rule may be used to include within the Royalty Base both infringing and non-infringing components or products.[1645] As noted by the *Cornell* court, "The entire point of that rule [Entire Market Value Rule] is to allow plaintiffs the advantage of collecting royalties on a system that encompasses more than the claimed invention when defendant's real

---

[1642] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F. Supp. 2d 279, 287 (N.D. New York 2009).
[1643] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-44.
[1644] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F. Supp. 2d 279, 287 (N.D. New York 2009). Citing *King Instruments Corp. v. Perego,* 65F. 3d 941, note 4 (Fed. Cir. 1995).
[1645] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F. Supp. 2d 279, 287 (N.D. New York 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

world earnings derive from real world system sales generated by demand for the claimed invention."[1646]

(1004)    The determination of whether the Entire Market Value Rule applies will depend on the facts of the case, and is not appropriate in all cases.  In general, the Entire Market Value Rule will apply in cases in which the commercial embodiment of the claimed invention of the patent-in-suit (i.e., "the patented product") creates demand for the larger product or for the non-patented components, and when patented product and the non-patented product constitutes a functional unit.  Functionality is generally considered to be the primary factor in determining whether the Entire Market Value Rule applies.  A functional relationship may exist between a patented device and an unpatented item that is used with the patented device, even though the patented device can be used with more than one unpatented item or the unpatented item can be used with other devices.[1647]  The Entire Market Value Rule, however, will not extend to items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage.[1648]  The Entire Market Value Rule also will not apply to circumstances in which there are a large number of factors other than the patented invention which drive demand and the reported sales.[1649]

(1005)    The Entire Market Value Rule in the context of royalties, requires adequate proof of each of the following three (3) conditions:

> a.  The infringing component or feature must be "the basis for customer demand" for the entire machine including the parts beyond the claimed invention, <u>or</u> "substantially create the value of the component parts;"[1650]

---

[1646] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F. Supp. 2d 279, 288 (N.D. New York 2009).
[1647] *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1550 (Fed. Cir. 1995).
[1648] *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1550 (Fed. Cir. 1995).
[1649] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F. Supp. 2d 279 (N.D. New York 2009).
[1650] *Uniloc USA, Inc. and Uniloc Singapore Private Limited, v. Microsoft Corporation, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  (Citing Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1336 (Fed. Cir. 2009), and Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1549 – 1550 (Fed. Cir. 1995).)*

Expert Report of Catharine M. Lawton

     b.  The individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are parts of a complete machine or single assembly of parts; and

     c.  The individual infringing and non-infringing components must be analogous to a single functioning unit.  It is not enough that the infringing and non-infringing parts are sold together for mere business advantage.[1651]

(1006)   The foregoing requirements are additive, not alternative ways to demonstrate the eligibility for application of the Entire Market Value Rule.[1652]

(1007)   In addition, whether or not a plaintiff is entitled to include the entire market value of a system incorporating infringing and non-infringing components in the royalty base is separate from the analysis of convoyed or collateral sales on the royalty rate.[1653] Reliance on hypothetical sales or estimated revenue is entirely permissible in connection with a reasonable royalty analysis.  The determination of a damage award is not an exact science, and the amount need not be proven with unerring precision.[1654]

(1008)   In this case, the currently available facts do not establish that live streaming is "the basis for customer demand."  While live streaming is an important feature, it clearly is not "the basis for customer demand" related to smartphones.

## N. The Royalty Base

(1009)   The determination of the Royalty Base depends on the facts and circumstances of the case.  In general, the royalty base is usually set with an eye toward ease of monitoring and payment.[1655]  More inclusive royalty bases generally command lower royalty rates and vice versa.[1656]  The starting point for determining the royalty base is to consider the

---

[1651] *Cornell University, et al. v. Hewlett-Packard Company, 609 F. Supp. 2d 279 (N.D. New York 2009).*
[1652] *Cornell University, et al. v. Hewlett-Packard Company, 609 F. Supp. 2d 279 (N.D. New York 2009).*
[1653] *Cornell University, et al. v. Hewlett-Packard Company, 609 F. Supp. 2d 279 (N.D. New York 2009).*
[1654] *Cornell University, et al. v. Hewlett-Packard Company, 609 F. Supp. 2d 279 (N.D. New York 2009).*
[1655] *See, e.g.,* David J. Teece. *Managing Intellectual Capital.*  Oxford University Press, 2002, p. 154.
[1656] *See, e.g.,* David J. Teece. *Managing Intellectual Capital.*  Oxford University Press, 2002, p. 154.

Expert Report of Catharine M. Lawton

market most aligned with the claimed invention, and consider the smallest, salable, patent-practicing unit.[1657]

(1010)    The Apple accused sales associated with each charge of infringement are set forth in Schedule 1B.

## O. The Royalty Rate

(1011)    The royalty rate depends on the facts and circumstances of the case and many factors are considered in determining the royalty rate. It should be noted that the royalty rate cannot be meaningfully assessed separate from the royalty base.[1658]   Total royalty payments are the product of one or more rates and one or more bases.[1659]

(1012)    Profitability of the products or services that incorporate the patented technology plays a dominant role in the royalty determination.[1660]   In general, industries with higher profitability tend to have higher royalty rates.[1661]   For example, royalty rates are generally higher in industries that have higher profit margins such as pharmaceutical, medical, software, and computers.[1662]   In contrast, royalty rates are generally lower in traditional industries with lower profit margins such as food, auto and consumer products.[1663]

---

[1657] *Cornell University, et al. v. Hewlett-Packard Company,* 609 F. Supp. 2d 279 (N.D. New York 2009).

[1658] *See, e.g.,* David J. Teece. *Managing Intellectual Capital.* Oxford University Press, 2002, p. 154.

[1659] *See, e.g.,* David J. Teece. *Managing Intellectual Capital.* Oxford University Press, 2002, p. 154.

[1660] Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA. "Profitability and Royalty Rates Across Industries: Some Preliminary Evidence," 2008, p. 2, (http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf).

[1661] Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA. "Profitability and Royalty Rates Across Industries: Some Preliminary Evidence," 2008, p. 2, (http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf); Stephen L. Becker, Ph.D. and Jiaqing Lu, Ph.D., CFA. "Royalty Rate and Industry Structure: Some Cross-Industry Evidence." 2009, p. 5, (http://www.royaltysource.com/news/Becker%20and%20Lu%20Royalty%20Rate-Market%20Structure%20Paper.pdf).

[1662] Stephen L. Becker, Ph.D. and Jiaqing Lu, Ph.D., CFA. "Royalty Rate and Industry Structure: Some Cross-Industry Evidence." 2009, p. 5, (http://www.royaltysource.com/news/Becker%20and%20Lu%20Royalty%20Rate-Market%20Structure%20Paper.pdf).

[1663] Stephen L. Becker, Ph.D. and Jiaqing Lu, Ph.D., CFA. "Royalty Rate and Industry Structure: Some Cross-Industry Evidence." 2009, p. 5.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(1013) Some of the factors that are usually examined are set forth in *Georgia-Pacific Corporation v. U.S. Plywood-Champion Papers Inc.*, 318 F.Supp. 116 (S.D.N.Y. 1970), and are commonly referred to as the *Georgia-Pacific* factors.

## P. The *Georgia-Pacific* Factors

(1014) The fifteen (15) factors set forth in *Georgia-Pacific* establish a conceptual framework to assist the court in establishing the royalty that would have resulted from a hypothetical negotiation between **Emblaze**, as hypothetical licensor, and **Apple**, as hypothetical licensee, assuming that the '473 Patent is valid, enforceable, and infringed by **Apple**, and determined in light of the circumstances when infringement began.[1664]  Because of the difficulty of recreating a negotiation in such a hypothetical manner, evidence of subsequent events is sometimes used as a basis for inferring what the pre-infringement negotiated value would have been.[1665]

(1015) The *Georgia-Pacific* factors were originally presented as a list of "some" of the factors "seemingly more pertinent to the issue," however, the 15 *Georgia-Pacific* factors have become the definitive criteria for determination of a reasonable royalty.[1666]  The *Georgia-Pacific* factors are used as a general guide of the factual information necessary to determine a reasonable royalty.[1667]  Not all factors will be relevant in a particular case.[1668] A party must adduce evidence only with respect to the factors relevant to that case.[1669] There is, however, "no formula by which these factors can be rated precisely in

---

(http://www.royaltysource.com/news/Becker%20and%20Lu%20Royalty%20Rate-Market%20Structure%20Paper.pdf).

[1664] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-255.

[1665] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-255.

[1666] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-195.

[1667] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-195.

[1668] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-195.

[1669] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-195.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

the order of their relative importance or by which their economic significance can be automatically transduced into their pecuniary equivalent."[1670]

(1016)   The most important *Georgia-Pacific* factor is Factor No. 15, which summarizes and shapes most of the others.[1671]   Factor No. 15 outlines the hypothetical negotiation defined in *Georgia-Pacific,* and defines the reasonable royalty as:

> The amount that a licensor (such as the patentee) and the licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

(1017)   Thus, the "amount" arrived at through the hypothetical negotiation is listed as *Georgia-Pacific* Factor No. 15, however, it essentially subsumes all of the first 14 factors.[1672]

(1018)   *Georgia-Pacific* Factor No. 14 is "The opinion testimony of qualified experts," and is the primary means by which the parties introduce evidence on what constitutes a reasonable royalty.[1673]

(1019)   The other thirteen (13) *Georgia-Pacific* factors generally fall into two (2) general groups:  a) the specific and general market conditions in the pertinent industry, and b) the anticipated profitability of the product or process made, used, sold or offered for sale by the infringer and covered by the patent.[1674]

---

[1670] *Compensatory Damages Issues in Patent Infringement Cases:  A Handbook for Federal District Court Judges.* January 2010, p. 5, (http://www.nationaljuryinstructions.org/documents/DamagesHandbookFinal.pdf).
[1671] *See, e.g.,* Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook:  The Role of the Financial Expert,*2001, p. 24-15.
[1672] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-195.
[1673] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-194, 20-252.
[1674] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-195.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

(1020)   At the outset, I note that the substantive facts that form the basis for my reasonable royalty opinion have already been discussed in detail in this report.  As such, in this section, I will only *briefly* summarize some of the key facts and reference the section of the report where the subject matter is fully addressed, which is incorporated herein by reference.   The following is my *brief* summary of the thirteen (13) *Georgia-Pacific* Factors as they relate to the facts of this case, (*Georgia-Pacific* Factor No. 15 will be discussed in the next section).

## 1) The Specific and General Market Conditions in the Pertinent Industry – "The *Georgia-Pacific* Rate Factors"

(1021)   This group of factors includes six (6) of the *Georgia-Pacific* Factors, which if applicable given the facts of the case, may point to a <u>rate(s)</u> that the parties would have adopted within the <u>range</u> established by the second set of factors.[1675]   The factors in the first group are:

### a.  <u>Prior and Existing Licenses Under the Patent.</u>

   i.   <u>Factor No. 1</u>: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

(1022)   The most influential factor in determining a reasonable royalty is that of prior and existing licenses negotiated under the patent in suit.[1676]  The theory is that the actual results reached by persons with conflicting economic interests constitutes direct and reliable evidence of the fair market value of a license under the patent.[1677]   In circumstances where the royalties received under license agreements to the patent in suit do not constitute an established royalty, the existing license rate may tend to show

---

[1675] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-195.
[1676] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-181.
[1677] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-196, 199.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

an established license rate.[1678] However, prior and existing license royalty rates are not conclusive because they may derive from conditions that deviate from those assumed by the willing buyer-willing seller rule.[1679] A patent owner may recover as a reasonable royalty an amount greater than that of prior and existing license rates by demonstrating that those rates were depressed by widespread infringement and defiance of the patent or by the pressures to settle threatened or pending litigation.[1680]

Emblaze has not entered into any licenses to the '473 Patent. As such, there is no evidence proving or tending to prove an established royalty.

Thus, *Georgia-Pacific* Factor No. 1 is **_neutral._**

## b. **Industry Custom and Licenses on Comparable Patents.**

i. **Factor No. 12:** The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

(1023)   Factor No. 12 addresses industry customs. The licensing customs in the industry are considered in determining both the royalty rate and royalty base for the reasonable royalty.[1681] The theory is that a willing licensor and a willing licensee, negotiating from positions of uncertainty as to the future profitability of the patented invention, would be guided to some degree by customary practices in the industry, but this factor is rarely given decisive or even substantial effect due to the generally unique character of

---

[1678] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-205.

[1679] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-199.

[1680] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-199.

[1681] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-208 – 209.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

the patented inventions and of the circumstances under which they are developed and exploited.[1682]

As stated previously, Apple has provided no information in this litigation regarding its licensing policies and practices and industry customs, if any. Based on my investigation, I am not aware of any licensing customs in either the multi-media industry or the handset industry as it relates to setting the royalty rate. In general, license agreements in the multimedia industry generally are based on rate per unit sold—however, information is not available that would provide insight regarding how the rates were determined. More generally, I am not aware of any "analogues" (as discussed previously) that are either economically and/or technically comparable to the '473 Patent.

Thus, *Georgia-Pacific* Factor No. 12 is ***neutral.***

### ii. Factor No. 2: The rates paid by the licensee for the use of other patents comparable to the patent in suit.

(1024)     Factor No. 2 addresses the licenses for comparable technology. Actual licenses on comparable patents are considered in determining both the royalty rate and royalty base for the reasonable royalty.[1683] The key issue here is whether the proffered license(s) are sufficiently comparable to the hypothetical license at issue.[1684] Comparable licenses are negotiated between similarly situated parties, contain similar terms and conditions and involve technology of similar economic value,[1685] and arose from circumstances that are similar to those presumed to prevail in the hypothetical royalty negotiation.[1686] "There must be a basis in fact to associate the royalty rates used

---

[1682] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-211.

[1683] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-208 – 209.

[1684] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009).

[1685] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-19.

[1686] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1329 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

in prior licenses to the particular hypothetical negotiation at issue in the case."[1687]  In *Georgia-Pacific,* the Court noted that more than a "simplistic discussion of the figures of royalty rates" in other licenses is required:

> The rudimentary principle of analysis has been largely disregarded by GP's simplistic discussion of the figures of royalty rates.  There is an absence of meaningful evidence about such obviously pertinent factors as the relative economic positions of the licensor and licensee at the time the particular royalty was negotiated, in terms of their respective bargaining strength and their competitive status inter se; the economics of the market for the particular product before and at the time the particular royalty was negotiated; the character of the particular product itself, as either new or commercially accepted, at the time the particular royalty was negotiated; the past performance of the licensed product in terms of profit-bearing and the degree of its commercial success; and many other similar features that would enable the Court to make a sound businesslike evaluation.  Without such evidence, bare data as to a royalty rate and cursory information as the nature of a particular license transaction are gravely deficient in probative value.  They lack the dimension of reality. . . .[1688]

Industry royalty rates, however, do not necessarily establish a ceiling for the royalty that may be assessed after an infringement.[1689]

Subsumed within this factor is the question of the form of the license:  lump sum payment or running royalty based on ongoing sales or usage.[1690]

This factor is rarely given decisive or even substantial effect due to the generally unique character of the patented inventions and of the circumstances under which they are developed and exploited.[1691]  This issue has been summarized as follows:

> Because markets for know-how are often extremely thin, and transactions are often highly confidential, one cannot determine

---

[1687] *Uniloc USA, Inc. and Uniloc Singapore Private Limited v. Microsoft Corporation,* 632 F.3d 1292, 1317 (Fed. Cir. 2011).

[1688] *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1140 (S.D.N.Y. 1970).

[1689] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-212.

[1690] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[1691] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-211.

Confidential - Attorney's Eyes Only                    510                    CORRECTED

Expert Report of Catharine M. Lawton

market values simply by interrogating a public database of identical or even roughly comparable transactions. This leaves royalty rates to be determined by negotiation between parties, often without benchmarks to assist one in determining market price. Even if comparable transactions for the same or similar technology and/or intellectual property could be located, license agreements can be structured in different ways, further complicating comparisons.[1692]

Apple counsel stated: "Apple does not license its HTTP Live Streaming protocol and Apple produced all licenses that could be considered "comparable" to the technology of the patent in suit."[1693] The licenses Apple has produced generally relate to the field of multimedia, and as such they are generally comparable. Most of Apple's licenses relate to compression technology, and some are SEP licenses. In addition, none of the license agreements were negotiated as the digital convergence was moving toward the inflection point. As such, the economic circumstances are not comparable. However, in view of the limited available information, I have considered the available licenses as summarized on Schedule 17A as minimum royalty rates in a very general range.

Thus, *Georgia-Pacific* Factor No. 2 suggests minimum royalty rates in the very general range of **$0.10 to $3.10 per unit**.

   iii. **Factor No. 3: The nature and scope of the license, as exclusive or non-exclusive; or restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

(1025)   Factor No. 3 raises fact issues that address the nature and scope of the hypothetical license agreement. Non-exclusive and restricted licenses generally command lower royalties than exclusive and non-restricted licenses.[1694] Stated differently, typically, higher royalty rates are associated with license agreements that provide the licensee with exclusive rights to use the IP.[1695]

---

[1692] David J. Teece. *Managing Intellectual Capital.* Oxford University Press, 2002, p. 149.
[1693] September 25, 2013 Defendant Apple Inc. Opposition to Emblaze's Motion to Compel, 16.
[1694] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1335 (Fed. Cir. 2009).
[1695] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1335 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

Based on the facts of this case, the hypothetical license would be non-exclusive and unrestricted. As such, because the license would be non-exclusive, it does not suggest a higher rate.

Thus, Georgia-Pacific factor No. 3 is **neutral.**

### c. Patent Owner's Licensing Policy and the Relation Between the Parties.

  i. **Factor No. 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

(1026)  Factor No. 4 addresses the patent owner's licensing policy with respect to the Patents-in-Suit.[1696]  The patent owner's bargaining power, however, would be greater if it followed a general policy of refusing to grant licenses.[1697]  This factor, however, does not easily translate into a specific quantitative difference in the reasonable royalty rate.[1698]

By 2009, Emblaze's licensing strategy, policy and practices were directed at broadly licensing its patents in an effort to establish its technology as an industry standard. Emblaze wanted everyone to use its technology.  Because Emblaze does not refuse to grant licenses, this factor does not suggest a higher royalty rate.

Thus, *Georgia-Pacific* factor No. 4 is ***neutral***.

---

[1696] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, pp. 20-212 – 213.
[1697] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-214.
[1698] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-214.

