[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

# EXHIBIT 2
# (REDACTED)

[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

- - -

| | |
|---|---|
| EMBLAZE LTD. | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No. |
| | : 5:11-cv-01079-PSG |
| APPLE, INC., a | : |
| California Corporation, | : |
| | : |
| Defendant. | : |

- - -

January 13, 2014

- - -

HIGHLY CONFIDENTIAL

Oral and videotaped deposition of CATHARINE M. LAWTON, taken pursuant to notice, was held at the law offices of Greenberg Traurig, 77 West Wacker Drive, Suite 3100, Chicago, Illinois, commencing at 9:35 a.m., on the above date, before Victoria C. Christiansen, a Professional Court Reporter in and for the State of Illinois.

- - -

MAGNA LEGAL SERVICES
1635 Market Street, 8th Floor
Philadelphia, Pennsylvania 19103
(866) 624-6221



```
 1                   APPEARANCES:
 2
         COZEN O'CONNOR
 3       BY: MS. LISA A. FERRARI, ESQUIRE
         277 Park Avenue
 4       New York, New York 10172
         212-297-2699
 5       lferrari@cozen.com
         Representing the Plaintiff
 6
 7       GREENBERG TRAURIG
         BY: MR. JAMES J. DeCARLO, ESQUIRE
 8       200 Park Avenue, P.O. Box 677
         Florham Park, New Jersey 07932
 9       973-360-7938
         decarloj@gtlaw.com
10
                  -and-
11
         GREENBERG TRAURIG
12       BY: MS. SARAH E. BARROWS (Via Telephone)
         4 Embarcadero Center
13       Suite 3000
         San Francisco, California 94111-5983
14       barrowss@gtlaw.com
         Representing the Defendant
15
                    - - -
16
17   ALSO PRESENT:
         MR. NAFTALI SHANI, Emblaze Ltd.
18
         MR. RYAN MORAN (Via Telephone)
19          IP Litigation Counsel, Apple, Inc.
20       MR. RICHARD LETTIERE, Ocean Tomo
21
22   VIDEOTAPED BY:  WELDON ANDERSON, Legal Videographer
                     MAGNA LEGAL SERVICES
23
24   REPORTED BY:  VICTORIA C. CHRISTIANSEN, RPR, CSR
                   Illinois CSR No. 84-3192
25
```



```
 1      A.    I did not, no.
 2      Q.    Did you review the hearing transcript?
 3      A.    I did, yes.
 4      Q.    And did you read the opinion of Judge
 5   Grewal in connection with those motions to compel?
 6      A.    I believe I did, yes.
 7      Q.    And after that motion, do you believe
 8   that Apple complied with the court's order?
 9      A.    I have no reason to believe that Apple
10   didn't comply.
11      Q.    So you continue both in your report and
12   today to indicate that there are difficulties with
13   Apple's production, so do you think Judge Grewal's
14   opinion was wrong?
15      A.    I'm not here to say his opinion's right
16   or wrong.  I'm here to tell you in 30 years of
17   practice in this field, I have never seen more
18   limited information produced.
19      Q.    And --
20      A.    Never, ever in 30 years has there been
21   an experience where a party like Apple has not
22   produced their internally prepared financial
23   documents for the products that are accused.  Never
24   in 30 years has that happened.
25            Partic- -- it's particularly striking in
```



```
 1        A.    All of the documents outlined in my
 2   Exhibit C, yes.
 3        Q.    And news reports covering Apple?
 4        A.    Absolutely.
 5        Q.    Did you have any conversations with --
 6        A.    Case studies, books, et cetera,
 7   et cetera.
 8        Q.    Did you have any conversations with any
 9   Emblaze personnel in connection with forming your
10   damages opinion?
11        A.    General conversations.  There were
12   extensive depositions that were taken of the party
13   personnel, and that's what I relied on.
14        Q.    So general conversations with whom at
15   Emblaze?
16        A.    Mr. Shani.
17        Q.    Do any of the conversations you had with
18   Mr. Shani form the basis of any of your opinions
19   reflected in your report?
20        A.    I don't believe so, no.
21        Q.    So how many hours have you spent on this
22   case?
23        A.    Um, through the preparation of my expert
24   report, in excess of 700.  Quite a number of
25   additional hours in connection with the additional
```



Case5:11-cv-01079-PSG   Document430-3   Filed05/20/14   Page6 of 15
[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Page 141

