[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

# EXHIBIT 3
# (REDACTED)



# OCEAN TOMO
INTELLECTUAL CAPITAL EQUITY

# EMBLAZE LTD.
# V.
# APPLE INC.

Case No. 5:11-cv-01079-PSG

## EXPERT REBUTTAL REPORT OF JAMES E. MALACKOWSKI

December 20, 2013

| | | |
|---|---|---:|
| 1. | **FIRM BACKGROUND AND QUALIFICATIONS** | 4 |
| 2. | **ASSIGNMENT** | 5 |
| 3. | **SUMMARY OF OPINIONS** | 7 |
| 4. | **INDUSTRY BACKGROUND** | 7 |
| 4.1 | SMARTPHONES | 7 |
| 4.2 | TABLETS | 10 |
| 4.3 | DIGITAL MUSIC PLAYERS | 14 |
| 4.4 | MOBILE APPLICATIONS | 15 |
| 4.5 | PERSONAL COMPUTERS | 19 |
| 4.6 | IP STREAMING DEVICES | 20 |
| 5. | **TECHNOLOGY BACKGROUND** | 21 |
| 5.1 | VIDEO DELIVERY METHODS | 21 |
| 5.2 | LIVE STREAMING AND VOD | 24 |
| 5.3 | HLS PROTOCOL | 24 |
| 5.4 | CONTENT DELIVERY NETWORKS | 24 |
| 5.5 | VIDEO DELIVERY ECOSYSTEM | 25 |
| 6. | **RELEVANT PARTIES** | 26 |
| 6.1 | EMBLAZE LTD. | 26 |
| 6.2 | APPLE INC. | 29 |
| 7. | **EMBLAZE PATENT-AT-ISSUE** | 31 |
| 7.1 | ASSERTED CLAIMS OF THE '473 PATENT | 32 |
| 7.2 | ALLEGED BENEFITS OF THE '473 PATENT | 32 |
| 8. | **APPLE PRODUCTS-AT-ISSUE** | 33 |
| 8.1 | IPHONE | 33 |
| 8.2 | IPAD | 35 |
| 8.3 | IPOD TOUCH | 36 |
| 8.4 | MAC COMPUTERS | 38 |
| 8.5 | APPLE TV | 39 |
| 8.6 | SUMMARY OF ACCUSED DEVICE SALES | 40 |
| 8.7 | IOS AND MAC OS X SOFTWARE UPGRADES | 40 |
| 8.8 | REVENUE FROM APPS ACCUSED OF INFRINGING THE '473 PATENT | 43 |
| 9. | **EVENT TIMELINE** | 43 |
| 10. | **TEECE CRITIQUE** | 44 |
| 11. | **LAWTON CRITIQUE** | 45 |
| 11.1 | MS. LAWTON'S ACCUSATIONS AGAINST APPLE | 45 |
| 11.2 | MS. LAWTON'S ROYALTY BASE | 60 |
| 11.3 | MS. LAWTON'S ROYALTY RATE | 72 |
| 12. | **REASONABLE ROYALTY COMPENSATION** | 88 |
| 12.1 | DATE OF HYPOTHETICAL NEGOTIATION | 89 |
| 12.2 | PARTIES TO THE NEGOTIATION | 89 |
| 13. | **IDENTIFICATION OF ACCUSED PRODUCTS** | 89 |
| 14. | **EVALUATION OF ROYALTY** | 90 |

14.1 MARKET APPROACH ................................................................................................................. 90
14.2 EMBLAZE'S RELEVANT LICENSING HISTORY ........................................................................... 90
14.3 APPLE'S LICENSING HISTORY .................................................................................................. 93
14.4 REVIEW OF PUBLICLY AVAILABLE LICENSES ......................................................................... 100
14.5 MARKET APPROACH CONCLUSION ......................................................................................... 100
14.6 INCOME APPROACH ................................................................................................................ 100
14.7 COST APPROACH .................................................................................................................... 104
14.8 *GEORGIA-PACIFIC* FACTOR ANALYSIS .................................................................................... 107
14.9 FORM OF ROYALTY PAYMENT ................................................................................................ 114
14.10 REASONABLE ROYALTY COMPENSATION .............................................................................. 115

