# EXHIBIT F

MARTIN L. FINEMAN (CA State Bar No. 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6575
Facsimile: (415) 276-6599
martinfineman@dwt.com

MARTIN B. PAVANE (admitted *pro hac vice*)
LISA A. FERRARI (admitted *pro hac vice*)
MARILYN NEIMAN (admitted *pro hac vice*)
COZEN O'CONNOR
277 Park Avenue
New York, NY 10172
Telephone: (212) 883-4900
Facsimile: (212) 986-0604
Email: mpavane@cozen.com
　　　　lferrari@cozen.com
　　　　mneiman@cozen.com

*Attorneys for Plaintiff Emblaze Ltd.*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., <br><br> Plaintiff(s), <br><br> v. <br><br> APPLE INC., a California Corporation, <br><br> Defendant(s). | CASE NO. 5:11-cv-01079-PSG |

**NOTICE OF DEPOSITION PURSUANT TO RULE 30(b)(6) OF DEFENDANT APPLE INC.**

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiff Emblaze Ltd. ("Emblaze"), by its attorneys, shall take the deposition, upon oral examination before a court reporter, of Apple Inc. ("Apple"), on August 7, 2013, commencing at 9:30 AM and continuing from day to day until completed.

The deposition will be held at the offices of Cozen O'Connor, 277 Park Avenue, New York, NY 10172, or at such other location that may be mutually agreed upon, and will be taken by a notary public or other person duly authorized to administer oaths, and may be recorded by any means

permitted under the Federal Rules of Civil Procedure, including videotaping and/or stenographic recording.

    The deponent is hereby advised of its duty to designate an individual or individuals to testify on its behalf as to the matters of examination listed below in Exhibit A. No later than ten (10) business days prior to the agreed date of the deposition, Apple is requested to provide Emblaze with written notice of the name and position of employment of each designee testifying on behalf of Apple and the topics as to which each such designee will testify. Also no later than ten (10) business days prior to the agreed date of the deposition, Apple is requested to produce any and all documents in the possession, custody, or control of Apple or any of its designee(s) relating to each topic to the extent all such documents have not been previously produced.

    You are invited to attend and cross-examine.

DATED: June 28, 2013

COZEN O'CONNOR

By: _/s/ M. Neiman_

Martin B. Pavane
Lisa A. Ferrari
Marilyn Neiman
277 Park Avenue
New York, NY 10172
Telephone: (212) 883-4900
Facsimile: (212) 986-0604
MARTIN L. FINEMAN (CA State Bar No. 104413)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6575
Facsimile: (415) 276-6599
*Attorneys for Plaintiff Emblaze Ltd.*

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.    CASE NO. 5:11-CV-01079-PSG

# EXHIBIT A

## DEFINITIONS

1. The "'473 Patent" means U.S. Patent No. 6,389,473.

2. "Accused Product(s)" means any device, software, or application which offers, provides or facilitates any form of media streaming in compliance with HLS, including, but not limited to, Apple Products.

3. "All" and "each" -- the terms "all" and "each" shall be construed as all and each.

4. "And" as well as "or" -- shall be construed either in the disjunctive or the conjunctive sense as necessary to bring within the scope of the discovery request in question all responses that might otherwise be construed to be outside of the scope of that request.

5. "Apple Product(s)" shall mean any MacBook Air, MacBook, MacBook Pro, Mac mini, iMac, Mac Pro, iPod Touch, iPad, iPad Mini, iPhone or Apple TV which includes an operating system that accommodates live streaming with HLS.

6. "CDN(s)" shall mean any Person that employs or provides a content distribution network for distributing audio and/or video over the internet using HLS, including, but not limited to, Akamai Technologies, Inc.; Level 3 Communications, LLC; and Limelight Networks, Inc.

7. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) regardless of physical embodiment.

8. "Concerning" means relating to, referring to, describing, evidencing or constituting.

9. "Content Provider(s)" shall mean any Person who sells, offers for sale, develops or distributes HLS Apps on Apple Products, including, but not limited to, ABC Television Network, CNN, Disney, ESPN, FOX, MLB, NBA, NBC, NFL and NHL.

10. "Defendant," "Apple," "you," "your" and "yourself" shall mean Defendant Apple Inc. its parent corporations, subsidiaries, affiliates, divisions, predecessors and successors in interest.

11. "Document" is synonymous in meaning and equal in scope to the usage of this term in Rule 34(a), FED. R. CIV. P., including, but not limited to, magnetic or electronically or optically recorded information or images and computerized data base compilations. A draft or non-identical copy is a separate document within the meaning of this term.

