UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD.,<br><br>                    Plaintiff,<br>    v.<br>APPLE INC.,<br>                    Defendant. | Case No. 5:11-cv-01079-PSG<br><br>**ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS**<br><br>**(Re: Docket Nos. 428 and 430)** |

Before the court are a pair of *Daubert* motions filed by Apple in this patent case.[1] The motions seek to exclude the opinions of Emblaze damages experts Catharine Lawton and David Teece. After considering the parties' respective arguments, in both the papers and at the hearing, the court holds that Lawton and Teese may testify at trial, subject to the restrictions laid out below.

### I. BACKGROUND

**A.    Lawton's Damages Analysis**

Lawton's report analyzed the accused Apple products using the so-called "income approach" method.[2] The income approach

---

[1] *See* Docket Nos. 428 and 430; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[2] *See* Docket No. 463-6, Ex. A at 464-67. Tellingly, Lawton and Apple damages expert James Malackowski each adopt the income approach, albeit with very different results.

1
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

is a method used to value intellectual property assets based on the present value of the future income stream generated by an asset.  There are three major inputs to the income approach: (1) expected future cash flows from the asset; (2) economic life of the asset; and (3) business risk associated with the realization of the cash flow stream.  The key goal is to estimate the present value of incremental profits generated by the asset over its economic life, taking into account the risk associated with generating those profits.  Once the present value of the incremental profits is determined, these profits are split in some manner between the licensor and licensee, typically in the form of a royalty.  (citations omitted).[3]

Using the income approach, Lawton calculated the additional gross profit margin on each of the accused products from the date Apple's http live-streaming ("HLS") was included.  This calculation served as a "high end" starting point for the reconstruction of the hypothetical royalty rate,[4] because the accused products include non-patented features.[5]

Lawton's rate analysis then turned to the *Georgia-Pacific* factors.[6]  Lawton concluded that factor 2 – the rate paid for comparable patents – supported minimum royalty rates in the range of $.10 to $3.10 per accused product unit.  The other factors were either neutral (factors 1, 3-6 and 12-13) or supported an increased hypothetically negotiated royalty rate (factors 7-11).[7]  Lawton concluded that the facts of this case supported a $2.00 per unit royalty for hardware and a 1% royalty for software and application revenue.[8]

---

[3] *See* Docket No. 463-5, Ex. A at 464; Docket No. 463-18, Ex. O at 100 (citing *Economic Damages in Intellectual Property*).

[4] Docket No. 463-4 at 8 ("Using the Income Approach, Lawton analyzed the excess gross profit margin on each of the accused products beginning from the date HLS was launched in that product. That led her to the data point $[], which she candidly acknowledged was on the 'high end' because it included non-patented features as well.").

[5] *See* Docket No. 463-6, Ex. A at ¶ 924 ("The foregoing analysis—because of the impossibility of apportionment described previously—does not measure the contribution of the '473 Patent alone. I am relying on this analysis [to] provide additional economic data that would inform the hypothetical negotiation."); *see also* Docket No. 463-16, Ex. M at 164:21-165:5 (noting the addition of live streaming in June 2009 was an "incremental addition" to the accused products).

[6] *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[7] *See* Docket No. 463-6, Ex. A at 525.

[8] *See id.*  Apple does not seek exclusion of Lawton's opinion regarding damages resulting from software and application revenue.

2
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

B.  **Teece's Expert Opinion on Digital Convergence and Network Effects**

Teece was retained by Emblaze "to address three topics: the convergence between computing and communications, network effects in software, and the implications of digital convergence and network effects for licensing the '473 patent at issue in this case."[9]

## II. LEGAL STANDARDS

Expert testimony may only be admitted in a manner consistent with the Federal Rules of Evidence, *Daubert*, *Kumho Tire Co. v. Carmichael*[10] and more recent appellate court progeny.[11]

A.  *Daubert* **Generally**

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue."[12] Expert testimony must be both relevant and reliable to be admitted pursuant to Rule 702.[13] When considering expert testimony, the trial court serves "as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards."[14]

---

[9] *See* Docket No. 428-1, Ex. 1 at ¶ 14.

