1  MARK FOWLER (Bar No. 124235)               SARAH BARROWS (Bar No. 253278)
   *mark.fowler@dlapiper.com*                   *barrowss@gtlaw.com*
2  ROBERT BUERGI (Bar No. 242910)              STEPHEN ULLMER (Bar No. 277537)
   *robert.buergi@dlapiper.com*                 *ullmers@gtlaw.com*
3  DLA PIPER LLP (US)                           GREENBERG TRAURIG, LLP
   2000 University Avenue                       4 Embarcadero Center, Suite 3000
4  East Palo Alto, CA  94303-2214              San Francisco, CA  94111-5983
   Tel:  650.833.2000                           Tel.:  415.655.1300
5  Fax:  650.833.2001                           Fax:  415.707.2010
6
   JOHN ALLCOCK (Bar No. 98895)                JAMES J. DECARLO (*Pro Hac Vice*)
7  *john.allcock@dlapiper.com*                  *decarloj@gtlaw.com*
   ERIN GIBSON (Bar No. 229305)                MICHAEL A. NICODEMA (*Pro Hac Vice*)
8  *erin.gibson@dlapiper.com*                   *nicodemam@gtlaw.com*
   ROBERT C. WILLIAMS (Bar No. 246990)         GREENBERG TRAURIG, LLP
9  *robert.williams@dlapiper.com*              MetLife Building
   DLA PIPER LLP (US)                           200 Park Avenue, 34th Floor
10 401 B Street, Suite 1700                    New York, New York  10166
   San Diego, CA  92101                         Tel:  212.801.9200
11 Tel:  619.699.2700                           Fax:  212.801.6400
12 Fax:  619.699.2701
13 Attorneys for Defendant
   APPLE INC.
14

15                    UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                        SAN JOSE DIVISION

18

19 EMBLAZE LTD.,                      CASE NO.  5:11-CV-01079 PSG

20            Plaintiff,              **DEFENDANT APPLE INC.'S MOTION
                                      FOR JUDGMENT AS A MATTER OF
21 v.                                 LAW AT THE CLOSE OF PLAINTIFF'S
                                      CASE**
22 APPLE INC., a California corporation,

23            Defendant.             Place:    Courtroom 5, 4th Floor
                                     Judge:    Hon. Paul S. Grewal
24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................. 1

II.   LEGAL STANDARD FOR JMOL.......................................................... 3

III.  THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW ON
      EMBLAZE'S INDUCEMENT CLAIMS.................................................. 4

      A.   Emblaze Did Not Prove Direct Infringement................................. 4

           1.   Emblaze Did Not Offer a Viable Direct Infringement Theory Based
                on the Accused Apple Products. ............................................. 4

           2.   Emblaze Did Not Prove Direct Infringement for the Accused NFL
                Preseason Live, Watch ESPN, CBS PGA Tour and ABC News
                Streams. ............................................................................. 4

           3.   Emblaze Did Not Prove That End Users Directly Infringe.......... 6

           4.   Emblaze Did Not Identify a Viable Alleged Direct Infringer for the
                Accused Apple Keynote and iTunes Festival Streams. ............ 6

           5.   Emblaze Did Not Prove that any Alleged Direct Infringement of the
                iTunes Festival Occurred in the United States........................ 7

      B.   Emblaze Did Not Prove Infringement on a Limitation-By-Limitation Basis. ........ 7

           1.   Emblaze Did Not Offer a Limitation-By-Limitation Analysis for
                Any Accused Stream Other Than MLB At Bat. ........................ 7

           2.   Emblaze Did Not Prove that Any Accused Stream Satisfies the
                Limitation "Each Slice Having A Predetermined Data Size.".... 8

           3.   Emblaze Did Not Prove that any Accused Stream Satisfies the
                Limitation "Real-Time Broadcasting." .................................... 8

           4.   Emblaze Did Not Prove that any Accused Stream "Uploads" a
                Sequence of Files to a Server. .............................................. 9

      C.   Emblaze Failed to Prove the Elements of Inducement. ................ 10

           1.   Emblaze Did Not Prove Apple Possessed the Required Knowledge
                and Specific Intent to Induce Infringement............................ 10

           2.   Apple Cannot Induce Infringement of the Asserted Claims Under
                Its Previously Proposed Claim Constructions.......................... 11

           3.   Emblaze Cannot Prove Induced Infringement for Method Claim 23
                As a Matter of Law. .......................................................... 11

      D.   Emblaze Did Not Even Try to Prove Infringement of Claim 23 Based on
           any Accused Stream Other Than MLB At Bat. ............................. 13

IV.   THE COURT SHOULD GRANT JMOL ON EMBLAZE'S DAMAGES
      CLAIMS........................................................................................ 13

      A.   JMOL on Damages Is Required Because Emblaze Did Not Apportion Its
           Royalty Base. .................................................................... 13

           1.   Emblaze Did Not Use the "Smallest Salable Unit" as the Starting
                Point for Its Royalty Base. ................................................. 13

2.     Emblaze's Device Unit Royalty Base Includes the Value of Hundreds of Unpatented Components. .......................................................... 16

3.     Emblaze Cannot "Apportion" Its Royalty Base by Adjusting Its Proposed Royalty Rate. ................................................................................ 18

B.   JMOL Is Required Because Emblaze Failed to Exclude Apple Products That Never Used the Accused Streams. ................................................................. 18

C.   JMOL Is Required Because Emblaze Relied on Non-Comparable License Information, Which Rendered Ms. Lawton's Royalty Rate Analysis a "Black Box." ...................................................................................................... 21

1.     The Licenses Ms. Lawton Considered Are Not Technologically or Economically Comparable to the Hypothetical License, and Ms. Lawton Did Not Account for the Identified Differences. ......................... 21

2.     Emblaze Did Not Introduce the Licenses Themselves or Offer Any Evidence of Their Actual Terms. .......................................................... 22

3.     Ms. Lawton's $2 Per Unit Royalty Rate Was "Plucked Out of Thin Air." ............................................................................................................ 23

V.     CONCLUSION. .......................................................................................................... 25

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................ 4

*Berry v. Bunnell*,
    39 F.3d 1056 (9th Cir. 1994) .............................................................................. 4

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    No. 10-cv-3428 PSG, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013) ..................... 17

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    418 F. Supp. 2d 1021 (S.D. Ind. 2006), *aff'd* 576 F.3d 1348 (Fed. Cir. 2009)...... 20

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
    1 Fed. App'x 879 (Fed. Cir. 2001)...................................................................... 20

*Commil USA, LLC v. Cisco Sys., Inc.*,
    720 F.3d 1361 (Fed. Cir. 2013)........................................................................... 11

*Cornell University v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009) ........................................................... 14, 15

*Dowagiac Mfr. Co. v. Minnesota Moline Plow Co.*,
    235 U.S. 641 (1915) ............................................................................................ 16

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
    Case No. 11-cv-05973 PSG, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ......... 15

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009)........................................................................... 10

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010) ............................................................... 24

*Fujitsu Ltd. v. Netgear, Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010)............................................................................. 4

*Garretson v. Clark*,
    111 U.S. 120 (1884) ............................................................................................ 16

*Global-Tech Appliances, Inc. et. al. v. SEB S.A.*,
    131 S.Ct. 2060 (2011) ......................................................................................... 10

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
    438 F.3d 1354 (Fed. Cir. 2006)........................................................................... 20

