MARTIN B. PAVANE (admitted pro hac vice)
LISA A. FERRARI (admitted pro hac vice)
ANDREW NEMIROFF (admitted pro hac vice)
MARILYN NEIMAN (admitted pro hac vice)
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Telephone:     (212) 883-4900
Facsimile:     (212) 986-0604
Email:         mpavane@cozen.com
               lferrari@cozen.com
               anemiroff@cozen.com
               mneiman@cozen.com

NATHAN DOOLEY (CA State Bar No. 224331)
COZEN O'CONNOR
601 South Figueroa Street
Los Angeles, California  90017
Telephone:     (213) 892-7900
Toll Free Phone: (800) 563-1027
Facsimile:     (213) 892-7999
Email:         ndooley@cozen.com

MARK V. ISOLA (SBN 154614)
REHON & ROBERTS
A Professional Corporation
830 The Alameda
San Jose, CA 95126
Telephone: (408) 494-0900
Facsimile: (408) 494-0909
Email: misola@rehonroberts.com

*Attorneys for Plaintiff Emblaze Ltd.*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD., <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., a California Corporation, <br><br> Defendant. | CASE NO.  5:11-cv-01079-PSG <br><br> **PLAINTIFF EMBLAZE'S MEMORANDUM  IN OPPOSITION TO DEFENDANT APPLE'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF CATHARINE LAWTON** <br><br> **HEARING DATE:  June 17, 2014** <br> **TIME:  10:00 a.m.** <br><br> Before: Hon. Paul S. Grewal |

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................1

II.     STATEMENT OF FACTS .........................................................................................2

        A.      Lawton's Analysis of Demand For and Use of HLS ......................................2

        B.      Apple's Deficient Document Production ........................................................4

        C.      Emblaze's Motion to Compel .........................................................................7

        D.      Lawton's Apportionment Analysis .................................................................8

        E.      The Public Record ..........................................................................................9

III.    ARGUMENT ...........................................................................................................10

        A.      Lawton's Royalty Base is Not Derived From the Entire Market Value Rule ...............11

                1.      The Wrongdoer Rule .........................................................................12

                2.      Apple is Wrong That a Royalty Base Based on Units Must Be Further
                        Apportioned .......................................................................................15

                3.      Lawton Properly Considered the Issue of Apportionment in
                        Determining The Royalty Rate ..........................................................16

                4.      Apple's Argument that the Royalty Base is Limited to a One-to-One
                        Correlation Based on Direct Infringement is Also Wrong .................17

        B.      Lawton's Analysis Is Not a "Black Box" Without Sound Economic and Factual
                Predicates ......................................................................................................19

        C.      Lawton's Analysis of Publicly Available Licenses and Damages Claims Should be
                Allowed ..........................................................................................................22

        D.      Lawton's Opinions on Apple's Document Production and Apple's Public History
                Are Within Her Expertise And Not Prejudicial ............................................24

IV.     CONCLUSION .........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Motorola,*
    869 F.Supp.2d 901 (N.D. Ill. 2012) ................................................14

*Apple Inc. v. Motorola, Inc.,*
    Case No. 12-4882, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014) ................17

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
    377 U.S. 476 (U.S. 1964) ......................................................15

*Bigelow v. R.K.O. Radio Pictures,*
    327 U.S. 251 (1946) ...........................................................13

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
    418 F. Supp.2d 1021 (S.D. Ind. 2006) .........................................17

*Carnegie Mellon Univ. v. Marvell Technology Group, Ltd.,*
    Civil No. 09-290, 2012 WL 3679564 (W.D. Pa. Aug. 24, 2012) ..........11, 16, 21, 22

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,*
    1 Fed.Appx. 879 (Fed. Cir. 2001) .........................................17, 18

*Contemporary Mission, Inc. v. Famous Music Corp.,*
    557 F.2d 918 (2d Cir. 1977) ..................................................14

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ...................................................10, 11, 19, 24

*Dowagiac Mfg. Co. v. Deere & Webber Co.,*
    284 F. 331 (8th Cir. 1922) ...................................................15

*Ericsson Inc. v. D-Link Corp.,*
    No. 6:10-CV-473, 2013 WL 2242444 (E.D. Tex. May 21, 2013) ...................11

*Fractus, S.A. v. Samsung Electronics Co., Ltd.,*
    876 F.Supp.2d 802 (E.D. Tex. 2012) ..........................................11

*Frumentum Co. v. Lauhoff,*
    216 F.601 (U.S. 1914) ........................................................15

*Golden Bridge Tech. v. Apple Inc.,*
    Case No. 5:12-cv-04882-PSG, slip op. (N.D. Cal. May 18, 2014) ...............10

*GPNE Corp. v. Apple, Inc.*,
   5:12-cv-02885, 2014 WL 1494247 (N.D. Cal. April 16, 2014) ........................................15, 21

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)........................................................................................24

*Imagexpo, LLC v. Microsoft Corp.*,
   284 F. Supp. 2d 365 (E.D. Va. 2003) ......................................................................17, 18

*Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*,
   761 F.2d 649 (Fed. Cir. 1985)........................................................................................16

*Lam, Inc. v. Johns-Mansville Corp.*,
   718 F.2d 1056 (Fed. Cir. 1983)......................................................................................14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)....................................................................................11, 12

*Metso Minerals, Inc. v. Powerscreen Int'l Dist. Ltd.*,
   833 F.Supp.2d 282 (E.D.N.Y. 2011 ...........................................................................21, 22

*Nickson Indus., Inc. v. ROL Manufacturing Co., Ltd.*,
   847 F.2d 795 (Fed. Cir. 1988)..................................................................................14, 15

*Paper Converting Machine Co. v. Magna-Graphics Corp.*,
   745 F.2d 11 (Fed. Cir. 1984)..........................................................................................20

*Scott v. Ross*,
   140 F.3d 1275 (9th Cir. 1998) .......................................................................................24

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) .......................................................................................23

*St. Clair Intellectual Property v. Canon, Inc.*,
   No. Civ.A. 03-241 JJF, 2004 WL 2213562 (D. Del. Sept. 28, 2004).........................................19

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931)......................................................................................................13

*SynQor, Inc. v. Artesyn Technologies, Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013)......................................................................................11

*TWM Mfg. Co. v. Dura Corp.*,
   789 F.2d 895 (Fed. Cir. 1986)........................................................................................14

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)......................................................................................12

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

iii

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

*United States v. 14.38 Acres of Land*,
  80 F.3d 1074 (5th Cir.1996) ...........................................................................................24

*Versata Software, Inc. v. SAP America, Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013)......................................................................................11

*Westinghouse Co. v. Wagner Mfg. Co.*,
  225 U.S. 604 (U.S. 1912)...........................................................................................13, 14

Plaintiff Emblaze Ltd. ("Emblaze") submits this Memorandum in Opposition to Defendant Apple Inc.'s Motion to Exclude Opinions and Testimony of Catharine Lawton ("Motion") [D.E. 430]. Apple Inc.'s ("Apple") arguments are without merit, and its motion to exclude Lawton from offering her opinions on damages should be denied in its entirety.

## I.   __INTRODUCTION__

Beginning in June 2009, Apple introduced HTTP Live Streaming ("HLS") into every device it offered for sale, requiring applications developers to use Apple's HLS protocol, and publishing the protocol to the IETF standards body to push through its implementation as the *de facto* standard for live streaming. Apple wanted its protocol adopted to benefit the Apple platform and ecosystem, including smartphones, tablets and laptops.

