MARTIN B. PAVANE (admitted pro hac vice)
LISA A. FERRARI (admitted pro hac vice)
ANDREW NEMIROFF (admitted pro hac vice)
MARILYN NEIMAN (admitted pro hac vice)
DARREN S. MOGIL (admitted pro hac vice)
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Telephone:    (212) 883-4900
Facsimile:    (212) 986-0604
Email:    mpavane@cozen.com
    lferrari@cozen.com
    anemiroff@cozen.com
    mneiman@cozen.com
    dmogil@cozen.com

NATHAN DOOLEY (CA State Bar No. 224331)
COZEN O'CONNOR
601 South Figueroa Street
Los Angeles, California  90017
Telephone:    (213) 892-7900
Toll Free Phone: (800) 563-1027
Facsimile:    (213) 892-7999
Email:    ndooley@cozen.com

MARK V. ISOLA (SBN 154614)
REHON & ROBERTS
A Professional Corporation
830 The Alameda
San Jose, CA 95126
Telephone: (408) 494-0900
Facsimile: (408) 494-0909
Email: misola@rehonroberts.com

*Attorneys for Plaintiff Emblaze Ltd.*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD.,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC., a California Corporation,<br><br>Defendant. | CASE NO.  5:11-cv-01079-PSG<br><br>**PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL**<br><br>**HEARING DATE: Sept. 30, 2014**<br>**TIME:  10:00 a.m.**<br><br>Before: Hon. Paul S. Grewal |

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

# TABLE OF CONTENTS

**Page**

I.      Introduction ............................................................................................................... 1

II.     Emblaze Is Entitled To A Judgment As A Matter Of Law On Direct Infringement And
        InduceD INFRINGEMENT ....................................................................................... 2

        A.      JMOL Standard ....................................................................................... 2

        B.      Direct Infringement ................................................................................. 2

                1.      The Asserted Claims ...................................................................... 2

                2.      Emblaze Proved Direct Infringement Of Each Asserted Claim ......... 2

                3.      Apple's Argument That Emblaze Had Not Proved Direct
                        Infringement Was Based On Three Claim Limitations .................... 3

                        a.      "each slice having a predetermined data size associated therewith" .... 4
                        b.      "real-time broadcasting" ................................................... 8
                        c.      "upload[] the sequence [of files] to a server" ..................... 11

                4.      Jury Instruction Concerning Infringement Of Apparatus
                        Claims 28, 37 and 40 ................................................................. 16

                5.      This Court Should Enter Judgment As A Matter Of Law That
                        Claims 23, 28, 37 And 40 Are Directly Infringed By The
                        Implementation Of Each Of The Accused Streams ....................... 17

        C.      Induced Infringement ............................................................................ 17

                1.      Apple Was Aware Of The Patent-In-Suit And Had Knowledge
                        That The Induced Acts Constituted Patent Infringement ............... 18

                2.      Apple Had Specific Intent To Encourage Direct Infringement ......... 21

III.    In The Alternative, Emblaze Is Entitled To A New Trial ........................................ 22

        A.      Prejudice Of The Jury Foreman Toward Apple ....................................... 22

        B.      Apple's Introduction Of Evidence Of Its Own Patents ............................. 24

IV.     CONCLUSION ...................................................................................................... 25

**Page(s)**

**Cases**

*Broadcom Corp. v. Qualcomm, Inc.,*
   543 F.3d 683 (Fed. Cir. 2008)...................................................................21

*Caterpillar Inc. v. Sturman Indus.,*
   387 F.3d 1358 (Fed. Cir. 2004)................................................................24

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.,*
   631 F.3d 1279 (Fed. Cir. 2011)................................................................16

*Chiron Corp. v. Genentech, Inc.,*
   363 F.3d 1247 (Fed. Cir. 2004)................................................................21

*Commil USA, LLC v. Cisco Sys.,*
   720 F.3d 1361 (Fed. Cir. 2013)................................................................21

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l,*
   246 F.3d 1336 (Fed. Cir. 2001)................................................................12

*DSU Med. Corp. v. JMS Co.,*
   471 F.3d 1293 (Fed. Cir. 2006)......................................................18, 20, 21

*Duro-Last, Inc. v. Custom Seal, Inc.,*
   321 F.3d 1098 (Fed. Cir. 2003)..................................................................4

*Free Motion Fitness, Inc. v. Cybex Int'l,*
   423 F.3d 1343 (Fed. Cir. 2005)................................................................11

*Global-Tech Appliance, Inc. v SEB S.A.,*
   131 S. Ct. 2060 (2011)........................................................................18, 21

*Hangarter v. Provident Life & Accident Ins. Co.,*
   373 F.3d 998, 1005 (9th Cir. 2004) ..........................................................2

*Headwaters Forest Def. v. Cnty. of Humboldt,*
   240 F.3d 1185, 1197 (9th Cir. 2000) ......................................................17

*i4i Ltd. P'ship v. Microsoft Corp.,*
   598 F.3d 831 (Fed. Cir. 2010)....................................................................4

*Linex Technologies, Inc. v. Hewlett-Packard Co., et al.,*
   Civ. No. 13-159(CW) (N.D. Cal.) ............................................................23

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

ii

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913, 936 (2005) ...........................................................................................18

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) ......................................................................................21

*Murphy v. Long Beach*,
    914 F.2d 183, 186 (9th Cir. 1990) ..............................................................................21

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) ........................................................................................2

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012).....................................................................................2

*Shum v. Intel Corp.*,
    633 F.3d 1067 (Fed. Cir. 2010) ..................................................................................17

*United States v. Necoechea*,
    986 F.2d 1273 (9th Cir. 1993) ....................................................................................21

*Water Techs. Corp. v. Calco, Ltd.*,
    850 F.2d 660, 669 (Fed. Cir. 1988)............................................................................20

*White v. Ford Motor Co.*,
    312 F.3d 998, 1010 (9th Cir. 2002) ............................................................................17

*Willis v. City of Fresno*,
    Case No. 1:09-CV-01766-BAM, 2014 U.S. Dist. LEXIS 52565 (E.D. Cal. Apr.
    14, 2014) .......................................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 50 ....................................................................................................1, 7, 25

Fed. R. Civ. P. 59 ..................................................................................................1, 21, 25

Fed. R. Evid. 402 ..............................................................................................................24

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

iii

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on September 30, 2014, at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiff Emblaze Ltd. ("Emblaze") will, and hereby does, respectfully move this Court pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law or, in the alternative, pursuant to Fed. R. Civ. P. 59 for a new trial. Emblaze's motion is based on the following Memorandum of Points and Authorities, the supporting Declaration of Lisa A. Ferrari ("Ferrari Dec.") and accompanying exhibits,[1] the orders, papers and records on file in this action, and such additional argument or evidence as the Court may consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff Emblaze Ltd. ("Emblaze") submits this Memorandum in support of Plaintiff Emblaze's Motion Pursuant To Fed. R. Civ. P. 50(b) For Judgment As A Matter Of Law Or, In The Alternative, Pursuant To Fed. R. Civ. P. 59 For A New Trial.

