UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMBLAZE LTD.,<br><br>            Plaintiff,<br>   v.<br>APPLE INC.,<br><br>            Defendant. | Case No. 5:11-cv-01079-PSG<br><br>**ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL**<br><br>**(Re: Docket Nos. 630, 631)** |

Mention HTTP Live Streaming to most people, even in Cupertino, and you are likely to get a blank stare. Mention watching live sports or other events on an iPhone or iPad, and you might at least see their eyes begin to blink. By breaking down a content stream into a series of chunks comprising HTTP-based files, HLS permits the stream to adjust to varying bandwidths and data rates. Convinced that HLS infringed its patent, Plaintiff Emblaze Ltd. filed suit against Defendant Apple Inc. A jury of nine rejected Emblaze's infringement claim, even as it rejected Apple's counterclaim that the patent is invalid.

Before the court is Emblaze's motion for judgment as a matter of law, or, in the alternative, for a new trial.[1] Apple also conditionally moves for judgment as a matter of law.[2] Apple states that "[i]f the Court does not disturb the jury's verdict and the Court's judgment . . . , then Apple

---

[1] *See* Docket No. 631.

[2] *See* Docket No. 630.

1  does not request judgment as a matter of law and/or a new trial on invalidity."[3]  After considering

2  the parties' arguments, the court DENIES Emblaze's motion.  Because the court denies Emblaze's

3  motion, Apple's motion is DENIED as moot.

**I.**

Emblaze is an Israeli corporation dedicated to the "development and marketing of innovative high-tech technologies and products."[4]  Apple is a California-based corporation that, among other things, markets phones, tablets and computers that incorporate "HTTP Live Streaming technology" capable of "real-time" broadcasting.[5]  In this patent infringement suit, Emblaze alleges that Apple infringes U.S. Patent No. 6,389,473.

The '473 patent claims methods and apparatuses that allow "transmission of live audio and video to multiple devices" without requiring "devoted streaming servers" and permitting adjustment to "different bandwidths" where necessary.[6]  As the abstract of the '473 patent puts it, the invention disclosed is:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, including providing at the transmitting computer a data stream having a given data rate, and dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith.  The slices are encoded in a corresponding sequence of files, each file having a respective index, and the sequence is uploaded to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate.

Independent Claim 1 of the '473 patent is representative:

> A method for real-time broadcasting from a transmitting computer to one or more client computers over a network, comprising:
>     providing at the transmitting computer a data stream having a given data rate;
>     dividing the stream into a sequence of slices, each slice having a predetermined data size associated therewith;
>     encoding the slices in a corresponding sequence of files, each file having a respective index; and
>     uploading the sequence to a server at an upload rate generally equal to the data rate of the stream, such that the one or more client computers can download the sequence

---

[3] *Id.* at 1.

[4] Docket No. 143 at ¶ 1.

[5] *Id.* at ¶ 11.

[6] *See* Docket No. 143 at ¶ 9.

2
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

over the network from the server at a download rate generally equal to the data rate.[7]

Emblaze claims that Apple's HTTP Live Streaming, which Apple introduced into its products around 2009,[8] infringes asserted '473 patent claims 23, 28, 37 and 40.

Not long after, Emblaze filed a complaint in the Southern District of New York.[9] Several months later, the case was transferred to this district.[10] After the parties initially declined to consent to magistrate judge jurisdiction, the case was assigned to Judge Armstrong.[11] Emblaze thereafter sought leave to amend its complaint to:

(1) amend the list of claims of the '473 Patent that are asserted by Emblaze so as to conform the allegations to what Emblaze has asserted in its Infringement Contentions;

(2) amend the products that Emblaze is accusing of infringement so as to conform the allegations of the Complaint to what Emblaze has learned in its ongoing investigation and from discovery thus far;

(3) remove certain allegations concerning Apple's presence in the Southern District of New York (no longer relevant now that the action has been transferred to the Northern District of California);

(4) update the firm affiliation of counsel for Emblaze and the change of venue from the Southern District of New York to the Northern District of California; and

(5) make minor editing changes to the text.[12]

After Apple filed a statement of non-opposition, Judge Armstrong granted Emblaze's motion for leave to amend the complaint. Apple then moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). Judge Armstrong dismissed Emblaze's indirect infringement claims with leave to amend, but denied Apple's related request to dismiss Emblaze's direct infringement or

---

[7] *See* Docket No. 143-1 at 14:18-32.