Confidential - Attorney's Eyes Only    512    CORRECTED

Expert Report of Catharine M. Lawton

        **ii.**  **Factor No. 5**: **The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor or promoter.**

(1027)    Factor No. 5 addresses the relationship—competitive v. noncompetitive—between the parties.[1699]  The willing buyer-willing seller rule necessarily and hypothetically assumes that the patent owner would have been willing to grant a license at a rate that would have enabled the infringer to have utilized the patent invention.[1700]  The patent owner's bargaining power, however, would be greater if it:  1) was a competitor of the infringer, 2) had the capacity to make the infringer's sales or production, and 3) followed a general policy of refusing to grant licenses.[1701]

In cases where the patent owner makes the patented article, the profitability of the owner's manufacture and sale also determines the royalty that would be charged.[1702] The reasonable royalty rate to a manufacturing patentee (or exclusive licensee) would not exceed a lost profits award if the patentee (or exclusive licensee) and infringer have similar cost structures.[1703]

In cases where the patent owner does not manufacture the invention, the patent owner expects to make money principally if not exclusively from the royalty.[1704]  In such cases, "it is necessary to enter into the complex counterfactual process of approximating the royalty that would have been agreed on by the parties that did not agree on anything at all, . . ."[1705]

---

[1699] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, pp. 20-212 – 213.
[1700] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-213 – 214.
[1701] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-214.
[1702] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-217.
[1703] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-217.
[1704] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-217.
[1705] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-217.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

This factor, however, does not easily translate into a specific quantitative difference in the reasonable royalty rate.[1706]

Emblaze and Apple are not competitors.  Emblaze did not have the capacity to achieve Apple's sales.  Emblaze did not follow a general policy of refusing to grant licenses.

Thus, *Georgia-Pacific* Factor No. 5 is **_neutral_**.

**Conclusion Regarding "The *Georgia-Pacific* Rate Factors":**     In this case, "The *Georgia-Pacific* Rate Factors" are generally neutral.  Factor No. 2 suggest minimum royalty rates in the very general range of **$0.10 to $3.10 per unit**.

## 2)  The Anticipated Profitability of the Product or Process Made, Used or Sold by the Infringer and Covered by the Patent – "The *Georgia-Pacific* Range Factors."

(1028)    This group of factors includes seven (7) of the *Georgia-Pacific* Factors and, when applicable given the facts of the case, may set the range of feasible rates since a willing patent owner would demand a greater than minimum rate for a profitable invention and a willing user would concede no more than the expected amount of profit (adjusted for the uncertainty as to its realization).[1707]   "While either the infringer's or the patentee's profit expectation may be considered in the overall reasonable royalty analysis, neither is an absolute limit on the amount of the reasonable royalty that may be awarded upon a reasoned hypothetical negotiation analysis under the *Georgia-Pacific* factors."[1708]   "[I]t is settled law that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped."[1709]   The factors in the second group are:

---

[1706] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-214.
[1707] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-195.
[1708] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1238 – 1239 (Fed. Cir. 2011).
[1709] *Powell v. Home Depot U.S.A., Inc.* 663 F.3d 1221, 1238 – 1239 (Fed. Cir. 2011).

Expert Report of Catharine M. Lawton

# d. Infringer's Anticipated Profits.

### i. Factor No. 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.

(1029)  Factor No. 8 addresses both the established profitability and the actual state of development and commercialization of the product or process covered by the patent, and is directed at addressing the anticipated profits or cost savings that the infringer would derive from use of the patented product or process.[1710]  The theory is that a willing licensor and willing licensee in a hypothetical negotiation would have set a royalty rate that would divide between them the predicted economic benefits to be realized by the licensor's adoption of the product or process.[1711]  In general, patented products sold with a high profit margin will support a higher reasonable royalty rate than patented products sold with a low profit margin.[1712]

In determining a reasonable royalty, what is important is not the actual profit made by the infringer but the anticipated profit at the time of the hypothetical negotiations leading up to the license agreement.[1713]  The reasonable royalty measure does not guarantee an actual residual profit to the infringer, and there is no rule that a royalty be no higher than the infringer's actual net profit margin.[1714]  Considerable weight is given to the anticipated profits, cost savings or benefits that the infringer would derive from use of the patented product or process, as such normally constitutes the limit on the amount a willing user would agree to pay as a royalty.[1715]  In some circumstances, indirect benefits of the invention may have induced the infringer to agree to a royalty

---

[1710] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-218.
[1711] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-218 – 219.
[1712] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1335 (Fed. Cir. 2009).
[1713] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-222.
[1714] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-222, 20-223.
[1715] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-181, 20-218.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

rate equal to or even in excess of the direct profits to be derived from adopting it.[1716] The infringer's actual profit performance over the period of infringement is frequently considered,[1717] however, greater emphasis must be placed on anticipated profits based on the factors which were apparent at the time of the hypothetical negotiation.[1718] This was reiterated by the *Lucent* court when it noted: "The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical negotiations would have considered at the time of the negotiations."[1719]

- Established Profitability: Profitability lies at the heart of market value.[1720] A license becomes attractive to the licensee, therefore, if the technology can increase the licensor's profits over what they otherwise would have been.[1721] Thus, one must measure not only the infringing product's profitability, but also calculate what the profitability might otherwise have been.[1722] The analysis should primarily focus on the projected profits of the infringer and the patentee at the time of the hypothetical negotiation.[1723] The "book of wisdom"—actual financial information after the date of the hypothetical negotiation—can be used when contemporaneous projections do not exist.[1724] Furthermore, use of the "book of wisdom" is particularly helpful when the date of damages assessment occurs well after the date of first infringement.[1725] In these circumstances, "experience is then available to correct uncertain prophecy. . .To correct uncertain prophecies in such circumstances is not to charge the offender

---

[1716] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-220 – 221.
[1717] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-221.
[1718] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-222.
[1719] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009). (Citing *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1081 (Fed. Cir. 1983).)
[1720] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-23.
[1721] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-23.
[1722] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-23.
[1723] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-23.
[1724] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-23.
[1725] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-256.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

with elements of value non-existent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning."[1726]

- **State of Development and Commercialization:** The state of development and commercialization affects both the estimated amount of economic benefit to the prospective licensee and the level of uncertainty as to its future realization.[1727] The theory is that a willing licensee in a hypothetical negotiation at the time infringement began would have been more disposed to agree to a high royalty if the product or process was fully developed and commercially established.[1728] In contrast, a willing licensee would be less disposed to agree to a high royalty if the product or process was paper technology and would require further investment in its development and commercialization.[1729]

Regarding the commercialization and popularity of the '473 Patent: mid- to late-2008 or early-2009, the industry had moved to HTTP; the industry had substantial installed HTTP server capacity and Microsoft and later Adobe were also promoting their competing HTTP-based approaches. In addition, for various reasons Apple's prior RTSP was not a viable option.

Regarding Apple's anticipated profits, Apple would have anticipated increased profits as from using the claimed invention of the '473 Patent to:

- Kill Flash and eliminate the risk of lost iTunes and App Store revenue and profits and improve its platform for the reasons Steve Jobs explained in his April 2010 letter, "Thoughts on Flash;"

- Reduce the risk of a battle with Microsoft, as discussed in detail previously;

---

[1726] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-256.
[1727] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-244.
[1728] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-243 – 244. Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA. *"Profitability and Royalty Rates Across Industries: Some Preliminary Evidence,"* 2008, p. 5.
http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf
[1729] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-244. Jonathan E. Kemmerer, CPA and Jiaqing Lu, Ph.D., CFA. *"Profitability and Royalty Rates Across Industries: Some Preliminary Evidence,"* 2008, p. 5, (http://law.unh.edu/assets/images/uploads/pages/ipmanagement-royalty-rates.pdf).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

- Achieve competitive parity with Samsung who had streaming video and Live TV features by June 2008;

- Protect the momentum of the highly valuable iPhone franchise as the market was moving toward an inflection point;

- Improve its reputation by becoming recognized as the leader in digital video and live streaming,

As stated previously, based on the very limited business and financial records Apple provided, my income analysis is limited to the excess margin analysis previously discussed.

Thus, *Georgia-Pacific* Factor No. 8 would tend to **_increase_** the hypothetically negotiated royalty rate.

### ii. Factor No. 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

(1030) Factor No. 11 addresses how much the patented invention has been used.[1730] Implicit in this factor is the premise that an invention used frequently is generally more valuable than a comparable invention used infrequently.[1731] Like the other factors in this group, Factor No. 11 provides information about how the parties would have valued the patented feature during the hypothetical negotiation.[1732]

Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful in assessing whether a royalty is reasonable.[1733] Usage or similar data may provide information that the parties would frequently have estimated during the negotiation.[1734] Depending on the case, usage data might come from sales projections based on past sales, consumer surveys, focus group testing, and other

---

[1730] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[1731] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[1732] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 (Fed. Cir. 2009).
[1733] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 – 1334 (Fed. Cir. 2009).
[1734] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1333 – 1334 (Fed. Cir. 2009).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

sources.[1735] Even though parties to a license negotiation will usually not have precise data about future usage, they often have rough estimates as to the expected frequency of use.[1736] Consideration of usage data will be guided by what parties regularly do during real-world licensing negotiations.[1737] For example, companies in the high-tech computer industry often strike licensing deals in which the amount paid for a particular technology is not necessarily limited to the number of times a patented feature is used by a consumer.[1738]

As discussed at length in this report, Apple has made significant use of the '473 Patent that includes: hosting live streaming events, promoting live streaming which was an important feature.

Thus, *Georgia-Pacific* Factor No. 11 would tend to ***increase*** the hypothetically negotiated royalty rate.

## e. Comparative Utility and Non-Infringing Alternatives.

### i. Factor No. 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

(1031) Factor No. 9 addresses the comparative utility of the patented invention. In particular, the comparative analysis is based on the advantage(s) of the patented invention compared to the closest prior art.[1739] The existence of non-infringing alternatives open to the infringer is also considered.[1740] The theory is that a willing licensee in a hypothetical negotiation would have been less disposed to agree to a high royalty if it

---

[1735] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009).
[1736] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009).
[1737] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009).
[1738] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009).
[1739] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1335 (Fed. Cir. 2009).
[1740] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-227.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

had available non-infringing alternatives that were equal or nearly equal in terms of cost and performance.[1741]

The comparative utility of the '473 Patent and the issue of non-infringing alternatives was discussed previously. The '473 Patent offer significant advantages, for which there are no alternatives.

Thus, the elements that comprise *Georgia-Pacific* Factor No. 9 individually and collectively would tend to ***increase*** the hypothetically negotiated royalty rate.

## f.  Collateral Benefits and Convoyed Sales.

   i.  **Factor No. 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

(1032)  Factor No. 6 addresses collateral benefits including convoyed sales of parts, supplies, accessories and related products that flow or would be expected to flow to the infringer from the right to manufacture, use, or sell the patented invention.[1742]  "Both the hypothetical licensor's expectant loss of collateral sales and the hypothetical licensee's expectation of profits on its collateral sales are relevant elements to be considered in determining a reasonable royalty."[1743]  The theory is that a willing licensee in a hypothetical negotiation to set a reasonable royalty would have been more disposed to agree to a high royalty if he or she could expect to derive such collateral benefits.[1744] This factor is based on the assessment of business practice and custom.[1745]  Convoyed

---

[1741] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-227 – 229.
[1742] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-234.
[1743] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1132 (S.D. New York 1970).
[1744] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, pp. 20-235 – 236..
[1745] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-236.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

sales affect the royalty determination in two ways. First, it may affect the selection of the royalty rate. Second, it may affect the royalty base.[1746]

Apple's overall business strategy is to offer a tightly integrated, carefully tended, end-to-end solution. Sales of each product help drive sales of the others. Features such as live streaming that offer important benefits to users, for example, being able to access breaking news while on the go—would be expected to contribute favorably to the value of the brand. Because all of Apple's principal products are accused of infringement in this case, it is a neutral factor.

Thus, *Georgia-Pacific* Factor No. 6 is **_neutral._**

## g. Improvements and Non-Patented Elements.

    i. **Factor No. 13**: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(1033)    Factor No. 13 addresses the relation between the claimed invention of the patent and the infringer's commercial product or process,[1747] and is aimed at elucidating how the parties would have valued the patented feature during the hypothetical negotiation.[1748] The theory is that a willing licensee in a hypothetical negotiation with a willing licensor would have been less disposed to agree to a high royalty if the patented feature is a small part, physically or economically of the licensee's product or process.[1749] The relative contribution of the patented feature often is a difficult matter to determine.[1750] Further, the weight properly accorded to this factor should vary greatly with the

---

[1746] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-22.
[1747] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-239.
[1748] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1332 (Fed. Cir. 2009).
[1749] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-239 – 240.
[1750] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-240.

circumstances.[1751] The amount of profit that can be properly attributed to the patented invention generally cannot be reduced to a simple mathematical computation (such as counting lines of code) but rather will depend on the balance between infringing and non-infringing features in the context of consumer demand.[1752]

See the prior discussion on apportionment.

Thus, *Georgia-Pacific* Factor No. 13 is **_neutral._**

## h. State of Development and Commercial Success.

### i. Factor No. 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

(1034)    Factor No. 10 addresses the invention's advantages,[1753] and is also aimed at elucidating how the parties would have valued the patented feature during the hypothetical negotiation.[1754] Examination of the advantages includes whether the claimed invention provides distinguishing features to the product or process; whether the claimed invention has attributes that the company can use to promote the product or that customers demand; whether the claimed invention has been widely adopted by the infringer and consumers; and whether the claimed invention provides significant benefits to those that use it.[1755] Utility and advantage influence the reasonable royalty rate only if they affect the product's market value.[1756]

Emblaze made substantial investments developing and promoting its technology, however it appears that they were ahead of their time. The '473 Patent does provide

---

[1751] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-240.
[1752] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1332 – 1333 (Fed. Cir. 2009).
[1753] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-24.
[1754] *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.,* 580 F.3d 1301, 1332 (Fed. Cir. 2009).
[1755] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-24.
[1756] See e.g., Peter B. Frank, CPA, Vincent E. O'Brien, DBA, and Michael J. Wagner, JD, CPA, "Chapter 24 – Patent Infringement Damages," *Litigation Services Handbook: The Role of the Financial Expert,* 2001, p. 24-25.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

distinguishing features and many advantages for which there was widespread market demand by 2008, as digital convergence was happening and the mobile market was moving to an inflection point,   Because HLS is the industry standard, this together with the other facts outlined in my report suggests that the '473 Patent has been widely adopted.

Thus, the elements that comprise *Georgia-Pacific* Factor No. 10 individually and collectively would tend to ***increase*** the hypothetically negotiated royalty rate.

## i.  Duration of the Patent.

### i.  Factor No. 7: The duration of the patent and the term of the license.

(1035)   Factor No. 7 addresses the duration of the patent term that remained when the infringement began.[1757]   The theory is that a willing licensee in a hypothetical negotiation with a willing licensor would have been more disposed to agree to a high royalty the longer the remaining term of the patent.[1758]   A longer term would allow the licensee to establish strong customer relations that would persist after patent expiration, and would render the alternative of waiting until patent expiration less feasible.[1759] This factor is rarely given decisive or even substantial effect.[1760]

The '473 Patent will not expire until March 24, 2019.  At the time of the hypothetical negotiation in July 2008 to February 2009, the remaining patent term was more than a decade.  In addition, even five years later, there are no alternative that appears to be poised to obsolete the '473 Patent.

---

[1757] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-244.
[1758] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-245.
[1759] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-245.
[1760] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement*, Volume 7, Chapter 20, p. 20-245.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

Thus, the elements that comprise *Georgia-Pacific* Factor No. 7 individually and collectively would tend to ***increase*** the hypothetically negotiated royalty rate.

(1036)    **Conclusion Regarding "The *Georgia-Pacific* <u>Range</u> Factors":**    In this case, "The *Georgia-Pacific* <u>Range</u> Factors" suggest a very general minimum range from **<u>$0.10 to $3.10 per unit to</u>** █████, with an expected rate—due to the impossibility of apportionment—towards the lower end of the range.

(1037)    **Table 16**, below, summarized my opinions on the *Georgia-Pacific* Factors.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## Table 16

| Georgia-Pacific Royalty Factor | | Factor Impact |
|---|---|---|
| Factor 1: | Royalties received by Emblaze | Neutral |
| Factor 2: | Rates Apple paid for comparable patents | minimum royalty rates in the very general range of $0.10 to $3.10. |
| Factor 3: | Nature and scope of the license | Neutral |
| Factor 4: | Emblaze's established policy to maintain monopoly | Neutral |
| Factor 5: | Commercial relationship between Emblaze and Apple | Neutral |
| Factor 6: | Effect of selling the patented specialty in promoting sales of other products | Neutral |
| Factor 7: | Duration of the patent | increase the hypothetically negotiated royalty rate. |
| Factor 8: | Established profitability and success of the patented product | increase the hypothetically negotiated royalty rate. |
| Factor 9: | Utility and advantage of the patent over old models | increase the hypothetically negotiated royalty rate. |
| Factor 10: | Nature of patented invention | increase the hypothetically negotiated royalty rate. |
| Factor 11: | Extent to which Apple has made use of the invention | increase the hypothetically negotiated royalty rate. |
| Factor 12: | Portion of the profit or selling price that may be customary to allow for the use of the invention | Neutral |
| Factor 13: | Portion of the realized profit that should be credited to the invention | Neutral |
| Factor 14: | The opinion of qualified experts | As set forth herein |
| Factor 15: | The amount Emblaze and Apple would have agreed upon at the time infringement began | A range of $0.10 per unit to ████ per unit, and would have agreed to a reasonable royalty of $2.00 per unit for hardware and 1% of revenue for software and applications. |

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## Q. The Emblaze – Apple Hypothetical Negotiation – *Georgia-Pacific* Factor No. 15

(1038)     As discussed above, *Georgia-Pacific* Factor No. 15 outlines the hypothetical negotiation and defines the reasonable royalty as:

> The amount that a licensor (such as the patentee) and the licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

The patent statute requires that the measure of damages be:

> adequate to compensate for the infringement but in no event less than a reasonable royalty, together with interest and costs fixed by the court. (35 U.S.C. §284)

A reasonable royalty represents the damages floor.[1761]

(1039)     In determining a reasonable royalty, the economics of the patented technology and the accused product(s) are studied.  The outcome of the hypothetical negotiation depends on a number of factors including the market power conferred by the patent, the relative bargaining power of the parties to the hypothetical negotiation—in this case, Apple and Emblaze—at the time of the hypothetical negotiation, the availability of acceptable non-infringing substitutes, and the timing of the negotiation.  The *Georgia-Pacific* factors qualitatively address many of the factors that determine the respective bargaining positions of the parties to the hypothetical negotiation.

The bargaining position of the respective parties establishes the negotiation outcome in terms of where within the feasible range of royalty rates the parties would have agreed.

---

[1761] *King Instruments Corporation v. Perego*, 65 F.3d 941 (Fed. Cir. 1995).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## 1) The Determinants of Bargaining Power

(1040)   In general, a licensor's bargaining position and power is increased when: a) there are no acceptable, available, non-infringing alternatives, b) it is more costly and difficult for the infringing party to "invent around" the patented technology,[1762] c) the intellectual property is paramount, and the complementary assets and skills needed to commercialize the innovation are readily available from a variety of sources,[1763] and d) the patent owner is a competitor of the infringer, had the capacity to make the infringer's sales or production, and followed a general policy of refusing to grant licenses.[1764]

(1041)   At the time of the hypothetical negotiation between July 2008 and February 2009, and based on the information and analysis set out in this report, the key facts would have been known to both parties because the hypothetical negotiation "contemplate[s] marshaling of all the pertinent facts which, like cards dealt face up, are for all to see."[1765] The key facts are as follows:

   a. Time was critical for Apple given the digital convergence was moving towards an inflection point.   At the same time, Apple was facing wars on three fronts: increased competition from the Samsung Instinct—which had both media streaming and Live TV, and the newly launched Android phones, and the Adobe-Microsoft battle over video streaming.

   b. The economic stakes were very high because of digital convergence, the nascent state of the smartphone market that was rapidly growing, Apple's then current momentum and highly valuable iPhone franchise, and the "winner-take-all" nature of the network effects industries.  Apple was already beginning to make inroads into the Microsoft dominance and one of Apple's key objectives would have been to continue increasing its market share.