1  covered it at length.  If we want to go to that
2  section, we can certainly go to that section, but
3  certainly there comes a point where the burden of
4  apportionment shifts to the defendant in the event
5  that they make it impossible for the patentee to do
6  more than what was possible in view of the factual
7  record --
8      Q.    So you believe --
9      A.    -- and in this case for the first time
10 in 30 years, I'm saying we're there.
11     Q.    So it's your opinion that the burden of
12 proving apportionment shifts to Apple in this case?
13     A.    It's my opinion that to the extent that
14 the information that was made available --
15 available to me is supplemented by my extensive
16 review of additional publicly available
17 information, in an effort to provide the most
18 complete possible record to the court in this case
19 that I have done all that is professionally
20 possible in view of what was available under, quite
21 candidly, unusually difficult circumstances.
22     Q.    So you found everything that can be
23 found, in your opinion --
24     A.    Your -- your question --
25     Q.    -- based on your extensive review of



1   what Apple's response would be and would have been
2   that's the purview of a damages expert that, you
3   know, Mr. Malackowski doesn't address.
4   BY MR. DeCARLO:
5       Q.   So that's one of your criticisms of
6   Mr. Malackowski's report?
7       A.   That's among the criticisms, yes.
8       Q.   When I asked you previously about the
9   impact on unit sales for live streaming, we were
10  only talking about the live streaming.
11           Are you able to quantify the -- whether
12  or not there would have been a lesser negative
13  impact on unit sales if the accused devices could
14  do video on demand streaming and just not do live
15  streaming?
16      A.   Well, that's an interesting question
17  from the standpoint that the devices were cap- --
18  the iOS devices were capable of doing video on
19  demand prior to the launch, so that would be a --
20  you know, that would be a no change.
21           The incremental addition was the
22  capability to do live streaming, which was a
23  feature set that -- that Ap- -- that the iOS
24  devices didn't have prior to the launch of iOS.
25  They had the capability to -- to watch video.



Page 165

1   Certain videos, YouTube videos, they had that
2   capability in iOS 1.0 and 2.0, and so the
3   incremental addition is really with the I- --
4   the -- the addition of live streaming as being the
5   impetus for the development of HLS that was added.
6           So I'm not sure, you know, what your
7   question is suggesting.  If they, you know, somehow
8   were able to get more video on demand through --
9   through HLS in add- -- beyond what they were doing?
10  I'm just not sure where you're --
11      Q.   Well, you're -- you are aware, are you
12  not, that HLS can be used for video on demand and
13  for live streaming, correct?
14      MS. FERRARI:  Objection, asked and answered.
15  BY THE WITNESS:
16      A.   And I'll refer to my prior answers and
17  the extended discussion that we had on that.
18           Absolutely I'm aware that HLS is used
19  for both video on demand and live streaming and
20  that video on demand is not accused in this
21  litigation.
22  BY MR. DeCARLO:
23      Q.   No, I just want to make sure I
24  understand your -- your testimony, and that is that
25  a hundred percent of the increase in sales after



[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

Page 167

1   on demand side plus live streaming in connection
2   with your question, or are you asking something
3   else?  Because clearly the incremental change in
4   the feature set was to make available live
5   streaming, because there was the capability for --
6   for video on demand prior to the launch of iOS 3.0.
7        Q.    So on Page 496 of your opinion, you talk
8   about the concept of apportionment, and if I can
9   direct your attention to Paragraph 996, do you have
10  it?  Are you with me so far?
11       A.    Yes.
12       Q.    So right before the -- the block quote,
13  the penultimate sentence begins, "That is."
14             Do you see that?
15       A.    Yes.
16       Q.    So it says, "That is, apportionment is
17  generally required and the sales or uses must be
18  apportioned between the patented invention and the
19  remaining unpatented components."
20             So do you still consider that to be an
21  accurate statement?
22       A.    Absolutely.  It's the -- I don't
23  think --
24       Q.    But then on Page 500 of your report,
25  about three sentences up from the bottom is a