**15. PREJUDGEMENT INTEREST** ..................................................................................................115

**16. REASONABLENESS TESTING AND COUNTERVAILING FACTS** ....................................116

16.1 REASONABLNESS TESTS ......................................................................................................... 116
16.2 COUNTERVAILING FACTS ....................................................................................................... 116

**17. SIGNATURE** ................................................................................................................................117


INTELLECTUAL CAPITAL EQUITY

In the following years, various phones emerged that introduced new features which would eventually be ubiquitous in smartphones. In 1999, the Nokia 7110 was the first cell phone to incorporate Wireless Application Protocol ("WAP"), which gave mobile users web access, albeit a stripped down, mostly text version of the web.[6] In the same year, GeoSentric's Benefon Esc added GPS navigation capabilities to a cell phone.[7] The following year, Sharp began selling the first camera phone, called the J-SH04.[8]

From the early-1990s to the mid-2000s, smartphones became increasingly powerful multifunctional tools. PDAs like the Palm Pilot and Blackberry popularized the use of mobile data and the idea of combining data functionalities with phone capabilities.[9] Nevertheless, smartphones "were primarily used as enterprise devices and were prohibitively expensive for most consumers."[10]

### 4.1.2   Introduction of Apple's iPhone

In June 2007, Apple introduced the iPhone, priced at $499 for a 4GB base model.[11] The iPhone's design was sleek,[12] with the majority of the phone dedicated to a large touch screen, with just a single button on the front of the phone.[13] The entirely new user interface was based on Apple's multi-touch display[14] that allowed customers to use their fingers to manipulate inputs instead of a stylus, like previous touch screen phones.[15] The multi-touch interface enabled gesture-based commands, allowing users to "flick" through lists of names, photos, or screens, as well as "pinch" to zoom in or out.[16] The iPhone's accelerometer added to the gesture-based interface. The accelerometer rotated the display when the phone was turned sideways, allowed games to sense the movement of the user, and made it possible to shuffle through songs with a quick shake of the device.[17]

Prior to the introduction of the iPhone, new smartphones generally provided one or two novel features. The 2007 release of the iPhone introduced a myriad of innovative features. As *ComputerWorld* magazine commented, "it's not one feature, but the aggregate of many features that has attracted people, and Apple has spent a lot of time marketing each one of the innovations separately."[18] By completely changing the design and interface of the smartphone, Apple transformed how consumers viewed the smartphone. Prior to the

---

[3] http://www.networkworld.com/slideshows/2010/061510-smartphone-history.html#slide2.
[4] http://press.nokia.com/1996/09/19/nokia-unveils-world%C2%92s-first-all-in-one-communicator-for-the-americas/.
[5] http://smartphones.wonderhowto.com/inspiration/from-backpack-transceiver-smartphone-visual-history-mobile-phone-0127134/.
[6] http://smartphones.wonderhowto.com/inspiration/from-backpack-transceiver-smartphone-visual-history-mobile-phone-0127134/.
[7] http://smartphones.wonderhowto.com/inspiration/from-backpack-transceiver-smartphone-visual-history-mobile-phone-0127134/.
[8] http://smartphones.wonderhowto.com/inspiration/from-backpack-transceiver-smartphone-visual-history-mobile-phone-0127134/.
[9] http://www.networkworld.com/slideshows/2010/061510-smartphone-history.html#slide3.
[10] http://www.networkworld.com/slideshows/2010/061510-smartphone-history.html#slide1.
[11] http://www.apple.com/pr/library/2007/06/26AT-T-and-Apple-Announce-Simple-Affordable-Service-Plans-for-iPhone.html.
[12] http://www.howstuffworks.com/iphone.htm.
[13] http://electronics.howstuffworks.com/iphone4.htm.
[14] http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html.
[15] http://www.businessinsider.com/10-ways-the-iphone-changed-smartphones-forever-2009-6?op=1.
[16] http://www.businessinsider.com/10-ways-the-iphone-changed-smartphones-forever-2009-6?op=1.
[17] http://www.businessinsider.com/10-ways-the-iphone-changed-smartphones-forever-2009-6?op=1.
[18] http://www.computerworld.com/s/article/318051/iPhone_One_Year_Later