12. "HLS" shall mean Apple's HTTP-based media streaming communications protocol referred to as "HTTP Live Streaming."

13. "HLS App(s)" shall mean application software for use on Apple Products which implements live streaming with HLS.

14. "HLS Software Developer(s)" shall mean any Person who develops or offers software (or hardware containing such software) which may be used for implementing HLS, including, but not limited to, Cisco Systems, Inc.; Inlet Technologies, LLC; Envivio Inc.; Harmonic Inc.; Elemental Technologies, Inc.; and Haivision Systems, Inc. (formerly known as Kulabyte).

15. "HLS Standard" shall mean the written protocol concerning HLS submitted initially by Roger Pantos to the IETF on or about May 1, 2009."

16. "IETF" shall mean Internet Engineering Task Force.

17. "Live Streaming" or "Live Streamed" means audio and/or video streaming of a live event over the internet, e.g. streaming of a live baseball game.

18. The "Litigation" shall mean the above-captioned matter, *Emblaze Ltd. v. Apple Inc.*

19. "Person" shall mean a natural person, partnership, firm, corporation, association, organization, governmental agency or department or other entity of any kind.

20. "Plaintiff" or "Emblaze" shall mean Plaintiff Emblaze Ltd., and its predecessors.

21. "Prior art" -- means, by way of example and without limitation, the subject matter described in each and every subdivision of 35 U.S.C. §§ 102 and 103.

22. "Thing" -- means any tangible object other than a document

## TOPIC AREAS FOR EXAMINATION

Pursuant to Rule 30(b)(6), the following topic areas are specified for examination:

1. Facts and documents supporting Apple's assertion that it has not infringed any claim of the '473 Patent, either directly or indirectly.

2. Facts and documents supporting Apple's assertion that each of the claims of the '473 Patent is invalid, unenforceable, and/or void for failing to comply with one or more requirements for patentability under the patent laws of the United States.

3. Facts and documents supporting Apple's assertion that Emblaze's claims are barred, in whole or in part, by the doctrine of laches, waiver and/or estoppel.

4. Facts and documents supporting Apple's assertion that Emblaze failed to comply with the notice provisions of 35 U.S.C. § 287.

5. Facts and documents supporting Apple's assertion that Emblaze is barred from recovering costs in connection with this action under 35 U.S.C. § 288.

6. Facts and documents supporting Apple's assertion that Emblaze's claims are barred, in whole or in part, by the doctrine of unclean hands.

7. Facts and documents supporting Apple's assertion that Emblaze fails to state a claim against Apple upon which relief may be granted.

8. Facts and documents supporting Apple's assertion that Apple has not engaged in any conduct that meets the applicable standard for willful infringement.

9. Facts and documents supporting Apple's assertion that this is an exceptional case under 35 U.S.C. § 285.

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.                          CASE NO. 5:11-CV-01079-PSG

10. Facts and documents supporting the denials by Apple in its current Answer filed in this Litigation.

11. Facts and documents supporting Apple's responses to each Interrogatory served by Emblaze.

12. Apple's conception, development and implementation of HLS and the HLS Standard.

13. Submissions to and communications with the IETF or any other standards body concerning HLS or the HLS Standard.

14. The identity and responsibilities of Apple personnel involved in the conception, development, implementation, use, marketing, and promotion of HLS.

15. Testing, analysis, or evaluation of Live Streaming using HLS.

16. Methods other than HLS used for Live Streaming.

17. Identification of patents owned by Apple with claims covering any aspect of HLS.

18. The earliest date that (i) Apple became aware of the '473 Patent, and (ii) Apple was accused of infringing the '473 Patent by Emblaze.

19. How Apple implements HLS, namely, (i) the manner in which data streams are encoded and segmented and uploaded to a server, including whether or not data streams are encoded at a constant bit rate, and any software or hardware used for encoding and/or segmenting; (ii) the format of the data streams, e.g., MPEG-2, MPEG-4; (iii) whether data streams are encoded as files, and if so, the composition and content of such files; (iv) whether the encoded data streams include a separate index file or playlist with URLs or other identifiers for the encoded files; (v) whether data streams are encoded in more than one quality level, and if so, the difference(s) between such quality levels, including whether the different quality levels have different bit rates; (vi) the manner in which end users download encoded data streams for play back, including the operating systems and

other software required to play back the data stream; and (vii) whether and how data streams at different quality levels can be played back by end users.