[10] 526 U.S. 137 (1999).

[11] *See Apple Inc. v. Motorola, Inc.*, Case No. 2012-1548, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014).

[12] *See Daubert*, 509 U.S. at 589 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto.").

[13] *See id.* at 597.

> To summarize: "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

[14] *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 589-90. A district court's decision to admit expert testimony under *Daubert* in a patent case follows the law of the regional circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a

An expert witness may provide opinion testimony if: (1) "the testimony is based upon sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods; and" (3) "the expert has reliably applied the principles and methods to the facts of the case."[15] Under *Daubert*, courts consider (1) whether a theory or technique "can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error;" and (4) whether there is "general acceptance" of the methodology in the "relevant scientific community."[16]

The inquiry into admissibility of expert opinion is a "flexible one," where shaky "but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[17] "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony."[18]

A trial court thus must be sure that its review of expert testimony focuses "solely on principles and methodology, not on the conclusions that they generate."[19] "*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness."[20] "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility

---

trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit.").

[15] Fed. R. Evid. 702; *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008) ("Patent cases, like all other cases, are governed by Rule 702. There is, of course, no basis for carving out a special rule as to experts in patent cases.").

[16] *Daubert*, 509 U.S. at 593-94.

[17] *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596).

[18] *Id.* (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

[19] *Daubert*, 509 U.S. at 595.

[20] *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010).

4
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

of one expert over another. These tasks are solely reserved for the fact finder."[21] "That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages."[22] The Federal Circuit "has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'"[23]

**B.   Section 284 and the *Georgia-Pacific* Factors**

35 U.S.C. § 284 provides that upon "finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." Infringement compensation can be the patentee's "lost profits" or the "reasonable royalty he would have received through arms-length bargaining."[24] The goal of the damages award is not to punish the infringer, but rather to make the patentee whole by ascertaining what the patent holder would have made "had the infringer not infringed."[25] "The burden of proving damages falls on the patentee."[26]

No lost profits are claimed in this case. Lawton's report instead proposes a per unit damages assessment for Apple's alleged infringement of the patent claims in suit.[27] The *Georgia-Pacific* factors are used in the "hypothetical negotiation" approach to determining a

---

[21] *Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435, at *19.

[22] *Id.*

[23] *Id.* (citing *i4i*, 598 F.3d at 856 ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."); *Micro Chem.*, 317 F.3d at 1392.).

[24] *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[25] *Id.*

[26] *Id.*

[27] *See Georgia-Pacific*, 318 F. Supp. at 1120.

5
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

reasonable royalty.[28] The hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."[29] "The hypothetical negotiation tries, as best as possible, to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement."[30]

The *Georgia-Pacific* factors constitute a non-exhaustive list of fifteen factors to consider in determining what reasonable royalty would result from the hypothetical negotiation.[31] The *Georgia-Pacific* court explained:

> A comprehensive list of evidentiary facts relevant, in general, to the determination of the amount of a reasonable royalty for a patent license may be drawn from a conspectus of the leading cases. The following are some of the factors mutatis mutandis seemingly more pertinent to the issue herein:
>
> 1.  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2.  The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3.  The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4.  The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5.  The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
>
> 6.  The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
>
> 7.  The duration of the patent and the term of the license.
>
> 8.  The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> 9.  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

---

[28] *See id.*

[29] *Lucent*, 580 F.3d at 1324 (Fed. Cir. 2009).

[30] *Id.* at 1325.

[31] *See Georgia-Pacific*, 318 F. Supp. at 1120.