3

*Golden Bridge Tech. v. Apple Inc.*,
4    Case No. 5:12-cv-4882-PSG, D.E. 471, Order Granting Def.'s Mot. to Exclude
    Opinions and Testimony of Karl J. Schulze at 10 (May 18, 2014) .........................................17

5

*GPNE Corp. v. Apple Inc.*,
6    No. 12-cv-02885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ..........................................24

7

*Imagexpo, L.L.C. v. Microsoft Corp.*,
    284 F. Supp. 2d 365 (E.D. Va. 2003) ...................................................................................20
8

9
*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .................................................................. 14, 16, 18, 23

10

*Lawrence v. Raymond Corp.*,
11    No. 09-cv-1067, 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011) *aff'd*, 501 F. App'x 515
    (6th Cir. 2012) ......................................................................................................................24

12

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
13    No. 12-786, 2014 WL 2440535 (U.S. June 2, 2014) .....................................................12, 13

14
*Linear Tech. Corp. v. Impala Linear Corp.*,
15    379 F.3d 1311 (Fed. Cir. 2004) ...............................................................................................7

16
*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ..................................................................................... passim
17

18
*Muniauction, Inc. v. Thompson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ..............................................................................................12

19
*Reeves v. Sanderson Plumbing Products, Inc.*,
20    530 U.S. 150 (2000) .................................................................................................................4

21
*ResQNet Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ...............................................................................................22
22

23
*Searfoss v. Pioneer Consol. Corp.*,
    374 F.3d 1148 (Fed. Cir. 2004) .........................................................................................4, 7

24
*Uniloc USA Inc. v. Microsoft Corp.*,
25    632 F.3d 1292 (Fed. Cir. 2011) ..............................................................................................18

26
*Wordtech Sys. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ..............................................................................................22
27

28
*Zamalloa v. Hart*,
    31 F.3d 911 (9th Cir. 1994) .....................................................................................................4

**STATUTES**

35 U.S.C. § 271 ..................................................................................................... 4, 6, 12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(a) ................................................................................................. 1, 4

Pursuant to Federal Rule of Civil Procedure 50(a), defendant Apple Inc. ("Apple") requests judgment as a matter of law ("JMOL") on the following grounds: (1) that Apple does not induce infringement of the '473 patent; and (2) that Emblaze failed to present legally proper evidence to support its claim for $511 million in damages.

## I. INTRODUCTION

### A. JMOL on Liability

The Court should grant JMOL on liability because, for the following reasons, Emblaze did not prove its claims for induced infringement:

- **Emblaze did not prove direct infringement.** Emblaze did not prove a viable direct infringement theory for the accused Apple devices. The accused iPhones, iPads, iPod Touches, Apple TVs and Mac OS X computers do not embody any of the asserted claim limitations and cannot practice any of the asserted claims by themselves. To prove that the seven accused streams infringe the asserted claims, Emblaze needed to (a) compare each stream to the asserted claims, or (b) at a minimum, show that such streams conform to the HLS protocol and that such conformance necessarily practices the claims. For the accused NFL Preseason Live, Watch ESPN, CBS PGA Tour, and ABC News streams, Emblaze did neither. Furthermore, the end user's use of the accused products cannot infringe the asserted apparatus claims, at least because the apparatus claims almost exclusively recite components that exist outside of the Apple devices. Further, Emblaze has not presented a legally viable theory of direct infringement for the accused Apple Keynote or iTunes Festival streams, nor did Emblaze prove direct infringement of the iTunes Festival in the United States.

- **Emblaze did not prove infringement on a limitation-by-limitation basis.** Dr. Madisetti did not present a limitation-by-limitation analysis for any of the accused streams other than MLB At Bat. Emblaze also failed to prove that any accused stream satisfies the claim limitation "each slice having a predetermined data size." Dr. Madisetti's measurements of the seven accused streams showed that for each stream, the slice sizes vary unpredictably, making it impossible to determine what the data size of the next segment is going to be. Emblaze also failed to prove the "real-time broadcasting" limitation, which the Court construed to require

"simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process." Emblaze did not prove that any of the seven accused streams simultaneously transmits any piece of data to one or more clients. Finally, Emblaze did not prove that any accused stream "uploads" a sequence of files to a server, as required by the claims and the Court's claim construction.

- **Emblaze did not prove the elements of inducement.** Emblaze offered no evidence sufficient for a reasonable jury to find that Apple knew that any of its acts would constitute infringement of the '473 patent. Nor did Emblaze offer any evidence sufficient for a reasonable jury to find that Apple specifically intended that any alleged direct infringer infringes the '473 patent. In fact, Apple cannot induce infringement of the asserted claims under Apple's previously proposed claim constructions. In any event, the alleged direct infringement of asserted method claim 23 based on the MLB At Bat stream involves multiple parties—MLB Advanced Media and Akamai—which is impermissible under the law. Apple therefore is entitled to JMOL that Apple does not induce infringement of claim 23.

- **Emblaze did not even try to prove infringement of claim 23 based on any accused stream other than MLB At Bat.** Emblaze asserts that only one of the seven accused streams—the MLB At Bat stream—satisfies claim 23. Dr. Madisetti offered no opinion or analysis that any other accused stream (*i.e.*, ABC News, CBS PGA Tour, Watch ESPN, NFL Preseason Live, Apple Keynote and iTunes Festival) satisfies claim 23. Because Emblaze has not even attempted to prove that any of these six accused streams satisfy claim 23, Apple is entitled to JMOL that these six streams do not infringe claim 23 and that Apple does not induce infringement of claim 23 with respect to those six streams.

## B. JMOL on Damages

The Court should reject Emblaze's damages claim on any one of the following independent grounds:

- **Emblaze did not use the smallest salable unit and did not apportion its unit royalty base.** Emblaze's damages expert, Catharine Lawton, failed to use the correct smallest salable patent-practicing unit. The smallest salable unit is not the device (iPhone, iPad, iPod

Touch, Apple TV or Mac), because those units contain hundreds of separate hardware and software components that have nothing to do with the accused live streaming functionality. The most appropriate smallest salable unit is the Apple operating system (iOS) upgrade that contains the accused feature. The iOS upgrade is a patent-practicing unit, because Ms. Lawton included iOS upgrades as accused products. The iOS upgrade also is "salable" because it was in fact sold to customers. Despite this, Ms. Lawton used unapportioned device units as her royalty base, making no attempt to apportion out the value of the hundreds of unpatented components in those products.

- **Emblaze did not exclude products that never used the accused streams.** Ms. Lawton also failed to exclude from her unapportioned royalty base units that did not use and have never used the accused live streams. Emblaze's technical expert identified five software apps that purportedly use the accused live streaming technology, plus two other live streams that generated no revenue for Apple, for a total of seven accused streams. Ms. Lawton admitted at trial that app downloads for three of the accused streams totaled just over 22 million. But Ms. Lawton made no attempt to exclude from her royalty base any of the 246 million accused devices that were sold during the relevant time. Only a small fraction of those devices used the accused streams, but Ms. Lawton failed to exclude a single noninfringing device from her royalty base. Emblaze was required to correlate its damages claim with the actual use of the accused feature, but did not.