Emblaze's damages expert, Catharine Lawton, an expert with 30 years' experience as a damages consultant, prepared a 528-page expert report in which she exhaustively reviewed the available evidence. Exhibit A (Excerpts of Expert Report of Catharine M. Lawton ("Lawton Report")).[1] She conducted a reasonable royalty analysis using the *Georgia-Pacific* factors to sketch the circumstances of a hypothetical negotiation taking place before the date of first infringement. Apple failed to produce financial data and information concerning demand for the patented feature in the accused products, and so Lawton combed the public record, analyzing industry and newspaper articles, SEC filings, transcripts from other litigations, publicly available licensing information, and more to evaluate demand for, and use of, HLS.

Although Apple did not have, or did not produce, the information necessary to perform a detailed apportionment analysis, Apple nonetheless criticizes Lawton's assessment of the royalty base, which Apple claims has not been properly apportioned between patented and unpatented features. Apple also claims that Lawton's analysis is a "black box", and that she impermissibly relied on publicly available licensing information and prejudicial information concerning Steve Jobs and Apple.

---

[1]   Exhibits referred to herein are attached to the Declaration of Lisa A. Ferrari ("Ferrari Dec."), filed herewith. Emblaze has not included Lawton's complete Expert Report in Exhibit A because of its size, but a complete version will be provided to the Court upon request.

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

1

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

As demonstrated herein, Lawton's methods are sound and reliable, set forth in full detail for the Court to evaluate, and her report easily satisfies the test for admissibility.  Apple's real issue is with Lawton's conclusions.

Apple's motion, moreover, violates the Court's October 22, 2013 Order [D.E. 294], in which the Court ordered that Apple may not criticize Emblaze for a failure to rely on or consider financial data that was not produced, and marketing information addressing what product features drive demand for the accused products.

Apple's motion should be denied, and the jury should hear Lawton's opinions and make its own determination of the damages owed to Emblaze.

## II.   STATEMENT OF FACTS

### A.   Lawton's Analysis of Demand For and Use of HLS

Apple first introduced the HLS live streaming feature into the iPhone iOS 3.0 in June 2009. As Roger Pantos, an Apple employee and one of the principal developers of HLS, testified, "the availability of live content is an interesting use case to many people . . . and makes our devices more valuable."  Ex. B (Excerpts of Deposition of Roger Pantos ("Pantos Dep.") at 27:12-15.

Lawton's report includes a comprehensive discussion of the demand for and value of HLS to the Apple ecosystem of products.  Lawton sets forth a history of live streaming (Ex. A at 138-219), in which she discusses Apple's early recognition of the "huge potential in digital video" and the enormous threat to Apple from Adobe Flash, Microsoft Silverlight, and the Samsung Instinct phone, all of which offered live streaming when Apple did not.  *Id.* at 140, 162-66, 170-75.

Lawton reports on the industry's recognition of a "technological sea change" and resulting shift to HTTP which occurred in 2008, and Apple's recognition of the business opportunities that offering live streaming on its products would present, including challenging the dominance of Adobe Flash in the mobile market, beating Microsoft's HTTP-based Smooth Streaming, and responding to the competitive challenge presented by a new generation of smartphones, including the Samsung Instinct.  *Id.* at 176, 178.  She sets forth how Apple's business decisions, including acquisitions, policy changes, and the launch of HLS, all indicated that "[s]treaming media is poised to play a more

PLAINTIFF EMBLAZE'S MEMORANDUM IN OPPOSITION TO DEFENDANT APPLE'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF CATHARINE LAWTON

2

*Emblaze Ltd. v. Apple, Inc.,* Case No. 5:11-CV-01079-PSG

prominent role in the company's future." *Id.* at 197-200.  When live streaming was introduced into the iPhone 3.0 in June 2009, it rapidly became the *de facto* standard for live streaming.  *Id.* at 200. As the industry recognized, live streaming is "important for many reasons at multiple levels."  *Id.* at 201.  The U2 concert live-streamed by YouTube in October 2009 "was the largest event in YouTube's history and generated more than 10 million live streams across 7 continents."  *Id.* at 202.

Lawton further analyzed demand for HLS by a detailed review of the following:

- **Apple deposition testimony** (*e.g.,* 30(b)(6) witness Roger Pantos: "the availability of live content is an interesting use case and interesting to many people . . . and makes our devices more valuable");

- **Apple documents and press releases** (*e.g.,* at Apple's Worldwide Developers Conference, "the most-requested feature was the ability to watch live video");

- **Statements by content delivery networks (CDNs) and other Apple partners** (*e.g.,* Akamai's 2011 White Paper on best practices for iPhone and iPad: "According to a recent study, 75% of worldwide data-capable handsets are able to download video clips, and almost 50% support streaming video. . . . But iPhone® users are much more active on the network than others, generating a disproportionate amount of mobile web and application traffic.");

- **Surveys** (*e.g.,* "More than 80% of consumers prefer to watch [sporting events and news] . . . live. Among these respondents, over 40% in the UK and US watch sporting events live on second screens (desktops, laptops, tablets and smartphones");

- **Third-party reports** (all citing the number of streams, contrary to Apple's contention that such data does not exist) (*e.g.,* For the July 2009 Michael Jackson memorial service, "CNN.com had . . . 9.7 million live video streams between noon and 5 pm PDT. . . . MSNBC.com says that visitors watched 3 million live streams of Jackson's service . . . ABC News reports nearly 6 million live Jackson memorial streams . . . MTV reports that its live stream of the memorial service ranked among its top 10 live streams ever. . . . [T]he Jackson memorial brought the internet's second largest day ever in terms of traffic"; similar data is presented for Prince William's wedding, the 2012 London Summer Olympics, and the selection of the new Pope).

*Id.* at 245-59.

Lawton also sets forth evidence of the extensive use of HLS (Ex. A at 260-78), including:

- **The rapid adoption of HLS as "the standard"** (*e.g.,* "[B]y December 2011, HTTP Live Streaming had become The Standard) (Ex. A at 260);

- **Apple's use of HLS** (Ex. A at 261-71).  Lawton details the record evidence showing that, although it was not produced, Apple had access to data showing the use of HLS through Akamai and Apple data centers.  She also details the evidence of the use of live streaming at Apple's Worldwide Developer Conferences and the Apple iTunes Festivals and other music events, including a February 2012 Paul McCartney concert at Capitol Studios in Hollywood);

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

3

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

- **Content Delivery Network ("CDN") use of HLS** (*e.g.,* Akamai issued a press release on July 1, 2009, announcing its support for live streaming and describing it as a "key feature" in the iPhone 3.0 update that "benefit[s] the consumer") (Ex. A at 272);

- **Content provider use of HTTP live streaming** (*e.g.,* the immediate adoption and use of HLS by numerous content providers, including MLB, CBS, NBA, Turner Broadcasting, CNN, and YouTube, as soon as it was available in June 2009) (Ex. A at 275-78).

### B.   Apple's Deficient Document Production

Apple's production of financial documents was limited to publicly available SEC filings and sales summaries prepared for this litigation. Ex. A at 425. Apple did not produce business planning documents, strategic plans, chart of accounts, product line profitability reports, budgets, management reports or similar documents. *Id.* at 425.

Apple's production of forecasts was limited to a one-page summary, prepared for this litigation, titled "Forecast History – WW Units & Revenue Forecast – Q1FY08 thru Q3FY13." *Id.* Apple claimed that it does not have projections for U.S. sales, does not prepare projections of profit for HLS, and does not prepare or report actual profits for any product line. *Id.* at 480; Ex. C (Excerpts of Deposition of Mark Buckley ("Buckley Dep.") at 226-28. When asked whether Apple had U.S. forecast information, Mark Buckley, Apple's 30(b)(6) witness on financial topics, said he had asked the head of the Financial Planning & Analysis group for that information "and she doesn't have a U.S. forecast." *Id.* at 231:21-232:9. But at the Apple/Samsung trial, Apple's Vice-President of Marketing, Phil Schiller, testified that it was *his* group that handled forecasts. Ex. D (Excerpts of Apple/Samsung Trials) at 665. Buckley never provided that information, and Apple never produced any forecasts from the Marketing group, despite a specific document request seeking such forecasts. *See id.*, Ex. E (Apple's Response to RFP Nos. 107, 127).