**I.     INTRODUCTION**

As relevant to this motion, the parties do not dispute the facts concerning direct infringement. The parties' disputes concern only the application of the facts to this Court's claim construction of three claim limitations. Accordingly, judgment as a matter of law is appropriate.

At trial, Emblaze established as a matter of law that MLB at Bat directly infringed claim 23 and that ABC News, PGA, MLB at Bat, NFL Preseason, ESPN, Apple Keynotes and iTunes Festival (collectively, "Accused Streams") directly infringed claims 28, 37 and 40 Emblaze's U.S. Patent No. 6,389,473 ("the '473 Patent"). As the evidence, construed in the light most favorable to Apple, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict, this Court should grant Emblaze's motion for judgment as a matter of law.

Additionally, while the jury did not reach the issue of induced infringement, as discussed below, Emblaze established that Apple was aware of Emblaze's '473 Patent, had knowledge that the

---

[1]  All Exhibits referenced herein are attached to the Ferrari Declaration submitted herewith.

induced acts constitute patent infringement, and that Apple had the specific intent to encourage direct infringement of the '473 Patent. Accordingly, Emblaze is also entitled to judgment as a matter of law that Apple induced infringement of the '473 Patent.

Alternatively, for the reasons explained below, Emblaze is entitled to a new trial.

## II. EMBLAZE IS ENTITLED TO A JUDGMENT AS A MATTER OF LAW ON DIRECT INFRINGEMENT AND INDUCED INFRINGEMENT

### A. JMOL Standard

"JMOL is appropriate when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1358 (Fed. Cir. 2012), quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004). *See also Pavao v. Pagay,* 307 F.3d 915, 918 (9th Cir. 2002) (A renewed motion for judgment as a matter of law is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict"); *Willis v. City of Fresno*, Case No. 1:09-CV-01766-BAM, 2014 U.S. Dist. LEXIS 52565 (E.D. Cal. Apr. 14, 2014) (internal quotation omitted) ("The court may grant [the losing party's] renewed motion for judgment as a matter of law if a reasonable jury would not have a legally sufficient evidentiary basis to find for the [other party]").

### B. Direct Infringement

#### 1. The Asserted Claims

Claims 23, 28, 37 and 40 ("the Asserted Claims") -- the only claims at issue at trial -- are reproduced in paragraph 3 of the Ferrari Declaration. *See also* Ex. A, PTX-1, 14:18-16:62.

#### 2. Emblaze Proved Direct Infringement Of Each Asserted Claim

Emblaze accused the implementation of certain HTTP Live Streaming ("HLS") streams (*i.e.*, the Accused Streams) of infringement. HLS is supported by certain versions of Apple's iOS and OS X operating systems, included on iPhones, iPads, iPod Touches, Apple TVs and Mac OS X

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

2

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

computers (collectively, "Apple Devices"). *See, e.g.*, Ex. B, Trial Transcript, 454:14-666:9; 698:28-768:2.

At trial, Emblaze's technical expert, Dr. Vijay Madisetti, provided a limitation-by-limitation analysis for each Accused Stream (*see, e.g.*, 601:17-630:9), starting with the MLB at Bat stream. *See, e.g.*, Ex. B, Trial Transcript, 454:14-666:9. Based on his Wireshark analysis of the Accused Streams, Dr. Madisetti testified that like the MLB At Bat stream, the implementation of the other Accused Streams, also infringed the four Asserted Claims. *See, e.g.*, Ex. B, Trial Transcript, 607:17-19; 616:12-14. Dr. Madisetti also explained, for each limitation, how the Apple's HLS protocol necessitates an implementation that meet the limitations of the claims. *See, e.g.*, Ex. B, Trial Transcript, 454:14-630:9.

Emblaze also provided uncontradicted evidence concerning the parties that directly infringed. For method claim 23, Emblaze provided evidence leading to only one reasonable conclusion -- that MLB at Bat practiced all claimed steps, *i.e.*, MLB at Bat directly infringed claim 23. *See, e.g.*, Ex. B, Trial Transcript, 409:19-20, 443:6-7 (during which Ex. D, excerpts from Mr. Inzerillo's August 23, 2013 deposition were played); 487:19-569:16. For apparatus claim 28, Emblaze provided clear evidence of direct infringement by end users. *See, e.g.*, Ex. B, Trial Transcript, 569:25-611:23; 617:1-621:6. For apparatus claims 37 and 40, Emblaze provided clear evidence of direct infringement by the content providers who put the apparatus as a whole into service. *See, e.g.*, Ex. B, Trial Transcript, 569:16-630:9; 400:15-16, 401:7-8, 402:8-9 (during which 74:6-22 from Ex. E, Mr. Pantos' August 13, 2013 deposition was played).

3.  <u>Apple's Argument That Emblaze Had Not Proved Direct Infringement Was Based On Three Claim Limitations</u>

At trial, Apple's non-infringement arguments focused only on the following three claim limitations, all of which are present in asserted claims 23, 28, 37 and 40: (1) "each slice having a predetermined data size associated therewith"; (2) "real-time broadcasting"; and (3) "upload[] the sequence [of files] to a server." As Apple did not rely on any other claim limitation as a basis for non-infringement, the jury could not have relied upon any claim limitation other than those three in

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

reaching its verdict that there was no direct infringement. And since the jury could not have made a factual finding concerning a claim limitation other than those three, no other limitation need be addressed. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 846 (Fed. Cir. 2010) ("In conducting this review, we must presume the jury resolved underlying factual disputes in i4i's favor because the jury made no explicit factual findings"); *see also Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1108 (Fed. Cir. 2003) ("When a party has preserved its right to appeal the jury verdict by filing a valid JMOL motion on obviousness, we first review the underlying factual findings, whether explicitly made by special verdict or presumed as necessary to support the jury verdict, to ascertain whether they are supported by substantial evidence").

a. <u>"each slice having a predetermined data size associated therewith"</u>

This Court construed the limitation "each slice having a predetermined data size associated therewith" to mean "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided." *See, e.g.*, D.E. 424, pp. 5-6. In the Summary Judgment Order, this Court explained that "the patent simply does not teach always assigning the exact number of bits prior to slice division. In fact, it teaches the opposite by describing one embodiment in which setting the time duration predetermines the data size of the slice." D.E. 424, p. 15. The Court further clarified "[c]laim 23 thus makes it clear that the predetermined data size of the slices in claim 1 may comprise a 'predetermined duration.'" D.E. 424, p. 16.