[8] Docket No. 143 at ¶ 12.

[9] *See* Docket No. 1.

[10] *See* Docket No. 24.

[11] *See* Docket No. 31.

[12] Docket No. 75 at 2-3 (verb tenses modified).

3
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

willfulness claims.[13] Emblaze responded with a second amended complaint claiming direct, induced, contributory and willful infringement.[14]

Pursuant to the parties' stipulation, the case was reassigned to the undersigned.[15] Following this latest reassignment and a tutorial and hearing, the court construed the disputed claim terms.[16] A few months later, Apple moved the court to reconsider or clarify its prior construction that the term "each slice having a predetermined data size associated therewith" means "each slice having a data size, which may be a time duration, assigned in advance of the stream being divided."[17] The court agreed that reconsideration was warranted and construed the term as meaning "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided."[18]

Apple next moved for leave to amend its invalidity contentions,[19] which the court granted.[20] Pursuant to another stipulation between the parties, the court held that it would consider Emblaze's revised patent disclosures to be its operative patent disclosures.[21] Needless to say, the court also resolved a variety of discovery disputes.[22]

As the case turned toward dispositive motion practice, the court denied Apple's motion to stay in light of the Supreme Court's decision to grant certiorari in *Akamai v. Limelight Networks*.[23]

---

[13] *See* Docket No. 137.

[14] *See* Docket No. 143.

[15] *See* Docket No. 150.

[16] *See* Docket No. 169. The court later explained the details of its reasoning. *See* Docket No. 653.

[17] *See* Docket No. 207.

[18] Docket No. 214 at 1.

[19] Docket No. 216.

[20] *See* Docket No. 248.

[21] *See* Docket No. 300.

[22] *See, e.g.,* Docket No. 294.

[23] *See* Docket No. 361; *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) *cert. granted*, 134 S. Ct. 895 (2014).

The court also held that although portions of Emblaze expert Vijay Madisetti's report would not be struck, Emblaze was precluded from introducing later-model accused products in its report that were not disclosed in Emblaze's original or revised infringement contentions.[24]

Apple next filed four summary judgment motions. After a hearing, the court granted Apple's motion for summary judgment of no willful infringement, granted-in-part Apple's motion for summary judgment of non-infringement as to all accused streams, denied Apple's motion for summary judgment of non-infringement of specific content providers and denied Apple's motion for summary judgment of invalidity.[25] In granting-in-part Apple's motion for summary judgment of non-infringement as to all accused streams, the court was obligated to construe the term "upload rate."[26] The court found that "'upload rate' in the context of the '473 patent should be read to include wait time between the transmission of files within a sequence."[27]

Following the Supreme Court's decision in *Akamai*, the court permitted Apple to file a motion for summary judgment of non-infringement as to Emblaze's asserted method claims.[28] The court granted it in-part.[29]

The parties then filed their pre-trial motions, including three *Daubert* motions. After a pre-trial conference, the court granted-in-part Apple's two *Daubert* motions and denied Emblaze's.[30] The case proceeded to trial; a nine-person jury returned a verdict finding that none of Apple's accused products infringed the '473 patent.[31] The parties now bring their post-trial motions.

---

[24] *See* Docket No. 394.

[25] *See* Docket No. 424.

[26] *See id.* at 11-14.

[27] *Id.* at 14.

[28] *See* Docket No. 468.

[29] *See* Docket No. 520.

[30] *See* Docket Nos. 519, 544.

[31] *See* Docket No. 609.

5
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

**II.**

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.  The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

**III.**

Fed. R. Civ. P. 50(b) provides that, upon a renewed motion for judgment as a matter of law, the court may: (1) "allow judgment on the verdict, if the jury returned a verdict," (2) "order a new trial" or (3) "direct the entry of judgment as a matter of law."  To grant a Rule 50(b) motion, the court must determine that "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's."[32]  In other words, to set aside the verdict, there must be an absence of "substantial evidence"—meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion"—to support the jury's verdict.[33]  "Substantial evidence is more than a mere" scintilla;[34] it constitutes "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence."[35]  In reviewing a motion for judgment as a matter of law, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."[36]  "In ruling on such a

---

[32] *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)) ("The Ninth Circuit upholds any jury verdict supported by substantial evidence.").