---

[1762] Bronwyn H. Hall and Rosemarie Ham Ziedonis.  *"The patent paradox revisited:  an empirical study of patenting in the U.S. semiconductor industry, 1979 – 1995." RAND Journal of Economics.* Vol. 32, No. 1, Spring 2001, p. 109.  (http://elsa.berkeley.edu/~bhhall/papers/HallZiedonis%20RJE01.pdf).
[1763] David J. Teece.  *Managing Intellectual Capital.*  Oxford University Press, 2002, p. 151.
[1764] Donald S. Chisum, *Chisum on Patents – A Treatise on the Law of Patentability, Validity and Infringement,* Volume 7, Chapter 20, p. 20-214.
[1765] *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1122 (S.D. New York 1970).

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

c. Apple had never been a leader in video—but had a chance to become one as it was seeking to mute the potential competitive effect of Microsoft's Smooth Streaming. While Apple's QuickTime remained a distant third in the multimedia market for more than a decade, in the short span of two years, Apple and HLS became the recognized leader.

d. Apple did not have time for a protracted license negotiation—similar to what it was then presently involved in with Motorola.

e. Emblaze would recognize the opportunity with Apple and would also recognize that it could not command a royalty for use of HLS for VOD streaming, which I understand does not infringe, and would negotiate with this fact in mind.

## 2) Negotiation Outcomes

(1042) It is my opinion that the parties would have negotiated within a range of $0.10 per unit to ▬▬▬ per unit, and would have agreed to a reasonable royalty of $2.00 per unit for hardware and 1% of revenue for software and applications.

## XXII.  Signature

Respectfully submitted by,

Catharine M. Lawton

On this day, November 9, 2013

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

# SCHEDULES

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 1B**
**U.S. Royalty Base (Units)**

| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | |
|---|---|---|---|---|---|---|---|---|---|
| Date | iPhone | iPod Touch | iPad | Mac | Apple TV | OS X Upgrades | iOS Upgrades (iPhone) | iOS Upgrades (iPod Touch) | Total |
| Q3 FY09 | | | | | | | | | |
| Q4 FY09 | | | | | | | | | |
| Q1 FY10 | | | | | | | | | |
| Q2 FY10 | | | | | | | | | |
| Q3 FY10 | | | | | | | | | |
| Q4 FY10 | | | | | | | | | |
| Q1 FY11 | | | | | | | | | |
| Q2 FY11 | | | | | | | | | |
| Q3 FY11 | | | | | | | | | |
| Q4 FY11 | | | | | | | | | |
| Q1 FY12 | | | | | | | | | |
| Q2 FY12 | | | | | | | | | |
| Q3 FY12 | | | | | | | | | |
| Q4 FY12 | | | | | | | | | |
| Q1 FY13 | | | | | | | | | |
| Q2 FY13 | | | | | | | | | |
| Q3 FY13 | | | | | | | | | |
| **Total** | | | | | | | | | |

Notes and Sources:
[A] Includes only "iOS 3.0+ iPhone Models" from Schedule 2A.
[B] Includes only "iOS 3.0+ iPod Touch Models" from Schedule 3A.
[C] Includes only "iOS 3.0+ iPad Models" from Schedule 4A.
[D] Includes only "10.6 OS X Mac Models" from Schedule 5A.
[E] Includes only "2nd/3rd Gen Apple TV Models" from Schedule 6A.
[F] Includes Snow Leopard Software Sales from Schedule 7.
[G] Includes iPhone upgrades from pre iOS 3.0 to iOS 3.0 or higher from Schedule 8.
[H] Includes iPod Touch iOS 3.0 Software Upgrades from Schedule 9.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 2A - Corrected**
**U.S. iPhone Sales**
**Units, Revenue and Standard Cost**



Source:
APPLE208741

Notes:
[A]  "Pre-iOS 3.0 iPhone Models" represents all models released prior to the release of iOS 3.0 on June 17, 2009. See Schedule 1C for additional details.
[B]  "iOS 3.0+ iPhone Models" represents all models released and/or sold after the release of iOS 3.0 on June 17, 2009. For example, figures for "N82," which was released in July 2008, were included starting from June 17, 2009. See Schedule 1C for additional details.
[C]  Apple did not provide revenue and standard cost breakdowns by iPhone model. The revenue and standard cost estimates shown are based on the overall "ASP" and "ASC" provided by Apple multiplied by the number of units.

Schedule 28
Worldwide iPhone Sales
Units, Revenue and Standard Cost



CONFIDENTIAL ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Schedule 3A
U.S. iPod Touch Sales
Units, Revenue and Standard Cost

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 38**
**Worldwide iPod Touch Sales**
Units, Revenues and Standard Cost

| | Q2FY09 | Q3FY09 | Q4FY09 | Q1FY10 | Q2FY10 | Q3FY10 | Q4FY10 | Q1FY11 | Q2FY11 | Q3FY11 | Q4FY11 | Q1FY12 | Q2FY12 | Q3FY12 | Q4FY12 | Q1FY13 | Q2FY13 | Q3FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | | | | | | | | | | | | |
| (A) Pre-iOS 3.0 iPod Touch Models | | | | | | | | | | | | | | | | | | | |
| (B) iOS 3.0+ iPod Touch Models | | | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | | | | | | | | |
| (A) Pre-iOS 3.0 iPod Touch Models | | | | | | | | | | | | | | | | | | | |
| (B) iOS 3.0+ iPod Touch Models | | | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | | | |
| **Standard Cost** | | | | | | | | | | | | | | | | | | | |
| (A) Pre-iOS 3.0 iPod Touch Models | | | | | | | | | | | | | | | | | | | |
| (B) iOS 3.0+ iPod Touch Models | | | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | | | |

Source:
APLNDT83817

CONFIDENTIAL - ATTORNEY EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 4A**
**U.S. iPad Sales**
**Units, Revenue and Standard Cost**

| | Q3 FY10 | Q4 FY10 | Q1 FY11 | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | | | | | | | |
| [A] Pre-iOS 3.0 iPad Models | | | | | | | | | | | | | | |
| [B] iOS 3.0+ iPad Models | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | | | |
| [A] Pre-iOS 3.0 iPad Models | | | | | | | | | | | | | | |
| [B] iOS 3.0+ iPad Models | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | |
| **Standard Cost** | | | | | | | | | | | | | | |
| [A] Pre-iOS 3.0 iPad Models | | | | | | | | | | | | | | |
| [B] iOS 3.0+ iPad Models | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | |

Source:
APPLE2187740

Notes:
[A] "Pre-iOS 3.0 iPad Models" represents all models released prior to the release of iOS 3.0 on June 17, 2009. See Schedule 1C for additional details
[B] "iOS 3.0+ iPad Models" represents all models released after the release of iOS 3.0 on June 17, 2009. See Schedule 1C for additional details

CONFIDENTIAL - ATTORNEYS EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 4B**
**Worldwide iPad Sales**
**Units, Revenue and Standard Cost**

| | Q3 FY10 | Q4 FY10 | Q1 FY11 | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | | | | | | | |
| [A] Pre-iOS 3.0 iPad Models | | | | | | | | | | | | | | |
| [B] iOS 3.0+ iPad Models | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | | | |
| [A] Pre-iOS 3.0 iPad Models | | | | | | | | | | | | | | |
| [B] iOS 3.0+ iPad Models | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | |
| **Standard Cost** | | | | | | | | | | | | | | |
| [A] Pre-iOS 3.0 iPad Models | | | | | | | | | | | | | | |
| [B] iOS 3.0+ iPad Models | | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | | |

Source:
APPLE273917

Notes:
[A] "Pre-iOS 3.0 iPad Models" represents all models released prior to the release of iOS 3.0 on June 17, 2009. See Schedule 1C for additional details.
[B] "iOS 3.0+ iPad Models" represents all models released after the release of iOS 3.0 on June 17, 2009. See Schedule 1C for additional details.

CONFIDENTIAL ATTORNEYS' EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 5A**
**U.S. Mac Sales**
**Units, Revenue and Standard Cost**



| | Q4 FY09 | Q1 FY10 | Q2 FY10 | Q3 FY10 | Q4 FY10 | Q1 FY11 | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Units**
[A] Pre-10.6 OS X Mac Models
[B] 10.6+ OS X Mac Models
        **Total**

**Revenue**
[A] Pre-10.6 OS X Mac Models
[B] 10.6+ OS X Mac Models
        **Total**

**Standard Cost**
[A] Pre-10.6 OS X Mac Models
[B] 10.6+ OS X Mac Models
        **Total**

Source:
APPLE208742

Notes:
[A] "Pre-10.6 OS X Mac Models" represents all models released prior to the release of Snow Leopard on August 28, 2009. No adjustment was attributable to determine the type of operating system for any of the adjustments or refurbished Mac computers; therefore, they were included in this category. See Schedule 1C for additional details.
[B] "10.6+ OS X Mac Models" represents all models released after the release of Snow Leopard on August 28, 2009. See Schedule 1C for additional details.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 3B**
**Worldwide Mac Sales**
**Units, Revenue and Standard Cost**

| | Q4 FY09 | Q1 FY10 | Q2 FY10 | Q3 FY10 | Q4 FY10 | Q1 FY11 | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | | | | | | | | | | |
| [A] Pre-10.6 OS X Mac Models | | | | | | | | | | | | | | | | | |
| [B] 10.6+ OS X Mac Models | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | | | | | | |
| [A] Pre-10.6 OS X Mac Models | | | | | | | | | | | | | | | | | |
| [B] 10.6+ OS X Mac Models | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | |
| **Standard Cost** | | | | | | | | | | | | | | | | | |
| [A] Pre-10.6 OS X Mac Models | | | | | | | | | | | | | | | | | |
| [B] 10.6+ OS X Mac Models | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | |

Source:
APPLE273639

Notes:
[A] "Pre-10.6 OS X Mac Models" represents all models released prior to the release of Snow Leopard on August 28, 2009. For allocations not available to determine the type of operating system for any of the adjustment data or only Snow Mac methods, download, they were included in this category. See Schedule 1C for additional details.
[B] "10.6+ OS X Mac Models" represents all models released after the release of Snow Leopard on August 28, 2009. See Schedule 1C for additional details.

CONFIDENTIAL-ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 6A**
**U.S. Apple TV Sales**
**Units, Revenue and Standard Cost**



| | Q1 FY11 | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Units
[A] First Gen Apple TV Models
[B] 2nd/3rd Gen Apple TV Models
            Total

Revenue
[A] First Gen Apple TV Models
[B] 2nd/3rd Gen Apple TV Models
            Total

Standard Cost
[A] First Gen Apple TV Models
[B] 2nd/3rd Gen Apple TV Models
            Total

Source:
APPLE208747

Notes:
[A] "First Gen Apple TV Models" are not considered to be accused. No information was available to determine generation of Apple TV for "All) APPLE TV", therefore, they were included in this category. See Schedule 1C for additional details.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

**Schedule 6B - Corrected**
**Worldwide Apple TV Sales**
**Units, Revenue and Standard Cost**

| | Q1 FY11 | Q2 FY11 | Q3 FY11 | Q4 FY11 | Q1 FY12 | Q2 FY12 | Q3 FY12 | Q4 FY12 | Q1 FY13 | Q2 FY13 | Q3 FY13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | | | | | |
| [A] First Gen Apple TV Models | | | | | | | | | | | | |
| [B] 2nd/3rd Gen Apple TV Models | | | | | | | | | | | | |
| Total | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | |
| [A] First Gen Apple TV Models | | | | | | | | | | | | |
| [B] 2nd/3rd Gen Apple TV Models | | | | | | | | | | | | |
| Total | | | | | | | | | | | | |
| **Standard Cost** | | | | | | | | | | | | |
| [A] First Gen Apple TV Models | | | | | | | | | | | | |
| [B] 2nd/3rd Gen Apple TV Models | | | | | | | | | | | | |
| Total | | | | | | | | | | | | |

Source:
APPLE273815

Notes:
[A] "First Gen Apple TV Models" are not considered to be accused. No information was available to determine generation of Apple TV for "ADJ APPLE TV", therefore, they were included in this category. See Schedule 1C for additional details.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 7**

[A] **U.S. Snow Leopard Software Sales**
**Units, Revenue and Standard Cost**

| Date | Units | Revenue | Standard Cost |
|------|-------|---------|---------------|
| Q3 FY09 | | | |
| Q4 FY09 | | | |
| Q1 FY10 | | | |
| Q2 FY10 | | | |
| Q3 FY10 | | | |
| Q4 FY10 | | | |
| Q1 FY11 | | | |
| Q2 FY11 | | | |
| Q3 FY11 | | | |
| Q4 FY11 | | | |
| Q1 FY12 | | | |
| Q2 FY12 | | | |
| Q3 FY12 | | | |
| Q4 FY12 | | | |
| Q1 FY13 | | | |
| Q2 FY13 | | | |
| Q3 FY13 | | | |
| **Total** | | | |

Source:
APPLE273823

Notes:
[A] Includes units, revenue and standard cost for Snow Leopard Software
sales only. See Schedule 1C for additional details.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 9**
**iPod Touch iOS 3.0 Software Upgrades**
**Units and Revenue**

| Date | Units | Revenue |
|------|-------|---------|
| Q3 FY09 | | |
| Q4 FY09 | | |
| Q1 FY10 | | |
| Q2 FY10 | | |
| Q3 FY10 | | |
| Q4 FY10 | | |
| Q1 FY11 | | |
| Q2 FY11 | | |
| Q3 FY11 | | |
| Q4 FY11 | | |
| Q1 FY12 | | |
| Q2 FY12 | | |
| Q3 FY12 | | |
| Q4 FY12 | | |
| Q1 FY13 | | |
| Q2 FY13 | | |
| Q3 FY13 | | |
| **Total** | | |

Source:
APPLE273821

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

## Schedule 10A - Corrected
## App, In-App and Bounty Revenue
## MLB.com, NFL, PGA, and ABC News

| App Family | App Revenue | In-App Revenue | Bounty | Total |
|---|---|---|---|---|
| MLB.com | | | | |
| NFL | | | | |
| PGA | | | | |
| ABC News | | | | |
| Total | | | | |

Notes:
Represents total app revenue which includes Apple's portion of the revenue. The Apps did not have any associated iAd revenues.

Sources:
Schedule 10B and Schedule 10C

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Schedule 10B - Corrected**
**App, In-App, and iAD Revenue**
**MLB.com, NFL, PGA, and ABC News**

| | [A] | | | [B] | [B] | [B] | [B] | [C] | |
|---|---|---|---|---|---|---|---|---|---|
| | App Family | Adam ID | App Name | App Downloads | In-App Downloads | Total App Revenue | Total In-App Revenue | iAD Revenue | Total Revenue |
| | MLB.com | | MLB.com At Bat Lite | | | | | | |
| | | | MLB.com At Bat 2010 | | | | | | |
| | | | At Bat 2010 for iPad | | | | | | |
| | | | MLB.com At Bat 11 for iPad | | | | | | |
| | | | MLB.com At Bat 11 | | | | | | |
| | | | MLB.com At Bat | | | | | | |
| | | | MLB.com Full Count | | | | | | |
| | NFL | | NFL Sunday Ticket | | | | | | |
| | | | NFL Mobile | | | | | | |
| | | | NFL '12 for iPad | | | | | | |
| | | | NFL Preseason Live | | | | | | |
| | | | Watch NFL Network | | | | | | |
| [D] | PGA | | The Open Championship 2012 | | | | | | |
| [D] | | | The Open Championship 2011 | | | | | | |
| [D] | | | The Open Championship 2012 for iPad | | | | | | |
| [E] | | | 2012 Ryder Cup | | | | | | |
| [E] | | | PGA Championship | | | | | | |
| | ABC News | | ABC7 - Los Angeles news, weather & sports source | | | | | | |
| | | | ABC7Chicago News | | | | | | |
| | | | ABC News for iPad | | | | | | |
| | | | ABC NEWS 4 | | | | | | |
| | | | ABC30 Fresno | | | | | | |
| | | | ABC13 Houston | | | | | | |
| | | | ABC7 Los Angeles | | | | | | |
| | | | 6abc Philadelphia | | | | | | |
| | | | ABC11 Raleigh-Durham | | | | | | |
| | | | ABC7 News San Francisco | | | | | | |
| | | | ABC27 News – Local news and weather for central Pennsylvania from WHTM-TV | | | | | | |
| | | | WATCH ABC | | | | | | |
| | | | WABC Eyewitness News | | | | | | |
| | | | ABC Action News Mobile for iPhone: Tampa | | | | | | |

Notes and Sources:
[A]  App Family determined by string (e.g., MLB.com) in the "App Name" field, unless otherwise noted.
[B]  APPLE273643
[C]  APPLE273814
[D]  Open Championship website, (http://www.pga.com/openchampionship/).
[E]  PGA website, "About PGA," (http://www.pga.com/pga-america/pga-information/about-pgacom).