Page 173

1  available, this is the best that can be done.
2            And certainly I'm quite experienced in
3  this field and have done many, many very detailed
4  apportionment analyses that have -- have stood up
5  so far.
6       Q.   My actual --
7       A.   Let me just --
8       Q.   -- question was only whether or not the
9  ▬▬▬ was the highest data point in the range of
10 data points that you used in arriving at your $2
11 reasonable royalty.
12           Is that the highest data point, or is
13 there a point above ▬▬▬ in your report?
14      A.   That's the number that I've calculated
15 to provide some -- some anchor, something that
16 somebody can look at to say, "Well, you know, where
17 is it?  Is it from, you know, zero up to the total
18 gross margin or is it some, you know, intermediate
19 waylay point?"  And this is the presentation that
20 I've made based on the -- the data that's been made
21 available to me.
22           I'm not suggesting that this is -- the
23 ▬▬▬ somehow under some construction would be
24 viewed as the value attributable to HLS.  Nowhere
25 do I say that.  It's a calculation that I've made



```
1    in view of my opinion that at this point on this
2    record that the burden's on Apple if they think
3    that there's more and better apportionment analysis
4    that should have been done.
5         Q.    So is -- is the ▮▮▮▮ per-unit increase
6    in gross margin that you calculated in your report
7    reflective of the value of the '473 patent to the
8    Apple accused devices?  Is that your opinion?
9         A.    That's a permutation of your prior
10   question.
11              Let me be very clear about this.  It's
12   my opinion that the burden is on Apple to make any
13   further apportionment beyond these relatively low
14   royalty rates that are attendant in the -- the
15   license agreements that I've laid out.
16              Clearly in a circumstance like this,
17   given the vast, as I've said before, benefits that
18   Apple achieved in ab- -- being able to catapult
19   itself into the -- a leadership position with
20   video, enabling it to win the -- the battle with
21   Flash and all the other points that I raise in my
22   report in view of the circumstance at the time that
23   this analysis is a minimum analysis.
24              The ▮▮▮▮ is simply a data point to
25   say -- we're not going -- we're not suggesting that
```



1  under some construction that the analysis goes up
2  to 100 percent of the gross margin.  We're not
3  saying that this is the feature that drives demand.
4  Not anything close to that.  We're not saying
5  that -- that ███ is attributable to the '473,
6  that it's attributable to HLS or that it's
7  attributable to anything else.  We're saying this
8  is a data point that shows the economic gain that
9  Apple enjoyed in terms of increase in gross margin
10 after the launch of HLS.
11            That's all that data point is.  It says,
12 "What is a measure of their gain?"
13      Q.    So on Page 500 of your report, you
14 state --
15            (WHEREUPON, there was a telephone
16             interruption.)
17      MR. DeCARLO:  Well, that was unexpected, and I
18 apologize for that.  That's a new one for me.  In
19 all my years, that's never happened.  Sound
20 familiar?
21 BY MR. DeCARLO:
22      Q.    So I'm going to restate my question.
23 I'm going to start over.  Sorry for that
24 interruption.
25            So on Page 500 on your report, it says,



1   that Apple has achieved, it would be reasonable to
2   infer that a substantial portion would be, but I'm
3   not saying -- I'm not concluding that in this case.
4            The ▮▮▮ and $2 as my conclusion,
5   clearly $2 is not a substantial fraction of ▮▮▮.
6   Under no construction of "substantial" would one
7   conclude that $2 is substantial relative to ▮▮▮.
8       Q.   So in arriving at your ▮▮▮ increase
9   in excess gross margin, did you take into account
10  any other factors that might have contributed to
11  that increase other than live streaming?
12      A.   Again, you know, I don't know how I can
13  state this any more plainly.  I've described what
14  it is that I've done in great detail.  I've
15  described in great detail what the limitations are
16  in terms of the data that's been made available and
17  the fact that Apple has included the HLS feature in
18  addition to 9- -- at least 99 other features on a
19  preexisting product, and in that circumstance, when
20  there's that many things that Apple commingled with
21  the alleged infringement related to the '473 patent
22  that -- it's somebody's obligation to unscramble
23  the spaghetti, and I've spent a lot of time and
24  I've done a significant investigation in an effort
25  to identify and collect data that would be helpful



Page 335

```
 1   STATE OF ILLINOIS  )
 2                      ) SS:
 3   COUNTY OF DuPAGE   )
 4
 5              I, VICTORIA C. CHRISTIANSEN, a Certified
 6   Shorthand Reporter of the State of Illinois, do
 7   hereby certify:
 8              That previous to the commencement of the
 9   examination of the witness, the witness was duly
10   sworn to testify the whole truth concerning the
11   matters herein;
12              That the foregoing deposition transcript
13   was reported stenographically by me, was thereafter
14   reduced to typewriting under my personal direction
15   and constitutes a true record of the testimony
16   given and the proceedings had;
17              That the said deposition was taken
18   before me at the time and place specified;
19              That I am not a relative or employee or
20   attorney or counsel, nor a relative or employee of
21   such attorney or counsel for any of the parties
22   hereto, nor interested directly or indirectly in
23   the outcome of this action.
24              IN WITNESS WHEREOF, I do hereunto set my
25   hand at Chicago, Illinois, this 21st day of
```



```
 1    January, 2014.

 2

 3              VICTORIA C. CHRISTIANSEN,

 4              Certified Shorthand Reporter.

 5

 6

 7    C.S.R. Certificate No. 84-3192.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