**Figure 9: Types of Apps Downloaded on Tablets or Smartphones**[124]



Currently there are over 960,000 apps available in the U.S. App Store.[125] At most, only about 3,300 apps[126] (0.3%) were even *capable* of live streaming as of June 2013.[127] As discussed later in this report, Emblaze has only accused five apps of infringing the '473 Patent.[128]

## 4.5 Personal Computers



In the 1970s, the personal computer was mainly used by hobbyists or electronic buffs.[129] Steve Jobs, Apple's co-founder, was part of this movement and had the idea to integrate a keyboard, screen, and computer into one single package.[130] Mr. Jobs and Apple co-founder Steve Wozniak developed Apple's first personal computer, the Apple I.[131] In 1984, a major computing breakthrough came when Apple released the original Macintosh, which was the first affordable computer to offer a graphical user interface.[132] At $2,495, the Macintosh also featured a

---

[124] APPLE272834-978 at 908.
[125] Conversation with Apple's Daniel Quinn.
[126] APPLE273643 (only apps from 2013 were counted).
[127] As discussed in more detail in in Apple's Supplemental Response to Emblaze's Fifth Set of Interrogatories, Interrogatory 12, Apple does not track whether applications in the App Store stream content that is live (or VOD). Apple conducted various searches in an effort to obtain a list of apps that *may* stream live content and Apple's designated 30(b)(6) witness C.K. Haun described in more detail how one could attempt to confirm whether any particular App does in fact use HLS to stream live content. Apple's Supplemental Response to Emblaze's Fifth Set of Interrogatories, p. 11; Deposition of C.K. Haun, August 21, 2013, pp. 76-77 and 78-81.; *see also* APPLE273643.
[128] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, pp. 44-90, 102, 112, and 116.
[129] http://www.history.com/topics/invention-of-the-pc.
[130] Walter Isaacson, *Steve Jobs*, Simon & Schuster, 2011, p. 60.
[131] Walter Isaacson, *Steve Jobs*, Simon & Schuster, 2011, p. 60.
[132] http://www.time.com/time/specials/packages/article/0,28804,1873486_1873491_1873480,00.html.



- Emblaze moved to compel a "Rule 30(b)(6) witness and documents concerning Apple's internal financial reports to management concerning U.S. and worldwide sales, costs, and forecasts" and a "Rule 30(b)(6) witness and documents concerning Apple's marketing of HLS and the accused products."[514]

- In its Motion to Compel and Reply in support of that motion, Emblaze called for a witness and documents responsive to Request No. 59 ("Documents sufficient to identify the advantages of Apple's organization structure, including, but not limited to, tax advantages and limitation of liability advantages for the period 2005 to present"); No. 133 ("Documents sufficient to identify any revenue that Apple received on an annual basis, from the…transfer…of each model of Accused Product"); and No. 159 ("Apple's chart of accounts for the period 2000 to present").[515]

- Emblaze also moved to compel documents and testimony on Emblaze's 30(b)(6) topic No. 49 (testimony on "[s]trategic plans, business plans, or marketing plans for Accused Products and HLS Apps"). In its Motion to Compel, Emblaze complained that Apple's designated 30(b)(6) witness, Travis Brown, "could not answer basic questions such as whether the marketing department issued internal reports to management . . . . [had not] spoken to Greg Joswiak, the head of the iOS product marketing team, and did not know whether Mr. Joswiak had produced any documents in the litigation."[516]

- During the October 22, 2013 hearing on Emblaze's Motion to Compel, counsel for Emblaze agreed that Apple does not have consumer surveys about HLS or live streaming and identified numerous statements from Mr. Brown's 30(b)(6) deposition where he referenced meeting with engineers, marketing and finance about HLS.[517] Counsel for Emblaze then asked the Court, "Where is this stuff? Is none of this stuff written down? It's all just discussions and theoretical stuff."[518] Judge Grewal responded, "So as to the remedy you are seeking here on this motion, I take it you want the documents, you want further deposition testimony."[519] In granting in part Emblaze's Motion to Compel, Judge Grewal denied Emblaze's requests for the further production of any documents.[520]