20. How Content Providers implement HLS, namely (i) the manner in which data streams are encoded and segmented and uploaded to a server, including whether or not data streams are encoded at a constant bit rate, and any software or hardware used for encoding and/or segmenting; (ii) the format of the data streams, e.g., MPEG-2, MPEG-4; (iii) whether data streams are encoded as files, and if so, the composition and content of such files; (iv) whether the encoded data streams include a separate index file or playlist with URLs or other identifiers for the encoded files; (v) whether data streams are encoded in more than one quality level, and if so, the difference(s) between such quality levels, including whether the different quality levels have different bit rates; (vi) the manner in which end users download encoded data streams for play back, including the operating systems and other software required to play back the data stream; and (vii) whether and how data streams at different quality levels can be played back by end users.

21. How HLS Apps implement HLS, namely (i) the manner in which data streams are encoded and segmented and uploaded to a server, including whether or not data streams are encoded at a constant bit rate, and any software or hardware used for encoding and/or segmenting; (ii) the format of the data streams, e.g., MPEG-2, MPEG-4; (iii) whether data streams are encoded as files, and if so, the composition and content of such files; (iv) whether the encoded data streams include a separate index file or playlist with URLs or other identifiers for the encoded files; (v) whether data streams are encoded in more than one quality level, and if so, the difference(s) between such quality levels, including whether the different quality levels have different bit rates; (vi) the manner in which end users download encoded data streams for play back, including the operating systems and other software required to play back the data stream; and (vii) whether and how data streams at different quality levels can be played back by end users.

22.     How HLS Software Developers implement HLS, namely (i) the manner in which data streams are encoded and segmented and uploaded to a server, including whether or not data streams are encoded at a constant bit rate, and any software or hardware used for encoding and/or segmenting; (ii) the format of the data streams, e.g., MPEG-2, MPEG-4; (iii) whether data streams are encoded as files, and if so, the composition and content of such files; (iv) whether the encoded data streams include a separate index file or playlist with URLs or other identifiers for the encoded files; (v) whether data streams are encoded in more than one quality level, and if so, the difference(s) between such quality levels, including whether the different quality levels have different bit rates; (vi) the manner in which end users download encoded data streams for play back, including the operating systems and other software required to play back the data stream; and (vii) whether and how data streams at different quality levels can be played back by end users.

23.     The use by Apple of HLS, including, but not limited to, for the Worldwide Developer Conference (WWDC), Apple's keynote speeches, and the Steve Jobs memorial service, namely (i) the manner in which data streams are encoded and segmented and uploaded to a server, including whether or not data streams are encoded at a constant bit rate, and any software or hardware used for encoding and/or segmenting; (ii) the format of the data streams, e.g., MPEG-2, MPEG-4; (iii) whether data streams are encoded as files, and if so, the composition and content of such files; (iv) whether the encoded data streams include a separate index file or playlist with URLs or other identifiers for the encoded files; (v) whether data streams are encoded in more than one quality level, and if so, the difference(s) between such quality levels, including whether the different quality levels have different bit rates; (vi) the manner in which end users download encoded data streams for play back, including the operating systems and other software required to play back the data stream; and (vii) whether and how data streams at different quality levels can be played back by end users.

24.     The identity of all Content Providers known to Apple.

25. The identity of all HLS Software Developers known to Apple.

26. The identity of all CDNs known to Apple.

27. Audio and/or video events Live Streamed by Content Providers, HLS Software Developers or CDNs using HLS.

28. Apple's guidelines, recommendations and requirements for submission, approval or use of HLS Apps, including documents concerning same.

29. Best practices suggested to Content Providers for creating and deploying HLS Apps.

30. Any guidelines, recommendations, or requirements to Content Providers, HLS Software Developers, CDNs, and Persons developing HLS Apps concerning use or implementation of HLS.

31. How Apple supports and interacts with Content Providers, HLS Software Developers, CDNs, and Persons developing HLS Apps concerning the implementation and use of HLS, namely, the manner in which Apple provides logistical and technical support, whether or not Apple provides sample files and/or software, and any agreements or guidelines concerning the foregoing.

32. All HLS Apps approved by Apple, and Apple's role, if any, in the design, development or marketing thereof.

33. Apple's knowledge of Emblaze and/or Emblaze's Live Streaming technology.

34. Apple's communications with Emblaze.

35. Communications between Apple and any Person concerning the '473 Patent.

36. Reports, evaluations and/or opinions of counsel prepared by or for Apple relating to the '473 Patent.

37. Any investigation conducted by or for Apple concerning the '473 Patent.

38. Prior art to the '473 Patent which Apple asserts is relevant to the validity or enforceability of the '473 Patent.

---

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.            CASE NO. 5:11-CV-01079-PSG

39. Efforts by Apple to design around or otherwise avoid infringement of the '473 Patent.

40. Apple's revenue from HLS Apps, how such revenue is calculated, and an explanation of documents produced by Apple concerning same.