6
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee--who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[32]

## C. The Entire Market Value Rule

"By statute, reasonable royalty damages are deemed the minimum amount of infringement damages 'adequate to compensate for the infringement.'"[33] To most accurately calculate the minimum amount of infringement damages adequate to compensate for infringement of an accused product, "it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"[34] The entire market value rule is a "narrow exception to the general rule" requiring royalties to be based on the smallest salable patent-practicing unit.[35] "If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product."[36] "Where small elements of multi-component products are accused of infringement,

---

[32] *Id.*

[33] *LaserDynamics*, 694 F.3d at 66 (quoting 35 U.S.C. § 284).

[34] *Id.* at 67 (citing *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)).

[35] *Id.*

[36] *Id.* (citing *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549, 1551 (Fed. Cir. 1995).

7
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product."[37]

Damages testimony attempting "to show economic entitlement to damages based on technology beyond the scope of the claimed" invention is not permissible.[38]  The reasoning behind the entire market value and smallest salable patent-practicing unit doctrines also is consistent with the Federal Circuit's rejection of the "25 percent rule of thumb" in *Uniloc* and the U.S. Supreme Court's early apportionment case law, which holds that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."[39]

### III. DISCUSSION

**A.  Wholesale Exclusion of Lawton's Testimony Is Not Warranted, But Limits on the Scope of Her Testimony Are**

Apple raises four essential challenges to the Lawton's opinions, which are persuasive only in part.

First, Apple argues that Lawton uses an inadmissible base consisting of Apple's unapportioned, additional gross margin following Apple's introduction of HLS in June 2009. According to Apple, such a base violates the EMVR because this unapportioned margin is not

---

[37] *Id.* at 67-68.

Regardless of the chosen royalty rate, one way in which the error of an improperly admitted entire market value rule theory manifests itself is in the disclosure of the revenues earned by the accused infringer associated with a complete product rather than the patented component only.  In *Uniloc*, we observed that such disclosure to the jury of the overall product revenues "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." [*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011)] (noting that "the $19 billion cat was never put back into the bag," and that neither cross-examination nor a curative jury instruction could have offset the resulting unfair prejudice).  Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is "adequate to compensate for the infringement."  *Id.*; *see* 35 U.S.C. § 284.

[38] *Cornell*, 609 F. Supp. 2d at 284-85.

[39] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

8

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

focused on the smallest saleable patent-practicing unit.[40]  Apple might be right about the inadmissibility of such a royalty base.  But its argument nevertheless is puzzling, as Lawton plainly uses a base of every unit of the accused infringing product, not the incremental gross margin Apple complains about.[41]  To the extent Lawton relies upon the incremental gross margin, she does so in her estimate of the hypothetical royalty rate, not the base.[42]  Because Apple mischaracterizes the base relied upon the expert, this argument must be rejected.[43]

Second, Apple argues that Lawton uses an inadmissible unit base of every unit sold.[44] Here, Apple emphasizes that no Apple units directly infringe.  Putting aside the inconsistency of this characterization of Lawton's base with Apple's characterization described above, Lawton's "all infringing unit" base is not methodologically flawed.  Apple does not cite to a single case suggesting that the royalty base of a hypothetical negotiation must be limited to units deemed to directly infringe.  Such a rule makes especially little sense in cases like this one, where indirect infringement by the defendant is alleged and the bulk of the direct infringement alleged is that of

---

[40] *See* Docket No. 429-4 at 16 (Lawton "treats the [gross margin increase] figure as an unapportioned royalty base, and then awards Emblaze a substantial fraction of that base based upon the accused technology's purported value to Apple."); Apple Slide Deck at 5 ($[] billion royalty base is her "starting point" – accused device increased profits ($[] per unit) since June 2009").

[41] *See* Docket No. 429-6, Schedule 1B.

[42] Even Apple appears to concede this fully in its reply, if not in its slide deck at the hearing. *See* Docket No. 490-5 at 2 ("Emblaze and Ms. Lawton took a risk when they refused to apportion the royalty base, adopted an unapportioned $[] per unit amount as the starting royalty rate, relied on incomparable licenses, and then picked a $2 per unit royalty out of thin air.").