- **Emblaze relied on non-comparable licenses to try to support its proposed royalty rate, which is the product of "black box" methodology.** Ms. Lawton relied on a number of licenses that were, by her own admission, not comparable to the hypothetical license between Apple and Emblaze. During her direct testimony, Emblaze did not present any of those licenses to the jury, which is grounds for JMOL by itself. Without these licenses, Emblaze has no evidence to support its request for $2 per unit for each accused product. Rather, her $2-per-unit running royalty was plucked out of thin air—exactly what the law prohibits.

## II.    LEGAL STANDARD FOR JMOL.

Federal Rule of Civil Procedure 50(a) provides: "If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally

sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

"A directed verdict is proper when the evidence permits only one reasonable conclusion. The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (citing *Zamalloa v. Hart*, 31 F.3d 911, 913 (9th Cir. 1994)). "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 (1986)).

## III. THE COURT SHOULD GRANT JMOL ON EMBLAZE'S INDUCEMENT CLAIMS.

### A. Emblaze Did Not Prove Direct Infringement.

#### 1. Emblaze Did Not Offer a Viable Direct Infringement Theory Based on the Accused Apple Products.

Emblaze accused iPhones, iPads, iPod Touches, Apple TVs, and Mac OS X computers of infringement. However, the accused products do not embody any of the asserted claims. It is basic patent law that the accused products must satisfy the limitations of the claims. 35 U.S.C. § 271(a); *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1148 (Fed. Cir. 2004). The asserted apparatus claims (claims 28, 37 and 40) almost exclusively recite components that exist outside of the accused Apple devices. Likewise, the asserted method claim (claim 23) exclusively recites steps that are performed outside of and do not involve the accused Apple products. In no case can any of the accused Apple products practice the asserted claims. Accordingly, Emblaze has not presented a viable theory of direct infringement based on the accused Apple products.

#### 2. Emblaze Did Not Prove Direct Infringement for the Accused NFL Preseason Live, Watch ESPN, CBS PGA Tour and ABC News Streams.

Emblaze was obligated to prove that an accused stream practices each claim limitation of an asserted claim before that stream can be found to infringe. *Fujitsu Ltd. v. Netgear, Inc.*, 620

F.3d 1321, 1327-28 (Fed. Cir. 2010). To prove the seven accused streams infringe the asserted claims, Emblaze needed to (a) compare each stream to the asserted claims, or (b) at a minimum, prove that the streams conform to the HLS protocol and that such conformance necessarily practices the claims. *Id.* For the NFL Preseason Live, Watch ESPN, CBS PGA Tour, and ABC News streams, Emblaze did neither.

For these four accused streams, Emblaze offered no documents, testimony, or other evidence regarding how the content providers generate these four streams, how the content providers set up their backend systems, or what equipment the content providers use to generate the streams (even assuming the content providers themselves generate the streams, which Emblaze also did not establish). Emblaze offered no testimony of any witness from any of these content providers, introduced no documents produced by any of these content providers, and showed no diagrams or other description of any of these content providers' streaming architectures.

For example, Dr. Madisetti confirmed he did not know what type of segmenter or encoder Watch ESPN used, or whether the segmenter and encoder were even in one unit. Trial Tr. at 655:6-19. Although Dr. Madisetti discussed certain measurements of these four accused streams that he obtained via the Wireshark tool, the Court previously held that "merely viewing the stream does not divulge the guts of how the stream is generated." Dkt. No. 394 at 4-5. Dr. Madisetti's client-side measurements therefore are insufficient to show "the guts of how the stream is generated" and insufficient to prove how the streams practice the asserted claims.

Dr. Madisetti also admitted that the accused CBS PGA Tour and ABC News streams rely on the Akamai RTMP architecture. Dkt. No. 404-1 at 5 ("ABC News and the PGA, which use the Akamai RTMP Architecture"). Yet Dr. Madisetti did not testify about the Akamai RTMP Architecture at all, and certainly did not testify about how the Akamai RTMP Architecture purportedly satisfies the asserted claims. Nor has Emblaze offered any other analysis about how the Akamai RTMP Architecture satisfies the claims. Such a showing cannot be inherent in the CBS PGA Tour and ABC News streams' use of HLS, because the Akamai RTMP architecture is materially different than, for example, the MLB At Bat architecture. *See*, *e.g.*, *id.* at 3 (diagram of

-5-

Akamai RTMP architecture.)  Because Emblaze did not prove how the Akamai RTMP
architecture allegedly satisfies the limitations of any asserted claim, Apple is entitled to JMOL
that the CBS PGA Tour and ABC News streams do not infringe the '473 patent.

**3.     Emblaze Did Not Prove That End Users Directly Infringe.**

Infringement requires making, using, selling or offering for sale, or importing the claimed
invention.  35 U.S.C. § 271(a).  For method claim 23, Emblaze pointed to content providers
and/or content delivery network providers, rather than end users of the accused products, as
allegedly practicing the steps of the claim.  Claim 23 recites no step performed by an end user of
the accused products, and Emblaze offered no evidence that an end user performs any of those
recited steps.  With regard to the apparatus claims (claims 28, 37 and 40), users of the accused
Apple devices do not make, sell, offer for sale, or import the claimed invention.  35 U.S.C.
§ 271(a).  The claimed systems almost exclusively describe components operated by the accused
stream's content providers and content delivery network providers.  Nor do users of the accused
Apple products use the claimed systems, because it is the content providers and content delivery
network providers that use almost all of the claimed components (*e.g.*, "a transmitting computer"
and "a server") to deliver streams to the end users.  The end user's use of the accused products
therefore cannot infringe the asserted apparatus claims at least because the asserted apparatus
claims almost exclusively recite components that exist outside of the accused Apple products.

Nor can the end users be said to be putting the claimed systems into service because the
claimed streaming systems are already in service before a user begins consuming the live stream.
The user is merely a consumer of the live stream, not an initiator of the live streaming processes.
Accordingly, end users cannot directly infringe any asserted claim.

**4.     Emblaze Did Not Identify a Viable Alleged Direct Infringer for the
Accused Apple Keynote and iTunes Festival Streams.**

Two of the seven accused streams are the Apple Keynote stream and the iTunes Festival
stream.  At trial, Dr. Madisetti opined that Apple is the alleged direct infringer for those streams.
Trial Tr. at 620:14-621:6.  The Court, however, has already found that Apple is not a direct
infringer of the '473 patent for any accused stream.  Dkt. No. 424 at 18 ("summary judgment that

Apple did not directly infringe the '473 patent is warranted"). Nor can Apple induce itself to infringe the '473 patent. Accordingly, Emblaze has not presented a legally viable theory of direct infringement for the accused Apple Keynote or iTunes Festival streams.

Dr. Madisetti also opined that Apple induces infringement of the Apple Keynote and iTunes Festival streams, without identifying a direct infringer other than Apple. Trial Tr. at 629:24-630:5. But "[t]here can be no inducement [of] infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004). Because Emblaze's theory of direct infringement for the Apple Keynote and iTunes Festival streams is not legally viable, there can be no inducement of these streams. *Id.* Accordingly, Apple is entitled to JMOL that the Apple Keynote and iTunes Festival streams do not infringe the '473 patent and that Apple does not induce infringement based on those streams.

### 5. Emblaze Did Not Prove that any Alleged Direct Infringement of the iTunes Festival Occurred in the United States.

Direct infringement of a United States patent must occur in the United States. The accused iTunes Festival, however, occurs outside the United States, in London. Emblaze failed to identify any "transmitting computer" or "server" associated with the iTunes Festival located in the United States. Accordingly, there cannot be direct infringement of the '473 patent based on the iTunes Festival as a matter of law.