Emblaze also requested product line profitability reports (Ex. E (Apple's Response to RFP No. 107, 128)), but none were produced. At his 30(b)(6) deposition, Buckley maintained repeatedly that Apple did not generate profitability reports on a per-product basis and that the only way to determine that information would be through the summaries of sales that Apple's litigation department had generated for this litigation. *See* Ex. C at 46:18-46:23 ("Q: And the costs that are the SGA [Selling, General and Administrative] costs, are they ever aggregated on a per-product basis?

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

4

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

A:  We've done some allocations, but it's not really something that management views.  We are kind of a one-P&L company."); *id.* at 262:10-23 ("Q:  Now, the form 10-Q that we looked at earlier, that identifies Apple's profits, is that right?  A: As a company worldwide, yes.  Q:  Okay.  Are there other records at Apple that identify the profitability of the company or the products?  A: Well, we are one P&L company, and the final profit is disclosed in our 10-K and 10-Qs.").  And, of course, if Apple did not generate profitability on a per-product basis, there certainly was no such exercise for an individual feature such as HLS.  *See id.* at 47:15-48:2 ("Q: In connection with HLS, . . . do you know if SGA was ever prepared concerning HLS?  A: . . . . No.  Nothing like that would ever be allocated to a feature or software.  It barely gets allocated to product lines.").  In addition to Apple's 30(b)(6) testimony, Apple maintained in response to Emblaze's motion to compel that Apple does not maintain cost of goods information for the U.S., only worldwide.  Defendant Apple Inc.'s Opposition to Emblaze's Motion to Compel [D.E. 257] at 8-9.

But at the Apple/Samsung trial, where Apple as plaintiff sought to prove its damages in a patent case, a very different story emerged.  At the first trial, Samsung's expert witness testified that Apple "has product line financials for the iPhone and for the iPad."  Ex. D at 3030:24-3031:16.  He testified that "Apple only produces information on a product line basis on worldwide sales, but it does produce information to their management as to U.S. prices, U.S. units. . . ."  *Id.* at 3047-3049.  At the second Apple/Samsung trial, Apple's expert witness, Julie Davis, testified that she calculated Apple's lost profits by utilizing data "that comes directly from Apple's GAAP, Generally Accepted Accounting Principles, line of business statements. . . . [T]hose are documents prepared in the ordinary course of business at Apple used in running the business."  *Id.* at 688.  Although the exhibit reporting that information was maintained under seal, she testified that "the first page has to do with the iPhones.  The second page is iPads."  *Id.*  Samsung's expert witness, Mike Wagner, confirmed his review of these product line profitability reports, *as well as the 30(b)(6) testimony of Apple's Mark Buckley,* who "explain[ed] . . . [Apple's] financials," including the methodology used by Apple to allocate cost among product lines.  *Id.* at 1019-21 (emphasis added); *see also id.* at 3030:24-3031:16.  Thus, while maintaining to Emblaze that it did not have *U.S.* per-product

profitability information, Apple used *worldwide* GAAP product line reports in the Apple/Samsung litigation to calculate Apple's U.S.-only profits.  Moreover, the same litigation-department financial witness, Mark Buckley, testified in the Emblaze case that there were no product line profitability reports, while testifying in the Apple/Samsung case as to the availability of such information.

Apple also produced no documents concerning HLS from senior executives, despite several documents indicating top management's involvement in the HLS technology.  In one summary of meeting notes from the HLS team, there is a reference to "Metrics for Phil and Steve" (understood to be Apple Vice-President of Marketing Phil Schiller and CEO Steve Jobs) with the items "Total number of requests for stream over day, week, month", "Peak simultaneous tune-ins", and "Avg viewing time" listed.  *See* Ex. F (APPLE040552-APPLE040553) at APPLE040552; Ex B (Pantos Dep.) at 227:20-228:2.  An email from HLS engineer Dennis Backus to Phil Schiller provided HLS numbers for an Apple keynote address and stated that "[t]hese are all unique visitor numbers *and not the total views I usually give you*."  Ex. G (APPLE139723-APPLE139726) at APPLE139723 (emphasis added).  In another, an Apple employee requested "HTTP streaming results" from the iTunes festival to compare "with other HTTP streaming results", and Dennis Backus responded that he would "have to check with Phil Schiller to get the okay to release that data.  It's confidential." Ex. H (APPLE133541).

Also, Apple produced virtually no internal surveys or analysis of customer demand for HLS, or data concerning HLS streams, such as the quantity of streams or data concerning Apple customers engaged in live streaming, despite Emblaze's requests for such information and references in several documents suggesting that such information existed.  In addition to the categories of "Metrics for Phil and Steve", and the "confidential data", "total views" and "the total views I usually give you", in a July 26, 2010 email, Backus wrote to key HLS developers that he "just did the numbers for the first seven days of the VOD video streams from the July 16th event" and "[h]ere are the percentages: HTTP Streams: 53.66%/RTSP Streams: 46.34%".  Ex. I (APPLE264057).  Indeed, Dennis Backus maintained a "reporting system" for tracking HTTP (i.e., HLS) streams; in response to a request for such numbers from someone from the iTunes Store, Backus wrote: "I can get RTSP Stream requests

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

6

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

up today.  The HTTP Stream numbers come from processing the actual traffic logs and so there's always a 2-3 day delay in getting those numbers."  Ex. J (APPLE120622-APPLE120641) at APPLE120622.  An August 12, 2011 agenda for a meeting with Akamai listed the "State of the market", including "[r]ecent top http streaming events, market dynamics, customer demands."  Ex. K (APPLE265112-APPLE265114) at APPLE265112.  *See also* Ex. L (APPLE267817-APPLE 267820) at APPLE267820 ("We spoke to Akamai today and . . . [t]hey had 60 companies streaming worldwide").  But other than these references, and the glimpses of data they included, Apple provided nothing, and certainly did not provide the "traffic logs" or "HTTP Stream numbers" referred to in Backus' email.

At her deposition, Lawton testified that "in 30 years of practice in this field, I have never seen more limited information produced", that "[n]ever, ever in 30 years has there been an experience where a party like Apple has not produced their internally prepared financial documents for the products that are accused.  Never in 30 years has that happened."  Ex. M (Excerpts of Deposition of Catharine M. Lawton ("Lawton Dep.")) at 38:16-24.

### C.      Emblaze's Motion to Compel

On September 11, 2013, Emblaze moved to compel, seeking both documents and a properly prepared 30(b)(6) witness on sales-related issues, financial and accounting issues, licensing, and marketing issues due to deficiencies in Apple's document production and 30(b)(6) testimony.  [D.E. 246].  Granting in part Emblaze's motion, the Court ruled: "Apple is ORDERED that it may not rely on marketing materials related to the accused products or criticize Emblaze's failure to rely on or consider such materials in addressing what product features drove demand of the accused products."  Oct. 22, 2013 Order [D.E. 294].  Emblaze's motion to compel made clear that "marketing materials" referred to consumer surveys, customer evaluations, projections, strategic plans, business plans, and marketing plans for the accused products and for HLS in particular.  Ex. N (Emblaze's Motion to Compel) at 14-16).  The Court also ruled that Apple "may not rely on any actual U.S. costs, U.S. sales, or U.S. earnings forecast data or criticize Emblaze's failure to rely on or consider such data."  Order [D.E. 294] at 2.  At the time of Emblaze's motion, the second Apple/Samsung trial, at which

1  witnesses Julie Davis and Mike Wagner made clear that Apple *did* maintain GAAP product line

2  reports, had not yet taken place.

3  ### D.        Lawton's Apportionment Analysis

4  After discussing the law of apportionment, Lawton acknowledges in her report that "the

5  currently available facts do not establish that live streaming is 'the basis for customer demand.'"  Ex.