As this Court recognized in the Summary Judgment Order, and consistent with this Court's claim construction, whether or not the data size of the slices varies is immaterial because the Asserted Claims do not require the data sizes to be uniform (*see* D.E. 424, p. 15), and nothing in the Asserted Claims requires that the actual data size of each slice be known in advance (*see* D.E. 424, pp. 16-17). Therefore, Apple's arguments to the jury as to why this limitation was not met by the implementation of the Accused Streams, *i.e.*, because all the slices did not have the same size and the data size of the slices was not known in advance (*see, e.g.*, Ex. B, Trial Transcript, 281:14-

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

4

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

284:23; 1950:23-1951:8; 1395:12-1416:17), were contrary to this Court's claim construction and therefore immaterial to the issue of infringement the jury was charged to decide.

Consistent with this Court's claim construction, Emblaze demonstrated at trial that all of the content providers establish both a time duration in advance of the stream being divided and a target data rate for each stream, and that the Accused Streams meet the "each slice having a predetermined data size associated therewith" limitation. *See, e.g.*, Ex. B, Trial Transcript, 454:14-630:9; 753:10-768:2; 400:15-16, 401:7-8, 402:8-9 (during which 42:1-25, 56:19-57:19 and 60:20-61:4 from Ex. E, Mr. Pantos' August 13, 2013 deposition were played).

For example, Joseph Inzerillo, the corporate representative of Major League Baseball Advanced Media, testified as follows:

> Q. What is the time duration that -- in your environment, what is the time duration for these chunks?
> A. You have to be specific about the time frame.
> Q. Okay.  2009.
> A. Ten seconds.

Ex. B, Trial Transcript, 409:19-20, 443:6-7 (during which 74:13-19 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition was played).  And he later testified:

> Q. Has that segment duration changed since then?
> A. Yes.
> Q. To what?
> A. Five seconds.
> Q. Is it currently five seconds?
> A. It is currently five seconds.

Ex. B, Trial Transcript, 409:19-20, 443:6-7 (during which 93:12-18 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition was played).  And that:

> Q. Is there an ideal percentage that you don't want it to be greater or less than with respect to the established bit rate?
> A. It depends on the application.
> Q. No, but what about Major League Baseball AM?
> A. Our target in general, from a quality standpoint, related to HLS in -- related to HLS in 2009 on Apple devices, I would try to keep it within 10 percent.
> Q. What is it today?
> A. In practice today, it is probably tighter than that.  It's probably between 5 and 8 percent variable, depending on the bit rate.

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

5

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

It changes -- the percentage is more variable on the lower bit rates and less variable on the higher bit rates.

Ex. B, Trial Transcript, 409:19-20, 443:6-7 (during which 63:16-19 and 64:5-17 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition was played). *See also* Ex. B, Trial Transcript, 409:19-20, 443:6-7 (during which 112:18-20 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition was played) ("Q. Based on your experience, is HLS a CBR [constant bit rate] or VBR [variable bit rate]? A. CBR").

Consistent with the Court's claim construction, Dr. Madisetti testified that the Accused Streams, including MLB at Bat, met the "predetermined data size associated therewith" limitation:

> A. . . . If you also look at the patent specification in column, if you can open up column 9, lines 1 through 5 of the specification . . . Yeah, the first few lines. And here what is interesting is that in the context of multi level -- in this embodiment that deals with multi level or multi quality slices, it describes here a size identifier describes the size of those slices in the stream that have a fixed size associated with them. So what it's saying here is that this association of the size of the slices to a fixed size. And the fixed size is something like small, medium, large or extra large, that each of these slices in the stream are associated with. And that's exactly what a size identifier is. And this is consistent with -- this provides additional support for the, the swim lane type of picture that I -- the swim lane type of picture that shows that there are three particular sizes that we are categorizing these file sizes into, each dependent on quality level.

Ex. B, Trial Transcript, 760:4-24. He also testified:

> Q. . . . Okay. First of all, is there -- in your understanding, is there anything in the court's claim construction that requires all of the segments in a particular stream at a particular quality level be of exactly the same size?
> A. No, not according to the claim or the claim construction --
> Q. Okay.
> A. -- because you can set a time duration.

Ex. B, Trial Transcript, 761:5-12; *see also* Ex. B, Trial Transcript, 539:7-540:9; 763:14-766:7; Ex. F, (slides used by Dr. Madisetti during trial).

As Dr. Madisetti explained, the "predetermined data size associated therewith" is a target data size (category) assigned to the slice before it is divided, so "you know what sort of data size it

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

6

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

should belong to" and this should not be confused with the number of bits in the file corresponding to the slice, which may vary.  Ex. B, Trial Transcript, 539:8-12.

Indeed, Apple's own expert agreed that the slices do not have to be the same size to meet the Court's claim construction:

> Q.  Can you just answer my question? Do they or do they not all have to be the same?
> A.  They don't all have to be the same.  They have to be predetermined.
> Q.  So that's not in the court's claim construction.  We agree on that? They don't have to be the same size?
> A.  The court's construction does not require the same size.

Ex. B, Trial Transcript, 1469:14-20.

On redirect examination, Emblaze's technical expert, Dr. Madisetti, explained that the '473 Patent taught that a "predetermined data size" could be established by setting a target data rate and a time duration for the slices at the encoder:

> Q.  Dr. Madisetti, a couple of times in response to Mr. Fowler's questions, you indicated a desire to say something with respect to column 13.  What is it that you wanted to say?
> A.  Yeah. I was trying to explain to the jury that columns 11, 12, and 13 go into explicit detail as to how you predetermine the size, and consistent with the court's construction, if you see the last line of, of this paragraph on lines -- column 9 [sic, column 13], lines 15 to 20, specifically the line starting on 17 with "preferably," it says that preferably, the computer calculates the optimal values of the compression ratio and the slice duration, the compression ratio is another name for the data rate, and the time duration, and it does that continuously to predetermine the size.
> And it also describes here that you can adjust the duration so that you can more closely match the rate, and that also means that you can have differing size for each file size.
> So all these are consistent with the, the construction of the predetermined size being assigned to a file.

Ex. B, Trial Transcript, 1893:24-1894:16.

Accepting this Court's claim construction -- as both sides must -- this evidence permits only one reasonable conclusion, *i.e.*, that implementation of the Accused Streams meets the "each slice having a predetermined data size associated therewith" limitation.  For this reason alone, *i.e.*, because no reasonable jury could have found that this claim limitation was not met, the jury's verdict

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

7

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

finding no direct infringement of the Asserted Claims cannot be sustained on the ground that the Accused Streams do not meet this claim limitation.

The jury's finding of no direct infringement of the Asserted Claims cannot be sustained based on this claim limitation for the additional reason that this Court incorrectly charged the jury as to the meaning of this clam term. Emblaze argued in its claim construction briefing and at the *Markman* hearing that the limitation "each slice having a predetermined data size associated therewith" should be construed to mean "each slice having an assigned data size which may be an assigned time duration." *See, e.g.*, D.E. 111, Emblaze Ltd.'s Opening Claim Construction Brief. Under Emblaze's proposed claim construction -- which for the reasons set forth in Emblaze's opening and reply claim construction briefs (D.E. 111 and D.E. 127) should have been adopted by this Court -- the evidence presented at trial and discussed above clearly established that implementation of all of the Accused Streams met the "each slice having a predetermined data size associated therewith" limitation.