[33] *Id.*

[34] *Chisholm Bris. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[35] *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

[36] *Transbay Auto Serv., Inc. v. Chevron U.S.A., Inc.*, Case No. 09-cv-04932, 2013 WL 496098, at *2 (N.D. Cal. Feb. 7, 2013) (quoting *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006) ("We must view the evidence in the light most favorable to the nonmoving party—here, Josephs,—and draw all reasonable inferences in that party's favor.")).

6
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

United States District Court
For the Northern District of California

motion, the trial court may not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists to support the verdict."[37]

Emblaze moves for judgment as a matter of law that the accused streams infringe the '473 patent. Apple's noninfringement position at trial focused on three claim terms: (1) "each slice having a predetermined data size associated therewith," (2) "real-time broadcasting" and (3) "uploading the sequence to the server . . . such that one or more client computers can download the sequence over the network from the server." Because Apple's noninfringement evidence on the "real-time broadcasting" limitation is sufficient to support the jury verdict, the court need only address that limitation.

The court construed "real-time broadcasting" to mean "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process." At trial, Apple argued that the accused streams do not meet this limitation because Apple's HLS technology includes a built-in delay from the time of the live event to the time a client views the event. In the art, this delay is referred to as "latency." According to Apple, the court's construction allows for some latency, but not the amount of latency used in HLS.

Apple presented substantial evidence at trial to establish that HLS is designed to include significant latency. For example, Apple's HLS overview document reveals that HLS is not "a real-time delivery system," as "[i]t has inherent latency corresponding to the size and duration of the media files containing stream segments. . . . Typical latency with recommended settings is in the neighborhood of 30 seconds."[38] Dr. Polish, Apple's technical expert, observed that Apple's HLS system exhibited between 15 and 30 seconds of latency so that it could deal with network problems: "HLS collects I believe it's two or three buffersworth [sic], or segments worth of data in the client before it plays. So that adds, depending upon how large those segments are, between 15

---

[37] *Id.* (citing *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984) ("Neither the district court nor this court may weigh the evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict.")).

[38] Docket No. 628-11 at PTX 23.35.

and 30 seconds worth of latency, and that gives them the ability to handle certain glitches in the network, and it gives them the ability to switch streams between different rates without getting a noticeable delay."[39] Dr. Polish also performed testing which demonstrated delays of 28 and 42 seconds between the video feed and the client's viewing of the video.[40]

Multiple Apple witnesses explained HLS was purposely designed to *not* be a real time system so that the client's stream would not freeze any time the HLS system encountered a slowdown in the network or a different data rate. William May, a software engineer at Apple, stated that "[t]here's a whole bunch of latency that gets introduced in HLS."[41] Specifically, "[t]here's latency that's built into the HLS system to allow the . . . data to flow through the Internet. So usually around three segments, which is usually between 15 and 30 seconds."[42] Mr. May further disclosed that the introduction of latency was an intentional design decision made by Apple.[43]

Returning to Apple's HLS overview document and Dr. Polish, Dr. Polish testified that the HLS overview document demonstrates that "Apple has deliberately added latency for the purpose of making it possible to switch data rates smoothly. So [the HLS overview document] is talking about how they've added latency to ensure seamless transition between segments, particularly

---

[39] Docket No. 636-3 at 1383:25-1384:6.

[40] *Id*. at 1389:2-1395:3; *see also id.* at 1383:20-23 (Q. "And in your analysis of HLS, and in particular the seven accused streams, did you see latency in its design that prevents it from being real time? A. Yes, I did.").

[41] *Id*. at 1326:1-2.

[42] *Id*. at 1326:6-9; *see also id.* at 1382:24-1383:10 (explaining that latency built into HLS is desirable because it allows for seamless switching between data rates).

[43] *See id*. at 1326:10-12; *see also id.* at 1143:23-1145:6.