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

## Schedule 10C - Corrected
## AppleTV Bounty Revenue
## MLB.com, NBA, and NHL

| | App Family | ITS Billings in USD-InApps | Purchase Royalty Price Inapps | Cancel Royalty Price In-Apps | Apple Proceeds In-Apps | Total |
|---|---|---|---|---|---|---|
| [A] | MLB.com | | | | | |
| [A] | NBA | | | | | |
| [B] | NHL | | | | | |

Notes and Sources:

[A] APPLE273892

[B] APPLE273651;

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Schedule 11A - Corrected**
**Top 50 Apps Ranked by Total App Revenues, In-App, and iAd Revenues**
**Apps Produced by Apple**
**From 2009 to June 30, 2013**

| | | App Revenues and Downloads | | | | | | Live Streaming | |
| | | [A] | [B] | [C] | [D] | [E] | [F] | [G] |
| Adam Id | App Name | Total App, In-App and iAd Revenues | Percent of Total Revenue | Number of Apps Downloaded | Number of In-App Purchases | Percent of Total Apps Downloaded | Apple Revenues from App, In-App, iAd | Notes confirm use of HLS | App Store/ Public Sources | Deposition |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MLB.com At Bat | $ | | | | | | Yes | Yes | Yes |
| 2 | Hulu Plus | $ | | | | | | No Notes | No | No |
| 3 | Netflix | $ | | | | | | No Notes | No | No |
| 4 | SlingPlayer for iPhone | $ | | | | | | Rejected | Yes | Yes |
| 5 | MLB.com At Bat 11 | $ | | | | | | No Notes | Yes | Yes |
| 6 | MLB.com At Bat 2010 | $ | | | | | | Yes | Yes | Yes |
| 7 | NBA Game Time 2012-13 | $ | | | | | | No Notes | Yes | Yes |
| 8 | MobiTV | $ | | | | | | Yes | Yes | No |
| 9 | Justin.tv | $ | | | | | | Yes | Yes | No |
| 10 | MLB.com At Bat 11 for iPad | $ | | | | | | Yes | Yes | Yes |
| 11 | Skyfire Web Browser for iPad - The Flash Video Browser | $ | | | | | | Yes | Yes | No |
| 12 | Skyfire Web Browser - Your Path to Flash Video on iPhone | $ | | | | | | Yes | Yes | No |
| 13 | CNN App for iPhone | $ | | | | | | Yes | Yes | Yes |
| 14 | Air Video - Watch your videos anywhere! | $ | | | | | | Not Required | No | No |
| 15 | Glamour | $ | | | | | | Rejected | No | No |
| 16 | At Bat 2010 for iPad | $ | | | | | | Yes | No | Yes |
| 17 | Puffin Web Browser | $ | | | | | | No | No | No |
| 18 | CBS Sports NCAA® March Madness on Demand® | $ | | | | | | Yes | No | No |
| 19 | Plex | $ | | | | | | Rejected | Yes | No |
| 20 | NBA League Pass Mobile | $ | | | | | | Yes | No | Yes |
| 21 | TVUPlayer | $ | | | | | | Rejected | Yes | No |
| 22 | NFL Mobile | $ | | | | | | Yes | Yes | Yes |
| 23 | iMissal Catholic [Mass Reading, Calendar, Lectionary] | $ | | | | | | Rejected | No | Yes |
| 24 | Justin.tv HD | $ | | | | | | Yes | Yes | No |
| 25 | NASCAR Mobile '13 | $ | | | | | | No Notes | Yes | No |
| 26 | OrbLive | $ | | | | | | Yes | Yes | Yes |
| 27 | UFC ® | $ | | | | | | Yes | Yes | No |
| 28 | Best Kids Songs - Stories | $ | | | | | | Not Required | No | No |
| 29 | iLoader for Facebook - Photo Video Batch Uploader with Came | $ | | | | | | Rejected | No | No |
| 30 | EyeTV | $ | | | | | | Yes | Yes | No |
| 31 | NFL Preseason Live | $ | | | | | | Yes | Yes | Yes |
| 32 | NBC Tour de France Live Mobile | $ | | | | | | Yes | Yes | No |
| 33 | MLS MatchDay | $ | | | | | | Yes | Yes | Yes |
| 34 | OPlayer HD - the best video and music media player for iPad | $ | | | | | | Rejected | Yes | No |
| 35 | SI Swimsuit 2010 | $ | | | | | | Not Required | No | No |
| 36 | Video Downloader Pro | $ | | | | | | No | No | No |
| 37 | VLC Streamer | $ | | | | | | Not Required | Yes | No |
| 38 | Tour de France All Access – NBC Sports Group's Coverage of Lc | $ | | | | | | No Notes | Yes | No |
| 39 | 48 Hours for iPad | $ | | | | | | No Notes | No | No |
| 40 | Official Versus Tour de France LIVE | $ | | | | | | Rejected | Yes | No |
| 41 | ACC Sports - Official Application of The Atlantic Coast Conferen | $ | | | | | | Yes | Yes | No |
| 42 | MythBusters iPhone and iPod Touch Edition | $ | | | | | | Not Required | Yes | No |
| 43 | NHL GameCenter 2010 PREMIUM | $ | | | | | | Yes | Yes | No |
| 44 | Algebra | $ | | | | | | Not Required | No | No |
| 45 | OPlayer - the best video and music media player for iPhone/iP | $ | | | | | | Not Required | No | No |
| 46 | netTV | $ | | | | | | Rejected | Yes | No |
| 47 | TVUPlayer iPad edition | $ | | | | | | Rejected | Yes | No |
| 48 | CBS Sports: Live College Games | $ | | | | | | Yes | Yes | Yes |
| 49 | FreeTV - Unlimited | $ | | | | | | No Notes | No | No |
| 50 | Playground TV | $ | | | | | | Yes | Yes | No |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]
Expert Report of Catharine M. Lawton

**Schedule 11A - Corrected**
**Top 50 Apps Ranked by Total App Revenues, In-App, and iAd Revenues**
**Apps Produced by Apple**
**From 2009 to June 30, 2013**

| Adam Id | App Name | Total App, In-App and iAd Revenues [A] | Percent of Total Revenue | Number of Apps Downloaded [B] | Number of In-App Purchases [C] | Percent of Total Apps Downloaded | Apple Revenues from App, In-App, iAd [D] | Notes confirm use of HLS [E] | App Store/ Public Sources [F] | Deposition [G] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | App Revenues and Downloads | | | | | | | Live Streaming | |
| | Other Apps | $ | | | | | | | | |
| | **Total Apps Produced by Apple** | $ | | | | | | Live & HLS Count: | 22 | [H] |

Sources and Notes:

[A]   Total App, In-App and iAd Revenues is the sum of APP_ACTL_AMT, IAP_ACTL_AMT (APPLE273643), see August 20, 2013 Deposition of Mark Buckley, 118:12-118:19; 120:3-120:14.
      For the Total iAD revenue, see Schedule 11E.
[B]   Number of App Downloads refers to APP_BILLING_QTY (APPLE273643) excluding those prior to 2009, see August 20, 2013 Deposition of Mark Buckley, 118:4-118:11.
[C]   Number of In-App Downloads refers to IAP_BILLING_QTY (APPLE273643) to excluding those prior to 2009, see August 20, 2013 Deposition of Mark Buckley, 120:3-120:14.
[D]   Apple's App and In-App Revenue refers to APP_PROCEEDS plus IAP_PROCEEDS (APPLE273643), see August 20, 2013 Deposition of Mark Buckley, 119:21-120:7. For Apple's iAD
      Revenue, see Schedule 11E.
[E]   A "Yes" means the notes explicitly state the App is using the HTTP Live Streaming Technology. "Rejected" means the apps last note was a rejection for not including HTTP Live
      Streaming. "Not Required" means the notes reject the App for not using HTTP Live Streaming, but its adoption is not confirmed. See Schedule 11D.
[F]   A "Yes" is given when the App Store or a Other Source has stated that the App provides live content. See Schedule 11C.
[G]   A "Yes" is given when Deposition Testimony has stated that the App provides live content. See Schedule 11C.
[H]   "Live & HLS Count" represents the number of Apps where "Notes confirm use of HLS" is a "Yes" and the "App Store/Public Sources" or "Deposition" indicate a "Yes."

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Schedule 11B - Corrected**
**Top 50 Apps Ranked by App Downloads**
**Apps Produced by Apple**
**From 2009 to June 30, 2013**

| | | App Revenues and Downloads | | | | | | Live Streaming | |
| | | [A] | [B] | [C] | | [D] | [E] | [F] | [G] |
| Adam Id | App Name | Total App, In-App and iAd Revenues | Percent of Total Revenue of Apps | Number of Apps Downloaded | Number of In-App Purchases | Percent of Total Apps Downloaded | Apple Revenue from App, In-App, and iAd | Notes confirm use of HLS | App Store/ Public Sources | Deposition |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | YouTube | | | | | | | Yes | Yes | No |
| 2 | Netflix | | | | | | | Yes | No | No |
| 3 | The Weather Channel for iPad | | | | | | | Yes | No | No |
| 4 | Hulu Plus | | | | | | | Yes | No | No |
| 5 | WatchESPN | | | | | | | Yes | Yes | No |
| 6 | WATCH ABC | | | | | | | Yes | Yes | No |
| 7 | CNN App for iPhone | | | | | | | Yes | Yes | Yes |
| 8 | HBO GO | | | | | | | No Notes | Yes | No |
| 9 | TV.com | | | | | | | No | No | No |
| 10 | WATCH Disney Channel | | | | | | | No Notes | Yes | Yes |
| 11 | XFINITY TV Remote | | | | | | | Not Required | No | No |
| 12 | CNN App for iPad | | | | | | | Yes | Yes | Yes |
| 13 | MLB.com At Bat | | | | | | | Yes | Yes | Yes |
| 14 | NFL Mobile | | | | | | | Yes | Yes | Yes |
| 15 | NBC Sports Live Extra | | | | | | | Yes | Yes | No |
| 16 | Cartoon Network | | | | | | | No Notes | Yes | No |
| 17 | NBA Game Time 2012-13 | | | | | | | No Notes | Yes | Yes |
| 18 | WATCH Disney Junior | | | | | | | No Notes | Yes | Yes |
| 19 | Amazon Instant Video | | | | | | | Rejected | No | No |
| 20 | BBC News | | | | | | | Not Required | Yes | No |
| 21 | WATCH Disney XD | | | | | | | No Notes | Yes | Yes |
| 22 | TED | | | | | | | No Notes | No | No |
| 23 | The CW Network | | | | | | | Yes | No | No |
| 24 | HBO | | | | | | | Yes | No | No |
| 25 | DIRECTV App for iPad | | | | | | | Yes | Yes | Yes |
| 26 | NBC Olympics | | | | | | | Yes | No | No |
| 27 | ESPN College Football | | | | | | | Not Required | Yes | No |
| 28 | NASA App | | | | | | | Yes | Yes | Yes |
| 29 | Ustream | | | | | | | Yes | Yes | No |
| 30 | FOX News for iPad | | | | | | | No Notes | Yes | No |
| 31 | U-verse | | | | | | | Yes | Yes | No |
| 32 | ABC News for iPad | | | | | | | No | Yes | Yes |
| 33 | The Masters Golf Tournament | | | | | | | Yes | Yes | Yes |
| 34 | MLB.com At Bat Lite | | | | | | | No Notes | No | Yes |
| 35 | Justin.tv | | | | | | | Yes | Yes | No |
| 36 | NFL Sunday Ticket | | | | | | | Yes | Yes | Yes |
| 37 | Showtime Anytime | | | | | | | No Notes | Yes | No |
| 38 | MAX GO | | | | | | | No Notes | No | No |
| 39 | Khan Academy | | | | | | | Yes | No | No |
| 40 | MobiTV | | | | | | | Yes | Yes | No |
| 41 | Crunchyroll - Watch Anime & Drama Now! | | | | | | | Yes | No | No |
| 42 | PBS | | | | | | | No Notes | No | No |
| 43 | NASA App HD | | | | | | | Yes | Yes | Yes |
| 44 | Chess - Play & Learn | | | | | | | Rejected | No | No |
| 45 | Original LS | | | | | | | Yes | No | No |
| 46 | TwitchTV | | | | | | | Rejected | Yes | No |
| 47 | MTV News | | | | | | | Not Required | No | No |
| 48 | The Onion | | | | | | | Not Required | No | No |
| 49 | NBA Game Time for iPad 2012-2013 | | | | | | | No Notes | Yes | Yes |
| 50 | SI Swimsuit 2010 | | | | | | | Not Required | No | No |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Schedule 11B - Corrected**
**Top 50 Apps Ranked by App Downloads**
**Apps Produced by Apple**
**From 2009 to June 30, 2013**

| | | App Revenues and Downloads | | | | | | Live Streaming | |
| | | [A] | | [B] | [C] | | [D] | [E] | [F] | [G] |
| Adam Id | App Name | Total App, In-App and iAd Revenues | Percent of Total Revenue of Apps | Number of Apps Downloaded | Number of In-App Purchases | Percent of Total Apps Downloaded | Apple Revenue from App, In-App, and iAd | Notes confirm use of HLS | App Store/ Public Sources | Deposition |
| | *Other Apps:* | | | | | | | | | |
| | **Total Apps Produced by Apple** | $ | | | | | | Live & HLS Count: | 17 | [H] |

Sources and Notes:

[A]  Total App, In-App and iAd Revenues is the sum of APP_ACTL_AMT, IAP_ACTL_AMT (APPLE273643), see August 20, 2013 Deposition of Mark Buckley, 118:12-118:19; 120:3-120:14. For the Total iAD revenue, see Schedule 11E.

[B]  Number of App Downloads refers to APP_BILLING_QTY (APPLE273643) excluding those prior to 2009, see August 20, 2013 Deposition of Mark Buckley, 118:4-118:11.

[C]  Number of In-App Downloads refers to IAP_BILLING_QTY (APPLE273643) to excluding those prior to 2009, see August 20, 2013 Deposition of Mark Buckley, 120:3-120:14.

[D]  Apple's App and In-App  Revenue refers to APP_PROCEEDS plus IAP_PROCEEDS (APPLE273643), see August 20, 2013 Deposition of Mark Buckley, 119:21-120:7.  For Apple's iAD Revenue, see Schedule 11E.

[E]  A "Yes" means the notes explicitly state the App is using the HTTP Live Streaming Technology. "Rejected" means the apps last note was a rejection for not including HTTP Live Streaming. "Not Required" means the notes reject the App for not using HTTP Live Streaming, but its adoption is not confirmed. See Schedule 11D.

[F]  A "Yes" is given when the App Store or a Other Source has stated that the App provides live content. See Schedule 11C.

[G]  A "Yes" is given when Deposition Testimony has stated that the App provides live content. See Schedule 11C.

[H]  "Live & HLS Count" represents the number of Apps where "Notes confirm use of HLS" is a "Yes" and the "App Store/Public Sources" or "Deposition" indicate a "Yes."

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 11E**
**iAd Revenues By App**
**Apps Produced by Apple**

| Adam Id | App Name | [A]<br>iAd Developer<br>Revenue | [B]<br>iAd Apple<br>Revenue | [C] = [A] + [B]<br>Total iAd<br>Revenue |
|---|---|---|---|---|
| | Xem Phim Lite | $ | | |
| | The Weather Channel for iPad | $ | | |
| | NDTV HD | $ | | |
| | Justin.tv | $ | | |
| | NDTV | $ | | |
| | KGW News | $ | | |
| | Viki - Watch Free TV, Movies, Korean Dramas & More with Subtitles | $ | | |
| | the Sheeps HD Free | $ | | |
| | Chess - Play & Learn | $ | | |
| | CBS News | $ | | |
| | KENS 5 | $ | | |
| | VLC Streamer Free | $ | | |
| | WCNC.com | $ | | |
| | Replays for SC2 | $ | | |
| | Original LS | $ | | |
| | WTVA News | $ | | |
| | TV.com | $ | | |
| | Popcornflix - Free Movies | $ | | |
| | MyCoosh Air | $ | | |
| | MLS MatchDay | $ | | |
| | OCRegister | $ | | |
| | قارون | $ | | |
| | Shkabaj | $ | | |
| | Science Friday | $ | | |
| | ProTV | $ | | |
| | CNET Video+ | $ | | |
| | News Republic | $ | | |
| | Post and Courier Charleston | $ | | |
| | Philly.com | $ | | |
| | Omaha World-Herald/Omaha.com | $ | | |
| | Thai Tunes (TV) Free | $ | | |
| | Ustream | $ | | |
| | FreeTV - Unlimited | $ | | |
| | Pocket Zoo ™ Free | $ | | |
| | BuzzFeed | $ | | |
| | Pantip Cafe+ | $ | | |
| | Free Quran Videos Hadith & Anashids Audio | $ | | |
| | TVCatchup Live TV | $ | | |
| | The Colorado Springs Gazette | $ | | |
| | Fort Worth (Texas) Star-Telegram | $ | | |
| | 공파신문 | $ | | |
| | Hot TV | $ | | |
| | Livecam 360 – The most beautiful French webcams (Free) | $ | | |
| | San Diego 6 News | $ | | |
| | قناة الدنيا | $ | | |
| | 후보스 영어 VOD 5탄 (시즌 2, 01~03화) | $ | | |
| | INTD | $ | | |
| | قناة العدالة الفضائية | $ | | |
| | Video Downloader Pro | $ | | |
| | MyMadrid HD | $ | | |
| | Univision Videos | $ | | |
| | Pregnancy App US | $ | | |
| | iTalianNews Free | $ | | |
| | CoolStreaming TV | $ | | |
| | The Monitor's Daily News | $ | | |

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 11E**
**iAd Revenues By App**
**Apps Produced by Apple**

| Adam Id | App Name | [A] iAd Developer Revenue | [B] iAd Apple Revenue | [C] = [A] + [B] Total iAd Revenue |
|---|---|---|---|---|
| | Anime Network | $ | | |
| | Digital TV ● Full HD | $ | | |
| | NewsChannel9.com - WTVC for iPad | $ | | |
| | TV HD PRO | $ | | |
| | MaaTV (iPad Edition) | $ | | |
| | Zumba! | $ | | |
| | RetrowareTV | $ | | |
| | The Gaston Gazette for iPad | $ | | |
| | Qello - Concerts & Music Documentaries | $ | | |
| | TV Gratis | $ | | |
| | Kansas Jayhawks Free | $ | | |
| | HIP HOP RADIO - Les meilleurs radios hip hop et rnb !!! | $ | | |
| | iLoader for Facebook HD Lite | $ | | |
| | Motorsport.com | $ | | |
| | TwitCasting Viewer - Watch Free Live Video and Radio | $ | | |
| | Top Movie | $ | | |
| | Northwest Florida Daily News for iPad | $ | | |
| | Thai Live TV & Radio | $ | | |
| | The Brownsville Herald | $ | | |
| | GuideUS-TV | $ | | |
| | TV World | $ | | |
| | Nepali Radio | $ | | |
| | Pawsitively Heaven Pet Resort | $ | | |
| | TDT Satélite TV - (Toda la Televisión en tu dispositivo!) | $ | | |
| | IslamboxPro | $ | | |
| | Yoga With Les | $ | | |
| | Fútbol TV Sports | $ | | |
| | Northwest Florida Daily News | $ | | |
| | Lovejoy High School | $ | | |
| | Railscasts | $ | | |
| | Deutsch Basic-TV Radio | $ | | |
| | The Gaston Gazette | $ | | |
| | 1Malaysia TV HD | $ | | |
| | On Air Live | $ | | |
| | Burlington Times-News for iPad | $ | | |
| | TVSB Lite | $ | | |
| | Revista Presei cu Live TV | $ | | |
| | RockPlayer2 | $ | | |
| | 3分钟名菜HD-广州名菜 | $ | | |
| | The Telegraph: Mobile | $ | | |
| | Catholic TV & Radio | $ | | |
| | YStream - Youtube edition | $ | | |
| | Fútbol TV Sports Basic | $ | | |
| | Pixorial MyPlayer HD | $ | | |
| | iPlanetaOnline | $ | | |
| | Burlington Times-News | $ | | |
| | LiveLeak | $ | | |
| | Tony Smith | $ | | |
| | DIY Plumbing | $ | | |
| | Jaidee TV | $ | | |
| | Korea Live TV | $ | | |
| | GeoVideo | $ | | |
| | iLoader for Facebook - Photo Video Batch Uploader with Camera Effects and Filters | $ | | |
| | Islambox Lite | $ | | |
| | Mobiles Fernsehen | $ | | |
| | España Premium-TV Radio | $ | | |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 11E**
**iAd Revenues By App**
**Apps Produced by Apple**

| Adam Id | App Name | [A]<br>iAd Developer<br>Revenue | [B]<br>iAd Apple<br>Revenue | [C] = [A] + [B]<br>Total iAd<br>Revenue |
|---|---|---|---|---|
| | Web Video News | $ | | |
| | VTV app - Truyền hình Trực tuyến | $ | | |
| | Inside Kinect | $ | | |
| | Coffee School | $ | | |
| | Tips for Facebook Pro | $ | | |
| | JournalDuGeek | $ | | |
| | Luxe.TV | $ | | |
| | Wing Chun Training | $ | | |
| | Football League - Official Clubs' App | $ | | |
| | German TV Pro | $ | | |
| | NEWCARNET | $ | | |
| | WFF MMA | $ | | |
| | Modern Weapons Assault Rifles (Encyclopedia of Guns) | $ | | |
| | bnt Live ! | $ | | |
| | Public : actus People & potins de Stars | $ | | |
| | View Favorite TV Shows | $ | | |
| | The Daily Press | $ | | |
| | Madison.com | $ | | |
| | Video France | $ | | |
| | DTRS | $ | | |
| | Mouviz Gay & Lesbian | $ | | |
| | Flixwagon+ | $ | | |
| | B and O Radio | $ | | |
| | Ray William Johnson | $ | | |
| | MyTV | $ | | |
| | encToday | $ | | |
| | Asian Cooking Made Easy | $ | | |
| | myNASA | $ | | |
| | ITALIA • dgtv | $ | | |
| | ifreshtv | $ | | |
| | USF Athletics | $ | | |
| | Télé 7 Programme TV | $ | | |
| | Parents' Class | $ | | |
| | Tubulous | $ | | |
| | Holiday Search Engine - Vacations, Flights and Holidays Worldwide | $ | | |
| | Flixwagon Live Video Share | $ | | |
| | United Kingdom DTT TV•HD | $ | | |
| | TapSameBall | $ | | |
| | JiniBox | $ | | |
| | 헬스 큐토리얼 - 비디오 | $ | | |
| | Korean Food | $ | | |
| | DKB Handball-Bundesliga | $ | | |
| | TV España | $ | | |
| | AJJ | $ | | |
| | TV y Radios de España | $ | | |
| | Pourcentages | $ | | |
| | Le Chat | $ | | |
| | France TNT•HD | $ | | |
| | Shop COSMO | $ | | |
| | IMTV - im2 | $ | | |
| | How to Pass your Road Test | $ | | |
| | iTelevisione: Tutta la TV Italiana in streaming sul tuo dispositivo! | $ | | |
| | OA Varsity for iPad | $ | | |
| | Conference Channel | $ | | |
| | PrimoItalia HD | $ | | |
| | RCT_News | $ | | |
| | Pregnancy App UK | $ | | |
| | NFL Mobile | $ | | |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 11E**
**iAd Revenues By App**
**Apps Produced by Apple**

| Adam Id | App Name | [A]<br>iAd Developer<br>Revenue | [B]<br>iAd Apple<br>Revenue | [C] = [A] + [B]<br>Total iAd<br>Revenue |
|---|---|---|---|---|
| | 中超賽事 | $ | | |
| | iGod Today with Father Mike Manning on Catholic Faith and Scripture | $ | | |
| | KoTiVi | $ | | |
| | Sinema | $ | | |
| | NLTV2 Free | $ | | |
| | Stierlitz1 | $ | | |