Tellingly, Ms. Lawton did address the *actual* issue that she faced in attempting to use the Income Approach to perform an apportionment analysis: "…Apple introduced HLS as part of iOS 3.0, which included more than 100 new features."[521] Only one of the "more than 100 features" was live streaming. HLS *itself* was not just live streaming. As noted, the overwhelming majority of video streams are VOD (as Ms. Lawton noted, "CDNs routinely state that 95% of what they deliver is on-demand content.").[522] Further, Ms. Lawton had all of the data the she needed to perform any one of the Income Approach methods she describes in her report (see below discussion). Even so, Ms. Lawton would still have been faced with one fundamental challenge:

---

[514] Order Granting-In-Part Emblaze's Motion to Compel, October 22, 2013, p. 2.
[515] Plaintiff Emblaze's Motion to Compel, September 11, 2013, pp. 10-11.
[516] Plaintiff Emblaze's Motion to Compel, September 11, 2013, p. 15.
[517] Hearing Transcript of Emblaze Motion to Compel and Apple Motion for Protective Order Proceedings, October 22, 2013, pp. 19-20.
[518] Hearing Transcript of Emblaze Motion to Compel and Apple Motion for Protective Order Proceedings, October 22, 2013, pp. 20-21.
[519] Hearing Transcript of Emblaze Motion to Compel and Apple Motion for Protective Order Proceedings, October 22, 2013, p. 21.
[520] Order Granting-In-Part Emblaze's Motion to Compel, October 22, 2013, p. 2; Judge Grewal ordered Apple to produce a 30(b)(6) witness on financial documents that Apple produced within 48 hours of Mark Buckley's August 20, 2013 deposition. Apple did so.
[521] Expert Report of Catharine M. Lawton, November 9, 2013, p. 465.
[522] Expert Report of Catharine M. Lawton, November 9, 2013, p. 251.



INTELLECTUAL CAPITAL EQUITY

### 11.2.2 Apportionment

Therefore, having determined that it is not, under EMVR, appropriate to determine a royalty based on a percentage of Apple's entire sales and/or profits of the accused devices, one must evaluate the second issue identified by Ms. Lawton, apportionment.

#### *11.2.2.1 Apple's SSPPU*

Emblaze's infringement expert has asserted that the following Apps and streamed events infringe the '473 Patent when used with the accused Apple devices:

- MLB.com AT BAT[568]
- NFL Preseason Live[569]
- CBS's Live Streaming of PGA Events[570]
- ABC's live streaming of news[571]
- WatchESPN App[572]
- Apple's iTunes Festival London 2013[573]
- Apple's Live Streamed Keynote Presentations[574]

Neither Mr. Madisetti nor Ms. Lawton accuses any streaming activity via a website. The royalty base in this case should be based on the smallest saleable patent practicing unit ("SSPPU"). Ms. Lawton's royalty base includes Apple devices and Apple App revenues. Therefore, Ms. Lawton has apparerently concluded that the Apple devices are the SSPPU, and applies a $2 per unit royalty to each device.

A recent ruling in *Network Protection Sciences LLC v Fortinent, Inc.,*[575] striking the expert report and excluding the testimony of the plaintiff's damages expert, noted

> …[plaintiff] has not shown (and a jury could not reasonably find on this record] that the **patented components drive demand for any accused products**. *Using the accused products as a royalty base therefore raises the same specter of error and jury prejudice as in LaserDynamics and runs afoul of the entire market rule."*

Similarly, in *Dynetix Design Solutions, Inc. v Synopsys, Inc.,*[576] the court noted

> *In Cornell, Chief Judge Rader required the patentee to utilize the 'smallest salable unit approach' to apportion the royalty base…Chief Judge Rader held that the smallest salable unit must be the starting point for the royalty base.*