41. Apple's worldwide sales, revenue and profit, by month and year, for Accused Products sold in the United States, including an explanation of sales summaries or other financial documents produced by Apple concerning same.

42. For each Accused Product, the quantities sold in the United States, by month and year, including an explanation of documents produced by Apple concerning same.

43. For each HLS App, the quantity sold or distributed in the United States by month and year.

44. Any valuation of HLS prepared by or for Apple.

45. Any monies paid or payable to Apple by Content Providers, HLS Software Developers, CDNs, or Persons developing HLS Apps for use of HLS.

46. Any monies paid or payable by Apple to Content Providers, HLS Software Developers, CDNs, or Persons developing HLS Apps for use of HLS.

47. Apple's reliance on HLS to offer or promote HLS Apps or Accused Products to customers or potential customers.

48. Forecasts of units, revenues, and profits from the sale or licensing of Accused Products and HLS Apps.

49. Strategic plans, business plans, or marketing plans for Accused Products and HLS Apps.

50. How Apple determined the prices charged or to be charged by Apple for Accused Products and HLS Apps.

51. Apple's knowledge of prices to be charged by Content Providers for HLS Apps.

52. Actual or estimated numbers of events Live Streamed using HLS, and total minutes (or other time measure) of events Live Streamed using HLS.

53. The Apple employees and departments who are responsible for marketing or promoting HLS, HLS Apps and Accused Products, and such employees' names, titles, locations, and responsibilities.

54. The types and categories of documents, reports, forecasts, and projections that Apple receives or has received, creates or has created, or maintains or has maintained, including the computer databases or document management systems in which such documents are located, concerning the manufacturing, marketing, advertising, importation, distribution, purchase, sale, offer for sale, and/or profitability of HLS, Accused Products and HLS Apps.

55. Marketing and advertising for Accused Products or HLS Apps that mentions, describes, promotes or explains HLS or any feature of an Accused Product that makes use of HLS.

56. Former, current, and proposed Apple policies, practices or strategies concerning the licensing or valuation of patents, and the factors that Apple considers when negotiating license agreements or attempting to determine the value of patents, including established or recognized industry licensing practices.

57. The efforts Apple took to collect and produce relevant information and documents, and to prepare Apple's responses to Emblaze's Interrogatories and Requests for Production in this Litigation, including the locations and sources of responsive information and documents (including electronically stored information), document retention and document destruction policies, procedures, manuals or guidelines applicable to Apple, and steps taken to locate and produce relevant information, documents, and electronically stored information, and by whom such steps were taken.

58.  Apple's organizational structure, and the functions and responsibilities, of Apple employees involved in the development, implementation, use, promotion and licensing of HLS or the marketing of the Accused Products.

59.  Apple's decision to develop a Live Streaming product including, namely:

(a)  Who first had the idea to develop a Live Streaming product;

(b)  Why Apple decided to develop a Live Streaming product and what the circumstances were that led to this decision;

(c)  What, if any, analysis did Apple undertake regarding the expected market for Live Streaming;

(d)  Was a business case prepared;

(e)  Who made the decision and where was the decision made;

(f)  When the decision was made;

(g)  The project's urgency and, if it was urgent, why it was urgent;

(h)  The projected launch date;

(i)  What were the pros and cons of developing a Live Streaming product;

(j)  What options or alternatives, if any, were considered;

(k)  Was Apple aware of Emblaze's technology and patent;

(l)  Who was responsible for overseeing the evaluation and decision process.

60.  Apple's development of what is now known as HLS, namely:

(a)  Identification of the development team;

(b)  When it was organized;

(c)  Where it was located;

(d)  What its mission was;

(e)  Alternatives to HLS, if any, that were considered;

(f)  The development schedule and interim status reporting;

(g)  Any reports or other documents that were prepared.

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.                              CASE NO. 5:11-CV-01079-PSG

61. Apple's testing of what is now known as HLS, including:

    (a) Apple's first testing, where the first testing occurred, who was involved in the first testing, and any reports, evaluation, analysis or other documents related to the first testing;

    (b) Apple's subsequent testing of what is now known as HLS, including alpha and beta testing, testing plans, who was responsible for the testing, and any reports, evaluation, analysis or other documents related to the testing.

62. Apple's final approval of HLS for inclusion in Accused Products, namely, who gave the final approval and the date of final approval.