[43] Lawton's use of the margin in her rate estimate, as either an "anchor" or a "starting point" is nevertheless problematic in that it is plainly and nothing more than a big number used to justify a small number.  Although here the resulting distortion is in the rate, not the base, Lawton invites the same type of jury error prohibited by the Federal Circuit in *Uniloc*.  632 F.3d 1292.  This she will not be permitted to do; no reference to Apple's unapportioned, additional gross margin following Apple's introduction of HLS in June 2009 will be permitted.

[44] See Docket No. 429-4 at 5-6 ("Lawton beigns with a royalty base consisting of more than [] million units of accused products sold (iPhones, iPads, iPod touches, Apple TVs, and Macs) and more than [] million units of operating system software upgrades in addition to Apple's revenue from applications capable of live streaming [].") (citing Docket No. 429-6, Ex. 1 at 503, Schedule 1B); Apple Slide Deck at 12 ("Lawton's unit base includes all units sold").

9
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

third parties.[45]

Third, Apple argues that Lawton uses no discernable or reliable methodology.  Apple focuses on both the "incomparable licenses or litigation demands" relied on by Lawton in her rate calculation and the fact that Lawton performs "no specific math" in her rate estimate.[46]  But in contrast to the expert testimony recently rejected by Judge Koh in *GPNE v. Corp. v. Apple, Inc.*, Lawton's analysis did not "fundamentally reduce to taking [her] opinion based on [] years of experience for granted."[47]  Lawton instead analyzed licenses and demands for the use of other patents she concluded were comparable to the hypothetical license at issue here among other *Georgia-Pacific* factors.  Although Apple remains well within its rights to question whether these other licenses and demands are indeed comparable,[48] that ultimate question must be resolved by the jury, not this court.  The court's task here is simply to determine whether that Lawton has identified a sufficient nexus between the licenses and demands to the hypothetical license at issue.[49]

---

[45] *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indusies., Inc.*, 1 Fed. Appx. 879, 884 (Fed. Cir. 2001) (rejecting implication that patenteee "is required to demonstrate a one-to-one correspondence between units sold and directly infringing customers").

[46] Docket No. 490-5 at 2, 15.

[47] Case No. 12-cv-02885-LHK-PSG, 2014 WL 1494247, at *6 (N.D. Cal. 2014).

[48] *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).

[49] *See i4i*, 598 F.3d at 856.  An evaluation of the admissibility of licenses in support of a damages case necessarily weighs two considerations.  First, license agreements must not be "radically different form the hypothetical agreement" under consideration.  *Lucent*, 580 F.3d at 1327.  Second, the jury must have an adequate basis to evaluate "the probative value of those agreements."  *Id.* at 1327-28.  The patentee bears the burden to prove that licenses are sufficiently comparable.  *Id.*  The Federal Circuit has "long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patents in suit."  *ResQNet.com* , 594 F.3d at 869.  "Re-bundled," untethered licenses inconsistent "with the other licenses" in the record, may not be used to support egregiously high royalty rates.  *Id.* ("The inescapable conclusion is that Dr. David used unrelated licenses on marketing and other services—licenses that had a rate nearly eight times greater than the straight license on the claimed technology in some cases—to push the royalty up into double figures.").

10
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

Because the court agrees with Apple that Lawton's report does not "do anything to establish that [the patentee's demands in *Apple v. Samsung* or the Apple-Motorola license disclosed in the *Apple v. Motorola* litigation] are technically and economically similar to the facts" of this case, Lawton may not rely on those licenses at trial.[50] Apple's challenge with respect to the publically available standards-essential technology licenses relating to MP3, MPEG-4 and AVC/H.264 is another story.  Here, Apple urges that public information regarding licensing in that space should be excluded not because of an insufficient nexus to this case, but because Apple has produced its own licenses to that technology.[51] The Federal Circuit, however, has approved the use of "publicly available information" and also held that the "existence of other facts" or data that could also have been relied upon does not make the evidence selected irrelevant.[52] Even if data are "imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.[53] Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury."[54] In addition, to the extent Lawton's resulting estimates are imprecise, any reasonable royalty analysis "necessarily involves an element of approximation and uncertainty."[55] Because the court does not find that the probative value of these publicly-available

---

[50] *See* Docket No. 429-4 at 21 (citing Docket No. 429-6, Ex. 1 at 413-17).