### B. Emblaze Did Not Prove Infringement on a Limitation-By-Limitation Basis.

#### 1. Emblaze Did Not Offer a Limitation-By-Limitation Analysis for Any Accused Stream Other Than MLB At Bat.

Dr. Madisetti did not present a limitation-by-limitation analysis for any of the accused streams other than MLB At Bat. For the six remaining streams, he simply concluded with no meaningful analysis that those streams infringe the asserted claims. Trial Tr. at 602:3-9, 603:21-605:8, 611:5-23, 616:4-21, 620:14-621:6, 625:20-626:8, 626:11-627:18. Such barebones, conclusory opinions are insufficient as a matter of law to prove infringement. *Searfoss*, 374 F.3d at 1148. Apple therefore is entitled to JMOL that the six accused streams other than MLB At Bat do not infringe the asserted claims.

1

2

### 2. Emblaze Did Not Prove that Any Accused Stream Satisfies the Limitation "Each Slice Having A Predetermined Data Size."

3

Each of the asserted claims recites, via the '473 patent's two independent claims, "each slice having a predetermined data size." Dr. Madisetti's own measurements of the seven accused streams showed that for each of the seven streams, the slice sizes vary unpredictably, making it impossible to determine what the data size of the next segment is going to be.

4

5

6

7

Although the Court found that a reasonable jury might be able to conclude that the "predetermined data size" limitation is satisfied in one of two conditions—a stream has a constant bit rate or a variable bit rate stream with a constraint on the maximum data rate (Dkt. No. 424 at 17)—Emblaze failed to prove that either case exists in any of the seven accused streams. Dr. Madisetti's measurements demonstrate that the seven accused streams have a variable bit rate rather than a constant bit rate because the stream's bit rates constantly vary. And Dr. Madisetti never identified a constraint on any of the seven accused streams that would prevent a stream's data rate from exceeding a particular value. Indeed, for each of the seven accused streams for which Dr. Madisetti provided Wireshark data, the stream's bit rate exceeded the estimated maximum bit rate provided in the stream's "BANDWIDTH" attribute.

8

9

10

11

12

13

14

15

16

17

Nor has Emblaze otherwise shown that any of the seven accused streams satisfies the "predetermined data size limitation."

18

19

### 3. Emblaze Did Not Prove That any Accused Stream Satisfies the Limitation "Real-Time Broadcasting."

20

21

Each of the asserted claims recites, via the patent's two independent claims, "real-time broadcasting," which the Court has construed to require "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process." Emblaze did not prove that any of the seven accused streams simultaneously transmits any piece of data to one or more clients. For example, Dr. Madisetti offered no particularized testimony explaining how the "simultaneous transmission" limitation allegedly was satisfied. Nor did Dr. Madisetti offer any analysis of the particular manner in which the seven accused streams' servers transmit segments to the client.

22

23

24

25

26

27

28

The only evidence about whether servers for the seven accused streams transmit data simultaneously or in a staggered manner demonstrated that such servers operate in a request/response model, where a client requests a stream segment from the server and, only then, the server responds to the client with a stream segment. In such a model, the server does not send data to clients simultaneously because the incoming client requests to the server are staggered and, in turn, the server's responses to the clients are staggered. Accordingly, HLS simply does not allow "simultaneous transmission of data to one or more clients."

**4.    Emblaze Did Not Prove that any Accused Stream "Uploads" a Sequence of Files to a Server.**

Each of the asserted claims recites, via the '473 patent's independent claims, "uploading the sequence to the server … such that the one or more client computers can download the sequence over the network from the server." The '473 patent therefore recognizes a distinction between an upload and a download. The Court's construction of this limitation requires "transmitting the files from the transmitting computer to the server at an upload rate," confirming that the transmission is an upload. Dkt. No. 169 at 2. Emblaze did not prove that any of the seven accused streams have a transmitting computer that uploads a sequence of files to a server, as opposed to having the server download the sequence of files from the transmitting computer. Indeed, for the MLB At Bat stream, the only fact witness who testified about the MLB At Bat architecture (Mr. Inzerillo) testified that the relevant transmission is a download, not an upload. Accordingly, Apple is entitled to JMOL that the seven accused streams do not satisfy the "uploading the sequence to the server" limitations of the asserted claims.

In addition, Dr. Madisetti admitted that the accused CBS PGA Tour and ABC News streams rely on the Akamai RTMP architecture. Dkt. No. 404-1 at 5 ("ABC News and the PGA, which use the Akamai RTMP Architecture"). Emblaze did not prove that the sequence of HLS files that clients download from the Akamai RTMP architecture are ever uploaded to a server. Indeed, as described above, Emblaze offered no theory or explanation of how the Akamai RTMP architecture satisfies any limitation of the asserted claims, let alone the limitations requiring "uploading the sequence to a server."

In fact, in the Akamai RTMP Architecture, the HLS segments that the client downloads are created by the Akamai "Ghost" software, which resides at the Akamai edge server. The edge server is the server that communicates directly with a client, meaning there are no other servers between the edge server and the client. The HLS segments that the client downloads therefore are never uploaded to a server as the asserted claims require, because they are created at the edge server itself. Apple is entitled to JMOL that the CBS PGA Tour and ABC News streams do not infringe the '473 patent.

### C. Emblaze Failed to Prove the Elements of Inducement.

#### 1. Emblaze Did Not Prove Apple Possessed the Required Knowledge and Specific Intent to Induce Infringement.

For Emblaze to prove that Apple induced infringement of the '473 patent, Emblaze was required to prove that: (1) Apple was aware of the '473 patent and knew that its acts, if taken, would constitute infringement of that patent; and (2) Apple specifically intended that the alleged direct infringer infringe the patent. *Global-Tech Appliances, Inc. et. al. v. SEB S.A.*, 131 S.Ct. 2060, 2068-2071 (2011). Emblaze offered no evidence sufficient for a reasonable jury to find that Apple knew that any of its acts would constitute infringement of the '473 patent. Nor did Emblaze offer any evidence sufficient for a reasonable jury to find that Apple "specifically intended" that any alleged direct infringer infringe the '473 patent. Instead, the only evidence admitted in Emblaze's case-in-chief probative of Apple's state of mind regarding the '473 patent are two pre-suit letters from Apple's counsel to Emblaze's counsel, in which Apple explained in detail that HLS does not satisfy the claims of the '473 patent and that the '473 patent is invalid in light of various prior art references. DTX-518 and 531.

Moreover, a reasonable belief of noninfringement supports a finding of lack of the specific intent required for induced infringement. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1351 (Fed. Cir. 2009). Here, the Court determined that Apple's noninfringement defenses based on the '473 patent's "uploading" and "predetermined data size" claim limitations are reasonable. Dkt. No. 424 at 27-29. Apple asserted its "uploading" noninfringement argument in the two pre-suit letters to Emblaze's counsel discussed above. DTX-0518 and 531. "Evidence of an accused

-10-

inducer's good-faith belief of invalidity may negate the requisite intent for induced infringement."

*Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1369 (Fed. Cir. 2013). Apple's February 19, 2010 pre-suit letter to Emblaze's counsel includes 20 pages of claim charts detailing why Apple believed the '473 patent was invalid in light of prior art U.S. Patents Nos. 5,434,860, 6,138,147, and 6,014,694. In stark contrast to these pre-suit letters demonstrating Apple's belief that the '473 patent is not infringed and invalid, Emblaze offered no evidence that Apple has ever considered the '473 patent to be infringed and valid, let alone evidence that Apple specifically intended to cause anyone to directly infringe the patent. Accordingly, Apple is entitled to JMOL that it does not induce infringement of any asserted claim of the '473 patent.

**2.    Apple Cannot Induce Infringement of the Asserted Claims Under Its Previously Proposed Claim Constructions.**

Under Apple's proposed claim constructions set forth in: (1) its claim construction briefing (Dkt. Nos. 118, 207) and its oral argument presented at the April 17, 2013 claim construction hearing; and (2) Apple's Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,389,473 as to All Accused Streams (Dkt. No. 346), its related briefing (Dkt. No. 407), and its oral argument presented at the April 8, 2014 hearing on Apple's motions for summary judgment, Apple is entitled to JMOL that Apple does not induce infringement of any asserted claim of the '473 patent. Apple incorporates here, by reference, the bases set forth in those briefs and at those hearings. In particular, with respect to the claim term "upload rate," under Apple's construction of "upload rate" where the upload rate is calculated using the time it takes to actually upload an individual file to the server, which excludes the wait time between the end of the upload and the beginning of the next upload, Apple cannot induce infringement of any asserted claim of the '473 patent.

**3.    Emblaze Cannot Prove Induced Infringement for Method Claim 23 As a Matter of Law.**

Emblaze's infringement theory for claim 23 also is precluded as a matter of law. A defendant cannot be liable for induced infringement of a method claim under 35 U.S.C. § 271(b) unless the practice of each step of the method claim is attributable to a single party. 35 U.S.C.

§ 271(a); *Limelight Networks, Inc. v. Akamai Techs., Inc.*, No. 12-786, 2014 WL 2440535 at *1, 4-6 (U.S. June 2, 2014); *Muniauction, Inc. v. Thompson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008).

Method claim 23 depends from independent claim 1. Claim 1 recites, among other limitations, a "transmitting computer," a "server," and various functions relating to each. As explained above, Emblaze asserts that only one of the seven accused streams—the MLB At Bat stream—practices claim 23. For the MLB At Bat stream, Dr. Madisetti relied on MLB Advanced Media's use of a Cisco Media Processor as alleged practicing the "transmitting computer" limitations of claim 1. Trial Tr. at 509:20-510:11, 511:3-10. Dr. Madisetti also testified that the MLB At Bat architecture uses a Content Delivery Network (CDN) provided by Akamai. *Id.* at 645:10-14 ("Yes, it does use Akamai based on my review of the deposition testimony."). Dr. Madisetti likewise testified that in the MLB At Bat stream, clients download stream segments from the CDN. *Id.* at 565:4-10 ("The cloud shape could be some sort of CDN or some sort of content data network … that is distributing the files … that are being downloaded then by the client.") Consistent with this testimony, Dr. Madisetti relied on a figure from Cisco to allegedly show that MLB At Bat practices the limitations of claim 1, which figure depicted clients downloading stream segments from a CDN. PDTX-68.

Because claim 1 recites that the "server" must allow "one or more client computers [to] download the sequence over the network," the "server" in the MLB At Bat architecture can be a server only in the Akamai CDN. Although Dr. Madisetti attempted to argue that an MLB-owned HTTP server may satisfy the recited "server," there is no evidence that a client can download stream segments from such an HTTP server as opposed to the CDN servers. The "server" of claim 1 therefore can be satisfied only by an Akamai server, and the recited step of "uploading the sequence to the server" therefore cannot be performed without such an Akamai server.

The alleged direct infringement of asserted method claim 23 based on the MLB At Bat stream therefore involves multiple parties—MLB Advanced Media and Akamai—in direct violation of *Akamai*. *Akamai*, 2014 WL 2440535 at *1, 4-6. Accordingly, Apple is entitled to JMOL that Apple does not induce infringement of claim 23.

/////

**D. Emblaze Did Not Even Try to Prove Infringement of Claim 23 Based on any Accused Stream Other Than MLB At Bat.**

Emblaze has asserted that only one of the seven accused streams—the MLB At Bat stream—satisfies claim 23. Dr. Madisetti offered no opinion or analysis that any of the seven accused stream other than MLB At Bat (*i.e.*, the ABC News, CBS PGA Tour, Watch ESPN, NFL Preseason Live, Apple Keynote and the iTunes Festival streams) satisfies claim 23. Dr. Madisetti instead opined that these six streams satisfied only asserted claims 28, 37 and 40. Dr. Madisetti expressly confirmed as much during his cross-examination. Trial Tr. at 642:21-643:15 ("I'm not naming NFL or CBS or ABC or ESPN for infringing claim 23. … I'm not saying that Apple's, Apple's iTunes Festival or Keynotes practice claim 23."). Because Emblaze has not even attempted to show that any of these six accused streams satisfy claim 23, Apple is entitled to JMOL that these six streams do not infringe claim 23 and Apple does not induce infringement of claim 23 with respect to those six streams.

**IV. THE COURT SHOULD GRANT JMOL ON EMBLAZE'S DAMAGES CLAIMS.**

**A. JMOL on Damages Is Required Because Emblaze Did Not Apportion Its Royalty Base.**

**1. Emblaze Did Not Use the "Smallest Salable Unit" as the Starting Point for Its Royalty Base.**

*"We're talking about software functionality that was added to the phone. That's what's at issue as it relates to live streaming."*

—Catharine Lawton, Emblaze's Damages Expert
Trial Tr. at 912:10-12

Apple could not have said it better—this case is about software functionality that was added to its mobile devices, and nothing more. By Ms. Lawton's own admission, the smallest saleable unit is the software containing the accused HLS functionality. That smallest salable unit is embodied in iOS 3.0—the first software upgrade to contain HLS—and subsequent iOS upgrades. By definition, any royalty base that contains <u>more</u> than the value of those software upgrades necessarily captures more than the smallest salable unit. This legal error fundamentally infects Emblaze's damages case.

APPLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW
5:11-CV-01079 PSG

In *LaserDynamics*, the Federal Circuit reaffirmed the requirement that patentees must properly identify and use the smallest salable patent practicing unit:

> We reaffirm that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature.

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012); *see also Cornell University v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 287-88 (N.D.N.Y. 2009).

At trial, Ms. Lawton confirmed that she did not select the smallest salable unit as the starting point for her royalty base. On the contrary, she started with the entire iPhone, iPad, iPod Touch, Mac and Apple TV units as her smallest salable unit. PDTX-1173. To try to justify the inclusion of hardware devices in her royalty base, she explained:

> [I]t's those devices that you have to be holding in your hand in order to be live streaming. You can't have the software on a disk or the software someplace else and be able to accomplish the objective, which is to be able to live stream news events or sporting events or what have you.