6  A at 503.   Live streaming is an "important feature", but "clearly is not 'the basis for customer

7  demand' related to smartphones."  *Id.*

8  For her apportionment analysis, Lawton first analyzed the data using the "Income

9  Approach."  *Id.* at 464-67.  Apple insinuates that Lawton made up the Income Approach herself

10  ("She uses something she calls the 'Income Approach'" (Motion at 6)), but the Income Approach is

11  a well-accepted method and, indeed, Apple's expert, James Malackowski, applies the Income

12  Approach in his reasonable royalty analysis.  *See* Ex. O (Excerpts of Expert Rebuttal Report of

13  James E. Malackowski ("Malackowski Report") at 100-104.

14  The Income Approach is based on the economic value—usually in the form of increased

15  sales and profits, or reduced costs—of the patented technology.  Ex. A (Lawton Report) at 464; Ex.

16  O (Malackowski Report) at 100.  The Income Approach is generally regarded as the most common

17  approach for patent valuation because it is directed to estimating the value of unique assets when

18  market transaction data is not available.  Ex. A (Lawton Report).   Using the Income Approach,

19  Lawton analyzed the excess gross profit margin on each of the accused products beginning from the

20  date HLS was launched in that product.  That led her to the data point $20.63, which she candidly

21  acknowledged was on the "high end" because it included non-patented features as well.

22  In performing the Income Approach, Lawton did not start with Apple's total gross margin

23  per unit, but rather analyzed the extent to which Apple's gross margin increased since the date HLS

24  was launched in each of the main accused devices.  *Id.* at 466-67 and Schedule 18A.  Lawton

25  acknowledged that this analysis "does <u>not</u> measure the contribution of the '473 Patent alone" and

26  that she is relying on this analysis to provide "additional economic data that would inform the

27  hypothetical negotiation."  *Id.* at 467.  At the same time, however, Lawton noted that when HLS was

28

introduced into the iPhone, iPhones had the ability to stream video on demand ("VOD"), but not the ability to live stream.   Thus, the addition of live streaming in June 2009 was an "incremental addition" to the feature set.   Ex. M (Lawton Dep.) at 164:21-165:5.

Lawton also sets forth her analysis of the hypothetical negotiation and *Georgia-Pacific* factors.   Apple comments that the portion of the report "which actually details her reasonable royalty 'analysis' is relatively short" (Motion at 5), but that ignores the hundreds of pages of analysis in Lawton's report that precedes the discussion of the *Georgia-Pacific* factors and is incorporated into that analysis.   Lawton concluded that Factor 2, which looks to the rate paid by Apple for comparable patents, supported minimum royalty rates in the general range of $0.10 to $3.10 per device.   The other factors were either neutral (Factors 1, 3, 4, 5, 6, 12 and 13) or tended to increase the hypothetically negotiated royalty rate (Factors 7 through 11).   Ex. A at 525.   Lawton ultimately concluded that the *Georgia-Pacific* analysis and the facts of this case supported a reasonable royalty of $2.00 per unit for hardware and 1% of revenue for software and applications.   *Id.*

### E.   The Public Record

Lawton explained that because of Apple's limited document production, she did an "extensive review of additional publicly available information, in an effort to provide the most complete possible record to the court."   Ex. M (Lawton Dep.) at 141:15-18.   She reviewed "trial transcripts, analyst reports, industry reports, trade press, Apple SEC filings.   You name it and it's publicly available and I went looking for it, and I specifically looked for data."   *Id.* at 142:5-8.

Apple takes issue with what it refers to as Lawton's "opinions" concerning the difficulty of apportionment (Motion at 7), but these are not opinions; they are rather observations based on Apple's document production and Lawton's experience concerning information and data that businesses typically maintain.   Apple quotes from some of the sources reviewed by Lawton (Motion at 7-8), insinuating that the opinions of others concerning Steve Jobs and Apple are Lawton's opinions.   But they are not; they are from the public record that Lawton reviewed.

## III.   **ARGUMENT**

In evaluating expert testimony in response to a *Daubert* motion, the critical prerequisite is that "the methodology . . . [be] sound." *Golden Bridge Tech. v. Apple Inc.,* Case No. 5:12-cv-04882-PSG, slip op. at 7 (N.D. Cal. May 18, 2014).  A review of Lawton's expert report and deposition testimony confirms that Lawton's opinions meet that test.  Therefore, "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'" *Id.* (quoting *Apple Inc. v. Motorola, Inc.,* Case No. 12-4882, 2014 WL 1646435, *19 (Fed. Cir. Apr. 25, 2014)).

Contrary to Apple's argument, the entire market value rule is not implicated by Lawton's damages opinion.  Lawton based her reasonable royalty opinion of the value of HLS, not the entire market value of the accused devices, and her methodology aligns with Federal Circuit precedent.

For apportionment, reasonable approximation is all that is required.  A degree of imprecision is permitted, and indeed is inherent, in calculating damages, especially in cases in which the defendant's conduct has made the calculation of damages difficult.  Lawton fulfilled her obligation to apportion the value of HLS in the absence of non-infringing features.  Apple latches on to a phrase in Lawton's report that Apple had made apportionment "impossible", and ignores the extensive evidence supporting Lawton's analysis of the value of the patented feature.

Moreover, in criticizing Emblaze for not showing the demand for the patented feature with the hyper-specificity Apple apparently demands, Apple violates the express ruling of this Court that Apple may not criticize Emblaze in view of Apple's inability to provide documents addressing what product features drove demand for the accused products.  [D.E. 294].

As for Lawton's statements concerning the extent of information produced by Apple, and information concerning Steve Jobs and Apple, these are neither irrelevant nor prejudicial.  Evidence concerning Apple's lack of production will assist the jury in evaluating Lawton's credibility and evidence concerning demand for and use of the patented feature.  As for the public record concerning Steve Jobs and Apple, this is not "mudslinging", but rather provides insight regarding Apple's business that Apple itself did not provide.  These facts are relevant to the hypothetical

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

10

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

negotiation because they show how Apple has bargained in the real world and are reasonably relied upon by experts in the field.

As the Supreme Court explained in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993), "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Lawton's opinion on damages, supported by her 500-plus page report, is far from shaky, but if Apple believes that it is, it can challenge it at trial.

### A.   <u>Lawton's Royalty Base is Not Derived From the Entire Market Value Rule</u>

The entire market value rule is a narrow exception to the general rule that royalties are awarded based on the smallest salable patent-practicing unit. *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012). "A patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *SynQor, Inc. v. Artesyn Technologies, Inc.,* 709 F.3d 1365, 1383 (Fed. Cir. 2013) (quoting *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1318 (Fed. Cir. 2011)).

Contrary to Apple's argument, Lawton did not rely on the entire market value of the accused devices to calculate the royalty base for Apple's infringement. To the contrary, Lawton concluded that live-streaming was not the basis of customer demand and, therefore, that the entire market value rule did not apply.

Instead, Lawton calculated a royalty base based on numbers of units sold, which in turn was based on her extensive analysis of the value attributable to HLS. The use of a per-unit royalty base does not implicate – or violate – the entire market value. *See Versata Software, Inc. v. SAP America, Inc.,* 717 F.3d 1255, 1268 (Fed. Cir. 2013) (where expert "merely accounted for all infringing sales" in his analysis, but applied royalty rate to value of infringer's sales, "the entire market value exception was never triggered"); *Ericsson Inc. v. D-Link Corp.,* No. 6:10-CV-473, 2013 WL 2242444, *3 (E.D. Tex. May 21, 2013) (same); *Fractus, S.A. v. Samsung Electronics Co., Ltd.,* 876 F.Supp.2d 802, 835 (E.D. Tex. 2012) (same); *Carnegie Mellon Univ. v. Marvell Technology Group,*

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

11

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

1   *Ltd.,* Civil No. 09-290, 2012 WL 3679564, *4 (W.D. Pa. Aug. 24, 2012) ("an apportionment

2   analysis needs to start somewhere, and simply starting with the total operating profits does not

3   inherently invoke the entire market value rule").