### b. "real-time broadcasting"

This Court construed the limitation "real-time broadcasting" to mean "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process." D.E. 169. At trial, Apple asserted that, under this Court's claim construction, "real-time broadcasting" requires simultaneous reception of the stream by the end users. But that is not correct under the Court's claim construction. The construction requires "simultaneous transmission" (or sending) of the stream, not simultaneous reception by end users. The simultaneous "transmission" is the upload of data, *i.e.*, the transmission of data from the transmitting computer to the server, not the downloading of information by the end users. Apple's arguments at trial to the contrary (*see, e.g.*, Ex. B, Trial Transcript, 277:20-279:1; 1385:12-1394:21; 1947:10-1950:22) were immaterial and only served to mislead the jury.

Indeed, Apple's expert agreed that "simultaneous transmission" does not require simultaneous reception:

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

8

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

Q. Okay. And, again, just show me again where in the court's claim construction there's a requirement that all of the clients viewing the live event have to see that live event at the same time. Show me where that appears in the claim. What are you relying on for that?

A. Well, what I'm relying on is the simultaneous transmission of data to one or more clients.

Q. Okay. It's simultaneous transmission. Does it say it has to be received by one or more clients at the same time?

A. No.

Ex. B, Trial Transcript, 1488:13-22.

Furthermore -- and again contrary to Apple's arguments to the jury (*see, e.g.*, Ex. B, Trial Transcript, 279:2-281:13; 1380:9-1385:11; 1943:12-1946:17) -- there is no requirement in the Court's claim construction that a stream be received by the end users at the same instant that the streamed event is occurring. In other words, the Court's claim construction allows for a lag time between occurrence of the streamed event and receipt of the stream by the end user. Indeed, the '473 Patent makes clear that a lag time is not only permissible, but is required:

> When one of computers 30 connects to server 36 and begins to download the data stream, it first reads the index file in order to identify at what point in stream 40 to begin and to start receiving the data stream substantially in real time, preferably with only a minimal lag, as it is transmitted from computer 34. Alternatively, a user of one of computers 30 may choose to begin downloading data stream 40 from an earlier point in time than that indicated by ID 52.

Ex. A, PTX-1, 8:1-9; *see also* PTX-1, 7:4-17; 8:32-41.

Applying the Court's construction, Dr. Madisetti testified that in all of the streams he analyzed there is simultaneous transmission of data to one or more clients matching the human perception of time. *See* Ex. B, Trial Transcript, 454:14-666:9; 698:28-768:2; 710:11-15 ("So in all the systems that analyzed [sic], you're transmitting to multiple clients at the same time because there's one video source sitting in the stadium, there's one video encoder sitting there transmitting to millions. That is simultaneous transmission").

Similarly, Mr. Inzerillo, the corporate representative of third party Major League Baseball Advanced Media, testified:

Q. Would you consider HLS to be a realtime system?

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

9

*Emblaze Ltd. v. Apple, Inc.*, Case No. 5:11-CV-01079-PSG

A. I would. I would consider it to be realtime in the sense of, if you don't have a completely external frame of reference, then it's live to you, is sort of the way it is. I think over time, the reason I would still consider it realtime is that the people, the customer, the public has a whole different concept of time than they used to.

. . .

Q. What is your understanding of live streaming?
A. Of --
Q. The term.
A. The term "live streaming"?
Q. Yes.
A. I mean, the term in modern parlance is somewhat of a misnomer. I mean, nothing is exactly live, but live is that when somebody joins within the latency boundaries of the protocol, they can get as close as they would, you know, like to, or in general organically feel like they are as close to the live event as possible as it occurs.

Ex. B, Trial Transcript, 409:19-20, 443:6-7 (during which 263:17-264:1 and 166:2-15 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition were played).

The evidence presented at trial could lead to only one reasonable conclusion, *i.e.*, that implementation of all of the Accused Streams met the "real-time broadcasting" limitation of the claims. *See* Ex. B, Trial Transcript, 454:14-666:9; 698:28-768:2; 710:11-15; 1488:13-22; 409:19-20, 443:6-7 (during which 263:17-264:1 and 166:2-15 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition were played); Ex. A, PTX-1, 8:1-9, 7:4-17; 8:32-41; D.E. 169. For this reason alone, *i.e.*, because no reasonable jury could have found that this claim limitation was not met, the jury's verdict finding no direct infringement of the Asserted Claims cannot be sustained on the ground that the Accused Streams do not meet this claim limitation.

The jury's finding of no direct infringement of the Asserted Claims cannot be sustained based on this claim limitation for the additional reason that this Court incorrectly charged the jury as to the meaning of this claim term. Emblaze argued in its claim construction briefing and at the *Markman* hearing that the limitation "real-time broadcasting" should be construed to mean "a broadcast data stream that is received at one or more clients without substantial delay after the broadcast." *See, e.g.*, D.E. 111, Emblaze Ltd.'s Opening Claim Construction Brief. Under Emblaze's proposed claim construction -- which for the reasons set forth in Emblaze's opening and

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

10

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

reply claim construction briefs (D.E. 111 and D.E. 127) should have been adopted by this Court -- the evidence presented at trial and discussed above clearly established that implementation of all of the Accused Streams met the "real-time broadcasting" limitation.

c.    "upload[] the sequence [of files] to a server"

The last limitation that Apple argued to the jury was not met by implementation of the Accused Streams is: "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate." This Court construed "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" to mean "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate," and the Court construed "such that one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" to mean "such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate." D.E. 169. Accordingly, "uploading the sequence [of files] to a server" means "transmitting the files from the transmitting computer to the server," and the Court's claim construction expressly recognized that the sequence can be downloaded from the server "over the network."

Apple argued that the clients must download the sequence directly from the same server to which the sequence was uploaded from the transmitting computer, but that argument is contrary to the wording of the claims and the Court's claim construction. The claims and the Court's construction recognize that the download is performed "over the network," *e.g.*, a content delivery network ("CDN"), such as Akamai's CDN. The claims do not require that the download is directly from the server to which the sequence has been uploaded. *See* Ex. A, '473 Patent, claims 1 and 25 (from which the Asserted Claims depend), 14:18-32, 15:63-16:9; D.E. 169; *see also* Ex. B, Trial Transcript, 1875:12-21; *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1353 (Fed. Cir. 2005) ("Basic patent law holds that a party may not avoid infringement of a patent claim using an

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

open transitional phrase, such as comprising [which is used in the '473 Patent claims], by adding additional elements"); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("[i]n the parlance of patent law, the transition "comprising" creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements").