8
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

when you're changing data rates."[44] In fact, according to David Biderman, an engineering manager at Apple, Apple developers "called it near-real-time streaming."[45]

Several Apple witnesses also compared HLS to the streaming technology used in Apple's FaceTime product, which is used for video calling. Roger Pantos, a software engineer at Apple, described the difference between HLS and FaceTime well:

> [I]n real time—what we view as a real time delivery system, you heard the fellow from Akamai talking about the hand wave test, which is that you wave a hand on camera and you start your stopwatch and you wait until you see—somebody sees it on the iPad.
>
> We at Apple feel that the hand wave test on a real time system is measured in hundreds of milliseconds, or tens of milliseconds, much less than a second.
>
> We feel that FaceTime, that audio-visual conference, video conference thing that Mr. Fowler talked about before, is an example of a real time system. It's something where you can sort of converse back and forth and you don't feel a perceptible lag.
>
> We wanted to make very clear, with HLS, that we had made deliberate decisions, we had made deliberate tradeoffs such that HLS could not be used in that way. It would have been nice if you, you know, could be all things to all people.
>
> But in our view, the requirements for scaling HLS to a hundred thousand, a million simultaneous viewers made those kinds of subsecond latencies prohibitively difficult for sort of all the parties involved.
>
> So we backed off from that and we said, we're not going to represent this as being real time. Understand that there are going to be lags . . . of up to 30 seconds, and that was a deliberate choice that we made.[46]

Through questioning by Apple's attorney, Mr. Biderman expounded on why Apple never considered using HLS technology to implement FaceTime:

> Q. Does Apple use HLS for FaceTime?
>
> A. No. We—it would not work for FaceTime.

---

[44] *Id.* at 1382:12-16; *see also id.* at 1384:16-24 ("And I've had a lot of experience with real time systems, and real time is not about a set amount of latency. It's really about the design. You can design systems that are real time that can meet certain specific deadlines, and that's part of the design. HLS is not designed in any way to meet particular deadlines. It simply has latency in there to enable scaling and to enable smooth switching. It's not designed as a real time system.").

[45] *Id.* at 1132:11-1133:2.

[46] *Id.* at 1257:8-1258:7.

9
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

> Q. Why not?
>
> A. I mentioned earlier that HLS has this inherent delay built into it, and that's so that it can scale to many, many users. But because of that delay, you couldn't have a real time interaction with someone. So, like, FaceTime where there's someone on the other end of the connection and you're talking and conversing with them, you couldn't ever do that with HLS. It wouldn't work.
>
> . . .
>
> Q. Was there some discussion about using HLS for FaceTime?
>
> A. No, that wasn't a consideration.
>
> Q. Why?
>
> A. Because of this inherent delay that would make it very hard to have a back and forth real time conversation with someone.[47]

Therefore, Apple presented substantial testimony that Apple intentionally designed HLS to have significant built-in latency, such that the accused streams do not practice the "real-time broadcasting" limitation, as construed by the court.

In response, Emblaze cites to testimony from Joseph Inzerillo, the Senior Vice President of Multimedia and Distribution at MLB Advanced Media. In a portion of Mr. Inzerillo's video deposition, which was played at trial, Mr. Inzerillo was asked, "[w]ould you consider HLS to be a realtime system?" Mr. Inzerillo answered: "I would. I would consider it to be realtime in the sense of, if you don't have a completely external frame of reference, then it's live to you, is sort of the way it is. I think over time, the reason I would still consider it realtime is that the people, the customer, the public has a whole different concept of time than they used to."[48] However, Mr. Inzerillo also testified that HLS "is definitely not a low latency system."[49] In addition, when Mr. Inzerillo was asked to compare HLS to a real time videoconferencing system, Mr. Inzerillo testified: "Using video conferencing as the barometer as to the concept of realtime, there's no way HLS is realtime in that construct."[50] Thus, Mr. Inzerillo's testimony provides some support for

---

[47] *Id*. at 1142:18-1143:22.

[48] Docket No. 631-3 at 409:19-20; 443:6-7 (during which Docket No. 631-5 at 263:17-264:1 was played).

[49] *Id*. (during which Docket No. 636-4 at 263:13-16 was played).

[50] *Id*. (during which Docket No. 636-4 at 270:25-271:6 was played).

both Emblaze and Apple. As such, it hardly begins to refute the voluminous evidence Apple presented indicating that Apple's HLS technology is not "real time."

Emblaze's only other argument on the "real-time broadcasting" limitation is that "[t]he Court's construction of 'real-time broadcasting' to mean 'simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process' allows for a lag time between the live occurrence of the streamed event and receipt of the stream by the end user."[51] On this point, Emblaze is right—the court's construction does allow "for a lag time between the live occurrence of the streamed event and receipt of the stream by the end user."[52] However, just because the '473 patent claims encompass streams with some latency does not mean that streams with an endless amount of lag are within the scope of the claims. Rather, whether an accused stream practices the "real-time broadcasting" limitation is a question of degree—is latency sufficiently minimal such that the "simultaneous transmission of data to one or more clients match[es] the human perception of time or proceed[s] at the same rate as a physical or external process?"