Notes:

[A]   Total iAd revenues and Apple's share of iAd revenues for each App are estimated from the iAd data provided for developers in APPLE273814 using the

[B]

Source:
APPLE273814

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Schedule 11A
Summary of Apple's Reported Statement of Operations

Source:

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| | [A] | [A] | [A] | [A] | [A] | [A] | [A] | [A] | [A] | [A] |
| **Net Sales** | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | |
| **Gross Margin** | | | | | | | | | | |
| Gross Margin (%) | | | | | | | | | | |
| **Operating Expenses:** | | | | | | | | | | |
| Research & Development | | | | | | | | | | |
| Sales, General and Administrative | | | | | | | | | | |
| Purchased In-Process Research and Development | | | | | | | | | | |
| Restructuring, Other Charges and Impairment of Property and Equipment | | | | | | | | | | |
| Executive Bonus | | | | | | | | | | |
| **Total Operating Expenses** | | | | | | | | | | |
| **Operating Income** | | | | | | | | | | |
| Operating Margin (%) | | | | | | | | | | |
| **Other Income/Expense, Net:** | | | | | | | | | | |
| Gains on Non-Current Investments, Net | | | | | | | | | | |
| Unrealized Gains on Convertible Securities | | | | | | | | | | |
| Interest and Other Income, Net | | | | | | | | | | |
| **Total Other Income and Expense** | | | | | | | | | | |
| **Income Before Provision for Income Taxes** | | | | | | | | | | |
| Income Before Provision for Income Tax Margin (%) | | | | | | | | | | |
| **Provision for Income Taxes** | | | | | | | | | | |
| **Net Income (Loss)** | | | | | | | | | | |
| **Shares used in computing earnings per share:** | | | | | | | | | | |
| Basic | | | | | | | | | | |
| Diluted | | | | | | | | | | |
| **Cash dividends declared per common share** | | | | | | | | | | |

**NOTE:**

[A] Based on Apple's fiscal year beginning in October of the previous year and ending in September.

[A] In-Process Research and Development is included in Sales, General and Development. Cost of Sales is the sum of Cost of Goods Sold and Depreciation. Operating Income includes Restructuring, Other Operating Expenses, which are not available in Compustat.

**SOURCES:**

[1] Compustat
[A] 1993 Apple 10-K, p. 23
[B] 1994 Apple 10-K, p. 24
[C] 1995 Apple 10-K, p. 21
[D] 1996 Apple 10-K, p. 27
[E] 1997 Apple 10-K, p. 32
[F] 1998 Apple 10-K, p. 34
[G] 1999 Apple 10-K, p. 34
[H] 2000 Apple 10-K, p. 34
[I] 2001 Apple 10-K, p. 39
[J] 2002 Apple 10-K, p. 36
[K] 2003 Apple 10-K, p. 37
[L] 2004 Apple 10-K, p. 61
[M] 2005 Apple 10-K, p. 61
[N] 2006 Apple 10-K, p. 74
[O] 2007 Apple 10-K, p. 56
[P] 2008 Apple 10-K, p. 55
[Q] 2009 Apple 10-K, p. 56
[R] 2010 Apple 10-K, p. 46
[S] 2011 Apple 10-K, p. 56
[T] 2012 Apple 10-K, p. 43
[U] 2013 Apple 10-K, p. 43

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Schedule 13A
Summary of Apple's Reported Statement of Operations

| | [B] 1991 | [C] 1992 | [D] 1993 | [E] 1994 | [F] 1995 | [G] 1996 | [H] 1997 | [I] 1998 | [J] 1999 | [K] 2000 | [L] 2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 6,378,942,000 | $ 7,086,542,000 | $ 7,976,954,000 | $ 9,188,000,000 | $ 11,062,000,000 | $ 9,833,000,000 | $ 7,081,000,000 | $ 5,941,000,000 | $ 6,134,000,000 | $ 7,983,000,000 | $ 5,363,000,000 |
| Cost of Sales | 3,314,118,000 | 3,991,337,000 | 5,248,834,000 | 6,844,580,000 | 8,204,000,000 | 8,865,000,000 | 5,713,000,000 | 4,462,000,000 | 4,438,000,000 | 5,817,000,000 | 4,128,000,000 |
| Gross Margin | $ 2,694,731,000 | $ 3,095,205,000 | $ 2,728,000,000 | $ 2,343,280,000 | $ 2,858,000,000 | $ 968,000,000 | $ 1,368,000,000 | $ 1,479,000,000 | $ 1,696,000,000 | $ 2,166,000,000 | $ 1,235,000,000 |
| Gross Margin (%) | 42.3% | 43.7% | 34.2% | 25.5% | 25.8% | 9.8% | 19.3% | 24.9% | 27.7% | 27.1% | 23.0% |
| **Operating Expenses** | | | | | | | | | | | |
| Research and Development | 583,046,000 | 602,135,000 | 665,030,000 | 564,305,000 | 614,000,000 | 604,000,000 | 485,000,000 | 303,000,000 | 314,000,000 | 380,000,000 | 430,000,000 |
| Selling, General and Administrative | 1,740,293,000 | 1,987,262,000 | 1,632,040,000 | 1,384,070,000 | 1,583,000,000 | 1,568,000,000 | 1,286,000,000 | 908,000,000 | 996,000,000 | 1,166,000,000 | 1,288,000,000 |
| Purchased In-Process Research and Development | | | | | | | 375,000,000 | 7,000,000 | | | 11,000,000 |
| Restructuring, Other Charges and Impairments in Property and Equipment | 224,043,000 | | 321,010,000 | (12,000,000) | (23,000,000) | 179,000,000 | 217,000,000 | 27,000,000 | 27,000,000 | 8,000,000 | 12,000,000 |
| Executive Bonus | | | | | | | 75,000,000 | | 98,000,000 | | |
| Total Operating Expenses | 2,547,382,000 | 2,589,397,000 | 2,618,000,000 | 1,871,090,000 | 2,174,000,000 | 2,351,000,000 | 2,118,000,000 | 1,218,000,000 | 1,877,000,000 | 1,641,000,000 | 1,579,000,000 |
| Operating Income | 447,349,000 | 805,808,000 | 1,123,000,000 | 522,000,000 | 684,000,000 | (1,383,000,000) | (1,279,000,000) | 261,000,000 | 319,000,000 | 522,000,000 | (344,000,000) |
| Operating Margin (%) | 7.5% | 11.4% | 14% | 5.7% | 6.2% | -14% | -51% | 4.4% | 5.2% | 6.5% | -6.4% |
| **Other Income/Expense, Net:** | | | | | | | | | | | |
| Gain on Non-Current Investment, Net | | | | | | | | 40,000,000 | 230,000,000 | 367,000,000 | 88,000,000 |
| Unrealized Loss on Convertible Securities | | | | | | | | | | | (13,000,000) |
| Interest and Other Income, Net | 52,395,000 | 49,634,000 | 30,000,000 | (22,000,000) | 110,000,000 | 88,000,000 | 25,000,000 | 28,000,000 | 87,000,000 | 203,000,000 | 217,000,000 |
| Total Other Income and Expense | 52,395,000 | 49,634,000 | 30,000,000 | (22,000,000) | 110,000,000 | 88,000,000 | 25,000,000 | 68,000,000 | 317,000,000 | 570,000,000 | 292,000,000 |
| Income Before Provision for Income Taxes | 499,744,000 | 855,442,000 | 140,000,000 | 500,000,000 | 794,000,000 | (1,295,000,000) | (1,595,000,000) | 329,000,000 | 676,000,000 | 1,092,000,000 | (52,000,000) |
| Income Before Provision for Income Tax Margin (%) | 7.9% | 12.1% | 2.0% | 5.4% | 6.7% | -13.2% | -14.9% | 5.5% | 11.7% | 13.7% | -1.0% |
| Provision for Income Taxes | 189,981,000 | 326,049,000 | 53,000,000 | 190,000,000 | 360,000,000 | (479,000,000) | (1,086,000,000) | 20,000,000 | 75,000,000 | 306,000,000 | (15,000,000) |
| Income Before Accounting Changes | 309,763,000 | 529,373,000 | 87,000,000 | 310,000,000 | 424,000,000 | (816,000,000) | (1,045,000,000) | 309,000,000 | 601,000,000 | 786,000,000 | (37,000,000) |
| Cumulative Effect of Accounting Changes, Net of Income Taxes | | | | | | | | | | | 12,000,000 |
| Net Income (Loss) | 309,841,000 | 529,373,000 | 87,000,000 | 310,000,000 | 424,000,000 | (816,000,000) | (1,045,000,000) | 309,000,000 | 601,000,000 | 786,000,000 | (25,000,000) |
| **Earnings per Share:** | | | | | | | | | | | |
| Basic | 2.58 | 4.33 | 0.73 | 2.61 | 3.45 | (6.59) | (8.29) | 3.17 | 2.10 | 2.42 | (0.07) |
| Diluted | 2.58 | 4.33 | 0.73 | 2.61 | 3.45 | (6.59) | (8.29) | 1.26 | 1.81 | 2.18 | (0.07) |
| **Shares used in computing earnings per share:** | | | | | | | | | | | |
| Basic | 120,283,000 | 122,490,000 | 119,125,000 | 128,735,000 | 123,047,000 | 123,734,000 | 126,062,000 | 263,948,000 | 286,314,000 | 324,568,000 | 345,613,000 |
| Diluted | | | | | | 123,734,000 | 126,062,000 | 335,834,000 | 348,328,000 | 360,324,000 | 345,613,000 |
| Cash dividends declared per common share | | | | | | | | | | | |

NOTE:

[A] Based on Apple's fiscal year beginning in October of the previous year and ending in September.
[A] In-Process Research and Development is included in Research and Development

SOURCES:

[A] Apple 10-K, p. 23
[B] 1993 Apple 10-K, p. 23
[C] 1994 Apple 10-K, p. 24
[D] 1995 Apple 10-K, p. 21
[E] 1996 Apple 10-K, p. 27
[F] 1997 Apple 10-K, p. 32
[G] 1998 Apple 10-K, p. 31
[H] 1999 Apple 10-K, p. 34
[I] 2000 Apple 10-K, p. 34
[J] 2001 Apple 10-K, p. 37
[K] 2003 Apple 10-K, p. 41
[L] 2005 Apple 10-K, p. 61
[M] 2006 Apple 10-K, p. 56
[N] 2007 Apple 10-K, p. 54
[O] 2008 Apple 10-K, p. 55
[P] 2009 Apple 10-K, p. 56
[Q] 2010 Apple 10-K, p. 46
[R] 2011 Apple 10-K, p. 43
[S] 2012 Apple 10-K, p. 43
[T] 2013 Apple 10-K, p. 45

CONFIDENTIAL - ATTORNEYS EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Schedule 13.4
Summary of Apple's Reported Statement of Operations

| Source: | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales** | $5,742,000,000 | $6,207,000,000 | $8,279,000,000 | $13,931,000,000 | $19,315,000,000 | $24,006,000,000 | $37,491,000,000 | $42,905,000,000 | $65,225,000,000 | $108,249,000,000 | $156,508,000,000 |
| **Cost of Sales** | 4,139,000,000 | 4,499,000,000 | 6,022,000,000 | 9,889,000,000 | 13,717,000,000 | 15,852,000,000 | 24,294,000,000 | 25,683,000,000 | 39,541,000,000 | 64,431,000,000 | 87,846,000,000 |
| **Gross Margin** | 1,603,000,000 | 1,708,000,000 | 2,257,000,000 | 4,042,000,000 | 5,598,000,000 | 8,154,000,000 | 13,197,000,000 | 17,222,000,000 | 25,684,000,000 | 43,818,000,000 | 68,662,000,000 |
| Gross Margin (%) | 27.9% | 27.5% | 27.3% | 29.0% | 29.0% | 34.0% | 35.2% | 40.1% | 39.4% | 40.5% | 43.9% |
| **Operating Expenses:** | | | | | | | | | | | |
| Research & Development | 446,000,000 | 471,000,000 | 489,000,000 | 535,000,000 | 712,000,000 | 782,000,000 | 1,109,000,000 | 1,333,000,000 | 1,782,000,000 | 2,429,000,000 | 3,381,000,000 |
| Sales, General and Administrative | 1,109,000,000 | 1,212,000,000 | 1,416,000,000 | 1,864,000,000 | 2,433,000,000 | 2,963,000,000 | 3,761,000,000 | 4,149,000,000 | 5,517,000,000 | 7,599,000,000 | 10,040,000,000 |
| Purchased In-Process Research and Development | | | | | | | | | | | |
| Restructuring/Other Charges and Impairment of Property and Equipment | 30,000,000 | 26,600,000 | 23,000,000 | | | | | | | | |
| Executive Bonus | | | | | | | | | | | |
| **Total Operating Expenses** | 1,585,000,000 | 1,709,000,000 | 1,928,000,000 | 2,399,000,000 | 3,145,000,000 | 3,745,000,000 | 4,870,000,000 | 5,482,000,000 | 7,299,000,000 | 10,028,000,000 | 13,421,000,000 |
| **Operating Income** | 17,000,000 | (1,000,000) | 313,000,000 | 1,643,000,000 | 2,453,000,000 | 4,409,000,000 | 8,327,000,000 | 11,740,000,000 | 18,385,000,000 | 33,790,000,000 | 55,241,000,000 |
| Operating Margin (%) | 0.3% | 0.0% | 3.8% | 11.8% | 12.7% | 18.4% | 22.2% | 27.4% | 28.2% | 31.2% | 35.3% |
| **Other Income/(Expense), Net:** | | | | | | | | | | | |
| Gains from Non-Current Investments, Net | | | | | | | | | | | |
| Unrealized Loss on Convertible Securities | | | | | | | | | | | |
| Interest and Other Income, Net | | | | | | | | | | | |
| **Total Other Income and Expense** | 112,000,000 | 83,000,000 | 53,000,000 | 165,000,000 | 365,000,000 | 599,000,000 | 620,000,000 | 326,000,000 | 155,000,000 | 415,000,000 | 522,000,000 |
| **Income Before Provision for Income Taxes** | 87,000,000 | 92,000,000 | 370,000,000 | 1,808,000,000 | 2,818,000,000 | 5,008,000,000 | 8,947,000,000 | 12,066,000,000 | 18,540,000,000 | 34,205,000,000 | 55,763,000,000 |
| Income Before Provision for Income Tax Margin (%) | 1.5% | 1.5% | 4.5% | 13.0% | 14.6% | 20.9% | 23.9% | 28.1% | 28.4% | 31.6% | 35.6% |
| **Provision for Income Taxes** | 22,000,000 | 24,000,000 | 104,000,000 | 480,000,000 | 829,000,000 | 1,512,000,000 | 2,828,000,000 | 3,831,000,000 | 4,527,000,000 | 8,283,000,000 | 14,030,000,000 |
| Income before Accounting Changes | 65,000,000 | 68,000,000 | 266,000,000 | 1,328,000,000 | 1,989,000,000 | 3,496,000,000 | 6,119,000,000 | 8,235,000,000 | 14,013,000,000 | 25,922,000,000 | 41,733,000,000 |
| Cumulative Effect of Accounting Changes, Net of Income Taxes | | | | | | | | | | | |
| **Net Income/(Loss)** | 65,000,000 | 69,000,000 | 266,000,000 | 1,328,000,000 | 1,989,000,000 | 3,496,000,000 | 6,119,000,000 | 8,235,000,000 | 14,013,000,000 | 25,922,000,000 | 41,733,000,000 |
| **Earnings per Share:** | | | | | | | | | | | |
| Basic | $0.18 | $0.19 | $0.36 | $1.64 | $2.36 | $3.93 | $6.94 | $9.22 | $15.41 | $28.05 | $44.64 |
| Diluted | $0.18 | $0.19 | $0.34 | $1.55 | $2.27 | $3.93 | $6.78 | $9.08 | $15.15 | $27.68 | $44.15 |
| **Shares used in computing earnings per share:** | | | | | | | | | | | |
| Basic | 355,022,000 | 360,631,000 | 743,180,000 | 808,439,000 | 844,058,000 | 889,292,000 | 881,592,000 | 893,016,000 | 909,461,000 | 924,258,000 | 934,818,000 |
| Diluted | 361,785,000 | 363,466,000 | 774,776,000 | 856,878,000 | 877,526,000 | 935,962,000 | 902,139,000 | 907,005,000 | 924,712,000 | 936,645,000 | 945,355,000 |
| **Cash dividends declared per common share** | $— | $— | $— | $— | $— | $— | $— | $— | $— | $— | $2.65 |

**NOTE:**
[A] Based on Apple's fiscal year beginning in October of the previous year and ending in September of that year.
[A] In-Process Research and Development is included in Research and Development.