---

check, the award was supported in part by the faulty foundation of the entire market value…Thus, the fact that the entire market value was brought in as only a "check" is of no moment."
[568] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, pp. 44-90.
[569] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, p. 90.
[570] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, p. 102.
[571] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, p. 112.
[572] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, p. 116.
[573] Expert Report on Infringement, Vijay Madisetti, November 8, 2013, p. 96.
[574] October 22, 2013 is specifically identified/described; see Expert Report on Infringement, Vijay Madisetti, November 8, 2013, p. 106.
[575] *Network Protection Sciences, LLC v Fortinet, Inc.*, Case 3:12-cv-01106-WHA.
[576] *Dynetix Design Solutions, Inc. v Synopsys, Inc.,* Case No. C 11-05973 PSG. Emphasis added.


lump sum payment structure. Further, the only payments that Emblaze received on the Samsung licenses were fixed fee payments (discussed below), not running royalties.[803] Therefore, contrary to Ms. Lawton's statement that Emblaze's licenses indicate a per unit royalty rate would have been the structure of the agreement reached at the hypothetical negotiation, Emblaze's agreements (with Wind Italy and Samsung) support a one-time, fixed fee payment for a license to the '473 Patent at the hypothetical negotiation.

### 11.3.3   Public Licenses to Standards

Ms. Lawton asserts that because Apple submitted HLS as a standard, she focused her investigation on licenses involving standards in the digital media industry.[804] However, as discussed previously, HLS was not submitted as a standard.

Ms. Lawton considers three publicly available standards licenses in her Schedule 17A: MP3, MPEG-4 Visual, and AVC/H.264. None of the information included about these standards licenses on Ms. Lawton's Schedule 17A was gathered from actual license agreements, even though Apple produced its license agreements for each of these standards. Instead of reviewing actual agreements, Ms. Lawton relied on various websites as her source of the alleged royalty rates associated with these standards licenses. I understand that the technology involved in all three licenses is incorporated into HLS.[805] Accordingly, an accurate analysis of these agreements is particularly relevant in analyzing a reasonable royalty in this matter.

MP3: Ms. Lawton lists a royalty of 75 cents to $1.25 per unit,[806] obtained from Technicolor's website.[807] As Ms. Lawton notes in her report, Technicolor serves as the licensing representative of the Fraunhofer Institute.[808] Prior to Technicolor, Thomson served as the licensing representative for Fraunhofer's MP3 patents.[809] ■■■ Accordingly, this industry standards license *does not support* a hypothetical license containing a per unit royalty. Further, ■■■

MPEG-4 Visual: Ms. Lawton lists a royalty of 25 cents per unit for MPEG-4 Visual. As previously discussed, ■■■ As noted on the first page of the public document that Ms. Lawton referenced, "Actual license agreements **will provide the only definitive and reliable statement of license terms.**"[812] Further, this document also includes references to royalty caps. For instance, the document states that the license includes "caps to provide cost predictability,"[813] and that the annual cap for MPEG-4 visual encoders or decoders is $1 million to $1.25 million per year ($2 million to $2.5 million for both encoders and decoders).[814] Other than a footnote on her

---

[803] Deposition of Naftali Shani, August 1, 2013, pp. 161-162.
[804] Expert Report of Catharine M. Lawton, November 9, 2013, p.453.
[805] Expert Report of Nathaniel Polish, Ph.D., December 20, 2013.
[806] Expert Report of Catharine M. Lawton, November 9, 2013, Schedule 17A.
[807] Expert Report of Catharine M. Lawton, November 9, 2013, Schedule 17A at Footnote 3.
[808] Expert Report of Catharine M. Lawton, November 9, 2013, p. 460.
[809] Expert Report of Catharine M. Lawton, November 9, 2013, p. 459 and APPLE002599-624 at 604-605.
[810] APPLE002933-966 at 941. Prior to the 2005 agreement, Apple paid 25 cents per unit for Macs, iPods, and iTunes. *See* Section 11.3.1.9.
[811] Exhibit 5.1
[812] BRG000011-021 at 011. Emphasis added.
[813] BRG000011-021 at 012.
[814] BRG000011-021 at 018.