63. The advantages and disadvantages of HLS over other Live Streaming protocols, including:

    (a) Apple's evaluation of the advantages of HLS;

    (a) Advantages of HLS compared to alternatives, if any;

    (b) Advantages if HLS were to be adopted as an industry standard, including but not limited to, the advantages to Apple;

    (c) Advantages of HLS, if any, that are related to the '473 Patent;

    (d) Advantages of HLS, if any, that are unrelated to the Patent-in-Suit.

64. Elements of HLS, if any, that Apple contends it added and are unrelated to the Patent-in-Suit.

65. Methodologies or analyses that Apple uses or relies on to establish the value of features, such as, including HLS, and comparison of prices and profits between products with and without HLS.

66. Apple's evaluation of the economic impact of HLS, including Apple's increase in market share, volume or increase in profits that Apple attributes to HLS.

67. Apple's accounting and financial reporting policies and procedures, as they concern the Accused Products, including:

    (a) General ledger system and chart of accounts;

---

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.　　　　　　　　　　CASE NO. 5:11-CV-01079-PSG

      (b)    Enterprise resource planning system;

      (c)    Data warehouse;

      (d)    Other accounting and financial reporting systems;

      (e)    Reports and data available from Apple's accounting and financial reporting systems;

      (f)    Location(s) of Apple's accounting and financial reporting systems and personnel.

68.    Apple's production of the Accused Products, including:

      (a)    the production location(s);

      (b)    the production orders and scheduling;

      (c)    production forecasts;

      (d)    production costs, forecast and actual;

      (e)    transfer pricing between and among Apple affiliates.

69.    Apple's sales of the Accused Products, including:

      (a)    Apple's sales process, sales activities and the location(s) of such sales activities;

      (b)    Shipped to, sold to and billed to data;

      (c)    Sales forecasts;

      (d)    Metrics related to sales.

70.    Apple's revenue recognition as it concerns sales of the Accused Products, including:

      (a)    Revenue recognition policies and procedures;

      (b)    When revenue is recognized;

      (c)    Where revenue is recognized, e.g., U.S. or non-U.S.;

      (d)    Revenue classification(s) used for any other purpose (i.e., management, compensation, return on investment).

71.    Apple's forecasted and reported profitability as it concerns sales of the Accused. Products, including:

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.        CASE NO. 5:11-CV-01079-PSG

(a) identification of components of sales;

(b) identification of components of cost of sales;

(c) identification of components of research & development costs;

(d) identification of components of selling, general and administrative expenses;

(e) identification of royalties paid;

(f) identification of other income/expense;

(g) definition of Net Sales;

(h) Definition of Gross Margin;

(i) Definition of Operating Profit;

(j) Definition of Net Income;

(k) Analysis of costs as fixed or variable.

72. Apple's policies and procedures concerning setting prices for the Accused Products, including:

(a) elasticity of demand studies and the impact that price has on volume;

(b) Apple's analysis of customer price sensitivity;

(c) Apple's analysis utilized in setting prices for the Accused Products, including the data, market information and other information used or considered;

(d) Apple's consideration of royalties paid in setting prices;

(e) Apple's pricing forecast.

73. Apple's licensing agreements and settlements concerning HLS.

74. Apple's analysis of customer demand for the Accused Products, including:

(a) The methods, analysis and data that Apple considers in evaluating customer demand;

(b) Apple's target market for each Accused Products;

(c) Factors that affect customer demand for each of the Accused Products;

(d) Customer demand for HLS, including focus group, surveys and other data regarding customer evaluation of HLS and HLS App(s).

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.　　　　　　　　　　　CASE NO. 5:11-CV-01079-PSG

## CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to the within action.

On June 28, 2013, I served a true copy of the foregoing NOTICE OF DEPOSITION PURSUANT TO RULE 30(b)(6) OF DEFENDANT APPLE INC. on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope addressed as follows and placed it for collection and mailing with the United States Post Office, following the ordinary business practice, and I also caused to be emailed a copy to the email addresses stated below:

James J. DeCarlo
Michael A. Nicodema
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166

Also, by email to: decarloj@gtlaw.com and nicodemam@gtlaw.com

and

Sarah Barrows
Stephen Ullmer
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983

Also, by email to: barrowss@gtlaw.com and ullmers@gtlaw.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 28, 2013.

Elizabeth Keenan

LEGAL\16804982\3 14183.0001.000/285867.000

NOTICE OF DEPOSITION PURSUANT TO
RULE 30(B)(6) OF DEFENDANT APPLE INC.                    CASE NO. 5:11-CV-01079-PSG