[51] *See* Docket No. 429-4 at 21-22 ("Lawton should be precluded from opining that unreliable public information about licenses to MP3, MPEG-4 and AVC/H.264 standards-essential technology would inform the hypothetical negotiation and influence the proper royalty rate, when Apple entered into actual license agreements to use this technology.").

[52] *i4i*, 598 F.3d at 855-56.

[53] *See Micro Chem.*, 317 F.3d at 1392.

[54] *i4i*, 598 F.3d at 856.

[55] *Lucent*, 580 F.3d at 1325; *Paper Converting Machine Co. v. Magna-Graphic Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984) ("while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result may be only approximate").

11
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

licenses evidence will be substantially outweighed by the danger of unfair prejudice,[56] exclusion is not warranted.

Finally, Apple argues that Lawton has engaged in naked "Apple bashing." Apple highlights a number choice quotes from Lawton's report, ranging from a charge that Apple has "turned into paranoid security Nazis" to various excerpts suggesting Steve Jobs is a thief or worse.[57] Other quotes focus on Apple's discovery practices.[58] This is an easy call. Lawton will not be permitted to engage in such emotional appeals.[59]

## B.   Teece Shall Be Restricted to the General Expert Opinion Tendered in His Report

Apple urges that the "degree of abstraction and imprecision of Teece's opinions renders" them largely unhelpful "to the trier of fact, and therefore inadequate under Rule 702(a)."[60] In support, Apple points out Teece "mentioned 'live streaming' in only a single paragraph of his" report and used the rest of his report to propound abstract opinions regarding digital convergence and network effects/externalities.[61] Teece's "conclusions" that "follow from the combination of digital convergence and network externalities" are only loosely connected to the facts and technology at issue in this case.[62] Teece's deposition also revealed sizable separation between the

---

[56] *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

[57] Docket No. 429-6, Ex. 1 at 184.

[58] *See* Docket No. 429-4 at 7-8 (citing Docket No. 429-6, Ex. 1).

[59] The court already addressed objection to evidence and argument suggesting Apple and/or Steve Jobs "have always been shameless about stealing great ideas." *See* Docket No. 519 at 3 ("Emblaze shall not offer any evidence or argument regarding Apple or Steve Jobs' alleged copying of third party products, ideas or inventions."). Evidence to this effect will not be permitted at trial.

[60] Docket No. 428 at 4.

[61] *See id.* (citing Docket No. 428-1, Ex. 1 at ¶¶ 15-53, 55-58). Teece's report appears to use network effects and network externalities interchangeably.

[62] *Id.* (citing Docket No. 428-1 at ¶ 49).

12
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

facts of this case and Teece's analysis. At deposition, Teece conceded he was only applying general principles to the case at the "level of principle" and not engaged in a "granular case-specific analysis."[63] At bottom, Teece's high-level opinions[64] are of limited use to the fact-finder in resolving any question of fact at issue in this case.

---

[63] *See* Docket No. 428-3 at 24:11-17.

> Q. Have you ever prepared an analysis on the impact of live video streaming and the massive convergence between computing and communications? A. I haven't done anything that specific.

*Id.* at 43:1-22

> Well, there -- my understanding is that [Lawton] did a significant amount of review of the public record and, you know, what trade -- excuse me, what industry analysts, what the trade press and other commentators refer to. So I wasn't being all that specific there, but I was just generally referring to the fact that I'm also somewhat familiar with the trade press because I do follow it to some extent.