Trial Tr. at 1043:24-1044:10. That is not the proper legal test. If Ms. Lawton were correct, the smallest salable unit inquiry would be meaningless. If Ms. Lawton were correct, the court in *Lucent* would have permitted Lucent's damages expert to include computer hardware in a royalty base where the patented feature resided in Microsoft Outlook software. After all, that software would not function without the hardware it runs on. But there, the district court granted a motion *in limine* to exclude Lucent's expert from opining that Microsoft and Lucent would have agreed to a royalty based on the entire price of the computer containing Outlook. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338 (Fed. Cir. 2009). If Ms. Lawton were correct, the court in *Cornell* would have permitted Cornell's expert to use a royalty base of servers and workstations, because the specialized accused processors would not function without those much larger, more expensive devices. But there, the district court excluded Cornell's expert from testifying "that the entire market value of Hewlett-Packard's servers and workstations should be used as the royalty base." *Cornell*, 609 F. Supp. 2d at 284. The court held that "the logical and readily available

APPLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW

alternative was the smallest salable infringing unit with close relation to the claimed invention—namely the processor itself." *Id*. at 288.

Here, there is a "logical and readily available alternative … with close relation to the claimed invention." *Id*. That smallest salable patent practicing unit is the iOS software upgrade that contains the accused HLS feature. Ms. Lawton included those upgrades—more than 9 million of them—as accused products, making clear they are "patent practicing" units. PDTX-1173. She also calculated the revenue attributable to "iPod Touch iOS 3.0 Software Upgrades," demonstrating these upgrades were not just "salable," but actually sold. PTX-383, Schedule 9. But rather than use this "readily available alternative" (*Cornell*, 609 F. Supp. 2d at 288) to calculate her royalty base, Ms. Lawton chose to use the entire hardware device as her smallest salable unit. This error alone warrants JMOL on Emblaze's damages claim.

Emblaze's failure to select the iOS upgrade as the smallest salable unit reveals another flaw—Emblaze's failure to apportion that smallest salable unit. In *Dynetix*, the plaintiff improperly relied on a royalty base that included sales of the defendant's entire product where the defendant had not separately sold any smaller components. *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, Case No. 11-cv-05973 PSG, 2013 WL 4538210, at *1 (N.D. Cal. Aug. 22, 2013). This Court excluded the plaintiff's expert's opinion as "fundamentally flawed" because he "relied on the blanket assumption that, once he selected the smallest salable unit … he could end the analysis… ." *Id.* at *4. The Court ruled that apportionment is required "even where the accused product is the smallest salable unit or where … the smallest salable unit is still a multi-component product encompassing non-patent related features." *Id.* at *3. The Court saw "no logical basis to depart from an apportionment requirement in a case, such as the present one, where the alleged smallest salable unit is not closely tied to the patented feature." *Id.*

So it is here. Ms. Lawton admitted that the upgrade to iOS 3.0 "added over 100 other features that were not related to live streaming or HLS." Trial Tr. at 910:17-20. But besides failing to use the iOS upgrade as her smallest salable unit, Ms. Lawton failed to account for any of those more than 100 features by apportioning out the value of those features. As in *Dynetix*, her testimony is "fundamentally flawed" for this additional reason.

### 2. Emblaze's Device Unit Royalty Base Includes the Value of Hundreds of Unpatented Components.

Compounding her failure to use the smallest salable unit, Ms. Lawton also failed to apportion the "device unit" royalty base to remove the value of the hundreds of unpatented hardware and software components in the accused iPhones, iPads, iPod Touches, Apple TVs and Macs. Since at least 1884, apportionment has been black-letter Supreme Court law:

> When a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance… . The rule on this head is aptly stated by Mr. Justice Blatchford in the court below: "The patentee," he says, "must in every case <u>give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features</u>, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature."

*Garretson v. Clark*, 111 U.S. 120, 121 (1884) (emphasis added); *see also Dowagiac Mfr. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 646 (1915) ("if the plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains" and is "required to take the initiative in presenting evidence looking to an apportionment"); *LaserDynamics,* 694 F.3d at 67 (requiring apportionment "where small elements of multi-component products are accused of infringement"); *Lucent,* 580 F.3d at 1332-33 (same).

Here, Ms. Lawton presented a royalty base of "<u>All</u> Devices, Upgrades and Applications" that included 246 million iPhone, iPad, iPod Touch, Mac and Apple TV "units" without any apportionment. PDTX-1173 (emphasis added). During her direct testimony, she never uttered the words "apportion" or "apportionment." On cross, however, Ms. Lawton admitted:

- The upgrade to iOS 3.0 "added over 100 other features that were not related to live streaming or HLS." Trial Tr. at 910:17-20.

- "But it's the basis for customer demand, and I'm not saying that live streaming is the basis of customer demand." Trial Tr. at 969:6-7.

- "We're talking about software functionality that was added to the phone. That's what's at issue in this case as it relates to live streaming." Trial Tr. at 912:10-12.

In spite of these admissions, Ms. Lawton failed to apportion out the value of hundreds of other features in those products that have nothing to do with live streaming. Ms. Lawton had the tools at her disposal to conduct an apportionment, but failed to use them. For example, Ms. Lawton could have calculated the number of app downloads that used the accused streams (starting with approximately 22 million downloads for three of those streams) and compared that against the total number of Apple devices that were capable of downloading those apps. PTX-383.27, Schedule 11B (total number of app downloads of Watch ESPN, MLB.com At Bat, ABC News for iPad, and MLB.com At Bat Lite). More to the point, she could have started with the per-unit price for iOS 3.0 upgrades (an average of $6.65 per upgrade) and calculated that figure against the total downloads of accused apps. Trial Tr. at 957:18-22; PTX-383, Schedule 9. As demonstrated above, those iOS upgrades are the most relevant smallest salable unit, which Ms. Lawton ignored. Using the "number-of-accused-downloads" and "price-of-iOS-upgrades" apportionment methods would have been a good start towards a proper apportionment in this case. Ms. Lawton did neither, nor did she do anything else to apportion.

Because Emblaze failed to apportion its royalty base to account for the value of features not covered by the '473 patent, JMOL is required. *Golden Bridge Tech. v. Apple Inc.*, Case No. 5:12-cv-4882-PSG, D.E. 471, Order Granting Def.'s Mot. to Exclude Opinions and Testimony of Karl J. Schulze at 10 (N.D. Cal. May 18, 2014) ("[T]he Court cannot square this no-base-apportionment, no-demand-analysis methodology with Lucent's central holding."); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-cv-3428 PSG, 2013 WL 831528, at *15 (N.D. Cal. Jan. 10, 2013) (granting new trial on damages).

Emblaze may contend that apportionment is taken care of by excising from its analysis the gross revenue numbers, or the incremental profit number. But that does not constitute apportionment—indeed, Ms. Lawton's analysis is unchanged in any material respect from what she presented in her expert report (and deposition), which was the subject of Apple's *Daubert* motion. The fact remains that she arrived at her $2 royalty rate without taking into account the

numerous unpatented features of accused products. Simply ignoring the total revenue or profit numbers in favor of a dollars-per-unit approach does not constitute apportionment. Her opinion as to the Apple hardware devices should be stricken because she indisputably used an unapportioned royalty base.