4          In the cases cited by Apple, the experts used a pool of *revenues* as the royalty base.  *See, e.g.,*

5   *LaserDynamics,* 694 F.3d at 68 (expert "opined that a 2% running royalty applied to QCI's total

6   revenues from sales of laptop computers in the United States--$2.53 billion—was an appropriate and

7   reasonable royalty"); *Golden Bridge Technology,* slip op. at 10 (expert opinion based upon "sales of

8   the infringing products").   They did not, as Lawton did, work from a royalty base comprised of

9   *units*.

10         For the value of HLS, Lawton's report presents substantial evidence "tending to separate or

11  apportion . . . the patentee's damages between the patented feature and the unpatented feature."

12  *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1318 (Fed. Cir. 2011) (quoting *Garretson v.*

13  *Clark,* 111 U.S. 120, 121 (1884)).   Notwithstanding Lawton's criticism of Apple's document

14  production, Lawton analyzed apportionment with the available evidence.

15         Lawton does not seek to "skew[] the damages horizon", *Uniloc USA, Inc.,* 632 F.3d at 1319,

16  by presenting Apple's entire revenues or profits from the accused devices.   The Federal Circuit's

17  concern in allowing such evidence has been that a large, multi-billion dollar number "only serve[s]

18  to make a patentee's proffered damages amount appear modest by comparison." *LaserDynamics*, 694

19  F.3d at 68; *Uniloc,* 632 F.3d at 1320 ("The disclosure that a company has made $19 billion dollars in

20  revenue from an infringing product cannot help but skew the damages horizon for the jury,

21  regardless of the contribution of the patented component to this revenue").   Here, however, the

22  multi-billion dollar "cat" need never leave the "bag" because Lawton's reasonable royalty base is not

23  based on Apple's total revenues or profits, but rather on a per-unit basis.

24                      1.     The Wrongdoer Rule

25         Whether the evidence does not exist, or was not produced, Apple's failure to produce

26  documents restricted Lawton's apportionment analysis.  Although documents produced in discovery

27  suggest that Apple did, in fact, track HLS usage and/or have access to third-party data on HLS

28

usage, no internal Apple data or surveys were produced that would have allowed Lawton to measure the value of HLS to accused devices with certainty.

As far back as the Supreme Court's 1912 decision in *Westinghouse*, courts have recognized that the consequences of the infringer losing documents, not producing documents, or not having information necessary to prove damages with specificity should fall on the infringer, not the party seeking redress.  In *Westinghouse Co. v. Wagner Mfg. Co.,* 225 U.S. 604 (U.S. 1912)*,* the Supreme Court stated:

> None of the cases cited discuss the rights of the patentee who has exhausted all available means of apportionment, who has resorted to the books and employees of the defendant, and by them, or expert testimony proved, that it was impossible to make a separation of the profits. This distinction, between difficulty and impossibility, is involved in the ruling by the Circuit Court of Appeals for the Sixth Circuit in Brennan & Co. v. Dowagiac Mfg. Co., 162, Fed. Rep. 472, 476, where the Garretson Case was distinguished, and the court said:

> "In the present case the infringer's conduct has been such as to preclude the belief that it has derived no advantage from the use of plaintiffs invention. . . . In these circumstances, upon whom is the burden of loss to fall? We think the law answers this question by declaring that it shall rest upon the wrongdoer, who has so confused his own with that of another that neither can be distinguished. It is a bitter response for the court to say to the innocent party, 'You have failed to make the necessary proof to enable us to decide how much of these profits are your own;' for the party knows, and the court must see, that such a requirement is impossible to be complied with. The proper remedy to be applied in such cases is that stated by Chancellor Kent in Hart v. Ten Eyck, 2 Johns. Ch. (N.Y.) 62,108, where he said: The rule of law and equity is strict and severe on such occasion, . . . All the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it."

> It may be argued that, in its last analysis, this is but another way of saying that the burden of proof is on the defendant. And no doubt such, in the end, will be the practical result in many cases. But such burden is not imposed by law; nor is it so shifted until after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impossible of accurate or approximate apportionment. If then the burden of separation is cast on the defendant it is one which justly should be borne by him, as he wrought the confusion.

*See also Bigelow v. R.K.O. Radio Pictures,* 327 U.S. 251, 265 (1946) (same); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563 (1931) (same).

1    Apple did not produce financial data, such as product line profitability reports, and it did not

2    produce evidence of demand for the HLS feature.  Whether the failure to produce was intentional or

3    the documents do not exist need not be resolved; the consequences should fall on Apple, not

4    Emblaze.

5    Apple's assertion that "[n]o case since 1952 has applied this burden-shifting doctrine"

6    (Motion at 23) is wrong.  The so-called Wrongdoer Rule has been expressly and repeatedly

7    recognized by the Supreme Court, and has been applied in the Federal Circuit and other courts to

8    various damages-related issues.  *See, e.g., Nickson Indus., Inc. v. ROL Manufacturing Co., Ltd.,* 847

9    F.2d 795, 799 (Fed. Cir. 1988) (quoting *Westinghouse Elec. & Mfg. Co.,* 225 U.S. 604)) ("We agree

10   that where it is 'impossible to make a mathematical or approximate apportionment' between

11   infringing and non-infringing items, the infringer must bear the burden and the entire risk"); *TWM*

12   *Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 900 (Fed. Cir. 1986) (internal citation omitted); (special

13   master "recognized that 'any adverse consequences must rest on the infringer when the inability to

14   ascertain lost profits is due to the infringer's own failure to keep accurate or complete records'");

15   *Lam, Inc. v. Johns-Mansville Corp.,* 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("when the amount of the

16   damages cannot be ascertained with precision, any doubts regarding the amount must be resolved

17   against the infringer"); *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d

18   Cir. 1977) (stating in upholding award of lost profits that "when the existence of damage is certain,

19   and the only uncertainty is as to its amount . . . the burden of uncertainty about the amount of

20   damage is upon the wrongdoer").

21   Not only does the Wrongdoer Rule apply to patent cases, but it applies in both the reasonable

22   royalty context and the lost profits context.  *See Nickson,* 847 F.2d at 799.  Indeed, Apple itself

23   relied upon this burden-shifting doctrine in *Apple Inc. v. Motorola,* 869 F.Supp.2d 901, 906 (N.D.

24   Ill. 2012), *rev'd on other grounds,* 2012 WL 1646435 (Fed. Cir. Apr. 25, 2014), when it argued the

25   issue of non-infringing alternatives.

26   Nor is Apple correct that *Westinghouse* is distinguishable because the plaintiff there sought

27   the infringer's profits under the old patent statute.  Apple first states that reasonable royalty damages

28

1   were not introduced until the Patent Act of 1952, but that is wrong -- the concept of reasonable

2   royalty damages existed long before codification.  *See, e.g., Frumentum Co. v. Lauhoff,* 216 F.601,

3   617 (U.S. 1914) (discussing alternative to award of profits "frequently spoken of as a 'reasonable

4   royalty'"); *Dowagiac Mfg. Co. v. Deere & Webber Co.,* 284 F. 331, 348 (8th Cir. 1922) (Plaintiff

5   entitled "to damages based upon a reasonable royalty").   Apple is also incorrect that the profit

6   remedy was eliminated in the Patent Act of 1952; it was legislation in 1946 that eliminated the

7   infringer's profits as a damages remedy.  *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377

8   U.S. 476, 505 (U.S. 1964) ("By the 1946 amendment, . . . the statute was changed to approximately

9   its present form, whereby only 'damages' are recoverable").   In any event, the Wrongdoer Rule

10   remains applicable today, as shown by cases such as *Nickson.*

11          In a recent opinion excluding a damages expert for a deficient expert report, Judge Koh

12   stated *twice* in her opinion that the expert "perform[ed] no apportionment analysis, *nor does he even*

13   *consider whether apportionment is appropriate.*"  *GPNE Corp. v. Apple, Inc.,* 5:12-cv-02885, 2014

14   WL 1494247, *4, *5 (N.D. Cal. April 16, 2014) (emphasis added).   Elsewhere, she stated that

15   "[w]ithout a methodology, an explicit apportionment analysis, or an explanation of why

16   apportionment is inappropriate, cross-examination is futile."  *Id.* at *6.   Judge Koh recognized,

17   however, that a strict apportionment may not be possible in every case.