Moreover, at trial, Emblaze provided evidence that implementation of the Accused Streams includes "uploading" a sequence of files to a server and downloading of that sequence of files by the clients from the same server. *See* Ex. B, Trial Transcript, 454:14-666:9; 698:28-768:2; 1451:3-1452:16; 409:19-20, 443:6-7 (during which 80:8-82:6 and 82:21-83:5 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition were played); 409:10-11 (during which 70:18-73:20 from Ex. C, Mr. Knox's August 29, 2013 deposition was played); Ex. G, PTX-162; Ex. H, PTX-163.

Apple's technical expert, Nathaniel Polish, admitted at trial that there is an upload and a download from the same HTTP server:

> Q. So here what's happening is filming the game; we go to the encoder, the encoder is where the compression takes place; then it goes to the segmenter and the segmenter divides it into little files. Right?
> A. Yes.
> Q. Files?
> A. It divides it into segments.
> Q. Okay. And then those segments are put on to this HTTP server; right?
> A. That's correct.
> Q. Okay. And that's an upload. You said that; right?
> A. Yeah. I believe Mr. Inzerillo said that, yes.
> Q. Okay. And all this is, this blue box, again, is all in Chelsea, New York; right?
> A. I believe so.
> Q. Okay. And then the client is making a request for a file; right?
> A. What do you -- are you talking about when it's doing streaming?
> Q. Yeah, it's doing streaming?
> A. Yes, it's making requests for files.
> Q. Okay. So it's making a request for a file, and when it makes a request for a file, it goes to the edge server; right?
> A. Yes, it's in direct communication with the edge server.
> Q. Right. But the edge server doesn't have that file; right? If this is the first time this streaming is coming to this client, it's the first time it's going this route, that edge server is not going to have that file; right?

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

12

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

A. That's correct.

Q. Okay. So the edge server is going to make a request back to this server, and this server is going to make a request back to this server, right, and it's going to pull it off that server; right?

A. Yes.

Q. Okay. So really the route is not just to here, it's all the way to here; right? So the file gets uploaded to this server, and then it gets downloaded from this server through these other servers back to that client; right?

A. Well, that's how it works.

Ex. B, Trial Transcript, 1451:3-1452:16.

There were only two methods presented at trial for uploading streams to the server; the method used, for example, by MLB at Bat, and the method which Apple referred to as the Akamai RTMP architecture. *See, e.g.*, Ex. B, Trial Transcript, 1740:8-16. Emblaze established that both methods for uploading streams to the server fall within the scope of the Asserted Claims. *See, e.g.*, Ex. B, Trial Transcript, 459:12-630:9; 1740:8-1741:17; 409:10-11 (during which 70:18-73:20 from Ex. C, Mr. Knox's August 29, 2013 deposition was played). The jury, therefore, did not have a legally sufficient evidentiary basis to find that the Accused Streams did not infringe the Asserted Claims because of the way that they were uploaded to the server.

For the Accused Streams that used the method used by MLB at Bat, Apple argued that the "upload[] the sequence [of files] to a server" limitation was not met because, even though the sequence is uploaded to a server and is downloaded from that server, there can be no infringement because the sequence is downloaded to an "edge server" before being downloaded by a client. But under the Court's claim construction, this distinction is immaterial because, as explained above, the claims do not require that the download to the clients must be directly from the same server to which the sequence was uploaded by the transmitting computer.

Likewise, Emblaze presented evidence that there is an upload and a download from the same server in the Akamai RTMP architecture. Third party Akamai Technology Inc.'s corporate representative, Christopher Knox, testified:

Q. [Looking at the page Bates Labeled AKAM000289 of PTX-6] The next box shown in the diagram after the entry point is something called RTMP core. Do you see that?

A. Yes.

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

Q. And what does the RTMP core box signify?

A. The RTMP core is a software component which leverages the RTMP protocol as a client and is responsible for acquiring the live stream from the entry point and making it available to the Akamai archiver system.

. . .

Q. Okay. So the -- the stream is output from the RTMP core software to the archiver; is that right?

A. Yes.

Q. And what is -- what happens -- withdrawn. Is the archiver a software program?

A. The -- the archiver is a -- a combination of server infrastructure and Akamai-developed software components.

Q. Okay. And what -- what transformation of the stream takes place in the archiver, if any?

A. No transformation.

Q. So what is the function of the archiver?

A. The function of the archiver is to store the content sent by the RTMP core and to deliver the content to Akamai GHost software, as well as upload content it receives, if long-term storage is needed, to net storage.

Q. Okay. You said to deliver -- to deliver the content as well as to have the ability to store it for long-term storage. Is that what you said?

A. The -- the role of the archiver is to -- to make the content that it received from the RTMP core available to upstream Akamai systems in the Akamai intermediate format and also to upload content to the Akamai net storage platform in that same intermediate format.

Q. Okay. So if I understood that correctly, the net storage is a long-term storage if the content is going to be archived, essentially?

A. Yes.

Q. But for -- for live streaming, if we're taking a stream and we're going to transmit it live to client devices such as the iPhone and iPad shown here on this diagram, the -- the path is from the archiver through the GHost?

. . .

THE WITNESS: The -- the content would flow from the RTMP core to the archiver, and Ghost would get content from either the archiver or the net storage system depending upon where it's able to get the object from. So if it -- if GHost was unable to reach the archiver system and the content had made its way to net storage, even in a live scenario, it could still get content from -- from net storage.

Ex. B, Trial Transcript, 409:10-11 (during which 70:18-73:20 from Ex. C, Mr. Knox's August 29, 2013 deposition was played).

Apple argued that the "upload[] the sequence [of files] to a server" limitation is not met in the Accused Streams using the Akamai RTMP architecture because the RTMP core creates an

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.*, Case No. 5:11-CV-01079-PSG

intermediate file format, which is converted to a different format and then downloaded to the client. But that argument is also wrong. As Dr. Madisetti explained:

> Q. Good. Okay. So you understand that the RTMP core creates something called an intermediate format; right?
> A. It creates an intermediate file format. It's called I.F. – Akamai's intermediate file format, and you note that this architecture is used only for two of the streams, the PGA and ABC, not for the others.
> . . .
> Q. Well, that's an interesting observation. So you understand that kind of the secret sauce of Akamai in terms of the RTMP architecture is that it uses that intermediate file format as a basis of raw materials to create not just HLS, but also an adobe -- basically something for adobe and also something for Akamai; right? Two other formats?
> A. That doesn't affect my answer. It's still the compressed data. It's still indexed. It is still the file.
> Q. So are you saying that an HLS segment is the same as an Adobe segment is the same as the Akamai version of the segment, that they're all the same?
> A. Insofar as the claims are concerned, they contain the same slice of compressed data and they contain an index.
> How you add sugar or pepper on the top doesn't change what it's supposed to be.

Ex. B, Trial Transcript, 1876:20-25; 1879:3-24. *See also* Ex. B, Trial Transcript, 409:10-11 (during which 74:11-75:14 from Ex. C, Mr. Knox's August 29, 2013 deposition was played).