Significantly, Emblaze agreed with Apple at claim construction that the claims cover some, but not much, delay. The parties merely disagreed over how to express that concept. Emblaze proposed that the court construe "real-time broadcasting" as requiring that the stream is received by clients "without substantial delay after the broadcast."[53] Apple suggested that "real-time broadcasting" means that the stream is received by clients "simultaneously with minimal delay."[54] While the court ultimately found both parties' proposals unsupported by the intrinsic and extrinsic evidence, the court's construction did not omit any limit on the amount of permissible delay. Indeed, the court construed the "real-time broadcasting" transmission as "matching the human perception of time or proceeding at the same rate as a physical or external process."

---

[51] Docket No. 642 at 6 (citation omitted).

[52] *Id*.

[53] *See* Docket No. 563 at 9.

[54] *Id*.

11
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

Taking another look at the '473 patent's specification confirms that "real-time broadcasting" includes—at most—a small amount of lag. For example, the '473 patent discloses that the clients "start receiving the data stream substantially in real time, preferably with only a minimal lag, as it is transmitted from computer 34."[55] The specification also explains that "[t]ime stamps in the data stream are used to synchronize the data, so that the multimedia sequence is played back just as it was input at computer 34, preferably with only a minimal necessary transmission and decoding delay."[56] Thus, the specification—just like the parties—contemplates that some delay is allowed, but that too much delay, however defined, takes an accused stream outside the scope of the invention.

In sum, both parties' proposed constructions presented the latency issue as a factual question of degree to be resolved by a jury. Now that a jury has found in favor of Apple, Emblaze argues for the first time that the court's construction allows for some unstated, large amount of delay. But that was neither party's position at claim construction, nor the court's understanding throughout this case. The court therefore reaffirms that "real-time broadcasting" means "simultaneous transmission of data to one or more clients matching the human perception of time or proceeding at the same rate as a physical or external process," which allows for some, but not limitless, delay. The jury's verdict of noninfringement is substantially supported by Apple's evidence—left undisputed by Emblaze—that the accused streams all embody by design a latency of at least 15 seconds. A reasonable jury could have found, relying on ample testimony from Apple's witnesses, that this amount of delay falls outside the scope of "real-time broadcasting," as construed by the court.

**IV.**

Fed. R. Civ. P. 59 states that the court "may, on motion, grant a new trial on all or some of the issues." The "trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon

---

[55] Docket No. 1-1 at 8:4-7.

[56] *Id.* at 10:49-54.

evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'"[57]

Emblaze argues for a new trial on two grounds. Neither is persuasive.

*First*, Emblaze asserts that juror number 8, who was the jury foreperson, was biased against Emblaze. Emblaze's theory goes like this: Juror number 8 is a finance manager at Aruba Networks, Inc. At Aruba, juror number 8's duties include collecting financial data for patent cases in which Aruba is a defendant. Aruba is a co-defendant with Apple in *Linex Technologies, Inc. v. Hewlett-Packard Co., et al.*, No. 13-cv-159 CW, a case unrelated to the instant case. Because juror number 8 collects patent-related financial data in his job at Aruba, "juror number 8 was undoubtedly involved in the *Linex* case in which Apple was a co-defendant with his employer."[58] Juror number 8 thus should have answered affirmatively when asked by the court during *voir dire* whether he was familiar with "the lawyers, the parties, or [the judge]."[59] Because juror number 8 did not answer affirmatively to this question, he improperly withheld information during *voir dire*. *Ergo*, juror number 8 was biased in favor of Apple. Also, Apple's in-house counsel present at trial should have known about this and notified the court of the situation.[60]

The legal standard for demonstrating implied juror bias in the Ninth Circuit—which is absent from Emblaze's opening brief—requires that "the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances."[61] Examples of implied juror bias include being personally involved in a situation involving a similar fact pattern, or being employed

---

[57] *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

[58] Docket No. 631 at 23.

[59] Docket No. 631-3 at 21:22-23.

[60] *See* Docket No. 631 at 23.

[61] *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990)).