**SOURCES:**
[A] 1993 Apple 10-K, p. 23
[B] 1994 Apple 10-K, p. 24
[C] 1995 Apple 10-K, p. 31
[D] 1996 Apple 10-K, p. 27
[E] 1997 Apple 10-K, p. 32
[F] 1998 Apple 10-K, p. 34
[G] 1999 Apple 10-K, p. 34
[H] 2000 Apple 10-K, p. 34
[I] 2001 Apple 10-K, p. 59
[J] 2002 Apple 10-K, p. 57
[K] 2003 Apple 10-K, p. 61
[L] 2004 Apple 10-K, p. 61
[M] 2005 Apple 10-K, p. 74
[N] 2006 Apple 10-K, p. 57
[O] 2007 Apple 10-K, p. 52
[P] 2008 Apple 10-K, p. 55
[Q] 2009 Apple 10-K, p. 56
[R] 2010 Apple 10-K, p. 46
[S] 2011 Apple 10-K, p. 48
[T] 2012 Apple 10-K, p. 43
[U] 2013 Apple 10-K, p. 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 13A**
**Summary of Apple's Reported Statement of Operations**

| | [1] 2013 |
|---|---|
| Source: | |
| Net Sales | $ 170,910,000,000 |
| Cost of Sales | $ 106,606,000,000 |
| Gross Margin | $ 64,304,000,000 |
| Gross Margin (%) | 37.6% |
| **Operating Expenses** | |
| Research & Development | $ 4,475,000,000 |
| Sales, General and Administrative | 10,830,000,000 |
| Purchased In-Process Research and Development | |
| Restructuring, Other Charges and Impairment of Property and Equipment | |
| Executive Bonus | |
| Total Operating Expenses | $ 15,305,000,000 |
| **Operating Income** | $ 48,999,000,000 |
| Operating Margin (%) | 28.7% |
| **Other Income/Expense, Net** | |
| Gains on Non-Current Investments, Inc. | |
| Unrealized Loss on Convertible Securities | |
| Interest and Other Income, Net | |
| Total Other Income and Expense | $ 1,156,000,000 |
| **Income Before Provision for Income Taxes** | $ 50,155,000,000 |
| Income Before Provision for Income Tax Margin (%) | 29.3% |
| **Provision for Income Taxes** | $ 13,118,000,000 |
| Income Before Accounting Changes | |
| Cumulative Effects of Accounting Changes, Net of Income Taxes | |
| Net Income (Loss) | $ 37,037,000,000 |
| **Earnings per Share:** | |
| Basic | $ 40.03 |
| Diluted | $ 39.75 |
| **Shares used in computing earnings per share:** | |
| Basic | 925,331,000 |
| Diluted | 931,662,000 |
| Cash dividends declared per common share | $ 11.40 |

**NOTE:**
[A] Based on Apple's fiscal year beginning in October of the previous year and ending
[A] In-Process Research and Development is included in Research and Development

**SOURCES:**
[A] Comp-Sat
[B] 1993 Apple 10-K, p. 23
[C] 1994 Apple 10-K, p. 24
[D] 1995 Apple 10-K, p. 21
[E] 1996 Apple 10-K, p. 27
[F] 1997 Apple 10-K, p. 32
[G] 1998 Apple 10-K, p. 23
[H] 1999 Apple 10-K, p. 34
[I] 2000 Apple 10-K, p. 38
[J] 2001 Apple 10-K, p. 39
[K] 2002 Apple 10-K, p. 53
[L] 2003 Apple 10-K, p. 57
[M] 2004 Apple 10-K, p. 61
[N] 2005 Apple 10-K, p. 61
[O] 2006 Apple 10-K, p. 74
[P] 2007 Apple 10-K, p. 56
[Q] 2008 Apple 10-K, p. 55
[R] 2009 Apple 10-K, p. 56
[S] 2010 Apple 10-K, p. 46
[T] 2011 Apple 10-K, p. 45
[U] 2012 Apple 10-K, p. 49
[V] 2013 Apple 10-K, p. 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Schedule 13B
Summary of Apple's State of Operations and Cash and Investments (in millions)
By Quarter

| Fiscal Quarter | Statement of Operations | | | | Balance Sheet | | | |
|---|---|---|---|---|---|---|---|---|
| | Net Sales [A] | Cost of Sales [A] | Gross Margin [A] | Gross Margin (%) [A] | Cash and Cash Equivalents [A] | Cash and ST Investments [B] | Short-Term Marketable Securities [A] | Long-Term Marketable Securities [A] |
| 1Q 1980 | $ 19.54 | $ 10.55 | $ 9.00 | 46.0% | $ - | $ 4.97 | $ - | $ - |
| 2Q 1980 | $ 23.55 | $ 13.27 | $ 10.28 | 43.7% | $ - | $ 5.36 | $ - | $ - |
| 3Q 1980 | $ 32.57 | $ 19.08 | $ 13.49 | 41.4% | $ - | $ 0.42 | $ - | $ - |
| 4Q 1980 | $ 41.47 | $ 24.43 | $ 17.03 | 41.1% | $ - | $ 2.47 | $ - | $ - |
| 1Q 1981 | $ 67.62 | $ 38.02 | $ 29.60 | 43.8% | $ - | $ 74.69 | $ - | $ - |
| 2Q 1981 | $ 78.77 | $ 44.60 | $ 34.17 | 43.4% | $ - | $ 75.89 | $ - | $ - |
| 3Q 1981 | $ 90.72 | $ 47.09 | $ 43.63 | 48.1% | $ - | $ 77.64 | $ - | $ - |
| 4Q 1981 | $ 97.68 | $ 50.66 | $ 47.02 | 48.1% | $ - | $ 72.83 | $ - | $ - |
| 1Q 1982 | $ 133.55 | $ 67.15 | $ 66.40 | 49.7% | $ - | $ 76.16 | $ - | $ - |
| 2Q 1982 | $ 131.02 | $ 65.70 | $ 65.32 | 49.9% | $ - | $ 101.31 | $ - | $ - |
| 3Q 1982 | $ 142.68 | $ 69.90 | $ 72.78 | 51.0% | $ - | $ 122.52 | $ - | $ - |
| 4Q 1982 | $ 175.81 | $ 85.25 | $ 90.56 | 51.5% | $ - | $ 153.06 | $ - | $ - |
| 1Q 1983 | $ 214.29 | $ 98.41 | $ 115.89 | 54.1% | $ - | $ 191.87 | $ - | $ - |
| 2Q 1983 | $ 227.98 | $ 111.07 | $ 116.92 | 51.3% | $ - | $ 209.54 | $ - | $ - |
| 3Q 1983 | $ 267.28 | $ 138.97 | $ 128.31 | 48.0% | $ - | $ 188.63 | $ - | $ - |
| 4Q 1983 | $ 273.21 | $ 157.32 | $ 115.89 | 42.4% | $ - | $ 143.28 | $ - | $ - |
| 1Q 1984 | $ 316.23 | $ 182.83 | $ 133.40 | 42.2% | $ - | $ 187.49 | $ - | $ - |
| 2Q 1984 | $ 300.10 | $ 178.33 | $ 121.77 | 40.6% | $ - | $ 203.44 | $ - | $ - |
| 3Q 1984 | $ 422.14 | $ 247.09 | $ 175.05 | 41.5% | $ - | $ 194.29 | $ - | $ - |
| 4Q 1984 | $ 477.40 | $ 270.34 | $ 207.06 | 43.4% | $ - | $ 114.89 | $ - | $ - |
| 1Q 1985 | $ 698.30 | $ 415.80 | $ 282.49 | 40.5% | $ - | $ 195.39 | $ - | $ - |
| 2Q 1985 | $ 435.34 | $ 259.93 | $ 175.42 | 40.3% | $ - | $ 194.17 | $ - | $ - |
| 3Q 1985 | $ 374.93 | $ 220.46 | $ 154.47 | 41.2% | $ - | $ 254.61 | $ - | $ - |
| 4Q 1985 | $ 409.71 | $ 221.67 | $ 188.04 | 45.9% | $ - | $ 337.01 | $ - | $ - |
| 1Q 1986 | $ 533.89 | $ 262.96 | $ 270.93 | 50.7% | $ - | $ 441.53 | $ - | $ - |
| 2Q 1986 | $ 408.94 | $ 177.58 | $ 231.36 | 56.6% | $ - | $ 518.76 | $ - | $ - |
| 3Q 1986 | $ 448.28 | $ 212.25 | $ 236.03 | 52.7% | $ - | $ 568.03 | $ - | $ - |
| 4Q 1986 | $ 510.79 | $ 238.32 | $ 272.46 | 53.3% | $ - | $ 576.21 | $ - | $ - |
| 1Q 1987 | $ 662.25 | $ 319.28 | $ 342.97 | 51.8% | $ - | $ 631.24 | $ - | $ - |
| 2Q 1987 | $ 575.33 | $ 287.48 | $ 287.84 | 50.0% | $ - | $ 702.44 | $ - | $ - |
| 3Q 1987 | $ 637.06 | $ 309.85 | $ 327.21 | 51.4% | $ - | $ 623.98 | $ - | $ - |
| 4Q 1987 | $ 786.42 | $ 379.60 | $ 406.82 | 51.7% | $ - | $ 565.09 | $ - | $ - |
| 1Q 1988 | $ 1,042.44 | $ 499.20 | $ 543.25 | 52.1% | $ 372.36 | $ 655.33 | $ - | $ - |
| 2Q 1988 | $ 867.16 | $ 415.93 | $ 451.23 | 52.0% | $ 372.36 | $ 611.14 | $ - | $ - |
| 3Q 1988 | $ 993.05 | $ 481.68 | $ 511.37 | 51.5% | $ 372.36 | $ 523.79 | $ - | $ - |
| 4Q 1988 | $ 1,168.72 | $ 594.07 | $ 574.65 | 49.2% | $ 372.36 | $ 545.72 | $ 173.36 | $ - |
| 1Q 1989 | $ 1,405.14 | $ 715.54 | $ 689.60 | 49.1% | $ 438.30 | $ 609.33 | $ - | $ - |
| 2Q 1989 | $ 1,246.92 | $ 670.40 | $ 576.52 | 46.2% | $ 438.30 | $ 539.87 | $ - | $ - |
| 3Q 1989 | $ 1,248.21 | $ 631.46 | $ 616.75 | 49.4% | $ 438.30 | $ 706.72 | $ - | $ - |
| 4Q 1989 | $ 1,383.75 | $ 677.43 | $ 706.32 | 51.0% | $ 438.30 | $ 808.95 | $ 370.65 | $ - |
| 1Q 1990 | $ 1,493.38 | $ 716.21 | $ 777.17 | 52.0% | $ 374.68 | $ 907.86 | $ - | $ - |
| 2Q 1990 | $ 1,346.20 | $ 609.59 | $ 736.61 | 54.7% | $ 374.68 | $ 995.84 | $ - | $ - |
| 3Q 1990 | $ 1,364.76 | $ 628.19 | $ 736.57 | 54.0% | $ 374.68 | $ 1,043.78 | $ - | $ - |
| 4Q 1990 | $ 1,354.09 | $ 652.24 | $ 701.86 | 51.8% | $ 374.68 | $ 997.09 | $ 622.41 | $ - |
| 1Q 1991 | $ 1,675.51 | $ 814.86 | $ 860.64 | 51.4% | $ 604.15 | $ 983.71 | $ - | $ - |
| 2Q 1991 | $ 1,597.68 | $ 818.61 | $ 779.07 | 48.8% | $ 604.15 | $ 1,041.29 | $ - | $ - |
| 3Q 1991 | $ 1,528.60 | $ 828.35 | $ 700.25 | 45.8% | $ 604.15 | $ 889.74 | $ - | $ - |
| 4Q 1991 | $ 1,507.06 | $ 852.30 | $ 654.77 | 43.4% | $ 604.15 | $ 892.72 | $ 208.57 | $ - |
| 1Q 1992 | $ 1,862.61 | $ 1,049.33 | $ 813.28 | 43.7% | $ 498.56 | $ 988.50 | $ - | $ - |
| 2Q 1992 | $ 1,716.03 | $ 960.50 | $ 755.53 | 44.0% | $ 498.56 | $ 1,335.86 | $ - | $ - |
| 3Q 1992 | $ 1,740.17 | $ 968.84 | $ 771.33 | 44.3% | $ 498.56 | $ 1,475.56 | $ - | $ - |
| 4Q 1992 | $ 1,767.73 | $ 1,012.67 | $ 755.07 | 42.7% | $ 498.56 | $ 1,435.50 | $ 936.94 | $ - |
| 1Q 1993 | $ 2,000.29 | $ 1,189.37 | $ 810.93 | 40.5% | $ 676.41 | $ 1,445.87 | $ - | $ - |
| 2Q 1993 | $ 1,973.89 | $ 1,213.13 | $ 760.76 | 38.5% | $ 676.41 | $ 1,079.38 | $ - | $ - |
| 3Q 1993 | $ 1,861.98 | $ 1,255.98 | $ 606.00 | 32.5% | $ 676.41 | $ 856.81 | $ - | $ - |
| 4Q 1993 | $ 2,140.79 | $ 1,590.36 | $ 550.43 | 25.7% | $ 676.41 | $ 892.30 | $ 215.89 | $ - |
| 1Q 1994 | $ 2,468.85 | $ 1,876.83 | $ 592.02 | 24.0% | $ 972.39 | $ 1,122.78 | $ 150.39 | $ - |
| 2Q 1994 | $ 2,077.00 | $ 1,578.00 | $ 499.00 | 24.0% | $ 1,375.00 | $ 1,105.99 | $ 611.00 | $ - |
| 3Q 1994 | $ 2,149.91 | $ 1,576.04 | $ 573.87 | 26.7% | $ 1,141.70 | $ 1,228.29 | $ 86.60 | $ - |
| 4Q 1994 | $ 2,493.24 | $ 1,815.13 | $ 678.10 | 27.2% | $ 1,203.00 | $ 1,257.86 | $ 55.00 | $ - |
| 1Q 1995 | $ 2,832.00 | $ 2,018.00 | $ 814.00 | 28.7% | $ 1,148.00 | $ 1,587.00 | $ 439.00 | $ - |
| 2Q 1995 | $ 2,652.00 | $ 1,957.00 | $ 695.00 | 26.2% | $ 1,203.00 | $ 1,986.00 | $ 55.00 | $ - |
| 3Q 1995 | $ 2,575.00 | $ 1,847.00 | $ 728.00 | 28.3% | $ 1,168.00 | $ 1,676.00 | $ 508.00 | $ - |
| 4Q 1995 | $ 3,003.00 | $ 2,382.00 | $ 621.00 | 20.7% | $ 756.00 | $ 952.00 | $ 196.00 | $ - |
| 1Q 1996 | $ 3,148.00 | $ 2,673.00 | $ 475.00 | 15.1% | $ 824.00 | $ 1,100.00 | $ 276.00 | $ - |
| 2Q 1996 | $ 2,185.00 | $ 2,606.00 | $ (421.00) | -19.3% | $ 500.00 | $ 592.00 | $ 92.00 | $ - |
| 3Q 1996 | $ 2,179.00 | $ 1,776.00 | $ 403.00 | 18.5% | $ 1,359.00 | $ 1,359.00 | $ - | $ - |
| 4Q 1996 | $ 2,321.00 | $ 1,810.00 | $ 511.00 | 22.0% | $ 1,552.00 | $ 1,745.00 | $ 193.00 | $ - |
| 1Q 1997 | $ 2,129.00 | $ 1,732.00 | $ 397.00 | 18.6% | $ 1,174.00 | $ 1,807.00 | $ 633.00 | $ - |
| 2Q 1997 | $ 1,601.00 | $ 1,298.00 | $ 303.00 | 18.9% | $ 1,273.00 | $ 1,459.00 | $ 186.00 | $ - |
| 3Q 1997 | $ 1,737.00 | $ 1,389.00 | $ 348.00 | 20.0% | $ 1,018.00 | $ 1,230.00 | $ 212.00 | $ - |
| 4Q 1997 | $ 1,614.00 | $ 1,294.00 | $ 320.00 | 19.8% | $ 1,230.00 | $ 1,459.00 | $ 229.00 | $ - |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Schedule 13B
Summary of Apple's State of Operations and Cash and Investments (in millions)
By Quarter