Schedule 17A, Ms. Lawton appears to completely ignore the royalty cap provision contained in this agreement. As with the MP3 standards license, this industry standards license *does not support* a hypothetical license containing a per unit royalty. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

AVC/H.264 Based on her internet research,[816] Ms. Lawton presents a royalty rate ranging from 10 cents to 20 cents per unit for H.264.[817] Similar to the MPEG-4 Visual agreement, the AVC/H.264 public document that Ms. Lawton references includes annual caps.[818] As discussed above, ██████████████████████████████████████████████████████. Other than a footnote on her Schedule 17A, ██████████████████████████████████████████████████████████████████ As with the other standards licenses, the AVC/H.264 license *does not support* Ms. Lawton's uncapped per unit royalty opinion. Further, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

### 11.3.4 Public Apple Litigation

Ms. Lawton's conclusion regarding Georgia-Pacific Factor 2 is:

> "…*I have considered the available [Apple] licenses as summarized on Schedule 17A…[which] suggests minimum royalty rates in the very general range of $0.10 to $3.10 per unit.*"[820]

This statement is incorrect and misleading. The $3.10 per unit amount was not from an Apple license. That amount is, as she noted elsewhere in her report, the royalty rate determined by Apple's damages expert in "connection with three patents [Apple] asserted with Samsung."[821] Therefore, contrary to her *Georgia-Pacific* factor 2 conclusion (which she ultimately parrots in her overall "Conclusion Regarding 'The *Georgia-Pacific* Range* Factors'"[822]), there is no Apple license agreement which "suggests" a $3.10 per unit royalty for the '473 Patent.

Additionally, it is not appropriate for a damages expert to use the opinion of another damages expert from an unrelated patent case to arrive at a royalty rate simply because both cases involved the same party. Ms. Lawton provides no discussion or analysis regarding the patents that Apple asserted in that case and their importance to the accused Samsung devices. She similarly does not discuss the fact that Apple and Samsung are (as she repeatedly noted) primary competitors, whereas Emblaze and Apple clearly are not. She simply has no basis for concluding that the $3.10 per unit opinion rendered in that case is in any way relevant to a royalty opinion in this matter. Ms. Lawton's $2 per unit opinion, though, appears inexorably tied to both her ████ faulty Income Approach analysis and the misclassified $3.10 Apple damages opinion in the Samsung case. Therefore, in the absence of these two upper bound royalty indicators, Ms. Lawton's $2 per unit royalty rate opinion must be significantly lowered.

---

[815] Exhibit 5.0
[816] Expert Report of Catharine M. Lawton, November 9, 2013, Schedule 17A at footnote 5.
[817] Expert Report of Catharine M. Lawton, November 9, 2013, Schedule 17A.
[818] BRG000007-010 at 008.
[819] Exhibit 5.4
[820] Expert Report of Catharine M. Lawton, November 9, 2013, p. 511.
[821] Expert Report of Catharine M. Lawton, November 9, 2013, pp. 415-416.
[822] Expert Report of Catharine M. Lawton, November 9, 2013, p. 524. Underline in text.



### 14.8.8 Factor #8: The established profitability of the product made under the patent; its commercial success; and its current popularity.

Apple's iPhones have been tremendously successful since their (pre-live streaming) launch in 2007. Indeed, the price premium and much stronger sales garnered by the non-live-streaming iPhone 3G compared to the live-streaming Samsung Instinct indicates that the popularity and success of the iPhone cannot be attributed to live streaming capability.

The accused Apple devices have varying levels of profitability, but have all been commercially successful. There is no indication that the '473 Patent contributed to either sales or profits of the accused devices. I note that in Ms. Lawton's assessment of this factor, she attempts to utilize her faulty Income Approach analysis (discussed earlier) to support her apparent opinion that the '473 Patent enabled Apple to expand its profit margins on the accused devices.[1035] She is incorrect. There is no evidence, including Ms. Lawton's faulty analysis, that supports any theory about Apple's ability to enhance its margin on the accused products as a result of HLS streaming of live content on the devices.