*Id.* at 45:1-48:25

> I did have some discussions with Cathy Lawton. I was generally familiar with the kinds of things she was referring to.
> 
> * * *
> 
> So there was some amount of discussion that was had between Cathy and myself and my staff that gave me a feel for some of the materials that she was relying on.
> 
> * * *
> 
> I didn't look at any specific documents produced by Apple or Emblaze. Q. Did you review the patent-in-suit in this litigation? A. Yes, I did have access to that, and I think I read it online early on. Q. But that's not listed as a document you relied upon in forming your opinion, correct? A. That is correct. Q. Did you speak to anyone about the patent-in-suit in this litigation? A. Besides counsel, no. Q. And when you spoke to counsel about the patent-in-suit litigation, how many times would you estimate that you spoke to counsel about the patent-in-suit? A. Maybe once. It wasn't as to the details. I was just simply aware that there was a patent litigation going on around certain Emblaze patents. Q. And what was your understanding based on your conversation with counsel as to what the technology in the patent -- in that patent-in-suit is? A. That they -- that the patents were accused of -- well, excuse me -- that Apple was accused of infringing Emblaze -- Emblaze's patents or some of Emblaze's patents in its streaming technologies, its HTTP-based streaming technologies. Q. And is it your understanding that the patent-in-suit -- there's only one patent-in-suit -- covers all streaming, all types of streaming? A. No.

*Id.* at 49:6-24.

> Q. Some -- did you review the complaint in this case? A. At one point, yes. I thought I'd answer that in response to your earlier question. I think I had seen it online. Q. Well, my earlier question was whether you had reviewed the patent-in-suit. That means just the actual patent document. A. Oh, okay. Then I misunderstood. Q. Oh, I see. A. Only inasmuch as there was some discussion of that, I think, in the complaint. Q. I see. So just to go back to my earlier question about whether you had reviewed the patent-in-suit, you didn't actually go on, like, Google Patents and look at the actual patent that was filed, the

13

Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

Nevertheless, Rule 702 permits general principles testimony without substantive connection to the facts of a case. The committee explains:

> If the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably. Yet it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.[65]

Because Teece's general expert testimony on digital convergence and network effects falls into this category of permissible testimony, exclusion is not warranted merely on the grounds that Teece has not sufficiently grounded his testimony in the case. Teece may generally opine that digital convergence and network effects could have affected the hypothetical negotiation. But that is it.

---

issue? A. No. I'm not a technical expert, and it wouldn't necessarily convey much meaning to me.

*Id.* at 53:5-56:8

Q. Can you recall any specific facts about this case that Ms. Lawton personally told you that shaped the content and scope of your opinion? A. No. Not -- not really. Because, as I said, it was, you know, more what -- what are the -- kind of the relevant background factors here that eventually, you know, a jury will need to understand to properly appreciate the context of any future or any hypothetical licensing negotiation. Q. And when you speak about the "relevant background factors," do you mean the relevant background factors you learned from Ms. Lawton or relevant background factors you know from your research as an economist? A. Well, I would say it's primarily the latter, but I didn't want my testimony -- testimony to be shaped in a way that was unhelpful to the Court, so I needed to get some overall focus on the issues at hand in this litigation. Q. But you can't name -- recall any specific case fact that you learned from Ms. Lawton that would help to focus on the issue at hand? A. Well, you know, the -- the obvious points that this -- that the patents at issue implicated streaming, that, you know, the history seemed to indicate that Apple was a bit of a Johnny-come-lately to the streaming party, and -- and that, you know, there came a point in time where -- where Apple did successfully develop software on the HTTP protocol that enabled it not to just catch up, but -- but also to get ahead in -- in video streaming.

[64] *See* Docket No. 428-1 at 49-58.

[65] Fed. R. Evid. 702, Advisory Committee's Notes (2000).

14
Case No. 5:11-cv-01079-PSG
ORDER RE: APPLE'S MOTIONS TO EXCLUDE EMBLAZE'S DAMAGES EXPERTS

**IT IS SO ORDERED.**

Dated: June 25, 2014

_____
PAUL S. GREWAL
United States Magistrate Judge