> **3.** **Emblaze Cannot "Apportion" Its Royalty Base by Adjusting Its Proposed Royalty Rate.**

Emblaze may argue that its proposed $2-per-unit royalty rate properly apportions the royalty base to exclude the value of unpatented components. This is legally impermissible. As the Federal Circuit held in *Uniloc*, "[t]he Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319-20 (Fed. Cir. 2011) (emphasis added). Thus, merely adjusting the royalty rate using *Georgia-Pacific* factor 13 does not amount to apportionment. But in any event, Ms. Lawton stated that factor 13 did not affect her royalty rate analysis. PDTX-1175

Rather than apportioning the royalty base, Ms. Lawton opined about qualitative "benefits" that Apple purportedly derived from using the '473 patent, including going from "being a third place in video to being first place and the leader in video with their industry leading HLS in a very short time." Trial Tr. at 887:6-8. In *LaserDynamics*, the Federal Court rejected a methodology relying on "vague qualitative notions of the relative importance of the [accused] technology." *LaserDynamics*, 694 F.3d at 69. The court reasoned that "[w]hether called 'product value apportionment' or anything else, the fact remains that the royalty was expressly calculated as a percentage of the entire market value of a laptop computer rather than a patent-practicing [optical disk drive] alone." *Id.* at 68. Thus, Ms. Lawton's use of a $2-per-unit royalty rate against an unapportioned "device unit" royalty base is legally impermissible.

> **B.** **JMOL Is Required Because Emblaze Failed to Exclude Apple Products That Never Used the Accused Streams.**

JMOL on damages is required for another independent reason—Emblaze failed to exclude from its royalty base those units that never used the accused streams. As Ms. Lawton admitted,

-18-

"the damages in this case are related, and have to be only related, to the infringement by the live streaming function."  Trial Tr. at 911:11-14; *see also id.* at 984:20-22 ("Q.  But that's what this case is limited to, the use of live streaming for those seven live streams; is that right?  A.  That's my understanding, yes.").  Of the more than 960,000 apps on the Apple App Store, only five of those apps use the accused streams:  (1) MLB.com At Bat; (2) Watch ESPN; (3) ABC News; (4) CBS PGA Tour; and (5) NFL Preseason Live.  Ms. Lawton admitted that the downloads of those accused apps on her Schedule 11B totaled approximately 22 million, while the total number of devices she included in her base was more than 246 million.  Trial Tr. at 982:5-983:21; PTX-383.27, Schedule 11B; PDTX-1173.  Apple's share of revenue from these five accused apps was about $10 million.  Trial Tr. at 985:19-986:2.  Although Ms. Lawton had the numbers of downloads and revenue associated with apps that deliver the accused streams, she presented no evidence demonstrating how often users actually downloaded those apps or used the seven accused live streams.

At trial, Ms. Lawton suggested that the accused streams could be accessed through the Safari web browser.  Trial Tr. at 984:2-6.  But in fact, Dr. Madisetti offered no evidence or analysis demonstrating that the accused application streams (ABC News, CBS PGA Tour, Watch ESPN, NFL Preseason Live) can be viewed through the Safari web browser on iOS devices.  Trial Tr. at 494:17-495:6 (discussing use only on Macs).  The evidence of record demonstrates that these live streams can be viewed only through the downloaded apps on iOS devices.

In *Lucent*, the Federal Circuit dealt with a similar issue, holding that a damages award must be correlated in some respect to the extent customers actually used the infringing method:

> [W]e observe that the evidence of record is conspicuously devoid of any data about how often consumers use the patented date-picker invention. … The damages award can't be supported by evidence that the infringers also used additional, non-infringing features. … <u>The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers.</u>  This is so because this is what the parties to the hypothetical negotiation would have considered.

*Lucent*, 580 F.3d at 1334 (emphasis added).  There, despite evidence of extensive sales, the Federal Circuit vacated the damages award because there was "[n]o evidence describ[ing] how

many … users had ever performed the patented method or how many times." *Id.* at 1334-35; *See also Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021 (S.D. Ind. 2006), *aff'd* 576 F.3d 1348, 1358-59 (Fed. Cir. 2009) ("Absent proof that St. Jude's devices were programmed for and actually executed the claimed method, CPI may not recover damages for the sales of devices merely capable of infringing."); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1372-73 (Fed. Cir. 2006) (damages award must be reduced by number of units returned without being assembled into infringing product); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 1 Fed. App'x 879, 882 (Fed. Cir. 2001) ("Although a single direct act of infringement is sufficient to satisfy the inducement of infringement analysis, a separate damages analysis must still be performed."); *Imagexpo, L.L.C. v. Microsoft Corp.*, 284 F. Supp. 2d 365, 369-70 (E.D. Va. 2003) (plaintiff must establish the connection between sales and direct infringement to establish damages for indirect infringement). Instruction 5.9 of this Court's Model Jury Instructions is in accord:

> In order to recover damages for induced infringement, [patent holder] must either prove that the [accused product] necessarily infringes the [patent in suit] or prove acts of direct infringement by others that were induced by [accused infringer]. <u>Because the amount of damages for induced infringement is limited by the number of instances of direct infringement, [patent holder] must further prove the number of direct acts of infringement of the [patent in suit]</u>, for example, by showing individual acts of direct infringement or by showing that a particular class of [products] [uses] directly infringes.

Model Patent Jury Instructions for the NDCA, Instruction 5.9 (emphasis added.)

Here, the accused Apple devices infringe, if at all, when a user consumes one of the seven accused live streams. Ms. Lawton did nothing to exclude from her royalty base the vast majority of devices that never use those accused streams and therefore never infringe. Just as in *Lucent*, Emblaze did not introduce evidence "describ[ing] how many … users [have] ever performed the patented method or how many times." *Lucent*, 580 F.3d at 1334-35. Thus, Emblaze not only failed to establish the number or frequency of direct infringement, it used an all-unit royalty base that contains many, many units that will never infringe.

/////

**C. JMOL Is Required Because Emblaze Relied on Non-Comparable License Information, Which Rendered Ms. Lawton's Royalty Rate Analysis a "Black Box."**

Ms. Lawton testified for two-and-a-half hours on direct, addressing some 165 demonstrative slides. Of that, she spent at most 10 minutes and four slides discussing the licenses that form the critical starting point for her royalty rate opinion. The balance of her two-plus-hour presentation was devoted to arguing why the jury should depart upward from the bulk of those licenses and choose a figure that will award Emblaze more than $1 billion over the life of the '473 patent—one of the largest patent litigation damages awards in history. Ms. Lawton's testimony was just the sort that juries tended to hear before the Federal Circuit's recent string of decisions challenging overinflated damages requests; namely, a brief discussion of some cherry-picked licenses with no evidence of comparability, inserted into a story putting the asserted patent at the center of the universe. Much more is required. Ms. Lawton's conclusory reliance on licenses suffers from several flaws that render Emblaze's evidence of damages legally unsupportable.

**1. The Licenses Ms. Lawton Considered Are Not Technologically or Economically Comparable to the Hypothetical License, and Ms. Lawton Did Not Account for the Identified Differences.**

The Court denied Apple's *Daubert* motion in part because counsel represented that Ms. Lawton would be able to identify at trial "a sufficient nexus between the licenses and demands to the hypothetical license at issue." Dkt. No. 544 at 10. Because she did not come even close to doing so, JMOL is warranted. To the contrary, Ms. Lawton testified that none of the licenses she considered in forming her range of royalty rates were technologically or economically comparable. Trial Tr. at 886:23-887:22 ("All of these license agreements that we're talking about, none of them are of the—they didn't provide that type of benefit. There are no license agreements in which a patent was licensed for purposes of developing a *de facto* standard. There isn't that type of evidence.") (emphasis added). Yet Ms. Lawton offered no analysis of the technological or geographical scope of those licenses and did not testify about the purported

technological and economic differences she identified in conclusory fashion. No other expert or fact witness provided any such testimony either.