18          2.   <u>Apple is Wrong That a Royalty Base Based on Units Must Be Further</u>
19              <u>Apportioned.</u>

20          Attempting to get another bite at the apportionment apple, Apple cites to cases that stand for

21   the proposition that apportionment of the base is generally required when the royalty base is *revenue.*

22   But those cases are inapposite because the royalty base here is *units.* Apple does not cite a single

23   case for the proposition that a per-unit royalty base must be apportioned.   Indeed, Apple's own

24   damages expert, Malackowski, did not apportion the royalty base, and relies on the very same unit

25   royalty base Ms. Lawton used -- all accused infringing units.  *See* Ex. O (Malackowski Report),

26   Schedules 3.2 and 7.

27          Moreover, and as discussed below, Apple ignores that Ms. Lawton properly assessed the

28   value of the patented feature in comparison to unpatented features in determining the *royalty rate*.

PLAINTIFF EMBLAZE'S MEMORANDUM IN                    15                *Emblaze Ltd. v. Apple, Inc.,*
OPPOSITION TO DEFENDANT APPLE'S MOTION                                Case No. 5:11-CV-01079-PSG
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

3.   <u>Lawton Properly Considered the Issue of Apportionment in Determining The Royalty Rate</u>

Lawton provides a detailed analysis of the demand for and use of HLS, concluding that it was a significant feature that resulted in substantial benefits to Apple.  As described earlier, after calculating the increase in gross margin subsequent to the launch of HLS in each Apple device, Lawton recognized that because of numerous non-patented features, "we're going to be in the lower end of the range."  Ex. M (Lawton Dep.) at 172:17.  Lawton did not suggest that the $20.63 "would be viewed as the value attributable to HLS", but rather that it provides an "anchor" based on available data.  *Id.* at 14-21.

Importantly, Lawton did not start with Apple's total gross margin per unit.  Rather, she determined the extent to which Apple's gross margin had increased since the launch of HLS, *i.e.,* $20.63 per unit, and then reduced that number to account for non-patented features.  Apple criticizes this number as "a key part" of Lawton's analysis, but "an apportionment analysis needs to start somewhere," *Carnegie Mellon Univ.,* 2012 WL 3679564, at *4, and "in view of the limitations on the subject of apportionment," Lawton reasonably started hers there.    Ex. M (Lawton Dep.) at 169:22-24.  As Lawton explained, the "$20.63 is simply a data point . . . . [W]e're not suggesting that under some construction that the analysis goes up to 100 percent of the gross margin. . . . We're saying this is a data point that shows the economic gain that Apple enjoyed in terms of increase in gross margin after the launch of HLS.  That's all the data point is."  *Id.* at 174:24-175:12.  Given that Apple incorporated the HLS feature on a pre-existing product and commingled it with "at least 99 other features", "it's somebody's obligation to unscramble the spaghetti."  Lawton made substantial effort to do just that.  *Id.* at 177:17-23.

The question for the Court is whether Lawton's reference to the $20.63 margin increase as a starting point was reasonable.  It was.  *See Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.,* 761 F.2d 649, (Fed. Cir. 1985) ("[i]n proving damages, the patent owner's burden of proof is not absolute, but rather one of reasonable possibility").   As the Federal Circuit recently held in overturning the exclusion of a damages opinion, "[w]hether . . . [the expert witness's] testimony was the product of reliable principles and methods is the focus of admissibility; whether the testimony

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

16

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

produced a correct degree of estimation of the value of the . . . patent [in suit] is a factual consideration reserved for the fact finder." *Apple Inc. v. Motorola, Inc.*, 2014 WL 1646435, at *24.

In the end, Apple's argument is not that no apportionment was done—because it was. Apple's argument is that *not enough* apportionment was done.  But that is a question for the jury.

4.   Apple's Argument that the Royalty Base is Limited to a One-to-One Correlation Based on Direct Infringement is Also Wrong

Apple's claim that the royalty base must be limited based on evidence of direct infringement (Motion at 12) does not survive scrutiny.  Apple cites to cases involving method claims, ignoring that Emblaze has also sued Apple on apparatus claims.  *See, e.g., Lucent Techs., Inc.,* 580 F.3d 1301, *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 418 F. Supp.2d 1021 (S.D. Ind. 2006).  For apparatus claims, it is enough to show sales of devices that include software capable of infringing with no intervention or programming required by the end users, and that is exactly the case here.

Apple is also incorrect that Emblaze must demonstrate a direct correlation between acts of infringement and the royalty base.  *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 1 Fed.Appx. 879, 884 (Fed. Cir. 2001) (overturning summary judgment on inducement damages, but stating: "We do not imply that Chiuminatta is required to demonstrate a one-to-one correspondence between units sold and directly infringing customers."); *Imagexpo, LLC v. Microsoft Corp.,* 284 F. Supp. 2d 365, 369-70 (E.D. Va. 2003) ("although the burden is on . . . [the plaintiff] to show a correlation between those units of . . . [accused software] that Microsoft has distributed and those through which it has actually induced an end user to employ an infringing application, . . . [the plaintiff] may do so by circumstantial evidence.  This proof need not necessarily be one-to-one, but it may be extrapolated from otherwise reliable and competent evidence").

Emblaze may prove inducement through circumstantial, in addition to direct, evidence. "'Proof of inducing infringement or direct infringement may be shown by circumstantial evidence.'" *Id.* (quoting *Moleculon Research Corp. v. CBS,* 793 F.2d 1261, 1272 (Fed. Cir. 1986).  "'It is hornbook law that direct evidence of a fact is not necessary.  Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."

1  *Chiuminatta Concrete Concepts, Inc.,* 1 Fed. Appx. at 884 (quoting *Moleculon Research Corp,* 793

2  F.2d at 1272).

3        Here, the evidence of Apple's instructions in the HTTP Overview document for developers

4  to use HLS, requiring developers to do so in order to have their applications approved in the App

5  Store, its submission of the HLS protocol on the IETF informational track in an effort to have the

6  protocol become the *de facto* standard, its HLS streaming of high-profile events such as the Paul

7  McCartney concert, the fact that HLS is the *only* approach to live streaming on Apple devices, and

8  the abundant evidence of demand and use by consumers such as the MLB At Bat apps, is exemplary

9  of the strong direct and circumstantial evidence relied upon by Lawton for her damages opinion.

10  Whether this evidence is sufficient is for the fact-finder.  *See Imagexpo, LLC,* 284 F. Supp. 2d at 370

11  ("Whether . . . [plaintiff's] proof is capable of establishing damages for indirect infringement for

12  every unit of . . . [accused software] Microsoft has distributed . . . is a question for the trier of fact,

13  not this Court").