Accordingly, the evidence adduced at trial could lead to only one reasonable conclusion, *i.e.*, that implementation of the Accused Streams includes "uploading" a sequence of files to a server and downloading of that sequence of files by the clients from a server over the network, and consequently that this limitation is met by all of the Accused Streams. *See* Ex. B, Trial Transcript, 454:14-666:9; 698:28-768:2; 1451:3-1452:16; 409:19-20, 443:6-7 (during which 80:8-82:6 and 82:21-83:5 from Ex. D, Mr. Inzerillo's August 23, 2013 deposition were played); 409:10-11 (during which 70:18-73:20 from Ex. C, Mr. Knox's August 29, 2013 deposition was played); Ex. G, PTX-162; Ex. H, PTX-163. For this reason, *i.e.*, because no reasonable jury could have found that this

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

15

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

claim limitation was not met, the jury's verdict finding no direct infringement of the Asserted Claims

cannot be sustained on the ground that the Accused Streams do not meet this claim limitation.

4.   Jury Instruction Concerning Infringement Of Apparatus Claims 28, 37 and 40

Concerning Emblaze's burden to prove direct infringement of apparatus claims 28, 37 and

40, the Court gave the following jury instruction: "[t]o prove infringement of claims 28, 37, or 40,

Emblaze must persuade you that: (1) it is more likely than not that a single third party put an

infringing apparatus into service, that is, controlled the apparatus as a whole and obtained benefit

from it . . ." Ex. B, Trial Transcript, 2007:12-18.  Emblaze timely objected to that instruction during

the jury charge conference.  *See, e.g.*, Ex. B, Trial Transcript, 1796:8-1799:17; 1800:18-1802:1.

Because this jury instruction required "a single third party [to have] put an infringing

apparatus into service, that is, controlled the apparatus," without explaining the meaning of "control"

in the context of the jury instruction, it is contrary to Federal Circuit precedent and left the jury to

guess at what "control" meant:

> We hold that the on-demand operation is a "use" of the system as a
> matter of law.  The customer puts the system as a whole into service,
> *i.e.*, controls the system and obtains benefit from it.  The customer
> controls the system by creating a query and transmitting it to Qwest's
> back-end.  The customer controls the system on a one request/one
> response basis.  This query causes the back-end processing to act for
> its intended purpose to run a query and return a result.  The user may
> then download the result and perform additional processing as required
> by the claim.  If the user did not make the request, then the back-end
> processing would not be put into service.  <u>By causing the system as a
> whole to perform this processing and obtaining the benefit of the
> result, the customer has "used" the system under § 271(a).  It makes no
> difference that the back-end processing is physically possessed by
> Qwest</u>.  <u>The customer is a single "user" of the system and because
> there is a single user, there is no need for the vicarious liability
> analysis from *BMC* or *Cross Medical*.</u>

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1285 (Fed. Cir. 2011)

(emphasis added).  It is unclear from the jury instruction that an end user (in the case of claim 28) or

a content provider (in the case of claims 37 and 40) could "use" or "control" the apparatus by

initiating the live streaming regardless of whether "the back-end processing [wa]s physically

possessed by [another party]."  Accordingly, the jury instruction was improper, and for this reason

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

16

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

1  the jury's verdict of no direct infringement of claims 28, 37 and 40 cannot be sustained on the basis

2  that Emblaze failed to prove the requisite "control."

3         Moreover, under the law concerning "control," from the evidence adduced at trial and

4  discussed above, the only reasonable conclusion a jury could have reached is that claims 28, 37 and

5  40 were directly infringed by implementation of all of the Accused Streams.

6         5.    <u>This Court Should Enter Judgment As A Matter Of Law That Claims 23, 28,
              37 And 40 Are Directly Infringed By The Implementation Of Each Of The
7              Accused Streams</u>

8         As demonstrated above, none of the arguments that Apple advanced at trial as to why the

9  jury should find no direct infringement is sustainable, either because when the evidence adduced at

10  trial is viewed in a light most favorable to Apple, the only reasonable conclusion is that all of the

11  Asserted Claims are directly infringed by implementation of each of the Accused Streams, or

12  because the Court incorrectly charged the jury.  In either event, because the evidence admits of only

13  one reasonable conclusion, this Court should enter judgment as a matter of law that each of Asserted

14  Claims 23, 28, 37 and 40 is directly infringed by implementation of each of the Accused Streams.

15    **C.    <u>Induced Infringement</u>**

16         Although the jury did not reach the issue of whether Apple was liable for induced

17  infringement, Emblaze is entitled to judgment as a matter of law on induced infringement because

18  there was no "legally sufficient evidentiary basis to find for [Apple] on that issue."  Fed. R. Civ. P.

19  50(a).  The Federal Circuit in *Shum v. Intel Corp.*, explained:

20             Judgment as a matter of law is proper "[i]f a party has been fully heard
              on an issue during a jury trial and the court finds that a reasonable jury
21             would not have a legally sufficient evidentiary basis to find for the
              party on that issue." Fed. R. Civ. P. 50(a).  The court may "grant a
22             motion for judgment as a matter of law against the party on a claim or
              defense that, under the controlling law, can be maintained or defeated
23             only with a favorable finding on that issue." *Id.*  A jury's inability to
              reach a verdict does not necessarily preclude a judgment as a matter of
24             law. *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185,
              1197 (9th Cir. 2000).  The question is "'whether the evidence,
25             construed in the light most favorable to the non-moving party, permits
              only one reasonable conclusion.'" *White v. Ford Motor Co.*, 312 F.3d
26             998, 1010 (9th Cir. 2002).

27  *Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010).

28

At trial, Emblaze established that Apple possessed the requisite knowledge and specific intent to prove that Apple induced infringement. The Supreme Court has explained that induced infringement requires that: (1) the alleged infringer is aware of the patent-in-suit and has "knowledge that the induced acts constitute patent infringement;" and (2) the alleged infringer had the specific intent to encourage another's direct infringement. *Global-Tech Appliance, Inc. v SEB S.A.*, 131 S. Ct. 2060, 2068-2071 (2011).

          1.    <u>Apple Was Aware Of The Patent-In-Suit And Had Knowledge That The Induced Acts Constituted Patent Infringement</u>

Apple learned of Emblaze's patent no later than October 29, 2009, when Emblaze sent a cease and desist letter to Apple. Therefore, at least from that date Apple was aware of the '473 Patent and knew that the conduct it was inducing constituted infringement of the '473 Patent. *See* Ex. B, Trial Transcript, 320:25-321:17; 1057:10-12 ("Apple first became aware of the '473 Patent on October 29th, 2009, when it received the letter entitled 're: Apple's http live streaming applications' from Edward M. Weisz); Ex. I, PTX-374.