13
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

by one of the parties.[62]  The facts here—where a juror is employed by a co-defendant of one of the parties in an unrelated case and where the juror's job duties include collecting patent-related financial data—provide no indication that juror number 8 may have been biased.  Critically, Emblaze, knowing juror number 8's occupation, asked no questions directed to juror number 8.

Emblaze also selectively quotes the court's question regarding jurors' familiarity with "the lawyers, the parties, or [the judge]."  After introducing the individual lawyers and representatives of the parties, the court asked: "Having been introduced to the lawyers and to the parties, having been introduced to me, does anybody know any of those individuals?  Either personally, professionally, or otherwise?  Does anybody know the lawyers, the parties, or me?  If so, please hold your card up.  Anyone?  Okay.  Good."[63]  Rather than inquire as to whether any of the jurors knew of Apple—a question that would likely have been answered affirmatively by nearly everyone—the court asked whether any of the jurors knew any of the individuals who had just been introduced in the courtroom.  All prospective jurors answered no.  There was nothing untoward in any of this.

*Second*, Emblaze contends that it is entitled to a new trial because the court erred in admitting evidence of Apple's patents covering the accused HLS technology.  When this issue arose, the court requested that the parties brief whether Apple's patents covering HLS technology should be admitted as evidence.  After the court considered the parties' briefs[64] and heard oral argument,[65] the court ruled that "the right way to balance [Federal Rule of Evidence] 401 and Rule 403" was to admit an Apple patent only if a named inventor testified about the patent and only if the patent issued over the asserted Emblaze patent.[66]  In addition, the court instructed the jury on the issue: "You may have heard evidence that Apple has its own patents.  However, ownership of

---

[62] *See Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997).

[63] Docket No. 631-3 at 21:19-24.

[64] *See* Docket Nos. 581, 583.

[65] *See* Docket No. 631-3 at 921:25-934:3.

[66] *See id.* at 933:3-13.

14
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

patents is not a defense to patent infringement and a party can still infringe even if it has its own patents in the same area."[67]

As recognized by the court's instruction to the jury and strict limitations on the admissibility of Apple's patents, "it is well-established that the existence of one's own patent does not constitute a defense to infringement of someone else's patent. It is elementary that a patent grants only the right to exclude others and confers no right on its holder to make, use, or sell."[68] However, the Federal Circuit has also found that the "fact of separate patentability is relevant, and is entitled to due weight."[69]

This case presented the rare situation in which the defendant's patents covering the accused technology issued over the plaintiff's asserted patent. Apple's admitted patents cited the asserted '473 patent in prosecution but were deemed novel and nonobvious despite the '473 patent being prior art. At trial, Apple's admitted patents were relevant to Apple's noninfringement position. Specifically, Apple was allowed to use its patents to demonstrate the differences between Emblaze's asserted claims and the accused HLS streams. By requiring a named inventor on the Apple patents to testify about the Apple patents, the court ensured that discussion of Apple's patents focused on the subjects to which Apple's patents were relevant: the differences between the asserted claims and Apple's accused technology.

The court further protected Emblaze from unfair prejudice by including an additional instruction to the jury. A jury instruction can help mitigate the risk of unfair prejudice.[70] Here, the court based its jury instruction on Instruction A.3 from the Northern District of California Model Patent Jury Instructions.[71] The court took care to note that "ownership of patents is not a defense

---

[67] Docket No. 636-3 at 2003:19-22.

[68] *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 879 n.4 (Fed. Cir. 1991) (emphasis omitted); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1559 (Fed. Cir. 1996) (same).

[69] *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996).

[70] *See United States v. Carrasco*, 257 F.3d 1045, 1049 (9th Cir. 2001).

[71] *See* Northern District of California Model Patent Jury Instructions, Instruction A.3 (June 17, 2014).

15
Case No. 5:11-cv-01079-PSG
ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

to patent infringement and a party can still infringe even if it has its own patents in the same area."[72]

In sum, the court took substantial precautions to admit the Apple patents only for their relevance and to mitigate the danger of unfair prejudice to Emblaze. First, the court strictly limited the Apple patents that Apple could present to the jury. The court also limited the way in which Apple could present those patents. Finally, the court instructed the jury that ownership of patents is not a defense to patent infringement. Based on these limitations, the probative value of Apple patents was not substantially outweighed by the danger of unfair prejudice.

**SO ORDERED.**

Dated: January 29, 2015

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[72] Docket No. 636-3 at 2003:19-22.