| | Statement of Operations | | | | Balance Sheet | | | |
| | [A] | [A] | [A] | [A] | [A] | [B] | [A] | [A] |
| Fiscal Quarter | Net Sales | Cost of Sales | Gross Margin | Gross Margin (%) | Cash and Cash Equivalents | Cash and ST Investments | Short-Term Marketable Securities | Long-Term Marketable Securities |
|---|---|---|---|---|---|---|---|---|
| 1Q 1998 | $ 1,578.00 | $ 1,225.00 | $ 353.00 | 22.4% | $ 1,193.00 | $ 1,627.00 | $ 434.00 | $ - |
| 2Q 1998 | $ 1,405.00 | $ 1,056.00 | $ 349.00 | 24.8% | $ 1,285.00 | $ 1,823.00 | $ 538.00 | $ - |
| 3Q 1998 | $ 1,402.00 | $ 1,042.00 | $ 360.00 | 25.7% | $ 1,203.00 | $ 1,993.00 | $ 790.00 | $ - |
| 4Q 1998 | $ 1,556.00 | $ 1,139.00 | $ 417.00 | 26.8% | $ 1,481.00 | $ 2,300.00 | $ 819.00 | $ - |
| 1Q 1999 | $ 1,710.00 | $ 1,228.00 | $ 482.00 | 28.2% | $ 1,221.00 | $ 2,578.00 | $ 1,357.00 | $ - |
| 2Q 1999 | $ 1,530.00 | $ 1,127.00 | $ 403.00 | 26.3% | $ 1,358.00 | $ 2,922.00 | $ 1,564.00 | $ - |
| 3Q 1999 | $ 1,558.00 | $ 1,131.00 | $ 427.00 | 27.4% | $ 1,773.00 | $ 3,106.00 | $ 1,333.00 | $ - |
| 4Q 1999 | $ 1,336.00 | $ 952.00 | $ 384.00 | 28.7% | $ 1,326.00 | $ 3,226.00 | $ 1,900.00 | $ 339.00 |
| 1Q 2000 | $ 2,343.00 | $ 1,736.00 | $ 607.00 | 25.9% | $ 1,586.00 | $ 3,660.00 | $ 2,074.00 | $ 2,140.00 |
| 2Q 2000 | $ 1,945.00 | $ 1,396.00 | $ 549.00 | 28.2% | $ 1,662.00 | $ 3,609.00 | $ 1,947.00 | $ 1,544.00 |
| 3Q 2000 | $ 1,825.00 | $ 1,282.00 | $ 543.00 | 29.8% | $ 1,344.00 | $ 3,826.00 | $ 2,482.00 | $ 1,236.00 |
| 4Q 2000 | $ 1,870.00 | $ 1,403.00 | $ 467.00 | 25.0% | $ 1,191.00 | $ 4,027.00 | $ 2,836.00 | $ 786.00 |
| 1Q 2001 | $ 1,007.00 | $ 1,028.00 | $ (21.00) | -2.1% | $ 1,737.00 | $ 4,065.00 | $ 2,328.00 | $ 447.00 |
| 2Q 2001 | $ 1,431.00 | $ 1,046.00 | $ 385.00 | 26.9% | $ 2,138.00 | $ 4,144.00 | $ 2,006.00 | $ 151.00 |
| 3Q 2001 | $ 1,475.00 | $ 1,041.00 | $ 434.00 | 29.4% | $ 2,121.00 | $ 4,218.00 | $ 2,097.00 | $ 146.00 |
| 4Q 2001 | $ 1,450.00 | $ 1,013.00 | $ 437.00 | 30.1% | $ 2,310.00 | $ 4,336.00 | $ 2,026.00 | $ 128.00 |
| 1Q 2002 | $ 1,375.00 | $ 953.00 | $ 422.00 | 30.7% | $ 1,946.00 | $ 4,367.00 | $ 2,421.00 | $ 101.00 |
| 2Q 2002 | $ 1,495.00 | $ 1,086.00 | $ 409.00 | 27.4% | $ 1,159.00 | $ 4,309.00 | $ 3,150.00 | $ 79.00 |
| 3Q 2002 | $ 1,429.00 | $ 1,038.00 | $ 391.00 | 27.4% | $ 1,246.00 | $ 4,306.00 | $ 3,060.00 | $ 48.00 |
| 4Q 2002 | $ 1,443.00 | $ 1,062.00 | $ 381.00 | 26.4% | $ 2,252.00 | $ 4,337.00 | $ 2,085.00 | $ 39.00 |
| 1Q 2003 | $ 1,472.00 | $ 1,066.00 | $ 406.00 | 27.6% | $ 2,612.00 | $ 4,462.00 | $ 1,850.00 | $ 28.00 |
| 2Q 2003 | $ 1,475.00 | $ 1,057.00 | $ 418.00 | 28.3% | $ 3,410.00 | $ 4,526.00 | $ 1,116.00 | $ - |
| 3Q 2003 | $ 1,545.00 | $ 1,117.00 | $ 428.00 | 27.7% | $ 3,507.00 | $ 4,545.00 | $ 1,038.00 | $ - |
| 4Q 2003 | $ 1,715.00 | $ 1,259.00 | $ 456.00 | 26.6% | $ 3,396.00 | $ 4,566.00 | $ 1,170.00 | $ - |
| 1Q 2004 | $ 2,006.00 | $ 1,470.00 | $ 536.00 | 26.7% | $ 3,724.00 | $ 4,791.00 | $ 1,067.00 | $ - |
| 2Q 2004 | $ 1,909.00 | $ 1,379.00 | $ 530.00 | 27.8% | $ 3,158.00 | $ 4,594.00 | $ 1,436.00 | $ - |
| 3Q 2004 | $ 2,014.00 | $ 1,455.00 | $ 559.00 | 27.8% | $ 3,120.00 | $ 4,966.00 | $ 1,846.00 | $ - |
| 4Q 2004 | $ 2,350.00 | $ 1,718.00 | $ 632.00 | 26.9% | $ 2,969.00 | $ 5,464.00 | $ 2,495.00 | $ - |
| 1Q 2005 | $ 3,490.00 | $ 2,494.00 | $ 996.00 | 28.5% | $ 2,275.00 | $ 6,448.00 | $ 3,973.00 | $ - |
| 2Q 2005 | $ 3,243.00 | $ 2,275.00 | $ 968.00 | 29.8% | $ 2,254.00 | $ 7,057.00 | $ 4,803.00 | $ - |
| 3Q 2005 | $ 3,520.00 | $ 2,476.00 | $ 1,044.00 | 29.7% | $ 3,094.00 | $ 7,526.00 | $ 4,432.00 | $ - |
| 4Q 2005 | $ 3,678.00 | $ 2,644.00 | $ 1,034.00 | 28.1% | $ 3,491.00 | $ 8,261.00 | $ 4,770.00 | $ - |
| 1Q 2006 | $ 5,749.00 | $ 4,185.00 | $ 1,564.00 | 27.2% | $ 4,150.00 | $ 8,707.00 | $ 4,557.00 | $ - |
| 2Q 2006 | $ 4,359.00 | $ 3,062.00 | $ 1,297.00 | 29.8% | $ 6,346.00 | $ 8,226.00 | $ 1,880.00 | $ - |
| 3Q 2006 | $ 4,370.00 | $ 3,045.00 | $ 1,325.00 | 30.3% | $ 8,013.00 | $ 9,176.00 | $ 1,163.00 | $ - |
| 4Q 2006 | $ 4,837.00 | $ 3,425.00 | $ 1,412.00 | 29.2% | $ 6,392.00 | $ 10,110.00 | $ 3,718.00 | $ - |
| 1Q 2007 | $ 7,115.00 | $ 4,895.00 | $ 2,220.00 | 31.2% | $ 7,159.00 | $ 11,869.00 | $ 4,710.00 | $ - |
| 2Q 2007 | $ 5,264.00 | $ 3,415.00 | $ 1,849.00 | 35.1% | $ 7,095.00 | $ 12,577.00 | $ 5,482.00 | $ - |
| 3Q 2007 | $ 5,410.00 | $ 3,415.00 | $ 1,995.00 | 36.9% | $ 7,118.00 | $ 13,767.00 | $ 6,649.00 | $ - |
| 4Q 2007 | $ 6,217.00 | $ 4,127.00 | $ 2,090.00 | 33.6% | $ 9,352.00 | $ 15,386.00 | $ 6,034.00 | $ - |
| 1Q 2008 | $ 9,608.00 | $ 6,276.00 | $ 3,332.00 | 34.7% | $ 9,162.00 | $ 18,448.00 | $ 9,286.00 | $ - |
| 2Q 2008 | $ 7,512.00 | $ 5,038.00 | $ 2,474.00 | 32.9% | $ 9,070.00 | $ 19,448.00 | $ 10,378.00 | $ - |
| 3Q 2008 | $ 7,464.00 | $ 4,864.00 | $ 2,600.00 | 34.8% | $ 9,373.00 | $ 20,774.00 | $ 11,401.00 | $ - |
| 4Q 2008 | $ 12,907.00 | $ 8,116.00 | $ 4,791.00 | 37.1% | $ 11,875.00 | $ 24,490.00 | $ 10,236.00 | $ 2,379.00 |
| 1Q 2009 | $ 11,880.00 | $ 7,373.00 | $ 4,507.00 | 37.9% | $ 7,236.00 | $ 25,647.00 | $ 18,411.00 | $ 2,498.00 |
| 2Q 2009 | $ 9,084.00 | $ 5,457.00 | $ 3,627.00 | 39.9% | $ 4,466.00 | $ 25,013.00 | $ 20,547.00 | $ 3,865.00 |
| 3Q 2009 | $ 9,734.00 | $ 5,751.00 | $ 3,983.00 | 40.9% | $ 5,605.00 | $ 24,222.00 | $ 18,617.00 | $ 6,899.00 |
| 4Q 2009 | $ 12,207.00 | $ 7,102.00 | $ 5,105.00 | 41.8% | $ 5,263.00 | $ 23,464.00 | $ 18,201.00 | $ 10,528.00 |
| 1Q 2010 | $ 15,683.00 | $ 9,272.00 | $ 6,411.00 | 40.9% | $ 7,609.00 | $ 24,796.00 | $ 17,187.00 | $ 15,024.00 |
| 2Q 2010 | $ 13,499.00 | $ 7,874.00 | $ 5,625.00 | 41.7% | $ 10,018.00 | $ 23,155.00 | $ 13,137.00 | $ 18,549.00 |
| 3Q 2010 | $ 15,700.00 | $ 9,564.00 | $ 6,136.00 | 39.1% | $ 9,705.00 | $ 24,288.00 | $ 14,583.00 | $ 21,551.00 |
| 4Q 2010 | $ 20,343.00 | $ 12,831.00 | $ 7,512.00 | 36.9% | $ 11,261.00 | $ 25,620.00 | $ 14,359.00 | $ 25,391.00 |
| 1Q 2011 | $ 26,741.00 | $ 16,443.00 | $ 10,298.00 | 38.5% | $ 10,734.00 | $ 26,977.00 | $ 16,243.00 | $ 32,730.00 |
| 2Q 2011 | $ 24,667.00 | $ 14,449.00 | $ 10,218.00 | 41.4% | $ 15,978.00 | $ 29,234.00 | $ 13,256.00 | $ 36,533.00 |
| 3Q 2011 | $ 28,571.00 | $ 16,649.00 | $ 11,922.00 | 41.7% | $ 12,091.00 | $ 28,395.00 | $ 16,304.00 | $ 47,761.00 |
| 4Q 2011 | $ 28,270.00 | $ 16,890.00 | $ 11,380.00 | 40.3% | $ 9,815.00 | $ 25,952.00 | $ 16,137.00 | $ 55,618.00 |
| 1Q 2012 | $ 46,333.00 | $ 25,630.00 | $ 20,703.00 | 44.7% | $ 10,310.00 | $ 30,156.00 | $ 19,846.00 | $ 67,445.00 |
| 2Q 2012 | $ 39,186.00 | $ 20,622.00 | $ 18,564.00 | 47.4% | $ 10,121.00 | $ 28,538.00 | $ 18,417.00 | $ 81,638.00 |
| 3Q 2012 | $ 35,023.00 | $ 20,029.00 | $ 14,994.00 | 42.8% | $ 7,945.00 | $ 27,654.00 | $ 19,709.00 | $ 89,567.00 |
| 4Q 2012 | $ 35,966.00 | $ 21,565.00 | $ 14,401.00 | 40.0% | $ 10,746.00 | $ 29,129.00 | $ 18,383.00 | $ 92,122.00 |
| 1Q 2013 | $ 54,512.00 | $ 33,452.00 | $ 21,060.00 | 38.6% | $ 16,154.00 | $ 39,820.00 | $ 23,666.00 | $ 97,292.00 |
| 2Q 2013 | $ 43,603.00 | $ 27,254.00 | $ 16,349.00 | 37.5% | $ 12,053.00 | $ 39,137.00 | $ 27,084.00 | $ 105,550.00 |
| 3Q 2013 | $ 35,323.00 | $ 22,249.00 | $ 13,074.00 | 36.9% | $ 11,248.00 | $ - | $ 31,358.00 | $ 104,014.00 |
| 4Q 2013 | $ 37,472.00 | $ 23,601.00 | $ 13,871.00 | 37.0% | $ 14,259.00 | $ - | $ 26,287.00 | $ 106,215.00 |

Notes:
Fourth Quarter Net Sales and Cost of Sales was calculated by subtracting the first three quarters from the annual number.
Short-Term Marketable Securities were reported in Apple 10-Q reports as Short-Term Investments.
Long-Term Marketable Securities were reported in Apple 10-Q reports as Non-Current Debt and Equity Investments.

Sources:
[A]  CompuStat for Fiscal Years 1980-1993; Apple's 10-K and 10-Q Reports for Fiscal Years 1994-2013.
[B]  Compustat.

**Schedule 13C**
**Summary of Apple's Annual Cash and Investments (in millions of US $)**

| | [A] | [B] | [C] | [D] | [E] |
|---|---|---|---|---|---|
| Fiscal Year | Cash and Cash Equivalents | Change in Cash from Prior Year | Cash and ST Investments | Short-Term Marketable Securities | Long-Term Marketable Securities |
| 1980 | $ · | | $ 2.47 | $ · | $ · |
| 1981 | $ · | | $ 72.83 | $ · | $ · |
| 1982 | $ · | | $ 153.06 | $ · | $ · |
| 1983 | $ (30.07) | | $ 143.28 | $ 173.36 | $ · |
| 1984 | $ (58.47) | $ (28.40) | $ 114.89 | $ 173.36 | $ · |
| 1985 | $ 163.66 | $ 222.13 | $ 337.01 | $ 173.36 | $ · |
| 1986 | $ 402.86 | $ 239.20 | $ 576.21 | $ 173.36 | $ · |
| 1987 | $ 391.74 | $ (11.12) | $ 565.09 | $ 173.36 | $ · |
| 1988 | $ 372.36 | $ (19.38) | $ 545.72 | $ 173.36 | $ · |
| 1989 | $ 438.30 | $ 65.94 | $ 808.95 | $ 370.65 | $ · |
| 1990 | $ 374.68 | $ (63.62) | $ 997.09 | $ 622.41 | $ · |
| 1991 | $ 604.15 | $ 229.47 | $ 892.72 | $ 288.57 | $ · |
| 1992 | $ 498.56 | $ (105.59) | $ 1,435.50 | $ 936.94 | $ · |
| 1993 | $ 676.41 | $ 177.86 | $ 892.30 | $ 215.89 | $ · |
| 1994 | $ 1,203.49 | $ 527.08 | $ 1,257.86 | $ 55.00 | $ · |
| 1995 | $ 756.00 | $ (447.00) | $ 952.00 | $ 196.00 | $ · |
| 1996 | $ 1,552.00 | $ 796.00 | $ 1,745.00 | $ 193.00 | $ · |
| 1997 | $ 1,230.00 | $ (322.00) | $ 1,459.00 | $ 229.00 | $ · |
| 1998 | $ 1,481.00 | $ 251.00 | $ 2,300.00 | $ 819.00 | $ · |
| 1999 | $ 1,326.00 | $ (155.00) | $ 3,226.00 | $ 1,900.00 | $ 339.00 |
| 2000 | $ 1,191.00 | $ (135.00) | $ 4,027.00 | $ 2,836.00 | $ 786.00 |
| 2001 | $ 2,310.00 | $ 1,119.00 | $ 4,336.00 | $ 2,026.00 | $ 128.00 |
| 2002 | $ 2,252.00 | $ (58.00) | $ 4,337.00 | $ 2,085.00 | $ 39.00 |
| 2003 | $ 3,396.00 | $ 1,144.00 | $ 4,566.00 | $ 1,170.00 | $ · |
| 2004 | $ 2,969.00 | $ (427.00) | $ 5,464.00 | $ 2,495.00 | $ · |
| 2005 | $ 3,491.00 | $ 522.00 | $ 8,261.00 | $ 4,770.00 | $ · |
| 2006 | $ 6,392.00 | $ 2,901.00 | $ 10,110.00 | $ 3,718.00 | $ · |
| 2007 | $ 9,352.00 | $ 2,960.00 | $ 15,386.00 | $ 6,034.00 | $ · |
| 2008 | $ 11,875.00 | $ 2,523.00 | $ 24,490.00 | $ 10,236.00 | $ 2,379.00 |
| 2009 | $ 5,263.00 | $ (6,612.00) | $ 23,464.00 | $ 18,201.00 | $ 10,528.00 |
| 2010 | $ 11,261.00 | $ 5,998.00 | $ 25,620.00 | $ 14,359.00 | $ 25,391.00 |
| 2011 | $ 9,815.00 | $ (1,446.00) | $ 25,952.00 | $ 16,137.00 | $ 55,618.00 |
| 2012 | $ 10,746.00 | $ 931.00 | $ 29,129.00 | $ 18,383.00 | $ 92,122.00 |
| 2013 | $ 14,259.00 | | $ · | $ 26,287.00 | $ 106,215.00 |

Notes:

[A] For 1983-1988, the Change in Cash was subtracted from the Cash balance to calculate the previous year's Cash.

[D] For 1983-1992, Subtract Cash from Cash and ST Investments. 'Short-Term Marketable Securities were reported in Apple 10-Q reports as Short-Term Investments.

[E] Long-Term Marketable Securities were reported in Apple 10-Q reports as Non-Current Debt and Equity Investments.

Sources:

[A] For 1983-1992, CompuStat; For 1993-2013, Apple, Inc. 10-K reports.

[B] CompuStat.

[C] CompuStat.

[D] For 1983-1992, CompuStat; For 1993-2013, Apple, Inc. 10-K Reports.

[E] Apple, Inc. 10-K Reports.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Schedule 13D
Apple, Inc. Worldwide Revenue By Product