Based on the above, this factor favors the licensee.

*Impact on Hypothetical Negotiation: Favors Licensee*

### 14.8.9 Factor #9: The utility and advantages of the patent property over old modes or devices, if any, that had been used for working out similar results.

### 14.8.10 Factor #10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

Factors 9 and 10 are frequently analyzed together due to their similarity and inherent overlap. As previously discussed, according to Apple's expert, Dr. Polish, the '968 Patent describes live streaming via HTTP, and its May 1996 filing was almost two years before the March 1998 Israeli filing of Emblaze's '473 Patent.[1036] Dr. Polish wrote that practicing the '968 Patent to stream live content is a non-infringing alternative to Emblaze's '473 Patent because the '968 Patent Fig. 1 embodiment segments the stream and forms it into files after the stream is uploaded to the server, while the asserted claims of the '473 Patent require that the data stream be segmented and formed into files before being uploaded to the server.[1037] According to Dr. Polish, it is technically feasible to divide a stream into the segments to be served to client devices over HTTP at the transmitting computer (as the '473 Patent discloses) or at the server.[1038] Additionally, Dr. Polish stated that dividing the stream at the server is similar in some ways to the process utilized by Akamai's Universal Streaming Live solution.[1039]

Tellingly, Emblaze, despite numerous attempts to introduce a successful mobile phone, never included the '473 patented technology in one of its phones. There is no evidence that Wind Italy, which utilized an Emblaze system that enabled it to provide live streaming to its subscribers, ever realized increased sales, profits, or customers due to the technology.

*Impact on Hypothetical Negotiation: Neutral*

---

[1035] Expert Report of Catharine M. Lawton, November 9, 2013, p. 518.
[1036] Expert Report of Nathaniel Polish, Ph.D., December 20, 2013.
[1037] Expert Report of Nathaniel Polish, Ph.D., December 20, 2013.
[1038] Expert Report of Nathaniel Polish, Ph.D., December 20, 2013.
[1039] Expert Report of Nathaniel Polish, Ph.D., December 20, 2013.



## 17. SIGNATURE

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_____                             December 20, 2013

James E. Malackowski                                              Date



OCEAN TOMO
INTELLECTUAL CAPITAL EQUITY

200 West Madison, 37th Floor

Chicago, Illinois  60606

(312) 327-4400 Ph

(312) 327-4401 Fx

www.oceantomo.com

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

*Emblaze Ltd. v. Apple Inc.*
**HLS LIVE STREAMING-CAPABLE APP REVENUE**
Exhibit 4.0

|  | 2009 | 2010 | 2011 | 2012 | Jan. - Jun. 2013 | Total |
|---|---|---|---|---|---|---|
| [1] App Proceeds | | | | | | |
| [1] In-App Purchase Proceeds | | | | | | |
| [2] iAd Revenue | | | | | | |
| [3] Bounty | | | | | | |
| **HLS Live Streaming-Capable App Revenue** | | | | | | |



**Notes:**
[1] APPLE273643; Listed under "App Proceeds" and "IAP Proceeds."
[2] Exhibit 4.5; Data in 2011 represents months July to December only.
[3] Exhibit 4.4.

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

*Emblaze Ltd. v. Apple Inc.*
**APPLE REVENUE FROM ACCUSED APPS [1]**
Exhibit 4.1



|  | 2009 | 2010 | 2011 | 2012 | Jan. - Jun. 2013 | Total |
|---|---|---|---|---|---|---|
| [2] MLB.com At Bat | | | | | | |
| NFL Preseason Live | | | | | | |
| PGA | | | | | | |
| ABC | | | | | | |
| WatchESPN | | | | | | |
| **Total Apple Revenue from Accused Apps** | | | | | | |

**Notes:**
[1] Exhibit 4.2 and Exhibit 4.3.
[2] Includes revenue from Apple TV bounty. *See* Exhibit 4.4.
[3] There is no corresponding iAd revenue for accused apps.

CONFIDENTIAL - ATTORNEYS' EYES ONLY