The licenses at issue stretch across several decades of technological development. Most convey worldwide rights. Several of the licenses involve dozens or hundreds of patents from leading technology companies. Without some of these licenses, Apple would not be able to sell music or play video in the dominant formats (MP3 and H.264, for example). Ms. Lawton provided the jury with nothing upon which it might make a reasonable comparison of these licenses to the hypothetical license between Emblaze and Apple. Evidence of royalty rates from licenses without a relationship to the claimed invention cannot form the basis of a reasonable royalty calculation. *ResQNet Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010); *see also Lucent*, 580 F.3d at 1327 (expert may not rely on license agreements that are "radically different from the hypothetical agreement under consideration" to determine a reasonable royalty); *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) ("[C]omparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them."), quoting *ResQNet*, 594 F.3d at 873.

### 2. Emblaze Did Not Introduce the Licenses Themselves or Offer Any Evidence of Their Actual Terms.

Far from providing the jury with sufficient analysis of the licenses that form the core of her opinions, neither Ms. Lawton nor the jury were shown a <u>single</u> license during Ms. Lawton's direct examination. There was no questioning on those licenses or their terms, and Apple has objected to the admission of those exhibits. The Court has advised that if the witness did not speak to an exhibit, it will not be admitted.

Ms. Lawton's summary recitation of the licenses upon which she purports to base her opinion is an insufficient basis upon which to admit her royalty rate testimony. Indeed, during her direct testimony, she relied merely on PDTX-1165, shown below:

/////

/////

/////

This slide conveys no information about the licenses themselves—nothing about the type or scope of the licensed products, the number and character of the licensed patents, the license duration, the payment terms, and the like. All Ms. Lawton said about the Apple licenses was that "they generally provide for running royalties, particularly the standards based licenses that range from 9 cents to $2.50 a unit. There are a variety of different – they're complicated license agreements with different rates that apply to different products." Trial Tr. at 888:14-18. This is all she said. In less than one minute of testimony, she concluded:

> And then as part of the hypothetical negotiation, in consideration of all of this information, it's my opinion that the parties would have agreed to a running royalty of $2 per unit and 1 percent of application revenue, which is within that range of the 9 cents per unit to $2.50 per unit on the Apple multimedia licenses.

*Id.* at 898:20-25. She did all of this without showing the jury a single actual license.

### 3. Ms. Lawton's $2 Per Unit Royalty Rate Was "Plucked Out of Thin Air."

Ms. Lawton provided no rationale for how she picked her $2 per unit royalty rate out of her range of data points. Rather, her royalty rate "appears to have been plucked out of thin air based on vague qualitative notions of the relative importance of the [accused] technology." *LaserDynamics*, 694 F.3d at 69. As Judge Koh recently held, "[e]xperts must follow some

-23-

discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v. Apple Inc.*, No. 12-cv-02885, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014), citing *Lawrence v. Raymond Corp.*, No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) *aff'd*, 501 F. App'x 515 (6th Cir. 2012). "The Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *Id.*; *accord Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court ... the court cannot simply take an expert's word for a specific proposition").

Here, Ms. Lawton did not explain her methodology for picking her $2 per unit rate out of her range of $0.09 to $2.50 per unit. PDTX-1166. Ms. Lawton simply identified which *Georgia-Pacific* factors tended to increase the royalty rate, and noted that her $2 per unit rate was "within that range of 9 cents per unit to $2.50 per unit on the Apple Multimedia licenses." Trial Tr. at 897:20-898:25. Ms. Lawton also relied on qualitative factors nearly identical to those rejected in *GPNE*, including: (1) Apple purportedly would have lost market share without a license (Trial Tr. at 846:15-23); (2) Apple allegedly needed the accused technology to compete (id. at 887:2-8); (3) Apple's ability to pay was "obviously … not a consideration here" (*id. at* 893:23-24); and (4) Apple allegedly understood the importance of the accused technology to its business (*id. at* 894:7-11). *GPNE Corp.*, 2014 WL 1494247, at *3. Ms. Lawton also admitted that:

- The Samsung-Emblaze license—the only Emblaze license she elected to discuss with the jury—was not a patent license and conveyed no rights to the '473 patent. Trial Tr. at 993:13-16.

- She ignored a 2005 Thomson-Apple "paid up" license to MP3 license in favor of three MP3 licenses that had been explicitly replaced by the 2005 license. Trial Tr. at 1002:17-1003:6; 1004:2-11.

- She ignored an Apple lump sum license to the AVC/H.264 standard from 2008. Trial Tr. at 1015:11-16, 1016:3-23.

- She relied on advertised royalty rates for standards, including MP3, MPEG-4 and AVC/H.264, even though Apple produced its actual licenses to these standards. For example, Ms. Lawton relied on a "Summary of AVC/H.264 License Terms," which stated on the first page that the terms are "not an offer to license and <u>may not be relied upon for any purpose</u>." PTX-1120 (emphasis added).

Ms. Lawton's scant analysis—revealing nothing about her methodology in coming to a $511 million damages demand—is not sufficient under *GNPE* and related precedent to permit the jury to consider her analysis.

The "black box" nature of Ms. Lawton's damages analysis (and the fact that she did not apportion) is particularly evident because her $2 royalty rate opinion did not change one penny in response to significant changes in the case. The Court struck her reliance on Apple's incremental gross profits following the introduction of HLS, described as Ms. Lawton's "anchor" and "starting point." Dkt. No. 544 at 9, n.43. The Court also denied her use of two of the nineteen "available royalty rates" she purportedly considered in connection with her royalty rate analysis. Dkt. No. 544 at 11. And Ms. Lawton admitted she was now only permitted to assume that seven accused streams infringed. Trial Tr. at 980:8-13, 981:5-10. Despite these sea changes in the case, Ms. Lawton's royalty rate opinion did not change (nor, in fact, did her opinions on the royalty base). This is the definition of a "black box" analysis.

## V.     CONCLUSION.

For the foregoing reasons, Apple requests that the Court grant judgment as a matter of law on liability and damages.

Dated:  July 8, 2014                     DLA PIPER LLP (US)


                                         By:  /s/Mark Fowler
                                             Mark Fowler (Bar No. 124235)
                                             mark.fowler@dlapiper.com
                                             Robert Buergi (Bar No. 242910)
                                             robert.buergi@dlapiper.com
                                             DLA PIPER LLP (US)
                                             2000 University Avenue
                                             East Palo Alto, California 94303
                                             T: 650.833.2000
                                             F: 650.833.2001

                                             John Allcock (Bar No. 98895)
                                             john.allcock@dlapiper.com
                                             Erin Gibson (Bar No. 229305)
                                             erin.gibson@dlapiper.com
                                             Robert Williams (Bar No. 246990)
                                             robert.williams@dlapiper.com
                                             DLA PIPER LLP (US)
                                             401 B Street, Suite 1700
                                             San Diego, California 92101

T: 619.699.2862
F: 619.764.6662

GREENBERG TRAURIG, LLP
Sarah Barrows (SBN 253278)
barrowss@gtlaw.com
Stephen Ullmer (SBN 277537)
ullmers@gtlaw.com
GREENBERG TRAURIG, LLP
4 Embarcadero Center, Suite 3000
San Francisco, CA 94111-5983
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

James J. DeCarlo (Admitted *Pro Hac Vice*)
decarloj@gtlaw.com
Michael A. Nicodema (Admitted *Pro Hac Vice*)
nicodemam@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, New York 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400

*Attorneys for Defendant Apple Inc.*