14        As for Apple's claim that Emblaze "does not allege that every accused Apple device is used

15  to directly infringe" and that Emblaze "is bound by a summary judgment order that only seven

16  accused streams constitute Emblaze's total evidence of direct infringement" (Motion at 12), Apple

17  misunderstands  Emblaze's claim, which is that every Apple device is capable of infringement,

18  without any modification or programming by the end user, and that in combination with

19  circumstantial evidence of demand and use, is sufficient to support a claim for damages for all units

20  sold.  *Chiuminatta Concrete Concepts, Inc.,* 1 Fed.App. 879*; Imagexpo, LLC,* 284 F. Supp. 2d 365.

21        Also, contrary to Apple's position, revenue from applications is not a full measure of the

22  value of the patented invention; Apple's business model is largely to give away apps and charge for

23  phones, i.e., focused on deriving revenue from hardware.  Second, Apple's reference to applications

24  as the SSU—not SS**PP**U—is a red herring that shows that even Apple knows that the applications

25  alone are not patent practicing. As Apple's 30(b)(6) witness Roger Pantos testified, HLS increases

26  the value of Apple's products and is an interesting use case to many people.  Ex. B (Pantos Dep.) at

27

28

PLAINTIFF EMBLAZE'S MEMORANDUM IN              18            *Emblaze Ltd. v. Apple, Inc.,*
OPPOSITION TO DEFENDANT APPLE'S MOTION                     Case No. 5:11-CV-01079-PSG
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

27:9-15.    Clearly, the appropriate SSPPU royalty base in this case is the hardware, not just applications.

Last, Apple is also wrong that the "record evidence that the percentage of users who actually use the infringing feature is small." Motion at 12. Lawton's report is replete with evidence of Apple's performance of HLS and the use of HLS by end users. Apple cherry-picks a single survey—that was not produced during discovery, is not limited to Apple devices, and is inconsistent with Apple's own survey information and other publicly available surveys cited by Lawton--for the proposition that under 50% of device owners access live streaming (Motion at 14). Survey evidence that Apple *did* produce reports that 21% of iPad owners watch live TV on their iPads every day, and only a small minority do not use the live TV option at least some of the time. Ex. P (Excerpt of Nielsen Survey) at APPLE272184. Lawton also cited extensive evidence of extraordinarily high usage of live streaming at groundbreaking news and sporting events. Apple also ignores the volume versus value point made by Lawton – that although video on demand had higher volume, it is live streaming that is the more valuable functionality. *See* Ex. Q (MLB Meeting Notes).

Apple's criticism of Lawton for not commissioning a survey of Apple device users (Motion at 14 n.4) is misplaced. Lawton presented abundant evidence of demand for HLS – Apple's own survey data, publicly reported survey data, and the Akamai website real-time live streaming meter. Once again, to the extent that granular evidence of use is unavailable, the consequences should fall on Apple, not Emblaze.

### B.    Lawton's Analysis Is Not a "Black Box" Without Sound Economic and Factual Predicates

Apple's suggestion that Lawton's methodology is a "black box" with no discernible methodology (Motion at 18) is absurd. Apple does not agree with Lawton's conclusions, plain and simple. But that is not a basis for a *Daubert* motion. Lawton relies upon the "well-worn" *Georgia-Pacific* factors and hypothetical negotiation approach, the very same approach that Apple's expert relies upon and that damages experts routinely rely upon in determining a reasonable royalty. *See St. Clair Intellectual Property v. Canon, Inc.,* No. Civ.A. 03-241 JJF, 2004 WL 2213562, *2 (D. Del. Sept. 28, 2004).    She does not pull her royalty opinion "out of thin air", but goes through a

comprehensive analysis to conclude that a reasonable royalty would be $2.00 per unit and 1% of software and applications revenue.

Lawton discloses how she derives her $2.00 per unit recommendation.  First, Lawton summarizes the benefits Apple derived as a result of its use of the invention, including that Apple became a leader in digital video and live streaming, Apple captured and kept a critical advantage in this arena, Apple increased its iDevice sales and operating profits, and Apple realized cost savings and other advantages from HLS.

Next, Lawton analyzes the *Georgia-Pacific* factors addressed to the market conditions in the industry (Factors 1, 2, 3, 4, 5, and 12), and concludes that five of these factors are neutral, but that Factor No. 2 (the rates paid by the licensee for the use of other patents comparable to the patent in suit) leads to a royalty rate range of $0.10 to $3.10 per unit.  *Id.* at 507-12.  She then analyzes the category of *Georgia-Pacific* factors addressed to the anticipated profitability of the product or process made, used, sold or offered for sale by the infringer and covered by the patent (Factors 6-11 and 13), and concludes that five of those factors would tend to increase the royalty rate, and two are neutral. Lawton concludes by reviewing the key circumstances existing at the time of the hypothetical negotiation, including that time was critical for Apple given that digital convergence was moving towards an inflection point; the economic stakes were extremely high because of digital convergence; Apple had never been a leader in video but had the chance to become one; Apple did not have time for a protracted negotiation like it was then engaged in with Motorola; and that Emblaze would recognize the opportunity with Apple, while also recognizing that it could not command a royalty for the use of HLS for non-infringing VOD streaming. *Id.* at 527-28.

A reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Lucent,* 580 F.3d at 1325 (quoting *Unisplay, S.A. v. Am. Elec. Sign Co*., 69 F.3d 512, 517 (Fed.Cir.1995)); *Paper Converting Machine Co. v. Magna-Graphics Corp.,* 745 F.2d 11, 22 (Fed. Cir. 1984) ("while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inferernce, although the result be only approximate") (quoting *Story Parchment Co.,* 282 U.S. at 563).  By

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

20

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

demanding a level of specificity that cannot be achieved, Apple is doing what this Court's Order instructed it not to – criticizing Emblaze for not considering granular financial information and materials addressed to customer demand.  Lawton has analyzed the available data on both issues, and scoured the public record to supplement her analysis.   Assessing the correctness of her conclusions is a job for the fact-finder.

Apple argues that Lawton's opinion is on a par with the expert opinion recently excluded by Judge Koh in *GPNE Corp.,* 2014 WL 1494247 (Motion at 19-20), but that is not so.  The expert in *GPNE Corp.,* 2014 WL 1494247, at *4, said he relied upon his "30 years of experience" as a damages expert and generally upon "all the evidence in the record."  Not surprisingly, the court rejected an expert whose argument "fundamentally reduce[d] to taking his opinion based on 30 years of experience for granted."  *Id.* at *6.  Lawton does nothing of the kind.  Taking nothing for granted, Lawton analyzed the available evidence and scoured the available public record to ascertain the demand for HLS and the circumstances existing at the time of the hypothetical negotiation.

Also, the expert report in *GPNE Corp.,* 2014 WL 1494247, at *5, "relie[d] on highly generic statements about 3G and 4G LTE technology, and how important cellular connectivity is to Apple."  The patents at issue, however, did "not cover all of 3G and 4G LTE technology," and the expert "cite[d] no evidence indicating the value of the specific technology claimed by GPNE's patents."  *Id.*  Here, in contrast, the patent at issue covers HLS, which is the only way to live stream on Apple devices.  Unlike the *GPNE Corp.* expert, Lawton's evidence is precisely directed to determining the value of HLS, the specific technology at issue.

In this case, as in all the cases in which Lawton's damages opinions have been approved, Lawton engaged in a thorough analysis of the *Georgia-Pacifc* factors.  *See, e.g., Carnegie Mellon Univ.,* 2012 WL 3679564, at *1 (stating in connection with denial of motion to exclude expert report that Lawton "left very few, if any, stones unturned" and "engaged in an extremely detailed *Georgia-Pacific* analysis in order to reach her opinion on a reasonable royalty for the case"); *Metso Minerals, Inc. v. Powerscreen Int'l Dist. Ltd.,* 833 F.Supp.2d 282, 311-312 (E.D.N.Y. 2011), *rev'd on other grounds,* 526 Fed.Appx. 988 (Fed. Cir. 2013) (Lawton "extensively reviewed the information

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

21

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

available to her to reach her conclusions.  In addition, she engaged in a thorough analysis of the 15 *Georgia-Pacific* factors as it related to the facts of this case").  As in *Carnegie Mellon* and *Metso,* there is no basis here to exclude Lawton's opinions.