Emblaze established that Apple "specifically intended" to induce infringement of the '473 Patent. In that regard, "[e]vidence of 'active steps . . . taken to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1305 (Fed. Cir. 2006) (quoting *MGM Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 936 (2005). Here, Apple took affirmative steps to encourage direct infringement. As Dr. Madisetti testified, "Apple has encouraged third parties to practice all the limitations of the asserted claims by distributing the literature, such as the Apple Overview [*i.e.*, "HTTP Live Streaming Overview"] and the [IETF] specification." Ex. B, Trial Transcript, 639:11-14; *see also* Ex. J, PTX-23; Ex. G, PTX-162; Ex. H, PTX-163. Dr. Madisetti further testified that Apple has "described how to implement an HLS compliant system," "sold Apple client devices that can play these multimedia live sequences using the HLS standard," and "worked with content providers, such as MLB, and discussed technology with them and how to implement the system to work out the problems." *Id*. at 639:15-20. *See also*

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

Ex. B, Trial Transcript, 454:14-630:9; 400:15-16, 401:7-8, 402:8-9 (during which 53:4-54:20 from Ex. E, Mr. Pantos' August 13, 2013 deposition was played).

Apple's HTTP Live Streaming Overview is a document prepared by Apple and distributed to app developers and content providers to help them generate HTTP live streams compatible with Apple's devices. *See, e.g.*, Ex. J, PTX-23; Ex. B, Trial Transcript, 400:15-16, 401:7-8, 402:8-9 (during which 202:8-203:10 from Ex. E, Mr. Pantos' August 13, 2013 deposition was played); Trial Transcript, 404:25-405:15 (during which 10:19-11:13 from Ex. K, Mr. May's June 20, 2013 deposition was played); Trial Transcript, 1292:1-11. This document directs app developers and content providers to follow certain steps (*i.e.*, encode the stream at multiple quality levels for accommodating different bandwidth connections to Apple devices; segment (or slice) the streams; and upload the streams to an HTTP server such that the streams are available for download by Apple devices, typically through the intermediary of a CDN to ensure that their live streams can be played on Apple devices. *See, e.g.*, Ex. J, PTX-23; Ex. B, Trial Transcript, 404:25-405:15 (during which 45:25-46:12, 47:10-49:25, 50:1-2, 50:5-7, 50:10-51:13, 53:18-21, 54:9-14, 59:10-14, 61:23-62:17, 63:14-23, 64:2-66:7, 66:10-67:13, 67:15-68:9, 72:17-73:1, 73:4-77:3, 77:6-23, 77:25-79:4, 77:25-79:4, 80:11-82:13, 83:1-11, 83:13-21, 83:23-85:17, 85:19-87:6, 87:8-89:10, 98:20-99:5, 111:16-22, 111:24-112:21, 112:23-25, 134:14-21, 134:24-136:17; 136:19-21, 140:11-1415, 148:1-6, 148:9-17, 148:19-149:4, 155:7-8, 155:10-156:3 from Ex. K, Mr. May's June 20, 2013 deposition was played); Trial Transcript, 1298:4-1299:9, 1305:16-1308:20. For example, the following diagram is included in Apple's HTTP Live Streaming Overview:

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG



*See* Ex. J, PTX-23, at 23.7.

The HTTP Live Streaming Overview also tells app developers and content providers that the media files (*i.e.*, slices) should be of equal duration. *See* Ex. J, PTX-23, at 23.13 ("The stream segmenter is a process – typically software - that reads the Transport Stream from the local network and divides it into a series of small media files of equal duration"). And the evidence at trial showed that implementation of all of the Accused Streams follows Apple's guidance. *See, e.g.*, Ex. B, Trial Transcript, 503:2-542:24, 545:16-630:9.

Apple's witnesses explained that they met directly with content providers to discuss implementation of their streams to comply with Apple's HLS protocol such that the streams could be played on Apple's devices (*see, e.g.*, Ex. B, Trial Transcript, 400:15-16, 401:7-8, 402:8-9 (during which 53:4-16 from Ex. E, Mr. Pantos' August 13, 2013 deposition was played)), and documents introduced at trial confirmed such meetings. *See, e.g.*, Ex. L, DTX-448; Ex. M, DTX-1447; Ex. N, PTX-152.

Here too, the evidence adduced at trial, when viewed in a light most favorable to Apple, allowed only one reasonable conclusion, *i.e.,* that on and after October 29, 2009, Apple was aware of the '473 Patent and knew that the conduct it was inducing constituted infringement of the '473 Patent.

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

## 2. Apple Had Specific Intent To Encourage Direct Infringement

The Federal Circuit has explained that induced infringement can be established by circumstantial evidence, and that a defendant's failure to produce an opinion of counsel is a relevant consideration in the induced infringement analysis:

> While inducement "requires more than just intent to cause the acts that produce direct infringement," and also requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement," *DSU*, 471 F.3d at 1306, this intent may be established through circumstantial evidence, *see Id.* Moreover, "[t]he requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988). . . . Because opinion-of-counsel evidence, along with other factors, may reflect whether the accused infringer "knew or should have known" that its actions would cause another to directly infringe, we hold that such evidence remains relevant to the second prong of the intent analysis. Moreover, we disagree with Qualcomm's argument and further hold that the failure to procure such an opinion may be probative of intent in this context. It would be manifestly unfair to allow opinion-of-counsel evidence to serve an exculpatory function, as was the case in *DSU* itself, see 471 F.3d at 1307, and yet not permit patentees to identify failures to procure such advice as circumstantial evidence of intent to infringe.

*Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008). *See also Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1366 (Fed. Cir. 2013) ("Circumstantial evidence can, of course, support a finding of actual knowledge or willful blindness just as it did in *Global-Tech*").

As proof of Apple's lack of specific intent to infringe Emblaze's '473 Patent, at trial Apple proffered two Apple employees (neither of whom is an attorney) that testified that they did not believe Apple was infringing the '473 Patent, and that they had no intent to infringe the '473 Patent. *See* Ex. B, Trial Transcript, 1148:6-15; 1287:16-23. However, on cross examination, both Apple witnesses admitted that they had never even read the '473 Patent. *See* Ex. B, Trial Transcript, 1149:17-18; 1288:17-20. Moreover, Apple never produced an opinion of counsel evidencing a good-faith belief that Apple did not infringe the '473 Patent, or that the claims of the '473 Patent were invalid.

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

21

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

Because the evidence introduced at trial, even when viewed in a light most favorable to Apple, leads to only one reasonable conclusion, *i.e.*, that Apple induced infringement of the '473 Patent, Emblaze is entitled to judgment as a matter of law on this issue.

### III.  IN THE ALTERNATIVE, EMBLAZE IS ENTITLED TO A NEW TRIAL

Grounds for a new trial under Fed. R. Civ. P. 59 include, but are not limited to, instances where "the verdict is against the weight of the evidence, [] the damages are excessive, or [] for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation omitted). *See also Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004), citing *Murphy v. Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("A trial court should grant a motion for a new trial if (1) the jury instructions were erroneous or inadequate, (2) the court made incorrect and prejudicial admissibility rulings, or (3) the verdict is contrary to the great weight of the evidence"); *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) (finding that the cumulative prejudice from multiple errors may warrant a new trial).

For the reasons explained above in Section II in support of Emblaze's motion for a judgment as a matter of law, Emblaze, in the alternative, is entitled to a new trial.

Emblaze is also entitled to a new trial because of: (1) prejudice of the jury foreman against Emblaze and in favor of Apple; and (2) this Court's ruling during the trial allowing Apple to introduce evidence of its own patents over Emblaze's objection.

### A.  Prejudice Of The Jury Foreman Toward Apple

The jury foreman, juror number 8 (prospective juror number 34), is a finance manager that collects financial data for patent cases in which his employer, Aruba Networks, Inc. ("Aruba"), is a defendant. During *voir dire*, juror number 8 stated that:

> Prospective juror: My current employer is Aruba networks where I'm a finance manager, and part of my duties involve collection of financial data relevant to patent cases in which Aruba is a defendant. I am -- I don't have any other special skills outside my financial analysis duties. . . .
> The Court: Juror number 34, can I ask you, you mentioned that your responsibilities include collecting patent-related financial data. Is that all that you do, or do you have other responsibilities?

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND
MOTION PURSUANT TO FED. CIV. P. 50(b) FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59
FOR A NEW TRIAL

22

*Emblaze Ltd. v. Apple, Inc.*,
Case No. 5:11-CV-01079-PSG

Prospective juror: I have other responsibilities as well, budgeting, forecasting, financial modeling.  The court: are you working in the comptroller's organization or some other part of the financial department?
Prospective juror: I work under the V.P. of finance.
The Court: You report directly to the V.P.?
Prospective juror: Yes.

Ex. B, Trial Transcript, 115:1-18; 164:4-23.

The Court asked the jury pool the following question:

Does anybody know the lawyers, the parties, or me?  If so, please hold your card up. Anyone?

Ex. B, Trial Transcript, 21:22-23 (emphasis added).  Juror number 8 did not raise his card in response to the Court's question.

After trial, Emblaze learned that Aruba is a co-defendant with Apple in a litigation in which Judge Wilken recently granted summary judgment (*Linex Technologies, Inc. v. Hewlett-Packard Co., et al.*, Civ. No. 13-159(CW), and that is now on appeal to the Federal Circuit (Appeal Nos. 2014-1625 and 2014-1626).  In *Linex*, Apple and Aruba were sued for infringement of patents related to wireless data transmission.  *See* D.E. 333, pp. 1 in Civ. No. 13cv159.  As juror number 8 stated during *voir dire*, he was responsible for collecting patent-related financial data.  Accordingly, juror number 8 was undoubtedly involved in the *Linex* case in which Apple was a co-defendant with his employer.  Accordingly, in response to the questioning of the Court, juror number 8 should have raised his card, whereupon Emblaze's counsel could have questioned him about the full extent of his knowledge of Apple and his company's dealings with Apple, thereby exposing his implied bias.  But he did not raise his card; he stayed mute.

Moreover, neither Apple in-house counsel present at trial (*i.e.*, Ryan Moran (IP Litigation Counsel at Apple) and David Melaugh (the director of Patent Litigation at Apple)) advised the Court that Apple was a co-defendant with Aruba.

During *voir dire*, juror number 8 did not give full and accurate answers, which would have disclosed his bias in favor of Apple.  Had the extent of his relationship with Apple been known, and consistent with the Court's other rulings excluding jurors, juror number 8, who became the jury

PLAINTIFF EMBLAZE'S NOTICE OF MOTION AND MOTION PURSUANT TO FED. R. CIV. P. 50(b) FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, PURSUANT TO FED. R. CIV. P. 59 FOR A NEW TRIAL

23

*Emblaze Ltd. v. Apple, Inc.,*
Case No. 5:11-CV-01079-PSG

foreman, should not have been seated because he was unable to render an unbiased decision in the case. *See, e.g., Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1371-1373 (Fed. Cir. 2004).

The fact that Emblaze had to try the case in Apple's backyard, mere miles away from Apple's headquarters, was burdensome enough. Emblaze should not have had to overcome the added burden of having on the jury a juror unable to render an unbiased verdict.[2]

## B.  Apple's Introduction Of Evidence Of Its Own Patents

Pursuant to the Joint Pretrial Statement (D.E. 454, p. 15), Apple informed Emblaze of the exhibits Apple intended to use during its direct examination of its witness Roger Pantos. Among the exhibits disclosed by Apple were U.S. Patent No. 8,301,725 (Ex. O, DTX-688), U.S. Patent No. 8,099,473 (Ex. P, DTX-689), U.S. Patent No. 8,099,476 (Ex. Q, DTX-690), and U.S. Patent No. 8,156,089 (Ex. R, DTX-705) (collectively, "Apple Patents").[3] The Apple Patents are all owned by Apple and concern Apple's HLS technology. Emblaze timely objected to Apple's use of the Apple Patents during trial. At the Court's request, the parties briefed the issue. The Court thereafter allowed Apple to introduce the Apple Patents as evidence during trial. *See* Ex. B, Trial Transcript, 933:2-13.

For the reasons explained in Plaintiff Emblaze Ltd.'s Bench Brief Concerning Apple Inc.'s Use Of Its Own Patents As A Defense To Infringement (D.E. 583) and during oral argument (*see, e.g.*, Ex. B, Trial Transcript, 922:7-933:2), the Apple Patents are irrelevant to any claim or defense in this case, and should have been excluded at trial. *See also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible"). The introduction of the Apple Patents at trial unfairly prejudiced Emblaze, as it permitted the inference that Apple had the right to practice HLS technology that infringes Emblaze's '473 Patent.

---

[2] Apple used its home-field advantage to the fullest, making such comments in closing as "[t]hat's because that's what [Emblaze is] about now. They're about suing companies, like Apple, who actually do something." *See* Ex. B, Trial Transcript, 1939:23-24.

[3] The earliest application for the Apple Patents is December 31, 2008, a decade after Emblaze filed for the '473 Patent.

IV.   **CONCLUSION**

For the reasons stated herein, Emblaze respectfully requests that this Court enter judgment as a matter of law in favor of Emblaze pursuant to Fed. R. Civ. P. 50(b) on the issues of direct infringement and induced infringement or, in the alternative, grant Emblaze a new trial pursuant to Fed. R. Civ. P. 59.  A Proposed Order is submitted herewith.

                                              Respectfully Submitted,

DATED:  August 8, 2014                        REHON & ROBERTS
                                              COZEN O'CONNOR

                                              By:  /s/ Martin B. Pavane
                                                    Martin B. Pavane *(admitted pro hac vice)*

                                              *Attorneys for Plaintiff Emblaze Ltd.*

LEGAL\19754311\4