| Fiscal Quarter | iPhone and Related Products and Services | iPad | iPod | Peripherals (Includes Apple TV) | Software, Service, and Other Sales | Mac | Other Music Related Products and Services | Total Revenue |
|---|---|---|---|---|---|---|---|---|
| Q1 1999 | | | | | $ 268 | $ 1,442 | | $ 1,710 |
| Q2 1999 | | | | | $ 296 | $ 1,234 | | $ 1,530 |
| Q3 1999 | | | | | $ 264 | $ 1,294 | | $ 1,558 |
| Q4 1999 | | | | | $ 224 | $ 1,112 | | $ 1,336 |
| Q1 2000 | | | | | $ 278 | $ 2,065 | | $ 2,343 |
| Q2 2000 | | | | | $ 293 | $ 1,652 | | $ 1,945 |
| Q3 2000 | | | | | $ 280 | $ 1,545 | | $ 1,825 |
| Q4 2000 | | | | | $ 247 | $ 1,623 | | $ 1,870 |
| Q1 2001 | | | | | $ 231 | $ 776 | | $ 1,007 |
| Q2 2001 | | | | | $ 231 | $ 1,200 | | $ 1,431 |
| Q3 2001 | | | | | $ 250 | $ 1,225 | | $ 1,475 |
| Q4 2001 | | | | | $ 248 | $ 1,202 | | $ 1,450 |
| Q1 2002 | | | | $ 160 | $ 124 | $ 1,071 | | $ 1,375 |
| Q2 2002 | | | | $ 153 | $ 133 | $ 1,209 | | $ 1,495 |
| Q3 2002 | | | | $ 148 | $ 121 | $ 1,160 | | $ 1,429 |
| Q4 2002 | | | | $ 193 | $ 156 | $ 1,094 | | $ 1,443 |
| Q1 2003 | | | $ 81 | $ 137 | $ 155 | $ 1,099 | | $ 1,472 |
| Q2 2003 | | | $ 31 | $ 185 | $ 160 | $ 1,099 | | $ 1,475 |
| Q3 2003 | | | $ 111 | $ 160 | $ 160 | $ 1,094 | $ 12 | $ 1,545 |
| Q4 2003 | | | $ 122 | $ 201 | $ 169 | $ 1,199 | $ 24 | $ 1,715 |
| Q1 2004 | | | $ 256 | $ 222 | $ 212 | $ 1,269 | $ 47 | $ 2,006 |
| Q2 2004 | | | $ 264 | $ 238 | $ 187 | $ 1,160 | $ 60 | $ 1,909 |
| Q3 2004 | | | $ 249 | $ 219 | $ 210 | $ 1,263 | $ 73 | $ 2,014 |
| Q4 2004 | | | $ 537 | $ 272 | $ 212 | $ 1,231 | $ 98 | $ 2,350 |
| Q1 2005 | | | $ 1,211 | $ 284 | $ 213 | $ 1,605 | $ 177 | $ 3,490 |
| Q2 2005 | | | $ 1,014 | $ 280 | $ 239 | $ 1,494 | $ 216 | $ 3,243 |
| Q3 2005 | | | $ 1,103 | $ 266 | $ 345 | $ 1,565 | $ 241 | $ 3,520 |
| Q4 2005 | | | $ 1,212 | $ 296 | $ 294 | $ 1,611 | $ 265 | $ 3,678 |
| Q1 2006 | | | $ 2,906 | $ 303 | $ 325 | $ 1,724 | $ 491 | $ 5,749 |
| Q2 2006 | | | $ 1,714 | $ 264 | $ 324 | $ 1,572 | $ 485 | $ 4,359 |
| Q3 2006 | | | $ 1,497 | $ 236 | $ 314 | $ 1,866 | $ 457 | $ 4,370 |
| Q4 2006 | | | $ 1,559 | $ 297 | $ 316 | $ 2,213 | $ 452 | $ 4,837 |
| Q1 2007 | | | $ 3,427 | $ 297 | $ 347 | $ 2,410 | $ 634 | $ 7,115 |
| Q2 2007 | | | $ 1,689 | $ 309 | $ 345 | $ 2,268 | $ 653 | $ 5,264 |
| Q3 2007 | $ 5 | | $ 1,570 | $ 308 | $ 386 | $ 2,533 | $ 608 | $ 5,410 |
| Q4 2007 | $ 118 | | $ 1,619 | $ 346 | $ 430 | $ 3,103 | $ 601 | $ 6,217 |
| Q1 2008 | $ 241 | | $ 3,997 | $ 382 | $ 628 | $ 3,552 | $ 808 | $ 9,608 |
| Q2 2008 | $ 378 | | $ 1,818 | $ 412 | $ 529 | $ 3,494 | $ 881 | $ 7,512 |
| Q3 2008 | $ 419 | | $ 1,678 | $ 437 | $ 501 | $ 3,610 | $ 819 | $ 7,464 |
| Q4 2008 | $ 5,704 | | $ 1,660 | $ 463 | $ 550 | $ 3,698 | $ 832 | $ 12,907 |
| Q1 2009 | $ 2,940 | | $ 3,371 | $ 387 | $ 606 | $ 3,565 | $ 1,011 | $ 11,880 |
| Q2 2009 | $ 2,427 | | $ 1,665 | $ 357 | $ 626 | $ 2,960 | $ 1,049 | $ 9,084 |
| Q3 2009 | $ 3,060 | | $ 1,492 | $ 340 | $ 530 | $ 3,354 | $ 958 | $ 9,734 |
| Q4 2009 | $ 4,606 | | $ 1,563 | $ 391 | $ 649 | $ 3,980 | $ 1,018 | $ 12,207 |
| Q1 2010 | $ 5,578 | | $ 3,391 | $ 469 | $ 631 | $ 4,450 | $ 1,164 | $ 15,683 |
| Q2 2010 | $ 5,445 | | $ 1,861 | $ 472 | $ 634 | $ 3,760 | $ 1,327 | $ 13,499 |
| Q3 2010 | $ 5,334 | $ 2,166 | $ 1,545 | $ 396 | $ 646 | $ 4,399 | $ 1,214 | $ 15,700 |
| Q4 2010 | $ 8,822 | $ 2,792 | $ 1,477 | $ 477 | $ 662 | $ 4,870 | $ 1,243 | $ 20,343 |
| Q1 2011 | $ 10,468 | $ 4,606 | $ 3,425 | $ 593 | $ 786 | $ 5,430 | $ 1,431 | $ 26,741 |
| Q2 2011 | $ 12,298 | $ 2,836 | $ 1,600 | $ 580 | $ 743 | $ 4,976 | $ 1,634 | $ 24,667 |
| Q3 2011 | $ 13,311 | $ 6,046 | $ 1,325 | $ 517 | $ 696 | $ 5,105 | $ 1,571 | $ 28,571 |
| Q4 2011 | $ 10,980 | $ 6,868 | $ 1,103 | $ 648 | $ 729 | $ 6,272 | $ 1,678 | $ 28,270 |
| Q1 2012 | $ 23,950 | $ 9,769 | $ 2,528 | $ 1,468 | | $ 6,598 | $ 3,020 | $ 46,333 |
| Q2 2012 | $ 22,276 | $ 6,264 | $ 1,207 | $ 1,195 | | $ 5,073 | $ 3,171 | $ 39,186 |
| Q3 2012 | $ 15,821 | $ 8,779 | $ 1,060 | $ 1,227 | | $ 4,933 | $ 3,203 | $ 35,023 |
| Q4 2012 | $ 16,645 | $ 7,133 | $ 820 | $ 1,255 | | $ 6,617 | $ 3,496 | $ 35,966 |
| Q1 2013 | $ 30,660 | $ 10,674 | $ 2,143 | $ 1,829 | | $ 5,519 | $ 3,687 | $ 54,512 |
| Q2 2013 | $ 22,955 | $ 8,746 | $ 962 | $ 1,379 | | $ 5,447 | $ 4,114 | $ 43,603 |
| Q3 2013 | $ 18,154 | $ 6,374 | $ 733 | $ 1,179 | | $ 4,893 | $ 3,990 | $ 35,323 |
| Q4 2013 | $ 19,510 | $ 6,186 | $ 573 | $ 1,319 | | $ 5,624 | $ 4,260 | $ 37,472 |

Notes:
Other Music Related Products and Services includes iTunes for 2013.
Operating Profit = Operating Revenue - COGS - Operating Expenses - Depreciation & Amortization.
Prior to Q3 2002, Apple included iPod Revenue in Peripherals. iPod revenue was included in Peripherals for all of 2002 since Q4 is calculated from annual figures and the first 3 quarters.
Prior to Q4 2001, Apple included Peripherals in Software, Service and Other Sales. Peripheral revenue was included in Software, Service and Other Sales for all of 2001 since Q4 is calculated from annual figures and the first 3 quarters.

Sources:
1999-2013 Apple 10-Q Reports.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

<span style="color:red">[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]</span>

Schedule 17A - Corrected
**Summary of Available Royalty Rates**

| I   Emblaze Licenses: | Effective Date | Year License is Effective | | | | | | | | | | | | | | | | Technology | Rates and Volumes (per unit) | | Rates on End-User Content |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | | Minimum | Maximum | |
| Samsung[1] | 11/8/1999 | | X | X | | | | | | | | | | | | | | Video Decoder (A3 chip) | $0.50 over 1,500,000 units | $0.75 for 500,001-1,500,000 units | |
| **II   Apple Licenses:[3]** | Date | | | | | | | | | | | | | | | | | Technology | Rate (per unit) | Rate (per unit) | |

[black redaction bar]

| III   Public Licenses to Standards: | Date | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Technology | Rates (per device) | Rates (per device) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MP3[2] | 9/1998 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | Compression (mp3 - audio) | $0.75/unit | $1.25/unit (MP3 PRO) | 2-3% of revenues (MP3 - MP3 PRO) |
| MPEG-4[4] | 1/1/2000 | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | Compression (MPEG-4) | | $0.25/unit over 50,000 units | 2% of sales or $0.02/title, $0.01-0.25/subscription |
| AVC/H264[5] | 1/1/2005 | | | | | | | X | X | X | X | X | X | X | X | X | X | Compression (AVC/H264) | $0.20/unit if over 100,000 and under 5 million units | $0.10/unit if over 5 million units | 2% of sales or $0.02/title, $0.10-0.25/subscription |
| **IV   Public Apple Litigation:** | Date | | | | | | | | | | | | | | | | | Technology | Rates (per device) | Rates (per device) | |
| Apple v. Samsung[6] | Around 2007 | | | | | | | | | | X | | | | | | | Smartphone Utility Features | $2.02/unit | $3.10/unit | |
| Apple v. Motorola[7] | Prior to August 2007 | | | | | | | | | | X | | | | | | | Cellular Standard | | $1.00/unit | |

Sources:

[1] Software Development and Licensing Agreement, between GEO Interactive Media Group Ltd. And Samsung Electronics Co. Ltd. (EMB02681-EMB02737).

[black redaction bar]

[2] Decoder Rates from http://mp3licensing.com/royalty/software.html; http://www.mp3licensing.com/royalty/emd.html; Bellis, Mary, "The History of MP3", November 7, 2013, About.com, (inventors.about.com/od/mstartinventions/a/MPThree.htm).

[4] Decoder Rates for MPEG-4 Visual License from http://www.mpegla.com. Annual caps per legal entity from $1 - 1.25 million.

[5] Decoder Rates for AVC/H.264 from http://www.mpegla.com. Annual caps per legal entity from $3.5 - 6.5 million.

[6] August 13, 2012 Apple Inc.v. Samsung Electronics, Transcript of Proceedings Before the Honorable Lucy H. Koh United States District Judge, Volume 7, pg. 2090:25-2091:2. Date of license assumed to be around time of iPhone release in 2007 since not mentioned in trial transcript. Smartphone utility features are identified in U.S. patents no.s 7,469,381, 7,844,915 and 7,864,163.

[7] Apple, Inc. v. Motorola Mobility, Inc., Opinion and Order, (W.D. Wisc.) dated October 29, 2012, pp. 34, 36.

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Schedule 18A - Corrected**
**Apple Worldwide Gross Margin at Different Points of Time**

| Description | Time Period | WW Gross Margin % | Increase in WW Gross Margin % | Increase in Gross Margin $ per Accused Unit | Cumulative Increase in WW Gross Margin % | Cumulative Increase in Gross Margin $ per Accused Unit |
|---|---|---|---|---|---|---|
| | | [A] | | | | |
| Pre-iPod Launch | 1Q 1996 - 4Q 2001 | | | | | |
| iPod Launch until Original iPhone Release | 1Q 2002 - 3Q 2007 | | | | | |
| Original iPhone Launch to iPhone 3GS | 3Q 2007 - 3Q 2009 | | | | | |
| iPhone 3GS Launch to Present | 3Q 2009 - 4Q 2013 | | | | | |

[B] Apple Accused Product Device Revenue
[B] Apple Accused Product Device Units

Sources and Notes:
[A] See Schedule 13B
[B] Represents revenue and units associated with the iPhone, iPod Touch, iPad, Mac, and Apple TV included in the royalty base.
See, Schedules 2A, 3A, 4A, 5A and 6A.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 18B**
**Apple Worldwide Gross Margins**

| Fiscal Quarter | Gross Margin (%) | Change in Gross Margin (%) | Fiscal Quarter | Gross Margin (%) | Change in Gross Margin (%) |
|---|---|---|---|---|---|
| 1Q 1980 | 46.0% |  | 2Q 1997 | 18.9% | 0.3% |
| 2Q 1980 | 43.7% | -2.4% | 3Q 1997 | 20.0% | 1.1% |
| 3Q 1980 | 41.4% | -2.3% | 4Q 1997 | 19.8% | -0.2% |
| 4Q 1980 | 41.1% | -0.3% | 1Q 1998 | 22.4% | 2.5% |
| 1Q 1981 | 43.8% | 2.7% | 2Q 1998 | 24.8% | 2.5% |
| 2Q 1981 | 43.4% | -0.4% | 3Q 1998 | 25.7% | 0.8% |
| 3Q 1981 | 48.1% | 4.7% | 4Q 1998 | 26.8% | 1.1% |
| 4Q 1981 | 48.1% | 0.0% | 1Q 1999 | 28.2% | 1.4% |
| 1Q 1982 | 49.7% | 1.6% | 2Q 1999 | 26.3% | -1.8% |
| 2Q 1982 | 49.9% | 0.1% | 3Q 1999 | 27.4% | 1.1% |
| 3Q 1982 | 51.0% | 1.2% | 4Q 1999 | 28.7% | 1.3% |
| 4Q 1982 | 51.5% | 0.5% | 1Q 2000 | 25.9% | -2.8% |
| 1Q 1983 | 54.1% | 2.6% | 2Q 2000 | 28.2% | 2.3% |
| 2Q 1983 | 51.3% | -2.8% | 3Q 2000 | 29.8% | 1.5% |
| 3Q 1983 | 48.0% | -3.3% | 4Q 2000 | 25.0% | -4.8% |
| 4Q 1983 | 42.4% | -5.6% | 1Q 2001 | -2.1% | -27.1% |
| 1Q 1984 | 42.2% | -0.2% | 2Q 2001 | 26.9% | 29.0% |
| 2Q 1984 | 40.6% | -1.6% | 3Q 2001 | 29.4% | 2.5% |
| 3Q 1984 | 41.5% | 0.9% | 4Q 2001 | 30.1% | 0.7% |
| 4Q 1984 | 43.4% | 1.9% | 1Q 2002 | 30.7% | 0.6% |
| 1Q 1985 | 40.5% | -2.9% | 2Q 2002 | 27.4% | -3.3% |
| 2Q 1985 | 40.3% | -0.2% | 3Q 2002 | 27.4% | 0.0% |
| 3Q 1985 | 41.2% | 0.9% | 4Q 2002 | 26.4% | -1.0% |
| 4Q 1985 | 45.9% | 4.7% | 1Q 2003 | 27.6% | 1.2% |
| 1Q 1986 | 50.7% | 4.9% | 2Q 2003 | 28.3% | 0.8% |
| 2Q 1986 | 56.6% | 5.8% | 3Q 2003 | 27.7% | -0.6% |
| 3Q 1986 | 52.7% | -3.9% | 4Q 2003 | 26.6% | -1.1% |
| 4Q 1986 | 53.3% | 0.7% | 1Q 2004 | 26.7% | 0.1% |
| 1Q 1987 | 51.8% | -1.6% | 2Q 2004 | 27.8% | 1.0% |
| 2Q 1987 | 50.0% | -1.8% | 3Q 2004 | 27.8% | 0.0% |
| 3Q 1987 | 51.4% | 1.3% | 4Q 2004 | 26.9% | -0.9% |
| 4Q 1987 | 51.7% | 0.4% | 1Q 2005 | 28.5% | 1.6% |
| 1Q 1988 | 52.1% | 0.4% | 2Q 2005 | 29.8% | 1.3% |
| 2Q 1988 | 52.0% | -0.1% | 3Q 2005 | 29.7% | -0.2% |
| 3Q 1988 | 51.5% | -0.5% | 4Q 2005 | 28.1% | -1.5% |
| 4Q 1988 | 49.2% | -2.3% | 1Q 2006 | 27.2% | -0.9% |
| 1Q 1989 | 49.1% | -0.1% | 2Q 2006 | 29.8% | 2.5% |
| 2Q 1989 | 46.2% | -2.8% | 3Q 2006 | 30.3% | 0.6% |
| 3Q 1989 | 49.4% | 3.2% | 4Q 2006 | 29.2% | -1.1% |
| 4Q 1989 | 51.0% | 1.6% | 1Q 2007 | 31.2% | 2.0% |
| 1Q 1990 | 52.0% | 1.0% | 2Q 2007 | 35.1% | 3.9% |
| 2Q 1990 | 54.7% | 2.7% | 3Q 2007 | 36.9% | 1.8% |
| 3Q 1990 | 54.0% | -0.7% | 4Q 2007 | 33.6% | -3.3% |
| 4Q 1990 | 51.8% | -2.1% | 1Q 2008 | 34.7% | 1.1% |
| 1Q 1991 | 51.4% | -0.5% | 2Q 2008 | 32.9% | -1.7% |
| 2Q 1991 | 48.8% | -2.6% | 3Q 2008 | 34.8% | 1.9% |
| 3Q 1991 | 45.8% | -3.0% | 4Q 2008 | 37.1% | 2.3% |
| 4Q 1991 | 43.4% | -2.4% | 1Q 2009 | 37.9% | 0.8% |
| 1Q 1992 | 43.7% | 0.2% | 2Q 2009 | 39.9% | 2.0% |
| 2Q 1992 | 44.0% | 0.4% | 3Q 2009 | 40.9% | 1.0% |
| 3Q 1992 | 44.3% | 0.3% | 4Q 2009 | 41.8% | 0.9% |
| 4Q 1992 | 42.7% | -1.6% | 1Q 2010 | 40.9% | -0.9% |
| 1Q 1993 | 40.5% | -2.2% | 2Q 2010 | 41.7% | 0.8% |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

**Schedule 18B**
**Apple Worldwide Gross Margins**

| Fiscal Quarter | Gross Margin (%) | Change in Gross Margin (%) | Fiscal Quarter | Gross Margin (%) | Change in Gross Margin (%) |
|---|---|---|---|---|---|
| 2Q 1993 | 38.5% | -2.0% | 3Q 2010 | 39.1% | -2.6% |
| 3Q 1993 | 32.5% | -6.0% | 4Q 2010 | 36.9% | -2.2% |
| 4Q 1993 | 25.7% | -6.8% | 1Q 2011 | 38.5% | 1.6% |
| 1Q 1994 | 24.0% | -1.7% | 2Q 2011 | 41.4% | 2.9% |
| 2Q 1994 | 24.0% | 0.0% | 3Q 2011 | 41.7% | 0.3% |
| 3Q 1994 | 26.7% | 2.7% | 4Q 2011 | 40.3% | -1.5% |
| 4Q 1994 | 27.2% | 0.5% | 1Q 2012 | 44.7% | 4.4% |
| 1Q 1995 | 28.7% | 1.5% | 2Q 2012 | 47.4% | 2.7% |
| 2Q 1995 | 26.2% | -2.5% | 3Q 2012 | 42.8% | -4.6% |
| 3Q 1995 | 28.3% | 2.1% | 4Q 2012 | 40.0% | -2.8% |
| 4Q 1995 | 20.7% | -7.6% | 1Q 2013 | 38.6% | -1.4% |
| 1Q 1996 | 15.1% | -5.6% | 2Q 2013 | 37.5% | -1.1% |
| 2Q 1996 | -19.3% | -34.4% | 3Q 2013 | 36.9% | -0.6% |
| 3Q 1996 | 18.5% | 37.8% | 4Q 2013 | 37.0% | 0.1% |
| 4Q 1996 | 22.0% | 3.5% | | | |
| 1Q 1997 | 18.6% | -3.4% | | | |

Source:
See Schedule 13B

CONFIDENTIAL - ATTORNEY'S EYES ONLY

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Expert Report of Catharine M. Lawton

**Schedule 18C - Corrected**
**Apple U.S. Gross Margins by Accused Product**

| | [A] | iPhone | | iPod Touch | | iPad | | Mac | | Apple TV | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Quarter | Apple Overall Gross Margin (%) | Gross Margin (%) | Revenue | Gross Margin (%) | Revenue | Gross Margin (%) | Revenue | Gross Margin (%) | Revenue | Gross Margin (%) | Revenue |
| 3Q 2009 | | | | | | | | | | | |
| 4Q 2009 | | | | | | | | | | | |
| 1Q 2010 | | | | | | | | | | | |
| 2Q 2010 | | | | | | | | | | | |
| 3Q 2010 | | | | | | | | | | | |
| 4Q 2010 | | | | | | | | | | | |
| 1Q 2011 | | | | | | | | | | | |
| 2Q 2011 | | | | | | | | | | | |
| 3Q 2011 | | | | | | | | | | | |
| 4Q 2011 | | | | | | | | | | | |
| 1Q 2012 | | | | | | | | | | | |
| 2Q 2012 | | | | | | | | | | | |
| 3Q 2012 | | | | | | | | | | | |
| 4Q 2012 | | | | | | | | | | | |
| 1Q 2013 | | | | | | | | | | | |
| 2Q 2013 | | | | | | | | | | | |
| 3Q 2013 | | | | | | | | | | | |
| Average | | | | | | | | | | | |

Note:
[A] Apple Overall Gross Margins are based on averages of gross margins of iPhone, iPod Touch, iPad, Mac and Apple TV weighted by revenue.

Source:
See Schedules 2A, 3A, 4A, 5A and 6A

CONFIDENTIAL - ATTORNEY'S EYES ONLY