### C.   Lawton's Analysis of Publicly Available Licenses and Damages Claims Should be Allowed

Apple complains that Lawton used publicly available licensing information in her reasonable royalty analysis "without doing anything to establish they are technically and economically similar to the facts of this case."  Motion at 21.  Again, that is not true.

Lawton considered the limited universe of 32 license agreements that Apple produced in this litigation.  Lawton viewed the agreements as "generally comparable" because they related generally to the field of multimedia, and used them in developing the range of what the hypothetical negotiation would yield in this case.   Ex. A (Lawton Report) at 511.  As Lawton opined, however, the agreements were limited in value because the economic circumstances existing at the time the agreements were entered are not comparable and they are not "technically comparable."  *Id.;* Ex. M (Lawton Dep.) at 93:12-13.  The agreements picked by Apple "are from periods of time that are generally prior to this digital convergence period", entered into prior even to the onset of video and many years prior to the date of the hypothetical negotiation.  *Id.* at 69:21-70:10; Ex. A (Lawton Report) at 511.  Also, they are for compression technology, not HLS live streaming, and are for standards-related licenses when this case is not a standards case.  Ex. M (Lawton Dep.) at 69:21-70:10; Ex. A (Lawton Report) at 511.  For these reasons, Lawton viewed these agreements as very different than a "protocol for live video streaming that was important to Apple for business reasons." *Id.* at 74:3-12.

To supplement the agreements selected by Apple, Lawton considered, *inter alia,* the '163 patent at issue in the Apple/Samsung case because "as it was described by Apple's technical expert, . . . when a mobile device encounters documents of a particular type, it's a user interface patent that improves the – the user experience associated with viewing that content. . . . [T]he user experience is improved coupled with the fact that the technology had a one-month design-around that was undisputed in that case balances against a whole category of content, namely live content, that isn't

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

22

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

1    otherwise viewable on an iOS device and for which Apple was able to leverage. . . into a de facto

2    standard." Ex. M (Lawton Dep.) at 89:20-90:14.  The data point utilized by Lawton was the range of

3    $2.02 to $3.10 per unit, the range that Apple sought from Samsung as a reasonable royalty for use of

4    the '163 patent and other patents at issue.  *Id.* at 90:19-23; Ex. A (Lawton Report), Schedule 17A.

5         Lawton also considered information from the Apple/Motorola litigation, mostly from

6    Apple's appellate brief in that case and the discussion of what Apple's negotiating posture would

7    have been in August 2007.  Ex. M (Lawton Dep.) at 92:9-21.  In that case, Apple's counsel stated

8    that Apple had paid royalties of approximately $1.00 for each phone for a license to certain Motorola

9    standards-essential patents.  Ex. A (Lawton Report) at 413.  Lawton also considered publicly

10   available information concerning licenses to standards-essential technology, *i.e.,* MP3, MPEG-4, and

11   H.264 licenses (*see* Ex. A (Lawton Report) at 456-63 and Schedule 17A), in addition to her

12   consideration of licenses produced by Apple for this technology.  Lawton emphasized that these

13   data points were not "directly comparable" but that "in view of the limited information", she

14   considered them.  Ex. M (Lawton Dep.) at 92:23.  Applying *Georgia-Pacific* Factor #2 (the rates

15   paid by the licensee for the use of other patents comparable to the patent in suit) to all of the

16   available licensing information, Lawton opined that the available information suggested a minimum

17   royalty rate in the general range of $0.10 to $3.10 per unit.  Ex. A (Lawton Report) at 511.

18        Contrary to Apple's argument (Motion at 21), the supplemental data points considered by

19   Lawton *do* have a relationship to the claimed invention and *are* tied to the relevant facts and

20   circumstances at the relevant time.  Lawton did not cite these agreements because the cases

21   "involved the same party" (Motion at 12); she cited them after explaining why they are technically

22   and economically similar to the facts of this case.  Apple argues that it is not appropriate for a

23   damages expert to use the opinion of another damages expert, citing to *Lucent,* 580 F.3d at 1327, but

24   *Lucent* says nothing of the kind.  *See Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1142

25   (9th Cir. 1997) (fact that an expert's opinions were based on data collected by others was immaterial

26   in determining admissibility).  Apple states that it is not proper to use publicly available information

27   concerning standards-essential technology because Apple produced "actual license agreements"

28   
PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

23

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

(Motion at 22), but there is nothing improper in an expert relying upon such information.  *See i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 856 (Fed. Cir. 2010) (expert's analysis of "publicly available information about other custom XML editing software" had sufficient nexus to relevant market, parties and alleged infringement to be admissible under *Daubert*).

Once again, Apple's argument is not directed to Lawton's methodology—but rather to her conclusions.  Apple's claims about comparability are grist for cross-examination and are for the jury to decide.

### D.   Lawton's Opinions on Apple's Document Production and Apple's Public History Are Within Her Expertise And Not Prejudicial

In the absence of documents from Apple, Emblaze's expert scoured the public record to perform her damages analysis.  Apple does not like the evidence amassed by Lawton.  But that issue can be addressed on cross-examination.   The district courts are not "intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir.1996); Fed.R.Evid. 702 (advisory committee notes, 2000 amendments). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

Apple muddles the issue by suggesting that Lawton is the one who holds strong views about Apple and Jobs.  Motion at 24-25.  But the quotes that Apple cherry-picks are not Lawton's opinions; they are the statements and views of others.  They are from authorized biographies, newspapers articles, industry press, all of which are commonly relied upon by experts.  *See Scott v. Ross,* 140 F.3d 1275, 1286 (9th Cir. 1998) (expert can rely on newspaper articles, pretrial testimony, and conversations with colleagues).   Indeed, Apple's own damages expert cites to many of the sources that Apple criticizes Lawton for relying upon, *i.e.,* the Isaacson biography of Steve Jobs. Apple cannot have it both ways.

Lawton's report contains "almost 30 pages of text regarding surveys and third-party reports on live streaming usage" (Motion at 24) because Apple did not produce such information and so Lawton turned to the public record for it. Apple says that Lawton failed to look at documents that Apple produced regarding why customers purchase accused devices, "perhaps because these Apple

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON
24
*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

internal documents do not mention HLS at all." *Id.* at 24.  Not only is Apple incorrect -- Lawton did consider these documents in her analysis -- but both documents Apple cites are red herrings and highlight the weakness of Apple's argument.  Both documents are dated well prior to Apple's June 2009 introduction of HLS into iPhones.  Exhibit 4, an Apple TV Recent Buyer Study, is dated May 2008, and Exhibit 5, titled "iPhone Early Buyer", is dated July 2007.  Of course, users of these products did not mention HLS because HLS had not yet been introduced.  Not surprisingly, these suddenly critical documents do not even appear on the list of documents Apple's damages expert, Malackowski, considered in his analysis.

## IV.   <u>CONCLUSION</u>

For the reasons stated herein, Apple's motion to exclude the opinions and testimony of Catharine Lawton should be denied in its entirety.  A Proposed Order is submitted herewith.

Respectfully Submitted,

DATED:  June 3, 2014

REHON & ROBERTS
COZEN O'CONNOR

By:  /s/ Lisa A. Ferrari
    Lisa A. Ferrari *(admitted pro hac vice)*

*Attorneys for Plaintiff Emblaze Ltd.*

LEGAL\19176857\1

PLAINTIFF EMBLAZE'S MEMORANDUM IN
OPPOSITION TO DEFENDANT APPLE'S MOTION
TO EXCLUDE OPINIONS AND TESTIMONY OF
CATHARINE LAWTON

25

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG